1  **JONES HELSLEY PC**
2  8365 N. Fresno Street, Suite 310
   Post Office Box 28340
3  Fresno, California  93729
   Telephone:  (559) 233-4800
4  Facsimile:  (559) 233-9330

5  Timothy Jones #119841
   John P. Kinsey #215916
6

7  Attorneys for:   All Plaintiffs

8

9                    **UNITED STATES DISTRICT COURT**

10                  **EASTERN DISTRICT OF CALIFORNIA**

11 | ROCKY MOUNTAIN FARMERS UNION; | Case No. 1:09-cv-02234-LJO-DLB |
   | REDWOOD COUNTY MINNESOTA |  |
12 | CORN AND SOYBEANS GROWERS; | **SECOND AMENDED COMPLAINT** |
   | PENNY NEWMAN GRAIN, INC.; | **FOR DECLARATORY AND** |
13 | FRESNO COUNTY FARM BUREAU; | **INJUNCTIVE RELIEF** |
   | NISEI FARMERS LEAGUE; |  |
14 | CALIFORNIA DAIRY CAMPAIGN; | **[28  U.S.C.  §§ 1331, 1343]** |
   | REX NEDEREND; GROWTH ENERGY |  |
15 | and the RENEWABLE FUELS |  |
   | ASSOCIATION, |  |
16 | | |
   | Plaintiffs, | |
17 | | |
   | v. | |
18 | | |
   | JAMES N. GOLDSTENE, in his official | |
19 | capacity as Executive Officer of the | |
   | California Air Resources Board, | |
20 | | |
   | Defendant. | |
21

22

23          Plaintiffs Rocky Mountain Farmers Union, Redwood County Minnesota Corn

24  and Soybean Growers, Penny Newman Grain, Inc., Fresno County Farm Bureau, Nisei

25  Farmers League, California Dairy Campaign, Rex Nederend, Growth Energy, and Renewable

26  Fuels Association respectfully state the following claims for declaratory and injunctive relief

27  against Defendant James N. Goldstene, Executive Officer of the California Air Resources

28  Board:

**NATURE OF THE ACTION**

1.      This is a civil action for declaratory and injunctive relief under the Commerce and Supremacy Clauses of the U.S. Constitution.  This action challenges the constitutionality of the California Low Carbon Fuel Standard ("LCFS"), which was recently adopted by the California Air Resources Board.  The LCFS is unconstitutional because (i) it conflicts with and is preempted by federal law, including the Energy Independence and Security Act of 2007; (ii) it interferes with the regulation of interstate commerce; and (iii) it discriminates against out-of-state corn ethanol producers and importers and improperly regulates their extraterritorial conduct.  Defendant Goldstene is the state officer charged with enforcement of the challenged regulation.  Absent relief from this Court, which has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), the Plaintiffs will suffer irreparable harm.

**APPLICABLE STATUTES, JURISDICTION,
VENUE, AND DESCRIPTION OF PARTIES**

2.      This action arises under 42 U.S.C. § 1983; the Commerce Clause of the U.S. Constitution, Article I, Section 8, clause 3; the Supremacy Clause of the U.S. Constitution, Article VI, paragraph 2; and the Clean Air Act ("CAA"), 42 U.S.C. §§  7401-7671.

3.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343(a)(3) (jurisdiction to redress constitutional violations).  Venue is proper in this Court under 28 U.S.C. § 1391(b).  This Court is authorized to issue a declaratory judgment pursuant to 28 U.S.C.§§ 2201, 2202.

4.      Plaintiff Rocky Mountain Farmers Union ("RMFU") is a cooperative association representing family farmers and ranchers in Wyoming, Colorado, and New Mexico.  Its members include farmers who grow No. 2 corn for use in producing ethanol nationwide.[1]

5.      Plaintiff Redwood County Minnesota Corn and Soybean Growers ("Minnesota Growers Association ") is a not-for-profit corporation whose members, located in Redwood

///

[1] No. 2 corn is the hard grain used in animal feed and ethanol production, different from the sweet corn sold for human consumption.

{7011/002/00247285.DOC}                                     2

1  County, Minnesota, include farmers who grow No. 2 corn for use in producing ethanol
2  nationwide.

3          6.      Plaintiff Penny Newman Grain, Inc. ("Penny Newman") is a leading merchant
4  in the market for grains and feed by-products in the southern San Joaquin Valley and
5  worldwide.  Founded in 1878 as a mercantile store in Fresno, California, it maintains its
6  headquarters at 2691 S. Cedar Avenue, and has other offices in California and Tennessee. The
7  headquarters office shares a 62-acre site with a rail and truck loading/unloading facility,
8  enclosed warehousing for 75,000 tons of dry commodities, open storage for an additional
9  75,000 tons of dry commodities, and tank storage for four million gallons of liquid
10  commodities. Penny Newman also has substantial commodities handling and storage facilities
11  in Hanford and Bakersfield.

