1   JOHN R. KROGER
    Oregon Attorney General
2   SETH T. KARPINSKI, Cal. Bar No. 137748
    STEPHANIE M. PARENT, Oregon State Bar No. 925908
3   Senior Assistant Attorneys General
    PAUL S. LOGAN, Oregon State Bar No. 015095
4   Assistant Attorney General
    Oregon Department of Justice
5   1515 SW Fifth Ave, Suite 410
    Portland, OR 97201
6   Telephone: (971) 673-1880
    Fax: (971) 673-5000
7   Email:  seth.t.karpinski@doj.state.or.us
            stephanie.m.parent@doj.state.or.us
8           paul.s.logan@doj.state.or.us

9   *Attorneys for Amicus State of Oregon*

10

11                  IN THE UNITED STATES DISTRICT COURT

12              FOR THE EASTERN DISTRICT OF CALIFORNIA

13                          FRESNO DIVISION

14

15

16  ROCKY MOUNTAIN FARMERS UNION;          Case No. 1:09-CV-02234-LJO-DLB
    REDWOOD COUNTY MINNESOTA CORN
17  AND SOYBEANS GROWERS; PENNY            STATE OF OREGON'S AMICUS BRIEF
    NEWMAN GRAIN, INC.; FRESNO
18  COUNTY FARM BUREAU; NISEI              Date:        May 26, 2010
    FARMERS LEAGUE; CALIFORNIA            Time:        8:30 a.m.
19  DAIRY CAMPAIGN; REX NEDEREND;         Courtroom:   Four
    GROWTH ENERGY and the RENEWABLE        Judge:       Honorable Lawrence J. O'Neill
20  FUELS ASSOCIATION,                     Trial Date:
                                           Action Filed: December 23, 2009
21          Plaintiffs,

22      v.

23  JAMES N. GOLDSTENE, in his official
    capacity as Executive Officer of the
24  CALIFORNIA AIR RESOURCES BOARD,

25          Defendant.

26

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

INTERESTS OF AMICUS CURIAE ............................................................................. 2

    I.    Effects of Climate Change in Oregon ................................................. 2

    II.   The Oregon Low Carbon Fuel Standard for Transportation Fuel ............................ 3

ARGUMENT ................................................................................................................... 3

    I.    Plaintiffs Cannot Overcome the Presumption Against Federal Preemption Because the Federal Clean Air Act Demonstrates congressional Intent to Explicitly Preserve State Authority to Regulate Fuels Through Low Carbon Fuel Standards ................................................................................. 3

        A.    Courts Recognize the Presumption that States Retain Their Historic Police Powers to Protect the Environment ................................... 4

        B.    The Plain Language of the Clean Air Act Demonstrates Clear and Manifest Intent to Preserve State Authority to Regulate Fuels ................. 5

        C.    The Energy Independence and Security Act of 2007 (EISA) Further Retains State Authority to Regulate Fuels ...................................... 8

    II.   Because Congress Clearly Did Not Intend to Preempt State Fuel Regulation, This Court Should Not Reach the Issue of Whether the California Low Carbon Fuel Standard Actually Conflicts with the Federal Renewable Fuel Standard ................................................................................ 10

    III.  California's Low Carbon Fuel Standard Does Not Conflict with the Purposes and Objectives of the Clean Air Act Renewable Fuel Standard Program .......................................................................................................... 12

CONCLUSION ............................................................................................................... 15

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(541) 686-7873 / Fax: (503) 947-4792

1

## TABLE OF AUTHORITIES

2

**Cases**

3   *BedRoc Ltd. v. United States*, 541 U.S. 176 (2004) ...................................................11

4   *California v. Federal Energy Regulatory Committee*, 495 U.S. 490 (1990)....................................5

5   *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624 (1973)...........................................5

6   *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249 (1992)........................................11

7   *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658 (1993) ................................................10

8   *English v. Gen. Elec. Co.*, 496 U.S. 72 (1990) ..................................................4, 11, 12

9   *Exxon Mobil Corp. v. United States EPA*, 217 F.3d 1246 (9th Cir. 2000).....................5, 6, 10, 11

10  *Freightliner Corp. v. Myrick*, 514 U.S. 280 (1995)...................................................10

11  *Geier v. American Honda Motor Co.*, 529 U.S. 861 (2000) ........................................4, 10, 11, 14

12  *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002)........................................11

13  *Green v. Fund Asset Management, L.P.*, 245 F.3d 214 (3rd Cir. 2001)....................................4, 12

14  *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 541 (2001) ..................................................5

15  *Massachusetts v. EPA*, 549 U.S. 497 (2007) ........................................................2

16  *Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) .....................................................4, 12

17  *O'Hara v. General Motors Corp.*, 508 F.3d 753 (5th Cir. 2007)....................................15

18  *Oxygenated Fuels Ass'n v. Davis*, 331 F.3d 665 (9th Cir. 2003) ...........................................passim

19  *Oxygenated Fuels Ass'n, Inc. v. Pataki*, 158 F.Supp.2d 248 (N.D.N.Y. 2001) ............................14

20  *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947) ..................................................4

21  *Sprietsma v. Mercury Marine*, 537 U.S. 51 (2002) .....................................................10

22  *State of North Dakota ex rel. Stenehjem v. Freeeats.com, Inc.*, 2006 N.D. 84, 712
23  N.W.2d 828 (S.Ct. N.D. 2006) ...........................................................10, 11

24

**United States Code**
25  42 U.S.C. § 7545(c)(1) .......................................................................7

26  42 U.S.C. § 7545(c)(4) .......................................................................6

Page ii

42 U.S.C. § 7545(c)(4)(A)(i)-(ii) .................................................................................7

42 U.S.C. § 7545(c)(4)(A)(ii) .....................................................................................7

42 U.S.C. § 7545(c)(4)(B) .........................................................................................11

42 U.S.C. § 7545(o)(1)(B) .........................................................................................13

42 U.S.C. § 7545(o)(1)(F) .........................................................................................13

42 U.S.C. § 7545(o)(1)(J) ..........................................................................................13

42 U.S.C. § 7545(o)(2)(A)(i) .....................................................................................14

42 U.S.C. § 7545(o)(2)(B) .........................................................................................13

**Other Authorities**

53 Cong. Rec. H14430 (Dec. 6, 2007) ........................................................................9

Pub. L. 110-140, 121 Stat. 1492 (2007) ............................................................9, 13, 15

**Rules and Regulations**

59 Fed. Reg. 7716, 7809 (Feb. 15, 1994) ...................................................................8

75 Fed. Reg. 14,670 (Mar. 26, 2010) ...................................................................7, 13, 15

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(541) 686-7873 / Fax: (503) 947-4792

1                              **INTRODUCTION**

2         Plaintiffs in this action[1] challenge the State of California's low carbon fuel standard by

3    alleging that it is preempted by the federal Clean Air Act. Due to the dangers that climate

4    change poses in Oregon, the State of Oregon is undertaking a variety of strategies to reduce

5    greenhouse gas emissions that cause climate change, including development and adoption of an

6    Oregon low carbon fuel standard. Plaintiffs' challenge is of particular concern to Oregon

7    because, if accepted by this Court and followed by other courts, it has the potential to affect the

8    State of Oregon's ongoing efforts to protect the health, safety and welfare of its citizens through

9    the adoption of an Oregon low carbon fuel standard.

