1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ROCKY MOUNTAIN FARMERS UNION, REDWOOD COUNTY MINNESOTA CORN AND SOYBEAN GROWERS, PENNY NEWMAN GRAIN, INC., GROWTH ENERGY, RENEWABLE FUELS ASSOCIATION, REX NEDEREND, FRESNO COUNTY FARM BUREAU, NISEI FARMERS LEAGUE, and CALIFORNIA DAIRY CAMPAIGN, | CASE NO. CV-F-09-2234 LJO DLB **ORDER ON DEFENDANT'S MOTION TO DISMISS** (Doc. 23) |
| Plaintiffs, | |
| vs. | |
| JAMES N. GOLDSTENE, Executive Officer of the California Air Resources Board, | |
| Defendant. | |

| | |
|---|---|
| NATIONAL PETROCHEMICAL & REFINERS ASSOCIATION, AMERICAN TRUCKING ASSOCIATIONS, CENTER FOR NORTH AMERICAN ENERGY SECURITY, and THE CONSUMER ENERGY ALLIANCE, | CASE NO. CV-F-10-163 LJO DLB **ORDER ON DEFENDANTS' MOTION TO DISMISS** (Doc. 25) |
| Plaintiffs, | |
| vs. | |
| JAMES GOLDSTENE, Executive Officer of the California Air Resources Board, MARY D. NICHOLS, DANIEL SPERLING, KEN YEAGER, DORENE D'ADAMO, BARBARA RIORDAN, JOHN R. BALMES, LYDIA H. KENNARD, SANDRA BERG, RON ROBERTS, RONALD O. LOVERIDGE, member of the California Air Resources Board; ARNOLD SCHWARZENEGGER, Governor of the state of Caliofrnia, and EDMUND BROWN, Attorney General of the state of California, | |
| Defendants. | |

and related intervenor actions and amici.

1

**INTRODUCTION**

Plaintiffs challenge the low carbon fuel standard ("LCFS") regulations promulgated by defendant California Air Resource Board ("CARB")[1] to implement provisions of California Assembly Bill 32 ("AB 32"), California's Global Warming Solutions Act of 2006, Cal. Heath & Saf. Code, §38500 et seq. California's LCFS focuses on the "carbon intensity" of fuels to estimate emissions related to a fuel's lifecycle, including greenhouse gases ("GHGs") emitted when the fuel is extracted, refined, and transported to California. Plaintiffs allege that the LCFS conflicts with and is preempted by federal law, including the Energy Independence and Security Act of 2007 ("EISA"), in violation of the Supremacy Clause, U.S. Const. Article VI, para. 2, and interferes with the regulation of interstate commerce, in violation of the Commerce Clause, U.S. Const., Art. I, sec. 8, cl. 3.

In moving to dismiss this action, pursuant to Fed. R. Civ. P. 12(b)(6), defendants argues that the United States Congress expressly authorized California to regulate fuels under the Clean Air Act, 42 U.S.C. §7401 et seq.. Defendants rely on 42 U.S.C. §7545(c)(4)(B) ("Section 211(c)(4)(B)"), and Clean Air Act savings clauses, to contend that because Congress has granted California express authority to regulate fuels, the LCFS cannot be preempted by federal law. Moreover, defendants assert that Section 211(c)(4)(B) authorizes California to violate the dormant Commerce Clause.

Having considered the parties' arguments, amici curiae briefs, and relevant legal authority, this Court finds that Section 211(c)(4)(B) provides no express authority for California's LCFS. Section 211(c)(4)(B), a narrow preemption exemption related to the regulation of "components of fuel and fuel additives," coextensive with the preemption provision of Section 211(c)(4)(A), is inapplicable to the LCFS. Moreover, plaintiffs state a claim that the effects of California's LCFS conflict with Section 211(o) of the Clean Air Act to satisfy their burden of pleading a preemption cause of action. In addition, this Court rejects defendants' contention that Section 211(c)(4)(B) authorizes California to violate the Commerce Clause. Accordingly, this Court DENIES defendants' motions to dismiss.

---

[1] Collectively, defendants are James N. Goldstene, in his official capacity as Executive Director of the California Resources Board ("CARB"); Mary D. Nichols, Daniel Sperling, Ken Yeager, Dorene D'Adamo, Barbara Riordan, John R. Balmes, Lydia H. Kennard, Sandra Berg, Ron Roberts, John G. Telles, and Ronald O. Loveridge, in their official capacities as members of CARB; Arnold Schwarzenegger, in his official capacity as Governor of the State of California, and Edmund G. Brown, Jr., in his official capacity as California Attorney General.

**BACKGROUND**

**Clean Air Act**

Over fifty years ago, Congress approved the Clean Air Act "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. §7401(b)(1).   The Clean Air Act is a comprehensive federal legislation that covers air pollution prevention and control, emissions standards, acid rain reduction, permits, and stratospheric ozone protection. *See generally*, Title 42 of the United States Code, Chapter 85.   In the area of emissions standards, Congress has enacted regulations related to motor vehicle emissions and fuel standards, air craft emissions standards, and clean fuel vehicles. Title II of the Clean Air Act.

Section 211 of the Clean Air Act, 42 U.S.C. §7545, sets forth the federal statutory framework for regulating motor vehicle fuels and fuel additives.   Section 211 authorizes the United States Environmental Protection Agency ("EPA") to regulate fuels to control vehicle emissions and to ensure a national market for fuels.  42 U.S.C. 7545.  Section 211 contains numerous, diverse provisions. Section 211(a) gives the EPA the authority to require registration of any fuel or fuel addition.  Section 211(c) allows the EPA to "control or prohibit" any fuel or fuel additive that is found to contribute to air pollution or water pollution.  Section 211(g) regulates the use of leaded gasoline.  Section 211(k) sets forth a fuels program for the reformulation of gasoline.  Section 211(*l*) requires that gasoline contain detergent additives, pursuant to federal specifications, to prevent the accumulation of engine and fuel supply deposits.  Section 211(m) requires that, during the winter months, gasoline sold in certain areas have an oxygen content that equals or exceeds 2.7 percent by weight.

The Energy Policy Act of 2005 ("EPAct") modified Section 211 of the Clean Air Act by establishing a national renewable fuel standard program ("RFS"), codified in 42 U.S.C. §7545(o) ("Section 211(o)").  The RFS under EPAct established a renewable fuel volume mandate to require 7.5 billion gallons of renewable fuels to be blended into gasoline by 2010.  The Energy Independence and Security Act of 2007 ("EISA") modified the RFS in a number of ways to create the second renewable fuel standard program ("RFS2").

Pursuant to EISA, RFS2 requires the EPA to consider lifecycle GHG emissions and to set lifecycle GHG performance thresholds.  EISA defines the term "lifecycle greenhouse gas emissions"

3

as:

> the aggregate quantity of greenhouse gas emissions (including direct emissions and significant indirect emissions such as significant emissions from land use changes), as determined by the Administrator, related to the full fuel lifecycle, including all stages of fuel and feedstock production and distribution, from feedstock generation or extraction through the distribution and delivery and use of the finished fuel to the ultimate consumer, where the mass values for all greenhouse gases are adjusted to account for their relative global warming potential.

42 U.S.C. §7545(o)(1)(H).  To ensure that each category of renewable fuels emits fewer greenhouse gases than the petroleum fuel it replaces, Section 211(o)(2) requires "that transportation fuel sold or introduced into commerce in the United States...on an annual average basis, contains at least the applicable volume of renewable fuel, advanced biofuel, cellulosic biofuel, and biomass-based diesel" mandated by EISA.

Section 211(o) requires renewable fuel facilities to achieve "at least a 20 percent reduction in lifecycle greenhouse gas emissions compared to baseline lifecycle greenhouse gas emissions."  42 U.S.C. §7545(o)(2)(A)(i).  Because the existing renewable fuel infrastructure of United States ethanol would not meet these standards, and to further RFS2's goals to reduce the dependence of the United States on energy imported from volatile regions of the worlds and to stabilize the cost and availability of energy, Section 211(o) exempts certain United States corn ethanol biorefineries from this provision.[2]  Biorefineries that were either in production, or had completed construction, at the time the provision was enacted were not required to comply with EISA's mandate to reduce GHS lifecycle emissions by 20%.  *Id*.  Plaintiffs contend that California's LCFS conflicts with this provision by requiring existing biorefineries who are exempt from the federal lifecycle emissions reduction regulation to comply with California's lifecycle emissions reduction standards.  In addition, Plaintiffs argue that California's LCFS frustrates the goals of Section 211(o) to provide for independence from foreign fuel and energy security.

### Clean Air Act and California

The Clean Air Act "encourage[s] or otherwise promote[s] reasonable Federal, State, and local government actions, consistent with the provisions of this Act, for pollution prevention." 42 U.S.C.

---

[2]Ethanol made from corn is a "renewable" fuel when it is produced from sources such as corn and other crops, because those crops can be replanted to produce additional fuel.  At present, approximately 98% of United States ethanol is made from corn grown in the United States, called "No. 2 corn."  No. 2 corn is also the type of corn used in animal feed, but is not the "sweet" type of corn used for human consumption.

4

§7401(c). Thus, although the Clean Air Act creates national standards and programs, it "generally seeks to preserve state authority in the area of pollution." *Oxygenated Fuels Assoc., Inc. v. Davis*, 331 F.3d 665, 670 (9th Cir. 2003) ("*Oxygenated Fuels*").  In some areas, federal, state and local governments work together to implement and enforce provisions of the Clean Air Act.  For example, the Clear Air Act grants the EPA the authority to set national ambient air quality standards, but allows states to create plans to meet those standards.  *Id*.  The Clean Act shares jurisdiction with states in some instances because "air pollution prevention...and air pollution control at its source is the primary responsibility of States and local governments." 42 U.S.C. §7401(a)(3).  Based on these principles, the Clean Air Act's savings clause provides a "substantial retention of State authority." *Oxygenated Fuels*, 331 F.3d at 671. 42 U.S.C. §7416 provides:

> Except as otherwise provided in sections 1857c-10(c), (e), and (f) (as in effect before August 7, 1977), 7543, 7545(c)(4), and 7573 of this title (preempting certain State regulation of moving sources) **nothing in this chapter shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution**; except that if an emission standard or limitation is in effect under an applicable implementation plan or under section 7411 or section 7412 of this title, such State or political subdivision may not adopt or enforce any emission standard or limitation which is less stringent than the standard or limitation under such plan or section.

