JONES HELSLEY PC
265 E. River Park Circle, Suite 310
PO Box 28340
Fresno, CA  93720
Telephone: (559) 233-4800
Facsimile:  (559) 233-9330

Timothy Jones #119841
John P. Kinsey #215916

Attorneys for all plaintiffs in Case No. 1:09-CV-02234-LJO-DLB

[Additional counsel for plaintiffs listed on signature page]

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROCKY MOUNTAIN FARMERS UNION; REDWOOD COUNTY MINNESOTA CORN AND SOYBEANS GROWERS; PENNY NEW-MAN GRAIN, INC.; FRESNO COUNTY FARM BUREAU; NISEI FARMERS LEGAL; CALI-FORNIA DAIRY CAMPAIGN; REX NEDE-REND; GROWTH ENERGY and the RENEWA-BLE FUELS ASSOCIATION, ) ) ) ) ) ) ) ) ) | **LEAD CASE NO.**<br>    **1:09-CV-02234-LJO-DLB**<br><br>**CONSOLIDATED WITH CASE NO.:**<br>    **1:10-CV-00163-LJO-DLB**<br><br>**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDG-MENT** |
| Plaintiffs, ) | |
| vs. ) | **Hearing Date:  February 23, 2011** |
| JAMES N. GOLDSTENE, in his official capacity as Executive Director of the CALIFORNIA AIR RESOURCES BOARD, ) ) ) | **Hearing Time:  8:30 a.m.**<br><br>**Courtroom:      Four** |
| Defendant. ) | **Judge:          Hon. Lawrence J. O'Neill** |
| ) | |
| and Related Consolidated Action ) | |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT.................................................................................................1

STATEMENT OF THE CASE.................................................................................................1

I.     THE CALIFORNIA LCFS REGULATION ...........................................................2

II.    IMPACTS OF THE REGULATION..................................................................4

SUMMARY JUDGMENT STANDARD.................................................................................4

ARGUMENT ........................................................................................................................5

I.     THE LCFS REGULATION DISCRIMINATES AGAINST OUT-OF-STATE
CORN ETHANOL...........................................................................................................5

    A.  The LCFS Regulation Facially Discriminates Against Out-Of-State
Commerce And Gives A Categorical Advantage To In-State Interests. ................6

    B.  The LCFS Regulation Has The Practical And Intended Effect Of Favoring
In-State Interests. .................................................................................................7

    C.  CARB Cannot Show That Discriminating Against Out-Of-State Corn
Ethanol Is Justified And Narrowly Tailored.........................................................9

II.    THE LCFS REGULATION REGULATES INTERSTATE COMMERCE AND
THE CHANNELS OF INTERSTATE COMMERCE. .................................................10

    A.  The Purpose And Effect Of The LCFS Regulation Are To Control
Activities Beyond California's Borders................................................................11

    B.  The LCFS Regulation Impermissibly Interferes With The Flow Of
Interstate Commerce. ..........................................................................................15

III.   THE LCFS REGULATION EXCESSIVELY BURDENS INTERSTATE
COMMERCE WITHOUT PRODUCING LOCAL BENEFITS. ................................18

    A.  The LCFS Regulation Does Not Regulate A Matter Of Local Concern And
Produces No Permissible Local Benefits.............................................................18

    B.  The Burdens On Interstate Commerce Are Significant, Are Largely Felt
Out-Of-State, And Outweigh The Regulation's Illusory Benefits........................19

IV.   THE LCFS REGULATION IS PREEMPTED BY THE ENERGY
INDEPENDENCE AND SECURITY ACT OF 2007..................................................22

    A.  The LCFS Regulation Interferes With And Poses Obstacles To Congress's
Goals In The 2007 Energy Act. ..........................................................................23

    B.  The LCFS Regulation Impermissibly Restricts The Geographic Areas In
Which Midwest Corn Ethanol May Be Sold. ......................................................27

CONCLUSION ..................................................................................................................28

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alaska Airlines Inc. v. City of Long Beach*,
  951 F.2d 977 (9th Cir. 1991) ...................................................................... 9, 10, 19

*Alliance for Clean Coal v. Miller*,
  44 F.3d 591 (7th Cir. 1995) ................................................................................ 6

*Am. Trucking Ass'ns v. Scheiner*,
  483 U.S. 266 (1987) .................................................................................. passim

*Armco Inc. v. Hardesty*,
  467 U.S. 638 (1984) ......................................................................................... 16

*Ass'n of Irritated Residents v. C&R Vanderham Dairy*,
  No. CIV F 05-1593, 2006 WL 2644896,
  (E.D. Cal. Sept. 14, 2006) .............................................................................. 27

*Baldwin v. G.A.F. Seelig, Inc.*,
  294 U.S. 511 (1935) .................................................................................. 12, 14

*BFI Med. Waste Sys. v. Whatcom County*,
  983 F.2d 911 (9th Cir. 1993) .............................................................................. 8

*Bibb v. Navajo Freight Lines Inc.*,
  359 U.S. 520 (1959) ......................................................................................... 20

*BMW of N. Am. v. Gore*,
  517 U.S. 559 (1996) ......................................................................................... 11

*Boston Stock Exch. v. State Tax Comm'n*,
  429 U.S. 318 (1977) ............................................................................ 7, 8, 12, 15

*Brimmer v. Rebman*,
  138 U.S. 78 (1891) ............................................................................................ 8

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*,
  476 U.S. 573 (1986) ......................................................................................... 17

*Burlington N.R. Co. v. Dep't of Pub. Serv. Reg.*,
  763 F.2d 1106 (9th Cir. 1985) .......................................................................... 20

*C&A Carbone Inc. v. Town of Clarkstown*,
  511 U.S. 383 (1994) ............................................................................ 5, 7, 10, 12

*Camps Newfound/Owatonna, Inc. v. Town of Harrison*,
  520 U.S. 564 (1997) ........................................................................................... 6

*Cavel Int'l, Inc. v. Madigan*,
  500 F.3d 551 (7th Cir. 2007) ........................................................................... 15

ii

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Chae v. SLM Corp.*,
   593 F.3d 936 (9th Cir. 2010),
   *cert. denied*, 79 U.S.L.W. 3226
   (U.S. Oct 12, 2010)...................................................................................... 27

*Chem. Waste Mgmt. Inc. v. Hunt*,
   504 U.S. 334 (1992) ..................................................................................... 16

*Chicanos Por La Causa, Inc. v. Napolitano*,
   558 F.3d 856 (9th Cir. 2009)
   *cert. granted*, 130 S. Ct. 3498 ................................................................. 23

*City of Morgan v. South La. Elec. Coop.*,
   31 F.3d 319 (5th Cir. 1994)........................................................................ 26

*City of Philadelphia v. New Jersey*,
   437 U.S. 617 (1978) .................................................................................. 7, 9

*Commonwealth Edison Co. v. Montana*,
   453 U.S. 609 (1981) ..................................................................................... 15

*Conservation Force, Inc. v. Manning*,
   301 F.3d 985 (9th Cir. 2002)........................................................................ 5

*Cuno v. DaimlerChrysler, Inc.*,
   386 F.3d 738 (6th Cir. 2004)...................................................................... 16

*Daghlian v. DeVry Univ., Inc.*,
   582 F. Supp. 2d 1231 (C.D. Cal. 2007) ..................................................... 7

*Dean Milk Co. v. City of Madison*,
   340 U.S. 349 (1951) ....................................................................................... 8

*Edgar v. MITE Corp.*,
   457 U.S. 624 (1982) ................................................................................ 11, 13

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*,
   541 U.S. 246 (2004)........................................................................ 26, 27, 28

*Fontenot v. Upjohn Co.*,
   780 F.2d 1190 (5th Cir. 1986) ...................................................................... 5

*Freeman v. Hewit*,
   329 U.S. 249 (1946) ..................................................................................... 15

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
   505 U.S. 88 (1992) .................................................................................. 25, 28

*Geier v. Am. Honda Motor Co.*,
   529 U.S. 861 (2000) ..................................................................................... 27

*Gibbons v. Ogden*,
   22 U.S. 1 (1824) ........................................................................................... 23

iii

*Haliburton Oil Well Cementing Co. v. Reily*,
    373 U.S. 64 (1963) ................................................................................. 7, 16, 21

*Healy v. Beer Institute*,
    491 U.S. 324 (1989) ....................................................................................... passim

*Hillsborough County v. Automated Med. Labs., Inc.*,
    471 U.S. 707 (1985) ................................................................................................ 23

*Hughes v. Oklahoma*,
    441 U.S. 322 (1979) .............................................................................................. 5, 9

*Indep. Living Ctr. of S. Cal. v. Maxwell-Jolly*,
    572 F.3d 644 (9th Cir. 2009),
    *cert. petn. filed*, 78 U.S.L.W. 3500
    (Feb 16, 2010) ................................................................................................ 26, 28

*Int'l Paper Co. v. Ouellette*,
    479 U.S. 481 (1987) ...................................................................................... 26, 28

*Jones v. Gale*,
    405 F. Supp. 2d 1066 (D. Neb. 2005) ................................................................ 7

*Jones v. Rath Packing Co.*,
    430 U.S. 519 (1977) ................................................................................................ 23

*Kleenwell Biohazard Waste and Gen. Ecology
    Consultants, Inc. v. Nelson*,
    48 F.3d 391 (9th Cir. 1995) ........................................................................ 6, 18, 19

*Knight v. U.S. Fire Ins. Co.*,
    804 F.2d 9 (2d Cir. 1986) .......................................................................................... 5

*Legal Aid Servs. of Or. v. Legal Servs. Corp.*,
    608 F.3d 1084 (9th Cir. 2010) ................................................................................ 4

*Lorillard Tobacco Co. v. Reilly*,
    533 U.S. 525 (2001) ................................................................................................ 23

*Maine v. Taylor*,
    477 U.S. 131 (1986) .............................................................................................. 5, 9

*Midwest Title Loans, Inc. v. Mills*,
    593 F.3d 660 (7th Cir. 2010),
    *cert. denied*, 79 U.S.L.W. 3170 (U.S. Oct 04, 2010) .............................................. 13

