1   MARIE L. FIALA (CA Bar No. 79676)
    SIDLEY AUSTIN LLP
2   555 California Street, Suite 2000
    San Francisco, CA 94104-1715
3   Telephone: 415-772-1200
    Facsimile: 415-772-7400
4   mfiala@sidley.com

5   **Counsel For Plaintiffs**
    **In Consolidated**
6   **Case No. 1:10-CV-00163 LJO DLB**

7   [ADDITIONAL PARTIES AND COUNSEL
    SHOWN ON SIGNATURE PAGE]

8

9                   UNITED STATES DISTRICT COURT

10               EASTERN DISTRICT OF CALIFORNIA

11                        FRESNO DIVISION

12

13  **ROCKY MOUNTAIN FARMERS UNION,**          )   LEAD CASE No. 1:09-CV-02234-LJO-DLB
    **et al.,**                                )   *Consolidated With* Case No. 1:10-CV-00163
14                                             )   LJO DLB
                Plaintiffs,                    )
15                                             )
           vs.                                 )   **MEMORANDUM IN SUPPORT OF**
16                                             )   **MOTION FOR PARTIAL SUMMARY**
    **JAMES GOLDSTENE, et al.,**               )   **JUDGMENT ON BEHALF OF THE NPRA**
17                                             )   **PLAINTIFFS**
                Defendants.                    )
18  _____        )
                                               )
19  **NATIONAL PETROCHEMICAL &**               )   **Hearing Date:   February 23, 2011**
    **REFINERS ASSOCIATION, et al.,**          )   **Hearing Time:   8:30 a.m.**
20                                             )   **Courtroom:      Four**
                Plaintiffs,                    )   **Judge:          Hon. Lawrence J. O'Neill**
21                                             )
           vs.                                 )
22                                             )
    **JAMES GOLDSTENE, et al.,**               )
23                                             )
                Defendants.                    )
24  _____        )

25

26

27

28

1

## Table of Contents

2
**Page**

INTRODUCTION AND SUMMARY ............................................................... 1

LEGAL STANDARDS .................................................................................... 3

FACTUAL BACKGROUND ........................................................................... 4

      A.    Plaintiffs' Complaint.......................................................................... 4

      B.    The LCFS Is Intended To Supplant Fuels Produced Outside California With Fuels Produced Within California. ......................................... 4

      C.    The LCFS Regulates "Carbon Intensity" and "Fuel Pathways" ........ 5

      D.    "Carbon Intensity" of Transportation Fuels Under the LCFS. .......... 7

            1.    Corn Ethanol. ......................................................................... 7

            2.    Crude Oil. ............................................................................... 9

      E.    The LCFS Regulates Out-of-State and Foreign Conduct. .............. 13

      F.    Impact of LCFS on Plaintiffs. ....................................................... 14

ARGUMENT ................................................................................................ 15

    I.    THE LCFS VIOLATES THE COMMERCE CLAUSE BY IMPERMISSIBLY DISCRIMINATING AGAINST INTERSTATE AND FOREIGN COMMERCE. .................................................................... 15

      A.    The LCFS Discriminates in Favor of California Fuels. ................... 16

            1.    The LCFS Discriminates in Favor of California Corn Ethanol and Against Midwest Corn Ethanol. ..................................... 16

            2.    The LCFS Discriminates in Favor of California Crude Oil and Against Crude Oils from Outside California. ...................... 19

      B.    Defendants Cannot Show That the LCFS Survives Strict Scrutiny. .............. 22

            1.    The LCFS is Designed to Promote Economic Protectionism. ............ 23

            2.    The LCFS Is Not the Only Means of Reducing GHGs. .................... 24

    II.    THE LCFS VIOLATES THE COMMERCE CLAUSE BY REGULATING INTERSTATE AND FOREIGN COMMERCE OUTSIDE CALIFORNIA. ............ 26

      A.    The Commerce Clause Prohibits Extraterritorial Regulation of Commerce. ..................................................................................... 26

      B.    The LCFS Violates the Commerce Clause Because It Regulates Interstate Commerce Outside California. ......................................... 29

i

CONCLUSION.................................................................................................................... 33

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3    C**ASES**

4    *Associated Indus. of Mo.* v. *Lohman*,
5       511 U.S. 641 (1994).................................................................................................15

6    *Bacchus Imports, Ltd.* v. *Dias,*
        468 U.S. 263 (1984).................................................................................................15
7
     *Baldwin* v. *G.A.F. Seelig, Inc.*
8       294 U.S. 511 (1935)........................................................................................ passim

9    *Boston Stock Exchange* v. *State Tax Comm'n,*
        429 U.S. 318 (1977).................................................................................................17
10
     *Brodheim* v. *Cry,*
11      584 F.3d 1262 (9th Cir. 2009) ..................................................................................3

12   *C & A Carbone, Inc.,* v. *Town of Clarkstown,*
        511 U.S. 383 (1993)...................................................................................15, 22, 30
13
     *Camps Newfound/Owatonna, Inc.* v. *Town of Harrison,*
14      520 U.S. 564 (1997)....................................................................................3, 17, 31

15   *Chemical Waste Mgmt. Inc.* v. *Hunt,*
        504 U.S. 334 (1992)........................................................................................ passim
16
     *City of Philadelphia* v. *New Jersey,*
17      437 U.S. 617 (1978).................................................................................................31

18   *Conservation Force, Inc.* v. *Manning,*
        301 F.3d 985 (9th Cir. 2002) ..................................................................................15
19
     *Daghlain* v. *DeVry Univ., Inc.,*
20      582 F. Supp. 2d 1231 (C.D. Cal. 2007) ..................................................................22
21
     *Dean Milk Co.* v. *Madison,*
22      340 U.S. 349 (1951).................................................................................................17

23   *Fort Gratiot Sanitary Landfill, Inc.* v. *Michigan Dep't of Natural Res.,*
        504 U.S. 353 (1992).................................................................................................22
24
     *Great Atlantic & Pacific Tea Co.* v. *Cottrell,*
25      424 U.S. 366 (1976).................................................................................................29
26
     *Hardage* v. *Atkins,*
27      619 F.2d 871 (10th Cir. 1980) ................................................................................28
28

iii

*Healy* v. *Beer Institute,*
    491 U.S. 324 (1989)................................................................................ passim

*Hunt* v. *Wash. State Apple Adver. Comm'n,*
    432 U.S. 333 (1977)...............................................................................18

*In re Barboza,*
    545 F.3d 702 (9th Cir. 2009) ...................................................................3

*Kashkool* v. *Chertoff,*
    553 F. Supp. 2d 1131 (D. Ariz. 2008) ...............................................3, 4

*Kraft General Foods, Inc.* v. *Iowa Dep't of Rev. & Finance,*
    505 U.S. 71 (1992).................................................................................15

*Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.,*
    475 U.S. 574 (1986).................................................................................3

*Moreland* v. *Las Vegas Metropolitan Police Dep't,*
    159 F.3d 365 (9th Cir. 1998) ...................................................................3

*NCAA* v. *Miller,*
    10 F.3d 633 (9th Cir. 1993) .............................................................. passim

*National Solid Waste Management* v. *Meyer,*
    165 F.3d 1151 (7th Cir. 1999) ...............................................................28

*National Solid Waste Management* v. *Meyer,*
    63 F.3d 652 (7th Cir. 1995) .............................................................27, 28

*New Energy Co. of Ind.* v. *Limbach,*
    486 U.S. 269 (1988)......................................................................... passim

*Oregon Waste Sys., Inc.* v. *Dep't of Envtl. Quality,*
    511 U.S. 93 (1994).......................................................................... passim

*South Carolina State Highway Dep't.* v. *Barnwell Bros., Inc.,*
    303 U.S. 177 (1938)...............................................................................25

*South-Central Timber Dev.* v. *Wunnicke,*
    467 U.S. 82 (1984)...........................................................................15, 25

*Thrifty Oil Co.* v. *Bank of America Nat'l Trust & Sav. Ass'n,*
    322 F.3d 1039 (9th Cir. 2003) .................................................................4

*United Haulers Ass'n* v. *Oneida-Herkimer Solid Waste Mgmt. Auth.,*
    550 U.S. 330 (2007)...........................................................................15, 22

iv

*United States* v. *Kapp*,
  564 F.3d 1103 (9th Cir. 2009) ................................................3

*West Lynn Creamery* v. *Healy*,
  512 U.S. 186 (1994)..................................................... passim

*Wyoming* v. *Oklahoma*,
  502 U.S. 437 (1992)..............................................2, 15

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. 1 §8, cl. 3 ..............................................3

**FEDERAL  RULES**

Fed. R. Civ. P. 56(c) .....................................................3

Fed. R. Civ. P. 56(d)(1).................................................4

**LOCAL RULES**

L.R. 260(a) ...............................................................1

**STATE REGULATIONS**

Cal. Code Regs. Tit. 17, §95480............................................24

Cal. Code Regs. Tit. 17, §95480.1(a) .......................................5

Cal. Code Regs. Tit. 17, §95481(a)(11)..................................6, 29

Cal. Code Regs. Tit. 17, §95481(a)(28)...........................2, 6, 13, 29

Cal. Code Regs. Tit. 17, §95482(a), Tables 1-2 ...........................14

Cal. Code Regs. Tit. 17, §95482(b) .........................................5

Cal. Code Regs. Tit. 17, §95482(c) .........................................5

Cal. Code Regs. Tit. 17, §95484............................................14

Cal. Code Regs. Tit. 17, §95484(c)(3)(A) ..................................14

Cal. Code Regs. Tit. 17, §95486(b), Table 6 ...................6, 7, 13, 16, 29

Cal. Code Regs. Tit. 17, §95486(b), Table 7 ...............................29

Cal. Code Regs. Tit. 17, §95486(b)(2)(A).................................11, 19

Cal. Code Regs. Tit. 17, §95486(b)(2)(A)(1) ..............................11

v

1

Cal. Code Regs. Tit. 17, §95486(b)(2)(A)(2)(a)(ii) ........................................................................10

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# INTRODUCTION AND SUMMARY

Plaintiffs National Petrochemical & Refiners Association ("NPRA"), American Trucking Associations, The Center For North American Energy Security, and The Consumer Energy Alliance (collectively, "Plaintiffs" or "NPRA Plaintiffs"), seek partial summary judgment under Federal Rule of Civil Procedure 56(c) and Local Rule 260 and an order enjoining enforcement of California's Low Carbon Fuel Standard, Title 17, California Code of Regulations, §§ 95480–95490 (hereinafter "LCFS"). As described below, and as shown in the Statement of Undisputed Facts, the text of the LCFS, and the administrative record confirm that the LCFS regulates transportation fuels and fuel components sold in California in a manner that violates the Commerce Clause of the United States Constitution. These violations strike at the core of the LCFS and require that it be struck down in its entirety.

