1  EDMUND G. BROWN JR.,
   Attorney General of California
2  ROBERT W. BYRNE,
   Supervising Deputy Attorney General
3  GAVIN G. MCCABE, State Bar No. 130864
   MARK POOLE, State Bar No. 194520
4  DAVID A. ZONANA, State Bar No. 196029
   M. ELAINE MECKENSTOCK, State Bar No. 268861
5  Deputy Attorney General
     455 Golden Gate Avenue, Suite 11000
6    San Francisco, CA  94102-7004
     Telephone:  (415) 703-5582
7    Fax:  (415) 703-5480
     E-mail:  Mark.Poole@doj.ca.gov
8  *Attorneys for Defendants*
   *James N. Goldstene, et al.*

9

10                    IN THE UNITED STATES DISTRICT COURT

                      FOR THE EASTERN DISTRICT OF CALIFORNIA
11

12

13  **ROCKY MOUNTAIN FARMERS UNION,**       LEAD CASE NO. :
    **et al.,**                              1:09-CV-02234-LJO-DLB
14
                                Plaintiffs,  *Consolidated With* Case No.:
15                                            1:10-CV-00163-LJO-DLB
            v.
16
                                            **DEFENDANTS' AND DEFENDANT-**
17  **JAMES N. GOLDSTENE, in his official**  **INTERVENORS' MEMORANDUM IN**
    **capacity as Executive Officer of the** **SUPPORT OF CROSS-MOTION FOR**
18  **CALIFORNIA AIR RESOURCES BOARD,**      **SUMMARY JUDGMENT, OR PARTIAL**
    **et al.,**                              **SUMMARY JUDGMENT**
19
                                Defendants.  Date:      February 23, 2011
20                                           Time:      8:30 a.m.
                                             Dept:      Four
21  ─────────────────────────────────────   Judge      The Honorable Lawrence J.
                                                        O'Neill
22  **NATIONAL PETROCHEMICAL &**
    **REFINERS ASSOCIATION, *et al.*,**      Trial Date
23                                           Action Filed:  12/23/2009
                                Plaintiffs,
24
            v.
25
    **JAMES GOLDSTENE, *et al.*,**
26
27                              Defendants.

28

1

**TABLE OF CONTENTS**

2

Page

3     INTRODUCTION ......................................................................................... 1

4     LEGAL BACKGROUND ............................................................................ 2

5         I.     CLEAN AIR ACT CONTEXT ............................................... 2

            A.    Federal Fuels Program ................................................ 2

6             B.    California's Fuels Program. ........................................ 3

7             C.    Legislative History of the Clean Air Act. ................. 4

            D.    The Implications of *Massachusetts v. EPA*. ............. 5

8     FACTUAL AND REGULATORY BACKGROUND ................................. 5

9         I.     DEVELOPMENT OF THE LCFS REGULATIONS. .............. 5

            A.    LCFS Development. ................................................... 5

10             B.    Regulatory Structure ................................................. 6

11             C.    Lifecycle Emissions Analysis. .................................. 7

12         II.    DEVELOPMENT OF THE RFS. ........................................... 8

13         III.   INTERPLAY BETWEEN RFS AND LCFS. ......................... 9

    ARGUMENT ............................................................................................... 10

14         I.     STANDARDS ON SUMMARY JUDGMENT ...................... 10

15         II.    THE LCFS IS AN AUTHORIZED CONTROL OF MOTOR VEHICLE FUEL. ......... 11

16             A.    Section 211(c)(4)(B) Provides California With Plenary Authority To Implement a Control on Carbon Emissions Associated with

17                  Fuels Independent Of Any Action That EPA May Undertake.. ............... 11

            B.    The LCFS Is a Control on Fuel Carbon. ................... 13

18             C.    The LCFS Is a Control that California Has Prescribed for Purposes

19                  of Motor Vehicle Emission Control ........................... 17

20         III.   SECTION 211(O) OF THE CLEAN AIR ACT CREATES NO CONFLICT WITH THE LCFS BECAUSE ITS PROVISIONS DO NOT RESTRICT

21               CALIFORNIA'S AUTHORITY UNDER 211(C)(4)(B) OR CALIFORNIA STATE LAW. ................................................................. 19

22             A.    The Savings Clauses In EISA Are Clear Congressional Intent to Preserve California's Fuels Authority. ....................... 19

23             B.    Based on ARB's Authority, the LCFS Is Not Preempted by the

24                  Federal RFS. ............................................................. 24

                 1.    Plaintiffs' Preemption Claims Fail as Facial Challenges to

25                      the LCFS. ...................................................... 24

                 2.    The Supremacy Clause Is Not Invoked In Resolving A

26                      Potential Conflict Between Two Provisions Of Federal Law. ...... 25

27         IV.   SECTION 211(C)(4)(B) INSULATES CALIFORNIA FUEL REGULATIONS FROM THE COMMERCE CLAUSE. ................................................. 27

28

i

1

**TABLE OF CONTENTS**
(continued)

2

Page

3

A.    The Plain Language of Section 211(C)(4)(B) Authorizes California to Adopt Fuels Regulations that Burden Interstate Commerce ................ 27

4

B.    The *Davis v. EPA* Case Does Not Diminish the Breadth of Authority Provided in Section 211(c)(4)(b). ............................................ 28

5

V.    THE LCFS' TREATMENT OF ETHANOL DOES NOT FACIALLY DISCRIMINATE AGAINST OUT-OF-STATE ENTITIES. ..................................... 29

6

A.    The LCFS Permissibly Distinguishes between Ethanols Based on Carbon Intensity, Not Geography. ............................................. 29

7

B.    The LCFS Permissibly Expands the Alternative Fuels Market in California. ........................................................... 31

8

VI.    THE LCFS' TREATMENT OF CRUDE OIL DOES NOT FACIALLY DISCRIMINATE AGAINST OUT-OF-STATE ENTITIES. ......................................... 32

9

VII.    THE LCFS DOES NOT HAVE A DISCRIMINATORY PURPOSE. .......................... 33

10

VIII.    THE LCFS DOES NOT REGULATE EXTRATERRITORIALLY OR DIRECTLY OUT OF CALIFORNIA. ........................................................ 34

11

CONCLUSION ............................................................................................................... 35

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

<u>Page</u>

**CASES**

*Am. Petroleum Inst. v. Jorling*,
  710 F. Supp. 421 (N.D.N.Y. 1989) ........................................................................ 3

*Amoco Oil v. U.S. Envtl. Prot. Agency*
  (1974) 501 F. 2d 722 ................................................................................... 14, 15

*Birchcrest Mktg. v. Akzan Distrib. Co.*,
  2010 WL 3070394 (C.D. Cal. Aug. 2, 2010) ...................................................... 11

*California Coastal Comm'n v. Granite Rock Co.*,
  480 U.S. 572 (1987) ........................................................................................ 24

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ........................................................................................ 11

*Chae v. SLM Corp*,
  593 F.3d 936 (2010) ........................................................................................ 24

*Chem. Waste Mgmt., Inc. v. Hunt*,
  504 U.S. 334 ............................................................................................. 30, 31

*Cippolone v. Liggett Group, Inc.*
  505 U.S. 504 (1992) ........................................................................................ 26

*Davis v. U.S. Envtl. Prot. Agency*
  348 F.3d 772 (9th Cir. 2003) .................................................................. 12, 28, 29

*Dep't of Revenue of Ky. v. Davis*,
  553 U.S. 328 .................................................................................................. 29

*English v. Gen. Elec. Co.*,
  496 U.S. 72 (1990) .......................................................................................... 13

*Exxon Corp. v. Maryland*,
  437 U.S. 117 (1978) ........................................................................................ 31

*Gade v. National Solid Waste Mgmt. Ass'n*,
  505 U.S. 88 (1992) .......................................................................................... 25

*Geier v. American Honda Motor Co.*,
  529 U.S. 861 (2000) ........................................................................................ 24

*Healy v. Beer Institute*,
  491 U.S. 324 (1989) ........................................................................................ 35

iii

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

*International Paper v. Ouellette,*
4      479 U.S. 481 (1987)........................................................................... 24

5 *Massachusetts v. U.S. Envtl. Prot. Agency,*
     549 U.S. 497 (2007)................................................................... 5, 17, 30

6

*Miller v. W. Bd. of Adjusters,*
7      427 F.2d 175 (9th Cir. 1970)........................................................... 11

8 *Motor Vehicle Mfrs. Ass'n v. N.Y. State Dep't of Envtl. Conservation,*
     79 F.3d 1298 (2nd Cir. 1996).......................................................... 3, 4
9

*Nat'l Endowment for the Arts v. Finley,*
10      524 U.S. 569 (1998)........................................................................... 24

11
*National Assn. of Home Builders v. San Joaquin Unified Air Pollution Control District,*
12      (December 7, 2010, No. 08-17309) ............................................ 22, 23

13 *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality of State of Or.,*
     511 U.S. 93 (1994)................................................................. 31, 32, 33
14

*Oxygenated Fuels Ass'n, Inc. v. Davis,*
15      163 F. Supp. 2d 1182 (E.D. Cal. 2001).................................... passim

16
*Radzanower v. Touche Ross & Co.,*
17      426 U.S. 148 (1976)........................................................................... 26

18 *Rice v. Norman Williams Co.,*
     458 U.S. 654 (1982)........................................................................... 25
19

*S.D. Myers, Inc. v. City and County of SF,*
20      253 F.3d 461 (9th Cir. 2001)........................................................... 35

21
*South-Central Timber Development, Inc. v. Wunnicke,*
22      467 U.S. 82 (1984)........................................................................... 27

23 *Stormans, Inc. v. Selecky,*
     586 F.3d 1109 (9th Cir. 2009)......................................................... 34
24

*T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n,*
25      809 F.2d 626 (9th Cir. 1987)........................................................... 11

26 *United States v. Borden Co.,*
     308 U.S. 188 (1939)........................................................................... 26
27

28

iv

## TABLE OF AUTHORITIES
### (continued)

Page

*United States v. Salerno,*
   481 U.S. 739 (1987) ...................................................................................... 24, 25

*W. Oil & Gas Ass'n v. Orange County Air Pollution Control Dist.,*
   14 Cal.3d 411 (1975) ........................................................................................ 4

**FEDERAL STATUTES**

42 U.S.C.
   § 211(c)(4)(B) ......................................................................................... passim
   § 7401(c) ................................................................................................... 2
   § 7408(f) .............................................................................................. 15, 19
   § 7543 ..................................................................................................... 13
   § 7545 ..................................................................................................... 13
   § 7545(c)(1) ............................................................................................ 14
   § 7545(c)(1), (c)(4)(B) ......................................................................... 13, 17
   § 7545(c)(4)(B) .......................................................................... 11, 13, 27
   § 7545(o) ............................................................................................ 2, 16
   § 7545(o)(1)(E) ....................................................................................... 32
   § 7545(o)(1)(J) ....................................................................................... 25
   § 7545(o)(2) .......................................................................................... 3, 8
   § 7545(o)(2)(A)(i) ................................................................................... 20
   § 7545(o)(2)(B)(I-III) ............................................................................... 3
   § 7545(o)(12) ...................................................................................... 3, 21
   § 17002 ............................................................................................. 3, 20

**STATE STATUTES**

California Health & Safety Code
   § 38501 .............................................................................................. 5, 30
   § 38560.5 ................................................................................................. 6
   § 39051.1 ................................................................................................. 3
   § 39051.2 ................................................................................................. 3

**OTHER FEDERAL AND STATE AUTHORITIES**

Pub. L. 109-58, § 1501, 119 Stat. 594, 1067-1076 ........................................ 2
Pub. L. 110-140, 121 Stat. 1492, 1521-1528, § 202 ...................................... 3
Pub.L. 110-140, 121 Stat. 1492, 1529, § 204(b) ...................................... 3, 20
Pub. L. 110-140, § 202(a)(2)(B)(i)(I-III), 121 Stat. 1492, 1521-1523 ............... 3
Pub. L. 110-140, § 202(a)(1), 121 .................................................................. 3

75 Fed. Reg. 14,670, 14,688 ......................................................................... 22

v

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3      75 Fed Reg. 14748-750 .................................................................................... 32

4

5      Fed. R. Civ. P. § 56(c)(2) ................................................................................ 10

6      Local Rule 260(a) .......................................................................................... 10

7      California Code Regulations

8      Title 13
       §§ 2250-72 ............................................................................................ 4
9      § 2250, 2251, 2253, 2253.2 ................................................................. 4
       § 2251 ................................................................................................... 4
10     § 2253 ................................................................................................... 4
       § 2253.2 ................................................................................................ 4

11
       Title 17
12     § 95480 (2010) ................................................................................ 6, 7
       § 95480.1(a) ........................................................................................ 25
13
14     Exec. Order S-01-07 ....................................................................................... 6

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Government bodies around the world recognize that the threat of climate change is real and the need to address the emissions of greenhouse gases is urgent. The atmosphere has experienced an unprecedented increase in the concentration of greenhouse gases, and an accompanying unprecedented increase in its average temperature. The results from this warming in California include rising oceans, decreased Sierra snowpack and spring runoff, more severe forest fires, and more severe heat waves (leading to more smog and worse ground level air quality).