12          7.      Plaintiff Fresno County Farm Bureau ("FCFB") is a non-profit membership
13  organization founded in 1917 to promote and protect agriculture.  Headquartered in Fresno
14  County, FCFB advocates for farmers and farming interests in Fresno County.  It has over 4500
15  members, most of who are in Fresno County.  Its members include corn growers who, when
16  market conditions permit them to do so, would attempt to sell to biorefineries for use in
17  producing ethanol.  FCFB's members also include dairies that purchase and use distillers
18  grains.

19          8.      Plaintiff Nisei Farmers League ("Nisei") is a farmer and grower support
20  organization committed to serving the needs of California agriculture.  With over 1000
21  members, Nisei is headquartered in Fresno.  Its members include corn growers located from
22  Modesto to Tulare who, when market conditions permit them to do so, would attempt to sell to
23  biorefineries for use in producing ethanol.  Nisei's members also include dairies in Kings,
24  Tulare, and Fresno Counties that purchase and use distillers grains.

25          9.      Plaintiff California Dairy Campaign ("CDC") represents the views and interests
26  of California dairy farmers.  Headquartered in Turlock, CDC has approximately 300 members.
27  Its members include dairy farms located in Madero, Kings, Fresno Tulare, and Kern Counties
28  that purchase and use distillers grains.  Because the prices dairies may obtain for their milk is

1   heavily regulated by the State, CDC's members are particularly sensitive to the prices of their

2   inputs, many of which will increase due to the LCFS and its impact on gasoline prices.

3        10.    Plaintiff Rex Nederend is a farmer and rancher who owns a dairy near Tipton,

4   California, and ranches near Wasco and Lemoore, California.  He employs approximately 30

5   people at his dairy and ranches.   He purchases and uses distillers' grains at his dairy, and he

6   grows No. 2 corn that, when market conditions permit him to do so, he would attempt to sell to

7   biorefineries for use in producing ethanol. Plaintiff Nederend, CDC, Nisei, FCFB, the

8   Minnesota Growers Association, and the RMFU are hereinafter referred to collectively as the

9   "farmer plaintiffs."

10       11.    Plaintiff Growth Energy is a non-profit corporation committed to the promise of

11  agriculture and growing America's economy through cleaner, greener energy.  Growth Energy

12  was formed in 2009 and its members include firms that produce ethanol for use in motor fuels

13  sold in Fresno County and other parts of the State, as well as other companies who provide

14  equipment and technology used to produce ethanol from corn.

15       12.    Plaintiff Renewable Fuels Association ("RFA") is a trade association whose

16  members include a broad cross-section of businesses, individuals, and organizations dedicated

17  to the expansion of the fuel ethanol industry in the United States.  Its members include

18  producers of ethanol for use in motor vehicle fuels sold in Fresno County and other parts of

19  California; importers of ethanol into California from other states; growers of corn for use in the

20  production of ethanol; and marketers of distillers grains and other feed co-products in the

21  State.  RFA members have been, and will continue to be, directly and adversely affected by the

22  LCFS and its regulation of corn ethanol producers and importers and related industries.

23       13.    Defendant James N. Goldstene is named as a defendant in his official capacity

24  as Executive Director of CARB.  He is the official charged with enforcement of the challenged

25  regulation, and is authorized under the LCFS to investigate noncompliance with the regulation

26  and impose fines for noncompliance.

27  ///

28  ///

# GENERAL ALLEGATIONS

### A.    Ethanol and Its Co-Products

14.    Ethanol has been used as motor fuel in the United States since at least 1908, when the Model T was designed to run on alcohol.  Since then, ethanol has been an important domestic alternative to foreign oil, and has been found to have significant environmental benefits, such as reducing smog-forming air pollutants and carcinogenic emissions, when blended into gasoline.

15.    Significantly, ethanol reduces greenhouse gas ("GHG") emissions.  Ethanol reduces direct GHG emissions between 48 to 59% compared to gasoline.  New processing and agricultural technologies, as well as additional feedstocks, promise even higher $CO_2$ reductions.

16.    In 2008, more than 9 billion gallons of ethanol were produced and used in the United States, reducing $CO_2$-equivalent GHG emissions by approximately 14 million tons. This reduction is equivalent to removing more than 2.1 million cars from America's roadways.

17.    Ethanol is used in domestic fuel in primarily two forms:  E85, which blends 85% ethanol with 15% gasoline; and E10, which blends 10% ethanol with 90% gasoline.