10        As defendant argues, preemption is not an issue because Congress preserved California's

11   authority to regulate "any fuel" through a special exemption from the preemption provision of

12   the federal Clean Air Act. Plaintiffs' preemption claim should be dismissed on this basis alone,

13   and the Court need go no further. Whether the Clean Air Act exempts from preemption any state

14   other than California is not at issue in this case. The State of Oregon therefore asks that this

15   Court not inadvertently decide the preemption issue with respect to other states.

16        In addition, plaintiffs' preemption claims fail because the Clean Air Act contains a

17   savings clause that preserves the authority of all states to regulate fuel unless the United States

18   Environmental Protection Agency (EPA) takes certain actions that are required to trigger

19   preemption, which EPA has not taken in this case. This Court must presume that states retain

20   their historic powers to protect the environment, unless there is a clear and manifest

21   congressional intent to preempt those powers. The Clean Air Act demonstrates congressional

22   intent to preserve, not preempt, state authority to regulate fuel. Nothing in the federal Energy

23   Independence and Security Act of 2007 (EISA), which amended the Clean Air Act, altered this

24   preservation of state authority. Indeed, the EISA also contains a savings clause that expressly

25   _____

[1] The State of Oregon is filing this same amicus brief in *Rocky Mountain Farmers Union, et al.*

26   *v. Goldstene*, No. 1:09-cv-02234-LJO-DLB and *National Petrochemical & Refiners Ass'n, et. al.*
     *v. Goldstene, et al.*, No. CV-F-10-0163 LJO DLB.

Page 1 -    STATE OF OREGON'S AMICUS BRIEF (1:09-CV-02234-LJO-DLB)
            STK/cjw/1997854-v1

                        Department of Justice
                        1162 Court Street NE
                        Salem, OR 97301-4096
                   (541) 686-7873 / Fax: (503) 947-4792

1   provides that it shall not be construed to limit any more environmentally-protective state law or

2   regulation.

3          Because the Clean Air Act demonstrates congressional intent to preserve California's

4   authority, the Court should not reach the issue of whether an actual conflict preempts the

5   California low carbon fuel standard. Should the Court reach the issue, though, there is no actual

6   conflict between the federal Renewable Fuel Standard program and California's low carbon fuel

7   standard. California's standard will enhance, not conflict with, the congressional purposes of the

8   Renewable Fuel Standard program to increase production of advanced biofuels and to reduce

9   greenhouse gas emissions of fuels beyond the minimum floor mandated by federal law.

10                          **INTERESTS OF AMICUS CURIAE**

11   **I.     Effects of Climate Change in Oregon.**

12          Courts have acknowledged that global climate change poses significant threats to the

13   health, safety and well-being of states and their citizens. *Massachusetts v. EPA*, 549 U.S. 497,

14   521 (2007) ("The harms associated with climate change are serious and well recognized.").

15   Climate change will have specific and particular impacts in the Pacific Northwest and Oregon.[2]

16   Warmer temperatures will lead to less snow pack on the mountains in the winter, which would

17   mean less water available later in the summer. A study by the Climate Impact Group indicates

18   that the spring snowpack in the Cascade mountains declined about 50 percent from 1950 to 2000.

19   Higher temperatures will result in lower summer water flows, changes in peak flow periods, and

20   higher risks of winter and spring floods and summer droughts. The changes in the water and

21   river systems in Oregon will impact fish and wildlife, reduce water available for agricultural

22   irrigation, and affect the ability to produce power through hydroelectric dams. The lost value of

23   irrigation water alone could range from $465 million to $2.4 billion for the Northwest. Rising

24   temperatures will impact Oregon's coastal areas, which will face more frequent storm surges,

25   _____

[2]*See generally* Governor's Advisory Group on Global Warming: Oregon Strategy for
26   Greenhouse Gas Reductions (2004) at 36-38 (available at
     http://www.oregon.gov/ENERGY/GBLWRM/docs/GWReport-FInal.pdf).

Page 2 -    STATE OF OREGON'S AMICUS BRIEF (1:09-CV-02234-LJO-DLB)
            STK/cjw/1997854-v1

1   more flooding, and likely the loss of land.  Oregon's coastal fisheries will change; adversely

2   affecting already-diminishing salmon stocks.  Oregon will also suffer more severe and more

3   frequent forest fires and increased forest pests and diseases, all of which will adversely affect

4   fish, wildlife and economic benefits derived from Oregon's forests.

5   **II.      The Oregon Low Carbon Fuel Standard for Transportation Fuel.**

6            In Oregon, the transportation sector is the single largest contributor to greenhouse gas

7   emissions, accounting for over one third of those emissions.[3]  In 2009, Oregon adopted

8   legislation which authorizes the Oregon Environmental Quality Commission to adopt an Oregon

9   low carbon fuel standard for the reduction of greenhouse gas emissions from transportation fuels.

10  Oregon Laws 2009, chapter 754, section 6.[4]  Pursuant to this authority, the Oregon Department

11  of Environmental Quality (DEQ) is actively working with an advisory committee of diverse

12  interests and stakeholders to develop such a standard.[5]  DEQ plans to propose a low carbon fuel

13  standard for adoption by the Oregon Environmental Quality Commission in December 2010.[6]

14                                          **ARGUMENT**

15  **I.      Plaintiffs Cannot Overcome the Presumption Against Federal Preemption Because**
16  **the Federal Clean Air Act Demonstrates congressional Intent to Explicitly Preserve**
    **State Authority to Regulate Fuels Through Low Carbon Fuel Standards.**

17           This Court must presume that states retain their historic powers to protect the

18  environment, unless there is a clear and manifest congressional intent to preempt those powers.

19  The Clean Air Act does not preempt the California low carbon fuel standard—or any state low

20  carbon fuel standard similar to California's—because Section 116 of the Clean Air Act

21  _____

22  [3] *The Governor's Climate Change Integration Group: Final Report to the Governor* (2008) at
    Appendix 1, page 8 (available at
23  http://oregon.gov/ENERGY/GBLWRM/docs/CCIGReport08Web.pdf).

24  [4] Copy included in the addendum to this brief.

25  [5] Oregon Department of Environmental Quality, *Low Carbon Fuel Avisory Committee* (available
    at http://www.deq.state.or.us/aq/committees/advcomLowCarbonFuel.htm).

26  [6] Oregon Department of Environmental Quality, *Oregon's Low Carbon Fuel Standard* (available
    at http://www.deq.state.or.us/aq/committees/lowcarbon.htm).

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(541) 686-7873 / Fax: (503) 947-4792

1   demonstrates congressional intent to preserve state authority to regulate fuels when, as in this

2   case, EPA has not taken the statutorily mandated actions required to trigger preemption by

3   section 211(c)(4)(A) of the Act.  Although plaintiffs claim preemption under section 211(o) of

4   the Clean Air Act, nothing in section 211(o) alters this scheme.  To the contrary, the EISA

5   amended section 211(o) and contains a savings clause that prevents preemption of any more

6   environmentally-protective state law or regulation, thus further demonstrating congressional

7   intent to preserve state authority.

8        A.      **Courts Recognize the Presumption that States Retain Their Historic Police**

9                **Powers to Protect the Environment.**

10          Article VI of the Constitution states that laws of the federal government "shall be the

11   supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary

12   notwithstanding."  However, "there is a general presumption against preemption in areas

13   traditionally regulated by states. '[W]e start with the assumption that the historic police powers

14   of the States were not to be superseded by the Federal Act unless that was the *clear and manifest*

15   *purpose* of Congress.'"  *Oxygenated Fuels Ass'n v. Davis*, 331 F.3d 665, 668 (9th Cir. 2003)

16   (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)) (emphasis added).