*Id*. (emphasis added).

As the only state to have adopted emissions standards prior to March 30, 1966, California enjoys special consideration under the Clean Air Act.  For example, although Section 209(a) of the Clean Air Act, 42 U.S.C. §7543(a), prohibits states from adopting or enforcing standards related to the control of emissions for new motor vehicles, Section 209(b) allows California to request a waiver from this preemption provision.  Similarly, Section 211(c) "explicitly contemplates that California can, in some instances, place restrictions on fuel additives." *Oxygenated Fuels*, 665 F.3d at 671.  Section 211(c) (related to offensive fuels and fuel additives) contains the following preemption provision:

> Except as otherwise provided in subparagraph (B) or (C), **no State (or political subdivision thereof) may prescribe or attempt to enforce, for purposes of motor vehicle emission control, any control or prohibition respecting any characteristic or component of a fuel or fuel additive in a motor vehicle or motor vehicle engine**– (i) if the Administrator has found that no control or prohibition of the characteristic or component of a fuel or fuel additive under paragraph (1) is necessary and has publishing his finding in the Federal Register, or

5

1   (ii) if the Administrator has prescribed under paragraph (1) a control or prohibition
2   application to such characteristic or component of a fuel or fuel additive, unless the State
    prohibition or control is identical to the prohibition or control prescribed by the
3   Administrator.

4   42 U.S.C. §7545(c)(4)(A). Congress created an express exemption from this preemption for California,

5   as it refers to the Section 209(b) waiver:

6   **Any state for which application of [Section 209(a)] has at any time been waived
    under [Section 209(b)] may at any time prescribe and enforce, for the purpose of
7   motor vehicle emission control, a control or prohibition respecting any fuel or fuel
    addition.**

8   42 U.S.C. §7545(c)(4)(B) ("Section 211(c)(4)(B)").   California is the only state that qualifies for the

9   Section 209 waiver or Section 211(c)(4)(A) preemption exemption. *See, Davis v. E.P.A,* 348 F.3d 772,

10  777 n. 1 (9th Cir. 2003); *Engine Mftrs. Ass'n v. United States*, 88 F.3d 1075, 1079 n. 9 (D.C. Cir. 1996).

11                        **California's Global Warming Solutions Act of 2006**

12      California passed the Global Warming Solutions Act of 2006 to address public concern about

13  the potential for man-made climate change or global warming.[3]  AB 32 has the goal of reducing GHG[4]

14  emissions in California to 1990 levels by the year 2020.  In an effort to attain these goals, CARB is

15  charged to develop and implement regulations in a number of areas.

16      Earlier this year, CARB approved a set of regulations to govern the marketing of gasoline-

17  ethanol blends sold in California, called the "low carbon fuel standard" regulations.  The LCFS focuses

18  on the carbon intensity of all feedstocks and fuel sources used in California.  It establishes different

19  standards for gasoline and diesel fuels, and provides for a gradual implementation of the fuel standards

20  for both, with a goal to reduce the carbon intensity of fuel by 10% by the year 2020.  The LCFS requires

21  providers to comply with reporting requirements which obligate them to identify for fuels sold or

22  imported into California, the type of fuels, whether the fuel is blended, and the fuel's production

23  process.  Providers are required to calculate the "carbon intensity" of each fuel component.  Reductions

24  in the average carbon intensity are mandated to begin in 2011, and the amount increases through the

26      [3]Counsel for all parties appear to accept as fact that global warming is without debate or dispute.

27      [4]Justice Stevens explains that the term "greenhouse gases" is used to describe certain gases that when "released into
28  the atmosphere,...act[] like a ceiling of a greenhouse, trapping solar energy and retarding the escape of reflected heat."
    *Massachusetts v. EPA*, 549 U.S. 497, 505 (2007).

6

1  year 2020.  Fuel providers may meet carbon intensity standards by blending low-carbon ethanol into

2  gasoline or buying credits generated from another fuel provider that has credits.

3      Carbon intensity does not measure how much carbon a fuel contains.  Rather, carbon intensity

4  is defined as "the amount of lifecycle greenhouse gas emissions, per unit of energy of fuel delivered,

5  expressed in grams of carbon dioxide per megajoule."  Cal. Code Regs. Title 17 ("LCFS") Section

6  95481(a)(11).  The California regulation defines "lifecycle greenhouse gas emissions" as the:

> aggregate quantity of greenhouse gas emissions (including direct emissions and
> significant indirect emissions such as significant emissions from land use changes), as
> determined by the Executive Officer, related to the full fuel lifecycle, including all stages
> of fuel and feedstock production and distribution, from feedstock generation or
> extraction through the distribution and delivery and use of the finished fuel to the
> ultimate consumer, where the mass values for all greenhouse gases are adjusted to
> account for their relative global warming potential.

11  LCFS Section 95481(a)(28).  The lifecycle analysis "includ[es] all stages of fuel and feedstock

12  production and distribution, from feedstock generation or extraction through the distribution and

13  delivery and use of finished fuel to the ultimate consumer." LCFS Section 95481(a)(28).  The direct

14  effects typically include feedstock generation or extraction (agricultural production such as planting and

15  harvesting of plant feedstocks for biofules or extraction for fossil fuels); conversion to finished fuel or

16  fuel blendstock (conversion to ethanol from plants or refining of petroleum); distribution; storage;

17  delivery; and final use of the finished fuel by the end user.  In short, carbon intensity is an estimate of

18  emissions related to a fuel's lifecycle that focuses on GHGs emitted when the transportation fuel is

19  extracted, refined, and transported to California.

20      To accomplish the carbon intensity reduction, the LCFS has assigned carbon intensity scores for

21  fuels, which are embodied in the "Lookup Table" included in LCFS Section 95486 (Appendix A to this

22  opinion).[5]  As applicable to these actions, the Lookup Table assigns a higher carbon intensity score to

23  corn-derived ethanol from the Midwest than it assigns to corn-derived ethanol from California.  The

24  Lookup Table assigns the lowest carbon intensity score to sugarcane-derived ethanol from Brazil.  The

25  difference in the carbon intensity scores of corn-based ethanol from California, corn-based ethanol

---

[5]The carbon intensity scores will affect the "credits" used in California's proposed "cap and trade" system.  The LCFS establishes an annual limit on carbon intensity applicable to the overall fuel mix of each fuel blender, refiner, and importer, with that limit decreasing each year through 2020.  Those whole fuel mix has a carbon intensity below the limit can generate credits that can be traded with those whose fuel mix has a carbon intensity above the limit.

1    outside of California, and sugarcane-based ethanol from Brazil California's is based on CARB's

2    lifecycle analysis of these fuels.

3                                  **Ethanol and Carbon Intensity**

4           There are no physical or chemical differences between ethanol made from sugarcane and ethanol

5    made from corn or other sources.  Nevertheless, the Lookup Table carbon intensity scores for ethanol

6    vary widely.[6]  A variety of factors account for the these differences.

7           CARB assigned a carbon intensity value to ethanol made from corn based on its estimate of the

8    "indirect effects" of ethanol produced from corn in the United States.  CARB arrived at this estimate

9    using an economic theory called the "indirect land-use change" ("ILUC").  Under the ILUC theory, the

10   production of corn ethanol is assumed to require the dedication of cropland to grown the necessary corn.

11   The use of the cropland to produce corn for ethanol is assumed to require increases in crop acreage for

12   corn and grains otherwise needed for animal nutrition.  CARB's ILUC theory further assumes that the

13   process of clearing land to grow more corn and other grains will release GHG emissions into the

14   atmosphere, and that the removal of any trees or other pre-existing vegetation will reduce the "carbon

15   sinks" available to absorb carbon dioxide.  All corn ethanol listed in the Lookup Table is assigned an

16   "indirect emissions" carbon penalty of 30 grams of carbon dioxide-equivalent emissions per megajoule

17   of energy.

18          The LCFS regulation assigns different carbon intensity scores to more than a dozen corn ethanol

19   "pathways" in what are the direct effects of GHG emissions.  Numerous distinctions are drawn among

20   different categories of corn ethanol producers.  Significant to this litigation, the Lookup Table assigns

21   different carbon intensity scores to "California" and "Midwest" corn pathways.  This distinction is based

22   on what CARB presents as inherently lower GHG emissions between California and Midwest ethanol

23   based on transportation (CARB notes that California corn ethanol does not have to travel as far to reach

24   the end-user in California).  CARB further assumes that California corn ethanol producers have better

25   access to electricity produced from hydropower and nuclear power plants than Midwestern corn ethanol

26

27          [6]According to the EPA lifecycle analysis, sugarcane ethanol made in Brazil will reduce GHG emissions by
     approximately 61% when compared to traditional gasoline, while corn ethanol made in the United States will reduce
     emissions by approximately 21%. 75 Fed. Reg. 14,786. Because of its low carbon intensity score, the EPA designates
28   sugarcane ethanol as an "advanced biofuel" whereas ethanol from corn is a "renewable fuel."

1   producers, and California producers will be at least as efficient as Midwestern producers in the use of
2   electricity.  Plaintiffs question these assumptions.

3       In addition to the "California" and "Midwest" distinction of corn ethanol, the Lookup Table
4   provides for other distinctions, as well.  For example, the Lookup Table distinguishes between corn
5   ethanol producers based on whether they use natural gas, coal, or renewable "biomass" fuels to power
6   the ethanol plant for conversion of corn to ethanol.  CARB further accounts for whether the corn ethanol
7   plant produces "wet mill" or "dry mill."  Mill refers to a by-product of the conversion process, called
8   "distillers grains."  Distillers grains are sold in a separate market as an animal nutrient, and can be sole
9   either wet or dry.  CARB assigns a higher GHG level to corn ethanol plants that produce dry will,
10  because CARB assumes that the heat used to dry the distillers grain requires additional energy.