*Minnesota v. Barber*,
    136 U.S. 313 (1890) .................................................................................................. 8

*Minnesota v. Clover Leaf Creamery Co.*,
    449 U.S. 456 (1981) ................................................................................................ 18

*Nat'l Ass'n of Optometrist & Opticians Lenscrafters,
    Inc. v. Brown*,
    567 F.3d 521 (9th Cir. 2009) ........................................................................ 5, 6, 15

iv

*Nat'l Audubon Soc'y v. Davis*,
   307 F.3d 835 (9th Cir. 2002) ............................................................ 13

*Nat'l Solid Wastes Mgmt. Ass'n v. Meyer*,
   165 F.3d 1151 (7th Cir. 1999) ................................................ 11, 13, 14

*New Energy Co. of Ind. v. Limbach*,
   486 U.S. 269 (1988) ..................................................................... 6

*New York v. Hawkins*,
   157 N.Y. 1 (1898) ........................................................................ 13

*Nippert v. City of Richmond*,
   327 U.S. 416 (1946) ...................................................................... 8

*North Carolina v. TVA*,
   No. 09-1623, 2010 WL 2891572
   (4th Cir. July 26, 2010) ................................................................ 21

*Or. Waste Sys., Inc. v. Dept. of Envtl. Quality of Or.*,
   511 U.S. 93 (1994) ................................................................. 5, 6, 9

*Pac. Gas & Elect. Co. v. State Energy Res. Conservation
   & Dev. Comm'n*,
   461 U.S. 190 (1983) ...................................................................... 13

*Pac. Nw. Venison Producers v. Smitch*,
   20 F.3d 1008 (9th Cir. 1994) .................................................... passim

*Pacific Merchant Shipping Ass'n v. Cackette*,
   No. CIV. S-06-2791, 2007 WL 2492681
   (E.D. Cal. Aug. 30, 2007),
   *aff'd*, 517 F.3d 1108 (9th Cir. 2008) ...................................... 26, 28

*Perez v. Campbell*,
   402 U.S. 637 (1971) ...................................................................... 27

*Pike v. Bruce Church, Inc.*,
   397 U.S. 137 (1970) ............................................................. 18, 19, 22

*Raymond Motor Trans. Inc. v. Rice*,
   434 U.S. 429 (1978) ...................................................................... 10

*S. Pac. Co. v. Arizona*,
   325 U.S. 761 (1945) ....................................................... 7, 18, 20, 21

*South-Central Timber Dev., Inc. v. Wunnicke*,
   467 U.S. 82 (1984) ........................................................................ 10

*Sporhase v. Nebraska, ex rel. Douglas*,
   458 U.S. 941 (1982) ....................................................................... 5

*Thompson Everett Inc. v. Nat'l Cable Advertising*,
   57 F.3d 1317 (4th Cir. 1995) ........................................................... 5

*Ting v. AT&T,*
    319 F.3d 1126 (9th Cir. 2003) ........................................................................... 26

*UFO Chuting of Haw., Inc. v. Smith,*
    508 F.3d 1189 (9th Cir. 2007) ..................................................................... 10, 19

*Union Pac. R.R. v. Cal. Pub. Utils. Comm'n,*
    346 F.3d 851 (9th Cir. 2003) ....................................................................... 20, 21

*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid*
    *Waste Mgmt. Auth.,*
    550 U.S. 330 (2007) ........................................................................................... 9

*Von Saher v. Norton Simon Museum,*
    592 F.3d 954 (9th Cir. 2010),
    *cert. petn. filed,* 78 U.S.L.W. 3629
    (Apr 14, 2010) ................................................................................................. 25

*Wyoming v. Oklahoma,*
    502 U.S. 437 (1992) ........................................................................................... 6

*Young v. Coloma-Agaran,*
    340 F.3d 1053 (9th Cir. 2003) ......................................................................... 27

**Statutes**

42 U.S.C. § 7545(o) ............................................................................... 22, 24, 27

**PRELIMINARY STATEMENT**

It is a bedrock principle of constitutional law that state laws and regulations cannot facially or in practice discriminate against, directly regulate, or excessively burden interstate commerce.   Nor can such laws and regulations interfere with federal laws and Congress's purposes and objectives for its laws.   Those principles, embodied in the Commerce and Supremacy Clauses of the U.S. Constitution, protect the national economic union from undue state interference and prevent States from imposing their policies on other States.

The low-carbon fuel standard ("LCFS") regulation enacted by the California Air Resources Board ("CARB") openly transgresses those limits, principally by (i) assigning higher carbon intensity scores to corn ethanol produced outside California; (ii) attempting to regulate conduct occurring wholly outside California; (iii) imposing excessive burdens on the national market for corn ethanol; and (iv) ultimately closing California to out-of-state corn ethanol, in conflict with federal energy laws, on the pretext that it is somehow worse than ethanol made within the state or from some other stock.  Given the plain text of the LCFS regulation, the State's projections about the regulation's effects, and admissions made during the rulemaking, the LCFS regulation is unconstitutional as a matter of law.  Plaintiffs are entitled to summary judgment and to the declaratory and injunctive relief they seek.

**STATEMENT OF THE CASE**

The main features of the LCFS regulation are outlined by the Court in its Order of June 16, 2010, denying defendant's motion to dismiss this action and the related case.[1]  As set forth below, the facts that entitle plaintiffs to summary judgment principally come from the text of the regulation itself,[2] from admissions by the Executive Officer and staff of the California Air

---

[1] *See* Order on Defendants' Motion to Dismiss, June 16, 2010, entered as ECF # 23 in Case No. 1:09-CV-02234-LJO-DLB (hereinafter "June 16 Order").

[2] The LCFS regulation is codified at 17 C.C.R. §§ 95480–90, and is cited in this memorandum as the "LCFS" by section number.

Resources Board ("CARB") during the LCFS rulemaking, and from incontrovertible statements and findings by the U.S. Environmental Protection Agency ("EPA") in a separate rulemaking.[3]

## I.    THE CALIFORNIA LCFS REGULATION

The stated goal for the LCFS regulation is to reduce the "carbon intensity" of transportation fuels used in California.  Carbon intensity is the "amount of lifecycle greenhouse gas emissions" of a fuel, LCFS § 95481(a)(11), which are, in turn, "the aggregate quantity of greenhouse gas emissions (including direct emissions and significant indirect emissions such as significant emissions from land use changes), as determined by [CARB], related to the full fuel lifecycle, including all stages of fuel and feedstock production and distribution, from feedstock generation or extraction through the distribution and delivery and use of the finished fuel to the ultimate consumer."  LCFS § 95481(a)(28).  In short, the carbon intensity of a fuel is tied to the amount of greenhouse gas ("GHG") emissions that CARB thinks are emitted, directly and indirectly, during the stages CARB deems to be a part of the fuel's lifecycle.  Because carbon intensity is not an inherent chemical property of a fuel, two physically identical fuels will have different carbon intensities under the LCFS if CARB concludes they are produced differently.

Starting in 2011, the LCFS regulation mandates annual reductions in the carbon intensity of all transportation fuels used in California.  LCFS §§ 95482, 95483.  Each year, regulated parties (*i.e.*, producers and importers of fuels used in California, LCFS § 95481(a)(36)–(a)(37) & (a)(23)–(a)(25)) must determine their fuels' carbon intensity level  (or "score"), LCFS § 95486(a), and must compare it with the statewide average carbon intensity level for that year.  If a party's score is *below* the statewide average level, the party may generate credits, provided it has obtained credit-generation approval from CARB (by obtaining and maintaining approval of how the party produces, ships, delivers, and distributes its fuels, from the location where the fuel is produced to where it ends up in California).  LCFS § 95484(d)(2); *see* Declaration of Robert M. Dinneen ("Dinneen Decl."), Exh. 1 (copy of "California Air Resources Board Low Carbon Fuel Standard Biofuel Producer Registration Form").  If the party's carbon intensity score is *above* the

---

[3] *See* U.S. EPA, *Regulation of Fuel and Fuel Additives:  Changes to Renewable Fuel Standard Program—Final Rule* 75 Fed. Reg. 14670 (Mar. 25, 2010); Plaintiffs' Statement of Material Facts Not Subject to Genuine Dispute, filed herewith (hereinafter, "Stmt.").

statewide average level, the party will generate deficits, which must be canceled by either retiring accumulated credits or purchasing credits from others.  LCFS § 95485.  Obviously, lower carbon-intensity scores are more valuable than higher carbon-intensity scores for purposes of compliance with the LCFS regulation.

Sellers of gasoline in California are expected to reduce their fuels' carbon intensity by blending gasoline with ethanol.  At the heart of the LCFS regulation, then, are the provisions for scoring the carbon intensity of ethanol.  Although ethanol is chemically and physically the same, wherever and however it is produced, the LCFS regulation assigns different carbon intensity scores depending on how it was produced, the feedstock from which it was made, and how it was shipped.  Stmt. ¶¶ 1-4, 12-14, 20.  Specifically, the regulation's "Lookup Table" lists different scores for corn ethanol that appear to depend on four factors:  (1) where the ethanol is made (California or Midwest); (2) the biorefinery's production process (dry mill or wet mill); (3) the type of fuel the biorefinery uses (natural gas, coal, biomass, or some combination); and (4) the form in which the producer sells distillers grains, an animal nutrient (wet or dry), *see* Stmt. ¶¶ 23-29.  LCFS § 95486(b).  A party must use the score assigned to the corn ethanol "pathway" that most closely tracks the ethanol's actual lifecycle.  LCFS § 95486(b).[4]

All else being equal, the Lookup Table assigns a higher carbon intensity score to corn ethanol produced in the Midwest than to corn ethanol produced in California.  Stmt. ¶ 6.  Half the Midwest corn ethanol pathways—including the pathway assigned to the most common corn ethanol production process in the United States, *id.* ¶ 9—are assigned scores higher than the baseline value for unblended gasoline.  *See* Lookup Table; Stmt. ¶¶ 7-9.  As a matter of simple mathematics, a regulated party who blends such corn ethanol into gasoline products intended for sale in California will *increase* the overall carbon intensity of its fuels and thus generate a deficit.