At its essence, the Commerce Clause provides that "Congress shall have Power . . . [t]o regulate Commerce with foreign Nations, and among the several States." U.S. Const. Art. I, § 8, cl. 3. This grant of power to Congress has "a 'negative' aspect" that "denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 98 (1994). "No State may attempt to isolate itself from a problem common to several States by raising barriers to the free flow of interstate trade." *Chemical Waste Mgmt., Inc. v Hunt*, 504 U.S. 334, 339-40 (1992). Rather, the Commerce Clause adopts "the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division." *Baldwin v. G.A.F. Seelig, Inc*. 294 U.S. 511, 523 (1935).

The NPRA Plaintiffs respectfully submit that the LCFS is preempted by federal law and violates the Commerce Clause in each of the ways described in Plaintiffs' Complaint. However, this *partial* summary judgment motion focuses on two claims: (1) the LCFS impermissibly discriminates in favor of transportation fuels from California and against such fuels from outside California; and (2) the LCFS impermissibly regulates in an extraterritorial manner based on a fuel's "pathway" – *i.e*., its production and transport – that occurs outside California.

1

First, the LCFS violates the Commerce Clause because it impermissibly discriminates *in favor* of California transportation fuels and fuel components and against out-of-state transportation fuels and fuel components.[1]  The LCFS purports to regulate transportation fuels based on "carbon intensity," *i.e.*, an estimate of the greenhouse gas (GHG) emissions associated with the "fuel pathway" or "lifecycle" of a transportation fuel including "all stages of fuel and feedstock production and distribution."  LCFS § 95481(a)(28).  On its face, and in its practical effect, there can be no debate that the LCFS benefits California-based fuels and discriminates against out-of-state transportation fuels in violation of the Commerce Clause.  Defendants have conceded that, under the LCFS, "[the] location of the production facility" and the "source of fuel" lead to more favorable "carbon intensities of some California-produced fuels" because California fuels "benefit from shorter transportation distances and lower carbon intensity electricity sources."  Statement of Undisputed Facts ("SUF") 2, 8 (Final Statement of Reasons ("FSOR") 508, 713).  In this manner, the LCFS discriminates against Midwest corn ethanol based on criteria tied to its place of origin.  Beyond ethanol, the LCFS also discriminates in favor of California crude oil at the expense of crude oils from other States and countries.  *E.g.*, SUF 13 (FSOR 23).

Defendants cannot salvage the LCFS because they cannot show, under strict scrutiny, that the LCFS is "unrelated to economic protectionism."  *See Wyoming v. Oklahoma*, 502 U.S. 437, 454 (1992); *see also New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273-74 (1988).  Nor can Defendants meet their burden of showing that the LCFS is the only available means of reducing global greenhouse gas emissions in California.  *See Chemical Waste*, 504 U.S. at 344-45.

Second, the LCFS also violates the Commerce Clause for the fundamental reason that the assignment of "carbon-intensity" values based on a product's "fuel pathway" is an impermissible effort by California to regulate conduct beyond its borders and thus to regulate interstate and foreign commerce directly.  *See Healy v. Beer Institute*, 491 U.S. 324, 336-37 (1989).  Defendants state that "the carbon intensity value assigned to each fuel reflects the GHG emissions associated with that

---

[1] In this Memorandum, the NPRA Plaintiffs refer to "transportation fuels" and "transportation fuel components" such as crude oil and ethanol collectively as "transportation fuels."

fuel's production, transport, storage, and use." SUF 54 (FSOR 507). Defendants may not establish barriers on the import of physically-identical fuels from outside California based on the manner in which they reach the California market. *See Baldwin*, 294 U.S. at 522.

Imposition of a carbon intensity based on the distance that a fuel must travel outside a State or the manner in which the product is derived or produced is a direct and impermissible regulation of interstate commerce. Under this same "lifecycle" analysis, California would be free to impose economic barriers on the import of oranges from Florida, wheat from the Midwest or Canada, or red wine from France, even though California permits (and, indeed, promotes) the very same products within California. The LCFS violates the Commerce Clause's goals of securing "a national economic union unfettered by state-imposed limitations on interstate commerce and the autonomy of the individual States within their own respective spheres," *Healy*, 491 U.S. at 335-36, and avoiding "'economic Balkanization' and the retaliatory acts of other States that may follow." *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 577 (1997) (citations omitted).

## LEGAL STANDARDS

Under Federal Rule of Civil Procedure 56(c) and Local Rule 260, partial summary judgment is appropriate where, as here, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Local Rule 260(a); *see Brodheim v. Cry*, 584 F.3d 1262, 1267 (9th Cir. 2009). This Court views the evidence in the light most favorable to the non-moving party and determines whether there are genuine disputes as to issues of material fact. "A disputed fact is material only if it can affect the outcome of the suit under governing law." *United States v. Kapp*, 564 F.3d 1103, 1114 (9th Cir. 2009). Defendants bear the burden of setting "forth specific facts showing that there is a genuine issue for trial." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2009). Defendants "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Rather, "[a] genuine issue of material fact exists only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998) (internal quotation omitted).

3

**MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT
ON BEHALF OF THE NPRA PLAINTIFFS
LEAD CASE NO. 1:09-CV-02234-LJO-DLB**

1    "When confronted with purely legal questions, the court does not defer to the non-moving

2    party." *Kashkool v. Chertoff*, 553 F. Supp. 2d 1131, 1140 (D. Ariz. 2008).  Instead, "[w]here . . . the

3    only disputes relate to the legal significance of undisputed facts, the controversy collapses into a

4    question of law suitable to disposition on summary judgment." *Thrifty Oil Co. v. Bank of Am. Nat'l*

5    *Trust & Sav. Ass'n*, 322 F.3d 1039, 1046 (9th Cir. 2003).  Finally, where, as here, summary

6    judgment is sought on less than "the whole action," this Court "should, to the extent practicable,

7    determine what material facts are not genuinely at issue."  Fed. R. Civ. P. 56(d)(1); *see also* Local

8    Rule 260(f) (setting forth interplay between Rule 56(d) and Local Rule 260).

9                                   **FACTUAL BACKGROUND**

10        **A.      Plaintiffs' Complaint.**

11            In the Complaint, the NPRA Plaintiffs have challenged the constitutionality of the LCFS

12   under the Commerce Clause and under the Supremacy Clause in four separate counts.  As relevant

13   here, the NPRA Plaintiffs seek partial summary judgment relating to two claims:  First, the LCFS

14   violates the Commerce Clause because it discriminates against interstate and foreign commerce with

15   respect to its treatment of transportation fuels and fuel feedstocks inside and outside of California.

16   *See* Complaint ("Compl.") ¶¶ 3, 7, 52-69, 102-110.  Second, the LCFS violates the Commerce

17   Clause because it regulates interstate and foreign commerce in other states and countries and thereby

18   creates a barrier to the free flow of trade.  *See id.* ¶¶ 38-45, 84-92.  These claims can be resolved in

19   favor of the NPRA Plaintiffs based on the text of the LCFS and the administrative record.[2]

20        **B.      The LCFS Is Intended To Supplant Fuels Produced Outside California**
            **With Fuels Produced Within California.**

21

22            The record materials show that, at its core, the LCFS is an effort to control the interstate and

23   international production and distribution of transportation fuels to California.  Defendants have

24   stated that the LCFS is "designed to reduce California's dependence on petroleum" and to "stimulate

25

26   [2]  As part of the administrative process, Defendants solicited comments from interested parties
     regarding the LCFS, and issued formal responses to those comments in official documents such as
27   the Final Statement of Reasons ("FSOR") and the Initial Statement of Reasons ("ISOR").

28

4

the production and use of alternative, low-carbon fuels *in California*," and that "these outcomes" are "important goals for California." *Id.* SUF 39 (FSOR 457) (emphasis added). Likewise, Defendants have identified the following "impacts" of the LCFS:

> Biofuels will displace some percent of petroleum-based transportation fuels.
>
> . . . .
>
> Reducing the volume of transportation fuels that are imported from other states will reduce foreign imports of oil into the U.S.
>
> . . . .
>
> The biorefineries expected to be built in the State will provide needed employment, an increased tax base for the State, and value added to the biomass used as feedstock. These benefits will be more important in rural areas of the State that are short on employment but rich in natural resources.
>
> Displacing imported transportation fuels with biofuels produced in the State keeps more money in the State.

SUF 41–44 (FSOR 479). According to Defendants, "[o]ne of the key advantages of the LCFS . . . is that it reduces our dependence on foreign oil." SUF 40 (FSOR 461). Defendants estimate that, under the LCFS, "[u]p to eighteen cellulosic ethanol and six corn ethanol plants could be built by 2020 with a total annual capacity of 1.2 billion gallons." SUF 45 (FSOR 419). "The estimated capital investment for these new businesses is approximately $8.5 billion . . . ." *Id.* (FSOR 420).

## C.   The LCFS Regulates "Carbon Intensity" and "Fuel Pathways"

The LCFS seeks to accomplish these goals by regulating importers and producers of transportation fuels that are "sold, supplied, or offered for sale in California." LCFS § 95480.1(a). The LCFS requires regulated parties to reduce the "average carbon intensity" of the transportation fuels they sell in California each year beginning in 2011, with the ultimate goal of a 10% reduction by 2020. *See* LCFS § 95482(b), (c), Tables 1–2; *see* Order on Defendants' Motion to Dismiss at 6 (June 16, 2010) ("June 16 Order"). As this Court has explained, the LCFS "focuses on the carbon intensity of all feedstocks and fuel sources used in California." *Id.* at 6. "Carbon intensity does not measure how much carbon a fuel contains." *Id.* at 7.

According to Defendants, "[c]arbon intensity is not an inherent chemical property of a fuel,

but rather it is reflective of the process in making, distributing, and using that fuel." SUF 51 (FSOR 951). Thus, "the LCFS contains no requirements that dictate the exact composition of compliant transportation fuels." SUF 59 (FSOR 442).

> A gallon of ethanol made from corn grown and processed in the Midwest will, under a microscope or other analytical device, look identical in every material way to a gallon of ethanol processed from sugar cane grown in Brazil. Both samples of ethanol will have the same boiling point, the same molecular composition, the same lower and upper limits of flammability – in other words, both will have identical physical and chemical properties because both products consist of 100% ethanol. On the other hand, the corn ethanol from the Midwest will have different carbon intensity than the sugar cane ethanol from Brazil.