Continuing its long history of environmental regulatory innovation and leadership, California adopted the world's first low carbon fuel standard (LCFS) in an effort to do its part to address climate change. The LCFS sets a performance standard for transportation fuels to reduce the overall greenhouse gas emissions that occur during the full "lifecycle" of transportation fuels, from production of fuels to emissions from the tailpipe, ultimately achieving a reduction in the carbon intensity of fuel by ten percent in the year 2020. In addition to reducing California's contribution to climate change, the purpose of the LCFS is to drive innovation in clean fuels' technology, reduce our dependence on foreign oil and ensure a lasting market for those clean, alternative fuels.

Plaintiffs Rocky Mountain Farmers' Union (RMFU) and National Petrochemicals and Refiners' Association (NPRA) claim that the LCFS is both preempted by the federal renewable fuels program and constitutes an unlawful burden on interstate commerce. Plaintiffs' claims fail. Plaintiffs ignore that California has unique and broad fuels' authority preserved by Congress in the Clean Air Act and under state law. The LCFS is an authorized exercise of this authority.

By this motion, defendants and defendant-intervenors (defendants) move for summary judgment on all of plaintiffs' claims. Because the LCFS is an authorized control of fuels supported by unmistakable congressional intent, it is not preempted and it is authorized under the Commerce Clause. Moreover, because the LCFS is a geographically and fuel neutral policy meant to reduce the carbon intensity of fuels in order to protect California's environment and set an example for other states, the federal government and other countries, it is not discriminatory on its face nor in its purpose. California is motivated by protecting its environment not by economic

protectionism in the LCFS.  Finally, because the LCFS controls only fuels offered for sale in California, it does not constitute impermissible extraterritorial or direct regulation of interstate commerce.  For all of these reasons, defendants respectfully request the Court enter summary judgment in their favor.

**LEGAL BACKGROUND**

### I.   CLEAN AIR ACT CONTEXT

The Clean Air Act sets forth the federal program for improving air quality. The primary goal is "to encourage or otherwise promote reasonable Federal, State, and local government actions, consistent with the provisions of this chapter, for pollution prevention."  42 U.S.C. § 7401(c).  Congress has found that air pollution prevention and control "is the primary responsibility of States and local governments."  *Id*. § 7401(a)(3).  Thus, States generally retain regulatory power:

> Except as provided in …[sections 209 and 211(c)(4)] nothing in [the Clean Air Act] shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants, or (2) any requirement respecting control or abatement of air pollution.

*Id*. § 7416.

### A.   Federal Fuels Program

Congress created a federal motor vehicle fuels program in 1970 as part of the Clean Air Act.  *See id.* § 7545.1.  Under this program, the United States Environmental Protection Agency ("EPA") may control or prohibit particular fuels or fuel additives, or emissions from fuels or fuel additives in order to protect the public health and welfare.  *See id.* § 7545(c)(1).

Congress established a renewable fuel standard ("RFS") in the Energy Policy Act of 2005 which requires the use of billions of gallons of renewable fuels, including ethanol, in the U.S. fuel supply.  Pub. L. 109-58, § 1501, 119 Stat. 594, 1067-1076 (current version at 42 U.S.C. §7545(o)).  Backers claimed the legislation would reduce dependence on foreign oil while boosting domestic energy production.  See e.g. Statement of Speaker Hastert, 151 Cong. Rec. H 6949, 6960, (July 28, 2005); Statement of Senator Domenici, 151 Cong. Rec. S 9255.

2

1      The Energy Independence and Security Act of 2007 (EISA) amended the RFS in several

2 ways.  Pub. L. 110-140, 121 Stat. 1492, 1521-1528, § 202.  The new law significantly increased

3 the required volume of renewable fuels for sale in gasoline, steadily increasing the amounts from

4 2009 to 2022 to achieve the goal of 36 billion gallons of biofuels.  42 U.S.C. § 7545(o)(2).  Of

5 particular significance, the EISA mandated that the majority of the renewable fuels produced by

6 2022 consist of "advanced biofuels," with an emphasis on cellulosic ethanol.  Pub. L. 110-140, §

7 202(a)(2)(B)(i)(I-III), 121 Stat. 1492, 1521-1523 (codified as amended at 42 U.S.C §

8 7545(o)(2)(B)(I-III)).  The Act required EPA to set regulations to ensure the reduction of

9 greenhouse gas emissions, emissions to be assessed on the full lifecycle of the biofuels.  Pub. L.

10 110-140, § 202(a)(1), 121 Sta. 1521-22.  Neither the 2005 Act nor the EISA, made any changes to

11 California's pre-existing authority to regulate fuels in section 211(c).  In fact, Congress included a

12 series of explicit savings clauses in EISA (discussed in detail in § III.A, *infra*) meant to preserve

13 all outside state and federal authority to regulate fuels and greenhouse gas emissions.  *See* 42

14 U.S.C. § 17002; Pub.L. 110-140, 121 Stat. 1492, 1529, § 204(b); 42 U.S.C. § 7545(o)(12).

15      **B.**    **California's Fuels Program.**

16      California has a long-standing fuels program.  California began regulating motor vehicle

17 fuels before the federal government, something Congress was mindful of when it established the

18 federal fuels program.  *See e.g.,* Cal. Health & Saf. Code, §§ 39051.1, 39051.2; *see* section D.,

19 *infra*.  As a result, in section 211(c)(4)(B), Congress provided that "California is exempt from

20 federal preemption: it may regulate fuel standards without seeking approval from the EPA."

21 *Motor Vehicle Mfrs. Ass'n v. N.Y. State Dep't of Envtl. Conservation*, 79 F.3d 1298, 1302 (2nd

22 Cir. 1996); *See also, Am. Petroleum Inst. v. Jorling*, 710 F. Supp. 421, 425 (N.D.N.Y. 1989)

23 (Section 211(c)(4)(B) "in effect grants California a special waiver").  Congress granted California

24 this broad preemption exemption because California was "already the 'lead[er] in the

25 establishment of standards for regulation of automotive pollutant emissions' at a time when the

26 federal government had yet to promulgate any regulations of its own."  *Engine Mfrs. Ass'n*, 88

27 F.3d at 1079.

28

DEFENDANTS' MEMO. IN SUPPORT OF CROSS-MTN FOR SUMM. JUDGMENT (1:09-CV-02234-LJO-DLB)

1    Specifically, California was regulating Reid vapor pressure and lead content in gasoline

2  before the federal government. See *W. Oil & Gas Ass'n v. Orange County Air Pollution Control*

3  *Dist.*, 14 Cal.3d 411, 414 (1975); CAL. CODE REGS. tit. 13, §§ 2250, 2251, 2253, 2253.2

4  (History).  California also led the way in later prohibiting the use of lead in gasoline.  See *Motor*

5  *Vehicle Mfrs. Ass'n*, 17 F.3d at 529; *See also*, CAL. CODE REGS. tit. 13, §§ 2250-72.

6  California's Phase 2 reformulated gasoline regulations set standards for eight gasoline

7  specifications: sulfur, benzene, olefins, aromatic hydrocarbons, oxygen, Reid vapor pressure, and

8  distillation temperatures for the 50% and 90% evaporation points.  *Id.*  Several of these

9  regulations involve emissions other than those directly from the motor vehicle.  And most

10  predated federal regulation.  In 1999, ARB approved amendments to its reformulated gasoline

11  regulations banning methyl tertiary butyl ether, or MTBE, due to concerns over contamination of

12  California's groundwater.  *Oxygenated Fuels Ass'n, Inc. v. Davis*, 163 F. Supp. 2d 1182, 1185-86

13  (E.D. Cal. 2001).  As a result, ethanol became the primary oxygenate in California gasoline.  The

14  LCFS is a continuation of this long history of fuels' regulation.

15        **C.    Legislative History of the Clean Air Act.**

16    The legislative history of the Clean Air Act confirms California's unique role.  Congress

17  intended to preserve California's broad authority to adopt its own fuel regulations:  "No State

18  may prescribe or enforce controls or prohibitions respecting any fuel or additive . . . . These

19  restrictions will not apply to California." H.R. CONF. REP. NO. 91-1783 (1970), *reprinted in* 1970

20  U.S.C.C.A.N. 5374, 5385.  The Senate affirmed that "States and localities are preempted from

21  presenting or enforcing controls or prohibitions not identical to those of the Federal government .

22  . . . California, however, is free to have any regulation of fuels or additives it finds necessary."

23  Sen. Debate Conf. Rep., 1970 Legislative History, vol. 1, 135. See also House Debate Conf. Rep.,

24  1970 Legislative History, vol.1, 113.

25    As mentioned above, when Congress preserved California's fuels' authority, it

26  acknowledged that California's existing standards were already more stringent than the proposed

27  national standards.  See House Debate Conf. Rep., 1970 Legislative History, vol.1, 113 (Question

28  by Mr. Rousselot: "California, which this year enacted additional and stricter laws…will not now

DEFENDANTS' MEMO. IN SUPPORT OF CROSS-MTN FOR SUMM. JUDGMENT (1:09-CV-02234-LJO-DLB)

1  be required to…obtain a waiver in order that those laws can be implemented?" Response by Rep.

2  Staggers: "California requires a waiver only with regard to new automobiles.") The House further

3  affirmed that "[t]he State is free with regard to fuels," and that "the laws that were put on the

4  books [in 1970] by California…which are stricter and more rigid than the national criteria will

5  not, in fact, be preempted by this legislation." *Id.*

6      None of the subsequent amendments to section 211 have restrained California's authority

7  in any way.  The legislative history confirms that Congress intended to preserve California's

8  ability to exercise its "police power in [the] field of the composition of fuel."  House Debate

9  Conf. Rep., 1970 Legislative History, vol.1, 113-114.

10      **D.    The Implications of *Massachusetts v. EPA*.**

11      In the seminal case of *Massachusetts v. U.S. Envtl. Prot. Agency*, 549 U.S. 497 (2007), the

12  U.S. Supreme Court established that greenhouse gases are a pollutant subject to regulation in the

13  Clean Air Act.  *Id.* at 532.  In the process, the Supreme Court clearly recognized the "well-

14  documented" science of climate change and the perils associated with it.  *Id.* at 518-20, 526.