18.    Approximately 98% of U.S. ethanol is derived from corn.  No matter where corn is grown, or where it is turned into ethanol, or how it is turned into ethanol (the two methods are known as dry-milling and wet-milling), the resulting corn ethanol is a fungible commodity.  In other words, corn ethanol made in Iowa with Illinois corn, in a dry-mill process using natural gas, is identical to corn ethanol made in California with California corn, produced by any process.

19.    Finished corn ethanol travels by truck or rail to facilities where it is blended with gasoline, either as an oxygenate in reformulated gasoline, or as the primary component of E85.

20.    Since the first embargo by the Organization of the Petroleum Exporting Countries in the 1970's, the use of corn-based ethanol has displaced part of the petroleum needed to fuel U.S. cars and trucks in steadily rising increments.

21.     While producing more corn for ethanol, America's farmers have also increased the yield from their croplands, increased exports of corn to feed foreign livestock, and decreased the area of land under tillage needed to produce corn.

22.     The corn ethanol industry also provides much-needed employment in rural and farming areas.  The industry employed nearly half a million Americans in 2008, during one of the worst recessions in U.S. history.  It also contributed an estimated $65.5 billion to the Nation's Gross Domestic Product in 2008, of which more than $4.3 billion was invested in new capacity.

23.     One important co-product of ethanol made from corn starch are "distillers grains," an animal nutrient used in cattle, dairy, swine and poultry operations worldwide, including on ranches and farms in the southern San Joaquin Valley.  Distillers' grains are a high-protein alternative to corn and soy meal, and are increasingly used to replace grain in animal diets.

24.     The market for distillers grains is a critical part of the business of many corn ethanol production companies, including the members of Growth Energy and the Renewable Fuels Association, as well as companies that trade in distillers' grains.  Penny Newman is a leading merchant in the DSG market, including in the southern San Joaquin Valley.

**B.     Federal Law And Policy On Ethanol**

25.     Against that backdrop, the last two American presidents have recognized the need for mandates that require the oil companies to add ethanol to gasoline.  As President Obama observed earlier this year, the emergence of the corn ethanol industry has made the industry "the primary near-term option for insulating consumers against future oil shocks."

26.     There has also been a broad consensus in Congress for decades that the U.S. ethanol industry has needed time to build a domestic production base free from predatory competition with foreign ethanol producers, who are controlled by foreign state-supported agricultural and energy enterprises that in turn are subject to little or no land conservation rules or fair-labor legislation.  As then-Senator Obama remarked in one debate in 2007, it was not the purpose of federal law to "replace our dependence on foreign oil with a new dependence on

1   foreign ethanol."  As President Obama and others have recognized, the survival of the U.S.

2   corn ethanol industry is critical to the transition from ethanol produced solely from corn starch

3   to ethanol produced from a variety of plants and other types of biomass.

4        27.    In the Energy Tax Act of 1978, Congress provided an exemption to a federal

5   fuel excise tax on gasoline for fuel blended with at least 10% ethanol.  In 1982, the Surface

6   Transportation Assistance Act raised the gasoline excise tax, while increasing the exemption

7   for ethanol.  Later federal legislation in 1984, 1988, and 1990 further promoted the use of

8   ethanol on the Nation's highways.  The Transportation Efficiency Act of the 21st Century,

9   enacted by Congress in 1998, extends ethanol tax incentives.

10        28.    In 1990, Congress amended the Clean Air Act, and created new gasoline

11   standards to reduce fuel emissions in highly polluted cites across the United States.  The

12   legislation required gasoline to contain fuel oxygenates, cleaner-burning additives that include

13   ethanol.

14        29.    On August 8, 2005, Congress enacted the Energy Policy Act of 2005, which

15   sets a national goal of 30% penetration of alternative fuels in certain vehicles by 2010, and

16   mandates the use of more than 7.5 billion gallons of ethanol and biodiesel by 2012.  The Act

17   also requires the federal government, alternative fuel providers, state and local governments,

18   and private fleets to purchase vehicles that run on alternative fuels.

19        30.    Two years later, on December 19, 2007, the President signed into law the

20   Energy Independence and Security Act of 2007 ("EISA").  This comprehensive energy

21   legislation increases the use of renewable fuels to 36 billion gallons by 2022, most of which

22   was intended to be corn ethanol.  The Act provides that "the production of transportation fuels

23   from renewable energy would help the United States meet rapidly growing domestic and global

24   energy demands, reduce the dependence of the United States on energy imported from volatile

25   regions of the world that are politically unstable, stabilize the cost and availability of energy,

26   and safeguard the economy and security of the United States."  Pub. L. 110-140, 121 Stat.

27   1492, 1722, § 806 (2007).  The law requires the blending of increasing levels of ethanol into

28   ///

gasoline, starting this year.  EISA also creates ambitious mandates for using ethanol from other feedstocks in addition to corn.