17          Courts apply the "clear and manifest purpose of Congress" standard to conflict

18   preemption claims, which plaintiffs have alleged in this case.[7]  *Id.* at 668, 673 (applying "clear

19   and manifest" standard and requiring "clear evidence" that Congress intended to preempt; citing

20   *Geier v. American Honda Motor Co.*, 529 U.S. 861, 885 (2000)); *Green v. Fund Asset*

21   *Management, L.P.*, 245 F.3d 214, 224 (3rd Cir. 2001) (applying "clear and manifest" standard;

22   quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)).

23   _____

[7] The Supreme Court has recognized three types of preemption: express preemption, field
24   preemption, and conflict preemption.  *Id.* at 667.  Conflict preemption may arise in two
circumstances: "where it is impossible for a private party to comply with both state and federal
25   requirements, or where state law 'stands as an obstacle to the accomplishment and execution of
the full purposes and objectives of Congress.'"  *Id.* (citing *English v. Gen. Elec. Co.*, 496 U.S.
26   72, 78-79 (1990) (other citations omitted)).  Plaintiffs have alleged only the latter type of conflict
preemption, termed "obstacle" preemption.

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(541) 686-7873 / Fax: (503) 947-4792

1    Environmental regulation, including air pollution prevention, is an area of traditional

2  state authority and regulation. *See Exxon Mobil Corp. v. United States EPA*, 217 F.3d 1246,

3  1255 (9th Cir. 2000) ("Air pollution prevention falls under the broad police powers of the states,

4  which include the power to protect the health of citizens in the state.  Environmental regulation

5  traditionally has been a matter of state authority."); *Oxygenated Fuels*, 331 F.3d at 673

6  ("Environmental regulation is an area of traditional state control.").  Thus, California's low

7  carbon fuel standard falls within the State's traditional authority, and federal law cannot preempt

8  it without proof of clear and manifest congressional intent to do so.

9    **B.    The Plain Language of the Clean Air Act Demonstrates Clear and Manifest**
10         **Intent to Preserve State Authority to Regulate Fuels.**

11    The plain language of the Clean Air Act explicitly preserves the authority of states—

12  including California, Oregon and others—to regulate fuels.  Plaintiffs base their preemption

13  claim solely on section 211(o) of the federal Clean Air Act, as added to the Clean Air Act by the

14  Energy Policy Act of 2005 and later amended by the EISA.  However, Clean Air Act

15  Section 116 provides for the "Retention of State Authority," which demonstrates Congress

16  considered, but decided not to preempt State authority, such as the authority exercised in

17  adopting the low carbon fuel standard at issue here.

18    "'Congressional purpose is the 'ultimate touchstone' of federal preemption analysis.'"

19  *Oxygenated Fuels*, 331 F.3d at 668 (citing *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 541 (2001)

20  (other citations omitted)).  Thus, "[p]reemption analysis requires a close examination of the

21  particular statutes and regulations at issue. '[E]ach case turns on the peculiarities and special

22  features of the federal regulatory scheme in question.'" *Id.* (citing *City of Burbank v. Lockheed

23  Air Terminal, Inc.*, 411 U.S. 624, 638 (1973)).  In particular, courts must give effect to evidence

24  "that Congress considered, and sought to preserve, the States' coordinate regulatory role in our

25  federal scheme." *Exxon Mobil*, 217 F.3d at 1254 (citing *California v. Federal Energy

26  *Regulatory Committee*, 495 U.S. 490, 497 (1990)).

Page 5 -    STATE OF OREGON'S AMICUS BRIEF (1:09-CV-02234-LJO-DLB)
STK/cjw/1997854-v1
Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(541) 686-7873 / Fax: (503) 947-4792

1    This precedent is particularly relevant to guide the Court's preemption analysis in this

2    case because the Clean Air Act includes a savings clause, described by the Ninth Circuit as a

3    "sweeping and explicit provision," that preserves state authority to regulate air pollution. *Exxon*

4    *Mobil*, 217 F.3d at 1255.  That savings clause, found in Clean Air Act section 116, preserves

5    state authority to regulate, among other things, fuel:

6        Retention of State Authority

7        Except as otherwise provided in sections 1857c-10(c), (e), and (f) (as in effect
    before August 7, 1977), 7543, 7545(c)(4), and 7573 of this title (preempting

8        certain State regulation of moving sources) nothing in this chapter shall preclude
    or deny the right of any State or political subdivision thereof to adopt or enforce

9        (1) any standard or limitation respecting emissions of air pollutants or (2) any
    requirement respecting control or abatement of air pollution. . . .

10

    42 U.S.C. § 7416.

11

12       Section 116 of the Clean Air Act explicitly preserves state regulatory authority for air

13   pollution and does not allow preemption, with limited exceptions.  Only one of the exceptions is

14   relevant to this case: section 211(c)(4) of the Clean Air Act, codified as 42 U.S.C. § 7545(c)(4).[8]

15   Section 211(c)(4)(A) authorizes EPA to preempt state regulation of fuel characteristics or

16   components, for purposes of motor vehicle emissions control, but only if EPA takes one of two

17   affirmative actions.  EPA must either (1) publish in the Federal Register a finding that no control

18   or prohibition of a fuel component or characteristic is necessary, or (2) prescribe by regulation,

19   under section 211(c)(1), a control or prohibition of a fuel component or characteristic:

20       (A) Except as otherwise provided in subparagraph (B) or (C), no State (or
    political subdivision thereof) may prescribe or attempt to enforce, for purposes of

21       motor vehicle emission control, any control or prohibition respecting any
    characteristic or component of a fuel or fuel additive in a motor vehicle or motor

22       vehicle engine—

23

24

---

25   [8] The other exceptions to the section 116 savings clause are not relevant to this case:  42 U.S.C
  §§ 1857c-10(c), (e), and (f), as in effect before August 7, 1977 (stationary source energy

26   shortages), 7543 (tailpipe emission standards for new motor vehicles and nonroad vehicles and
engines), and 7573 (aircraft emission standards).

Page 6 -    STATE OF OREGON'S AMICUS BRIEF (1:09-CV-02234-LJO-DLB)
    STK/cjw/1997854-v1

1

2

3

4

5

> (i) if the Administrator has found that no control or prohibition of the characteristic or component of a fuel or fuel additive under paragraph (1) is necessary and has published his finding in the Federal Register, or
> (ii) if the Administrator has prescribed under paragraph (1) a control or prohibition applicable to such characteristic or component of a fuel or fuel additive, unless State prohibition or control is identical to the prohibition or control prescribed by the Administrator.

6

42 U.S.C. § 7545(c)(4)(A)(i)-(ii).

7          Although section 211(c)(4)(A) authorizes EPA to preempt certain state fuel regulation, it

8    has not taken the required actions to do so.  The State of Oregon is not aware of EPA taking the

9    required actions, and plaintiffs have not alleged it.  For example, plaintiffs allege that EPA has

10   established rules under section 211(o) that require fuel distributors to provide minimum volumes

11   of biofuels pursuant to the Renewable Fuel Program.  However, the plain language of

12   section 211(c)(4)(A)(ii) specifically states that preemption arises only when EPA prescribes

13   regulations pursuant to section 211(c)(1).  42 U.S.C. § 7545(c)(4)(A)(ii) ("if the Administrator

14   has prescribed under paragraph (1) a control or prohibition").  When EPA adopts regulations

15   pursuant to section 211(c)(1), it must first find that the fuel causes or contributes to pollution that

16   may reasonably be anticipated to endanger the public health or welfare.  42 U.S.C. § 7545(c)(1).