11      The United States' chief rival in the global ethanol industry is Brazil, which manufactures
12  ethanol from sugarcane.  CARB and the EPA assign ethanol from sugarcane the lowest carbon intensity
13  score for a variety of reasons.  First, the tailpipe emissions from combustion of sugarcane ethanol is
14  considered to be zero, because the carbon dioxide released from combustion is estimated to offset by
15  the absorption of carbon dioxide from the feedstock.  Second, the energy consumed and GHGs resulting
16  from planting and growing sugarcane (machinery, fertilizer, etc.) is lower than for other crops, because
17  sugarcane is harvested by cutting off the stalks without destroying the root system.  Sugarcane is
18  replanted every five to seven years, whereas corn is replanted every year.  Third, harvesting practices
19  have allowed for the export of electricity from sugarcane ethanol plants in Brazil using energy from
20  burning the crop residue (leaves and stalks).  CARB's ILUC analysis assigns an "indirect emissions"
21  carbon penalty of 46 grams of carbon dioxide-equivalent emissions per megajoule of energy to
22  sugarcane ethanol from Brazil.  Indirect effects include deforestation of the Amazon rainforest.

23                              **Plaintiffs' allegations**

24      In *Rocky Mountain*, 09cv2234, plaintiffs allege that California's LCFS is designed to benefit in-
25  state interests to the detriment of out-of-state ethanol producers, while producing no local environmental
26  benefits.  Plaintiffs contend that the LCFS will close California's borders to traditional corn ethanol
27  produced in the Midwest, and regulate improperly extraterritorial conduct that has no effect on the corn
28  ethanol brought into the state, thereby balkanizing the domestic transportation fuel market and,

1   ultimately, crushing the corn ethanol industry.  Plaintiffs conclude that these actions and their

2   consequences would frustrate Congress' clear objectives in adopting EISA, which fosters United States

3   independence on foreign sources of fuel and strengthens national security, and would violate the

4   Commerce Clause.

5          In *National Petrochemical*, 10cv163, plaintiffs argue that the LCFS violates the Commerce

6   Clause on three grounds: (1) the LCFS discriminates, both on its face and as applied, against fuels

7   produced in other states and other countries; (2) the LCFS regulates interstate and foreign commerce;

8   and (3) the LCFS imposes substantial burdens on interstate and foreign commerce that are clearly

9   excessive when measured against the purported local benefits.  In addition, plaintiffs argue that the

10  LCFS conflicts with, and presents an obstacle to the accomplishment of Congress' goals in, Section

11  211(o).

12         Plaintiffs seek declaratory judgment that the LCFS violates federal law, and also seek njunctive

13  relief to enjoin defendants from implementing or enforcing the LCFS.

### PARTIES

### Rocky Mountain et al, v. Goldstene, 09cv2234

16         The plaintiffs in *Rocky Mountain* represent groups that have an interest in protecting the corn

17  ethanol industry.  Plaintiffs are corn growers (California and out-of-state farmers), users, merchants and

18  marketers of distillers grain (a by-product created during the corn-to-ethanol process that is fed to cows),

19  producers of corn ethanol, and importers of ethanol into California from other states.

20                          *"Farmer Plaintiffs"*

21         Rocky Mountain Farmers Union is a cooperative association representing family farmers and

22  ranchers in Wyoming, Colorado, and New Mexico.  Its members include farmers who grow No. 2 corn

23  for use in producing ethanol nationwide.

24         Redwood County Minnesota Corn and Soybean Growers is a not-for-profit corporation whose

25  members, located in Redwood County, Minnesota, include farmers who grow No. 2 corn for use in

26  producing ethanol nationwide.

27         Penny Newman Grain, Inc. ("Penny Newman") is a leading merchant in the market for grains

28  and feed by-products in the southern San Joaquin Valley and worldwide.  Penny Newman is

10

1    headquartered in Fresno, California and has other offices in California and Tennessee and commodities

2    handling and storage facilities in Hanford and Bakersfield.

3         Rex Nederend is a farmer and rancher who owns a dairy near Tipton, California and ranches near

4    Wasco and Lemoore, California.  He purchases and uses distillers' grains at his dairy and he grows No.

5    2 corn that, when market conditions permit him to do so, he would attempt to sell to biorefineries for

6    use in producing ethanol.

7         Fresno County Farm Bureau ("Farm Bureau") is a non-profit membership organization that

8    advocates for farmers and farming interests in Fresno County.  Its members include corn growers who,

9    when market conditions permit them to do so, would attempt to sell to biorefineries for use in producing

10   ethanol.  Farm Bureau's members also include dairies that purchase and use distillers grains.

11        Nisei Farmers League ("Nisei") is an organization committed to serving the needs of California

12   agriculture.  With over 1000 members, the organization is headquartered in Fresno, California.  Nisei

13   members include corn growers located in Modesto and Tulare who, when conditions permit them to do

14   so, would attempt to sell to biorefineries for use in producing ethanol.  Nisei's members also include

15   dairies in Kings, Tulare, and Fresno counties that purchase and use distillers' grains.

16        California Dairy Campaign ("CDC") represents the views and interests of California Dairy

17   Farmers.  Headquartered in Turlock, CDC has approximately 300 members.  Its members include dairy

18   farms located in Madera, Kings, Fresno, Tulare, and Kern Counties that purchase and use distillers

19   grains.  Because the milk price is heavily regulated, CDC members are sensitive to the prices of

20   commodities.  CDC members are concerned that the LCFS and its impact on gasoline prices will

21   increase the costs of their inputs.

22        Rocky Mountain Farmers Union, Minnesota Growers Association, Mr. Nederend, Nisei, Farm

23   Bureau, and CDC are collectively referred to as the "farmer plaintiffs."

24                          *Corn Ethanol Industry Plaintiffs*

25        Growth Energy in a non-profit corporation committed to the promise of agriculture and growing

26   America's economy through cleaner, greener energy.  Formed in 2009, Growth Energy and its members

27   include firms that produce ethanol in motor fuels sold in Fresno County and other partes of the state as

28   well as companies who provide equipment and technology used to produce ethanol from corn.

1  Renewable Fuels Association is a trade association whose members include a broad cross-section

2  of businesses, individuals, and organizations dedicated to the expansion of the fuel ethanol industry in

3  the United States.  Its members include producers of ethanol for use in motor vehicle fuels sold in

4  Fresno County and other parts of California; importers of ethanol into California from other states;

5  growers of corn for use in the production of ethanol; and marketers of distillers grains and other feed

6  co-products in California.

7  *Defendant*

8  James N. Goldstene, in his official capacity as Executive Director of CARB.

9  **National Petrochemical & Refiners Association, et al. v. Goldstene, 10cv163**

10  The plaintiffs in National Petrochemical represent United States petrochemical refiners and

11  manufacturers, the American trucking industry, and organizations who promote energy security and the

12  development of non-conventional fuels domestically.  The United States petrochemical refiners and

13  manufacturers are interested to protect the current infrastructure and processes for gasoline production

14  in the United States.  The trucking industry is interested in continuing and maintaining the interstate

15  transport of fuels, including corn ethanol, into California.  The energy security plaintiffs are interested in

16  protecting, encouraging, and developing the domestic production of energy.

17  *Petrochemical Refiners and Manufacturers Plaintiff*

18  National Petrochemical & Refiners Association ("NPRA") is a trade association of more than

19  450 companies.  NPRA members include virtually all United States refiners and petrochemical

20  manufacturers.  NPRA members supply consumers nationwide with a wide variety of products,

21  including gasoline, diesel fuel, and the chemicals that service as "building blocks" in making diverse

22  products such as plastics, clothing, medicine, and computers.  Its members own and brand multiple

23  transportation fuel outlets in the Fresno area.

24  *Trucking Industry Plaintiff*

25  American Trucking Associations ("ATA") is a federation of motor carriers, state trucking

26  associations, and national trucking conferences created to promote and protect the interest of the

27  trucking industry.  ATA encompasses over 30,000 companies and every type and class of motor carrier

28  operation.

12

*"Energy Security" Plaintiffs*

Center for North American Energy Security is a limited liability company organized for the purpose of promoting North American energy security through the responsible development of oil sands, oil shale, and similar so-called "non-conventional" energy resources in North America. CNAES includes members who have a financial interest in such non-conventional resources and/or technologies for developing those resources.

Consumer Energy Alliance in a nonprofit, nonpartisan organization with more than 125 affiliated organizations and tens of thousands of individual grassroots members that support the thoughtful utilization of energy resources to help ensure improved domestic and global energy security and stable prices for consumers. CEA seeks to improve consumer understanding of the nation's energy security, including the need to properly balance our energy needs with environmental and conservation goals and continue efforts to diversify our energy resources.

*Defendants*

James Goldstene, in his official capacity as the Executive Officer of CARB. Mary D. Nichols, Daniel Sperling, Ken Yeager, Dorene D'Adamo, Barbara Riordan, John R. Balmes, Lydia H. Kennard, Sandra Berg, Ron Roberts, John G. Telles, and Ronald O. Loveridge, in their official capacities as members of CARB. The Governor of the State of California, Arnold Schwarzenegger. The Attorney General of the State of California, Edmund G. Brown, Jr.

**Intervenor Defendants**

Natural Resources Defense Council, Inc. ("NRDC"), Sierra Club, and Conservation Law Foundation are intervenor defendants in both cases. All of the intervenor defendants have spent time, money, and energy to promote the passage of AB 32, believing that it will reduce GHGs and reduce the man-made effects of global warming. These organizations are interested to protect the environment and their investment. NRDC and Conversation Law Foundation are represented by David Pettit. Sierra Club is represented by Pat Gallagher.

NRDC is a national non-profit organization. One of NRCD's organizational purposes is to protect the environment and public health. NRCD "spearheaded the effort to pass AB 32 and enact the Global Warming Solutions Act of 2006. NCRD participated in the California LCFS rulemaking process,

13

1    prepared technical analyses responsive to agency proposals, provided written and oral comments at

2    hearings and workshop, and engaged in direct discussions with CARB staff and personnel.  NRDC has

3    a strong and long-standing interest in supporting the LCFS as a means to represent and protect the

4    interest of its members and program interest, and as such, has an interest in the success of the defendant.

5           Sierra Club is a national organization with a purpose to explore, enjoy, and protect the wild

6    places of the Earth, to practice and promote the responsible use of the Earth's ecosystems and resources,

7    and to educate and enlist humanity to protect and restore the quality of the natural and human

8    environments.  Sierra Club's top national priority is its Global Warming and Energy Campaign, which

9    seeks to promote solutions to global warming using current and cutting-edge technologies.