---

[4] Remarkably, those four main factors in setting the carbon intensity of a given corn ethanol pathway thus include a producer's decision to produce a particular type of animal nutrient—called "dried distillers grains" ("dry DGS" or "DDGS")—which is not a motor fuel, and whose production neither California nor any other State has ever attempted to regulate outside its borders.  *See* Stmt. ¶¶ 23-29 *and* pp. 11-13, *infra*.

1    **II.    IMPACTS OF THE REGULATION**

2          CARB's own analyses of the LCFS regulation, which were required under California law,

3    demonstrate the obvious conclusion:  the regulation will eventually force Midwest corn ethanol

4    out of California.  Stmt. ¶ 10.  According to CARB, the reductions in Midwest corn ethanol sales

5    in California are expected to start in 2011 and continue to drop over the next few years.  *Id.* ¶ 11.

6    For the ethanol industry (particularly the parts located in the Midwest) and the farmers who

7    depend upon it, those consequences are severe and are more than enough to establish this Court's

8    jurisdiction over the plaintiffs' claims.  The only concrete benefit that CARB attributed to the

9    regulation was to support and grow the in-state ethanol industry, to raise tax revenue, and to make

10   feedstocks for ethanol production in California more costly (and therefore more valuable to the

11   owners of the feedstocks).  *Id.* ¶ 21-22.  CARB admited that the LCFS regulation will have no

     significant environmental benefit by itself.  *Id.* ¶ 32; *see also* pp. 18-19, *infra.*

12         In addition to trumpeting the local economic benefits of the LCFS regulation, CARB

13   emphasized the differences in how the national corn ethanol industry was treated in its regulation,

14   compared to federal programs under the recently enacted Energy Independence and Security Act

15   of 2007, Pub. L. 110-140, 121 Stat. 1492 (2007).  Stmt. ¶¶ 30-31; *see* June 16 Order at 3 and pp.

16   22-28, *infra.*[5]  While the federal law was designed in part to protect investments in existing corn

17   ethanol production facilities nationwide, the only existing plants protected by CARB's regulation

18   are the corn ethanol plants located in California, and overall the regulation is intended, in

19   CARB's words, to "transition away" from the federal program.  *Id.* ¶ 34.

20                          **SUMMARY JUDGMENT STANDARD**

21         Summary judgment is proper whenever, on the undisputed facts, plaintiffs are entitled to

22   judgment as a matter of law.  *Legal Aid Servs. of Or. v. Legal Servs. Corp.*, 608 F.3d 1084, 1093

23   (9th Cir. 2010).  Indeed, when supported by the law and facts not subject to genuine dispute,

24   summary judgment is "favored as a mechanism to secure the 'just, speedy and inexpensive

25   determination' of a case, when its proper use can avoid the cost of trial."  *Thompson Everett Inc.*

26   _____

27   [5] The immediate and irreparable impacts and injury to some ethanol producers provide the basis
     for a separate motion for a preliminary injunction.  *See* Memorandum in Support of Motion for

28   Preliminary Injunction in Case No. 1:09-CV-02234-LJO-DLB (filed Nov. 1, 2010).

*v. Nat'l Cable Advertising*, 57 F.3d 1317, 1322 (4th Cir. 1995) (quoting Fed. R. Civ. P. 1); *see also Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986); *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1197 (5th Cir. 1986).  Here, the Court should award summary judgment on both Counts in the Second Amended Complaint filed in this action.[6]

## ARGUMENT

## I.    THE LCFS REGULATION DISCRIMINATES AGAINST OUT-OF-STATE CORN ETHANOL.

Unlawful discrimination under the Commerce Clause can occur in three ways—facially, practically, or purposefully.  *See Nat'l Ass'n of Optometrist & Opticians Lenscrafters, Inc. v. Brown*, 567 F.3d 521, 525 (9th Cir. 2009).  The LCFS regulation does all three.  It facially discriminates because, as this Court observed, it "assigns a higher carbon intensity score to corn-derived ethanol from the Midwest than it assigns to corn-derived ethanol from California."  June 16 Order at 7; *see* Stmt. ¶ 6.  It practically discriminates because it purports to base carbon intensity scores on variables intertwined with origin.  *Id.* ¶¶ 13-14.  And it purposefully discriminates by closing California to Midwest corn ethanol while preserving a market for local corn ethanol.  *Id.* ¶¶ 10-11. The regulation thus is subject to "the strictest scrutiny."  *Hughes v. Oklahoma*, 441 U.S. 322, 337 (1979); *see C&A Carbone Inc. v. Town of Clarkstown*, 511 U.S. 383, 390 (1994); *Healy v. Beer Institute*, 491 U.S. 324, 337 n.14 (1989).  And because it treats chemically and physically identical ethanol, Stmt. ¶¶ 1-3, made from the same production processes differently—based on origin—and because a discriminatory state law is "virtually *per se*" invalid, *Or. Waste Sys., Inc. v. Dept. of Envtl. Quality of Or.*, 511 U.S. 93, 99 (1994), defendant cannot carry his heavy burden of justifying the discrimination.  *See Maine v. Taylor*, 477 U.S. 131, 138 (1986); *see also Sporhase v. Nebraska, ex rel. Douglas*, 458 U.S. 941, 957-58 (1982); *Conservation Force, Inc. v. Manning,* 301 F.3d 985, 995 (9th Cir. 2002).

---

[6] *See* Second Am. Compl. ¶¶ 65-81 (Count I: Preemption), ¶¶ 82-95 (Count II: discrimination, extraterritorial regulation, and undue burden of interstate commerce, in violation of the dormant Commerce Clause).

1
2

**A.    The LCFS Regulation Facially Discriminates Against Out-Of-State Commerce And Gives A Categorical Advantage To In-State Interests.**

There can be no dispute that the LCFS regulation facially discriminates between corn ethanol produced in-state and corn ethanol produced in the Midwest.  Stmt. ¶ 6; *see also* Lookup Table.  For at least four identical production processes that create physically and chemically identical ethanol, the Lookup Table assigns a higher carbon intensity score to corn ethanol produced in the Midwest and a lower score to the ethanol produced the same way in California.[7] Stmt. ¶¶ 1-3.  On its face, the regulation therefore makes "geographical distinctions between similarly situated entities."  *LensCrafters*, 567 F.3d at 527-28.  Because the LCFS regulation discourages the use of higher-carbon-intensity fuels, Stmt. ¶ 5, it creates an impermissible "preference for [corn ethanol] from domestic sources," which "cannot be characterized as anything other than protectionist and discriminatory."  *Wyoming v. Oklahoma*, 502 U.S. 437, 455 (1992).

Such discrimination plainly violates the dormant Commerce Clause.  Plaintiffs do not have to show either "a widespread advantage to in-state interests" or "a widespread disadvantage to out-of-state competitors."  *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 276 (1988); *see Or. Waste Systems*, 511 U.S. at 100 n.4 ("the degree of a differential burden or charge on interstate commerce … 'is of no relevance.'") (quoting *Wyoming*, 502 U.S. at 455).  It is immaterial that the LCFS regulation "does not facially compel the use of [domestic products] or forbid the use of out-of-state [products]."  *Alliance for Clean Coal v. Miller*, 44 F.3d 591, 596 (7th Cir. 1995); *see Biohazard Waste and Gen. Ecology Consultants, Inc. v. Nelson*, 48 F.3d 391, 398 (9th Cir. 1995) (a law that "make[s] doing business in the state … more costly for out-of-state companies relative to in-state firms" must satisfy strict scrutiny).  It is enough that the LCFS creates incentives in favor of California corn ethanol over Midwest corn ethanol.  *See Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 578 (1997) (differing tax exemptions for in-state and out-of-state charities is impermissible because it provides "a strong

---

[7] Specifically, those four processes are:  (1) Dry Mill; Wet Distillers Grains; Natural Gas; (2) Dry Mill; Dry Distillers' Grains; Natural Gas; (3) Dry Mill; Dry Distillers Grains; 80% Natural Gas, 20% Biomass; (4) Dry Mill; Wet Distillers Grains; 80% Natural Gas, 20% Biomass.  *See* Lookup Table.  For those four pathways, the Midwest carbon intensity score is about 10% higher.

incentive for affected entities not to do business with nonresidents"); *see also Boston Exch. v. State Tax Comm'n*, 429 U.S. 318, 336 (1977) (the severity of a state law cannot turn on whether a transaction is preceded by intrastate or interstate activity).  And whether the LCFS regulation benefits some out-of-state interests (such as Brazilian ethanol, Stmt. ¶¶ 35-36) or burdens some in-state interests is also immaterial; "legislation favoring in-state economic interests is facially invalid under the dormant Commerce Clause, even when such legislation also burdens some in-state interests or includes some out-of-state interests in the favored classification." *Daghlian v. DeVry Univ., Inc.*, 582 F. Supp. 2d 1231, 1243 (C.D. Cal. 2007) (internal quotation marks omitted) (quoting *Jones v. Gale*, 405 F. Supp. 2d 1066, 1081 (D. Neb. 2005)); *see C&A Carbone*, 511 U.S. at 391.

## B.  The LCFS Regulation Has The Practical And Intended Effect Of Favoring In-State Interests.

Defendant will presumably argue that Midwest corn ethanol is not penalized because it is from the Midwest *per se*, but rather because CARB has determined that Midwest corn ethanol is associated with greater GHG emissions.  To that end, defendant may argue that transporting Midwest corn ethanol to California emits more GHGs than transporting California corn ethanol within the state, Stmt. ¶ 13, and that the electricity used by California biorefineries is less carbon-intense than electricity used in the Midwest, Stmt. ¶ 14.  Those theoretical distinctions are indistinguishable from origin.  "[E]quality for purposes of competition and the flow of commerce is measured in dollars and cents, not legal abstractions." *Haliburton Oil Well Cementing Co. v. Reily*, 373 U.S. 64, 70 (1963).  However "legitimate" CARB's goal might be, it cannot "be achieved by the illegitimate means of isolating the State from the national economy," for the "evil of protectionism can reside in legislative means as well as legislative ends." *City of Philadelphia v. New Jersey*, 437 U.S. 617, 626, 627 (1978).