SUF 60 (ISOR V-30). Defendants admit that the LCFS does "not set[] a fuel standard," SUF 59 (FSOR 439), and it does not "establish any motor-vehicle fuel specifications." Id. (FSOR 439, 442). Rather, the LCFS purports to assign different carbon intensity values to chemically and physically identical fuels based upon an estimate of the "lifecycle greenhouse gas emissions" associated with various "fuel pathways." LCFS § 95486(b), Table 6.

"Carbon intensity" is defined as "the amount of lifecycle greenhouse gas emissions, per unit of energy of fuel delivered, expressed in grams of carbon dioxide per megajoule (gCO2E/MJ)." LCFS § 95481(a)(11); *see* June 16 Order at 7. In turn, "[l]ifecycle greenhouse gas emissions" are defined as "the aggregate quantity of greenhouse gas emissions . . . related to the full fuel lifecycle, including all stages of fuel and feedstock production and distribution, from feedstock generation or extraction through the distribution and delivery and use of the finished fuel to the ultimate consumer." LCFS § 95481(a)(28); *accord* June 16 Order at 7. According to Defendants, "the carbon intensity value assigned to each fuel reflects the GHG emissions associated with that fuel's production, transport, storage, and use," SUF 54 (FSOR 507), so that the LCFS "discourages the use of higher-carbon-intensity fuels," SUF 66 (FSOR 477).

As described below, the LCFS discriminates in favor of California transportation fuels and impermissibly regulates interstate and foreign commerce in an extraterritorial manner.

**D.      "Carbon Intensity" of Transportation Fuels Under the LCFS.**

**1.      Corn Ethanol.**

Corn ethanol produced in the Midwest is chemically and physically identical to corn ethanol produced in California regardless of the production process or the source of the energy used to produce the ethanol.  SUF 60 (ISOR V-30).  Nevertheless, the LCFS discriminates against corn ethanol from the Midwest by assigning "a higher carbon intensity score to corn-derived ethanol from the Midwest than it assigns to corn-derived ethanol from California."  June 16 Order at 7; LCFS § 95486(b), Table 6.  That discrimination is illustrated below:

**Carbon Intensities Assigned to Midwest And California Corn Ethanol[3]**

| Fuel | "Fuel Pathway" | Assigned Carbon Intensity (gCO2e/MJ) | Difference Between Carbon Intensities For Midwest and California Corn Ethanol (gCO2e/MJ) |
|---|---|---|---|
| Corn Ethanol | 1.  Midwest; Dry Mill; Dry DGS; NG | 98.40 | 9.50 |
| | 1a. California; Dry Mill; Dry DGS; NG | 88.90 | --- |
| | 2.  Midwest; Dry Mill; Wet DGS; NG | 90.10 | 9.40 |
| | 2a. California; Dry Mill; Wet DGS; NG | 80.70 | --- |
| | 3.  Midwest; Dry Mill; Wet DGS; 80% NG; 20% Biomass | 86.80 | 9.36 |
| | 3a. California; Dry Mill; Wet DGS; 80% NG; 20% Biomass | 77.44 | --- |

As reflected in the Table, the LCFS assigns California ethanol (e.g., "No. 1a.  Ethanol from Corn; California; Dry Mill; Dry DGS, NG") a carbon intensity of 88.90 gCO2e/MJ, but assigns the same ethanol produced in the Midwest ("No. 1.  Ethanol from Corn; Midwest; Dry Mill; Dry DGS, NG") a carbon intensity of 98.40 gCO2e/MJ, which is more than 10% larger than that assigned to its California counterpart.  LCFS  § 95486(b), Table 6.  Likewise, the LCFS assigns "Ethanol from Corn; California; Dry Mill; Wet DGS; NG" a carbon intensity of 80.70 gCO2e/MJ, but assigns the same ethanol produced in the Midwest a carbon intensity of 90.10 gCO2e/MJ, which is more than 10% greater than its California counterpart.  LCFS  § 95486(b), Table 6.  The differences in carbon

---

[3] *See* LCFS § 95486(b), Table 6.

1   intensity scores for California and Midwest corn ethanol are critical because the LCFS requires a

2   reduction in the average carbon intensity of transportation fuels each year through 2020.[4]

3          For example, the LCFS increases the carbon-intensity value assigned to a transportation fuel

4   based on the distance the fuel must be transported to bring it to market in California.  The distinction

5   between the carbon intensities for "'California' and 'Midwest' corn pathways" is thus based, in part,

6   on CARB's assessment that "California corn ethanol does not have to travel as far to reach the end-

7   user in California."  June 16 Order at 8.  As Defendants admit, "California-produced fuels . . .

8   benefit from shorter transportation distances . . . ."  SUF 8 (FSOR 713).  Further, the LCFS assigns a

9   carbon-intensity value based on the manner in which corn ethanol is produced.  The production

10  process does not affect the physical or chemical properties of the corn ethanol used in California as a

11  transportation fuel.  SUF 60 (ISOR at V-30).

12         In addition, the LCFS assigns a carbon intensity value based on aspects of an ethanol

13  producer's business occurring *after* the production of ethanol, assigning different carbon intensities

14  to a fuel depending on how the plant handles a co-product of ethanol ("distillers grains").  June 16

15  Order at 9.  For example, corn ethanol plants may produce distillers grains for sale "in a separate

16  market as an animal nutrient."  *Id*.  The LCFS assigns a higher carbon intensity if the producer

17  chooses to dry the distillers grains because "the heat used to dry the distillers grains requires

18  additional energy."  *Id*.  Whether a production facility produces wet or dry distillers grains in the

19  Midwest does not affect the physical properties of ethanol used in California.

20         Finally, the LCFS "distinguishes between corn ethanol producers based on whether they use

21  natural gas, coal, or renewable 'biomass' fuels to power the ethanol plant for conversion of corn to

22  ethanol."  *Id*. at 9.  According to Defendants, "California corn ethanol producers have better access

23  to electricity produced from hydropower and nuclear power plants than Midwestern corn ethanol

---

24  [4] According to Defendants, under the LCFS, "[t]he source of the ethanol will change . . . to those

25  suppliers who can produce it with lower carbon intensities."  SUF 6 (FSOR 426).  Defendants state
    that the LCFS assigns carbon-intensity scores for corn ethanol based on the "location of the

26  production facility (California or Midwest)," the "type of corn milling (wet or dry)," the "type of
    distillers grains produced (wet or dry)" and the "source of fuel for heat energy and co-generated

27  electrical power (natural gas, coal, biomass)."  SUF 57 (FSOR 508).

28

1    producers, and California producers will be at least as efficient as Midwestern producers in the use

2    of electricity."  June 16 Order at 8–9.  Defendants state that "[c]urrently California biorefineries do

3    not use coal in their operation, and ARB does not expect coal use in in-state refineries in the future

4    due to cost and regulatory requirements."  SUF 4 (FSOR 602).  Further, Defendants do not "expect

5    ethanol produced using coal power to be used in California under the LCFS."  SUF 5 (FSOR 521).

6    Defendants admit that California corn ethanol benefits as compared to Midwest corn ethanol as a

7    result of "lower carbon intensity electricity sources."  SUF 8 (FSOR 713).

8                    **2.      Crude Oil.**

9            The LCFS treats crude oil from California more favorably than crude oil from outside

10   California in two separate respects.  First, the LCFS discriminates against "emerging crude sources"

11   of high carbon intensity crude oil by treating them less favorably than high carbon intensity crude oil

12   from California.  *Second*, the LCFS requires that all "existing crude sources" be assigned the same

13   carbon intensity even though, according to Defendants, high carbon intensity crude oil from

14   California has a higher carbon intensity than other low carbon intensity crude oils from Alaska and

15   other countries.  In both cases, the LCFS provides less favorable treatment for crude oils from

16   outside California and from foreign countries.

17                    a.      LCFS's Treatment of "Emerging Sources" of Crude Oil

18           With regard to "emerging crude sources" – *i.e.*, crude oils that made up less than 2% of the

19   2006 California baseline – the LCFS requires that they be "evaluated individually" "to ensure that

20   increased use of 'high carbon intensity crude oil' production methods are accurately accounted for

21   within the regulation."  SUF 19 (FSOR 235).  As Defendants explain, "[t]he LCFS differentiates

22   between crude oil sources that were used in significant quantities in California in 2006 (e.g.

23   'included in the 2006 California baseline crude mix') and those crude sources that were not used in

24   significant quantities in 2006."  SUF 17 (FSOR 233).  "The two percent threshold is designed to

25   differentiate established crude sources that made up a significant fraction of the California crude oil

26   supply in 2006 from potential emerging crude sources that could be a significant part of the crude

27   supply in the future . . . ."  SUF 16 (FSOR 24).  Any high carbon intensity crude oil from outside

28

9

1    California is subjected to different treatment than if it were high carbon intensity crude oil from

2    California.[5]

3        For example, parties seeking to introduce high carbon intensity crude oil from outside

4    California from sources such as Canada or Venezuela would be required to demonstrate "that the

5    carbon intensity for crude production and transport has been reduced to no more than 15.00

6    $gCO_2e/MJ$ – through technologies such as carbon capture and sequestration."  SUF 32 (FSOR 24);

7    *see* LCFS § 95486(b)(2)(A)(2)(a)(ii).  If a regulated party meets that burden, then the high carbon

8    intensity crude "would qualify for the default carbon intensity values based on overall averages,"

9    *i.e.*, 6.93 $gCO_2e/MJ$.  SUF 32 (FSOR 24).  If, not, then "the actual carbon intensity from production

10   and transport of the crude would have to be used."  *Id*.  An illustration of the LCFS's treatment of

11   high carbon intensity crude oil is shown below:

12
13        **Comparison of Assigned and Calculated Carbon Intensities For**
         **Californian TEOR and Venezuelan High Carbon Intensity Crude Oil[6]**

| Crude Oil (Percent of California Crude Market in 2006) | Carbon Intensity Calculated for Fuel Production and Transport ($gCO^2e/MJ$) | Carbon Intensity Assigned By LCFS for Fuel Production and Transport ($gCO^2e/MJ$) | Difference Between Assigned And Calculated Carbon Intensity Values ($gCO^2e/MJ$) |
|---|---|---|---|
| California – TEOR (14.80% of crude market) | 18.89 | 6.93 | 11.96 |
| Venezuelan Crude Oil (0.63% of crude market) | 21.95 | 21.95 | No Difference |

20       With regard to "emerging sources" of crude oil, Defendants state that "[r]equiring all crude

21   sources not part of the 2006 baseline mix to be evaluated individually will help to ensure that

22   increased use of 'high carbon intensity crude oil' production methods are accurately accounted for

23   within the regulation."  SUF 19 (FSOR 235).  In response to comments that this treatment of

24   "emerging" sources of crude oil would result in "fuel shuffling," with the "end result" of "little or no

25   ───────────────
     [5] SUF 31 (FSOR 24) ("The HCICO that qualifies for the default average carbon intensity values . . .
26   is California crude oil produced using TEOR").