15  Accordingly, the Supreme Court observed that the "harms associated with climate change are

16  serious and well-recognized."  *Id.* at 521.  This one decision altered the landscape in the fight

17  against climate change, prompting EPA to act and resolving that greenhouse gases are an

18  appropriate pollutant subject to state and federal regulation.

19                **FACTUAL AND REGULATORY BACKGROUND**

20  **I.    DEVELOPMENT OF THE LCFS REGULATIONS.**

21      **A.    LCFS development**

22      In its Global Warming Solutions Act of 2006 ("AB 32"), the California Legislature

23  recognized the relationship between GHG emissions and global warming, as well as a host of

24  economic, health and other threats global warming poses for the State.  Cal. Health & Safety

25  Code § 38501.  The Legislature directed ARB to regulate GHG emissions in order to reduce them

26  to 1990 levels by 2020.  *Id.* §§ 38510, 38550.  That is an enormous undertaking, especially given

27  the growth in both population and economic activity anticipated for California and the fact that

28  emissions rose 12% between 1990 and 2004.  Def. Sep. Stmt. ¶ 4.

On January 18, 2007, the Governor issued an Executive Order charged the ARB with the task of adopting regulations to reduce the carbon intensity of transportation fuel by ten percent by the year 2020.  Exec. Order S-01-07.  In the order, the Governor noted that the transportation sector is the largest source of GHG emissions in California, contributing 38 percent of California's total greenhouse gas emissions in 2007.  *Id.*  Def. Sep. Stmt. ¶ 47.

Since 2006 when AB 32 was passed, ARB has been engaged in a series of rulemakings to meet the statutory goals for emissions reductions, of which the LCFS is one.[1]  Def. Sep. Stmt. ¶¶ 1-4.  The LCFS is designed to accomplish its overall purpose of emissions' reductions by driving development and commercialization of lower carbon fuels which furthers yet another purpose of the LCFS – to reduce California's dependence on foreign oil.   Def. Sep. Stmt. ¶ 4.[2]

Following two years of regulatory development including numerous public workshops with industry, consumer, environmental and public health and welfare stakeholders, ARB adopted Resolution 09-31 on April 23, 2009, approving the proposed LCFS regulations, pending the Executive Officer's finalization of the regulation.  The LCFS became effective in two parts, on January 12, 2010 and April 15, 2010.

**B.    Regulatory structure**

Under the LCFS regulation, "carbon intensity" is a measure of the greenhouse gas emissions associated with the entire lifecycle of a transportation fuel.  CAL. CODE REGS. tit. 17, § 95480 (2010); Def. Sep. Stmt. ¶¶ 14-15.  This includes the direct greenhouse gas emissions associated with the production, transportation and use of the fuel in motor vehicles.  *Id.* § 95486; Def. Sep. Stmt. ¶¶ 16, 22.  For some biofuels, it also includes greenhouse gas emissions resulting

---

[1] In June 2007, the LCFS was identified by ARB as an "early action item" for compliance with A.B. 32.  See Cal. Health & Saf. Code, § 38560.5.

[2] Then Senator Obama indicated his approval of California's efforts saying, "In signing the executive order creating the low carbon fuel standard, Governor Schwarzenegger noted some of the dangers of his State's excessive reliance on gasoline: volatile oil prices dictated by hostile foreign countries, lack of economic security, American jobs at risk, businesses in jeopardy, and, most importantly, dangerous levels of greenhouse gas emissions. I applauded the Governor's leadership on this issue and want to take his proposal one giant step further." 153 Con. Reg. S7704.  Addressing the different incentives between the RFS and LCFS, Senator Obama also stated that "[j]ust as the existing RFS has spurred the construction of ethanol plants, a low carbon fuel standard would incentivize development of new advanced fuels." 153 Con. Reg. S7704.

6

1  from land use changes associated with the fuel.  *Id*. § 95486(b), Table 6.  The regulation sets

2  declining annual carbon intensity standards starting in 2011 for gasoline and diesel fuels.  *Id*. §

3  95482.  These standards are phased in gradually, requiring only a .25 percent reduction in the first

4  year, a .5 percent reduction in year two, and steepening in the later years of the regulation, until a

5  10 percent reduction is achieved in 2020.  *Ibid*.  This is to allow the industry time to ramp up

6  production of lower carbon fuels.

7       The annual carbon intensity standards apply to specified providers of transportation fuels.

8  Each year, a regulated party's overall carbon intensity for its pool of transportation fuels must

9  meet the applicable annual carbon intensity standards.  *Id*. §§ 95484(b)(1), 95485; Def. Sep. Stmt.

10  ¶¶ 5-13.  Compliance can be achieved with any combination of fuels produced or supplied and

11  with LCFS credits generated in previous years or acquired from other regulated parties.  *Id*. §§

12  95485, 95484(b)(1). In order for a regulated party's fuels to be compared against the annual

13  carbon intensity standard, the regulation contains two "Lookup Tables" that set forth the carbon

14  intensity values to be used for particular fuels. Id. § 95486(b), Tables 6 and 7; Def. Sep. Stmt. ¶

15  20.  For most diesel fuel and "CARBOB" – the blendstock to which ethanol is added to produce

16  finished California gasoline – there are single carbon intensity values based on the average crude

17  oil delivered to California refineries in 2006, and average California refinery efficiencies.  For

18  other fuels, there are multiple carbon intensity values that apply depending on which particular

19  fuel "pathway" is used to produce and transport the fuel.  For instance, there are more than 10

20  different pathways for ethanol from corn, and three for ethanol from sugarcane.  *Id*. § 95486(b),

21  Table 6.  For each fuel pathway – including CARBOB and diesel fuel – the LCFS identifies the

22  carbon intensity contribution of each lifecycle activity, including the considerable proportion that

23  comes from tailpipe emissions from vehicles using the fuel.  For fuels not covered by a specified

24  pathway, the regulation specifies a mechanism – called Method 2A and Method 2B – to be used

25  to identify the specific carbon intensity of that fuel.  *Id*. § 95486(c), (d); Def. Sep. Stmt. ¶ 21.

26

27

28      **C.**    **Lifecycle Emissions Analysis.**   7

One of the critical building blocks for the LCFS is the regulation of carbon emissions from the full lifecycle of the fuel. Def. Sep. Stmt. ¶¶ 14-16, 18-20. The regulation of greenhouse gases is relatively new territory. Carbon emissions, unlike other pollutants, are emitted by almost every aspect of human activity.

Due to the very nature of carbon emissions, then, in order to fully capture and account for the emissions of greenhouse gases from transportation fuels, they must be analyzed on a lifecycle basis. There is growing consensus on this evidenced by the fact that all jurisdictions which have confronted the problem have adopted a lifecycle approach. Def. Sep. Stmt. ¶¶ 18-19. Lifecycle analysis has therefore become an accepted practice. *Id.* In this type of analysis, fuels that may be the same molecularly are not necessarily identical on a lifecycle basis. This is essential in order to accurately account for all emissions associated with fuels. Def. Sep. Stmt. ¶ 52.

## II.    DEVELOPMENT OF THE RFS.

The RFS is meant to reduce U.S. dependence on foreign oil and create a viable domestic biofuel supply as well as to reduce greenhouse gas emissions from the U.S. transportation fuel sector. Def. Sep. Stmt. ¶¶ 67, 68. To accomplish these goals, the RFS sets four mandated levels of volumes of biofuels. 42 U.S.C. § 7545(o)(2). The RFS2 differentiates among the four levels based on general categories of greenhouse gas performance. *Id.* It places an emphasis on growth in advanced and cellulosic biofuels with significantly lower lifecycle greenhouse gas emissions, increasing the volumes from almost nothing to 21 billion gallons by 2020. *Id.* Unlike the advanced and cellulosic categories, there is no guaranteed minimum of corn ethanol. Def. Sep. Stmt. ¶¶ 70, 71. While the RFS2 does allow some existing facilities to qualify for the 20 percent threshold, it does not guarantee a continued place for corn ethanol if it cannot compete in the future against advanced biofuels. Def. Sep. Stmt. ¶ 74.

In passing the EISA, many members of Congress had significant reservations about the continued reliance on corn ethanol to fulfill the volumetric mandates of the RFS. Def. Sep. Stmt. ¶ 73. As a result, the EISA as enacted emphasizes the development of advanced and cellulosic biofuels and not corn ethanol which is already approaching the cap for conventional biofuels. Def. Sep. Stmt. ¶¶ 67, 70-74.

8

1    **III.   INTERPLAY BETWEEN RFS AND LCFS.**

2         The LCFS and RFS, while authorized by different sections of the Clean Air Act and state

3    law, are complementary policies with several similarities.  Both policies include a lifecycle

4    accounting of greenhouse gas emissions.  Both policies incorporate emissions resulting from

5    indirect land use change.  And both policies emphasize the future is advanced fuels other than

6    petroleum.  Def. Sep. Stmt. ¶ 61.

7         However, there are differences as well, particularly in the regulatory mechanisms employed

8    by each.  The most obvious difference is that the RFS regulates biofuels <u>only</u> while the LCFS

9    applies to all transportation fuels sold or offered for sale in California.  Def. Sep. Stmt. ¶ 5, 62; 42

10   U.S.C. § 7545(o)(2).  This is much more than just a difference in approach.  The LCFS does not

11   mandate a specific increase in biofuels' use although that may happen as a result.  The LCFS is

12   designed to provide incentives to all segments of the transportation fuels market.  By applying to

13   the entire transportation fuel supply, the LCFS provides an incentive to produce the lowest carbon

14   fuel in the most efficient (i.e., cost-effective) manner.  Def. Sep. Stmt. ¶¶ 19, 25, 62.  The RFS

15   has a much narrower aim:  to mandate specific quantities of biofuels at four levels of GHG

16   performance on a lifecycle basis, with an emphasis on growing the market for advanced and

17   cellulosic biofuels.  By relying on these broad categories, it does not reward incremental

18   improvements.

19         This leads to the second main difference.  The RFS is a pure volumetric mandate whereas

20   the LCFS is a specific performance standard.  The RFS sends a market signal that biofuels –

21   again advanced and cellulosic in particular – will have a long term future in the national fuel

22   supply.  The LCFS on the other hand places tremendous flexibility in the hands of the regulated

23   community to meet the compliance obligations of reduced carbon in the fuel supply in the most

24   economical manner possible.  It serves to drive innovation across the transportation fuel industry

25   in order to reduce greenhouse gas emissions in California and ensure a continuing market for

26   clean alternative fuels.  Rather than set a volume mandate, the LCFS encourages the market to

27   decide what the best clean fuels and fuel technologies are and how to most efficiently produce

28   them.

9

A third difference between the two complementary policies is that the RFS has a threshold requirement for biofuels to qualify for the volumetric mandate.  For newly constructed facilities making "conventional biofuels" – the only category into which biofuel from corn starch can get RFS credits - that threshold is a 20 percent reduction in greenhouse gas emissions. 42 U.S.C. § 7545(o)(2).  The LCFS has no threshold requirements.  Under the LCFS, all fuels are still eligible to be sold in California.  No fuel is prohibited.  Consistent with its design as a performance standard, there are no requirements for reductions from specific fuels or categories of fuels.  Rather, the standard is imposed on fuel providers who must figure out how to meet the compliance obligations for a particular year across their entire product supply.  This enables fuel providers to comply in myriad combinations of lower and higher carbon fuels, at lower and higher prices, depending on what is available and when.  ARB expects based on basic market economics that this will result in lower carbon fuels demanding a price premium in California and an expansion in the development and supply of such low carbon fuels nationally and even internationally.  Def. Sep. Stmt. ¶ 9.  Low carbon fuel providers are in agreement.  *See* Adler Decl. and Ellis Decl.  In this respect, the LCFS operates as an <u>advantage</u> to the industry.  The overall market for biofuels will still largely be driven by the volumetric mandates of the RFS.  Despite these different approaches, the RFS2 and LCFS reinforce each other's goals.