31.     Achieving the targets set by EISA will require advances in biofuel development, continued private and public investments to compete with the prevailing business models of the oil industry, and the preservation of the American ethanol industry against predatory competition.  Scientists across the nation are attempting to discover how to produce ethanol from domestic sources other than from corn.  Biorefinery engineers are reducing their facilities' need for fossil-based fuels such as natural gas, or electricity produced from coal, to produce ethanol.

32.     In EISA, Congress also recognized the potential need to evaluate the GHG emissions from biofuels usage, including corn ethanol.  However, in light of the uncertainty of the scientific and economic principles necessary for assessing GHG emissions associated with biofuels, as well as the national interest in fostering the domestic corn ethanol industry and energy independence, Congress struck a balance and exempted ethanol produced at existing ethanol biorefineries and biorefineries then under construction from GHG reduction requirements.

33.     Specifically, Congress limited any requirement to consider the potential GHG emissions impact of ethanol usage to ethanol produced at biorefineries that began construction on or after the date EISA was passed.  *See* 42 U.S.C. § 7545(o)(2)(A)(i).  As part of the dual goals of EISA to reduce dependence on foreign oil and to encourage further biofuel innovation, Congress thus "grandfathered" first generation biofuels.  CARB, on the other hand, has disagreed with the grandfathering of "existing and planned corn ethanol production plans from the GHG requirements," and creates a different, conflicting set of incentives for the "innovation and development of law carbon fuels" that discourages the use of biofuels from grandfathered facilities.

34.     Congress also gave the U.S. Environmental Protection Agency ("EPA") authority to take additional steps to ensure that ethanol would be available from facilities like those operated by the members of Growth Energy and RFA, and to ensure that any regulation

of biofuels "shall not ... restrict geographic areas in which renewable fuels may be used" or "harm the economy" of any State or region of the United States. 42 U.S.C. §§ 7545(o)(2)(A)(iii)(II)(aa), 7545(o)(7)(A). Although CARB has acknowledged that each "State is expected to consume an amount of [corn ethanol] production roughly proportional to its share of overall U.S. transportation fuel consumption," the effect of its LCFS regulation will be to draw more foreign ethanol and so-called "advanced" ethanol "to California in the next 10 years," and less of the corn ethanol expressly grandfathered by Congress.

35. Congress, the President, the American farming community, and the ethanol industry are all partners in the drive to use ethanol to reduce America's dependence on foreign energy.

**C. CARB's Low Carbon Fuel Standard ("LCFS") Regulation**

36. In 2006, the California Legislature passed the "Global Warming Solutions Act" to address public concern about the potential for man-made climate change, or global warming.

37. The goals of the Global Warming Solutions Act are not inconsistent with the goals of EISA and other federal laws, because the federal statutes also seek to reduce GHG emissions from the transportation sector. However, the specific steps taken by CARB to implement the Global Warming Solutions Act are flawed, and violate federal law.

38. In response to the Act, Governor Schwarzenegger in 2007 ordered the establishment of separate state regulations to govern the use of ethanol in gasoline sold in California, to reduce GHG emissions and address the issue of global warming.

39. Earlier this year, the California Air Resources Board ("CARB") approved a set of regulations to govern the marketing of gasoline-ethanol blends sold in California, called the "Low Carbon Fuel Standard" ("LCFS") regulation.

40. The focus of the LCFS is the "carbon intensity" of all feedstocks and fuel sources used in California. Although it does not directly dictate the content of any individual batches or types of fuels, the LCFS applies to "any transportation fuel" sold in California, including all fuels containing any amount of corn ethanol. LCFS § 95480.1(a)(1), (a)(8), and (a)(10).

41.     The LCFS regulates all "producers" and "importers" of all covered fuels, requiring them to use state-approved methods to determine the carbon-intensity levels for the total amount of fuel they provide in California.   LCFS § 95481(a)(36)–(a)(37), & (a)(23)-(a)(25); LCFS § 95486(a).   Every year, starting in 2011, LCFS sets a steadily decreasing, statewide average carbon intensity value for all fuels (labeled Table 1 in the regulations, which are attached as Exhibit 1 to the Second Amended Complaint).   LCFS §§ 95482 & 95483.

42.     Regulated parties must compare the carbon intensity of their fuels with the statewide average for the year.   If the overall carbon intensity of products sold by a regulated party is below the statewide average, that party may generate a credit, provided it has obtained state approval to generate credits.   LCFS § 95484(d)(2).   If the overall carbon intensity of products sold by a regulated party is above the statewide average, that party will generate a deficit.   LCFS § 95485.   Deficits must be canceled by either retiring or purchasing credits from others.   LCFS § 95484(b).