17   Because EPA adopted its Renewable Fuel Standard program rules pursuant to section 211(o), but

18   not under section 211(c)(1) and without the required endangerment finding required by section

19   211(c)(1), the preemption allowed by section 211(c)(4)(A)(ii) does not arise.[9]  75 Fed. Reg.

20   14,670 (Mar. 26, 2010) ("Under the Clean Air Act Section 211(o), as amended by the [EISA],

21   the [EPA] is required to promulgate regulations implementing changes to the Renewable Fuel

22   Standard program.")

23

24   _____

[9] In addition, defendant's motions to dismiss correctly point out that section 211(c)(4)(B) of the

25   Clean Air Act specifically exempts California from preemption by section 211(c)(4)(A).
Defendant's Motions to Dismiss at 13-14.  Therefore, even if EPA took the mandated actions

26   under section 211(c)(4)(A)(i)-(ii), California would remain exempt from preemption under
section 211(c)(4)(A).

Page 7 -    STATE OF OREGON'S AMICUS BRIEF (1:09-CV-02234-LJO-DLB)
            STK/cjw/1997854-v1

1     When EPA intends to trigger the preemption by regulating under section 211(c)(1), it

2  knows how to do so, and has done so in the past.  Subsection 211(c) grants EPA general

3  authority to regulate fuel to minimize air pollution.  Other subsections of section 211 direct EPA

4  to regulate fuel for very specific purposes, such as the subsection (o) Renewable Fuel Standard

5  mandate to sell certain volumes of biofuels.  To preempt state fuel regulation under this

6  congressional design, EPA has elected to adopt rules under the authority of both subsection (c)

7  and under another subsection.  When EPA established a reformulated gasoline program pursuant

8  to section 211(k), it adopted rules under the authority of both subsections 211(k) and (c) for the

9  specific purpose of preempting similar state fuel regulation.  59 Fed. Reg. 7716, 7809 (Feb. 15,

10  1994) ("EPA … is issuing [the reformulated gasoline] rule under the authority of sections 211

11  (k) and (c), and promulgate [*sic*] under section 211(c)(4) that dissimilar State controls be

12  preempted unless either of the exceptions to federal preemption specified by section 211(c)(4)

13  applies.").

14     Therefore, in the absence of the required EPA actions under section 211(c)(4)(A)(i)-(ii),

15  the Clean Air Act section 116 savings clause preserves the authority of states such as California

16  and Oregon to regulate motor vehicle fuels for air pollution control, including the authority to

17  adopt low carbon fuel standards.  Courts look to the statutory text as evidence of congressional

18  intent concerning alleged conflict preemption.  *See Oxygenated Fuels*, 331 F.3d at 670-73.  The

19  text of the Clean Air Act demonstrates congressional intent to preserve the states' role in fuel

20  regulation, and cannot support a finding of "clear and manifest" congressional purpose to

21  preempt the states.

22    **C.**    **The Energy Independence and Security Act of 2007 (EISA) Further Retains**
            **State Authority to Regulate Fuels.**

23

24     Nothing in the EISA, which amended Clean Air Act section 211(o) in 2007, alters the

25  Clean Air Act section 116 savings clause or the scope of potential federal preemption of state

26  fuel regulation allowed by sections 116 and 211(c)(4).  In fact, the EISA also demonstrates

Page 8 -   STATE OF OREGON'S AMICUS BRIEF (1:09-CV-02234-LJO-DLB)
       STK/cjw/1997854-v1

1    congressional intent to preserve state fuel regulation authority.  The EISA contains its own

2    savings clause that prevents the EISA from preempting any more environmentally protective

3    state law or regulation:

4        Except as provided in section 211(o)(12) of the Clean Air Act, nothing in the
       amendments made by this title to section 211(o) of the Clean Air Act shall be
5        construed as superseding, or limiting, any more environmentally protective
       requirement under the Clean Air Act, or under any other provision of State or
6        Federal law or regulation, including any environmental law or regulation.

7

8    EISA, Pub. L. 110-140, 121 Stat. 1492 (2007), section 204(b).  *See* 153 Cong. Rec. H14430

9    (Dec. 6, 2007) (Rep. Waxman remarks that the EISA "won't seize authority from the States to

10   act on global warming.").

11      Section 211(o)(12), exempted from the savings clause above, does not affect federal

12   preemption of state fuel regulation either.  Rather, it states that the regulation of greenhouse

13   gases pursuant to section 211(o), by itself, does not affect or expand the regulation of greenhouse

14   gases under other provisions of the Clean Air Act:

15        Effect on other provisions.-- Nothing in [section 211(o)], or regulations issued
       pursuant to this subsection, shall affect or be construed to affect the regulatory
16        status of carbon dioxide or any other greenhouse gas, or to expand or limit
       regulatory authority regarding carbon dioxide or any other greenhouse gas, for
17        purposes of other provisions (including section 165) of this Act. The previous
       sentence shall not affect implementation and enforcement of this subsection.
18

19   EISA, Pub. L. 110-140, 121 Stat. 1492 (2007), section 210(b).  Accordingly, the EISA does not

20   support plaintiffs' preemption argument.  Like the Clean Air Act section 116 savings clause, the

21   EISA savings clause demonstrates congressional intent to preserve the states' role in fuel

22   regulation, and cannot support a finding of "clear and manifest" congressional purpose to

23   preempt the states.

24

25

26

Page 9 -    STATE OF OREGON'S AMICUS BRIEF (1:09-CV-02234-LJO-DLB)
       STK/cjw/1997854-v1

1  **II.**    **Because Congress Clearly Did Not Intend to Preempt State Fuel Regulation, This**
**Court Should Not Reach the Issue of Whether the California Low Carbon Fuel**
2            **Standard Actually Conflicts with the Federal Renewable Fuel Standard.**

3            As explained above, the plain language of the Clean Air Act clearly demonstrates that

4   Congress did not intend to preempt state fuel regulation, and therefore this Court should not

5   reach the issue of whether the California low carbon fuel standard actually conflicts with the

6   Renewable Fuel Standard enacted under Clean Air Act section 211(o). This Court must give full

7   effect to these provisions, which demonstrate that Congress decided to preserve California's

8   authority to regulate fuels. *Exxon Mobil*, 217 F.3d at 1254 (courts must "'give full effect to

9   evidence that Congress considered, and sought to preserve, the States' coordinate regulatory role

10  in our federal scheme.'" (citation omitted)).