10   Implementing California's LCFS was one of the components of this campaign.  In addition to its efforts

11   in California, the Sierra Club is working with eleven northeastern states to assist in the development of

12   a regional LCFS that is based on the California LCFS.  Those efforts will be severely hampered if the

13   California LCFS program is enjoined.  In sum, Sierra Club has a very strong interest, as part of its

14   overall national campaign aimed at promoting solutions to global warming, to ensure that the California

15   LCFS regulations are upheld in this case.

16          Conservation Law Foundation is a New England environmental advocacy organization that

17   works to solve environmental problems that threaten people, natural resources, and communities of New

18   England.  CLF took a key role in the formulation, adoption and implementation of the Regional

19   Greenhouse Gas Initiative ("RGGI"), a cooperative effort by ten New England and mid-Atlantic states

20   designed to limit greenhouse gas emissions.  RGGI was the first mandatory market-based CO2

21   emissions reduction program in the United States.  CLF has now taken a lead role in advancing the

22   Northeast/Mid-Atlantic regional LCFS, modeled in large part after the California LCFS at issue in this

23   case.  CLF staff testified before CARB, and the Northeast/Mid-Atlantic LCFS initiative was identified

24   by CARB officials as one of the important considerations that supported adoption of a useful California

25   program.  On December 29, 2009, the governors of the ten RGGI states and Pennsylvania signed a

26   Memorandum of Understanding in which the states committed to develop a policy framework for a

27   regional LCFS, followed by a model rule, based on California's LCFS.

28   ///

14

1           **Amici Curiae**

2           *State of Oregon*

3           The State of Oregon is undertaking a variety of strategies to reduce GHG emissions that cause

4    climate change, including development and adoption of an Oregon LCFS.  Plaintiffs' challenge is of

5    particular concern to Oregon because, if accepted by this Court and followed by other courts, it has the

6    potential to affect the State of Oregon's ongoing efforts to protect the health, safety, and welfare of its

7    citizens through the adoption of an Oregon LCFS.  Oregon argues that preemption is not an issue

8    because Congress preserved California's authority to regulate "any fuel" through a special exemption

9    from the preemption provision of the federal Clean Air Act.  Whether the Clean Air Act exempts from

10   preemption any state other than California is not an issue in this case.  The State of Oregon therefore

11   asks this Court not to decide inadvertently the preemption issue with respect to other states.

12          *Brazilian Sugar Cane Industry Association ("UNICA")*

13          UNICA is the leading trade association for the sugarcane industry in Brazil, representing nearly

14   two-thirds of all sugarcane production and processing in that county.  UNICA's members represent the

15   top producers of sugar, ethanol, renewable electricity and other sugarcane co-products in Brazil.

16   UNICA's members exported to the United States approximately 600 million gallons of sugarcane-based

17   ethanol in 2008 for use as transportation fuel.  California's LCFS rules recognize ethanol made from

18   sugarcane to have extremely low carbon intensity, generating lower life-cycle carbon emissions than

19   ethanol made from other biofuels, including corn.  California's LCFS strongly encourages California's

20   fuel distributors to use sugarcane-based ethanol in California.  As a result, UNICA's members share

21   California's interest in the success of the LCFS.  A decision on California's LCFS will have a significant

22   impact on UNICA's members.  In addition, UNICA raises issues of international trade law and policy.

23          *Oregon Petroleum Association*

24          Oregon Petroleum Association ("OPA") is an Oregon association of fuel distributors, retailers,

25   commercial fueling and heating oil markets.  OPA is concerned that a higher carbon intensity number

26   given to a fuel source produced outside of the State of Oregon would lead to much higher prices for fuel

27   sources produced within the state.  OPA takes no position on whether the California Low Carbon Fuel

28   Standard violates the Commerce Clause or whether it is preempted by federal law.  OPA surmises,

however, that if Oregon adopts an LCFS, the issues decided in this litigation would very likely appear in litigation challenging an Oregon LCFS.  Thus, OPA submits an amicus brief "in response to mistaken assertions in the State of Oregon's Amicus Brief."  Specifically, OPA is concerned with Oregon's argument that 49 other states can follow California's lead without regard to the limitations of the Commerce Clause and federal preemption under the Clean Air Act.

### STANDARD OF REVIEW

A motion to dismiss pursuant to Fed R. Civ. P. 12(b)(6) is a challenge to the sufficiency of the pleadings set forth in the complaint.  A Fed. R. Civ. P. 12(b)(6) dismissal is proper where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balisteri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990).  In considering a motion to dismiss for failure to state a claim, the court generally accepts as true the allegations of the complaint, construes the pleading in the light most favorable to the party opposing the motion, and resolves all doubts in the pleader's favor.  *Lazy Y. Ranch LTD v. Behrens,* 546 F.3d 580, 588 (9th Cir. 2008).

To survive a motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1974 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility for entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 557).  A court is "free to ignore legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal conclusions cast in the form of factual allegations." *Farm Credit Services v. American State Bank*, 339 F.3d 765, 767 (8th Cir.2003) (citation omitted).  "[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Service*, 572 F.2d 962, 969 (9th Cir.2009).

///

**Judicial Notice**

Both plaintiffs and defendants have submitted requests for judicial notice in support of their briefing in both motions to dismiss. Pursuant to Fed. R. Civ. P. 12(b)(6) standards, a court may look only at the face of the complaint and documents attached to or referenced in the complaint to decide a motion to dismiss. *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir.2002). Certain materials extrinsic to the complaint may be considered, however, but only if they are properly subject to judicial notice. *See Mack v. South Bay Beer Distributors, Inc.*, 798 F.2d 1279, 1282 (9th Cir.1986). To be judicially noticed, a fact must not be subject to a reasonable dispute because it must be either generally known within the territorial jurisdiction of the court or "capable of accurate and ready determination by sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201.

"Judicial notice" is the court's recognition of the existence of a fact without the necessity of formal proof. *See United States v. Harrison*, 651 F.2d 353, 355 (5th Cir.1981); *Castillo Villagra v. I.N.S.*, 972 F.2d 1017, 1026 (9th Cir.1992). Facts proper for judicial notice are those facts not subject to reasonable dispute and either "generally known" in the community, or "capable of accurate and ready determination" by reference to sources whose accuracy cannot be reasonably questioned. Fed.R.Evid. 201; *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir.1986) (court may take judicial notice of official records and reports. The court need not accept as true allegations that contradict facts which may be judicially noticed by the court.). Courts may take judicial notice of public records. *Cachil Dehe Band of Wintun Indians of Colusa Indian Community v. State of Calif.*, 536 F.3d 1034, 1039-1040 & fn. 4 (9th Cir.2008).

In both actions, defendants seek judicial notice of the following documents:

1.   Notice of Approval of Regulatory Action dated January 12, 2010

2.   Air Resources Board Resolution 09-31

3.   State of California Governor Executive Order S-01-07 dated January 18, 2007

4.   House Debate Conference Report, 1970 Legislative History

5.   Section 213 of the Clean Air Act Amendments of 1990, Pub. L. No. 101-549

6.   Legislative History of the Clean Air Act Amendments of 1990

7.   "EPA Finalizes Regulations of the National Renewable Fuel Standard Program for 2010

1  and Beyond," Office of Transportation and Air Quality, EPA-420-F-10-007, Feb. 2010

2  8.   Low Carbon Fuel Standard Final Regulation Order

3  9.   1999 Initial Statement of Reasons for MTBE

4  10.   2000 Amendments to Initial Statement of Reasons

5  11.   December 9, 1999 Resolution 99-39

6  12.   June 14, 2007 Resolution 07-21

7  13.   2007 Amendments to Initial Statement of Reasons

8  14.   December 29, 1969 Report to the Assembly on Recommended Standards for the
9         Composition of Gasoline

10  15.   April 23, 2009 Resolution 09-31

11  16.   December 2009 Final Statement of Reasons

12  17.   Legislative History of the Clean Air Amendments of 1970

13  The Rocky Mountain plaintiffs seek judicial notice of the following documents:

14  1.   Proposed Regulation to Implement the Low Carbon Fuel Standard–Volume I, Staff
15        Report: Initial Statement of Reasons.

16  2.   Proposed Regulation to Implement the Low Carbon Fuel Standard–Volume II,
17        Appendices.

18  3.   California's Low Carbon Fuel Standard–Final Statement of Reasons.

19  4.   Letter from Barack Obama to the Hons. John Hoeven and Chet Culver of the Governor's
20        Biofuels Coalition dated May 27, 2009

21  5.   Collection and analysis of date on energy markets in the United States ans a report on
22        filings under Chapter 11 of the United States Bankruptcy Code, prepared and released
23        by the Energy Information Administrative of the United States Department of Energy
24        on November 18, 2009

25  6.   Report prepared by Sierra Research, Inc. and submitted to CARB in the rulemaking and
26        found in the rulemaking file maintained by CARB pursuant to Cal. Gov. Code 11347.3

27  7.   Excerpts from Congressional Debate on the 1970 Clean Air Act Amendments

28  8.    Excerpt from testimony at a hearing on the Subcommittee on Energy at the Environment

18

of the Committee on Science and Technology of the U.S. House of Representatives, conducted on June 14, 2007 and published in A Path Toward Broader Use of Biofuels: Enhancing the Federal Commitment to Research and Development to Meet the Growing Need: Hearing Before the Subcomm. on Energy and Environment of the House Comm. on Science and Technology, 110 Cong. 1st Sess (2007)

9.   Excerpts from the Congressional Debate on EISA

The National Petrochemical plaintiffs request this Court to take judicial notice of the following documents:

1.   California's Low Carbon Fuel Standard–Final Statement of Reasons (December 2009)

2.   California Environmental Protection Agency Air Resources Board Proposed Regulation to Implement the Low Carbon Fuel Standard–Staff Report: Initial Statement of Reasons with Appendices (March 5, 2009)

3.   Final Regulation Order (November 25, 2009)

4.   Office of the Governor–White Paper: The Role of a Low Carbon Fuel Standard in Reducing Greenhouse Gas Emissions and Protecting our Economy (January 8, 2007)

5.   California's Low Carbon Fuel Standard (An Update on the Califonria Air Resources Board's Low Carbon Fuel Standard Program) (October 2009)

6.   CARB, Detailed California-Modified GREET Pathway for Corn Ethanol (February 27, 2009)

7.   CARB, Detailed California-Modified GREET Pathways for Brazilian Sugarcane Ethanol: Average Brazilian Ethanol, With Mechanized Harvesting and Electricity Co-produce Credit, With Electricity Co-product Credit (September 23, 2009)

8.   Clean Air Act Amendments of 1970

9.   Legislative History of the Clean Air Act Amendments of 1970

10.   University of California Davis, A Low Carbon Fuel Standard for California Part 1: Technical Analysis, Institute of Transportation Studies (August 1, 2007)

11.   University of California Davis, A Low Carbon Fuel Standard for California Part 2: Policy Analysis, Institute of Transportation Studies

19

1    As set forth above, the Court takes judicial notice of public records not subject to reasonable

2    dispute, and documents attached to or relied upon in the complaint.  Accordingly, the Court grants the

3    parties' requests for judicial notice of the statutes, and those documents specifically quoted in the

4    complaints.  The Court may also take judicial notice of the legislative histories of the statutes.  *See Louis*

5    *v. McCormick & Schmick Restaurant Corp.*, 460 F. Supp. 2d 1153 (C.D. Cal. 2006).  To the extent that

6    the legislative histories conflict, or represent the statements of individual legislators, this Court will

7    consider the weight to give to the statements and resolve all doubts in favor of plaintiffs pursuant to

8    motion to dismiss standards.  That is, while this Court may take judicial notice of the legislative

9    histories, the statements contained therein may be subject to dispute.