Tying carbon intensity scores to the distance a good travels in interstate commerce discriminates against interstate commerce.  The national economic union could not survive if each State were free to impose a surcharge, tax, or penalty based on the distance a product travels. *Cf. Am. Trucking Ass'ns v. Scheiner*, 483 U.S. 266, 284 (1987); *S. Pac. Co. v. Arizona*, 325 U.S. 761, 773-75 (1945).  Products do not materially differ simply because one product "has travelled many miles" more than another, so state laws and regulations that draw distinctions on that basis

7

are impermissible. *BFI Med. Waste Sys. v. Whatcom County*, 983 F.2d 911, 913 (9th Cir. 1993); *see Dean Milk Co. v. City of Madison*, 340 U.S. 349, 354 (1951) (holding that law banning milk not pasteurized within 5 miles of town "in practical effect excludes from distribution in Madison wholesome milk produced and pasteurized in Illinois"); *Brimmer v. Rebman*, 138 U.S. 78, 81-4 (1891) (holding unconstitutional a state law requiring inspection of all meats sold more than 100 miles from the place of slaughter). Discrimination against long-distance shipping, an "activity which is essential for an out-of-state enterprise but not essential for a competing local business," is discrimination against interstate commerce. Tribe, 1 *Am. Constitutional Law* 1109 (3d ed. 2000); *see Nippert v. City of Richmond*, 327 U.S. 416, 432 (1946) ("the very difference between interstate and local trade, taken in conjunction with the inherent character of the tax, makes equality of application as between those two classes of commerce ... impossible").

Similarly, distinctions purportedly drawn on the differences in the carbon intensity of electricity available in California and electricity available in the Midwest also discriminate based on origin. Thus, in *Minnesota v. Barber*, 136 U.S. 313 (1890), the Supreme Court struck down a state law requiring, as a condition of in-state sale of animal meat, an in-state inspection 24 hours before the slaughter of the animal. As the Court observed, "the time, expense and labor of sending animals from points outside of Minnesota to points in that State to be there inspected, and bringing them back, after inspection, to be slaughtered at the place from which they were sent … will be so great as to amount to an absolute prohibition upon sales in Minnesota of meat from animals not slaughtered within its limits." *Id.* at 322. Here, for corn ethanol producers who cannot access California electricity, use of out-of-state electricity simply serves as a proxy for origin. And for corn ethanol producers who can access California electricity, the LCFS regulation creates an "inexorable hydraulic pressure" to buy and use it. *Am. Trucking Ass'ns*, 483 U.S. at 286. Whatever authority California may have to regulate corn ethanol, the State cannot leverage it "as a means of requiring (other) business operations to be performed" within its borders. *Boston Stock Exch.*, 429 U.S. at 336.

In crafting and adopting the LCFS, CARB embraced its discriminatory effects and their inevitable consequences. Stmt. ¶¶ 21-22. CARB predicted that the regulation will cause

"decreasing volumes of Midwestern corn ethanol, along with a constant 300 million gallons-per-year of low-carbon-intensity California corn ethanol." *See* CARB, *California's Low Carbon Fuel Standard: Final Statement of Reasons*, at 826 (Dec. 2009) ("FSOR").  Thus, the LCFS regulation not only facially discriminates against Midwest corn ethanol producers; it also by design will ban their products while maintaining a constant demand for California corn ethanol.  Origin-based bans violate the Commerce Clause.  *Cf. Pac. Nw. Venison Producers v. Smitch*, 20 F.3d 1008, 1012 (9th Cir. 1994) (ban permissible only "as long as the ban on commerce does not make distinctions based on the origin of the items").  If not enjoined, the result of the LCFS regulation will be to "displace[] … imported blendstocks," including Midwest corn ethanol, with "biofuels produced in the State," thus increasing California "employment" and California's "tax base," and "keep[ing] more money in the State"—protectionist benefits that CARB explicitly and repeatedly touted during the LCFS rule-making (FSOR 479, 499, 749).  Indeed, one of California's explicit goals is to "*ensure that a significant portion of the biofuels used in the LCFS are produced in California*."  *See* CARB, *Proposed Regulation to Implement the Low Carbon Fuel Standard, Staff Report: Initial Statement of Reasons*, at II-3 (Mar. 5, 2009) ("ISOR").  Suffice it to say, such "simple economic protectionism" is unconstitutional.  *City of Philadelphia*, 437 U.S. at 624.

### C.   CARB Cannot Show That Discriminating Against Out-Of-State Corn Ethanol Is Justified And Narrowly Tailored.

Because the LCFS regulation, on its face and in practical effect, discriminates against out-of-state commerce, defendant must show *both* that it "'serves a legitimate local purpose' and that this purpose could not be served as well by available nondiscriminatory means."  *Maine*, 477 U.S. at 138 (quoting *Hughes*, 441 U.S. at 336).  In other words, defendant must show both that the discrimination in the LCFS regulation is "unrelated to economic protectionism," *Or. Waste*, 511 U.S. at 106, and that the state has "no other means to advance a legitimate local purpose," *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338-39 (2007).  Defendant cannot make either showing.

First, the LCFS regulation serves no local purpose, let alone a legitimate one.  Its purported focus—*global* climate change—is a national (even international) concern.  Nor does the LCFS even make the necessary "discernible contribution" to global climate change.  *Alaska Airlines Inc. v. City of Long Beach*, 951 F.2d 977, 983-84 (9th Cir. 1991) (citing *Raymond Motor*

*Trans. Inc. v. Rice*, 434 U.S. 429 (1978)); *see UFO Chuting of Haw., Inc. v. Smith*, 508 F.3d 1189, 1196 (9th Cir. 2007) ("A statute is unreasonable or irrational when the asserted benefits of the statute are in fact illusory ....'") (quoting *Alaska Airlines*, 951 F.2d at 983).   CARB has conceded that the LCFS regulation, by itself, will have no siginifiicant impact on global climate change.   Stmt. ¶ 32.   "GHG emission reductions by the LCFS alone *will not result in significant climate change*" (FSOR 342 (emphasis added)).   Concomitantly, the discrimination in the LCFS regulation is related to ecnomic protectionism, as CARB's analyses predict that it will increase in-state employment, augment state tax resources, raise the value of biomass located in California, and keep more money in state by displacing imported transportation fuels.   *See* Stmt. ¶¶ 21-22.

<u>Second</u>, California's legislative goal of reducing GHG emissions, *see* Cal. Assembly Bill 32 § 38501(h), can be achieved without discriminating against out-of-state corn ethanol producers.   As it stands, the LCFS regulation exports the burdens of California's GHG emission reduction goals to other states.   "Courts step in through the dormant Commerce Clause to prevent such exports because legislative action imposing a burden 'principally upon those without the state ... is not likely to be subjected to those political restraints which are normally exerted on legislation where it affects adversely some interests within the state.'"   *C&A Carbone*, 511 U.S. at 426 (quoting *South-Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 92 (1984)).   Instead of treating in-state and out-of-state interests differently in an effort to reduce GHG emissions occurring entirely out-of-state, CARB could focus on simply reducing in-state emissions.

## II.   THE LCFS REGULATION REGULATES INTERSTATE COMMERCE AND THE CHANNELS OF INTERSTATE COMMERCE.

The LCFS regulation strives to control conduct occurring wholly outside California.   As CARB told the Court, the LCFS "regulates emissions *in addition to those emitting from the motor vehicle*" operated in California.   Reply in Supp. CARB's Mot. to Dismiss ("MTD Reply") at 5 (emphasis added).   Those efforts include assigning certain carbon intensity scores for corn ethanol to reflect "*how was that fuel made*, *distributed* and used" (ISOR at V-30 (emphasis added)).   Stmt. ¶ 20.   Much, if not most, of the production and distribution of corn ethanol occur entirely outside California, *id.* ¶¶ 15-17, and has no impact on the chemical or physical properties of the corn ethanol ultimately used in California, *id.* ¶¶ 1-2, or the tailpipe emissions of motor vehicles using ethanol, *id.* ¶¶ 3-4.   However ambitious or farsighted CARB may consider its

10

"lifecycle" approach, the question remains:  does California have the authority, consistent with the Commerce Clause, to calibrate carbon intensity scores so that they regulate, among other things, deforestation in South America, how Midwest farmers use their land, and how ethanol plants produce animal nutrients?

It does not.  The "Commerce Clause … precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State" and whether or not the "statute's extraterritorial reach was intended by the legislature."  *Healy*, 491 U.S. at 336 (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 642-43 (1982)).  "The critical inquiry is whether the *practical effect* of the regulation is to control conduct beyond the boundaries of the State."  *Id.* (emphasis added).  The practical effects of the LCFS regulation are obviously extraterritorial.  By design, it regulates conduct occurring wholly outside California, like ethanol production processes, ethanol co-product processing, and land-use decisions in the Midwest and foreign countries.  Moreover, it interferes with the natural flow of commerce by attracting to California ethanol produced by processes favored by CARB, while effectively banning ethanol produced by disfavored processes—despite the fact that those production processes have no effect on the end-product.  Finally, the LCFS regulation regulates channels of interstate commerce by directly regulating and restricting ethanol "pathways."

## A.   The Purpose And Effect Of The LCFS Regulation Are To Control Activities Beyond California's Borders.

To prevent one State from "offend[ing] sister States," *Edgar*, 457 U.S. at 643 (plurality), a State's "legislative power is limited to what happens in" its own territory.  *Nat'l Solid Wastes Mgmt. Ass'n v. Meyer*, 165 F.3d 1151, 1154 (7th Cir. 1999); *cf. BMW of N. Am. v. Gore*, 517 U.S. 559, 572-73 (1996) (a State "does not have the power … to punish … conduct that was lawful where it occurred and that had no impact on [the state] or its residents.").