27   [6] These data are taken from ISOR, C-56 Table C12-1; C-59 Table C12-6; *see* SUF 23-25, 29, 31.

28

1   net change  in fuel carbon content on a global scale," FSOR 715, Defendants stated that "[a]n

2   important goal of the LCFS is to establish a durable fuel carbon regulatory template that is capable

3   of being exported to other jurisdictions," SUF 58 (FSOR 477, 715), and "as LCFS regulations

4   become more widely adopted by state and national governments the potential for crude shuffling will

5   be greatly diminished."  SUF 48 (FSOR 235).  That response assumes that other state and foreign

6   governments will establish trade barriers similar to those established by the LCFS.

7          A number of parties, including the Government of Canada and The Center for North

8   American Energy Security (CNAES), urged Defendants to adopt a single standard carbon intensity

9   for all "mainstream crude oil fuel pathways from light to heavy crudes, including oil sands crude,

10  rather than only the crudes in the [2006] baseline . . . crudes mix."  FSOR 605-06; *see also* FSOR

11  232-33.  Defendants rejected these arguments, stating that crude oils outside the 2006 baseline mix

12  would be "evaluated individually" and that "the average crude carbon intensity" would not apply to

13  all crude oils.  SUF 34 (FSOR 606, 232).

14                    b.      The LCFS's Treatment of "Existing" Sources of Crude Oil.

15         In contrast to "emerging crude sources," the LCFS assigns a single average carbon intensity

16  value for diesel fuel and gasoline from crude oils that made up more than 2% of the California crude

17  market in 2006.  For crude oil sources within the 2006 California baseline mix, the LCFS assigns a

18  single average carbon intensity for diesel fuel (94.71 gCO2e/MJ) and a single average carbon

19  intensity for CARBOB, the feedstock to which ethanol is added to produce gasoline (of 95.86

20  gCO2e/MJ).  LCFS § 95486(b)(2)(A); *see also* SUF 9 (FSOR 23).  Under the LCFS, "regulated

21  parties *must* use these single carbon intensity values for all California CARBOB and diesel fuel

22  regardless of the actual carbon intensity of producing or transporting the specific crude oil used, or

23  the specific refinery operations."  SUF 13 (FSOR 23); *see* LCFS § 95486(b)(2)(A)(1).

24         According to Defendants, "[t]he portion of the total average carbon intensity value that is

25  attributable to the average carbon intensity of producing and transporting the crude oil for California

26  CARBOB and diesel fuel is 6.93 gCO2e/MJ."  SUF 12 (FSOR 23).  The LCFS requires that this

27  average be assigned to all crude oils in the 2006 California baseline even though, according to

28

Defendants, the "carbon intensities for mainstream crude oil production methods range from about 4 to more than 20 gCO2e/MJ." SUF 18 (FSOR 235). The LCFS's treatment of a number of crude oils in the 2006 baseline crude mix is illustrated below:

**Comparison of Carbon Intensities For Crude Oils**
**Within The 2006 California Baseline Crude Mix[7]**

| Crude Oils Within 2006 California Baseline Mix (Percent of California Crude Market in 2006) | Carbon Intensity *Calculated* for Production and Transportation (gCO2e/MJ) | Carbon Intensity *Assigned* By LCFS for Production and Transportation (gCO2e/MJ) | Difference Between Assigned And Calculated Carbon Intensity Values (gCO2e/MJ) |
|---|---|---|---|
| California – TEOR (14.80% of crude market) | 18.89 | 6.93 | -11.96 |
| Alaskan Light Crude (16.10% of crude market) | 4.36 | 6.93 | +2.57 |
| Imported Light Crude (44.44% of crude market) | 4.65 | 6.93 | +2.28 |

Under the LCFS, California crude oil produced using thermal enhanced oil recovery (TEOR) is assigned an carbon intensity of 6.93 gCO2e/MJ for its production and transportation even though, according to Defendants, the "carbon intensity from the production and transportation of this crude is 18.89 gCO2e/MJ." SUF 24, 31 (FSOR 23–24). According to Defendants, "[t]he only 'high carbon intensity crude oil' that is included in the 2006 California baseline crude mix" that "qualifies for the default average carbon intensity values . . . is California crude oil produced using thermal enhanced oil recovery processes." SUF 31 (FSOR 233, 24). For a number of crude oils from outside California, the LCFS assigns them an average carbon intensity that is *higher* than the carbon intensity calculated by Defendants.[8]

According to Defendants, regulated parties must use average carbon intensity values for

---

[7] These data are taken from ISOR, C-56 Table C12-1, C-59 Table C12-6; *see* SUF 21-22, 24-27.

[8] For example, for light crude oils from Alaska and other countries (including Saudi Arabia, Iraq, Brazil, and Mexico), the LCFS assigns them a carbon intensity of 6.93 gCO2e/MJ for their production and transportation even though, according to Defendants, the carbon intensity for their production and transport is 4.36 and 4.65 gCO2e/MJ, respectively. SUF 21 (ISOR C-56, C-59 Table C12-6).

1    these crude oils to "reduce the incentive for regulated parties to comply with the LCFS by shifting to

2    less carbon-intensive crude oils or refinery operations." SUF 13 (FSOR 23, 63).[9]

3              **E.      The LCFS Regulates Out-of-State and Foreign Conduct.**

4              Under the LCFS's "lifecycle analysis," the carbon intensity of a "fuel pathway" is not limited

5    to greenhouse gas emissions that occur in California.  Instead, "[c]arbon intensity" purports to

6    regulate "'all stages of fuel and feedstock production and distribution, from feedstock generation or

7    extraction through the distribution and delivery and use of finished fuel to the ultimate consumer.'"

8    LCFS § 95481(a)(28); *see* June 16 Order at 7.[10]  As a result, the LCFS assigns a carbon intensity

9    score to transportation fuels from outside California based on, and to influence, the manner in which

10   the fuels are produced and transport to the California market.

11             For example, the LCFS assigns carbon intensity values based on activities occurring on farms

12   in the Midwest.  The LCFS assigns carbon intensity scores based on an assessment of other states'

13   "[f]arming practices (e.g., frequency and type of fertilizer used); [c]rop yields; [h]arvesting

14   practices; [and] [c]ollection and transportation of the crop." SUF 55 (ISOR IV-4 to IV-5).  In

15   addition, the LCFS includes a "land use change" component.  LCFS § 95486(b), Table 6; FSOR 631.

16   According to Defendants, the LCFS assigns carbon intensity based on these activities to provide an

17   "incentive for regulated parties to adopt production methods which result in lower emissions." SUF

18   50 (FSOR 84).

19

20   _____

21   [9] Defendants state that the "[u]se of less carbon intensive crude oils would likely do nothing to reduce global GHG emissions because the higher carbon-intensive crude oils replaced would be refined and used elsewhere." SUF 14 (FSOR 23, 63).  Defendants acknowledge that "the potential for fuel shuffling is not limited to petroleum-based fuels" and that "[i]t is highly likely that supplies of ethanol with the lowest carbon intensity will be sent to California with the remaining 'high intensity' ethanol being sold outside of California." SUF 49 (FSOR 241).

22

23

24   [10] The LCFS regulates direct effects and indirect effects.  "'The direct effects typically include feedstock generation or extraction (agricultural production such as planting and harvesting of plant feedstocks for biofuels or extraction for fossil fuels); conversion to finished fuel or fuel blendstock (conversion to ethanol from plants or refining of petroleum); distribution; storage; delivery; and final use of the finished fuel by the end user.'" June 16 Order at 7 (quoting LCFS § 95481(a)(28)).  The "indirect effects" include estimates of increased emissions of GHGs resulting from "land use changes." LCFS § 95481(a)(28).

25

26

27

28

**F.      Impact of LCFS on Plaintiffs.**

NPRA is a trade association whose members include refiners and petrochemical manufacturers which operate in the United States, including California.  One of more members of NPRA is a regulated party subject to the requirements of the LCFS.  SUF 61 (Declaration of Timothy Hogan ¶¶ 4-5 (Nov. 1, 2010) ("Hogan Decl.")).

Beginning in 2010, the LCFS's reporting requirements obligate regulated parties to identify, for fuels sold or imported into California, the type of fuels, whether the fuel is blended, and the fuel's production process.  LCFS § 95484(c)(3); June 16 Order at 6.[11]  According to Defendants, the yearly cost of compliance with LCFS's reporting and recordkeeping requirements will be $4.6 million industry wide and $170,000 for each regulated party.  SUF 65 (FSOR 437, 426).

The LCFS also imposes substantive requirements, beginning in 2011, which mandate that regulated parties reduce the average carbon intensity of the fuels that they sell in California.  The amount of those reductions increases each year through 2020.  LCFS § 95482(a), Tables 1–2; June 16 Order 6–7; *see* SUF 64 (Hogan Decl. ¶ 7).  According to Defendants, the LCFS creates an incentive for "shuffling" of transportation fuels, whereby regulated parties would transport fuels that have been assigned higher carbon-intensity values away from California and transport fuels that have been assigned lower carbon-intensity values to California.  SUF 47-49.  This "fuel shuffling" would result in less efficient fuel distribution routes in which transportation fuels travel further distances.  SUF 64 (Hogan Decl. ¶ 8).

According to Defendants, the LCFS also is designed to promote the development of new local infrastructure to handle the influx of new sources of transportation fuels.  SUF 45-46.  As a result, regulated parties may be required to invest in infrastructure within California, including, for example, improved tankage facilities.  SUF 46 (FSOR 420); see SUF 64 (Hogan Decl. ¶ 9).

---

[11]  Regulated parties are required to calculate the "carbon intensity" for each fuel component.  LCFS § 95484(c)(3)(A); June 16 Order at 6.  The LCFS requires regulated parties to report quarterly regarding each transportation fuels, including (i) the type of fuel, (ii) the number of blendstocks, (iii) the blendstock feedstock, (iv) and the carbon intensity for each fuel or blendstock.  LCFS § 95484.