## ARGUMENT

### I.      STANDARDS ON SUMMARY JUDGMENT

Under the Federal Rules of Civil Procedure, a motion for summary judgment should be granted when "there is no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. § 56(c)(2); *See* Local Rule 260(a).  Summary judgment "is proper where a trial would serve no useful purpose."  *Miller v. W. Bd. of Adjusters*, 427 F.2d 175, 177 (9th Cir. 1970).  A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion" and of demonstrating "the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will

10

1   bear the burden of proof at trial." *Id*. at 322.  In deciding a motion for summary judgment, courts

2   "must view the evidence in the light most favorable to the nonmoving party."  *T.W. Elec. Serv.*

3   *Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  Summary judgment "is

4   proper when a rational trier of fact would not be able to find for the non-moving party on the

5   claims at issue."  *Birchcrest Mktg. v. Akzan Distrib. Co.*, 2010 WL 3070394, at *2 (C.D. Cal.

6   Aug. 2, 2010) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 89

7   L.Ed.2d 538, 106 S.Ct. 1348 (1986)).  Because plaintiffs cannot prevail on their claims due to

8   ARB's authority to promulgate the LCFS and specific flaws inherent in their Commerce Clause

9   claims, defendants respectfully request that the Court grant their motion for summary judgment.

10  **II.      THE LCFS IS AN AUTHORIZED CONTROL OF MOTOR VEHICLE FUEL.**

11
            **A.      Section 211(c)(4)(B) Provides California With Plenary Authority To Implement**
12
    **a Control on Carbon Emissions Associated with Fuels Independent Of Any Action That**
13
    **EPA May Undertake.**
14
            Section 211 (c)(4)(B) of the Clean Air Act is a special congressional authorization to
15
    California to "<u>at any time</u> prescribe and enforce, for the purpose of motor vehicle emission
16
    control, a control or prohibition respecting any fuel or fuel additive."  42 U.S.C. section
17
    7545(c)(4)(B) (emphasis added).  This provision clearly establishes that California has full,
18
    independent authority to move forward with a program of controls on fuels, including controls on
19
    fuel carbon, irrespective of what EPA may be doing under Section 211(c)(4)(A).  In interpreting
20
    the scope of California's authority under this section, the overarching question is how does
21
    California's authority fit into the overall scheme of section 211 of the Clean Air Act, and, more
22
    specifically, what is the relationship, if any, between California's authority to "prescribe and
23
    enforce" such a control and EPA's authority pursuant to Section 211(c)(1) or as described in
24
    Section 211(c)(4)(A).  As explained in more detail below, because California has unique and
25
    unqualified authority to act, and the LCFS is a control respecting fuel – specifically, a control
26
    respecting fuel carbon – "for the purpose of motor vehicle emission control", the LCFS is
27
    properly authorized by section 211(c)(4)(B).
28
                                                    11

1      The ability of California to act under section 211 (c)(4)(B) is unqualified.  California may

2   act "at any time."  *Id.*  Since California may act "at any time", it may do so either before, during

3   or after the Administrator has taken action under Section 211(c)(1) or otherwise that would

4   trigger either Section 211(c)(4)(A)(i) or (ii).[3]  *See Oxygenated Fuels,* 163 F.Supp. at 1184-85

5   (California's "broad grant of authority is unqualified by any requirements in § 7545(c) imposed

6   upon the EPA before it controls or prescribes any fuel and, in this respect, California has a freer

7   hand than EPA.")  Congress could hardly have made it clearer that California's authority to

8   prescribe and enforce a control on fuel under 211(c)(4)(B) is independent of what EPA does

9   under Section 211(c)(1) or 211(c)(4)(A)(i) or (ii).[4]

10      Furthermore, the terms used in 211(c)(4)(B), such as "control…respecting any fuel" are

11   essentially the same as the terms used in 211(c)(1), and Congress made no effort to replicate or

12   incorporate by reference the terminology of 211(c)(4)(A), such as "any control respecting any

13   characteristic or component of a fuel."[5]  This strongly indicates that Congress intended for

14   California's power to "control" to be at least as broad in scope as EPA's.  And by not restricting

15   California – "at any time" – as well as unburdening California with the requirements imposed on

16   the Administrator in 211(c)(2)-(c)(4)(A), Congress arguably preserved an even "freer hand" for

17   California.  *Oxygenated Fuels,* 163 F.Supp. at 1184-85.  Indeed, this unqualified authority of

18   California to prescribe and enforce fuel controls is consistent with the critical role that Congress

19   envisioned for California under Title II of the Clean Air Act more generally as both a promoter of

20   fuel and motor vehicle engine technological and regulatory innovation.[6]  *See generally,* 42 U.S.C.

---

21      [3] EPA has not invoked its authority under section 211(c)(1) and 211(c)(4)(A) to regulate
   fuel carbon.
22      [4] This reading of section 211(c) is consistent with the Ninth Circuit's decision in *Davis v.
   U.S. Enytl. Prot. Agency* 348 F.3d 772, 786 (9th Cir. 2003).
23      [5] Section 211(c)(4)(A) contains a restriction, not present in section 211(c)(4)(B), limiting
   the scope of preemption under (A) to "characteristic or component of a fuel or fuel additive."  By
24   adding this restriction in the 1990 amendments, Congress further limited the federal preemption
   of state fuel regulations.  *See* H.R. Rep. No. 101-490, at 314 (1990) ("the revision clarifies that a
25   Federal fuel or fuel additive regulation only preempts a nonidentical State regulation governing
   the same component or characteristic of the fuel or fuel additive.").  As stated, section
26   211(c)(4)(B) is not so limited.
      [6] This does not mean, however, that California's authority to regulate emissions from fuels
27   is "unrestricted".  ARB has consistently held the view that, for example, it could not adopt
   regulations that operate to make compliance with federal law a "physical impossibility".  *See*
28                                                        12
                                                                              (continued…)

1   §§ 7543, 7545.  The only questions remaining then are whether the LCFS constitutes a

2   "control…respecting any fuel" and whether it is "for the purpose of motor vehicle emission

3   control".

4         **B.      The LCFS Is A Control On Fuel Carbon.**

5         Section 211(c)(4)(B) provides that California may "prescribe and enforce … a control…

6   respecting any fuel…."  42 U.S.C. section 7545(c)(4)(B).  Congress intended for this "control"

7   authority to be broad.  As set forth below, the LCFS is clearly such a control.

8         The language of 211(c)(1) (the scope of EPA's authority) and 211(c)(4)(B) (the scope of

9   California's authority) to control various aspects of fuels are very similar, particularly in the way

10   the term "control" is used.  42 U.S.C. § 7545(c)(1), (c)(4)(B).  As a result, the scope of one

11   should be consistent with the scope of the other.  Plaintiffs' position in this case is that section

12   211(c)(4)(B) does not or should not enable California to incorporate into its fuel carbon control

13   program upstream carbon emissions associated with the production and transport of fuels,

14   emissions that are included in the carbon intensity values in Table 6 of the LCFS.  Def. Sep. Stmt.

15   ¶¶ 14-16, 19-20.  By so doing, plaintiffs might as well be arguing that EPA cannot incorporate the

16   regulation of carbon from fuels under its 211(c)(1) authority.  Plaintiffs are wrong.  Congress did

17   not limit the reach of section 211(c) exclusively to vehicular <u>combustion</u> emissions.  There is

18   nothing supporting such a construction on the face of the statute.  And the legislative history

19   dictates a broad reading of section 211(c).

20         The concept of "control" in 211(c)(1), and by extension, the use of the term "control" in

21   211(c)(4)(B), goes beyond simple regulation of the direct combustion emissions of fuels.  Section

22   211(c)(1) specifically states that the Administration may control "any fuel or fuel additive, or any

23   emission product of such fuel or fuel additive" that impairs public health or welfare.  42 U.S.C.

24   section 7545(c)(1).  If "control… of such fuel" meant nothing more than "control… of any

25   emission product of such fuel….", there would be no reason for Congress to have used both

26   (…continued)
    *English v. Gen. Elec. Co.*, 496 U.S. 72, 78-79 (1990).  In addition to federal law principles, ARB

27   must also adhere to any limitations under state law, including the prohibition on arbitrary and
    capricious action.

28                                              13

terms.  By implication then, the control of a fuel extends beyond the control of that fuel's "emissions products".

Illustrative of this interpretation of the term "control" is the case of *Amoco Oil v. U.S. Envtl. Prot. Agency* (1974) 501 F. 2d 722.  In *Amoco*, oil companies challenged EPA's regulations prohibiting the use of leaded gasoline in automobiles fitted with catalytic converters and requiring widespread retail marketing of at least one grade of unleaded gasoline.  In that challenge, petitioners argued that section 211(c) of the Clean Air Act did not empower EPA to require marketing of any fuel but rather must be limited to the "control" of fuels or additives that impair vehicle devices.  *Id.* at 744.  Petitioners claimed that EPA could regulate leaded gasoline because it impaired catalytic converters, but not unleaded gasoline because it did not.  The D.C. Circuit rejected the petitioners "cramped reading" of the Clean Air Act and broadly construed the term "control" in section 211(c) to cover more than just direct regulation of  fuel emissions, stating

> That the term 'control' encompasses the power to promote the availability of fuels needed for proper operation of emission control devices is indicated both by the wording of Section 211(c)(1) and by the provision's legislative history. The provision allows fuel regulation whenever the Administrator finds that a device needing special fuel 'is in general use, or has been developed to a point where in a reasonable time it would be in general use were such regulation to be promulgated.' The emphasized phrase contemplates that fuel regulation may be adopted for the express purpose of encouraging wider use of catalytic converters. If the only fuel regulation available to the Administrator were, as petitioners urge, a ban on using leaded gasoline in converter-equipped cars, there could be no direct encouragement given to the use of catalytic converters by automakers and new car buyers. The broad objectives of Section 211(c)(1) would be frustrated.

*Id.* at 744, (emphasis added).  Moreover, after analyzing the legislative history debating variations on the scope of the authority under section 211, the court found that Congress

> decided that such authority should also be extended to the 'control' of a fuel's introduction into commerce. This authority to 'control' the use of fuels is intended to give the Secretary greater flexibility than the authority to 'prohibit.'"

*Id.* at 745.  Thus, "control" as used in 211(c)(1) encompasses not just the control of fuel emission products, but the control of emissions from the manufacture, transportation and sale of any such fuel.  Because of the way 211(c)(4)(B) uses the term "control", the scope of California's authority under (B) is comparable to that of EPA under (c)(1); in other words, the control may

14

cover not just the emission products from fuel consumption, but emissions from its manufacture and transport when science and the protection of public health and welfare so demands.[7]  The use of the term "control" must therefore be given the same broad meaning in defining the scope of California's authority.[8]

The LCFS controls the carbon intensity of fuels offered for sale in California.  It does so by applying a lifecycle analysis.  Def. Sep. Stmt. ¶¶ 14-16, 19-20, 22.

There is no question that the regulation of emissions from the combustion or <u>use</u> of fuel in a motor vehicle falls within California's Clean Air Act authority to regulate fuels.  Even plaintiffs must concede this.  The LCFS regulates such emissions for every fuel offered for sale in California.[9]  For gasoline, emissions from combustion constitute approximately 75% of the overall lifecycle emissions associated with gasoline.  Def. Sep. Stmt. ¶ 44.  There can be no doubt that this portion of the fuel lifecycle is clearly within the authority of California to regulate.