43.     CARB issued a "look-up table" as part of the LCFS that assigns carbon intensity values to different fuels according to CARB's assumptions about their "fuel pathway." LCFS § 95486(b).   (The "look-up table" is Table 6 in section 95486(b) of the regulation, attached hereto as Exhibit 1.)   For the ethanol "fuel pathways," CARB made numerous assumptions about various processes associated with the lifecycle of corn ethanol from the time corn is first planted until the time when the ethanol from the corn reaches the end-user in California.   Those assumptions include: farming practices (including how the corn is fertilized and harvested); transportation of the corn to an ethanol biorefinery; the production process used at the biorefinery (including the energy used to convert the corn into ethanol, the efficiency of the plant and process, and the value of the process's co-products); how the ethanol produced at the biorefinery is transported to the end-users in California; and the ultimate combustion of the fuel containing that ethanol in end-users' vehicles in California.

44.     For ethanol produced outside California, only two parts of the overall lifecycle of the ethanol—transportation of the ethanol within California and the combustion of ethanol in a motor vehicle in operation—occur inside California.

45.     As part of the assumptions underlying the "look-up table," CARB purported to gauge the so-called indirect "land use or other indirect effect" from the production of corn itself, predominately in the Midwest, ascribing a penalty to all corn ethanol based on its assumed indirect contribution to worldwide GHG emissions.   In CARB's view, by participating in the market for certain biofuels, regulated parties incentivize other, non-regulated parties all over the world to turn non-agricultural land into agricultural land; that land-use change by third parties supposedly releases GHG emissions, which CARB in turn attributes to the use of biofuels in this country.

46.     The LCFS thus penalizes all corn ethanol based on the purported indirect effects of assumed farming practices that occur predominately outside California, and through the regulation, California seeks to curb or eliminate these farming practices throughout the United States and beyond by making the entire corn ethanol market responsible for them.

47.     Unlike federal law, the LCFS draws significant distinctions between ethanol made from corn grown in the United States and ethanol made from sugar cane grown overseas (mainly, if not exclusively, Brazil), assigning to cane ethanol comparatively favorable carbon intensity vis-à-vis corn ethanol.   The effect of the LCFS regulation thus will be to require regulated entities producing gasoline for sale in California quickly to try to obtain ethanol produced in Brazil, not the United States.   This will injure the business of all corn ethanol biorefineries in the United States, including those located in California.

48.     The LCFS also draws significant distinctions among different producers of U.S. corn ethanol, depending on whether the ethanol is produced in California or outside California. The effect of those regulatory distinctions is to drive corn ethanol out of the California market for reasons independent of CARB's preference for Brazilian ethanol.

49.     Notably, for at least four corn ethanol fuel pathways, the "look-up table" assigns a higher total carbon intensity value to corn ethanol originating in the Midwest than to identical corn ethanol originating in California, based on factors almost entirely beyond any single producer's control.   One reason for the discrepancy is that the LCFS makes Midwest corn ethanol producers and importers responsible for the carbon emitted during the interstate

transportation of their ethanol. Another reason for the discrepancy is CARB's apparent belief that California ethanol facilities will obtain more of their electricity from renewable and nuclear power sources.   This interstate distinction is integral to and not functionally severable from the rest of the LCFS regulation, and there is no evidence that CARB would have adopted the other portions of the LCFS regulation without this distinction.

50.     Under the LCFS, being able to generate credits, which are necessary for regulated parties to cancel their deficits, is valuable; otherwise, to continue to sell fuel in California, a regulated party must purchase credits, raising the cost of its product.  The LCFS provides that a regulated party may generate credits only if the state approves of how that party produces, ships, delivers, and distributes its product, beginning at the location(s) where some components are or produced, be they in-state or out-of-state, and ending in California.  LCFS § 95484(d)(2).

51.     Furthermore, to continue to generate credits, a regulated party must seek state approval whenever that party makes a material change to any aspect of its shipping, delivery, and distribution methods.  LCFS § 95484(d)(2)(D).  The LCFS, in short, makes California the arbiter of interstate transportation of fuel and feedstocks.

52.     A "regulated party is subject to penalties to the extent permitted under State law."  LCFS § 95484(b)(4)(B).  Any violation of the LCFS regulation can also be enjoined.  LCFS § 95484(e).

**D.     The Effects and Consequences of the LCFS**

53.     CARB expressly recognizes that the effect of the LCFS regulation will be to eliminate the California market for Midwest ethanol.  Specifically, CARB expects "decreasing volumes of Midwestern corn ethanol," while California corn ethanol remains constant.  CARB projects that the LCFS regulation will displace fuel feedstocks imported into California from other states, replacing them with biofuels produced in-state, which "keeps more money in the State."