11           "Where Congress has included an express provision granting states the power to enact

12  laws . . . it cannot frustrate the intent of Congress when the state acts within the terms of the

13  grant." *State of North Dakota ex rel. Stenehjem v. Freeeats.com, Inc.*, 2006 N.D. 84, 712

14  N.W.2d 828, 841 (S.Ct. N.D. 2006) (rejecting conflict preemption where plain language

15  reflected clear congressional intent not to preempt); *see also Sprietsma v. Mercury Marine,* 537

16  U.S. 51, 62-63 (2002) (the plain wording of the statute "necessarily contains the best evidence of

17  Congress's pre-emptive intent" (quoting *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 664

18  (1993))). In certain cases, courts have reached the conflict preemption analysis where the scope

19  of the preemption provision, by itself, does not foreclose, through negative implication, any

20  possibility of implied conflict preemption. *Freightliner Corp. v. Myrick,* 514 U.S. 280, 288

21  (1995). Nor does a savings clause necessarily bar the ordinary working of conflict preemption

22  principles, so long as the savings clause is not rendered ineffectual. *Geier v. American Honda*

23  *Motor Co.*, 529 U.S. 861, 869 (2000). However, here, the Clean Air Act provisions expressly

24  preserve State authority to regulate fuels, foreclosing implied conflict preemption.

25           The court in *Freeeats.com, Inc.* explained that in *Geier* and other obstacle preemption

26  cases, the statutory preemption provisions and savings clauses were "inconsistent and

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(541) 686-7873 / Fax: (503) 947-4792

1  conflicting," and in the absence of clear congressional intent found in the plain language of the

2  statute, courts considered actual conflicts.  But when Congress has pronounced its intent *not* to

3  preempt through explicit statutory language, the court's task is an easy one, and the court in that

4  case rejected the obstacle preemption claim.  *Freeeats.com, Inc.*, 712 N.W.2d. at 841 (citing

5  *English,* 496 U.S. at 78-79).

6         As California has argued, in section 211(c)(4)(B), Congress enacted a special and broad

7  provision that California is *not* preempted from regulating fuels.  42 U.S.C. § 7545(c)(4)(B)

8  (California "may at any time prescribe and enforce, for the purpose of motor vehicle emission

9  control, a control or prohibition respecting any fuel or fuel additive.").  If this Court were to find

10  preemption based on an implied conflict preemption analysis, section 211(c)(4)(B) would be

11  rendered meaningless.  *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 217-18

12  (2002) (courts must "avoid rendering what Congress has plainly done . . . devoid of reason and

13  effect"); *BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004) (courts must "'presume that

14  [the] legislature says in a statute what it means and means in a statute what it says there.'"

15  (quoting *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992)).

16         Moreover, the Clean Air Act section 116 savings clause and the section 211(c)(4)(A)

17  preemption provision are precisely fitted together, reflecting a clear and harmonious

18  congressional design, as opposed to the inconsistent and conflicting statutory provisions

19  examined in *Geier*.  State fuel regulation authority is preserved by the savings clause, and may

20  be preempted only pursuant to the requirements section 211(c)(4)(A), which is specifically

21  carved out from the savings clause.  The Court must give effect to such evidence of intent to

22  preserve state authority.  *Exxon Mobil*, 217 F.3d at 1254.

23         Therefore, because the Clean Air Act clearly demonstrates that Congress did not intend to

24  preempt state fuel regulation, this Court should not consider whether an actual conflict exists

25  between state and federal law.

26

Page 11 -  STATE OF OREGON'S AMICUS BRIEF (1:09-CV-02234-LJO-DLB)
     STK/cjw/1997854-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(541) 686-7873 / Fax: (503) 947-4792

1  III.  **California's Low Carbon Fuel Standard Does Not Conflict with the Purposes and Objectives of the Clean Air Act Renewable Fuel Standard Program.**

2

3       Should this Court reach the issue, there is no actual conflict between the federal

4  Renewable Fuel Standard program and California's low carbon fuel standard.  There is an actual

5  conflict when state regulation "'stands as an obstacle to the accomplishment and execution of the

6  full purposes and objectives of Congress.'"  *Oxygenated Fuels*, 331 F.3d at 667 (citing *English*,

7  496 U.S. at 78-79) (other citations omitted)).  The historic police powers of the states are not to

8  be superseded unless that was the clear and manifest purpose of Congress.  *Green*, 245 F.3d at

9  224 (applying "clear and manifest" standard to actual conflict analysis; quoting *Medtronic, Inc.*

10  *v. Lohr*, 518 U.S. 470, 485 (1996)).

11       Congress's overall purpose in adopting the Renewable Fuel Standard program in 2005, as

12  section 211(o) of the Clean Air Act, was to reduce U.S. dependency on foreign oil and increase

13  production of domestic renewable fuels by requiring a certain amount of renewable fuel by

14  volume.  The specific objective of the EISA amendments to the Renewable Fuel Standard

15  program was to increase the required volume of renewable fuel and to increase the production of

16  "advanced biofuels"—defined as those renewable fuels that have lower lifecycle greenhouse gas

17  emissions—which would result in reducing greenhouse gas emissions that contribute to climate

18  change.  Congress did not require, nor guarantee, the use of corn ethanol to meet the volume

19  requirement in any market.  Therefore, as a matter of law, California's low carbon fuel standard

20  does not actually conflict with Congress' objectives, even if there is some impact on the ability

21  of corn ethanol producers to sell in the California market.  In fact, California's low carbon fuel

22  standard will help meet the congressional objective to increase production of advanced biofuels

23  by regulating the carbon intensity of fuels sold in California.

24       In 2005, Congress amended the Clean Air Act to create the Renewable Fuel Standard

25  program, which required that gasoline sold or introduced into commerce in the United States

26  contain a certain amount of renewable fuel by volume.  Energy Policy Act of 2005, Pub. L.

Page 12 -  STATE OF OREGON'S AMICUS BRIEF (1:09-CV-02234-LJO-DLB)
     STK/cjw/1997854-v1

1    109-58, § 1501(a)(2),119 Stat. 1069-71.  Congress defined "renewable fuel" broadly to include

2    motor vehicle fuels derived from grain, such as corn ethanol, as well as fuels derived from sugar

3    or potatoes or other biomass; natural gas produced from a biogas source; and cellulosic biomass

4    ethanol.  *Id.*  The volume requirement could be met with any type of renewable fuel; it did not

5    require nor guarantee the use of corn ethanol to meet the volume requirement.

6          In 2007, Congress enacted the EISA and amended the Renewable Fuel Standard program

7    to increase the total minimum volume requirement for renewable fuels, and, specifically, to

8    require a certain amount of that volume requirement be met by advanced biofuels to reduce

9    greenhouse gas emissions.  Again, Congress did not require nor guarantee the use of corn ethanol

10   to meet the increased volume requirement.  In fact, Congress defined ethanol derived from corn

11   starch as "conventional biofuel." 42 U.S.C. § 7545(o)(1)(F).  Congress defined "advanced

12   biofuel" as "renewable fuel, other than ethanol derived from corn starch, that has lifecycle

13   greenhouse gas emissions . . . that are at least 50 percent less than baseline lifecycle greenhouse

14   gas emissions." 42 U.S.C. § 7545(o)(1)(B).  "Renewable fuel" is defined generally as "fuel

15   produced from renewable biomass and that is used to replace or reduce the quantity of fossil fuel

16   present in a transportation fuel." 42 U.S.C. § 7545(o)(1)(J).

17         The total renewable fuel volume requirements include a "nested" requirement that a

18   certain amount of the total renewable fuel volume include a certain volume of advanced biofuel.