10    Moreover, the Court finds that many of the documents are not judicially-noticeable.  Documents

11    presented by the parties purport to establish as fact those facts that are directly in dispute in this action.

12    This Court will not consider those documents.  To consider these documents would convert these Fed.

13    R. Civ. P. 12(b)(6) motions to Fed. R. Civ. P. 56 motions.  No party has requested summary judgment

14    at this early stage of these proceedings.  Accordingly, this Court will not consider these documents in

15    this motion.

16                                              **DISCUSSION**

17                                              **PREEMPTION**

18    **A.      Standards**

19    Under the U.S. Constitution's Supremacy Clause, the U.S. Constitution and federal laws "shall

20    be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary

21    notwithstanding."  U.S. Const. Art. VI, cl. 2.  "Congress has the authority, when acting pursuant to its

22    enumerated powers, to preempt state and local law."  *Oxygenated Fuels*, 331 F.3d at 667.  Three types

23    of preemption are recognized:  (1) express ("Congress can define explicitly the extent to which its

24    enactments pre-empt state law"); (2) field ("state law is pre-empted where it regulates conduct in a field

25    that Congress intended the Federal Government to occupy exclusively"); or (3) conflict ("state law is

26    pre-empted to the extent that it actually conflicts with federal law").  *English v. General Elec. Co.*, 496

27    U.S. 72, 78-79, 110 S.Ct. 2270 (1990); *Oxygenated Fuels*, 331 F.3d at 667.  Plaintiffs allege conflict

28    preemption.  Specifically, plaintiffs allege that California's LCFS is preempted to the extent that it

1   conflicts with Section 211(o), as adopted by EISA in 2007.

2          "Congressional purpose is the 'ultimate touchstone' of preemption analysis." *Lorillard Tobacco*

3   *Co. v. Reilly*, 533 U.S. 525, 541 (2001).  "As a result, any understanding of the scope of a pre-emption

4   statute must rest primarily on 'a fair understanding of congressional purpose.'" *Medtronic, Inc. v. Lohr*,

5   518 U.S. 470, 485-486, 116 S.Ct. 2240 (1996).  "Evidence of pre-emptive purpose is sought in the text

6   and structure of the statute at issue. . . . If the statute contains an express pre-emption clause, the task

7   of statutory construction must in the first instance focus on the plain wording of the clause, which

8   necessarily contains the best evidence of Congress' pre-emptive intent."  *CSX Trans., Inc. v. GTE*

9   *Sylvania, Inc.*, 447 U.S. 102, 108, 113 S.Ct. 1732 (1993).  "Statutory construction must begin with the

10  language employed by Congress and the assumption that the ordinary meaning of that language

11  accurately expresses the legislative purpose."  *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S.

12  189, 194, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985).  Nonetheless, "[p]reemption provisions are narrowly

13  and strictly construed."  *Montalvo v. Spirit Airlines*, 508 F.3d 464, 474 (9th Cir. 2007).

14         Even where a federal statute preempts an entire field of regulation, "every state statute that has

15  some indirect effect [on that field] . . . is not pre-empted." *Schneidewind v. ANR Pipeline Co.*, 485 U.S.

16  293, 308, 108 S.Ct. 1145, 1155 (1988).  "Tension between federal and state law is not enough to

17  establish conflict preemption."  *Incalza v. Fendi North America, Inc.*, 479 F.3d 1005, 1010 (9th Cir.

18  2007).  A court finds preemption only in "those situations where conflicts will necessarily arise."

19  *Goldstein v. California*, 412 U.S. 546, 554, 93 S.Ct. 2303 (1973).  A "hypothetical conflict is not a

20  sufficient basis for preemption."  *Total TV v. Palmer Communications, Inc.*, 69 F.3d 298, 304 (9th Cir.

21  1995).

22  **B.      Whether ordinary preemption principles apply**

23         Defendants assert that preemption principles do not apply in this action for two reasons.  First,

24  defendants argue that because this action involves an alleged conflict between two federal statutes or

25  statutory provisions, the Supremacy Clause is not implicated.  Second, defendants argue that Section

26  211(o) of the Clean Air Act, under EISA, cannot preempt California's LCFS regulation because

27  "conflict preemption principles do not apply" where a statute has express preemption provisions and

28  savings clauses.  For the following reasons, this Court rejects both of these arguments.

21

1    Defendants' first argument is an attempt to reframe the issue presented by plaintiffs.  In their

2    complaints, plaintiffs clearly allege that California's LCFS conflicts with Section 211(o) of the Clean

3    Air Act.  In their motion to dismiss, defendants contend that "plaintiffs' claim actually involves two

4    provisions within section 211 of the Clean Air Act"; namely, Section 211(c)(4)(B) and Section 211(o).

5    Defendants make this statement after acknowledging the "remarkable omission of any reference to

6    section 211(c)(4)(B) in plaintiffs' complaint."  Defendants' position ignores impermissibly the

7    allegations of plaintiffs' complaints and erroneously implies that plaintiffs challenge Section

8    211(c)(4)(B).

9    Moreover, defendants' argument relies on its position that Section 211(c)(4)(B) grants California

10   "broad authority" and "substantial latitude" to prescribe any control respecting any fuel so long as it

11   targets motor vehicle emissions.  As described more fully below, however, "the sole purpose of [Section

12   211](c)(4)(B) is to waive for California the express preemption provision found in [Section

13   211](c)(4)(A)."  *Davis*, 348 F.3d at 786.   This Court agrees with plaintiffs that the preemption

14   exemption of Section 211(c)(4)(B) does not transform a California regulation into federal law for

15   Supremacy Clause purposes and "does not bar the ordinary working of conflict pre-emption principles."

16   *Geier*, 529 U.S. at 869.

17   Similarly, defendants' second argument is without merit, and is a misrepresentation of well-

18   settled law.  Defendants contend that ordinary conflict preemptions do not apply when a federal statute

19   contains an express preemption provision.  To support their position, defendants rely on *Freightliner*

20   *Corp. v. Myrick*, 514 U.S. 280, 288 (1995), and quote the following passage: "When Congress has

21   considered the issue of pre-emption and has included in the enacted legislation a provision explicitly

22   addressing that issue...there is no need to infer congressional intent to pre-empt state laws from the

23   substantive provisions of the legislation." This passage from *Freightliner* is a quotation from *Cipollone*

24   *v. Liggett Group, Inc*., 505 U.S. 504 (1992), used in *Freightliner* to explain where the source of the

25   *mistaken impression* that an express preemption provision foreclosed conflict preemption principles.

26   In isolating this quote, defendants ignore that the *Freightliner* Court went on to distinguish and limit

27   *Cipollone*: "Our subsequent decisions have not read *Cipollone* to obviate the need for analysis of an

28   individual statute's pre-emptive effects." 514 U.S. at 289.   In fact, the *Freighliner* court rejected

22

defendants' argument advanced here as "without merit." *Id.* And, in a series of more recent cases, *Geier v. American Honda Motor Co.*, 529 U.S. 861 (2000), *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001), and *Sprietsma v. Mercury Marine,* 537 U.S. 51, 65 (2002), the Court has clarified that ordinary conflict preemption principles do apply despite other express preemption provisions or savings clauses. In *Spreitsma*, the Court held:

> Congress' inclusion of an express pre-emption clause does not bar the ordinary working of conflict pre-emption principles that find implied pre-emption where it is impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

537 U.S. at 65 (internal quotations and citations omitted). Here, plaintiffs argue that the LCFS stands as an obstacle to the accomplishment of the purposes and objectives of Section 211(o). According, this Court shall apply ordinary conflict preemption principles notwithstanding the savings clause and express preemption clause of the Clean Air Act.

## C.   Scope and Purpose Section 211(c)(4)(B)

Defendants argue that because Section 211(c)(4)(B) explicitly authorizes California to enact regulations related to fuels, and because the LCFS is a fuels regulation targeting the lifecycle of carbon emissions related to motor vehicle fuels, California is neither preempted nor subject to the Commerce Clause. As set forth above, Section 211(c)(4)(b) provides:

> Any State for which application of section [209](a) of this title has at any time been waived under section [209](b) of this title may at any time prescribe and enforce, for the purpose of motor vehicle emission control, a control or prohibition respecting any fuel or fuel additive.

42 U.S.C. §7545(c)(4)(B). Defendants contend that Section 211(c)(4)(B) gives California broad authority to regulate fuels, and preserves California's pre-existing exercise of its state police power to regulate any aspect of motor vehicle fuel for emissions control purposes. CARB maintains that the LCFS satisfies this provision, and is therefore not subject to preemption.