The principal aim of the LCFS regulation is to control manufacturing, business, and farming activities, almost all of which occur outside California.  Indeed, that is the whole premise of the regulation's "lifecycle" approach to carbon intensity scoring.  *See* Stmt. ¶¶ 12, 20. The regulation was enacted to try to account for and thus limit GHG emissions occurring *before* a fuel is used in California.  "[A] fuel's carbon intensity is inferred from the various steps taken to produce that fuel and the relative impacts to climate change associated with each step (vis-à-vis

11

the steps' carbon intensity)." ISOR at V-30.  As CARB put it, "the relevant inquiry with carbon intensity [as devised by CARB] is not so much what is contained in a fuel, but *how was that fuel made*, distributed and used." *Id.* (emphasis added).  Different methods of preparing corn for fermentation into ethanol, Stmt. ¶ 23, are scored differently based on CARB's assumptions about the different GHG emissions of each method. *See* Lookup Table.  Carbon intensity scores further distinguish among producers based on whether they use natural gas, coal, or renewable "biomass" fuels to power the ethanol plant, *id.*, and how they process distillers grains, a co-product of corn ethanol production, the preparation of which has nothing to do with corn ethanol production, Stmt. ¶¶ 23-29.[8]

For Midwest corn ethanol producers who want to sell to California buyers, the activities the LCFS regulates and their associated GHG emissions occur entirely outside California.  Only the producers' corn ethanol is ever connected with California, and that corn ethanol is chemically and physically unaffected by the amount of GHGs the producers emitted when producing it. *Id.* ¶¶ 1-3.  The LCFS regulation nonetheless penalizes out-of-state corn ethanol producers who do not follow CARB's favored production methods, by assigning their ethanol a worse carbon intensity score.

CARB cannot constitutionally regulate the extraterritorial activities of farmers and corn ethanol producers for the amount of GHGs they emit outside California.  Importation of a product—a "local event at the end of interstate commerce"—grants a state only a limited license to regulate a producer's out-of-state activities. *Boston Stock Exch.*, 429 U.S. at 332 n.12.  Whatever power a State might have to regulate an imported product for its intrinsic qualities, the State cannot "attach restrictions to … imports in order to control commerce in other states." *C&A Carbone*, 511 U.S. at 393.  It thus cannot "condition importation upon proof of a satisfactory wage scale in [a] factory or shop, or even upon proof of the profits of the business." *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 524 (1935).  It cannot "depress the price or restrict the sale of articles of commerce merely because they happen to be made [by one method] while the same articles made in some other place and by [another method] are left untouched by the regulation."

---

[8] *See* note 4, *supra*.

*New York v. Hawkins*, 157 N.Y. 1, 16-17 (1898) (convict labor versus free labor); *cf. Nat'l Audubon Soc'y v. Davis*, 307 F.3d 835, 857 (9th Cir. 2002) (California's restriction on a product produced by one method—fur obtained from animal foot traps—was constitutional because it applied only to trapping done in California). Yet the purpose and effect of scoring the carbon intensity of corn ethanol are to exert control over GHG emissions and production choices—*e.g.*, fermentation method, fuel used at the plant, and fuel used by the utility that sells electricity to the plant—that are purely extrinsic to the ethanol ultimately imported into California.[9]  Stmt. ¶¶ 1-3, 5, 20.

The LCFS regulation goes beyond regulating the out-of-state production processes for corn ethanol imported into California. It further penalizes corn ethanol producers for their *entirely separate* business decision to dry distillers grains co-products, rather than leave them wet, *after their ethanol fuel is produced*. *See* Lookup Table; Stmt. ¶ 29. The practical effect of regulating that decision is to regulate out-of-state transactions with purchasers of animal feed. Such regulation is manifestly unconstitutional. *See, e.g.*, *Edgar*, 457 U.S. at 642 (holding Illinois law unconstitutional when it "could be applied to regulate a [transaction] which would not affect a single Illinois shareholder"); *Nat'l Solid Wastes*, 63 F.3d at 661 (holding Wisconsin law unconstitutional

---

[9] CARB's approach to regulating out-of-state electricity consumption, Stmt. ¶ 14, is unconstitutionally extraterritorial because it attempts to control the lawful public policies of other states. Power generation policies are quintessentially reserved to each state. *See Pac. Gas & Elect. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 205 (1983) ("Need for new power facilities, their economic feasibility, and rates and services, are areas that have been characteristically governed by the States."). Each state's public utilities commission may come to its own conclusions about the relative significance of reducing GHG emissions in electricity generation or about what practices best reduce GHG emissions. California has no power to overrule another state's electricity policy decisions. Because the Constitution has a "special concern" with the "autonomy of the individual States within their respective spheres," *Healy*, 491 U.S. at 335-36, the Commerce Clause forbids a state "to apply its law" to transactions "in a different state that has a different law," for that "would be arbitrarily to exalt the public policy of one state over that of another," *Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660, 667-68 (7th Cir. 2010), *cert. denied*, 79 U.S.L.W. 3170 (U.S. Oct 04, 2010). Similar regulatory approaches have been held to be unconstitutionally extraterritorial. *See Nat'l Solid Wastes Mgmt. Ass'n v. Meyer*, 63 F.3d 652, 658 (7th Cir. 1995) (holding unconstitutional Wisconsin law that prohibited waste generators from using the state's landfills unless their home communities adopted and enforced Wisconsin's recycling standards); *see also Nat'l Solid Wastes*, 165 F.3d at 1154 ("efforts ... to tell neighboring jurisdictions what laws to enact[] are doomed").

---

when its practical effect was "to impose the requirements of Wisconsin law on numerous waste generators who neither reside, nor dispose of their waste in Wisconsin").

The LCFS regulation also directly regulates the activities of out-of-state corn growers, even when those growers are not engaged in commerce with California. The regulation purports to account for the GHGs emitted by the fuel and chemicals an out-of-state corn grower uses to grow, harvest, and ship each bushel of corn that eventually becomes corn ethanol imported into California. Stmt. ¶¶ 12, 20. The practical effect of scoring farming practices is to penalize the practices CARB disfavors, even when they occur thousands of miles away.

Moreover, CARB imposes a substantial penalty—more than 30% of the carbon intensity score for corn ethanol—for what it calls "indirect land use," which exemplifies the breathtaking extraterritoriality of the regulation. The penalty reflects CARB's view that corn ethanol production should be curbed to discourage farmers around the world from converting nonagricultural land into farmland to enter the corn market, a process CARB thinks emits GHGs. Stmt. ¶ 33. The fundamental premise of the indirect land-use change penalty is to thwart the economic incentives to grow biofuel crops and thereby control the use of nonagricultural lands far beyond California. It might be possible for CARB to impose penalties based on changes in land use that occurred *within California*, but once it imposes penalties based on land use outside California, it exceeds its authority. *See Nat'l Solid Wastes*, 165 F.3d at 1154. Indeed, CARB expressly recognizes that the indirect land use penalty will have no effect on land use in California, observing that "very little California-grown corn is currently, *or will in the future*, be used for ethanol production" (FSOR at 826 (emphasis added)). The purpose and (purported) effect of preventing the conversion of non-agricultural land to farmland beyond California's borders violate the Commerce Clause.

If every state could penalize out-of-state activities tangentially connected with a product imported into its territory just because it believed those activities emit GHGs, it would "invite a speedy end of our national solidarity." *Baldwin*, 294 U.S. at 523. Yet that is precisely CARB's rationale for the LCFS regulation. Because CARB is regulating out-of-state activities that have no bearing on the products actually imported into California for use in motor vehicles, it is unconstitutionally regulating extraterritorial conduct. *Cf. Am. Trucking Ass'ns*, 483 U.S. at 291

14

("[W]hen the measure of a tax *bears no relationship to the taxpayers' presence or activities in a State*, a court may properly conclude … that the State is imposing an undue burden on interstate commerce.") (quoting *Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 629 (1981) (emphasis added).

**B.     The LCFS Regulation Impermissibly Interferes With The Flow Of Interstate Commerce.**

By "creat[ing] an area of trade free from interference by the States," *Boston Stock Exch.*, 429 U.S. at 328 (quoting *Freeman v. Hewit*, 329 U.S. 249, 252 (1946)), the Commerce Clause "promotes a national market and the free flow of commerce between the states," *Lenscrafters*, 567 F.3d at 523.  State laws cannot "distort the operation of interstate markets."  *Cavel Int'l, Inc. v. Madigan*, 500 F.3d 551, 555 (7th Cir. 2007).  The LCFS regulation, however, radically distorts interstate markets in ethanol.  Even though "a gallon of ethanol made from corn grown and processed in the Midwest will, under a microscope or other analytical device, look identical in every material way to a gallon of ethanol processed from sugarcane grown in Brazil" (ISOR at V-30), Stmt. ¶¶ 1-2, the former will be banned while the latter could be shipped to California in volumes rivaling California corn ethanol.  Stmt. ¶¶ 35-36  The regulation also will draw more advanced ethanol to California in the next 10 years, and away from other States, than would otherwise occur.  *Id.* ¶ 34.  Beyond that, the LCFS regulation will encourage the domestic biofuels industry to relocate inside California.  *Id.* ¶¶ 21-22.  And for those producers who remain outside the state, the regulation will still require them to seek California's approval of their "physical pathways," *i.e.*, their transportation and distribution methods.  Because only Congress can wield such power, the LCFS regulation impermissibly regulates interstate commerce.

**1.     The LCFS Regulation Balkanizes Interstate Commerce In Ethanol And Distorts The Market For Ethanol Production By Advantaging Local Ethanol.**

"[T]he purpose of the Commerce Clause is to protect the nation against economic Balkanization." *Pac. Nw. Venison Producers*, 20 F.3d at 1015.  Yet economic Balkanization is the LCFS regulation's purpose and inevitable effect.  Although all ethanol—no matter how or where it is made—is a true, interchangeable commodity with the same chemical and physical properties, Stmt. ¶¶ 1-2, the LCFS regulation legally transforms it into a menagerie of unique

products and redirects its flow across state lines based on how and where it is made.  Instead of allowing California to consume its share of the 15 billion gallons of corn ethanol expected to be produced in 2015, CARB touts a system whereby, in its own words, "[u]nder the market structure created by the LCFS … consumption of corn ethanol would diminish to approximately 0.3 billion gallons by about 2018" (FSOR at 407).  CARB cannot "isolate" California "from a problem," like global climate change, "common to the several States by raising barriers to the free flow of interstate trade." *Chem. Waste Mgmt. Inc. v. Hunt*, 504 U.S. 334, 339-40 (1992).