**ARGUMENT**

**I.    THE LCFS VIOLATES THE COMMERCE CLAUSE BY IMPERMISSIBLY DISCRIMINATING AGAINST INTERSTATE AND FOREIGN COMMERCE.**

The Commerce Clause "directly limits the power of the States to discriminate against interstate commerce." *Wyoming*, 502 U.S. at 454; *NCAA v. Miller*, 10 F.3d 633, 638 (9th Cir. 1993). "Discrimination simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 331 (2007). In assessing whether a state regulation is discriminatory, "the magnitude and scope of discrimination have no bearing on the determinative question whether discrimination has occurred." *Associated Indus. of Mo. v. Lohman*, 511 U.S. 641, 650 (1994).

If a "restriction on commerce is discriminatory, it is virtually *per se* invalid." *Oregon Waste*, 511 U.S. at 99; *see Miller*, 10 F.3d at 638. That is, a discriminatory state law must be struck down unless the *defendant* can "demonstrate, under rigorous scrutiny, that it has *no other means* to advance a legitimate local interest." *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 392 (1993) (emphasis added); *see also United Haulers*, 550 U.S. at 357; *Conservation Force, Inc. v. Manning*, 301 F.3d 985, 995 (9th Cir. 2002). Even if a State is purporting to advance a legitimate end, it may not do so through invalid "legislative means." *Chemical Waste*, 504 U.S. at 340. As a result, a defendant bears the burden of showing that its justification for a discriminatory law is "unrelated to economic protectionism." *New Energy Co.*, 486 U.S. at 274. "A finding that state legislation constitutes 'economic protectionism' may be made on the basis of either discriminatory purpose or discriminatory effect." *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270 (1984) (citation omitted). Where, as here, the discrimination implicates foreign commerce, the State regulation is "subjected to a more rigorous and searching scrutiny," *South-Central Timber Dev. v. Wunnicke*, 467 U.S. 82, 100 (1984), because "discriminatory treatment of foreign commerce may create problems, such as the potential for international retaliation, that concern the Nation as a whole." *Kraft Gen. Foods, Inc. v. Iowa Dep't of Revenue & Fin.*, 505 U.S. 71, 79 (1992).

15

The LCFS fails under these standards because it impermissibly discriminates against interstate and foreign commerce in an effort to promote in-state fuels.

## A.    The LCFS Discriminates in Favor of California Fuels.

The LCFS discriminates on its face, and in its practical effect, in favor of California transportation fuels and against transportation fuels from other States and countries.

### 1.    The LCFS Discriminates in Favor of California Corn Ethanol and Against Midwest Corn Ethanol.

The LCFS's discriminatory treatment of physically and chemically identical fuels is reflected on the face of the LCFS. *See* LCFS § 95486(b), Table 6. Corn ethanol produced in California and the Midwest have "identical physical and chemical properties." SUF 60 (ISOR V-30). That is, corn-derived ethanol fuels "consist of 100% ethanol" and cannot be differentiated "under a microscope or other analytical device." *Id*. Nevertheless, the LCFS Lookup Table provides lower, more favorable, carbon-intensity scores for corn ethanol produced in California than corn ethanol from the Midwest. *See* LCFS § 95486(b), Table 6. That discrimination favors California corn ethanol over Midwest corn ethanol because the LCFS is designed to "discourage[] the use of higher-carbon-intensity fuels." SUF 66 (FSOR 477).

As reflected in the Table on page 7, "California, Dry Mill, Dry DGS, NG" corn ethanol is assigned a carbon intensity score of 88.90 gCO2e/MJ, whereas "Midwest, Dry Mill, Dry DGS, NG" corn ethanol is assigned a carbon intensity score of 98.40, *i.e.*, over ten percent higher than the chemically identical California fuel. LCFS § 95486(b), Table 6. The same is true for each of the California corn ethanol "fuel pathways" when compared to the chemically-identical Midwest corn ethanol pathways. *Id*. On its face, the LCFS reflects "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon*, 511 U.S. at 99 (1994). By assigning higher carbon intensity values to Midwest corn ethanol, the LCFS creates a discriminatory "economic barrier against competition with the products of another state." *Baldwin*, 294 U.S. at 527.

a.   The LCFS Discriminates in Favor of California Corn Ethanol
Based on Where the Ethanol Is Produced

As the Supreme Court has explained, "the purpose of, or justification for, a law has no bearing on whether it is facially discriminatory." *Oregon Waste*, 511 U.S. at 100.  Here, Defendants state that the LCFS discriminates between California and Midwest corn ethanol based, *inter alia*, on (i) the "location of the production facility (California or Midwest)," and (ii) the "source of fuel for heat energy and co-generated electrical power (natural gas, coal, or biomass)."  SUF 2 (FSOR 508) (emphasis added).  These criteria, on their face, and in their practical impact, confirm that the LCFS impermissibly discriminates against Midwest corn ethanol.

First, as to the location of the production facility, Defendants have stated that the LCFS assigns higher carbon intensity values to fuels, including corn ethanol, "based on  . . . [the] location of the production facility" so that "[t]he carbon intensities of some California produced fuels . . . benefit from shorter transportation distances."  SUF 8, 57 (FSOR 508, 713); SUF 3 (FSOR 521) (GHG "emissions associated with transporting ethanol from the Midwest to California" are included in the "pathway assessments" for Midwest ethanol).  Imposition of a higher carbon intensity score based on the "location of the production facility" constitutes express discrimination against Midwest corn-derived ethanol and in favor of California corn ethanol.  Defendants may not impose a barrier to interstate commerce based on the distance that the product must travel in interstate commerce.  *Cf. Dean Milk Co. v. Madison*, 340 U.S. 349, 354 n.4 (1951) (striking down local requirement that required milk sold in the city to be pasteurized within five miles of the city lines); *see also West Lynn Creamery v. Healy*, 512 U.S. 186, 202 (1994) ("the imposition of a differential burden on any part of the stream of commerce . . . is invalid, because a burden placed at any point will result in a disadvantage to the out-of-state producer").

Nor could this discrimination be excused even if the LCFS merely "discourage[d]," SUF 66 (FSOR 477), rather than banned, fuels produced outside California that travel longer distances in interstate and foreign commerce.  The law is settled that "where discrimination is patent, . . . neither a widespread advantage to in-state interests nor a widespread disadvantage to out-of-state

17

1  competitors need be shown."  *New Energy Co.*, 486 U.S. at 275-76; *accord Camps*

2  *Newfound/Owatonna*, 520 U.S. at 578 ("discriminatory burdens on interstate commerce imposed by

3  regulation or taxation may also violate the Commerce Clause").  Indeed, "the very purpose of the

4  Commerce Clause was to create an area of free trade among the several States."  *Boston Stock*

5  *Exchange v. State Tax Comm'n*, 429 U.S. 318, 328 (1977).

6  Second, assignment of higher carbon intensity values based on the "source of fuel" used to

7  produce the ethanol likewise has the practical effect of discriminating in favor of California ethanol

8  and against Midwest corn ethanol.  See *West Lynn Creamery*, 512 U.S. at 201 ("'The commerce

9  clause forbids discrimination, whether forthright or ingenious'").  Here, again, Defendants

10  acknowledge that "California-produced fuels do benefit from . . . lower carbon intensity electricity

11  sources," SUF 8 (FSOR 713), and that, under the LCFS, "the source of the ethanol will change  . . .

12  to those suppliers who can produce it with lower carbon intensities."  SUF 6 (FSOR 426).  Although

13  the LCFS provides a number of possible "fuel pathways" for Midwest ethanol produced in whole or

14  in part using coal, Defendants acknowledge that they "do not . . . expect ethanol produced using coal

15  power to be used in California under the LCFS."  SUF 5 (FSOR 521).

16              b.      The LCFS's Discrimination Is a Barrier to Interstate Commerce.

17  By assigning a higher carbon intensity to Midwest corn ethanol (produced in the Midwest

18  using Midwest sources of electricity) than to California corn ethanol (produced in California using

19  electricity sources available in California), the LCFS discourages the use of Midwest corn ethanol

20  and "strips away" from the Midwest corn ethanol industry the "competitive and economic

21  advantages it has earned for itself" by combining the close proximity of corn fuel and economical

22  sources of energy and electricity.  *See Hunt v. Wash.ton State Apple Advertising Comm'n*, 432 U.S.

23  333, 351 (1977).

24  The Commerce Clause prohibits the LCFS because it is a barrier to the free flow of interstate

25  commerce.  For example, in *Hunt*, the Supreme Court struck down a North Carolina regulation that

26  required apples shipped to North Carolina in closed containers "to display either the applicable

27  USDA grade or none at all."  *Id.* at 337.  The Court explained that the regulation violated the

28

1    Commerce Clause despite its "facial neutrality" because it (i) imposed disparate burdens on

2    Washington apple growers who would be required "to alter their marketing practices," (ii) stripped

3    away from the Washington apple industry the competitive and economic advantage it had earned for

4    itself through its expensive inspection and grading system," and (iii) "ha[d] a leveling effect which

5    insidiously operates to the advantage of local apple producers" that denied them the benefit of "free

6    market forces at work."  *Id*. at 351-52.[12]

7              Here, too, the LCFS discriminates by attempting to deny Midwest corn ethanol its

8    competitive advantage in the market for corn-derived ethanol.  As Defendants note, "the LCFS is

9    designed to . . . stimulate *the production* and use of alternative, low-carbon fuels in California."

10   SUF 39 (FSOR 457) (emphasis added).  According to Defendants, the criteria employed by the

11   LCFS – e.g., the production location and fuel source – favor California-produced ethanol because (i)

12   California corn ethanol benefits from shorter travel distances and (ii) "[c]urrently California

13   biorefineries do not use coal in their operation, and ARB does not expect coal use in in-state

14   refineries in the future due to cost and regulatory requirements."  SUF 4 (FSOR 602).  As a result,

15   the LCFS discourages the sale of corn ethanol produced in the Midwest as compared to corn ethanol

16   produced in California.

17              **2.      The LCFS Discriminates in Favor of California Crude Oil and**
                         **Against Crude Oils from Outside California.**
18

19             The LCFS also discriminates in favor of California crude oil and against crude oils from

20   other States and countries both for "emerging crude sources" – *i.e.*, those that made up less than 2%

21   of the 2006 California baseline crude mix – and with respect to "established crude sources" – *i.e.*,

22   those included in the 2006 California baseline crude mix.