However, unlike the "control" of a criteria pollutant such as NOx or sulfur dioxide that can be captured at the tailpipe, greenhouse gas emissions from fuel are fundamentally different.  For pollutants that can be captured at the tailpipe, there is no reason for California to have prescribed controls over anything but the emission products of the fuel or the components of the fuel that contribute to emission products.  But that is decidedly not the case with fuel carbon.  There is no way to capture carbon emissions from every aspect of the fuel lifecycle, from extraction or growth of the feedstock, through production, transportation and ultimately, use. Def. Sep. Stmt. ¶ 19.  As a result, the regulatory approach to carbon pollution must be different.

Moreover, as fuel sources diversify – a primary objective of the LCFS – differentiating among them on the basis of lifecycle carbon intensity becomes even more critical.  To illustrate

---

[7] This does not raise a commerce clause problem.  The scope of "control" of fuels is different from the locus of that control.  While the LCFS controls the full lifecycle of fuel carbon as demanded by the nature of carbon emissions, it only controls the emissions related to fuels sold in California.  Def. Sep. Stmt. ¶¶ 14-16, 19-20, 22.  The LCFS does not control conduct outside the state of California.

[8] The use of the term "control" elsewhere in the Clean Air Act also supports a broad reading.  *See, e.g.,* 42. U.S.C. section 7408(f).

[9] This, of course, assumes that there are emissions from combustion.  As noted below, for some fuels, such as electricity, there are zero emissions from the vehicle itself.

1    why this approach is essential, consider the use of electricity to power vehicles. These fuels have

2    zero emissions associated with their use in the vehicle. Def. Sep. Stmt. ¶53. However, assigning

3    these fuels a carbon intensity value of zero would lead to perverse results due to the emissions

4    related to their production. In some cases – for example, if the electricity was generated by coal-

5    burning power plants – the emissions could be so significant as to impact policies regarding its

6    very use as a transportation fuel. The failure to account for these upstream emissions would not

7    accurately capture the true environmental impact associated with these fuels. Similarly, while

8    various ethanols are the same when judged at the tailpipe, they are vastly different on a lifecycle

9    basis. Even Congress recognized this fact in the EISA, separating corn (conventional biofuel)

10   and advanced biofuel and cellulosic biofuel categories based on their lifecycle carbon emissions.

11   42 U.S.C. § 7545(o); Def. Sep. Stmt. ¶ 73.

12       Due to the nature of carbon pollution described above, the LCFS therefore goes further than

13   the simple regulation of combustion emissions. In formulating the LCFS, California recognized

14   that a fuel carbon emission standard that just covered direct vehicular tailpipe emissions of carbon

15   would inaccurately account for the contribution of the use of transportation fuels to the total

16   carbon pollution in the state. For this reason, California employed a life-cycle analysis approach

17   of fuel carbon, utilizing the GREET model, that took into account different pathways for the

18   production and transport as well as use of different fuels. Def. Sep. Stmt. ¶¶ 14-16, 19-22.

19   Thus, California, in order to accomplish its objective of controlling fuel carbon, devised a rule

20   that encompassed the carbon emissions resulting from a fuel's manufacture, transport and

21   combustion.  42 U.S.C. § 7545(c)(1) and (c)(4)(B).

22       Fundamentally, then, the inability to capture the full lifecycle of carbon emissions would

23   undermine environmentally protective laws and policies. If California were so limited, it would

24   prevent the state from accomplishing its goal of reducing pollution, a result contrary to

25   congressional intent. Fortunately, Congress did not limit California – or EPA for that matter – in

26   this manner. Because of the very nature of carbon and carbon emissions, the lifecycle approach is

27   the only way that California could, as a matter of science and policy, "prescribe or enforce….a

28   control… respecting" fuel carbon. *Id.* § 7545(c)(4)(B).

16

**C.      The LCFS Is A Control That California Has Prescribed For Purposes of Motor Vehicle Emission Control.**

Finally, Section 211(c)(4)(B) prescribes that any control respecting a fuel that California adopts must be "… for the purpose of motor vehicle emission control." 42 U.S.C. section 211(c)(4)(B). It is clear that California has adopted the LCFS for this purpose.

As the Supreme Court noted in *Massachusetts v. EPA*, carbon dioxide is a significant air pollutant, subject to Clean Air Act regulation, and a major contributor to global warming. *Massachusetts v. U.S. Envtl. Prot. Agency* (2007) 549 U.S. 497, 521, 532 (the court recognized that the problems posed by climate change are "serious and well recognized."). Since the carbon emissions of the transportation system are a major contributor to the State's total carbon emissions inventory for which it is responsible and which AB 32 mandates reductions, the California has rightly focused on the transportation system and the contribution of transportation fuels to its total carbon emissions. Motor vehicles in California contribute 38 percent of the State's total inventory of carbon. Def. Sep. Stmt. ¶ 48. By confronting the emissions from this sector, California has essentially assumed legal and political responsibility for emissions of carbon resulting from the production and transport, regardless of location, of transportation fuels actually used in California. This is a daunting responsibility. However, reductions of emissions from the transportation sector are one of the pillars upon which AB 32 is built. Thus, California designed the LCFS entirely for the purpose of controlling total motor vehicle carbon emissions.[10]

Moreover, the term "motor vehicle emissions control" properly covers total California motor vehicle transportation fuel emissions, including upstream emissions. Specifically, the term "motor vehicle emissions control" is not limited just to "motor vehicle combustion emission control" or "motor vehicle tailpipe emission control". There is no indication in the statute or the legislative history that demands such a narrow reading. And such a construction would be inconsistent with the broad discretion granted California. Certainly, in the context of controlling

---

[10] Unlike the MTBE ban, the LCFS is clearly not for the purpose of protecting groundwater quality. Cite Oxygenated Fuels. And even in assessing the MTBE ban, the Ninth Circuit viewed the authority question under section 211(c)(4)(B) as "a close call." [cite] Here, it is not close.

17

1  motor vehicle carbon emissions, the LCFS, which looks at fuel manufacture and transport carbon

2  emissions in addition to carbon from the combustion of fuels, is all "for the purpose of motor vehicle

3  vehicle emission control".

4      The LCFS is not the only regulation of fuels for the purposes of motor vehicle emissions

5  control that regulates beyond the vehicle itself.  For example, California's gasoline is subject to

6  benzene and aromatic limits which are designed to reduce both exhaust and evaporative emissions

7  from the vehicle and to reduce evaporative emissions during the transport of the fuel from the

8  refinery and from delivery to the vehicle itself at the filling station.  Def. Sep. Stmt. ¶ 48.[11]

9      Finally, another section of the Clean Air Act titled "Air quality criteria and control

10  techniques", supports a broad reading of both control and for the purposes of motor vehicle

11  emissions.  *See* 42 U.S.C. section 7408(f).  Under this section, EPA is obligated to provide

12  "Information regarding processes, procedures, and methods to reduce or control pollutants in

13  transportation; reduction of mobile source related pollutants; reduction of impact on public

14  health."  *Id.*  In complying with this obligation, EPA is directed to consider a litany of different

15  possible sources of "emission reduction potential of transportation control measures related to

16  criteria pollutants and their precursors" ranging from public transit, high occupancy vehicle lanes,

17  traffic flow improvements, improved bicycle and pedestrian access, and flex-work schedules.  *Id.*

18  This underscores that the potential universe of actions to control emissions is very broad.

19  Obviously, the LCFS does not extend that far afield.  However, its focus is clearly on the

20  reduction of total motor vehicle carbon emissions associated with fuels.  This is authorized under

21  section 211(c)(4)(B).

22

23  **III.  SECTION 211(O) OF THE CLEAN AIR ACT CREATES NO CONFLICT**
24      **WITH THE LCFS BECAUSE ITS PROVISIONS DO NOT RESTRICT**
         **CALIFORNIA'S AUTHORITY UNDER 211(C)(4)(B) OR CALIFORNIA**
25      **STATE LAW.**

26  _____

27      [11] While not a fuels regulation *per se*, the Pavley tailpipe emissions regulations also
    account for the upstream emissions associated with alternative fuels such as ethanol in devising a
28  credit scheme for alternative fuel vehicles.  CAL. CODE REGS., tit. 13, §§ 1900, 1961, 1961.1.

18

**A.    The Savings Clauses in EISA Are Clear Congressional Intent to Preserve California's Fuels Authority.**

In enacting the EISA, Congress explicitly conditioned the RFS program on a series of savings clauses that limit its preemptive reach.  In effect, Congress placed the RFS in a box all its own and legislated that it was to operate so as not to prevent the development of other, more environmentally protective laws and policies.  While Congress clearly was establishing a large volume mandate (and market) for biofuels, it simultaneously had significant reservations about the continued expansion of corn ethanol as a transportation fuel and did not wish the RFS to inhibit innovative transportation fuel policies.  Def. Sep. Stmt. ¶ 73.  As a result, nothing in the LCFS conflicts with any provision of section 211(o) of the Clean Air Act, including those relating to existing corn ethanol facilities.

As described above, Section 211(o) authorizes the RFS program.  It sets volumetric mandates that are designed to assure that an increasing portion of biofuels have life cycle carbon intensities at least 20% below those of gasoline, and that an increasing portion are advanced biofuels, such as cellulosic fuels, with life cycle carbon intensities less than half those of gasoline. At the same time, Congress provided that in determining compliance with the volumetric mandates, corn ethanol made from plants the construction of which was completed before December 19, 2007 when Congress enacted EISA could qualify for inclusion in those volumes even if some of those plants could not actually meet the 20% reduction threshold.  42 U.S.C. § 7545(o)(2)(A)(i).[12]

At the same time, however, Congress made it clear that all of the provisions of 211(o) were part of a self-contained program that would otherwise not affect what other federal agencies or states could do under other provisions of the federal Clean Air Act or state laws or regulations. Section 204(b) of EISA makes the self-contained nature of 211(o) very clear:

> Except as provided in section 211(o)(12) of the Clean Air Act, <u>nothing</u> in the amendments made by this title to section 211(o) of the Clean Air Act <u>shall be construed as superseding, or limiting, any more environmentally protective</u>

---

[12] To reach this conclusion about "grandfathered" facilities, a negative construction of the provisions in section 211(o) is required.

19

<u>requirement under the Clean Air Act, or under any other provision of State or Federal law or regulation, including any environmental law or regulation</u>.

Pub.L. 110-140, 121 Stat. 1492, 1529, § 204(b).  (emphasis added).  *See also*, § 3 of EISA, codified at 42 U.S.C. § 17002.

Thus, none of the provisions in 211(o) would limit or supersede any more environmentally protective requirements of the Clean Air Act, including Sections 209(b), 211(c)(1) and 211(c)(4)(B), or even state law or regulation, unless section 211(o)(12) provides otherwise.  But Section 211(o)(12) does not provide otherwise.  Specifically, Section 211(o)(12) provides:

> Nothing in this subsection, or regulations issued pursuant to this subsection, shall affect or be construed….to expand or limit regulatory authority regarding carbon dioxide or any other greenhouse gas, for purposes of other provisions (including section 7475 of this title) of this chapter.

42 U.S.C. § 7545(o)(12).  Section 211(o)(12, by emphasizing specifically other regulation of carbon dioxide, simply reinforces the above principle that Section 211(o) operates in its own box with no restrictions imposed on more stringent federal or state environmentally protective requirements, such as requirements respecting fuel carbon.