54.     While it effectively closes the California market to Midwest ethanol, the LCFS regulation produces no local benefits.  As CARB concedes, unless it succeeds in exporting its

regulatory scheme to other jurisdictions across the country and around the world, "fuel producers are free to ship lower-carbon-intensity fuels" to California, "while shipping higher-carbon-intensity fuels elsewhere."

55.     CARB's regulatory approach to GHG emissions (*i.e*, considering the lifecycle of a fuel from "seed-to-wheel," *see* ¶ 43 above) attributes GHG emissions that theoretically could be released outside of California to attenuated conduct inside California.

56.     Further, it is generally acknowledged that GHG emissions mix into the atmosphere so thoroughly that their only effects are worldwide.  Stated differently, the immediate locality from which the GHG is emitted is affected no more or no less than the entire world.  Therefore, a ton of GHG emitted in India or China has the same effect on GHGs in California as a ton of GHGs emitted in California or Iowa.

57.     CARB has recognized that "GHG emission reductions by the LCFS alone will not result in significant climate change."  It has stated that "[i]t is unlikely that the LCFS alone will result in any measurable climate change and reduction of global warming," and notes that one commenter provided an independent analysis of the effect of the LCFS using the climate model used by the Intergovernmental Panel on Climate Change to show that the impact of the LCFS would be "undetectable."

58.     CARB has also acknowledged that "[i]t is highly likely that supplies of ethanol with the lowest carbon intensity will be sent to California with the remaining 'high intensity' ethanol being sold outside of California."  "The end result of this fuel 'shuffling' process is little or no net change in fuel carbon-intensity on a global scale."

59.     Once the LCFS regulation is fully implemented, ethanol produced from corn starch by biorefineries located outside California will be excluded from the California market. By requiring the phase-out of such corn ethanol produced in the United States, the LCFS regulation will irreparably harm the market for renewable fuels and their co-products, including ethanol produced from corn starch and distillers' grains, in the United States.

60.     While there are virtually no local benefits to the LCFS regulation, all plaintiffs in this action are injured by that regulation and the distinctions it draws among different

sources of ethanol from biorefineries currently in production or that were in production at the time when EISA was enacted, and because the LCFS regulation will eliminate corn ethanol produced in the United States from use in gasoline sold in California.

61.    Once the LCFS regulation is fully implemented, companies selling gasoline in California will not use U.S. corn ethanol because the LCFS regulation will make the use of U.S. corn ethanol economically impracticable.  Companies selling gasoline in California will use ethanol from other sources, including ethanol imported from overseas.

62.    California is the largest single state market for corn ethanol in the United States. Because it will be economically impracticable for companies subject to the LCFS to continue to rely on ethanol produced from corn starch, the market for corn growers nationwide, including corn by the farmer plaintiffs, will be substantially reduced, and will be subject to increased volatility.  Each farmer plaintiff will be deprived of revenue, profits and goodwill as a result of implementation of the LCFS regulation.  As a result, each farmer plaintiff has suffered a loss in the value of its business.

63.    California is also a very significant market for distillers' grains.  It is economically impracticable to produce large volumes of distillers' grains except at corn ethanol biorefineries.  The volume of distillers' grains produced, and the volume of distillers' grains available for marketing, is directly related to the volume of ethanol produced from corn starch in the United States.  The LCFS regulation will reduce the volume of corn starch ethanol produced in the United States and the volume of distillers' grains produced in the United States.  Because Penny Newman Grain trades in distillers' grains, particularly in California, the LCFS regulation will deprive Penny Newman Grains of revenue, profits and goodwill, including revenue, profits and goodwill generated by its operations in Fresno, Hanford and Bakersfield.  As a result, Penny Newman Grains has suffered a loss in the value of its business.

64.    Members of Growth Energy and RFA own and operate corn-starch ethanol biorefineries across the United States.  Because the LCFS regulation will close California as a market for corn-starch ethanol once the regulation is fully implemented, the LCFS regulation

///

will deprive those members of Growth Energy and RFA of revenue, profits and goodwill.  As a result, plaintiffs' members have suffered a loss in the value of their businesses.

**CLAIMS FOR RELIEF**

**COUNT I—FOR DECLARATORY AND INJUNCTIVE RELIEF
THE LCFS IS PREEMPTED BY FEDERAL LAW**

65.     Plaintiffs reallege paragraphs 1 through 64 of Second Amended Complaint as if fully set forth herein.

66.     The U.S. Constitution makes federal law and regulations "the supreme Law of the Land."  U.S. CONST. art. VI, cl. 2.

67.     State laws and regulations that conflict with federal requirements are also preempted, and a conflict will be found, when the state law or regulation "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 492 (1987).  A state law or regulation is also preempted "if it interferes with the methods by which the federal statute was designed to reach this goal."  *Id*. at 494.