19   42 U.S.C. § 7545(o)(2)(B); 75 Fed. Reg. at 14674 (Table I.A.1-1 showing volume requirements)

20   and at 14675 (discussing "nested requirements").  Any fuel that is advanced biofuel qualifies to

21   meet the total renewable fuel requirement, but corn ethanol (conventional biofuel) does not

22   qualify to meet the advanced biofuel volume requirement.   75 Fed. Reg. at 14674-75.  For

23   example, in 2012, the total renewable fuel requirement is 15.2 billion gallons, of which 2 billion

24   gallons must be advanced biofuel, but none of which is required nor guaranteed to be corn

25   ethanol.  *Id.*  Moreover, the total renewable fuel requirement increases each year, and by 2016,

26   the required annual incremental increase must be comprised totally of advanced biofuel, further

Page 13 -  STATE OF OREGON'S AMICUS BRIEF (1:09-CV-02234-LJO-DLB)
          STK/cjw/1997854-v1

                              Department of Justice
                              1162 Court Street NE
                              Salem, OR 97301-4096
                        (541) 686-7873 / Fax: (503) 947-4792

1   demonstrating Congress intended to increase production of advanced biofuel with the objective

2   to reduce greenhouse gas emissions, not to maintain support for the corn ethanol industry.

3        Therefore, Congress did not intend to guarantee fuel providers an unconstrained choice of

4   renewable fuels, and did not intend to guarantee a market for ethanol. *See, e.g., Oxygenated*

5   *Fuels*, 331 F.3d at 672 (Congress did not intend to give gasoline producers unconstrained choice

6   of fuel oxygenates under Clean Air Act section 211 program); *Oxygenated Fuels Ass'n, Inc. v.*

7   *Pataki*, 158 F.Supp. 2d 248, 260, n. 6 (N.D.N.Y. 2001) (use of one particular fuel oxygenate not

8   essential to congressional purpose of Clean Air Act section 211 program requiring oxygenates to

9   be added to fuels).

10        An additional requirement imposed by the EISA is that new facilities must achieve "at

11   least a 20 percent reduction in lifecycle greenhouse gas emissions compared to baseline lifecycle

12   greenhouse gas emissions." 42 U.S.C. § 7545(o)(2)(A)(i).  Again, congressional purpose is to

13   reduce the amount of greenhouse gas emissions, which California's low carbon fuel standard will

14   help achieve.  Congress did not require existing facilities to retrofit to meet the 20 percent

15   reduction, nor does California's low carbon fuel standard impose such a requirement.

16        There is no clear and manifest intent that Congress's objective was to maintain the

17   existing market for the corn ethanol industry.  In fact, the opposite appears to be true.  Congress

18   intended to increase the market for advanced biofuel, which does not include corn ethanol, by

19   imposing annual renewable fuel volume requirements that are increasingly composed of

20   advanced biofuel, with the ultimate objective to reduce the amount of greenhouse gas emissions.

21   Any potential impact on corn ethanol producers from California's low carbon fuel standard does

22   not actually conflict with congressional purposes and objectives for the Renewable Fuel Standard

23   program.

24        Moreover, there is no conflict because the federal Renewable Fuel Standard program

25   creates a minimum requirement that was intended to provide a floor. *See Geier*, 529 U.S. at 870

26   (savings provision preserved those state tort actions "that seek to establish greater safety than the

Page 14 -   STATE OF OREGON'S AMICUS BRIEF (1:09-CV-02234-LJO-DLB)
       STK/cjw/1997854-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(541) 686-7873 / Fax: (503) 947-4792

1   minimum safety achieved by a federal regulation intended to provide a floor"); *O'Hara v.*

2   *General Motors Corp.*, 508 F.3d 753, 763 (5th Cir. 2007) (action not preempted where court

3   found federal glazing standard to be a minimum safety standard).

4        The federal Renewable Fuel Standard program creates a floor, both in its minimum fuel

5   volume requirements as well as the provision that requires, at a minimum, that new facilities

6   reduce greenhouse gas emissions by 20 percent.  75 Fed. Reg. at 14673 ("program intended to

7   require minimum volume"); 75 Fed. Reg. at 14869 ("volume of renewable fuel from

8   grandfathered facilities exempt from the 20% GHG threshold" limited to baseline volume

9   because allowing the exemption to apply to volume resulting from increased production "would

10  likely lead to a substantial increase in production of fuel that is not subject to any GHG

11  limitations, which EPA does not believe would be consistent with the objectives of the Act.").

12       The savings provision in the EISA makes it clear that the federal program does not limit

13  "any more environmentally protective requirement under the Clean Air Act, or under any other

14  provision of State or Federal law or regulation, including any environmental law or regulation."

15  EISA, Pub. L. 110-140, 121 Stat. 1492 (2007), section 204(b).  California is not directly

16  regulating the volume of renewable fuels or the facilities that produce renewable fuels.  To the

17  extent that the California low carbon fuel standard may increase production of advanced biofuels

18  or encourage changes in production that will reduce greenhouse gas emissions beyond the

19  requirements of the federal Renewable Fuel Standard program, the standard is a "more

20  environmentally protective requirement" that is allowed by the EISA, and one that will help

21  achieve congressional objectives.

22                              **CONCLUSION**

23       Amicus curiae the State of Oregon joins defendant in asking the Court to dismiss these

24  actions.  In addition to the reasons set forth in defendant's Motion to Dismiss, the federal Clean

25  Air Act does not preempt the low carbon fuel standard of any state because the Act demonstrates

26  congressional intent to preserve state authority to regulate fuels, and because California's low

Page 15 -   STATE OF OREGON'S AMICUS BRIEF (1:09-CV-02234-LJO-DLB)
              STK/cjw/1997854-v1

                              Department of Justice
                              1162 Court Street NE
                              Salem, OR 97301-4096
                          (541) 686-7873 / Fax: (503) 947-4792

1    carbon fuel standard will enhance, rather than conflict with, the purposes of the federal

2    Renewable Fuel Standard to increase production of advanced biofuels and to reduce greenhouse

3    gas emissions of fuels beyond the minimum floor mandated by federal law.

4          DATED this _12th_ day of May, 2010.

5                                        Respectfully submitted,

6                                        JOHN R. KROGER
                                         Attorney General of the State of Oregon
7

8

9                                        SETH T. KARPINSKI, Cal. Bar No. 137748
                                         STEPHANIE M. PARENT, OSB No. 925908
10                                       Senior Assistant Attorneys General
                                         PAUL S. LOGAN, OSB No. 015095
11                                       Assistant Attorney General
                                         Of Attorneys for State of Oregon
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Page 16 -   STATE OF OREGON'S AMICUS BRIEF (1:09-CV-02234-LJO-DLB)
            STK/cjw/1997854-v1

# ADDENDUM

Approved by the Governor July 22, 2009
Filed in the office of Secretary of State July 22, 2009
Effective date July 22, 2009

## CHAPTER 754

## AN ACT                    HB 2186

Relating to greenhouse gas emissions; and declaring an emergency.

Be It Enacted by the People of the State of Oregon:

SECTION 1. (1) As used in this section:

(a) "Greenhouse gas" has the meaning given that term in ORS 468A.210.

(b) "Heavy-duty truck" has the meaning given that term in ORS 468A.795.

(c) "Medium-duty truck" has the meaning given that term in ORS 468A.795.

(d) "Return on investment" means:

(A) A net monthly savings gained through fuel efficiency that is equal to or greater than the net monthly payment obligation under a financing instrument; or

(B) The owner's or operator's initial capital costs, if self-funded, to comply with any potential requirements under this section are recouped in fuel savings within three years of the owner's or operator's expenditure of the initial capital costs.