Defendants argue repeatedly that the breadth of California's authority pursuant to Section 211(c)(4)(B) is unrestricted, and that this section gives California substantial latitude and broad authority to regulate fuels. Defendants assert that Section 211(c)(4)(B) is unlimited by the restrictive language of Section 211(c)(4)(A), which reads:

> Except as otherwise provided in subparagraph (B) or (C), **no State (or political subdivision thereof) may prescribe or attempt to enforce, for purposes of motor vehicle emission control, any control or prohibition respecting any characteristic or component of a fuel or fuel additive in a motor vehicle or motor vehicle engine**–
> (i) if the Administrator has found that no control or prohibition of the characteristic or component of a fuel or fuel additive under paragraph (1) is necessary and has publishing his finding in the Federal Register, or
> (ii) if the Administrator has prescribed under paragraph (1) a control or prohibition application to such characteristic or component of a fuel or fuel additive, unless the State prohibition or control is identical to the prohibition or control prescribed by the Administrator.

42 U.S.C. §7545(c)(4)(A). Defendants point out that the limited scope of Section 211(c)(4)(A), which limits a preemption to a "characteristic or component of a fuel or fuel additive," was added to this Section in the 1990 Amendments to the Clean Air Act. *See* H.R. Rep. No. 101-490, at 314(1990) ("the revision clarifies that a Federal fuel or fuel additive regulation only preempts a nonidentical State regulation governing the same component or characteristic of the fuel or fuel additive."). Defendants maintain that in adding this restriction, Congress intended to limit further the federal preemption of state fuel regulations, but did not intend to restrict in any way California's authority to regulate fuels. Based on these premises, defendants conclude that Section 211(c)(4)(B) provides California broad authority to regulate fuels, unrestricted by the language of Section 211(c)(4)(A).

Having considered the applicable statutes and relevant case law, this Court finds that Section 211(c)(4)(B) does not grant California unfettered authority to regulate fuels, as defendants suggest. Section 211(c)(4)(B) grants California an exemption from federal preemption in the area of fuel components and fuel additives regulation, notwithstanding defendants' repeated assertions, that preemption provision–and its exception–are limited in scope.

In *Davis*, the Ninth Circuit rejected California's argument that Section 211(c)(4)(B) authorized California to disregard compliance with the requirements of different section of the Clean Air Act, Section 211(k), and held:

> The structure of [211(c)(4)] makes it clear that the sole purpose of [211(c)(4)(B)] is to waive for California the express preemption provision found in [211(c)(4)(A)]. It was not intended to allow California, at its sole discretion, to relieve refiners of their obligations to comply with federal fuel requirements such as the RFG program under [211(k)(2)(B)].

348 F.3d at 786. Similarly, Section 211(c)(4)(B) does not allow California, in its sole discretion, to

1    frustrate the purposes and objectives of Section 211(o).  As plaintiffs allege, and pursuant to the statute,

2    Section 211(o) establishes a renewable fuels standard program that considers lifecycle emissions of

3    fuels, including ethanol.  Section 211(c)(4)(B) does not grant California affirmative authority either to

4    conflict with the provisions of Section 211(o) or to ignore them altogether.  Accordingly, California's

5    LCFS is subject to preemption.

6           Moreover, based on *Oxygenated Fuels*, and the plain language of the statutes when read together,

7    the scope of California's preemption exemption is limited.  First, California  has "substantial latitude

8    in regulating, and choosing among, *fuel additives* under the (c)(4)(B) exemption." *Id*. at 669 (emphasis

9    added).  Second, California's regulation of fuel additives and components must be "for the purpose of

10   motor vehicle emission control." *Id*.; *see also, Davis*, 348 F.3d at 777.  This conclusion is supported by

11   the well-settled principle that "[p]reemption provisions are narrowly and strictly construed." *Montalvo,*

12   508 F.3d at 474.

13          To support their position that the Section 211(c)(4)(B) provides broader authority than Section

14   211(c)(4)(A), defendants rely on *Oxygenated Fuels*, 331 F.3d at 670.  In *Oxygenated Fuels*, however,

15   the Ninth Circuit made clear that Section 211(c)(4)(A) and Section (c)(4)(B) must be read together, and

16   that the "two provisions are precisely coextensive." *Id*.  The court reasoned:

17          The language of the Section 211(c)(4)(A) express preemption provision parallels the
            language of the (c)(4)(B) exemption.  Under the (c)(4)(A) preemption provisions, other
18          states may not enforce a fuel control provision *for the purpose of emission control*, but
            under the (c)(4)(B) exemption, California may.  *See* 42 U.S.C. §7545(c)(4)(A)-(B)."
19          (emphasis in original).

20   *Oxygenated Fuels*, 331 F.3d at 670.  Thus, the restrictive language of Section (c)(4)(A) applies to the

21   Section 211(c)(4)(B) preemption exemption.  To fit within the preemption exemption, then, LCFS must

22   both regulate a component of a fuel or a fuel additive and be for the purpose of motor vehicle emissions

23   control.

24          Defendants attempts to distinguish *Davis* are unpersuasive, and their limited reading of

25   *Oxygenated Fuels* is unsupported and unsupportable.  As set forth above, defendants rely on *Oxygenated*

26   *Fuels* to argue that they have "substantial latitude" and "broad authority" to regulate fuels, but ignore

27   the language in the very same case that unambiguously limits that exemption to the preemption

28   provision.  For example, defendants point out that in *Oxygenated Fuels*, the Court found that the Clean

1   Air Act "explicitly contemplates that California can, in some instances, place restrictions on fuel

2   additives" *Id.* at 670-71.  Defendants then interject a parenthetical that "by extension" California may

3   regulate "fuels themselves."  This extension is unsupported by the case or the plain language of Section

4   211(c)(4)(A), which limits the preemption and its exemption to components of fuels and fuel additives

5   and for the purpose of motor vehicle emissions.  To distinguish *Davis*, among other arguments,

6   defendants argue that *Davis'* ruling that the "sole purpose of Section 211(c)(4)(B)" is to waive the

7   preemption exemption is "not essential to the court's decision" and is "almost in the category of dicta."

8   As plaintiffs correctly point out, "Defendants' novel characterization cannot hide that the formal term

9   for 'almost dicta' is the holding of the Ninth Circuit on a controlling issue of law."

10      In addition, defendants concede that Sections 211(o) and 211(c)(4)(B) relate to different subjects,

11   and that both provisions can and should be given effect.  "[W]hen two statutes are capable of co-

12   existence, it is the duty of the courts...to regard each as effective." *Radzanower v. Touche Ross & Co.*,

13   426 U.S. 148, 155 (1976).  Indeed, defendants urge the Court in this motion to give both provisions full

14   effect.  In reading through the statutory context as a whole, Section 211 contains several subsections that

15   address many aspects of motor vehicle fuels.  Federal preemption, and California's exceptions, differ

16   under each section.  Thus, while California has an exemption from preemption of motor vehicle fuel

17   components and additives under Section 211(c), California was required to request a waiver from the

18   federal oxygen fuel requirements under Section 211(k).  In *Davis*, the Court rejected California's

19   position that Section 211(c)(4)(B) granted California authority broader than Section 211(c)(4)(A), and

20   ruled that Section 211(c)(4)(B) does not allow California to ignore other provisions of Section 211(k).

21   Viewing Section 211 as a whole, this Court finds that although California is exempt from the preemption

22   of Section 211(c), that exemption preemption does not allow California to disregard the RFS2 as set

23   forth in Section 211(o).  This conclusion recognizes that Section 211(c) and Section 211(o) regulate

24   different aspects of fuels, and gives full effect to each of Section 211's provisions.  Accordingly, while

25   Section 211(o) contains no express preemption provision, Section 211(o) may preempt California's

26   LCFS under conflict preemption principles.

27   **D.**     **Whether Section 211(c)(4)(B) is applicable to the LCFS**

28      As set forth above, Section 211(c)(4)(B) grants California permission to disregard the express

26

preemptive effects of Section 211(c)(4)(A) and to enact "control[s] or prohibition[s] respecting any characteristic or component of a fuel or fuel additive" for "purposes of motor vehicle emission control." Defendants argue the LCFS is a "control or prohibition respecting any fuel for the purpose of motor vehicle emissions control." Plaintiffs contend that Section 211(c)(4)(B) is inapplicable to the LCFS standard, and therefore does not authorize it, because it does not control a component of a fuel or a fuel additive and does not address motor vehicle emissions. For the following reasons, this Court agrees with plaintiffs to find that Section 211(c)(4)(B) is inapplicable. More specifically, in a motion to dismiss, this Court accepts as true plaintiffs' well-pleaded allegations. According to plaintiffs' allegations, as set forth below, the LCFS does not regulate a component of a fuel or fuel additive, and was not passed for the purpose of regulating motor vehicle emissions.

Plaintiffs allege that the LCFS does not regulate a component of a fuel or a fuel additive. Plaintiffs allege that carbon intensity "is not an inherent chemical property of a fuel, but rather it is reflective of the process in making, distributing, and using that fuel." Final Statement of Reasons, 951. Thus, the LCFS does not purport to control the "chemical or physical properties" of fuel used in California. As CARB explained:

> A fuel's carbon intensity is inferred from the various steps taken to produce that fuel and the relative impacts to climate change associated with each step.... Thus, the relevant question for the LCFS is exactly the opposite of the above examples of actual fuel specifications: Exactly how was the product made, since the process for producing and distributing the product is what affects the product's carbon intensity?

> A gallon of ethanol made from corn grown and processed in the Midwest will, under the microscope or other analytical device, look identical in every material way to a gallon of ethanol processed from sugar cane grown in Brazil. Both samples of ethanol will have the same boiling point, the same molecular composition, the same lower and upper limits of flammability–in other words, both will have identical physical and chemical properties because both products consist of 100% ethanol. On the other hand, the corn ethanol made from the Midwest will have different carbon intensity than the sugar cane ethanol from Brazil.

CARB, *Initial Statement of Reasons*, V-30 (Mar. 2009). Thus, the LCFS regulates "*how* a fuel or blendstock was made." *Id*. (emphasis in original).

As set forth above, defendants insist that Section 211(c)(4)(B) provides California "broad authority" to regulate any aspect of motor vehicle fuel, and is not limited to components of a fuel or fuel additives. This Court rejects this argument, as explained more fully above.

27

1    On a motion to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6), this Court accepts as true the factual

2    allegations of the complaints.  Plaintiffs have alleged that lifecycle analysis of the LCFS does not

3    regulate a component of a fuel of a fuel additive.  Rather, the LCFS regulates how fuels that have

4    identical chemical compositions are made.  Based on these allegations, this Court concludes Plaintiffs

5    have successfully pled that California's LCFS does not come within the Section 211(c)(4)(B)

6    preemption exception. *Oxygenated Fuels*, 331 F.3d at 669.