The LCFS regulation's penalty on interstate shipping has the Balkanizing purpose and effect of favoring local ethanol over out-of-state ethanol.[10]  *See* pp. 7-8, *supra*.  As a result, the regulation distorts the market for ethanol production, "exert[ing] an inexorable hydraulic pressure on interstate businesses to ply their trade within [California] rather than 'among the several States.'"  *Am. Trucking Ass'ns*, 483 U.S. at 286-87  (quoting U.S. Const. Art. I, § 8, cl. 3); *see Cuno v. DaimlerChrysler, Inc.*, 386 F.3d 738 (6th Cir. 2004) (tax credit violated dormant Commerce Clause because it created incentives for increased activity in Ohio and burdened those companies with Ohio tax liability that decided to expand their out-of-state operations), *vacated for lack of standing*, 547 U.S. 332 (2006).  If every State adopted such a regime, they would plainly "interfere[] with free trade" in ethanol and with ethanol production.  *Armco Inc. v. Hardesty*, 467 U.S. 638, 644 (1984).  "The economic advantages of a single" biorefinery for a corn ethanol producer's "multistate activities would be decreased" for ethanol "sent to every State other than the State of residence," because the penalties on ethanol depend on where it is produced.  *Halliburton*, 373 U.S. at 72.  A producer, in response, would have strong incentives to locate its "operations in the State of largest use" for its corn ethanol, selling locally to avoid the transportation penalties.  *Id*.  This is the definition of Balkanization that the Constitution seeks to prevent, and such parochialism is antithetical to "the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce."  *Healy*, 491 U.S. at 335-36.

---

[10] There is nothing in Defendant's logic that would limit California to penalize only transportation fuels for the distance they are shipped in interstate commerce.  If the LCFS regulation is upheld, California (or any other state) could favor any local good over its out-of-state equivalent—all in the name of reducing global warming.

### 2.    The LCFS Regulation Impermissibly Regulates The Channels Of Interstate Commerce.

Before a party can generate credits under the LCFS regulation, it must produce maps and other documentation to prove to CARB how its fuel or feedstock is transported into California. *See* LCFS § 95484(d)(2).   Any and every "material change" to that transportation—including changes to the out-of-state legs of the transportation, such as replacing "rail with truck or ship transport," LCFS § 95484(d)(2)(D)—must be approved by CARB, or else the party loses its right to generate credits.   Nothing illustrates this better than the registration form CARB requires ethanol producers to submit, which "entails providing facility information that supports the identification of Carbon Intensity (CI) values and an Initial Demonstration of the Physical Pathway (how the fuel arrives in California) for the fuel(s) produced at [the registrant's] facility." *See* Dinneen Decl., Exh. 1 (copy of "California Air Resources Board Low Carbon Fuel Standard Biofuel Producer Registration Form").   Among other things, an ethanol producer must

> Enter a description for the route by which the fuel is transported to California.   This description needs to include the method of transportation (*i.e.* rail, marine transport, truck), transportation company(ies), and the route descriptions (*i.e.* highway number, railway company and route).   Please describe the physical transport of the fuel in detail.   If more than one company is involved in the delivery, each segment on the map must be linked to a specific company who is expected to transport the fuel through each segment of the physical pathway.   Also, the companies that own the fuel during each transportation segment must be listed.

*Id.*  As proof, the producer is expected to provide maps "show[ing] the truck/rail lines or routes, pipelines, transmission lines, and other delivery methods (segments) that, together, comprise the physical pathway." *Id.*

By reserving that "[a]ll information is subject to ARB review and validation," *id.*, CARB in essence purports to be the arbiter of interstate transportation decisions.[11]  Yet "[f]orcing a merchant to seek regulatory approval in one State before undertaking a transaction in another directly regulates interstate commerce." *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 582 (1986).   For this reason also, the LCFS regulation is unconstitutional.

---

[11] If a similar requirement were applied to a firm like Amazon.com, for example, it would mean that the company could not switch its method for shipping books from the Post Office, UPS, or Federal Express, without first obtaining approval from the State.

## III.   THE LCFS REGULATION EXCESSIVELY BURDENS INTERSTATE COMMERCE WITHOUT PRODUCING LOCAL BENEFITS.

State laws that purport to "regulate[] even-handedly to effectuate a legitimate local public purpose" are unconstitutional if the "burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970); *see Nelson*, 48 F.3d at 398. Even assuming the LCFS regulation were even-handed (it is not), it is unconstitutional. It plainly does not address a legitimate *local* concern because it is designed to remedy *global* climate change. And by CARB's own admission, the LCFS regulation will have virtually no effect on global climate change. As such, the LCFS regulation cannot survive *Pike*: its indiscernible benefits, Stmt. ¶ 32, are clearly outweighed by its significant burdens, which include closing the California market to Midwest corn ethanol within seven years according to CARB's own estimates, *id.* ¶ 10. Given CARB's own determinations and admissions, the LCFS regulation is unconstitutional under *Pike*.

### A.   The LCFS Regulation Does Not Regulate A Matter Of Local Concern And Produces No Permissible Local Benefits.

"[T]here is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent regulate it." *S. Pac. Co.*, 325 U.S. at 767; *see Nelson*, 48 F.3d at 398 ("The Supreme Court has consistently held that a state's power to regulate commerce is at its zenith in areas traditionally of local concern."). Crucially, "the regulation of matters of local concern" must be "local in character and effect." *S. Pac. Co.*, 325 U.S. at 767. The LCFS regulation is not local. There is nothing local about the concern it purportedly addresses: *global* climate change is not a *local* phenomenon. A ton of GHGs emitted from California has no greater or lesser effect on global climate change than a ton of GHGs emitted anywhere else in the world. The scope and effect of the LCFS regulation—to, *inter alia*, regulate conduct beyond California's borders and to close the California market to corn ethanol from the Midwest—are not local, either.[12]

---

[12] It is no answer to point to dicta suggesting that "environmental protection and resource con-servation" are "areas of legitimate local concern." *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 471 (1981). Environmental concerns may be local, national, or global. Far from ad-dressing a local environmental concern—such as smog in the Los Angeles basin—the LCFS reg-ulation seeks to solve an international environmental problem. Indeed, the United States recently
(footnote continued on next page)

---

Yet even if California's interest in global climate change could be deemed local, its interest would nonetheless be "tenuous" at best, *Pike*, 397 U.S. at 145, which would not be enough to make LCFS regulation constitutional because the regulation does not make a significant (*i.e.*, any discernible) reduction in global climate change. Stmt. ¶ 32. The LCFS regulation will have no perceptible impact on temperatures, sea level, rainfall levels, flora, fauna, snowpack, or any other climate, health or environmental-quality metric in California because, as CARB admits, "[w]ithout the wider adoption of fuel carbon-intensity standards" there will be "little or no net change in fuel carbon-intensity on a global scale" (FSOR at 477, 715). The LCFS regulation is merely a political statement, albeit one with significant costs.

Given that the regulation's only apparent benefits will be to increase California employment and broaden the California tax base, Stmt. ¶ 22, it cannot be sustained as remedying a legitimate local concern. *See UFO Chuting*, 508 F.3d at 1196 (Commerce Clause forbids laws when their "asserted benefits … are in fact illusory or relate to goals that evidence an impermissible favoritism of in-state industry over out-of-state industry") (quoting *Alaska Airlines*, 951 F.2d at 983).

> **B.    The Burdens On Interstate Commerce Are Significant, Are Largely Felt Out-Of-State, And Outweigh The Regulation's Illusory Benefits.**

Because the LCFS regulation produces no local benefits except illegitimate, protectionist ones, any burden it places on interstate commerce would violate the Commerce Clause. *See Pike* 397 U.S. at 142; *see also Nelson*, 48 F.3d at 399. Yet its potential burdens are substantial— including closing the California market to corn ethanol and subjecting corn ethanol producers and corn growers to inconsistent and conflicting regulatory regimes—and are largely felt out-of-state. Such "disruption of travel and shipping …, impacts on commerce beyond the borders of the defendant state, and impacts that fall more heavily on out-of-state interests" are precisely the

---

made a similar point distinguishing claims of injury due to global warming from those due to tra-ditional localized effects: "The medium that transmits injury to potential plaintiffs is literally the Earth's entire atmosphere—making it impossible to consider the sort of focused and more geo-graphically limited effects characteristic of traditional nuisance suits targeted at particular nearby sources of water or air pollution." *Am. Elec. Power Co. v. Conn.*, No. 10-174, U.S. Solicitor General's Br. for Valley Authority at 15 (S. Ct. Aug. 2010); *see id*. at n.7.

"types of impacts on interstate commerce" that "are of special importance in the balance with the state's putative interest." *Pac. Nw. Venison Producers*, 20 F.3d at 1015.

### 1.    The LCFS Regulation Will Transform The Ethanol Market.

The LCFS regulation substantially impedes the free flow of commerce in ethanol.  Within seven years (according to CARB), it will eliminate the California market for Midwest corn ethanol, leaving only California corn ethanol and ethanol from other feedstocks able to access the market.  Stmt. ¶¶ 10-11.  California is the largest single State market for ethanol, annually representing approximately 10% of the national total.  *Id.* ¶ 19.  Over *10 billion gallons* of corn ethanol are produced domestically each year, 75 Fed. Reg. at 14,746, and keeping almost all of it from a market like California will have a tremendous, crippling impact on interstate commerce.  More fundamentally, CARB's actions forcefully segment the market for ethanol, which is a fungible commodity, into distinct, submarkets based on feedstock and production method.  Those actions will hamper the free trade of *all* ethanol, not just ethanol destined for California.  Such burdens outweigh any putative local benefits of the LCFS regulation.