23                        a.      For "Emerging Crude Sources," the LCFS Discriminates Against
                                 <u>High Carbon Intensity Crude Oils from Outside California.</u>
24
             The LCFS discriminates against high carbon intensity crude oil from outside California when
25

26   _____

[12] Defendants have been candid about the discriminatory effect of the LCFS.  They detailed a series
27   of compliance scenarios, each of which shows Midwest corn ethanol use dropping from 1.15 billion
     gallons to 0 gallons from 2010 to 2018.  SUF 7 (ISOR App. E, E-3–E-9).
28

1    compared to similar crude oil from California.  The LCFS assigns a value of 6.93 gCO2e/MJ for the

2    production and transport components for all crude oils included in the 2006 California baseline crude

3    mix "regardless of the actual carbon intensity of producing or transporting the specific crude oil

4    used, or the specific refinery operations."  SUF 13 (FSOR 23).  In contrast, for "emerging crude

5    sources," if the carbon intensity for their production and transport is greater than 15.00 gCO2e/MJ,

6    then the LCFS requires that the "actual carbon intensity from production and transport of the crude

7    would have to be used."  SUF 32 (FSOR 24); *see* LCFS § 95486(b)(2)(A).  Defendants admit that

8    the LCFS discriminates (*i.e.*, "differentiate[s]") between "established crude sources that made up a

9    significant fraction of the California crude oil supply in 2006 from potential emerging crude sources

10   that could be a significant part of the crude supply in the future."  SUF 16 (FSOR 24).

11          The result of this discrimination is that the LCFS favors high carbon intensity crude from

12   California over high carbon intensity crude oils from outside California such as Venezuela or

13   Canada.  *See* SUF 30 (FSOR 25) ("HCICO produced from oil sands is most likely to come to

14   California from Canadian producers").  Under the LCFS, high carbon intensity crude from

15   California is treated as if the carbon intensity for its production and transport were 6.93 gCO2e/MJ,

16   even though, according to Defendants, the actual value for production and transport is 18.89

17   gCO2e/MJ.  SUF 24, 31 (FSOR 23-24).  According to Defendants, the production and transport of

18   Venezuelan crude oil results in a carbon intensity of 21.95 gCO2e/MJ.  SUF 23 (ISOR C-59, Table

19   C12-6).  Under the LCFS, however, Venezuelan crude would not be assigned the 6.93 gCO2e/MJ

20   average carbon intensity for production and transport applicable to high carbon intensity crude from

21   California because Venezuelan crude oil made up less than 2.0% of the 2006 California baseline

22   crude mix.  *See* LCFS § 95486(b)(2)(A).  Thus, a regulated party using Venezuelan crude oil must

23   use "the actual carbon intensity from production and transport of the crude would have to be used."

24   SUF 13, 32 (FSOR 24).  As reflected in the Table of page 10, the impact of that discriminatory

25   treatment is significant.[13]

26   _____

27   [13] Because Venezuelan crude oil is treated as an "emerging crude source," it would be assigned a
     carbon intensity for production and transport that defendants have calculated as 21.95 gCO2e/MJ, a
     value that is 15.02 gCO2e/MJ higher than the carbon intensity values assigned by the LCFS to high

28
                                                                              *(Footnote continued)*

The practical effect of this discrimination is that high carbon intensity crude oils from "emerging crude sources" will be assigned significantly higher carbon intensity values than high carbon intensity crude from California without regard to the "actual carbon intensity of producing or transporting" high carbon intensity crude from California.  SUF 32 (FSOR 24).  This treatment discriminates in favor of high carbon intensity crude from California and against Venezuelan or other emerging sources of high carbon intensity crude oil.  See SUF 66 (FSOR 477) ("the LCFS discourages the use of higher-carbon-intensity fuels").

> b.   For "Established Crude Sources," The LCFS Discriminates In <u>Favor of California Crude Oil.</u>

For crude oils within the 2006 California baseline, the LCFS requires regulated parties to use the *average* carbon intensity values identified by defendants for "all California CARBOB and diesel fuel."  SUF 13 (FSOR 23).  According to Defendants, however, the carbon intensities for these different crude oils are not the same.  The LCFS treats high carbon intensity crude from California as if it had a *lower* carbon intensity than that calculated by Defendants, and crude oils from Alaska and other countries as if they had *higher* carbon intensities than those calculated by Defendants.  As reflected in the Table on page 12, the LCFS thus tilts the competitive playing field in favor of California and against crude oils from outside California.

According to Defendants, for crude oils in the 2006 California baseline, the "portion of the total average carbon intensity values that is attributable to the *average* carbon intensity of producing and transporting the crude oil for California CARBOB and diesel fuel is 6.93 gCO2e/MJ."  SUF12 (FSOR 23) (emphasis added).  Under the LCFS, regulated parties must "use these single carbon intensity values for all California CARBOB and diesel fuel regardless of the actual carbon intensity of producing or transporting the specific crude oil used, or the specific refinery operations."  *Id*.  That requirement favors high carbon intensity crude oil from California because, according to

---

carbon intensity crude from California.  *See* SUF 24, 31 (FSOR 23-24).  If, however, the LCFS did not discriminate against "emerging crude sources," then the carbon intensity value assigned to Venezuelan crude oil would 6.93 gCO2e/MJ.  *Id.*

1   Defendants, the carbon intensity for its production and transport is 18.89 gCO2e/MJ.  SUF 13

2   (FSOR 23); SUF 24 (ISOR C-59, Table C12-6).  The LCFS requires regulated parties to treat high

3   carbon intensity crude oil from California as if its carbon intensity was 11.96 gCO2e/MJ lower

4   (18.89 minus 6.93) than the carbon intensity actually calculated by Defendants.

5          Conversely, the LCFS imposes a burden on Alaskan and foreign crude oils with carbon

6   intensities lower than the 2006 California baseline average.  For these out-of-state crude oils,

7   Defendants calculated the carbon intensity for their production and transport to be 4.36 and 4.65

8   gCO2e/MJ, respectively.  SUF 21 (ISOR C-59, Table C12-6).  The LCFS, however, requires that

9   these fuels from outside California be treated as if the carbon intensity for their production and

10  transport was 6.93 gCO2e/MJ.  SUF 13 (FSOR 23); SUF 2 (ISOR C-59 Table C12-6).

11         The LCFS benefits high carbon intensity crude oil from California and burdens crude oil

12  from Alaska and other foreign light crude oils.  The LCFS requires regulated parties to treat all crude

13  oils used in California in 2006 as if they had the same carbon intensity even though, according to

14  Defendants, they do not.  SUF 18, 21, 24.  Defendants admit that their approach to established crude

15  oil sources seeks to "reduce the incentive for regulated parties to comply with the LCFS by shifting

16  to less carbon-intensive crude oils or refinery operations."  SUF 13 (FSOR 23).[14]

17         **B.    Defendants Cannot Show That the LCFS Survives Strict Scrutiny.**

18         Because the LCFS discriminates against transportation fuels from outside California,

19  Defendants must overcome a virtual per se rule of invalidity and satisfy the strictest scrutiny.

20  Defendants must show both (i) that the discrimination in the LCFS is "'unrelated to economic

21  protectionism,'" *Oregon Waste*, 511 U.S. at 106, *and* (ii) that they have "no other means to advance

22  a legitimate local purpose."  *United Haulers*, 550 U.S. at 331; *accord C & A Carbone*, 511 U.S. at

---

[14] That some in-state crude oil sources might also be burdened with inflated carbon intensity values
is of no consequence.  *See C & A Carbone*, 511 U.S. at 391 ("The ordinance is no less
discriminatory because in-state or in-town processors are also covered by the prohibition."); *accord
Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Natural Res.*, 504 U.S. 353, 362 (1992);
*Daghlain v. DeVry Univ., Inc.*, 582 F. Supp. 2d 1231, 1243 (C.D. Cal. 2007).  As explained in *New
Energy*, "[v]arying the strength of the bar against economic protectionism according to the size and
number of in-state and out-of-state firms affected would serve no purpose except the creation of new
uncertainties in an already complex field."  486 U.S. at 276-77.

1    390; *Oregon Waste*, 511 U.S. at 101.  Defendants can show neither.

2                    **1.      The LCFS is Designed to Promote Economic Protectionism.**

3            First, Defendants cannot show that the discrimination in the LCFS is unrelated to economic

4    protectionism.  As the Supreme Court has explained, a regulation addressing interstate commerce

5    that gives regulated parties "who handle domestic articles of commerce a cost advantage over their

6    competitors handling similar items produced elsewhere constitutes such protectionism." *Oregon*

7    *Waste*, 511 U.S. at 106; *see also New Energy*, 486 U.S. at 275.  Here, Defendants admit that the

8    LCFS "discourages the use of higher-carbon-intensity fuels," SUF 66 (FSOR 477), and that

9    "California-produced fuels do benefit from shorter transportation distances and lower carbon

10   intensity electricity sources."  SUF 8 (FSOR 713).  The regulatory record confirms that one of the

11   "important goals" for California through adoption of the LCFS was to "stimulate the production and

12   use of alternative, low-carbon fuels *in California*."  SUF 39 (FSOR 457) (emphasis added).

13           In particular, Defendants have estimated that "[u]p to eighteen cellulosic ethanol and six corn

14   ethanol plants could be built by 2020 with a total annual capacity of 1.2 billion gallons."  SUF 45

15   (FSOR 419).  Further, the "total cost" for California construction of "new/upgraded alternative fuel

16   infrastructures and the cost of alternative fuel plants to be approximately $10 billion over the next

17   decade."  SUF 46 (FSOR 420).  Defendants highlight that "[t]he biorefineries expected to be built in

18   the State will provide needed employment, an increased tax base for the State, and value added to

19   the biomass used as feedstock," and that "[t]hese benefits will be more important in rural areas of the

20   State that are short on employment but rich in natural resources."  SUF 43 (FSOR 479); SUF 38

21   (FSOR 474) ("To the extent that California can produce more of its own transportation fuel, lower

22   the amount of money spent on imported oil or petroleum products, and lower dependence on out-of-

23   state biofuels, business competitiveness should be improved overall in the State.").

24           Defendants acknowledge that these benefits to California would come at the expense of

25   transportation fuel producers from outside California.  Defendants state that, under the LCFS, "[t]he

26   source of the ethanol will change . . . to those suppliers who can produce it with lower carbon

27   intensities."  SUF 6 (FSOR 426).  Thus, while coal remains an important energy source for

28

                                            23

1    producers of corn ethanol in the Midwest, Defendants have made clear that they do not "expect

2    ethanol produced using coal power to be used in California under the LCFS." SUF 5 (FSOR 521).

3    Indeed, according to Defendants, "[c]urrently California biorefineries do not use coal in their

4    operation, and ARB does not expect coal use in in-state refineries in the future due to cost and

5    regulatory requirements." SUF 4 (FSOR 602). Likewise, with regard to crude oil, according to

6    Defendants, "[o]ne of the key advantages of the LCFS . . . is that it reduces our dependence on

7    foreign oil." SUF 40 (FSOR 461).