In other words, nothing in 211(o), including the provisions regarding what plaintiffs refer to as the "grandfathered" corn ethanol facilities, may be construed to limit the regulatory authority that both EPA and California have under Clean Air Act section 7545 (sections 211(c)(1) and 211(c)(4)(B)) to prescribe and enforce controls respecting fuel and fuel carbon or, for that matter, the regulatory authority that California has under Section 209(b) to adopt its own motor vehicle emission standards, or under the California Health and Safety Code to regulate greenhouse gases more generally.  Section 211(o) has as its purpose the expansion of production and use of biofuels nationally, including existing ethanols and then, increasingly, innovative biofuels.  However, in enacting and then amending this section, Congress explicitly provided that this federal policy is not to limit or override more environmentally protective state or federal regulations under the Clean Air Act or other statutes, including those specifically addressing greenhouse gases.  California's authority to prescribe and enforce controls respecting transportation fuel carbon under Section 211(c)(4)(B) is therefore unaffected.

20

This is supported by statements made during the debate over the EISA.  Regarding the

savings clause in section 211(o)(12), Representative Dingell stated that it was added to the Clean

Air Act

> to clarify that nothing in subsection (o) or rules issued thereunder shall affect or be
> construed to affect the regulatory status of carbon dioxide or any other greenhouse
> gas, or to expand or limit regulatory authority regarding carbon dioxide or any other
> greenhouse gas, for purposes of other provisions of the Clean Air Act.

153 Cong. Rec. E2666.

This construction is also consistent with statements by EPA in the RFS2 Rulemaking.

There, EPA noted that in the RFS

> there is no 'specific' corn-ethanol mandated volume, and [] any advanced biofuel
> produced above and beyond what is required for the advanced biofuel requirements
> could reduce the amount of corn ethanol needed to meet the total renewable fuel
> standard.

75 Fed. Reg. at 14743.  EPA underscored this stating that

> Although there is not a set corn ethanol requirement, EISA allows for 15 billion
> gallons of the 36 billion gallon renewable fuel standard to be met by conventional
> biofuels.  We expect that corn ethanol will fulfill this requirement, <u>provided it is more
> cost competitive than imported ethanol or cellulosic biofuel in the marketplace</u>.

*Id.* at 14746 (emphasis added).[13]  Clearly, then corn ethanol is not guaranteed a certain

volume and must compete in the fuels marketplace.

Even the NPRA plaintiffs agree with this dim view of the "grandfathering" provisions of

the EISA.  In comments submitted in the RFS2 rulemaking, NPRA states

> These limitations to the [grandfathering] exception are consistent with congressional
> intent.  Congress clearly intended the renewable fuels provisions of EISA to result in
> greenhouse gas emission reductions….If it is not limited, instead of improving
> existing facilities and building new more efficient facilities to produce biofuels with
> greater greenhouse gas emissions reduction benefits, renewable fuel producers are
> likely to simply modify existing facilities to produce greater volumes of the least-
> performing biofuels.  Sunsetting the grandfathering provision is also consistent with
> congressional intent…."

Defendants' RJN, Exh. U.

---

[13]  EPA went so far as to state in the RFS2 rulemaking that "[e]nding the grandfathering
exemption after its usefulness is over would help to streamline the ongoing implementation of the
program." 75 Fed. Reg. 14,670, 14,688 (Final Rule) (March 26, 2010)

21

Moreover, unlike in the recently decided Ninth Circuit case of *National Assn. of Home Builders v. San Joaquin Unified Air Pollution Control District*, (December 7, 2010, No. 08-17309) ("*NAHB*"), section 211(o) does not "create[] a zone of implied preemption." *Id.* at 19540. In *NAHB*, the court analyzed the intersection between the indirect source review provisions in the Clean Air Act, section 110, with the nonroad engine provisions in section 209(e) of the Clean Air Act, in upholding the Air District's rule requiring reductions of air emissions from construction sites. The *NAHB* challenged the rule on the basis that it was preempted as an improper regulation of construction equipment in violation of section 209(e). Applying implied preemption principles, the court upheld the district court and rejected this argument holding that the Air District's rule is an indirect source review program not preempted by section 209(e). In so doing, the court noted

> Emissions from any indirect source come from the direct sources located there; that is precisely what makes an indirect source indirect. Every regulation of the emissions from an indirect source, then, will ultimately regulate direct sources. If an indirect source review program were not allowed in some circumstances to impute direct sources of emissions to an indirect source as a whole, there could be no regulation of the emissions from indirect sources and no indirect source review program could exist.

*Id.* at 19543. The LCFS' regulation of lifecycle carbon emissions for fuels is directly analogous. Lifecycle analysis, by its very definition, necessitates including the regulation of upstream emissions. Since carbon is emitted at every stage of the lifecycle of a fuel, and since lifecycle emissions analysis is an accepted approach for regulating carbon emissions, the LCFS adoption of this approach is authorized. In the words of the Ninth Circuit,

> If an indirect source review program could not attribute the emissions from mobile sources, while they are stationed at an indirect source, to the indirect source as a whole, states could not adopt any indirect source review program. What allows Rule 9510 to qualify as an indirect source review program under section 110(a)(5) is precisely what allows the Rule to avoid preemption under section 209(e)(2): its site-based regulation of emissions. In this way, the two sections do not conflict, but rather fit together neatly like two interlocking puzzle pieces. *See La. Pub. Serv. Comm'n*, 476 U.S. at 370.

*Id.* at 19548. Similar to the indirect source review program in *NAHB*, if a fuels regulation could not control lifecycle carbon emissions associated with fuels, then there cannot be an

22

1   effective and accurate regulation of the impacts of fuels on climate change.  Because Congress

2   designed the scope of section 211(c) and California's authority thereunder to be broad and to be

3   able to respond to the regulation of future pollutant challenges, the LCFS does not conflict with

4   the RFS.  Indeed, as the Ninth Circuit recently observed, "[i]t would be odd if the [Clean Air] Act

5   took away from the states with one hand, what it granted with the other.  '[W]here possible,

6   provisions of a statute should be read so as not to create a conflict.'"  *Id.* at 19545 (citing *La. Pub.*

7   *Serv. Comm'n v. FCC* (1986) 476 U.S. 355, 370.).

8          Since 211(o)(12) states expressly that nothing in 211(o) limits the authority that Congress

9   has preserved for California under section 211(c), section 211(o) does not limit what California

10  could otherwise do in terms of adopting controls respecting fuels under 211(c)(4)(B).  Thus, there

11  is no possible conflict in purpose, goal or implementation mechanism between what California

12  can do under 211(c)(4)(B) and what Congress has allowed by way of a carve-out for certain older

13  corn ethanol plants because Congress has expressly provided that there is no conflict.

14      **B.   Based On ARB's Authority, The LCFS Is Not Preempted By The Federal
             RFS.**

15
16          As is clear from the above discussion, the LCFS is an authorized exercise of California's

17  authority to control fuels under section 211(c)(4)(B) of the Clean Air Act.  While the above

18  discussion disposes of plaintiffs' claims, they are also deficient because they are framed as facial

19  challenges and involve a clash of two federal statutory provisions.

20      **1.   Plaintiffs' Preemption Claims Fail as Facial Challenges to the LCFS.**

21          Preemption challenges can either be "facial" or "as applied."  An as applied challenge

22  contends that an otherwise valid state law is preempted as applied to the party or circumstance at

23  issue.  Thus, for example, in several cases relied on by plaintiffs in prior briefing in this case, the

24  issue was whether state tort or contract law was preempted "as applied" in a particular lawsuit.

25  See, e.g., *Chae v. SLM Corp*, 593 F.3d 936, 944 (2010); *Geier v. American Honda Motor Co.,*

26  529 U.S. 861 (2000); *International Paper v. Ouellette*, 479 U.S. 481, 494 (1987).  Here, however,

27  plaintiffs do not argue that the LCFS is invalid solely in its application to plaintiffs.  Rather,

28  plaintiffs present facial challenges to the LCFS.

                                      23

1       Facial invalidation is "'manifestly, strong medicine' that 'has been employed by the Court

2   sparingly and only as a last resort.'" *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580

3   (1998) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)).  A party mounting a facial

4   challenge "must establish that no set of circumstances exists under which the [law] would be

5   valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *California Coastal Comm'n v.*

6   *Granite Rock Co*., 480 U.S. 572, 577, 580, 589 (1987).  The conflict between state and federal

7   law must be a necessary and not simply a possible outcome:  the State law must "require or

8   authorize conduct that necessarily constitutes a violation" of federal law " in all cases. " *Rice v.*

9   *Norman Williams Co*., 458 U.S. 654, 661 (1982) (emphasis added); *see also*, *Gade v. National*

10  *Solid Waste Mgmt. Ass'n*, 505 U.S. 88, 110 (1992) ("A high threshold must be met if a state law is

11  to be preempted for conflicting with the purposes of a federal Act. Any conflict must be

12  'irreconcilable… The existence of hypothetical or potential conflict is insufficient to warrant the

13  pre-emption of the state statute.'"), quoting *Rice*, *supra*,  458 U.S. at 659 (Kennedy, J., concurring

14  in part and concurring in judgment).

15      Here, as a matter of law, plaintiffs cannot meet these high standards because the LCFS

16  regulates fuels that the federal law does not purport to reach.  Plaintiffs' preemption claim is

17  based on Section 211(o) of the Clean Air Act, which limits its scope to renewable fuel.[14]   On the

18  other hand, the LCFS applies to multiple transportation fuels that are not regulated by RFS2.  Def.

19  Sep. Stmt. ¶ 5; CAL. CODE REGS. tit. 17, § 95480.1(a).

20      This list of fuels is indisputably broader than the fuels included under the definition of

21  renewable fuels in Section 211(o).  Moreover, plaintiffs' preemption claims are based entirely on

22  only one particular subcategory of renewable fuel:  corn ethanol.  RMFU Second Amended

23  Complaint, at ¶ 68.  Even if the Court were to construe plaintiffs' claims broadly to include all

24  "renewable fuels," the LCFS' regulation of fuels that fall outside that definition cannot conflict

25

26      _____

27      [14] Renewable fuel is defined in Section 211(o)(1)(J) as "fuel that is produced from
    renewable biomass and that is used to replace or reduce the quantity of fossil fuel present in a
    transportation fuel." 42 U.S.C. § 7545(o)(1)(J).  Subcategories of renewable fuel are further
    defined in Section 211(o).

28                                              24

with Section 211(o) or otherwise be preempted by Section 211(o).[15]  Under the *Salerno* standard,

the entire LCFS is facially constitutional if there is at least one "set of circumstances" under

which it could be valid.  *Salerno*, 481 U.S. at 745.  Thus, the Court is compelled to enter

judgment for defendants on plaintiffs' preemption claims.

### 2. The Supremacy Clause Is Not Invoked In Resolving A Potential Conflict Between Two Provisions Of Federal Law.

Alternatively, plaintiffs' preemption claims fail because they do not involve preemption at

all.  These are not cases pitting state law versus federal law.  Rather plaintiffs' claims actually

involve two provisions within section 211:  section 211(c)(4)(B) and section 211(o).  As such,

plaintiffs cannot state a claim for preemption.  Where two federal statutes or statutory provisions

are at issue, the Supremacy Clause is not implicated. *See, e.g., United States v. Borden Co.*, 308

U.S. 188, 198 (1939); *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155 (1976).  In

adjudicating a potential conflict between two provisions "upon the same subject, the rule is to

give effect to both if possible."  *Borden*, 308 U.S. at 198.