68.     When Congress enacted the Energy Independence and Security Act ("EISA") in 2007, it expressly exempted existing corn ethanol biorefineries (that were either in production or under construction on the date the EISA was enacted) from the requirement of having to claim or demonstrate reductions in GHG emissions.  42 U.S.C. § 7545(o)(2)(A)(i).   The purpose of the §211(o) exemption was to protect investments in and the business value of corn ethanol biorefineries that existed when EISA was enacted, and thereby encourage further innovation.

69.     Under the EISA, the members of Growth Energy and RFA are exempt under §211(o) from a requirement to claim or demonstrate reductions in GHG emissions because they operate facilities that are exempt.

70.     The LCFS interferes with and frustrates the EISA because it effectively excludes ethanol production facilities operated by the members of Growth Energy and RFA from participating in the market for ethanol as a blending fuel for gasoline for sale in

California.   The LCFS discourages and, as a practical matter, prevents ethanol from those production facilities from participation in the state market.

71.     State regulations such as the LCFS cannot prohibit or limit the sale of ethanol products based on the level of GHG emissions purportedly attributed to them when Congress has specifically foreclosed limitations on the sale of the same ethanol products based on GHG emissions.

72.     More broadly, the LCFS regulation cannot create a different and conflicting set of incentives for ethanol producers from those adopted by Congress in the EISA.   Congress sought to ensure future innovation by guaranteeing a market for ethanol from then-existing facilities, whereas CARB seeks to force innovation by rendering ethanol from those same facilities unmarketable in California.   Thus, the LCFS regulation "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in the EISA.

73.     Indeed, CARB has stated that "[w]e believe the regulation is sending correct signals to the market that biofuels made from food crops are not going to ultimately get us to the end goal.   To this point, the addition of indirect effects to fuel carbon intensities will help spur innovation for fuels derived from renewable sources, thus providing more fuel choices and diversifying the fuel pool."   Therefore, the LCFS poses an additional obstacle to Congress's objectives in the EISA.

74.     Moreover, regulation of ethanol in motor vehicle fuel to achieve global GHG reductions is not a traditional area of regulation in California or any other State.   State regulations cannot prohibit or limit the sale of ethanol products based on the level of GHG emissions attributed to them when Congress has specifically foreclosed prohibitions or limitations on the sale of the same ethanol products based on the level of GHG emissions attributed to them.

75.     CARB's enactment and enforcement of the LCFS intrudes upon a field expressly reserved by Congress for federal regulation, and its actions conflict with federal regulation of ethanol in motor vehicle fuel.

///

76.     In addition, gasoline providers in California to whom plaintiffs sell ethanol are assured by EISA of the ability to use any type of corn ethanol from exempt facilities in blending gasoline for sale anywhere in the United States.   Sections 211(o)(2)(A)(i) and 211(o)(2)(A)(iii)(II)(aa) of the EISA provide that federal regulations may not "restrict" geographic areas in which renewable fuels including ethanol from exempt production facilities may be used.  42 U.S.C. §§ 7545(o)(2)(A)(i), (o)(2)(A)(iii)(II)(aa).  The LCFS has the effect of prohibiting the use of corn ethanol from those exempt facilities in California, thereby disadvantaging members of Growth Energy and RFA.

77.     The LCFS also interferes with the U.S. Environmental Protection Agency's discretion under the EISA to adjust the percent reductions in lifecycle GHG emissions standards set forth by Congress based on commercial feasibility, as well as the EPA's discretion to waive such requirements altogether based on EPA's determination of harm to the economy or environment of a state, region, or the United States.  *See* 42 U.S.C. §§ 7545(o)(4), 7475(o)(7)(A).  Congress, in furthering its goal of energy independence, thus provided a means for ensuring a robust domestic ethanol supply, whereas, regardless of commercial feasibility or impacts on the economy, the LCFS would force the importation of foreign feedstocks.

78.     Accordingly, the LCFS is preempted by federal law.

79.     The portions of the LCFS regulation that are preempted by federal law are not severable from the balance of the LCFS regulation.

80.     All Plaintiffs in this action are injured by this aspect of the LCFS.

81.     These violations of the U.S. Constitution threaten Plaintiffs with irreparable injury for which there is no adequate remedy at law.

## COUNT II - FOR DECLARATORY AND INJUNCTIVE RELIEF

### THE LCFS IMPROPERLY REGULATES, DISCRIMINATES AGAINST, AND UNDULY BURDENS INTERSTATE COMMERCE

82.     Plaintiffs reallege paragraphs 1 through 81 of this Second Amended Complaint as if fully set forth herein.

///

83.     The Commerce Clause of the U.S. Constitution provides that "Congress shall have Power . . . To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes; . . ."  U.S. Const. art. I, sect. 8, cl. 3.