(2)(a) The Department of Environmental Quality shall conduct a study of potential requirements regarding the maintenance or retrofitting of medium-duty trucks and heavy-duty trucks in order to reduce aerodynamic drag and otherwise reduce greenhouse gas emissions from those trucks. In conducting the study, the department shall evaluate:

(A) Comparable requirements of other states or the United States Environmental Protection Agency;

(B) The availability of financing programs to fund initial capital costs that are recouped in fuel savings over time;

(C) Differences among truck types, such as short-haul trucks and long-haul trucks;

(D) Implementation according to a phased-in schedule taking into account fleet size;

(E) The feasibility of requiring sellers of medium-duty trucks and heavy-duty trucks to disclose to buyers the existence of applicable greenhouse gas emissions reduction requirements; and

(F) The feasibility of providing economic hardship exemptions and deferrals for owners and operators of trucks, after considering the ability of owners and operators of trucks to attain a return on investment within the time period specified in any financing instrument available to fund initial capital costs associated with any potential requirements.

(b) As part of the study under this section, the department shall also study potential restrictions on engine use by parked commercial vehicles, including but not limited to medium-duty trucks and heavy-duty trucks.

(3) In conducting the study under this section, the department shall consult with relevant stakeholders.

(4) The department shall submit a report of its study, and shall include recommendations for legislation, to the interim legislative committees on environment and natural resources on or before October 1, 2010.

SECTION 2. Section 3 of this 2009 Act is added to and made a part of ORS chapter 468A.

SECTION 3. (1) As used in this section:

(a) "Greenhouse gas" has the meaning given that term in ORS 468A.210.

(b) "Motor vehicle" has the meaning given that term in ORS 801.360.

(2) The Environmental Quality Commission may adopt by rule standards and requirements described in this section to reduce greenhouse gas emissions.

(3)(a) The commission may adopt requirements to prevent the tampering, alteration and modification of the original design or performance of motor vehicle pollution control systems.

(b) Before adopting requirements under this section, the commission shall consider the anti-tampering requirements and exemptions of the State of California.

(4) The commission may adopt requirements for motor vehicle service providers to check and inflate tire pressure according to the tire manufacturer's or motor vehicle manufacturer's recommended specifications, provided that the requirements:

(a) Do not apply when the primary purpose of the motor vehicle service is fueling vehicles; and

(b) Do not require motor vehicle service providers to purchase equipment to check and inflate tire pressure.

(5) The commission may adopt restrictions on engine use by commercial ships while at port, and requirements that ports provide alternatives to engine use such as electric power, provided that:

(a) Engine use shall be allowed when necessary to power mechanical or electrical operations if alternatives are not reasonably available;

(b) Engine use shall be allowed when necessary for reasonable periods due to emergencies and other considerations as determined by the commission; and

(c) The requirements must be developed in consultation with representatives of Oregon ports and take into account operational considerations, operational agreements, international

protocols and limitations, the ability to fund the purchase and use of electric power equipment and the potential effect of the requirements on competition with other ports.

(6) In adopting rules under this section, the commission shall evaluate:

(a) Safety, feasibility, net reduction of greenhouse gas emissions and cost-effectiveness;

(b) Potential adverse impacts to public health and the environment, including but not limited to air quality, water quality and the generation and disposal of waste in this state;

(c) Flexible implementation approaches to minimize compliance costs; and

(d) Technical and economic studies of comparable greenhouse gas emissions reduction measures implemented in other states and any other studies as determined by the commission.

(7) The provisions of this section do not apply to:

(a) Motor vehicles registered as farm vehicles under the provisions of ORS 805.300.

(b) Farm tractors, as defined in ORS 801.265.

(c) Implements of husbandry, as defined in ORS 801.310.

(d) Motor trucks, as defined in ORS 801.355, used primarily to transport logs.

SECTION 4. Except as provided in section 5 of this 2009 Act, section 3 of this 2009 Act becomes operative on January 1, 2011.

SECTION 5. The Environmental Quality Commission may adopt rules before the operative date specified in section 4 of this 2009 Act or take any action before the operative date specified in section 4 of this 2009 Act that is necessary to carry out the provisions of section 3 of this 2009 Act. Any rules adopted by the commission under this section do not become operative until on or after January 1, 2011.

SECTION 6. (1) As used in this section:

(a) "Greenhouse gas" has the meaning given that term in ORS 468A.210.

(b) "Low carbon fuel standards" means standards for the reduction of greenhouse gas emissions, on average, per unit of fuel energy.

(c) "Motor vehicle" has the meaning given that term in ORS 801.360.

(d) "PADD 5 region" means the Petroleum Administration for Defense District 5 states of Arizona, Nevada, Oregon and Washington.

(2)(a) The Environmental Quality Commission may adopt by rule low carbon fuel standards for gasoline, diesel and fuels used as substitutes for gasoline or diesel.

(b) The commission may adopt the following related to the standards, including but not limited to:

(A) A schedule to phase in implementation of the standards in a manner that reduces the average amount of greenhouse gas emissions per unit of fuel energy of the fuels by 10 percent below 2010 levels by the year 2020;

(B) Standards for greenhouse gas emissions attributable to the fuels throughout their lifecycles, including but not limited to emissions from the production, storage, transportation and combustion of the fuels and from changes in land use associated with the fuels;

(C) Provisions allowing the use of all types of low carbon fuels to meet the low carbon fuel standards, including but not limited to biofuels, biogas, compressed natural gas, gasoline, diesel, hydrogen and electricity;

(D) Standards for the issuance of deferrals, established with adequate lead time, as necessary to ensure adequate fuel supplies;

(E) Exemptions for liquefied petroleum gas and other alternative fuels that are used in volumes below thresholds established by the commission;

(F) Standards, specifications, testing requirements and other measures as needed to ensure the quality of fuels produced in accordance with the low carbon fuel standards, including but not limited to the requirements of ORS 646.910 to 646.923 and administrative rules adopted by the State Department of Agriculture for motor fuel quality; and

(G) Adjustments to the amounts of greenhouse gas emissions per unit of fuel energy assigned to fuels for combustion and drive train efficiency.

(c) Before adopting standards under this section, the commission shall consider the low carbon fuel standards of other states, including but not limited to Washington, for the purpose of determining schedules and goals for the reduction of the average amount of greenhouse gas emissions per unit of fuel energy and the default values for these reductions for applicable fuels.

(d) The commission shall provide exemptions and deferrals as necessary to mitigate the costs of complying with the low carbon fuel standards upon a finding by the commission that the 12-month rolling weighted average price of gasoline or diesel in Oregon is not competitive with the 12-month rolling weighted average price in the PADD 5 region.

(3) In adopting rules under this section, the Environmental Quality Commission shall evaluate:

(a) Safety, feasibility, net reduction of greenhouse gas emissions and cost-effectiveness;

(b) Potential adverse impacts to public health and the environment, including but not limited to air quality, water quality and the generation and disposal of waste in this state;

(c) Flexible implementation approaches to minimize compliance costs; and

(d) Technical and economic studies of comparable greenhouse gas emissions reduction

measures implemented in other states and any other studies as determined by the commission.

(4) The provisions of this section do not apply to:

(a) Motor vehicles registered as farm vehicles under the provisions of ORS 805.300.

(b) Farm tractors, as defined in ORS 801.265.