7    Section 211(c)(4)(B) is inapplicable for the additional reason that the regulation was not passed

8    for the purpose of motor vehicle emissions control.  The Court first points out that the Court considers

9    whether the LCFS specifically, rather than the entire statutory scheme under AB 32, was enacted for the

10   purpose of motor vehicle emission control." *Oxygenated Fuels*, 331 F.3d at 669.  Defendants argue that

11   the fundamental purpose of the LCFS is to reduce motor vehicle carbon emissions.  Plaintiffs counter

12   that LCFS does not control motor vehicle emissions.  Plaintiffs point out that although the chemical

13   properties of ethanol are identical, which would mean that the motor vehicle emissions of any fuel

14   containing ethanol would be the same, the LCFS assigns various carbon intensity rates and caps to

15   ethanol.  Plaintiffs allege that the lifecycle analysis of the LCFS, then, is not aimed at reducing motor

16   vehicle emissions.  Plaintiffs contend that the LCFS considers and regulates the direct and indirect

17   effects of the process of making fuels, such as the land use, deforestation, conversion, and storage.

18   Thus, Plaintiffs conclude the LCFS lifecycle approach that favors certain pathways that grow and

19   process feedstocks with less energy use controls how a fuel is made was passed for the purpose of

20   controlling emissions generally, not for the purpose of reducing emissions from a motor vehicle

21   specifically.  As in *Oxygenated Fuels*, this is a close call, but on a "motion to dismiss under Rule

22   12(b)(6)," this Court must find that the LCFS "does not come within the (c)(4)(B) exemption from

23   preemption." 331 F.3d at 670.

24   **E.       Legislative History of Clean Air Act**

25   Defendants cite legislative history suggesting that Congress intended California to have broad

26   authority over its control over fuels and emissions.  Plaintiffs cite legislative history to suggest that

27   Congress expected Section 211(c)(4)(B) to be a narrow limitation, and did not consider that Section

28   211(c)(4)(B) would allow California to violate the Commerce Clause.  At this early stage of the

28

proceedings, and even though Congressional intent is the touchstone of preemption analysis, the Court "hesitate[s] to examine the legislative history," because "the text of the Act [is] relatively clear." *Oxygenated Fuels*, 331 F.3d at 671.  Further, even if [the Court] look[s] at the history cited by [defendants], it is composed primarily of statements of individual legislators.  In analyzing legislative history, committee reports are 'the authoritative source for finding the Legislature's intent,' and statements of individual legislators are given much less weight." *Oxygenated Fuels*, 331 F.3d at 671 (quoting *Garcia v. United States*, 469 U.S. 70, 76 (1984)).  In examining the competing legislative histories submitted, the Court resolves all questions in favor of plaintiffs in this Fed. R. Civ. P. 12(b)(6) motion.  Accordingly, the legislative histories presented at this stage does not establish the facts Plaintiffs wish to assert.

**F.      Whether LCFS frustrates Clean Air Act's purposes and objectives**

Having considered the scope of Section 211(c)(4)(B), and having ruled that Section 211(c)(4)(B) does not expressly authorize the LCFS and ordinary preemption principles apply, this Court turns now to whether plaintiffs have stated a claim for conflict preemption.  The Court is mindful of the standards for review set forth above.  Additionally, the Court considers that a "state law is invalid to the extent it 'actually conflicts with a . . . federal statute.'" *Int'l Paper v. Ouellette*, 479 U.S. 481, 491-92 (1987).  Such a conflict can result in preemption where it is impossible for a private party to comply with both the state and federal requirements.  *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990).  Conflict preemption can also be found where "the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Int'l Paper*, 479 U.S. at 491-92 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

Plaintiffs allege that the LCFS and EISA share a common goal–to reduce GHG emissions–and that EISA has an additional goal to protect energy independence and security.  EISA declares that "the production of transportation fuels from renewable energy would help the United States meet rapidly growing domestic and global energy demands, reduce the dependence of the United States on energy imported from volatile regions of the world that are politically unstable, stabilize the cost and availability of energy, and safeguard the economy and security of the United States." EISA, Pub. L. 110-140, § 806(a)(4), 121 Stat. 1492, 1722 (2007).  Plaintiffs further allege that the LCFS and EISA use

1   conflicting methods to achieve the goal of reducing GHG emissions that are vastly different in their

2   treatment of corn ethanol.  Plaintiffs argue that the LCFS frustrates the purposes of Section 211(o), as

3   revised by EISA.  Plaintiffs conclude that Section 211(o) preempts the LCFS, because the practical

4   effects of the LCFS "interfere[] with the methods by which the federal statute was designed to reach [its]

5   goal." *Gade v. Nat'l Solid Wastes Management Assn.*, 505 U.S. 88, 103 (1992).

6            Plaintiffs allege that to further the goals of energy independence and security, EISA provided

7   the exemption for existing corn ethanol facilities, and those under construction in December 2007, from

8   the need to demonstrate compliance with GHG reductions.  Plaintiffs allege that EISA was passed to

9   protect historical business investments that were made prior to the enactment of EISA; specifically, the

10  first generation of corn ethanol producers.  Congress expressed its intent to preserve the existing corn

11  ethanol industry because the EPA's final RFS2 implementing rules acknowledges that "many of the corn

12  ethanol plants may find it difficult if not impossible to retrofit existing plants to comply with the 20

13  percent GHG threshold." 75 Fed. Reg. 14, 689-90.  Thus, the federal program preserves a level playing

14  field among all ethanol producers in the United States, protects investments in all plants operating or

15  under construction at the end of 2007, and gives corn ethanol producers feasible means of increasing

16  their production if they demonstrate compliance with the GHG reduction targets set by Congress.  The

17  protection of the first generation of United States corn ethanol industry serves EISA's purposes of

18  energy security and protection from foreign energy independence.  In addition, plaintiffs allege that

19  preserving the United States corn ethanol industry furthers Congress' goal to reduce GHG emissions,

20  because the national corn ethanol industry is investing millions of dollars annually to research and

21  develop cleaner fuels.

22           By contrast, plaintiffs allege that the California's LCFS protects only investments in California

23  corn ethanol plants and ultimately will close the market to all non-California corn ethanol, including,

24  as plaintiffs allege, corn ethanol that would be subject to the exception under Section 211(o)'s

25  grandfather provision. Plaintiffs contend that according to CARB's economic analysis, the LCFS would

26  result in the total elimination of Midwest corn ethanol from the California energy market by 2018.  The

27  same analysis showed that in the first year of implementation of the LCFS, sales of Midwest corn

28  ethanol in California would drop by 15 to 20 percent from the levels that CARB estimated for 2010.

1    According to plaintiffs, the impact of the LCFS regulation on the national corn ethanol industry will be

2    immense. California represents about 10 percent of the corn ethanol market in the United States, making

3    it the largest market in the United States, on a state-by-state basis. The loss of 10 percent of the national

4    market will add to the industry's chronic condition of overcapacity, which has in the past triggered plant

5    closures and bankruptcy filings. Moreover, in the near term, a 15 to 20 percent reduction in demand for

6    corn ethanol will have a devastating impact on some Midwest corn ethanol producers. Some Midwest

7    producers are likely to be unable to compete in the California market starting in the first year of the

8    LCFS program's mandate (2011), because no gasoline marketer will want to buy ethanol from a supplier

9    to whom CARB has assigned a carbon-intensity score higher than gasoline. If those Midwest producers

10   try to sell their ethanol in other States, price margins in an already saturated market will plummet, and

11   some firms will fail. Based on these allegations, among others, plaintiffs conclude that the effects of

12   the LCFS frustrate the full effectiveness of EISA.

13        In reply, defendants assert that "viewed in the correct light," the LCFS is a proper exercise of

14   California's Clean Air Act authority, and complements Section 211(o). Defendants argue that the LCFS

15   does not bar any fuel from the California market, and that there is no indication that Congress intended

16   to preserve the California fuels market as it existed in 2007. Defendants do not address plaintiffs' well-

17   pleaded allegations that one of EISA's goals is to protect the United States corn ethanol industry, nor

18   do defendants challenge plaintiffs' allegations that the effects of the LCFS would stand as an obstacle

19   to that goal.

20        Accepting plaintiffs allegations as true, this Court finds that plaintiffs state a claim that

21   implementation of California's LCFS would "frustrate [ ] the full effectiveness of federal law." *Perez*

22   *v. Campbell*, 402 U.S. 637, 652 (1971). Accordingly, defendants' motions to dismiss plaintiffs'

23   preemption claims are denied.

24                                **COMMERCE CLAUSE**

25        Defendants again rely on Section 211(c)(4)(B) to argue that the Section 211(c)(4)(B) authorizes

26   the LCFS and, therefore, insulates the LCFS from the Commerce Clause. Moreover, defendants contend

27   that the plain language of Section 211(c)(4)(B) authorizes California to adopt fuels regulations that

28   burden interstate commerce. Defendants argue that Section 211(c)(4)(B) expressly authorizes California

1    to regulate "all fuels and fuel additives for the purposes of motor vehicle emissions control."

2    Defendants submit that in enacting Section 211(c)(4)(B), Congress "explicitly conferr[ed] on California

3    the authority to regulate fuels sold in California but manufactured both inside and outside of California,"

4    and that as a result "Congress directly authorized California to regulate a significant aspect of interstate

5    commerce."   Defendants argue that Section 211(c)(4)(B) authorizes what would otherwise be a

6    Commerce Clause violation, and that in enacting Section 211(c)(4)(B), "Congress was keenly aware that

7    allowing, and in fact, encouraging California to set stricter emission standards would affect interstate

8    commerce."   Defendants assert that "Congress explicitly granted California the authority to regulate

9    fuels knowing full well that it would have effects on interstate commerce."   Defendants conclude that

10   Section 211(c)(4)(B) authorizes California to adopt regulations that violate the Commerce Clause.

11   Plaintiffs' arguments fail for the following reasons.

12        "The Commerce Clause...is in its negative aspect...a limitation on the regulatory authority of the

13   states.   Thus, although a state has power to regulate commercial matters of local concern, a state's

14   regulations violate the Commerce Clause if they are discriminatory in nature or impose an undue burden

15   on interstate commerce." *Shamrock Farms Co. v. Veneman*, 146 F.3d 1177, 1179 (9th Cir. 1998)

16   (citations and internal quotations omitted).   "[F]or a state regulation to be removed from the reach of

17   the dormant Commerce Clause, congressional intent must be unmistakably clear." *South-Central Timber*

18   *Dev., Inc. v. Wunnicke*, 467 U.S. 82, 91 (1984).   As a result, to authorize a Commerce Clause violation,

19   Congress must do more than simply authorize a State to regulate in an area, it must "affirmatively

20   contemplate otherwise invalid state legislation," *id.*, and clearly express its intent to "remove federal

21   Constitutional constraints." *Sporhase v. Nebraska ex rel. Douglas*, 458 U.S. 941, 960 (1982).

22   Defendants bear the burden of "demonstrating [this] clear and unambiguous intent." *Wyoming v.*

23   *Oklahoma*, 502 U.S. 437, 458 (1992).