### 2.    The LCFS Regulation Will Subject Ethanol Producers To Conflicting Regulatory Regimes.

"[B]ecause of the need of national uniformity," states cannot regulate matters that "can only be regulated by the national government."  *Union Pac. R.R. v. Cal. Pub. Utils. Comm'n*, 346 F.3d 851, 870 (9th Cir. 2003) (quoting *Burlington N.R. Co. v. Dep't of Pub. Serv. Reg.*, 763 F.2d 1106, 1114 (9th Cir. 1985)).  In assessing the burden that CARB's regulation places on interstate commerce, the Court must consider what would happen if other states imposed similar burdens.  *See, e.g.*, *Am. Trucking Ass'ns*, 483 U.S. at 284; *Bibb v. Navajo Freight Lines Inc.*, 359 U.S. 520, 526-27 (1959); *S. Pac. Co.*, 325 U.S. at 773-75.  After all, if California may impose its standards, "so can every other state, *and there is no guarantee that the standards will be similar.*"  *Union Pac. R.R.*, 346 F.3d at 871 (emphasis added).  Another State might assign different carbon intensity scores, concluding that one production process results in lower GHG emissions than CARB has concluded.  But because the LCFS regulation assigns scores in light of out-of-state conduct, an ethanol producer engaged in interstate commerce could not rely on the laws of its home jurisdiction but would be subject to the possibly conflicting laws of wherever it shipped its

ethanol.   State regulations could work at cross-purposes:   one State penalizing, the other rewarding, the same conduct.   "The effect of such a patch-work regulatory scheme would be immense."   *Id*.   A producer seeking to avoid conflicting regulations would have to locate its "operations in the State of largest use" for its product and restrict its sales to the local market.   *See* p. 16, *supra* (quoting *Halliburton*, 373 U.S. at 72).   Moreover, States could assign different burdens to different industries based on local preferences.   But deciding which industries or segments should make "changes to accommodate the *Nation's* need to reduce carbon-dioxide emissions, *or at what rate* such reductions should occur" are not decisions well suited to a patchwork approach.[13]

While States are free to adopt their own solutions to *local* problems, crippling regulatory conflict is inevitable if States could adopt idiosyncratic solutions to *global* phenomena, particularly if they penalize out-of-state conduct.   Subjecting Midwest corn ethanol producers "to the extensive amount of inconsistent state regulation California's rule would necessarily permit, would undermine the need for substantial uniformity in this area and interfere with interstate commerce."   *Union Pac. R.R.*, 346 F.3d at 870 (quoting *Union Pac. R.R. v. Cal. Pub. Utils. Comm'n*, 109 F. Supp. 2d 1186, 1217 (N.D. Cal. 2000).   The response to an interstate problem requires a nationally-coordinated solution.   *See id.*; *see also S. Pac. Co.*, 325 U.S. at 767.

### 3.      The LCFS Regulation's Burdens Fall More Heavily On Out-Of-State Interests.

When the impacts of a state regulation "fall more heavily on out-of-state interests," they are of "special importance in the balance with the state's putative interest."   *Pac. Nw. Venison Producers*, 20 F.3d at 1015; *see Healy*, 491 U.S. at 337.   The LCFS regulation's impact on interstate commerce in corn ethanol will be felt almost entirely out of state:   very little corn ethanol production capacity is sited in California, Stmt. ¶ 15, and there is virtually no corn grown

---

[13] *Am. Elec. Power Co. v. Connecticut*, S. Ct. No. 10-174, Solicitor General's Br. for Tennessee Valley Authority at 15-16 (emphasis added); *Cf. North Carolina v. TVA*, No. 09-1623, 2010 WL 2891572, at *1 (4th Cir. July 26, 2010) (suit involving a state common law claim; "encourag[ing] courts to use vague public nuisance standards to scuttle the nation's carefully created system for accommodating the need for energy production and the need for clean air" would result in "a balkanization of clean air regulations and a confused patchwork of standards, to the detriment of industry and the environment alike").

to produce ethanol in California, *id.*¶ 16.  The regulation's impact on the corn ethanol market will also be felt out of state:  while the regulation will keep California producing a constant 300 million gallons-per-year of corn ethanol, CARB projects decreasing volumes of Midwestern corn ethanol.  *Id.* ¶ 11.  Those disparate out-of-state impacts must be given significant weight.  *See Pac. Nw. Venison Producers*, 20 F.3d at 1015; *Healy*, 491 U.S. at 337.  And when balanced against the absence of discernible local benefits, the regulation is unconstitutional under *Pike*.

## IV.     THE LCFS REGULATION IS PREEMPTED BY THE ENERGY INDEPENDENCE AND SECURITY ACT OF 2007.

The 2007 Energy Act, codified in relevant part at Clean Air Act § 211(o),  42 U.S.C. § 7545(o), which modified the national renewable fuel standard program ("RFS2"), reflects Congress's judgment that "the production of transportation fuels from renewable energy would help the United States meet rapidly growing domestic and global energy demands, reduce the dependence of the United States on energy imported from volatile regions of the world that are politically unstable, stabilize the cost and availability of energy, and safeguard the economy and security of the United States."  Pub. L. 110-140 § 806(a)(4), 121 Stat. 1492, 1722 (2007).  In adopting EISA, Congress sought to serve two purposes:  (i) to enhance energy independence and security and to protect pre-existing investment by mandating the use of renewable fuels, and in so mandating, (ii) to help the Nation contribute to global efforts to reduce GHG emissions.   In furthering those dual goals, Congress struck a balance:  "to further RFS2's goals to reduce the dependence of the United States on energy imported from volatile regions of the world and to stabilize the cost and availability of energy, Section 211(o) exempts certain United States corn biorefineries" from the requirement to achieve a 20 percent reduction in lifecycle greenhouse gas emissions.  *See* June 16 Order at 4.  Biorefineries, including corn ethanol biorefineries, that "were either in production, or had completed construction, at the time the provision was enacted were not required to comply with EISA's mandate to reduce GHG lifecycle emissions by 20%."  *Id.* (citing 42 U.S.C. § 7545(o)(2)(A)(i)).

The LCFS regulation disrupts Congress's balance by closing California to ethanol produced by more than 150 "grandfathered" biorefineries.  Stmt. ¶¶ 10-11, 17.  Because the Supremacy Clause "invalidates state laws that 'interfere with, or are contrary to, federal law,'"

*Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712 (1985) (quoting *Gibbons v. Ogden*, 22 U.S. 1, 82 (1824), the LCFS regulation is preempted.

### A.   The LCFS Regulation Interferes With And Poses Obstacles To Congress's Goals In The 2007 Energy Act.

While preemption of a state regulation "can be either express or implied," *Chicanos Por La Causa, Inc. v. Napolitano*, 558 F.3d 856, 863 (9th Cir. 2009) *cert. granted*, 130 S. Ct. 3498 (June 28, 2010), "[c]ongressional purpose is the 'ultimate touchstone' of preemption analysis." June 16 Order at 21 (quoting *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541 (2001)).  Under principles of conflict preemption, a state law is preempted if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Jones v. Rath Packing Co.*, 430 U.S. 519, 526 (1977).

The LCFS regulation is an obstacle to Congress' purposes in the 2007 Energy Act.  By CARB's own assessment, the state and federal laws seek to achieve "different objectives using vastly different approaches."  *See* Mem. of P. & A. in Supp. Of Mot. to Dismiss ("MTD") at 23. While both aim to control lifecycle emissions from biofuels usage, CARB's program provides different incentives because CARB believed "more was needed."  *See* MTD at 25; MTD Reply at 16.  Yet the "more" CARB adopted—closing 10 percent of the U.S. market to Midwest corn ethanol, Stmt. ¶¶ 10-11, 19—eviscerates the balance struck by Congress by driving down the demand for grandfathered corn ethanol.

### 1.   In The 2007 Energy Act, Congress Balanced Reducing GHG Emissions Against Energy Independence And Promoting The Domestic Corn Ethanol Industry.

When they began work on the 2007 Energy Act, committees of the 110th Congress received testimony on the possible impact of biofuels on global GHG emissions, including from indirect land-use change; at the same time, they learned that the scientific models for predicting lifecycle emissions impacts had "important uncertainties."[14]  Congressmen also believed that the

---

[14] *See, e.g., A Path Toward the Broader Use of Biofuels: Enhancing the Federal Commitment to Research and Development to Meet the Growing Need: Hearing Before the Subcomm. on Energy and Env't of the House Comm. on Science and Tech.*, 110th Cong., 1st Sess. 40-41 (2007) (statement of David Waskow).

existing corn ethanol industry was critical to the Nation's rural economy and that the industry needed "market certainty" in order to build capital for new technologies.[15]   The final legislation reflected a compromise between the national interest in the industry's stability and the need to account for the full lifecycle emissions of alternative fuels:   Congress drew bright lines, exempting corn ethanol produced at facilities that were either in existence or under construction in December 2007 from having to demonstrate compliance with any indirect land-use change and greenhouse gas emissions requirements.   42 U.S.C. § 7545(o)(2)(A)(i).   This grandfathering approach protects investments in "first generation" ethanol production and provides critical "market certainty."[16]

Put simply, "the federal program preserves a level playing field among all ethanol producers in the United States, protects investments in all plants operating or under construction at the end of 2007, and gives corn ethanol producers feasible means of increasing their production if they demonstrate compliance with the GHG reduction targets set by Congress.   The protection of the first generation of United States corn ethanol industry serves EISA's purposes of energy

---

[15] *See* 153 Cong. Rec. S7680, S7704 (daily ed., June 14, 2007) (statement of Sen. Obama) (supporting program to "ensure[] widespread development and use of biofuels from agricultural products" and to "provide[] … market certainty that its critical for investment dollars in key technologies").   *See also* 153 Cong. Rec. S7680, S7694 (daily ed., June 14, 2007); *id.* at S7695 (statement of Sen. Thune) ("we need to be doing all we can to invest in it and encourage its growth—not the growth of foreign ethanol companies"); 153 Cong. Rec. S8002, S8007 (daily ed., June 20, 2007) (statement of Sen. Thune) (opposing an ultimately rejected amendment supporting imported ethanol, on the ground that it "would send mixed signals to our ethanol producers, their investors, and the farmers who sell their products to ethanol plants");   153 Cong. Rec. H9722, H9735 (daily ed., Aug. 4, 2007) (statement of Rep. Chabot) (biofuels "provide an economic boost for farmers and rural communities"); 153 Cong. Rec. H16738, H16741 (daily ed., Dec. 18, 2007) (statement of Rep. Velázquez) (legislation needed to "enable small farmers to produce more clean energy").