8            Simply put, the LCFS should be struck down in its entirety because Defendants cannot meet

9    their burden of showing, under strict scrutiny, that the LCFS is unrelated to economic protectionism.

10                   **2.      The LCFS Is Not the Only Means of Reducing GHGs.**

11           The stated purpose of the LCFS is "to reduce greenhouse gas emissions." LCFS § 95480.

12   Defendants cannot meet their burden of showing that the LCFS is the only means available for

13   Defendants to accomplish that goal.

14           First, Defendants acknowledge that, unless other states adopt similar regulatory frameworks,

15   "fuel producers are free to ship lower-carbon fuels to areas with such standards, while shipping

16   higher-carbon fuels elsewhere" so that the "end result of this fuel 'shuffling' process is little or no

17   net change in fuel carbon-intensity on a global scale." SUF 47 (FSOR 477); SUF 15 (FSOR 234-35)

18   ("We agree that California's LCFS, operating in isolation, may temporarily increase the potential for

19   crude oil shuffling"); SUF 49 (FSOR 241) ("It is highly likely that supplies of ethanol with the

20   lowest carbon intensity will be sent to California with the remaining 'high intensity' ethanol being

21   sold outside of California"). As a result, it is doubtful that Defendants could establish that the LCFS

22   even advances the goal of reducing GHG emissions, let alone show that Defendants could not reduce

23   GHG emissions in California through another non-discriminatory means.

24           Defendants do not contend that they lack authority to adopt regulations that require

25   reductions in GHG emissions in California generally or to require reductions in GHG emissions in

26   California associated with transportation fuels used in California. *See Chemical Waste*, 504 U.S.

27   344-45 (striking down state law where "[l]ess discriminatory alternatives . . . are available to

28

24

MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT
ON BEHALF OF THE NPRA PLAINTIFFS
LEAD CASE NO. **1:09-CV-02234-LJO-DLB**

1   alleviate this concern").  To the contrary, Defendants admit that the State can reduce GHG emissions

2   associated with transportation fuels by "increasing vehicle efficiency," or "reducing the number of

3   vehicle miles traveled."  SUF 36 (FSOR 74).  Defendants would be free (i) to impose a

4   nondiscriminatory tax on the sale of transportation fuels to consumers in California (thereby

5   attempting to reduce the demand for all transportation fuels) or (ii) to cap the volume of

6   transportation fuels sold in California (if done in a nondiscriminatory manner).  What Defendants

7   cannot do is impose regulations that discriminate against out-of-state fuels.

8          Defendants acknowledge that in advancing the goal of reducing GHGs, they were

9   constrained (by State statute) to develop the "LCFS in a manner that minimizes costs and maximizes

10  the total benefits to California."  SUF 37 (FSOR 476).  That provision requiring that California

11  interests are maximized and its burdens minimized underscores the problems inherent in a state

12  regulation that discriminates against transportation fuels from outside California:  the LCFS lacks

13  appropriate "political restraints" that normally guide legislation and regulatory action.  See South

14  Carolina State Highway Dep't v. Barnwell Bros., Inc., 303 U.S. 177, 185 n.2 (1938).  As the

15  Supreme Court has explained, "[u]nrepresented interests will often bear the brunt of regulations

16  imposed by one State having a significant effect on persons or operations in other States."  South-

17  Central Timber Dev., 467 U.S. at 92.

18         Here, according to Defendants, "stimulat[ing] the production and use of alternative, low-

19  carbon fuels in California" is an "important goal[]" of the LCFS.  SUF 39 (FSOR 457).  Further,

20  according to Defendants, a "key advantage" of the LCFS is that it would "reduce[] [California's]

21  dependence on foreign oil."  SUF 40 (FSOR 461).  These goals, in turn, would "kee[p] more money

22  in the State" by "[d]isplacing imported transportation fuels with biofuels produced in the State."

23  SUF 40 (FSOR 479).  Simply put, discrimination against transportation fuels and fuel components

24  from outside California permeates the LCFS and was viewed as a "key advantage."  SUF 40 (FSOR

25  461).  By discriminating against out-of-state and foreign transportation fuels, the LCFS violates the

26  Commerce Clause's requirement "of the unitary national market by handicapping out-of-state

27  competitors."  West Lynn Creamery, 512 U.S. at 193.

28

1   Finally, Defendants cannot rely upon cases upholding the "quarantine" of noxious or harmful

2   products to justify its discrimination.  See Chemical Waste, 504 U.S. at 346.  The "LCFS is not

3   setting a fuel standard."  SUF 59 (FSOR 439).  It does not "dictate the exact composition of

4   compliant transportation fuels."  SUF 59 (FSOR 442).  Further, Defendants do not prohibit the

5   production or use of corn "ethanol" in California; rather, the LCFS is designed to afford corn ethanol

6   produced in California with a benefit over chemically identical corn ethanol from the Midwest.

7   Likewise, the LCFS does not prohibit the use of high carbon intensity crude oil; instead, the LCFS

8   provides beneficial treatment to high carbon intensity crude from California to "reduce the

9   incentive" of regulated parties from meeting their obligations under the LCFS by switching to lower

10  carbon intensity crude oils from outside California.  SUF 13 (FSOR 23-24).

11  Defendants cannot show that the LCFS is "unrelated to economic protectionism" or that there

12  are no other means of reducing GHG emissions in California.

13  **II.    THE LCFS VIOLATES THE COMMERCE CLAUSE BY REGULATING
        INTERSTATE AND FOREIGN COMMERCE OUTSIDE CALIFORNIA.**

14

15  In addition to its impermissible discrimination, the LCFS independently violates the

16  Commerce Clause because it purports to regulate interstate and foreign commerce outside of

17  California.  The LCFS  purports to regulate "fuel pathways," that is, the manner in which fuels are

18  produced and transported to the California market.  That extraterritorial regulation by Defendants of

19  interstate and foreign commerce is prohibited by the Commerce Clause.  This infirmity strikes at the

20  core of the LCFS and requires that it be struck down in its entirety.

21  **A.    The Commerce Clause Prohibits Extraterritorial Regulation of Commerce.**

22  "[T]he 'Commerce Clause . . . precludes the application of a state statute to commerce that

23  takes place wholly outside of the State's borders, whether or not the commerce has effects within the

24  State.'"  Healy v. Beer Institute, 491 U.S. 324, 336 (1989).  Such a regulation "exceeds the inherent

25  limits of the enacting State's authority and is invalid regardless of whether the statute's

26  extraterritorial reach was intended by the legislature."  Id.  Moreover, the practical effect of a state

27  regulation "must be evaluated not only by considering the consequences of the statute itself, but also

28

26

1    by considering how the challenged statute may interact with the legitimate regulatory regimes of

2    other States and what effect would arise if not one, but many or every, State adopted similar

3    legislation."  Id.  If a law regulates interstate or foreign commerce outside a state, it "per se" violates

4    the Commerce Clause and must be struck down regardless of the "balance" between "the burden on

5    interstate commerce" and the "the local benefit derived from the Statute."  Miller, 10 F.3d at 640.

6    As set forth below, the LCFS violates these standards.

7           For example, in Baldwin v. G.A.F. Seelig, Inc., 294 U.S. 511 (1935), the Court struck down

8    a New York law that prohibited the sale of milk in New York if it had been purchased out-of-state at

9    a price lower than the New York in-state minimum price.  Id. at 519.  The Court explained that this

10   barrier to interstate commerce could not be adopted as part of an effort to modify conduct in another

11   state (i.e., "to stimulate the observance of sanitary requirements in the preparation of the product" in

12   Vermont), id. at 524, and that such regulation was impermissible because it would lead to lead to

13   regulations that "condition importation upon proof of a satisfactory wage scale . . . or even upon

14   proof of the profits of the business."  Id.  The Baldwin Court ruled that "[o]ne state may not put

15   pressure of that sort upon others to reform their economic standards," id., because one state "has no

16   power to project its legislation into [another state] by regulating the price to be paid in that state for

17   milk acquired there."  Id. at 521.

18          Likewise, in Healy, the Supreme Court invalidated a Connecticut statute that required beer

19   producers to sell beer in Connecticut at a rate no higher than the lowest rate at which they sold beer

20   in other states.  491 U.S. at 335.  The Court emphasized "the Constitution's special concern both

21   with the maintenance of a national economic union unfettered by state-imposed limitations on

22   interstate commerce and with the autonomy of the individual States within their respective spheres,"

23   id. at 335-36, and struck down the statute because Connecticut "may not deprive businesses and

24   consumers in other states of 'whatever competitive advantages they may possess' based on the

25   conditions of the local market."  Id. at 339 (quoting Brown-Forman Distillers Corp. v. New York

26   State Liquor Auth., 476 U.S. 573, 580 (1986)).  The Court emphasized that extraterritorial regulation

27   was especially problematic under the Commerce Clause because similar statutes could be adopted by

28

27

1    "every other State in the Nation," but that such regulation is "reserved by the Commerce Clause to

2    the Federal Government and may not be accomplished piecemeal through the extraterritorial reach

3    of individual state statutes."  Id. at 339, 340.

4           The Ninth Circuit, Seventh Circuit and Tenth Circuit likewise have struck down efforts by

5    States to regulate interstate commerce in an extraterritorial fashion.  In Miller, the Ninth Circuit

6    struck down a Nevada law that, in its practical effect, would have required the NCAA to follow

7    certain procedures mandated for disciplinary hearings in Nevada across the country.  10 F.3d at 639.