Here, the alleged clash occurs between two subparts of the very same section of the Clean

Air Act.  As discussed above, when Congress created the renewable fuel program in 2005, and

amended it in 2007, it made not a single change to section 211(c)(4)(B).  In fact, due to the

inclusion of the savings clauses, the legislation and the legislative history compel the conclusion

that California's authority was preserved.  See § III.A., *supra*.  As the Supreme Court in

*Radzanower* observed,

> The statutory provisions at issue here cannot be said to be in "irreconcilable conflict"
> in the sense that there is a positive repugnancy between them or that they cannot
> mutually coexist.  It is not enough to show that the two statutes produce differing
> results when applied to the same factual situation, for that no more than states the
> problem.  Rather, "when two statutes are capable of co-existence, it is the duty of the
> courts . . . to regard each as effective."

*Radzanower*, 426 U.S. at 155 (quoting *Morton v. Mancari*, 417 U.S. 535, 551).  The same

is true here.  Given Congress' explicit intent in amending section 211(o) to preserve existing state

---

[15] Nor can plaintiffs argue for preemption of only a subset of the LCFS fuels since they have pled that "[t]he portions of the LCFS regulation that are preempted by federal law are not severable from the balance of the LCFS regulation." RMFU Second Amended Complaint at ¶ 79.

25

and federal authority to protect the environment and the absence of any Congressional intent in

the amendments to the RFS program to override California's fuels authority in section

211(c)(4)(B), the Court should give effect to both.[16]  Because this is not a case of preemption,

plaintiffs' conflict preemption claims must fail.

## IV.    SECTION 211(C)(4)(B) INSULATES CALIFORNIA FUEL REGULATIONS FROM THE COMMERCE CLAUSE.

The LCFS is a flexible, market-based regulatory mechanism designed to spur innovation

and help California do its part to reduce the effects of global warming.  Nonetheless, plaintiffs

attempt to cast the LCFS as a move toward economic isolation and protectionism.  The LCFS is

clearly nothing of the kind.  The LCFS distinguishes among fuels on the basis of carbon intensity

alone.  It is the fuel's contribution to the greenhouse gasses that are warming our planet that

matters, not the fuel's origin.  That is not discrimination.

### A.    The plain language of Section 211(c)(4)(B) Authorizes California to Adopt Fuels Regulations that Burden Interstate Commerce.

Congress may authorize states to burden interstate commerce and such Congressional

authorization removes a state regulation from the reach of the dormant Commerce Clause.  The

question of law is whether Section 211(c)(4)(B) provides such authorization for the LCFS.  As

the Supreme Court has explained, there are no magic words or 'talismanic phrases' that Congress

must use to provide this authorization.  *South-Central Timber Development, Inc. v. Wunnicke*,

467 U.S. 82, 91-92 (1984).  Instead, a court must examine the plain language of a statute and any

relevant legislative history to determine if Congress had "unmistakably clear" intent to insulate

state regulation form the Commerce Clause.  *Id.*  Here, the plain language of Section 211(c)(4)(B)

and the legislative history demonstrate unmistakably clear intent to allow California to regulate

fuels in a manner that would burden interstate commerce.

Plaintiffs' Commerce Clause claims fail to confront the plain language of the statute itself.

Other than the requirements that a California regulation be "for the purpose of motor vehicle

---

[16] In addition, the strong congressional intent regarding California's fuels' authority in Section 211(c)(4)(B) is, in the words of the Supreme Court, "reliable indicium" of congressional intent not to preempt.  *See Freightliner*, 514 U.S. at 288-89; *see also Cippolone v. Liggett Group, Inc.* 505 U.S. 504, 516 (1992).

emission control," and that the regulation address "any fuel or fuel additive," this grant of authority is unqualified.   42 U.S.C. § 7545(c)(4)(B).  As described above, Congress intended for EPA and California's fuels' authority to be broad.  This plain language alone demonstrates unmistakably clear intent that California fuels' regulations are not subject to the Commerce Clause.

There is only one prior case that considers the precise question presented here as to the interplay between Section 211(c)(4)(B) and the Commerce Clause, the *Oxygenated Fuels* case, in which this Court examined the plain language of Section 211(c)(4)(B) in the context of both a preemption claim and a Commerce Clause claim.  As Judge Levi noted, Section 211(c)(4)(B):

> permits California, as a state that regulated automotive emissions before Congress entered the field, to 'at any time prescribe and enforce, for the purpose of motor vehicle emission control, a control or prohibition respecting any fuel or fuel additive.' [211(c)(4)(B)].  This broad grant of authority is unqualified by any of the requirements in *§ 7545(c)* imposed upon the EPA before it controls or prescribes any fuel and, in this respect, California has a freer hand than the EPA.

163 F.Supp. 2d at 1184-85.  Given that EPA is authorized to regulate fuels nationally (which inherently burdens interstate commerce), a grant of authority that is "freer" than EPA's can only be construed as the type of specific Congressional authorization that removes California fuel regulations from the reach of the Commerce Clause.

**B.    The *Davis v. EPA* Case does not diminish the breadth of authority provided in Section 211(c)(4)(B).**

In the briefing on the motion to dismiss, plaintiffs relied heavily on the case of *Davis v. U.S. Envtl. Prot. Agency*, 348 F.3d 772 (9th Cir. 2003), to support their Commerce Clause claims. Plaintiffs latched on to one sentence in the *Davis* case, removed it from its context, and inflated it into "binding precedent" on the issue of whether Section 211(c)(4)(B) insulates California fuels regulations from the Commerce Clause.  The *Davis* case, however, does not once mention the Commerce Clause, much less set forth any analysis or a binding ruling as to the interplay between Section 211(c)(4)(B) and the Commerce Clause.

*Davis* involved section 211(k)(2)(B) which allows EPA to waive the oxygen content requirement.  In that case, California asked EPA for a waiver, which EPA denied.  The Court

27

ruled in California's favor and vacated the waiver denial and remanded the matter back to EPA.
*Davis,* 348 F.3d at 787.  Despite this result, plaintiffs seized on a portion of the opinion dealing
with California's alternate arguments which states

> The structure of [Section 211(c)(4)] makes it clear that the sole purpose of [Section
> 211(c)(4)(B)] is to waive for California the express preemption provision found in
> [Section 211(c)(4)(A)].  It was not intended to allow California, at its sole discretion,
> to relieve refiners of their obligations to comply with federal fuel requirements such
> as the RFG program under [Section 211(k)(2)(B)].  [Section 211(k)] contains no
> permission for California or any other state unilaterally to reject any of its provisions,
> and instead includes a provision, [Section 211(k)(2)(B)], that addresses requests for
> waiver of the federal oxygen requirement.

*Id.*  The *Davis* court's ruling on this issue stands for the limited proposition that Section
211(c)(4)(B) does not authorize California to relieve gasoline refiners of the obligation to comply
with the federal gasoline content requirements set forth in Section 211(k).  As Congress explicitly
stated in Section 211(k)(2)(B), only EPA can waive compliance with those requirements.  Viewed
in context, the *Davis* court's observation of the "sole purpose" of Section 211(c)(4)(B) is thus to
authorize California to adopt and enforce its own fuels standards, with the limited caveat that
California's standards do not displace but exist side-by-side with federal fuels regulations.  This
"sole purpose" does not diminish the authority that Congress provided when it enacted Section
211(c)(4)(B).   The *Davis* court's harmonization of Sections 211(c)(4)(B) and 211(k) does not
implicate the Commerce Clause or provide any precedent as to the relationship between Section
211(c)(4)(B) and the Commerce Clause.  Given the inapplicability of *Davis*, the *Oxygenated
Fuels* case remains as the only relevant prior decision on the precise point of law presented here.[17]
The Court should therefore find that Section 211(c)(4)(B) removes the LCFS from the reach of
the Commerce Clause.

## V.   THE LCFS' TREATMENT OF ETHANOL DOES NOT FACIALLY DISCRIMINATE AGAINST OUT-OF-STATE ENTITIES.

### A.   The LCFS Permissibly Distinguishes Between Ethanols Based On Carbon Intensity, Not Geography.

---

[17] Notably, plaintiffs/appellants in the *Oxygenated Fuels* case conceded the weakness of
their Commerce Clause claim and did not appeal the District Court ruling on that claim.

The basic facts of how the LCFS works and the carbon intensity values available under it demonstrate that the LCFS does not facially discriminate against out-of-state ethanol.[18]  These facts are explained and analyzed thoroughly in defendants' opposition briefing.  In sum, the carbon intensity ("CI") value of a fuel under the LCFS determines whether the fuel generates a credit or a deficit.   Based on a clear consensus in the scientific community, that CI value is derived from the fuel's lifecycle GHG emissions. Def. Sep. Stmt., ¶¶ 18-19.  Thus, the LCFS does not distinguish among fuels based on origin, but rather based on their impact on global warming.  In other words, the LCFS exhibits "undiscriminating hostility" toward higher carbon fuels.  *Chem. Waste Mgmt., Inc. v. Hunt*, 504 U.S. 334, 347 n.11 (quoting *Illinois v. Gen. Elec. Co.*, 683 F.2d 206, 214 (7th Cir. 1982)).  Undiscriminating hostility to "the thing itself [e.g. carbon intensity], not to merely interstate shipments of the thing . . . [is] nondiscriminatory."  *Id.* at 347.

California has a "reason, apart from their origin," to distinguish between fuels it consumes on the basis of their carbon intensity.  *Id.* at 341 (quoting *Philadelphia v. New Jersey*, 437 U.S. 617, 627 (1978)).  That reason is California's legitimate interest in reducing the emissions associated with its activities, in order to minimize the very real threats posed by global warming.  *See Massachusetts v. E.P.A.*, 549 U.S. 497, 518-20, 526 (2007); Cal. Health & Safety Code § 38501 (Legislature's findings of threats).

Two very clear facts stand in stark contrast to plaintiffs' allegations that carbon intensity is somehow a proxy for origin.  First is the fact that, from the beginning, ethanol carbon intensities bore no nexus to in-state or out-of-state status.  The range of CI values for California ethanols (77.44 to 88.90) was right in the middle of the much larger range of values for out-of-state ethanols (58.40 to 120.99).  Second is the existence, again from the beginning, of Method 2A and

---

[18] Plaintiffs attempt to narrow the Commerce Clause comparison to a more specific, plant-by-plant level is simply incorrect, as explained in Defendants' Opposition to RMFU Plaintiffs' Motion for Summary Judgment p. 6, and in Defendants' Opposition to NPRA Plaintiffs' Motion for Summary Judgment p. 7, 20. Ethanol is a fungible commodity, which means all ethanol plants compete against each other *See* Spatari Decl., at ¶ 20;   *see also Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337-38 (defining economic protectionism as "regulatory measures designed to benefit in-state economic interests by burdening out-of-state *competitors*.") (emphasis added).

29

1    2B by which ethanol producers may apply for and obtain a lower, individualized CI value.  That

2    opportunity is not contingent on in-state or out-of-state status.  LCFS Sec. 94486(c), (d); Scheible

3    Decl., at ¶¶ 57-64.  Notably plaintiffs never mention the 2A and 2B procedures.  This is not

4    surprising, because that kind of generally available flexibility cannot be labeled discriminatory.

5         Twenty-five new out-of-state ethanol pathways were recently published through the 2A and

6    2B procedures. Def. Sep. Stmt., ¶ 42.  Eight of those out-of-state ethanol pathways are equal to

7    or lower than the lowest ethanol pathway for which a California facility has registered (80.70).

8    That brings the number of ethanol pathways that receive more favorable treatment than any

9    California pathway to eleven.  Plaintiffs can cite to no case where discrimination was found in

10   which out-of-state entities were treated more favorably than in-state entities.[19]  That is because

11   such a situation defies the very definition of discrimination:  "differential treatment of in-state and

12   out-of-state economic interests that benefits the former and burdens the latter."  *Or. Waste Sys.,*

13   *Inc. v. Dep't of Envtl. Quality of State of Or.*, 511 U.S. 93, 99 (1994).