84.     The Commerce Clause prohibits state laws and regulations that, *inter alia*, (i) discriminate against interstate commerce; (ii) regulate extraterritorial commerce; or (iii) unduly burden interstate and extraterritorial commerce.

85.     The LCFS facially and unconstitutionally discriminates against Midwest corn ethanol producers and importers by assigning them relatively higher total carbon intensity values vis-à-vis California corn ethanol producers, who use substantially the same production methods to produce substantially the same product, principally because Midwest corn ethanol originates out of state.  Midwest corn ethanol producers and importers therefore are subject to the LCFS's deficit-reduction mandate before their in-state counterparts and are unable to generate the same credits as their in-state, California counterparts.  California effectively has erected a barrier to Midwest corn ethanol around its borders.

86.     The LCFS unconstitutionally interferes with and regulates the channels of interstate commerce, and the use of the channels of interstate commerce, by subjecting out-of-state corn ethanol producers and importers to higher in-state burdens merely because they must ship their corn ethanol into California from out-of-state.  This unconstitutional interference and regulation occurs when the LCFS ties the total carbon intensity value for out-of-state producers and importers to their interstate shipping decisions.

87.     By requiring that producers and importers of corn ethanol obtain state approval of their interstate shipping, delivery, and distribution methods before the producers and importers can generate credits, the LCFS facially regulates the channels of interstate commerce and their use.

88.     In actuality and in practical effect, the LCFS regulates conduct and commerce occurring wholly outside of California.  The purpose of assigning carbon intensity values to fuels used in California is to change behavior occurring completely outside the state.  By encouraging regulated parties to minimize the assumed carbon emissions throughout the

putative lifecycle of a fuel, the LCFS regulates how out-of-state corn ethanol producers and importers produce and transport corn and corn ethanol, even though out-of-state production (farming, crop yields, harvesting practices, crop collection and transportation, fuel used in production, and energy efficiency of production) and much of the transportation of corn ethanol occur outside of California and have no effects in or connection with the California. And by penalizing all corn ethanol producers and importers for the indirect land use effects of their participation in the corn ethanol market, the LCFS also regulates extraterritorial land use. Accordingly, the LCFS unconstitutionally projects California state policy outside its borders.

89.    These regulatory effects are even more suspect when viewed in light of CARB's forecast that it expects "decreasing volumes of Midwestern corn ethanol," while California corn ethanol remains constant.  Indeed, CARB projects that the LCFS regulation will displace fuel feedstocks imported into California from other states, replacing them with biofuels produced in-state, which "keeps more money in the State."

90.    The burden of the LCFS on interstate commerce in corn ethanol is clearly excessive in relation to any purported local benefits.  California is the nation's largest market for corn ethanol.  The LCFS therefore will subject the great majority of American corn and corn ethanol producers and importers to significant burdens.  Yet the LCFS will not result in any measurable global climate change, nor in any measurable reduction of the effects of global warming.  California's share of those immeasurable changes and reductions is likewise immeasurable, meaning the LCFS provides no local benefit to the state.

91.    The LCFS further burdens interstate commerce by effectively closing the California markets to corn ethanol from other States.

92.    The LCFS is not justified by a valid public welfare, consumer protection, or procompetitive purpose unrelated to economic protectionism.

93.    The portions of the LCFS regulation that violate the Commerce Clause are not severable from the balance of the LCFS regulation.

94.    All Plaintiffs in this action are injured by this aspect of the LCFS.

///

1    95.    These violations of the U.S. Constitution threaten Plaintiffs with irreparable

2  injury for which there is no adequate remedy at law.

3                                **PRAYERS FOR RELIEF**

4          **WHEREFORE**, plaintiffs respectfully request that this Court enter the

5  following relief:

6          A.    As to each Count, a declaratory judgment, pursuant to 28 U.S.C. § 2201 and

7  Rule 57 of the Federal Rules of Civil Procedure, that the LCFS regulation violates federal law

8  in the manner alleged above.

9          B.    As to each Count preliminary and permanent injunctions, pursuant to Rule 65 of

10  the Federal Rules of Civil Procedure, enjoining defendant from implementing or enforcing the

11  LCFS regulation.

12          C.    Such other relief available under federal law that may be considered appropriate

13  under the circumstances, including other fees and costs of this action to the extent allowed by

14  federal law (including but not limited to 42 U.S.C. § 1988), and further relief as this Court

15  deems just and proper.

16  Dated: January 28, 2010                 JONES HELSLEY PC

17

18                                  By:  ___/s/  Timothy Jones_____
                                        Timothy Jones,
19                                      Attorneys for all Plaintiffs

20

21

22

23

24

25

26

27

28

---

{7011/002/00247285.DOC}                    20

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF [28 U.S.C. §§ 1331, 1343]