(c) Implements of husbandry, as defined in ORS 801.310.

(d) Motor trucks, as defined in ORS 801.355, used primarily to transport logs.

SECTION 7. (1) Except as provided in subsection (2) of this section, section 6 of this 2009 Act becomes operative on July 1, 2011.

(2) The Environmental Quality Commission may adopt rules before the operative date specified in subsection (1) of this section or take any action before the operative date specified in subsection (1) of this section that is necessary to carry out the provisions of section 6 of this 2009 Act. Any rules adopted by the commission under this section do not become operative until on or after July 1, 2011.

SECTION 8. Sections 6 and 7 of this 2009 Act are repealed on December 31, 2015.

SECTION 9. (1) The Department of Environmental Quality shall report on the implementation of sections 3 and 6 of this 2009 Act to:

(a) The interim legislative committees on environment and natural resources on or before December 31, 2010; and

(b) The Seventy-sixth, Seventy-seventh and Seventy-eighth Legislative Assemblies in the manner provided by ORS 192.245.

(2) The reports required under subsection (1) of this section must contain a description of:

(a) Rules adopted under sections 3 and 6 of this 2009 Act;

(b) The manner in which the Environmental Quality Commission complied with the requirements of sections 3 and 6 of this 2009 Act in adopting the rules;

(c) Significant policy decisions made by the commission in adopting rules under section 3 of this 2009 Act; and

(d) The anticipated effects of the December 31, 2015, repeal of sections 6 and 7 of this 2009 Act on the availability of low carbon fuels and the development of biofuels production facilities and electric vehicle infrastructure in Oregon.

SECTION 10. (1) There is created the Metropolitan Planning Organization Greenhouse Gas Emissions Task Force consisting of 16 members appointed as follows:

(a) The President of the Senate shall appoint two members from among members of the Senate.

(b) The Speaker of the House of Representatives shall appoint two members from among members of the House of Representatives.

(c) The Governor shall appoint the following members:

(A) One representative from each of the six metropolitan planning organizations in this state, at least three of whom must be elected local government officials.

(B) Four members who are representatives of transportation and land use stakeholders.

(C) The chairperson of the Oregon Transportation Commission.

(D) The chairperson of the Land Conservation and Development Commission.

(2) The task force shall:

(a) Study and evaluate the development of alternative land use and transportation scenarios that accommodate planned population and employment growth in those areas of the state that are served by metropolitan planning organizations while achieving a reduction in greenhouse gas emissions from motor vehicles with a gross vehicle weight rating of 10,000 pounds or less. The task force shall take into account the amount of greenhouse gas emissions caused by motor vehicles with a gross vehicle weight rating of 10,000 pounds or less that need to be reduced by 2035 in order to meet the goals stated in ORS 468A.205. The task force shall take into consideration the reductions in vehicle emissions that are likely to result by 2035 from the use of improved vehicle technologies and fuels.

(b) Evaluate potential fiscal and other resource needs to implement land use and transportation scenarios described in paragraph (a) of this subsection, including staffing and resources needed by state agencies, local governments and each metropolitan planning organization.

(c) Evaluate impediments to implementing land use and transportation scenarios that reduce greenhouse gas emissions.

(d) Recommend legislation to the interim Legislative Assembly committees related to transportation and to the environment establishing a process for adoption and implementation of plans for reducing greenhouse gas emissions caused by motor vehicles with a gross vehicle weight rating of 10,000 pounds or less by 2035, in an amount sufficient to meet the goals stated in ORS 468A.205, in each area of this state served by a metropolitan planning organization, including a schedule for the planning process and an estimate of funding required to complete the planning process.

(3) A majority of the members of the task force constitutes a quorum for the transaction of business.

(4) Official action by the task force requires the approval of a majority of the members of the task force.

(5)(a) The President of the Senate and the Speaker of the House of Representatives shall serve as cochairpersons of the task force.

(b) The chairperson of the Oregon Transportation Commission and the chairperson of the Land Conservation and Development Commission shall serve as vice chairpersons of the task force.

(6) If there is a vacancy for any cause, the appointing authority shall make an appointment to become immediately effective.

(7) The task force shall meet at times and places specified by the call of the chairpersons.

(8) The task force may adopt rules necessary for the operation of the task force.

(9) The task force shall submit a report with recommendations for legislation to the interim legislative committees related to transportation and to the environment and natural resources prior to January 1, 2010.

(10) The Department of Transportation and the Department of Land Conservation and Development shall provide staff support to the task force. The Department of Transportation shall use available federal flexible funds for the staffing and support of the task force.

(11) Members of the task force who are not members of the Legislative Assembly are not entitled to compensation, but may be reimbursed for actual and necessary travel and other expenses incurred by them in the performance of their official duties in the manner and amounts provided for in ORS 292.495. Claims for expenses incurred in performing functions of the task force shall be paid out of funds appropriated to the Department of Transportation for purposes of the task force.

(12) All agencies of state government, as defined in ORS 174.111, are directed to assist the task force in the performance of its duties and, to the extent permitted by laws relating to confidentiality, to furnish such information and advice as the members of the task force consider necessary to perform their duties.

(13) For the purposes of this section, "metropolitan planning organization" means an organization located wholly within the State of Oregon and designated by the Governor to coordinate transportation planning in an urbanized area of the state pursuant to 49 U.S.C. 5303(c).

**SECTION 11.** Section 10 of this 2009 Act is repealed on the date of the convening of the next regular biennial legislative session.

**SECTION 12.** This 2009 Act being necessary for the immediate preservation of the public peace, health and safety, an emergency is declared to exist, and this 2009 Act takes effect on its passage.

Approved by the Governor July 22, 2009
Filed in the office of Secretary of State July 22, 2009
Effective date July 22, 2009

---

## CHAPTER 755

### AN ACT                    HB 2013

Relating to task force on public school facilities; appropriating money; limiting expenditures; and declaring an emergency.

Be It Enacted by the People of the State of Oregon:

**SECTION 1.** (1) The Oregon School Facilities Task Force is established to conduct a study on the status of public school facilities and make recommendations as described in section 2 of this 2009 Act.

(2) The task force consists of 15 members as follows:

(a) The State Treasurer, or the designee of the State Treasurer.

(b) The President of the Senate shall appoint to the task force the chairperson of the Senate committee on education.

(c) The Speaker of the House of Representatives shall appoint to the task force the chairperson of the House committee on education.

(d) The Governor shall appoint to the task force the following members:

(A) One architect who specializes in designing school facilities.

(B) One member of a district school board.

(C) Three school facility managers as follows:

(i) One who represents a school district that has fewer than 3,000 students;

(ii) One who represents a school district that has 3,000 or more students, but not more than 10,000 students; and

(iii) One who represents a school district that has more than 10,000 students.

(D) One superintendent who was a superintendent for a school district that, within the previous five years, constructed a school facility and incurred bonded indebtedness for the purpose of financing the school facility.

(E) One civil engineer.

(F) One bond counsel or bond sales specialist.

(G) One general contractor who constructed a school facility within the previous five years.

(H) One public health official.

(I) Two members of the public.

(3) The State Treasurer, or the designee of the State Treasurer, and members of the Legislative Assembly who serve on the task force are nonvoting members of the task force and may act in an advisory capacity only.

(4) A majority of the voting members of the task force constitutes a quorum for the transaction of business.

(5) Official action by the task force requires the approval of a majority of the voting members of the task force.