24        According to these standards, plaintiffs' Commerce Clause claims can only be dismissed if the

25   defendants establish that Congress expressly, unmistakably, and unambiguously authorized California

26   to violate the Commerce Clause in each of they ways alleged in the complaint.   Plaintiffs argue that

27   there is nothing in the text or history of the Clean Air Act that clearly evidences Congress' intent in

28   Section 211(c)(4)(b) to "extend to [California] new powers...that [it] would not have possessed absent

1   the federal legislation." *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 49 (1980). On the contrary, as

2   the Ninth Circuit held in *Davis v. EPA*, "the structure of 211(c)(4) makes it clear that the **sole purpose**

3   of 211(c)(4)(B) is to waive for California the express preemption provision found in 211(c)(4)(A)." 348

4   F.3d 772, 786 (9th Cir. 2003) (emphasis added).

5          Plaintiffs argue that defendants' motion to dismiss the Commerce Clause fails for two reasons.

6   First, Section 211(c)(4)(B) cannot authorize a violation of the Commerce Clause because the "sole

7   purpose of 211(c)(4)(B) is to waive for California the express preemption provision found in

8   211(c)(4)(A)." *Davis*, 348 F.3d at 786, and a federal statute that merely exempts state law from the

9   preemptive effect of another federal provision does not authorize a violation of the Commerce Clause.

10  *E.g. New England Power Co. v. New Hampshire*, 455 U.S. 331, 341 (1982). Second, Section

11  211(c)(4)(B) cannot authorize defendants to violate the Commerce Clause because the LCFS was not

12  adopted pursuant to Section 211(c)(4)(B). To the extent defendants now claim otherwise, their

13  argument is refuted by the statements defendants made when developing and adopting the LCFS, and,

14  in all events, any dispute on this issue must be resolved in favor of plaintiffs in a motion to dismiss. For

15  the following reasons, this Court agrees.

16         Under *Lewis*, *New England Power*, and *Wyoming*, a federal provision that exempts a state law

17  from preemption under another federal statute is insufficient to exempt the state law from the

18  requirements of the Commerce Clause. In addition, under *Davis*, this Ninth Circuit made clear that the

19  "sole purpose of [211(c)(4)(B)] is to waive for California the express preemption provision found in

20  [211(c)(4)(A)]. 348 F.3d at 786. Just as California is not, by virtue of Section 211(c)(4)(B), "authorized

21  to negate the requirements imposed by Congress" in provisions other than Section 211(c)(4)(A), *id*. at

22  787, defendant likewise may not rely upon Section 211(c)(4)(B) to violate the requirements imposed

23  by the Commerce Clause.

24         Moreover, the savings clauses of Clean Air Act and the EISA do not authorize defendants to

25  violate the Commerce Clause. *See Wyoming*, 502 U.S. at 458; *Sporhase*, 458 U.S. 960; *New England*

26  *Power*, 455 U.S. at 434; *Lewis*, 447 U.S. at 48-49. In each of these cases, the Supreme Court held that

27  federal statutes that exempted state law from express preemption under a specific federal statute merely

28  "define the extent of the federal legislation's preemptive effect on state law" and do not "alter the state

power otherwise imposed by the Commerce Clause." *New England Power*, 455 U.S. at 341.  This rule applies even where a savings clause was intended to allow State regulation "more restrictive than federal law." *Lewis*, 447 U.S. at 48-49.

Ultimately, defendants fail to bear their burden to establish by clear and unmistakable evidence that Congress intended to exempt the LCFS from scrutiny under the Commerce Clause.  Section 211(c)(4)(B) provides no express and unambiguous authority for California to violate the Commerce Clause.  Section 211(c)(4)(B) exempts California from federal preemption in regulating components of fuels and fuel additives for the purposes of motor vehicle emissions control.  That statute provides no explicit authority to regulate interstate and foreign commerce through a fuels provision.  Defendants have failed to demonstrate that when it adopted Section 211(c)(4)(B), Congress "affirmatively contemplated" and authorized California (i) to discriminate against other states; (ii) engage in extraterritorial regulation of conduct outside of California; and (iii) impose burdens on interstate and foreign commerce that clearly outweigh local benefits. *Wunnicke*, 467 U.S. at 91.  Defendants fail to support their position that "there is no limitation whatsoever as to any extraterritorial impact of a California fuels regulation."  Accordingly, the motions to dismiss plaintiffs' commerce clause causes of action are denied.

## CONCLUSION AND ORDER

For the foregoing reasons, this Court DENIES defendants' motions to dismiss.

**IT IS SO ORDERED.**

**Dated: June 16, 2010**                    **/s/ Lawrence J. O'Neill**
                                             UNITED STATES DISTRICT JUDGE

Appendix

Table 6. Carbon Intensity Lookup Table for Gasoline and Fuels that Substitute for Gasoline.

| Fuel | Pathway Description | Carbon Intensity Values (gCO₂e/MJ) | | |
|---|---|---|---|---|
| | | Direct Emissions | Land Use or Other Indirect Effect | Total |
| Gasoline | CARBOB - based on the average crude oil delivered to California refineries and average California refinery efficiencies | 95.86 | 0 | 95.86 |
| Ethanol from Corn | Midwest average; 80% Dry Mill; 20% Wet Mill; Dry DGS | 69.40 | 30 | 99.40 |
| | California average; 80% Midwest Average; 20% California; Dry Mill; Wet DGS; NG | 65.66 | 30 | 95.66 |
| | California; Dry Mill; Wet DGS; NG | 50.70 | 30 | 80.70 |
| | Midwest; Dry Mill; Dry DGS, NG | 68.40 | 30 | 98.40 |
| | Midwest; Wet Mill, 60% NG, 40% coal | 75.10 | 30 | 105.10 |
| | Midwest; Wet Mill, 100% NG | 64.52 | 30 | 94.52 |
| | Midwest; Wet Mill, 100% coal | 90.99 | 30 | 120.99 |
| | Midwest; Dry Mill; Wet, DGS | 60.10 | 30 | 90.10 |
| | California; Dry Mill; Dry DGS, NG | 58.90 | 30 | 88.90 |
| | Midwest; Dry Mill; Dry DGS; 80% NG; 20% Biomass | 63.60 | 30 | 93.60 |
| | Midwest; Dry Mill; Wet DGS; 80% NG; 20% Biomass | 56.80 | 30 | 86.80 |
| | California; Dry Mill; Dry DGS; 80% NG; 20% Biomass | 54.20 | 30 | 84.20 |
| | California; Dry Mill; Wet DGS; 80% NG; 20% Biomass | 47.44 | 30 | 77.44 |
| Ethanol from Sugarcane | Brazilian sugarcane using average production processes | 27.40 | 46 | 73.40 |
| | Brazilian sugarcane with average production process, mechanized harvesting and electricity co-product credit | 12.40 | 46 | 58.40 |
| | Brazilian sugarcane with average production process and electricity co-product credit | 20.40 | 46 | 66.40 |
| Compressed Natural Gas | California NG via pipeline; compressed in CA | 67.70 | 0 | 67.70 |
| | North American NG delivered via pipeline; compressed in CA | 68.00 | 0 | 68.00 |
| | Landfill gas (bio-methane) cleaned up to pipeline quality NG; compressed in CA | 11.26 | 0 | 11.26 |
| | Dairy Digester Biogas to CNG | 13.45 | 0 | 13.45 |

35

| | | | | |
|---|---|---|---|---|
| Liquefied Natural Gas | North American NG delivered via pipeline; liquefied in CA using liquefaction with 80% efficiency | 83.13 | 0 | 83.13 |
| | North American NG delivered via pipeline; liquefied in CA using liquefaction with 90% efficiency | 72.38 | 0 | 72.38 |
| | Overseas-sourced LNG delivered as LNG to Baja; re-gasified then re-liquefied in CA using liquefaction with 80% efficiency | 93.37 | 0 | 93.37 |
| | Overseas-sourced LNG delivered as LNG to CA; re-gasified then re-liquefied in CA using liquefaction with 90% efficiency | 82.62 | 0 | 82.62 |
| | Overseas-sourced LNG delivered as LNG to CA; no re-gasification or re-liquefaction in CA | 77.50 | 0 | 77.50 |
| | Landfill Gas (bio-methane) to LNG liquefied in CA using liquefaction with 80% efficiency | 26.31 | 0 | 26.31 |
| | Landfill Gas (bio-methane) to LNG liquefied in CA using liquefaction with 90% efficiency | 15.56 | 0 | 15.56 |
| | Dairy Digester Biogas to LNG liquefied in CA using liquefaction with 80% efficiency | 28.53 | 0 | 28.53 |
| | Dairy Digester Biogas to LNG liquefied in CA using liquefaction with 90% efficiency | 17.78 | 0 | 17.78 |
| Electricity | California average electricity mix | 124.10 | 0 | 124.10 |
| | California marginal electricity mix of natural gas and renewable energy sources | 104.71 | 0 | 104.71 |
| Hydrogen | Compressed $H_2$ from central reforming of NG (includes liquefaction and re-gasification steps) | 142.20 | 0 | 142.20 |
| | Liquid $H_2$ from central reforming of NG | 133.00 | 0 | 133.00 |
| | Compressed $H_2$ from central reforming of NG (no liquefaction and re-gasification steps) | 98.80 | 0 | 98.80 |
| | Compressed $H_2$ from on-site reforming of NG | 98.30 | 0 | 98.30 |
| | Compressed $H_2$ from on-site reforming with renewable feedstocks | 76.10 | 0 | 76.10 |