[16] EPA's regulations implementing the 2007 Energy Act have likewise been framed as for the "protection [of] historical business investments that were made prior to the enactment of EISA." *Regulation of Fuels and Fuel Additives:  Changes to Renewable Fuel Standards Program; Proposed Rule*, 74 Fed. Reg. 24,904, 24,925 (May 26, 2009); *see also id.* at 24,908, 24,926, 24,930, 24,035.   Indeed, with respect to plants that commenced construction after the enactment of EISA, but before the end of 2009, and which are fired with natural gas or biomass, EPA determined that grandfathering was required by EISA because to do otherwise "*would be generally inconsistent with the energy independence goals of EISA.*"   75 Fed. Reg. 14,670, 14,688 (Final Rule) (Mar. 26, 2010) (emphasis added).

security and protection from foreign energy independence."   June 16 Order at 30; *see* 74 Fed. Reg. at 24,925; 75 Fed. Reg. at 14,866, 14,871-72.

### 2.        The LCFS Regulation Frustrates EISA's Effectiveness.

As shown, Congress had several objectives for the 2007 Energy Act besides reducing GHG emissions.  *See* EISA § 806(a)(4).  But that was CARB's only purported objective for the LCFS regulation.  Indeed, in finalizing the LCFS a year ago, the CARB Executive Officer unabashedly criticized the 2007 Energy Act as insufficiently focused on global warming, asserting that it "achieves only approximately 30 percent of the GHG reductions projected under the LCFS program" (FSOR at 11).  And he also criticized the RFS2 as "providing no incentive for reducing the carbon intensity" for exempted corn ethanol production plants.  *Id.* at 178.   In that respect the LCFS regulation represents a policy disagreement between CARB and Congress on how best to meet U.S. transportation fuel needs while reducing GHG emissions.  *Cf. Von Saher v. Norton Simon Museum*, 592 F.3d 954, 965 (9th Cir. 2010), *cert. petn. filed*, 78 U.S.L.W. 3629 (Apr 14, 2010) ("California has expressed its dissatisfaction with the federal government's resolution (or lack thereof) ...").  When federal and state governments clash over matters within Congress's authority, federal courts must ensure that state law "must yield."  *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992).

CARB's disagreements with Congress pervade the LCFS regulation's design.  <u>First</u>, the regulation "does not contain any provisions that protect investments in fuel production technologies" (FSOR 746), nor does it "exempt[] existing and planned corn ethanol production plants from the GHG requirements" (FSOR at 11).  *See* Stmt. ¶¶ 30-31.  Rather, it regulates all transportation fuels and distinguishes among corn ethanol only to facilitate regulating how and where the ethanol is produced.  <u>Second</u>, the LCFS regulation provides no market stability for corn ethanol, *id*. ¶ 31, which Congress thought was necessary to encourage the industry to develop new biofuel technologies, *see* June 16 Order at 30 (quoting 75 Fed. Reg. 14,689-90).  Instead, the LCFS regulation severely penalizes corn ethanol, by starting to eliminate a large market next year and ultimately eliminating for all domestic producers a market for *more than a billion gallons of ethanol*.  Stmt. ¶ 19.  CARB believes its harsh approach "encourages much greater innovation than the federal program by providing important incentives to continuously improve the carbon

intensity of biofuels and to deploy other fuels with very low carbon intensities" (FSOR at 11, 178).  <u>Third</u>, it makes no difference under the LCFS regulation whether the replacement for displaced Midwest corn ethanol comes from within the United States or from abroad.  Yet, Congress was concerned about simply replacing a dependence on foreign oil with a dependence on foreign ethanol.  *See, e.g.*, 153 Cong. Rec. S7680, S7694-95 (daily ed., June 14, 2007).

If California "may enact such rules, then so may any other" State.  *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 255 (2004).  Tellingly, if each State adopted the LCFS regulation, "the end result would undo Congress's carefully calibrated regulatory scheme." *Id.*  There would be no domestic market for grandfathered corn ethanol and 15 billion gallons of capacity of American-made fuel would be rendered idle—despite Congress's recognition that preserving investment was vital to energy independence and to spur future investment.

For those reasons, the answer to the preemption question is unaffected by the fact that the LCFS regulation and the 2007 Energy Act share a purpose of reducing GHG emissions (notwithstanding that the LCFS regulation totally disregards the federal law's other purposes).  Conflict preemption "focuses on both the objective of the federal law and the method chosen by Congress to effectuate that objective."  *Ting v. AT&T*, 319 F.3d 1126, 1137 (9th Cir. 2003).  "To the extent a state law interferes with the manner in which Congress intended the federal law to operate, the state law is preempted *even where the state and federal laws share common goals*." *Pacific Merchant Shipping Ass'n v. Cackette*, No. CIV. S-06-2791, 2007 WL 2492681 *5 (E.D. Cal. Aug. 30, 2007) (emphasis added), *aff'd*, 517 F.3d 1108 (9th Cir. 2008); *see Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987); *Indep. Living Ctr. of S. Cal. v. Maxwell-Jolly*, 572 F.3d 644, 653 (9th Cir. 2009), *cert. petn. filed*, 78 U.S.L.W. 3500 (Feb 16, 2010) (state law is preempted where it interferes with the "method chosen by Congress to effectuate [its] objective").

It is also no answer for Defendant to say that "[t]he LCFS does not bar any fuel from the California market."  *See* MTD 24.  The regulation's literal requirements do not prevail over their obvious and inevitable effect—ending the California market for corn ethanol from grandfathered plants in the Midwest, a goal CARB has identified and embraced, Stmt. ¶¶ 30-31—because "state action is preempted if its effect is to discourage conduct that federal legislation specifically seeks to encourage."  *City of Morgan v. South La. Elec. Coop.*, 31 F.3d 319, 322 (5th Cir. 1994).  Nor is

it an answer for Defendant to say that the 2007 Energy Act "does not actually *require* that 15 billion gallons of grandfathered corn ethanol be part of the mandated 36.0 billion gallons of renewable fuel." *See* MTD 23. That argument was rejected in *Geier v. Am. Honda Motor Co.*, 529 U.S. 861 (2000), where the Supreme Court held that states could not require automobile manufacturers to use a particular passive restraint when the Department of Transportation had allowed manufacturers to choose from among several different passive restraint options. *See id.* at 875. Here, Congress has explicitly allowed refiners the option of purchasing a certain quantity of fuel from existing biorefineries. So, while federal law does not mandate that corn ethanol producers continue to produce grandfathered ethanol or that refiners continue to buy it, "the presence of some flexibility in the [federal] regulations does not mean that regulatory uniformity is not vital" to EISA's objectives. *Chae v. SLM Corp.*, 593 F.3d 936, 946 (9th Cir. 2010), *cert. denied*, 79 U.S.L.W. 3226 (U.S. Oct 12, 2010). Where federal law maintains a market, to say that state law may close it "is in conflict." *Id.* at 948. A "manufacturer's right to sell federally" grandfathered corn ethanol "is meaningless in the absence of a purchaser's right to buy [it]." *Engine Mfrs. Ass'n.*, 541 U.S. at 255; *cf. Young v. Coloma-Agaran*, 340 F.3d 1053, 1057 (9th Cir. 2003) ("Simply stated, the ban completely excludes the plaintiffs from conducting their federally-licensed … businesses.").

This Court has already found that plaintiffs' allegations state a claim that implementation of the LCFS regulation would "'frustrate[] the full effectiveness of federal law.'" *See* June 16 Order at 31 (quoting *Perez v. Campbell*, 402 U.S. 637, 652 (1971)). The allegations were drawn directly from the LCFS regulatory text, supporting documentation, and CARB's analysis of its effects. Thus, if the LCFS regulation performs as CARB says it will, it will frustrate the objectives and full effectiveness of federal law. *See Ass'n of Irritated Residents v. C&R Vanderham Dairy* No. CIV F 05-1593, 2006 WL 2644896, *12 (E.D. Cal. Sept. 14, 2006). The LCFS regulation therefore is preempted.

**B.    The LCFS Regulation Impermissibly Restricts The Geographic Areas In Which Midwest Corn Ethanol May Be Sold.**

Congress determined that the market for renewable fuels should be national, not regionally Balkanized. In EISA, Congress prohibited the "restrict[ion of] geographic areas in which [a] renewable fuel may be used." 42 U.S.C. § 7545(o)(2)(A)(iii)(II)(aa). And of the 15

27

billion gallons of corn ethanol expected to be produced by 2015 under the 2007 Energy Act and RFS2, "[e]ach State is expected to consume an amount of that production that is roughly proportional to its share of overall U.S. transportation fuel consumption" (FSOR 407).

Yet, "despite California's obligation under the RFS2 to consume its share of nationally produced biofuels," CARB "predicts that the LCFS will reduce the use of higher-carbon corn ethanol to only about 300 million gallons per year by 2018," instead of the expected "1.5 billion gallons" (FSOR at 407, 411).  *See* Stmt. ¶¶ 10-11, 18-19, 34.  If every State imitated California, there would be no market for corn ethanol in the United States.  *See Engine Mfrs. Ass'n*, 541 U.S. at 255.  Such unilateral opting-out will thwart congressional design and is, therefore, preempted. *See, e.g.*, *Gade*, 505 U.S. at 103; *Int'l Paper*, 479 U.S. at 494; *Indep. Liviing Ctr.*, 572 F.3d at 653; *Pac. Merch.*, 2207 WL 2492681 at *5.

CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that the Court grant their motion for summary judgment.

Dated:  November 1, 2010

Respectfully submitted,

By:   /s/  Timothy Jones
Timothy Jones #119841
John P. Kinsey #215916
JONES HELSLEY PC
265 E. River Park Circle, Suite 310
PO Box 28340
Fresno, CA  93720
Attorneys for all plaintiffs

Charles H. Knauss
Thomas R. Lotterman
Bryan M. Killian
(*Admitted Pro hac vice*)
BINGHAM MCCUTCHEN LLP
2020 K Street, NW
Washington, DC  20006-1806
(202) 373-6000
Attorneys for plaintiff Renewable Fuels
   Association

Stuart A. C. Drake
John C. O'Quinn
(*Admitted Pro hac vice*)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Washington, DC  20005
(202) 879-5000
Attorneys for plaintiff Growth Energy