8    The Ninth Circuit concluded that the Nevada statute's "extraterritorial reach" violated the Commerce

9    Clause based on the potential interaction or conflict with similar statutes in other jurisdictions given

10   that "'the Commerce Clause protects against inconsistent regulation arising from the projection of

11   one state regulatory regime into the jurisdiction of another State.'"  Id. at 639 (quoting Healy, 491

12   U.S. at 336).

13          In National Solid Waste Management v. Meyer, 63 F.3d 652, 658 (7th Cir. 1995), the

14   Seventh Circuit struck down a Wisconsin statute that required out-of-state communities to adopt

15   Wisconsin's recycling standards before they could dispose of their waste in Wisconsin.  Id. at 658.

16   Applying Healy, the Seventh Circuit ruled that the Wisconsin statute violated the Commerce Clause

17   because "[i]t essentially controls the conduct of those engaged in commerce occurring wholly

18   outside the State of Wisconsin and therefore directly regulates interstate commerce."  Id.  The

19   Seventh Circuit held that the Commerce Clause "constrains a state from projecting its economic

20   legislation onto commerce wholly occurring in its sister states," id. at 659, and that Wisconsin could

21   not "force [its] judgment . . . on communities in its sister states 'at the pain of an absolute ban on the

22   flow of interstate commerce.'"  Id. at 660-61 (quoting Baldwin, 294 U.S. at 524).[15]

---

[15] Subsequently, Wisconsin amended its law so that landfills could accept waste from jurisdictions
even if they did not have the approved recycling standards, so long as those jurisdictions followed
similar standards when handling waste bound for Wisconsin.  The Seventh Circuit again rejected the
Wisconsin statute, stating that Wisconsin could not discriminate against out-of-state waste that was
"identical" to waste inside Wisconsin based on how the out-of-state waste were treated before it
arrived in Wisconsin.  See Nat'l Solid Waste Mgmt. v. Meyer, 165 F.3d 1151, 1152 (7th Cir. 1999).
The Court held that the limitation on the import of waste into Wisconsin could not stand because
"[n]o state has the authority to tell other polities what laws they must enact or how affairs must be
conducted outside its borders."  Id. at 1153 (citations omitted).

28                                                    28

1    Finally, in Hardage v. Atkins, 619 F.2d 871 (10th Cir. 1980), the Tenth Circuit struck down

2    an Oklahoma statute that "prohibited out-of-state hazardous waste generators from shipping their

3    waste to Oklahoma disposal facilities unless their home state had adopted 'substantially similar'

4    standards for controlling industrial waste disposal as those which Oklahoma ha[d] enacted." Id. at

5    873. The Hardage Court held that "Oklahoma cannot use the threat of economic isolation[ism] as a

6    weapon to force other states to enact substantially similar legislation." Id. By doing so, the

7    Oklahoma statute impermissibly "reaches out and seeks to force the enactment in the state of origin

8    of a statute with standards similar to Oklahoma." Id.

9    Application of the principles confirms that the LCFS violates the prohibition against

10   regulation of interstate and foreign commerce.

11   **B.      The LCFS Violates the Commerce Clause Because It Regulates Interstate
            Commerce Outside California.**

12

13   The LCFS violates the Commerce Clause because it purports to regulate the sale of

14   transportation fuels in California based upon conduct occurring outside California separate and apart

15   from the physical and chemical properties of the transportation fuel sold in California. LCFS §

16   95481(a)(11), (28). As discussed above, the LCFS regulates the import of transportation fuels into

17   California based upon an analysis of "fuel pathways," which are the means through which fuels are

18   extracted, produced and brought to market in California. LCFS § 95486(b), Tables 6–7. For

19   example, for corn ethanol, the LCFS assigns carbon intensities based upon the following conduct

20   occurring outside of California.

21       •      Farming practices (e.g., frequency and type of fertilizer used);
         •      Crop yields;
22       •      Harvesting practices;
         •      Collection and transportation of the crop;
23       •      Type of fuel production process (technology, efficiency of plant/process, etc.);
         •      Fuel used in the production process (Coal/Natural Gas/Biomass);
24       •      Energy efficiency of the production process;
         •      The value of co-products generated (e.g. distillers grain);
25       •      Transport and distribution of the fuel

26   SUF 55 (ISOR IV-4 to IV-5). For crude oil, the LCFS assigns carbon intensity values that purport to

27   "cove[r] crude production, refining, use of the fuel, and all transportation and distribution activities."

28
                                              29

1  SUF 11 (FSOR 23).[16]

2       Defendants cannot erect barriers to interstate and foreign commerce based on the distance a

3  product must travel to reach the California market or based on California's assessment of the way in

4  which an imported product is produced.  Under that same analysis, California could undermine

5  interstate and foreign commerce by creating barriers to competing imports such as oranges from

6  Florida, wine from France, or food products from the Midwest or Canada.[17]  The Commerce Clause,

7  however, is designed to create "an area of free trade among the several States."  Great Atlantic &

8  Pacific Tea Co. v. Cottrell, 424 U.S. 366, 370 (1976).

9       By erecting barriers to the import of transportation fuels based upon the manner in which the

10  fuels were produced and brought to market, the LCFS has the practical effect of controlling

11  "commerce occurring wholly outside the boundaries of a State."  Healy, 491 U.S. at 336.  For

12  example, the LCFS regulates the import of corn ethanol produced in the Midwest based upon the

13  manner in which producers outside California have chosen, based upon local conditions, to

14  manufacture this transportation fuel.[18]  Similarly, the LCFS seeks to regulate the manner in which

15  transportation fuels such as ethanol are produced and the energy used to produce them.  E.g., SUF 57

16  (FSOR 508) (setting forth criteria LCFS applies to differentiate among corn ethanol).  Likewise,

17  with respect to "emerging crude sources," the LCFS regulates their import into California based

18

19  [16] The LCFS similarly attempts to regulate ethanol production internationally, pushing Brazilian
20  ethanol producers to use mechanized harvesting, which would reduce their ethanol's assigned carbon
    intensity from 66.40 gCO2e/MJ to 58.40 gCO2e/MJ.  LCFS § 95486(b), Table 6.

21  [17] Although the barrier imposed by regulation of the manner in transportation fuels reach California
22  is not a complete ban, as noted, the Supreme Court has rejected the view that a state can avoid the
    requirements of the Commerce Clause by imposing a barrier – rather than an outright ban – against
23  interstate commerce.  Cf. New Energy Co., 486 U.S. at 276.

24  [18] For example, one of the by-products of corn ethanol production is Distiller's Grains Plus Solubles
    (DGS), which are marketed separately as an animal nutrient.  Corn ethanol producers may process
25  the DGS either dry or wet.  The LCFS assigns different carbon intensity scores for ethanol
    depending on whether the producer processes its DGS by-product:  "Midwest; Dry Mill; Dry DGS;
26  80% NG; 20% Biomass" is assigned a carbon intensity of 93.60 gCO2e/MJ, whereas the "Wet
    DGS" version of the same feedstock is assigned a carbon intensity of only 86.80 gCO2e/MJ.  LCFS
27  § 95486(b), Table 6.  Thus, the LCFS assigns a higher carbon-intensity to ethanol that results in dry
    DGS than ethanol associated with wet DGS.

28

1    upon the manner in which the oil is extracted and produced.  SUF 11 (FSOR 24).  Defendants may

2    not "attach restrictions to . . . imports in order to control commerce in other States" because doing so

3    "would extend the [State's] police power beyond its jurisdictional bounds."  C & A Carbone, 511

4    U.S. at 393.

5         To be sure, the Commerce Clause allows a State to quarantine "noxious articles, whatever

6    their origin," but the transportation fuels imported into California which the LCFS seeks to

7    discourage are chemically and physically identical to the transportation fuels produced and used in

8    California.  See Chemical Waste, 504 U.S. at 346-47 (ruling that quarantine cases are inapplicable

9    where a state permits the production and sale of the product "within its borders").  Indeed, the LCFS

10   is designed to promote the production of corn ethanol from California and to ensure the continued

11   use of California crude oil.

12        Finally, the extraterritorial reach of the LCFS is particularly suspect because there is a

13   significant risk that other states will adopt their own low carbon fuel standards in response to or in

14   retaliation against the California LCFS.  See Healy, 491 U.S. at 336.  Throughout the administrative

15   process, Defendants have highlighted that "[a]n important goal of the LCFS is to establish a durable

16   fuel carbon regulatory template that is capable of being exported to other jurisdictions."  SUF 58

17   (FSOR 477).  The Supreme Court has held that avoiding "'economic Balkanization' and the

18   retaliatory acts of other States that may follow, is one of the central purposes of [its] negative

19   Commerce Clause jurisprudence."  Camps Newfound/Owatonna, 520 U.S. at 577 (citations omitted).

20   As held by the Ninth Circuit in Miller, extraterritorial regulation violates the Commerce Clause

21   "because of its potential interaction or conflict with similar statutes in other jurisdictions," 10 F.3d at

22   639, and "[t]he serious risk of inconsistent obligations wrought by the extraterritorial effect of the

23   [state law] demonstrates why it constitutes a per se violation of the Commerce Clause."  Id. at 639-

24   40.

25        If Defendants are permitted to impose barriers on interstate commerce based upon their

26   assessment of the manner in which products are produced outside California, then other States would

27   be equally free to adopt inconsistent import barriers on the sale of transportation fuels or other

28

31

1    products from California.  The Commerce Clause precludes that result.  Just as the Commerce

2    Clause requires invalidation of the California LCFS in this case, so too will it "protect [California] in

3    the future, just as it protects her neighbors now, from efforts by one State to isolate itself in the

4    stream of interstate commerce from a problem shared by all."  City of Philadelphia v. New Jersey,

5    437 U.S. 617, 629 (1978).

6                                        *        *        *        *

7            The Commerce Clause violations reflected in the LCFS are endemic and irreparable.  The

8    LCFS must be struck down in its entirety because it impermissibly discriminates against interstate

9    commerce and impermissibly regulates conduct outside California in a manner that purports to

10   regulate "fuel pathways" and thus to set barriers to selling transportation fuels in California based

11   upon the manner in which they reach the California market.

## CONCLUSION

For these reasons, the NPRA Plaintiffs' Motion for Partial Summary Judgment should be granted, the LCFS should be struck down in its entirety, and the Court should issue an order enjoining enforcement of the LCFS.


Dated:  November 1, 2010                              Respectfully Submitted,

                                                     SIDLEY AUSTIN LLP



                                            By: /s/ Marie L. Fiala
                                                _____
                                                Maria Fiala
                                                Counsel for Plaintiffs
                                                In Consolidated
                                                Case No. 1:10-CV-00163 LJO DLB

ADDITIONAL COUNSEL OF RECORD

Paul J. Zidlicky (DC Bar No. 450196) *(Admitted Pro Hac Vice)*
Roger R. Martella, Jr. (DC Bar No. 976771) *(Admitted Pro Hac Vice)*
James W. Coleman (DC Bar No. 986626) *(Admitted Pro Hac Vice)*
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C.  20005
Telephone:  202-736-8000
Facsimile:  202-736-8711
rmartella@sidley.com
pzidlicky@sidley.com
jcoleman@sidley.com

*Counsel for Plaintiffs*
*In Consolidated*
*Case No. 1:10-CV-00163 LJO DLB*

Kurt E. Blase (DC Bar No. 288779)
Blase Law Group
879 N. Kentucky St.
Arlington, VA  22205
Telephone:  703-525-3161
Facsimile:  703-525-3161
kurt@blasegroup.com

*Counsel for Plaintiff Center for*
*North American Energy Security*