14        The undisputed facts here clearly establish the absence of discrimination.  For one thing, all

15   ethanols are subject to the same regulatory requirements and the same scientifically-based

16   calculation of CI value.  That alone distinguishes the LCFS from the prototypical facially

17   discriminatory regulation.  *See, e.g., Chem. Waste Mgmt., Inc.*, 504 U.S. at 336-37 (invalidating

18   disposal fee that only applied to out-of-state waste).  Further, the LCFS distinguishes among

19   comparable fuels on the basis of life cycle GHG emissions, or carbon intensity, not origin.

20   Regulations, like the LCFS, that draw facial distinctions on the basis of attributes other than

21   origin or destination are not facially discriminatory.  *See C&A Carbone, Inc.*, 511 U.S. 383, 390

22   (1994).

23        **B.    The LCFS Permissibly Expands The Alternative Fuels Market In**
              **California.**

24

25   _____

26   [19] Neither can plaintiffs cite to a finding of facial discrimination where numerous out-of-
     state entities were actively participating in the allegedly discriminatory regime.  So far, 49
27   Midwest ethanol plants have expressed their intention to sell ethanol in California under the
     LCFS.  RJN – registration list (44 plants); new pathways (5 plants).  Where is the burden on
     interstate commerce?

28
                                        30

1    Notably, the dormant Commerce Clause protects "the interstate *market*, not particular

2  firms." *Exxon Corp. v. Maryland*, 437 U.S. 117, 127-28 (1978).  While the LCFS may make

3  high-CI fuels less competitive in California, firms that produce such fuels are not entitled to

4  individualized protection under the dormant Commerce Clause.  In addition, the LCFS *supports*

5  interstate commerce, because it is explicitly designed to *expand* the transportation fuels market –

6  increasing the number of low carbon fuels available – despite the fact that many of those fuels

7  may be produced out-of-state.  Scheible Decl., ¶ 32; Spatari Decl., ¶¶ 11, 21-23; Defendants RJN,

8  Exh. P, EPA RFS2 75 Fed Reg 14748-750.

9    Consideration of one possible next-generation renewable fuel – cellulosic ethanol –provides

10  a useful illustration.  Cellulosic ethanol is expected to be a very low carbon fuel.  *See* 42 U.S.C. §

11  7545(o)(1)(E) (anticipating 60% emissions reductions over gasoline); Spatari Decl., ¶¶ 16-22;

12  Scheible Decl., ¶ 32..  It is chemically and physically identical to ethanol produced from corn and

13  sugarcane.  Spatari Decl., ¶ 20.  Thus, it will compete with corn and sugarcane ethanol in the

14  market.  Low carbon cellulosic ethanol would be valuable under the LCFS, because it would

15  generate significant credits, despite the fact that both ARB and the U.S. EPA have recently

16  surveyed cellulosic demonstration plants and found few, if any, in California.  ISOR p. B-31-33;

17  EPA RFS2 Rulemaking, 75 Fed. Reg. at 14749-50.  In addition, plaintiffs RFA and Growth

18  Energy have indicated that many of their members, most of whom are located in the Midwest, are

19  well-situated to convert their corn ethanol plants to cellulosic processes when the latter becomes

20  commercially viable.  Def. Sep. Stmt. ¶ 76.  This expansion of the market in low carbon fuels is

21  precisely what the LCFS is designed to encourage and reward.  It is also precisely the opposite of

22  what the dormant Commerce Clause prohibits.  *See C&A Carbone, Inc.*, 511 U.S. at 392

23  (invalidating ordinance that "squelches competition…, leaving no room for investment from

24  outside").

25    The LCFS regulates evenhandedly, distinguishing among ethanols only on the basis of

26  carbon intensity, as it must to achieve its objectives.  It is a flexible, market-based mechanism that

27  even permits out-of-state ethanol producers to receive more favorable treatment than in-state

28  producers.  All of these facts are apparent from the face of the regulation and rulemaking

31

documents, and they rule out a finding of discrimination.  Therefore, summary judgment should be granted to defendants on plaintiffs' claim that the LCFS facially discriminates against out-of-state ethanol.

## VI.   THE LCFS' TREATMENT OF CRUDE OIL DOES NOT FACIALLY DISCRIMINATE AGAINST OUT-OF-STATE ENTITIES.

The manner in which the LCFS regulates crude oil is described in some detail in Defendants' Opposition to NPRA Plaintiffs' Motion for Summary Judgment (p. 18-20).  To avoid overly duplicative briefing, defendants respectfully refer the court to that brief for a full description.  In sum, all crude oils are assigned the same CI value, except for high carbon intensity crude oils ("HCICOs") that comprised less than 2% of the 2006 California baseline.  In other words, two factors determine a crude oil's CI value:  1) whether or not the crude is a high carbon intensity crude and 2) whether or not the crude comprised 2% or more of California's 2006 oil mix.  Neither of those factors is origin.  Combining the two factors, the regulatory "determinant" becomes even more removed from origin, especially since a single state or country can produce multiple crudes, some high carbon and some not.  *Or. Waste Sys., Inc.*, 511 U.S. at 99.

This is simply not facial discrimination "against an article of commerce by reason of its origin."  *C&A Carbone, Inc.*, 511 U.S. at 390.  Summary judgment should be granted to defendants on NPRA plaintiffs' claim of facial discrimination against out-of-state crude oil.

## VII.  THE LCFS DOES NOT HAVE A DISCRIMINATORY PURPOSE.

The primary purpose of the LCFS is to reduce GHG emissions associated with the consumption of transportation fuels in California.  LCFS Sec. 95480.  A science-based life cycle analysis is the only way to achieve that goal.  Def. Sep. Stmt., ¶¶ 19.  There is nothing about adopting a life cycle model to reduce emissions from fuels that even hints at "local economic protectionism."  *C&A Carbone, Inc.*, 511 U.S. at 390.

In fact, the context in which the LCFS was promulgated and adopted, described above, makes clear that its purposes are to drive innovation in order to reduce GHG emissions, develop a lasting market for clean, alternative fuels and reduce our dependence on foreign oil.   The same

32

theme runs consistently throughout the rulemaking documents.  *See, e.g.,* FSOR pp. 24 ("The objective of the LCFS program is to stimulate more fundamental changes to the transportation fuel pool, moving towards fuels that meet the much lower carbon intensities needed to meet long-term GHG emissions goals."); 61 ("In addition, the LCFS is designed to reduce California's dependence on petroleum, create a lasting market for clean transportation technology, and stimulate the production and use of low-carbon fuels in California."); 148 ("One of the purposes of the LCFS is to incentivize the use of fuels that have lower carbon intensity."); 164 ("The primary purpose of the LCFS is to provide an incentive for the use of transportation fuels with low-carbon intensity values."); 440 ("One of the purposes of the LCFS is to incentivize improvements to existing fuels and the development of new fuels.").

As discussed in defendants' opposition briefs, plaintiffs' attempts to find ulterior motive relies on a "patchwork quilt of concerns, ideas and motivations" that cannot withstand scrutiny. *See Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1133 (9th Cir. 2009).

Plaintiffs' attempt to characterize the LCFS as a means of protecting either California's corn ethanol industry or its crude oil producers is absurd.  RMFU Br. p. 9; NPRA Br. p. 19.  It is clear that ARB did not anticipate more growth in the California tiny corn ethanol industry.  ISOR VII-9 (showing all "potential" corn ethanol plants as "existing").  And California's crude oil industry is declining because the resources available for extraction are diminishing.  Def. Sep. Stmt. ¶ 75.  Not to mention that the crude oil market is fluid, global and lucrative, and the crude oil industry needs no protection.  *Id.*

In the end, plaintiffs admit, as they must, that a significant purpose of the LCFS is "to control lifecycle emissions from biofuels usage."  RMFU's Br. p. 23.  *See also* RMFU's Br. p. 25 (asserting that ARB's "only purported objective for the LCFS regulation" was reducing GHG emissions); NPRA's Motion p. 16 ("[T]he LCFS is designed to 'discourage[] the use of higher-carbon intensity fuels.'").  That is not economic protectionism.  Nor is the purpose of the LCFS really disputed.  Thus, summary judgment should be granted for defendants on plaintiffs' claims of a discriminatory purpose.

33

**VIII. THE LCFS DOES NOT REGULATE EXTRATERRITORIALLY OR DIRECTLY OUT OF CALIFORNIA.**

Both RMFU and NPRA plaintiffs assert claims for extraterritorial regulation. (RMFU SAC at ¶¶ 86-88; NPRA Complaint at ¶¶ 85-89.)[20]  Courts invalidate state laws under the extraterritorial regulation aspect of the dormant Commerce Clause doctrine when:  1) the regulation directly controls commerce taking place wholly outside the state; 2) there is a threat of economic Balkanization; and 3) the regulation applies only to interstate commerce. *Healy v. Beer Institute*, 491 U.S. 324, 336, 342 (1989).  An examination of the LCFS, the undisputed facts, and the relevant case law demonstrates that the LCFS does not violate this aspect of the Commerce Clause.  Based on the argument presented in the two opposition briefs, plaintiffs' claims of extraterritorial regulation cannot be sustained.  Accordingly, judgment should be entered for defendants on this aspect of plaintiffs' commerce clause claims.[21]

**CONCLUSION**

For all of the above reasons, defendants respectfully request the Court grant its motion for summary judgment.

---

[20] This branch of the Commerce Clause doctrine is referred to, *inter alia*, as "extraterritorial regulation", "direct regulation," and "regulation of channels of interstate commerce."

[21] As set forth in *S.D. Myers, Inc. v. City and County of SF*, 253 F.3d 461, 467 (9th Cir. 2001), since both plaintiffs raise facial challenges, they can prevail only if the LCFS must necessarily be read as directly regulating interstate commerce.  The Court must construe the regulation narrowly and resolve any ambiguities in favor of the interpretation that most clearly supports constitutionality.  Plaintiffs do not meet their burden under this high standard.

34

1    Dated:  December 17, 2010                    Respectfully Submitted,

2                                                 EDMUND G. BROWN JR.
                                                  Attorney General of California
3                                                 ROBERT W. BYRNE
                                                  Supervising Deputy Attorney General
4

5

6                                                 /s/ Mark Poole
                                                  MARK POOLE
7                                                 Deputy Attorney General
                                                  *Attorneys for Defendant*
8                                                 *James N. Goldstene, et al.*

9                                                 NATURAL RESOURCES DEFENSE
                                                  COUNCIL
10

11                                                By: /s/ David Pettit_____
12                                                DAVID PETTIT
                                                  Attorneys for Defendant-Intervenor,
13                                                Natural Resources Defense Council, Inc.

14

15                                                SIERRA CLUB

16
                                                  By: /s/ Pat Gallagher_____
17                                                PAT GALLAGHER
                                                  Attorney for Defendant-Intervenor,
18                                                Sierra Club

19

20                                                CONSERVATION LAW FOUNDATION

21
                                                  By: /s/ Jane West_____
22                                                JANE WEST
                                                  Attorney for Defendant-Intervenor,
23                                                Conservation Law Foundation

24                                                ENVIRONMENTAL DEFENSE FUND

25

26                                                By: /s/ James T.B. Tripp_____
                                                  James T.B. Tripp
27
                                                  Attorney for Defendant-Intervenor,
28                                                Environmental Defense Fund

                              35

SF2010400011
20383584.doc

DEFENDANTS' MEMO. IN SUPPORT OF CROSS-MTN FOR SUMM. JUDGMENT (1:09-CV-02234-LJO-DLB)