EDMUND G. BROWN JR.,
Attorney General of California
ROBERT W. BYRNE,
Supervising Deputy Attorney General
GAVIN G. MCCABE, State Bar No. 130864
MARK POOLE, State Bar No. 194520
DAVID A. ZONANA, State Bar No. 196029
M. ELAINE MECKENSTOCK, State Bar No. 268861
Deputy Attorneys General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 703-5524
  Fax:  (415) 703-5480
  E-mail:  David.Zonana@doj.ca.gov
*Attorneys for Defendants*
*James N. Goldstene et al.*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| **ROCKY MOUNTAIN FARMERS UNION, et al.,**<br><br>                                    Plaintiffs,<br><br>    v.<br><br>**JAMES GOLDSTENE, et al.,**<br><br>                                    Defendants.<br><br>And Related Consolidated Action.<br><br>------------------------------------------------------<br><br>**NATIONAL PETROCHEMICAL & REFINERS ASSOCIATION, *et al.*,**<br><br>                                    Plaintiffs,<br><br>    v.<br><br>**JAMES GOLDSTENE, *et al.*,**<br><br>                                    Defendants. | LEAD CASE No.<br>1:09-CV-02234-LJO-DLB<br><br>*Consolidated With* Case No.:<br>1:10-CV00163-LJO-DLB<br><br><br>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO RMFU'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:        February 23, 2011<br>Time:        8:30 a.m.<br>Courtroom:   Four<br>Judge:       The Honorable Lawrence J. O'Neill<br>Trial Date:  TBD<br><br>Action Filed:  12/23/2009 |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 3

SUMMARY JUDGMENT STANDARD................................................................................. 4

ARGUMENT ..................................................................................................................... 4

I.     THE COURT SHOULD DENY PLAINTIFFS' MOTION BASED ON DEFENDANTS CROSS-MOTION. ....................................................................... 4

II.    THE LCFS DOES NOT DISCRIMINATE AGAINST INTERSTATE COMMERCE........................................................................................................ 5

     A.    The LCFS Does Not Facially Discriminate Against Out-of-State Ethanol. ................................................................................................... 5

     B.    The LCFS Does Not Cause Discriminatory Effects on Out-of-State Ethanol. ................................................................................................... 9

     C.    The LCFS Does Not Have a Discriminatory Purpose. ........................... 11

     D.    The LCFS Should Survive Strict Scrutiny. ............................................ 12

          1.    The LCFS Has Several Legitimate Local Purposes..................... 12

          2.    There Are No Reasonable Nondiscriminatory Alternatives. ........ 13

III.    THE LCFS DOES NOT REGULATE EXTRATERRITORIAL COMMERCE........................................................................................................ 14

     A.    The LCFS Does Not Directly Regulate Wholly Out of State Activities. ................................................................................................. 14

     B.    The LCFS Will Not Lead to Balkanization............................................. 17

          1.    The LCFS Impose No Transportation Penalty and No Trade Barriers. ....................................................................................... 18

          2.    The LCFS Does Not Impermissibly Regulate Channels of Interstate Commerce. ................................................................... 19

IV.   ANY BURDEN IMPOSED ON INTERSTATE COMMERCE BY THE LCFS IS INCIDENTAL RELATIVE TO ITS LOCAL BENEFITS.................... 19

     A.    Plaintiffs Balancing Claim is Not Appropriate for Summary Judgment. ................................................................................................ 20

     B.    The Local Benefits of the LCFS are Well Established as a Matter of Law.......................................................................................................... 20

     C.    The Evidence Indicates No Burden on Commerce Let Alone an Excessive One. ........................................................................................ 20

V.    SUMMARY JUDGMENT AS TO PLAINTIFFS' CONFLICT PREEMPTION ARGUMENTS MUST BE DEFERRED OR DENIED. ............ 21

     A.    Plaintiffs' Conflict Preemption Arguments Rest on Disputed Facts Concerning the Effect of the LCFS on Existing Corn Ethanol Producers and the Intent of California. ................................................... 22

i

**TABLE OF CONTENTS**
(continued)

Page

B.   The Presumption Against Preemption Requires That Plaintiffs Demonstrate a Clear and Manifest Purpose of Congress to Preempt the LCFS. ........................................................................................... 23

  1.   Congress Expressly Narrowed the Scope of Preemption in EISA to Allow for State Environmental Laws Such as the LCFS. .................................................................................... 24

  2.   Congress's Silence Concerning the LCFS Belies a Clear and Manifest Purpose to Preempt State Law. .................................. 26

  3.   EPA Views RFS2 as Compatible With Parallel State LCFS Programs. ............................................................................. 27

C.   The LCFS Does Not Conflict With Congress' Intent, Goals or Methods. ................................................................................... 28

  1.   The LCFS Compliments the Energy Security Intent and Goals of Congress in EISA. ............................................... 28

  2.   The LCFS Does Not Conflict With Congress' Goals With Respect to Existing Corn Ethanol Plants. ..................................... 30

  3.   RFS2 Does Not Give Rise to a Method Conflict with The LCFS. ................................................................................... 32

D.   Contrary to Plaintiffs' Argument, EISA Bars EPA From Restricting Geographic Markets in order to Leave Room for State Regulation.......... 34

CONCLUSION ................................................................................................. 35

1

# TABLE OF AUTHORITIES

2

**Page**

3

4   **CASES**

5   *Alaska v. Arctic Maid*
6       366 U.S. 199, 204 (1961) ................................................................. 6

7   *Alliance for Clean Coal v. Miller*
    44 F.3d 591 (1995) .......................................................................... 8
8
*Am. Trucking Ass'ns, Inc. v. Scheiner*
9       483 U.S. 266, 284 (1987) ................................................................ 9

10   *American Petroleum Institute v. Cooper*
    681 F.Supp.2d 635, 642 (E.D. North Carolina 2010) ................. 22, 23, 30
11

12   *Arnett v. Myers*
    281 F.3d 552, 561 (6th Cir.2002) .................................................. 4
13
*Baldwin v. G.A.F. Seelig, Inc.*
14       294 U.S. 511, 521 (1935) ............................................................... 16

15   *BFI Med. Waste Sys. v. Whatcom County*
    983 F.2d 911, 913 ......................................................................... 9
16

17   *Birth Hope Adoption Agency, Inc. v. Ariz. Health Care Cost Containment Sys.*
    218 F.3d 1040 (9th Cir. 2000) ...................................................... 6

18
*Boston Stock Exch. v. State Tax Comm'n*
19       429 U.S. 318 (1977) ...................................................................... 8

20   *Brimmer v. Rebman*
    138 U.S. 78 (1891) ........................................................................ 10
21

22   *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*
    476 U.S. 573, 582 (1986) ............................................................... 16
23
*Camps/Newfound/ Owatonna, Inc. v. Town of Harrison, Me.*
24       520 U.S. 564 (1997) ...................................................................... 6, 8

25   *Cavel Int'l, Inc. v. Madigan*
    500 F.3d 551, 555 (7th Cir. 2007) ................................................ 17
26

27   *Celotex Corp. v. Catrett*
    477 U.S. 317, 323, 91 L.Ed.2d 265, 106 S.Ct. 2548 (1986) ...................... 4

28

**DEFENDANTS' MEMO. OF P & A's IN OPP. TO RMFU'S MOTION FOR SUMMARY JUDGMENT**
(No. 1:09-CV-02234-LJO-DLB)

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Chae v. SLM Corp.*
593 F.3d 936, 944 (2010) .................................................................................. 30

*Chem. Waste Mgmt., Inc. v. Hunt*
504 U.S. 334, 336-37 (1992) .............................................................................. 6

*Cippollone v. Liggett Group, Inc.*
505 U.S. 504, 516 (1992) .................................................................................. 23

*Daghlian v. DeVry Univ., Inc.*
582 F. Supp. 2d 1231 (C.D. Cal. 2007) ............................................................. 6, 7

*Dean Milk Co.v. City of Madison, Wis.*
340 U.S. 349, 354 .............................................................................................. 9

*Dep't of Revenue of Ky. v. Davis*
553 U.S. 328, 337-38 (2008) ........................................................................ 5, 12

*Edgar v. MITE Corp.*
457 U.S. 624, 642-643 (1982) .......................................................................... 16

*English v. General Elec. Co.*
496 U.S. 72, 78-79 (1990) ................................................................................ 22

*Exxon Corp. v. Governor of Md.*
437 U.S. 117, 127 (1978) ........................................................................ 6, 15, 17

*Exxon Mobil Corp. v. U.S. Envtl. Prot. Agency*
217 F.3d 1246, 1255 (9th Cir. 2000) ................................................................ 23

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*
505 U.S. 88, 92 (1992) ..................................................................................... 30

*Gen. Motors Corp. v. Tracy*
519 U.S. 278, 298 (1997) ........................................................................ 5, 6, 15

*Granholm v. Heald*
544 U.S. 460, 466-67 (2005) ............................................................................. 6

*Grier v. Am. Honda Motor Co.*
529 U.S. 861 (2000) ......................................................................................... 30

*Harris v. United States*
536 U.S. 545, 555 (2002) .................................................................................. 23

iv

### TABLE OF AUTHORITIES
**(continued)**

Page

*Healy v. Beer Institute*
  491 U.S. 324, 336-341 (1989) .................................................................................. 13, 15, 16

*Hillsborough County, Florida v. Automated Medical Laboratories, Inc.*
  471 U.S. 707, 721 (1985) .......................................................................................... 22, 24

*Hunt v. Wash. State Apple Adver. Comm'n*
  432 U.S. 333 (1977) ................................................................................................. 8

*Int'l Paper Co. v. Ouellette*
  479 U.S. 481, 494 (1987) .......................................................................................... 30

*Kleenwell Biohazard Waste and Gen'l Ecology Consultants, Inc. v. Nelson*
  48 F.3d 391, 398 (9th Cir. 1995) .............................................................................. 8

*Malabed v. North Slope Borough*
  335 F.3d 864, 869 (9th Cir. 2003) ............................................................................ 23

*Massachusetts v. E.P.A.*
  549 U.S. 497 (2007) ................................................................................................. 12, 18, 20

*Medronic, Inc. v. Lohr*
  518 U.S. 470, 474 (1996) .......................................................................................... 26, 30

*Minn.v. Clover Leaf Creamery Co.*
  449 U.S. 456, 473 (1981) .......................................................................................... 21

*Nat'l Ass'n of Home Builders v. San Joaquin Valley Unified Air Pollution Control District*
  No. CIV F 07-0820, 2008 WL 4330449, *9 (E.D. Cal. Sept. 19, 2008), *aff'd*, No. 08-
  17309, 2010 WL 4948510 (Dec. 7, 2010 9th Cir.) ................................................. 24

*Nat'l Ass'n of Optometrists & Opticians Lenscrafters, Inc. v. Brown*
  567 F.3d 521, 525 (9th Cir. 2009) ............................................................................ 5, 6

*Nat'l Solid Wastes Mgmt. Ass'n v. Meyer*
  165 F.3d 1151, 1154 (7th Cir. 1999) ........................................................................ 16

*New Energy Co. of Ind. v. Limbach*
  486 U.S. 269, 276 (1988) .......................................................................................... 7

*Nippert v. City of Richmond*
  327 U.S. 416 (1946) ................................................................................................. 10

*Or. Waste Sys., Inc. v. Dep't of Envtl. Quality of the State of Or.*
  511 U.S. 93, 99 (1994) ............................................................................................. 5, 7, 9

# TABLE OF AUTHORITIES
### (continued)

Page

*Oxygenated Fuels Ass'n v. Davis*
    331 F.3d 665, 670-671 (9th Cir. 2003) ................................................................. 23

*Pac. Nw. Venison Producers v. Smitch*
    20 F.3d 1008, 1015 (9th Cir. 1994)................................................................. 19, 20

*Pacific Gas & Elec. Co. v. State Energy Res. Conserv. and Dev. Comm'n*
    461 U.S. 190, 206 (1983) ................................................................. 23, 30

*Pacific Merchant Shipping Ass'n v. Cackette*
    2007 WL 2492681 (Aug. 30, 2007 E.D.Cal.) ................................................... 4, 30

*Pike v. Bruce Church, Inc.*
    397 U.S. 137, 142 (1970) ................................................................. 19, 21

*Rice v. Norman Williams Co.*
    458 U.S. 654, 659 (1982) ................................................................. 24

*S.D. Myers, Inc. v. City and County of SF*
    253 F.3d 461, 467 (9th Cir. 2001) ................................................................. 14, 16

*S. Pac. Co. v. Ariz.*
    325 U.S. 761 (1945) ................................................................. 9

*South-CentralTimber Dev. v. Wunnicke*
    467 U.S. 82, 87 (1984) ................................................................. 7

*Ting v. AT&T*
    319 F.3d 1126 (9th Cir. 2003) ................................................................. 30

*Total TV v. Palmer Commc'ns, Inc.*
    69 F.3d 298, 304 (9th Cir. 1995)................................................................. 24

*Union Pac. R.R. Co. v. Cal. Pub. Utils. Comm'n*
    346 F.3d 851, 871 (9th Cir. 2003) ................................................................. 21

*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*
    550 U.S. 330, 346 (2007) ................................................................. 19

*West Lynn Creamery, Inc. v. Healy*
    512 U.S. 186, 201 (1994)................................................................. 9, 16

*Wyeth v. Levine*
    129 S.Ct. 1187, 1194 (2009) ................................................................. passim

1
2

# TABLE OF AUTHORITIES
## (continued)

**Page**

3
4

*Wyoming v. Oklahoma*
   502 U.S. 437 (1992) ................................................................. 8

5

**STATUTES**

6

42 U.S.C.

7
8
9
10

§ 211(o)(1)(H) ....................................................................... 13, 14
§ 7401(a)(3) ................................................................................. 23
§ 7545(o)(2)(A)(iii)(II)(aa) .......................................................... 30
§ 7545(o)(5) ................................................................................. 30
§ 7545(o)(12) ............................................................................... 25
§ 9545(o)(1)(H) ........................................................................... 17

11

CAL. CODE REGS. Title 17

12
13
14

§ 95480.1(a) ........................................................................... 15, 16
§ 95482 (2010) ............................................................................... 3
§ 95484(d)(2)(D) ......................................................................... 18
§ 95486 ......................................................................... 7, 10, 11

15

CAL. HEALTH & SAFETY CODE §§ 38500-38599 ..................................... 3

16

Clean Air Act, § 211(o)(2)(B) ....................................................... 30
Clean Air Act § 211, subd. (1)(B)(ii)(II) ...................................... 29

17
18

Global Warming Solutions Act of 2006 ("AB 32") ....................... 1, 3

19

**CONSTITUTIONAL PROVISIONS**

20

U.S. CONST. Article VI, cl. 2 ......................................................... 22

21

**COURT RULES**

22
23

Fed. R. Civ. P. 56(c)(2) ................................................................... 4
Fed.R. Civ. P. 56(d) ............................................................. 1, 2, 20

24

Local Rule 260(a) ........................................................................... 4

25
26
27
28

**DEFENDANTS' MEMO. OF P & A's IN OPP. TO RMFU'S MOTION FOR SUMMARY JUDGMENT**
(No. 1:09-CV-02234-LJO-DLB)

1

### TABLE OF AUTHORITIES
(continued)

2
Page

3   OTHER AUTHORITIES

4   75 FED REG

5   14669.................................................................................................................... 14
6   14670.................................................................................................................... 27
    14764.................................................................................................................... 27
7   14766.................................................................................................................... 14

8   153 Cong. Rec. E2665-01.................................................................................. 28, 29
    153 Cong. Rec. S7680....................................................................................... 29
9   153 Cong. Rec. S7694....................................................................................... 29
    153 Cong. Rec. S7704....................................................................................... 26
10  153 Cong. Rec. H14434-02.............................................................................. 28, 29
    153 Cong. Rec. H14451-02.............................................................................. 26
11  153 Cong. Rec. H16651-02.............................................................................. 29
    153 Cong. Rec. H9722-03................................................................................ 28
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEFENDANTS' MEMO. OF P & A's IN OPP. TO RMFU'S MOTION FOR SUMMARY JUDGMENT**
(No. 1:09-CV-02234-LJO-DLB)

1    **INTRODUCTION**

2        The Rocky Mountain Farmers' Union and other corn ethanol interests ("RMFU" or

3    "plaintiffs") are challenging the Low Carbon Fuels Standard regulation ("the LCFS") adopted by

4    the California Air Resources Board ("ARB") in 2009.  The LCFS uses a market-based

5    performance standard designed to gradually reduce the overall greenhouse gas emissions from

6    transportation fuels consumed in California and to reduce California's dependence on petroleum.

7    The LCFS is a critical piece of ARB's strategy to reduce statewide emissions of greenhouse

8    gasses to 1990 levels by 2020, pursuant to its mandate under Assembly Bill 32, the Global

9    Warming Solutions Act of 2006 ("AB 32").

10        Plaintiffs seek summary judgment on their claims that the LCFS violates the Commerce

11   Clause and the Supremacy Clause of the United States Constitution.  Specifically, plaintiffs seek

12   summary judgment based on no less than five Commerce Clause arguments (facial

13   discrimination, discriminatory purpose, discriminatory effect, regulation of out-of-state

14   commerce, and undue burden), as well as an argument that the LCFS conflicts with the federal

15   Renewable Fuels Standard ("RFS2") and, therefore, is preempted.

16        Although there has been no discovery, plaintiffs' early motion for summary judgment

17   encompasses every claim in their case.  Many of plaintiffs' arguments are simply premature

18   because defendants require discovery in order to oppose those arguments.  In particular, because

19   efficiency improvements at Midwest corn ethanol facilities appear to be lowering their carbon

20   intensity value under the LCFS, plaintiffs' assertions that the LCFS will cause a substantial

21   burden on their members and conflict with the goals of federal law must be tested in discovery.

22   Thus, defendants move concurrently, pursuant to Rule 56(d) of the Federal Rules of Civil

23   Procedure, for an order denying or deferring consideration of all of plaintiffs' arguments except

24   their Commerce Clause claims of facial discrimination, discriminatory purpose and

25   extraterritorial regulation.  Defendants address those claims here and in their Cross-Motion for

26   Summary Judgment.[1]  In the event, however, that the issues plaintiffs raise in their motion are not

27   ──────────────
          [1] Concurrently with this opposition and in addition to their Rule 56(d) motion, defendants
28   move by targeted cross-motion for summary judgment and adjudication.  To reduce duplication,
                                                                                     (continued…)
                                                    1
     **DEFENDANTS' MEMO. OF P & A's IN OPP. TO RMFU'S MOTION FOR SUMMARY JUDGMENT**
                                                                        (No. 1:09-CV-02234-LJO-DLB)

1   deferred pursuant to the Rule 56(d) motion, or resolved by defendants' Cross-Motion, plaintiffs'

2   motion for summary judgment should be denied for the additional reasons presented herein.

3       First, plaintiffs' commerce clause arguments lack any merit.  The LCFS is not facially

4   discriminatory; it is facially neutral.  The LCFS measures the carbon intensity of all fuels,

5   regardless of origin, based on the same scientifically-based factors.  Nor does the LCFS have the

6   practical effect of discriminating against out-of-state transportation fuels.  Indeed, the

7   "transportation" component of the LCFS's lifecycle analysis, which plaintiffs attack as

8   discriminatory, actually favors Midwest ethanol producers over California producers.  In addition,

9   the LCFS is not a disguised protectionist measure.  It is an environmental law designed to reduce

10  the emissions that cause climate change and pose a serious threat to the public health, natural

11  resources and environment of California.  Nor does the LCFS *regulate* interstate commerce

12  outside California.  To the contrary, it regulates fuel consumed in California.  For these reasons,

13  the LCFS is not subject to strict scrutiny.  Lastly, for Commerce Clause purposes, any incidental

14  burden on interstate commerce from the LCFS is far outweighed by the environmental benefit:

15  namely, reducing greenhouse gas emissions from the transportation sector in California by 16

16  million metric tons in 2020.

17      Nor does plaintiffs' preemption argument stand up to examination.  Fundamentally,

18  plaintiffs' conflict preemption argument is based on disputed facts and speculation about the

19  effects of the LCFS on Midwest ethanol producers and therefore is not appropriate for summary

20  judgment.  Further, because California is regulating in an area of traditional state authority,

21  because Congress was fully aware of the state law at issue, and because the relevant federal

22  statute expressly permits state law in that area, plaintiffs cannot demonstrate a clear and manifest

23  purpose of Congress to preempt the LCFS, as required to overcome the presumption against

24  preemption.  Nor can plaintiffs maintain a "method conflict" argument when they lack any indicia

25  of Congressional intent to establish a "uniform standard" or method *and* the relevant federal

26  (…continued)
    defendants cross-reference their Rule 56(d) Motion and their Cross-Motion for Summary
27  Judgment where possible.  Defendants hereby incorporate both motions and their supporting
    papers in full in this opposition to RMFU plaintiffs' Motion for Summary Judgment.

28
                                    2

1   agency views the state and federal laws as complimentary.  Defendants therefore request that the

2   Court deny plaintiffs' motion for summary judgment in full.

3                                   **BACKGROUND**

4                   **AB 32 AND CALIFORNIA'S LOW CARBON FUEL STANDARD**

5           In September 2006, California's Legislature enacted AB 32, finding that, among other

6   things, "[g]lobal warming poses a serious threat to the economic well-being, public health, natural

7   resources, and the environment of California."  *See* CAL. HEALTH & SAFETY CODE § 38501.  AB

8   32 directed ARB to identify and adopt measures that would reduce California's emissions of

9   greenhouse gasses to 1990 levels by 2020.  *Id.* at §§ 38550, 38560.  In January 2007, California's

10  Governor issued Executive Order S-01-07, setting a statewide goal to "reduce the carbon intensity

11  of California's transportation fuels by at least 10 percent by 2020," and calling on ARB to

12  "determine if an LCFS can be adopted as a discrete early action measure pursuant to AB 32."

13  RJN Exh. E.  In June 2007, ARB adopted the LCFS as an early action measure and initiated

14  public workshops on the issue, followed by a formal rulemaking and culminating in a board vote

15  in April 2009 and final adoption of the regulation in April 2010.  Defendants' Statement of Facts

16  (hereafter "ARB's Sep. Stmt.")[2] ¶ 13.

17          The LCFS establishes declining carbon intensity standards that all producers and importers

18  selling transportation fuels in California must meet each year, starting with a 0.25 percent

19  reduction in 2011 and gradually scaling up to a 10 percent reduction in 2020.  CAL. CODE REGS.

20  tit. 17 (hereafter "LCFS Section"), § 95482 (2010).  The LCFS measures the carbon intensity

21  ("CI") of fuels using a lifecycle analysis that includes the emissions associated with producing,

22  transporting, and using the fuels.  *Id.* at Section 95481(a)(28); *see also* Declaration of Michael

23  Scheible ("Scheible Decl.") at ¶¶ 14-25.  The regulation uses a market-based system of credits

24  and deficits that gives fuel producers and importers the flexibility to determine the mix of fuels

25  they use in California.  Scheible Decl., at ¶¶ 29-31.  The LCFS is designed to incentivize the

26  _____

27          [2] Defendants' Separate Statement follows its response to plaintiffs statement of facts, in a
    single document titled "Defendants' Response to RMFU Plaintiffs' Statement of Material Facts
    Not Subject to Dispute; and Defendants Statement of Facts."

28

                                          3

1  steady introduction of lower carbon fuels, which could include ethanol, biodiesel, and renewable

2  diesel, as well as non-liquid fuels.  ARB Request for Judicial Notice ("RJN"), Exh. B (ARB's

3  Initial Statement of Reasons ("ISOR")) at ES-1.  ARB estimates that the LCFS will reduce

4  emissions from the transportation sector in California by about 16 million metric tons in 2020.[3]

5  *Id.*

6                               **SUMMARY JUDGMENT STANDARD**

7          Under the Federal Rules of Civil Procedure, a motion for summary judgment should be

8  granted when "there is no genuine issue as to any material fact" and "the movant is entitled to

9  judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2); *See* Local Rule 260(a).  A party seeking

10 summary judgment "bears the initial responsibility of informing the district court of the basis for

11 its motion" and of demonstrating "the absence of a genuine issue of material fact."  *Celotex Corp.*

12 *v. Catrett*, 477 U.S. 317, 323 (1986).  "The plaintiff movant 'must establish beyond peradventure

13 all of the essential elements of the claim or defense to warrant judgment in his favor.'"  *Pacific*

14 *Merchant Shipping Ass'n v. Cackette*, 2007 WL 2492681 (Aug. 30, 2007 E.D.Cal.) (citing

15 *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir.1986)) (emphasis in original); *Arnett v.*

16 *Myers*, 281 F.3d 552, 561 (6th Cir. 2002) ("a substantially higher hurdle must be surpassed,

17 particularly where ... the moving party bears the ultimate burden of persuasion ... at trial").

18                                          **ARGUMENT**

19 **I.      THE COURT SHOULD DENY PLAINTIFFS' MOTION BASED ON
               DEFENDANTS CROSS-MOTION.**
20

21         Defendants' Cross-Motion for Summary Judgment, filed concurrently herewith, raises

22 several arguments that are dispositive of some or all of plaintiffs' claims and thus, would dispose

23 of their motion for summary judgment.  Rather than repeat those arguments here, defendants

24 incorporate their Cross-Motion and supporting papers by reference.

25

26

27         [3] *See also* Defendants' Cross-Motion for Summary Judgment, at 7-9 (discussing the
       development and structure of the LCFS).
28

                                                  4

## II.     THE LCFS DOES NOT DISCRIMINATE AGAINST INTERSTATE COMMERCE.

"The modern law of what has come to be called the dormant Commerce Clause is driven by concern about economic protectionism – that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337-38 (2008) (internal quotation omitted).  A regulatory scheme "can discriminate against out-of-state interests in three different ways:  (a) facially, (b) purposefully, or (c) in practical effect." *Nat'l Ass'n of Optometrists & Opticians Lenscrafters, Inc. v. Brown*, 567 F.3d 521, 525 (9th Cir. 2009).  Plaintiffs allege that the LCFS discriminates in all three ways.  Plaintiffs' Br. p. 5.  In reality, the LCFS does none of the above.

### A.     The LCFS Does Not Facially Discriminate Against Out-of-State Ethanol.

"[D]iscrimination simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality of the State of Or.*, 511 U.S. 93, 99 (1994).  As plaintiffs acknowledge, "any notion of discrimination assumes a comparison of substantially similar entities." *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298 (1997).  But plaintiffs' construction of "similarly situated" lacks any basis in either law or logic.  Plaintiffs want to isolate and compare the carbon intensity ("CI") values for a subset of ethanol pathways that they claim have "identical production processes [and] create physically and chemically identical ethanol," and on that narrow basis have the Court conclude the regulation is facially discriminatory.[4]  Plaintiffs' Br. p. 6.

As a matter of law, plaintiffs' construction of "similarly situated" is simply wrong.  The question of whether entities are "similarly situated" under the dormant Commerce Clause turns on whether they compete in a market, not whether they employ "identical production processes." *See Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 127 (1978) (rejecting the "notion that the

---

[4] Defendants contest plaintiffs' characterization of these pathways as "identical production processes."  ARB Response to Plaintiffs' Statement of Material Facts Not in Dispute ("ARB Resp. Stmt."), at ¶ 6.  Plant efficiencies vary greatly, and that is an important factor in the lifecycle emissions of the production process. *See* Scheible Decl., at ¶¶ 46-47.

5

1   Commerce Clause protects the particular structure or *methods of operation* in a . . . market")

2   (emphasis added).  *See also Gen. Motors Corp. v. Tracy*, 519 U.S. at 299; *Exxon Corp.*, 437 U.S.

3   at 127 ("[The dormant Commerce] Clause protects the interstate market, not particular interstate

4   firms."); *Alaska v. Arctic Maid*, 366 U.S. 199, 204 (1961).  In other words, production processes

5   are irrelevant to the dormant Commerce Clause <u>unless</u> they produce different products that do not

6   compete.[5]  But, ethanol is a fungible commodity.  Scheible Decl., at ¶ 16; Babcock Decl., at ¶ 77-

7   84.  Thus, the proper consideration under the dormant Commerce Clause is whether the LCFS

8   discriminates between in-state ethanol and out-of-state ethanol.[6]

9       Under the LCFS, all ethanols are regulated in the same manner.  All are assigned a CI

10   value, based on lifecycle emissions calculations determined by the same scientific modeling tool

11   (CA-GREET).  RJN Exh. A.  Those facts alone stand in contrast to the paradigmatic facial

12   discrimination cases where the regulation only applies to either in-state or out-of-state entities.[7]

13   Plaintiffs rely on a similarly distinguishable case, *Daghlian v. DeVry Univ., Inc.*, 582 F. Supp. 2d

14   1231 (C.D. Cal. 2007).  The statute in that case granted a regulatory exemption only to certain

15   entities based entirely on geography and was, therefore, facially discriminatory.  *Id.* at 1241-42.[8]

---

16   [5] Plaintiffs do not, and cannot, allege that ethanol plants with different production

17   processes have "different responsibilities, different purposes [or] different business structures" such that they should not be considered similarly situated under the dormant Commerce Clause. *See Lenscrafters*, 567 F.3d at 527 (9th Cir. 2009).

18

19   [6] Confusingly, plaintiffs urge the Court to use "identical production processes" as the

20   basis for comparing the treatment of ethanol plants under the LCFS.  But, then, plaintiffs urge the Court to conclude that the LCFS is discriminatory because it considers emissions related to transportation and electricity *used during production of the fuel*.  Plaintiffs' Br. at 13.  Plaintiffs

21   do not explain why aspects of the production process are legitimate for purposes of comparing regulatory treatment but are somehow completely off limits for consideration in regulatory

22   design.

23   [7] *See, e.g., Granholm v. Heald*, 544 U.S. 460, 466-67 (2005) (invalidating law restricting

24   only out-of-state wineries from selling directly to consumers); *Camps/Newfound/ Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564 (1997) (invalidating tax exemption that only applied to camps serving primarily in-state residents); *Chem. Waste Mgmt., Inc. v. Hunt*, 504 U.S. 334, 336-

25   37 (1992) (invalidating disposal fee that only applied to out-of-state waste); *Birth Hope Adoption Agency, Inc. v. Ariz. Health Care Cost Containment Sys.*, 218 F.3d 1040 (9th Cir. 2000)

26   (invalidating statute requiring only out-of-state adoptive parents to reimburse the state for prenatal care and delivery expenses).

27   [8] *Daghlian* can be further distinguished from this case by the fact that *Daghlian* was

28   involved a residency requirement. *Id.* at 1245.  The LCFS contains no such requirements.

                                           (continued…)

6

1   The LCFS has no such on/off switch.  It applies, in the same manner, to all ethanols, regardless of

2   origin.

3        In addition, the CI values themselves confirm that in-state or out-of-state status is not "[t]he

4   statutory determinant for which [carbon intensity value] applies to any particular" ethanol.  *See*

5   *Or. Waste Sys., Inc.*, 511 U.S. at 99.  As originally promulgated, the CI values for in-state ethanol

6   ranged from 77.44 to 88.90.  LCFS Section 95486 (Table 6).  The CI values for out-of-state

7   ethanol ranged from 58.40 to 120.99.[9]  *Id.*  There was, thus, no correlation between in-state status

8   and lowest CI values or out-of-state status and highest CI values.[10]  New pathways have since

9   been proposed through Methods 2A and 2B, which permit fuel producers to request an

10   individualized CI value.  Twenty-five new ethanol pathways have been published under those

11   Methods and are currently available for use.  ARB Sep. Stmt. ¶ 8; RJN Exh. H.  All of these new

12   pathways are for out-of state ethanol producers.  *Id.*  They range in CI value from 63.94 to 92.4,

13   with many in the mid-to-low 80s.  *Id.*  Indeed, there are now five Midwest ethanol pathways with

14   lower CI values than the value for which California plants have registered (80.70).  *Id.*  These

15   additional ethanol pathways simply underscore that the LCFS is non-discriminatory – both

16   because it distinguishes among fuels based on carbon intensity, rather than origin, and because it

17   provides the flexibility for low carbon fuel producers to apply for a lower, individualized CI

18   value, regardless of the location of their facility.[11]

19   _____

20   (…continued)

21      [9] This range includes Brazilian ethanol from sugarcane.  The dormant Commerce Clause
    considers and protects foreign competitors as well as domestic.  *See South-CentralTimber Dev. v.*

22   *Wunnicke*, 467 U.S. 82, 87 (1984).  This range also demonstrates that plaintiffs have failed to
    meet their burden for a facial challenge.  *S.D. Myers, Inc. v. City and Cnty of San Francisco*, 253
    F.3d 461, 467 (9th Cir. 2001).

23

24      [10] Plaintiffs assert that they need not show "a widespread advantage to in-state interests
    nor a widespread disadvantage to out-of-state competitors."  *New Energy Co. of Ind. v. Limbach*,

25   486 U.S. 269, 276 (1988).  But that rule only applies "where discrimination is patent," *id.*, which
    it is not here.  Regardless, this rule simply means there is no *de minimus* exception to the

26   Commerce Clause.  Defendants do not assert that there is.

27      [11] These two facts further distinguish the LCFS from the statute in *Daghlian*, which
    provided no out-of-state entities with better treatment than in-state entities and no opportunity to

28   apply for the desirable exemption.  *Daghlian*, 582 F. Supp. 2d at 1242-43.

7

1  Relying on *Wyoming v. Oklahoma*, 502 U.S. 437 (1992), plaintiffs allege that the LCFS

2  creates a discriminatory preference for "domestic" (i.e., California) corn ethanol.  Plaintiff's Br.

3  at  6.  The LCFS's market-based mechanism bears no resemblance to the requirement in

4  *Wyoming* that Oklahoma power plants buy at least 10% of their coal in-state.  *See* 502 U.S. at

5  443.  It also bears no resemblance to the statute in *Alliance for Clean Coal v. Miller*, 44 F.3d 591

6  (1995), which "essentially mandate[d] that [large] generators burn Illinois coal."  44 F.3d at 596.

7  That statute also contained another provision that amounted to "price fixing for the benefit of

8  local producers."  *Id.*  The LCFS contains no such mandates or price fixing provisions, and

9  plaintiffs point to none.  Rather, market forces determine the ultimate mix of fuels in California.

10  ARB Sep. Stmt. ¶ 24.

11  Analogizing to *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564

12  (1997), plaintiffs also allege that the LCFS creates impermissibly strong incentives not to do

13  business with out-of-state ethanol producers.  Plaintiffs' Br. at  6-7.  But that case, and the one

14  upon which it relies, involved state laws that "tended 'to discourage *domestic corporations* from

15  plying their trades in interstate commerce.'"  *Camps*, 520 U.S. at 579 (quoting *Fulton Corp. v.*

16  *Faulkner*, 516 U.S. 325, 327 (1996) (emphasis added)).   Plaintiffs allege nothing, and indeed

17  there is nothing, about the LCFS that discourages California ethanol producers from "plying their

18  trades in interstate commerce."[12]

19  Plaintiffs arguably allege that the LCFS makes selling ethanol in California "more costly"

20  for out-of-state producers than in-state producers.  Plaintiffs' Br. at 6.  Plaintiffs neither explain

21  this allegation or provide any factual basis for it.  The undisputed facts demonstrate that all

22  regulated parties are subject to the same compliance costs, if any.[13]  RJN Exh. A.  Ultimately,

23  _____

[12] *Boston Stock Exch. v. State Tax Comm'n*, 429 U.S. 318 (1977) is equally inapplicable.

24  *See* 429 U.S. at 334-35 (invalidating "discriminatory taxes [designed] to assure that nonresidents direct their commerce to businesses within the State").

25  [13] The case on which plaintiffs rely for this point also did not find increased business costs

26  for out-of-state entities.  *Kleenwell Biohazard Waste and Gen'l Ecology Consultants, Inc. v. Nelson*, 48 F.3d 391, 398 (9th Cir. 1995).  The case upon which *Kleenwell* relies, however, did

27  find such increased costs, but those costs resulted from a regulation that would have forced the out-of-state entities to radically alter marketing mechanisms in which they had heavily invested.

28  *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333 (1977). That is not this case.

8

1   plaintiffs cite no cases that support a finding of facial discrimination where, as here, the

2   regulation applies to all competitors, where some out-of-state competitors are treated more

3   favorably than in-state competitors, and where treatment under the regulation is based on

4   scientifically-validated modeling rather than origin.  Thus, plaintiffs' motion on their facial

5   discrimination claim should be denied, and defendants' cross-motion should be granted.

6       **B.**    **The LCFS Does Not Cause Discriminatory Effects on Out-of-State Ethanol.**

7       Plaintiffs complain about inclusion of emissions from two parts of the lifecycle:  the

8   transportation of ethanol to California and the electricity used in the production of ethanol.

9   Plaintiffs call these "theoretical distinctions."  Plaintiffs' Br. at  7.  Plaintiffs offer no legal

10  support for separating out two components of carbon intensity for an independent discrimination

11  analysis.  The dormant Commerce Clause doctrine focuses on the aspect of the regulation that

12  determines how an entity will be treated.  *See, e.g., Or. Waste Sys., Inc.*, 511 U.S. at 99.  Courts

13  should *not* separately analyze bits and pieces of a regulation for discrimination.  *West Lynn*

14  *Creamery, Inc. v. Healy*, 512 U.S. 186, 201 (1994) (rejecting respondent's argument to "analyze

15  separately two parts of an integrated regulation" and considering instead "the entire program").

16  In any event, plaintiffs claims have no merit.

17      Plaintiffs focus on the emissions from transportation and allege that consideration of those

18  emissions discriminates against interstate commerce based on the distance that the product

19  travels.  Plaintiffs' Br. at 7.  In fact, inclusion of emissions from transportation provides a net

20  advantage to Midwest corn ethanol plants compared to California corn ethanol plants, because of

21  the inclusion of the emissions for transporting the corn (which is grown in the Midwest).  ARB

22  Sep. Stmt. ¶ 34; Scheible Decl., at ¶ 45.  There is no relative "penalty" to Midwest producers

23  based on their distance from California.  There is, thus, no discrimination, and the cases to which

24  plaintiffs cite for this argument are inapplicable.[14]

---

25      [14] *See Am. Trucking Ass'ns, Inc. v. Scheiner*, 483 U.S. 266, 284 (1987) (invalidating a flat tax for entry into Pennsylvania by motor vehicle); *S. Pac. Co. v. Ariz.*, 325 U.S. 761 (1945)

26  (invalidating regulations on lengths of trains); *BFI Med. Waste Sys. v. Whatcom County*, 983 F.2d 911, 913 (reiterating finding of earlier case that medical waste does not become more hazardous

27  the longer it travels); *Dean Milk Co.v. City of Madison, Wis.*, 340 U.S. 349, 354 (invalidating requirement to pasteurize milk within 5 miles of town because it acted as a ban on out-of-state

28      (continued…)

9

1    Plaintiffs then turn to the carbon intensity of the electricity available in the Midwest and

2    California and argue that inclusion of emissions from electricity also discriminates "based on

3    origin."  Plaintiffs seem to be alternately concerned that ethanol producers will be put to "time,

4    expense and labor" to travel to and from California, or that the LCFS will exert significant

5    pressure on California ethanol producers to "buy and use" California electricity, or that ethanol

6    producers will be required to perform business operations in California.  Plaintiffs' Br. at 8.

7    These allegations are nonsensical.  Nothing in the LCFS requires any one to travel to or set up

8    operations in California.  And California ethanol producers use California electricity regardless of

9    the existence of the LCFS.  Nothing in plaintiffs' arguments about the inclusion of electricity

10   provides any basis to exclude it from a proper lifecycle analysis or to conclude that it will have a

11   discriminatory effect on the ethanol market.

12    It is well-established as a matter of both science and policy that capturing lifecycle

13   emissions is the best way to reduce emissions from transportation fuels.  ARB Sep. Stmt. ¶¶ 32-

14   33.  It is equally well-established that *all* aspects of the lifecycle must be counted, including

15   transportation and electricity.  *Id.*   The mere fact that these two, of many, components of the

16   lifecycle calculation bear some connection to location does not render lifecycle carbon intensity

17   "indistinguishable from origin."[15]  The determinant of regulatory treatment under the LCFS is

18   carbon intensity, not geographic origin.  That is why Midwest corn ethanol plants initially had a

19   variety of CI values  ranging from 86.80 to 120.99.  LCFS Section 95486 (Table 6).  Today, that

20   range is even broader as a result of customized CI values for individual facilities.  RJN Exh. H.

21

22   (…continued)

23   milk); *Brimmer v. Rebman*, 138 U.S. 78 (1891) (invalidating a similar law regarding meat, again
     because it acted as a ban on out-of-state-meat); *Nippert v. City of Richmond*, 327 U.S. 416 (1946)
24   (invalidating a license fee for out-of-state solicitors procuring orders for subsequent interstate
     shipment). To the extent that plaintiffs argue some of these cases *are* applicable because the
25   LCFS acts as a ban to Midwest corn ethanol, that is a heavily disputed fact and not appropriate as
     a basis for summary judgment.  ARB Resp. Stmt. ¶¶ 10-11.

26    [15] Clearly, many other factors go into carbon intensity that have nothing to do with
27   location or origin.  For example, the thermal heat source – the energy used to "cook" the
     feedstock – makes a significant difference and explains why the highest CI values in Table 6 are
     for pathways using coal for thermal heat.  Table 6.

28

10

1    Finally, plaintiffs offer no explanation for the fact that 49 Midwest ethanol plants have

2    indicated, either by registration or through the 2A/2B procedures, their intent to sell ethanol in

3    California under the LCFS.  It is entirely unclear why so many Midwest ethanol producers would

4    affirmatively seek to participate in a regulatory scheme as severely stacked against them as

5    plaintiffs paint the LCFS.

6        **C.    The LCFS Does Not Have a Discriminatory Purpose.**

7        Plaintiffs also allege that the LCFS was adopted with a discriminatory purpose to ban

8    Midwest corn ethanol "while maintaining a constant demand for California corn ethanol."

9    Plaintiffs' Br. at 9.  Plaintiffs rely on a collage of phrases, many taken out of context, to support

10   their claim, and it cannot bear the weight.  The "compliance scenarios," upon which much of

11   plaintiffs' claim is based, were developed to demonstrate that the LCFS is feasible.  ARB Resp.

12   Stmt. ¶ 10; Scheible Decl., at ¶¶ 65-66, 70.  The rulemaking record clearly identifies them not as

13   predictions but as "what if" exercises to show several possible ways in which compliance with the

14   LCFS would be possible.  *Id.*; see also RJN Exh. D (FSOR) at 71, 339, 431, 433.  The compliance

15   scenarios do show declining volumes of "Midwest average corn ethanol," while California

16   production is shown at 300 million gallons per year.  Plaintiffs RJN, Exh. C.  "Midwest average

17   ethanol" is just that – an average.  Scheible Decl., at ¶ 39.  Significantly, five specific Midwest

18   pathways, representing actual production processes, have values lower than "Midwest average

19   ethanol."  LCFS Section 95486 (Table 6).  There are now 27 Midwest pathways with CI values

20   lower than 99.40, including ones as low as 73.20.  RJN (new pathways).  There is no reason to

21   assume those pathways will decline as the Midwest average is shown to do.  *See* Babcock Decl.,

22   at ¶ 10; Scheible Decl., at ¶ 71. In addition, plaintiff RFA estimates California ethanol production

23   in 2011 to be 60 million gallons, not 300.  David Decl. at 6 n.5.  Similarly, there is no reason to

24   assume California's production will immediately rise from 60 to 300 million gallons, even though

25   300 is the figure in the compliance scenarios.

26       There is no "ban" of any fuel, including Midwest corn ethanol, under the LCFS.  ARB

27   Resp. Stmt. ¶¶ 10-11, 16-19, 34, 36.  Nor is there a 300 million gallon guarantee to California

28

1  producers.[16]  The absence of any prohibitions on ethanol is simply becoming more obvious as

2  more lower carbon pathways for Midwest ethanol come through the Method 2a and 2b

3  procedures.  *See* Scheible Decl. at ¶¶ 57-64.  The LCFS is designed to let market forces determine

4  the mix of fuels for any given year, within the aggregate carbon intensity limit for that year.  *Id*. at

5  ¶¶ 29-33.  That is hardly protectionist.

6       Plaintiffs ignore the true purposes of the LCFS which are the antithesis of protectionism.  A

7  primary goal of the LCFS is to encourage the development and commercialization of lower

8  carbon fuels, which will diversify the market, not contract it.  Scheible Decl. at ¶¶ 10-12. This

9  primary goal will enable California to reduce GHG emissions associated with transportation fuels

10  consumed in the state, to reduce the threats posed by global warming, and to reduce dependency

11  on foreign oil.  *Id*.; *see also* ARB Sep. Stmt. ¶¶ 10-11, 20.  The LCFS clearly lacks any purpose to

12  discriminate against interstate commerce, and plaintiffs' summary judgment motion must be

13  denied.

14      **D.**    **The LCFS Should Survive Strict Scrutiny.**

15       If the Court disagrees with the arguments above and finds that the LCFS impermissibly

16  discriminates under the Commerce Clause, the Court must still refrain from invalidating the

17  LCFS "if it advances a legitimate local purpose that cannot be adequately served by reasonable

18  nondiscriminatory alternatives."  *Dep't of Revenue of Ky. v. Davis*, 553 U.S. at 338 (internal

19  quotation omitted).  The LCFS meets both of these criteria and should survive strict scrutiny.

20      **1.**    **The LCFS Has Several Legitimate Local Purposes.**

21       Plaintiffs assertion that California has no legitimate interest in reducing the risks from

22  global warming flies in the face of the Court's opinion in *Massachusetts v. E.P.A.*, 549 U.S. 497

23  (2007).  The Court recognized as fully legitimate a state's "well-founded desire to preserve its

24

25      [16] Plaintiffs assert that the LCFS intends that "a significant portion of the biofuels used in
the LCFS are produced in California."  Plaintiffs' Br. at 9.  That language they cited in ARB's
Initial Statement of Reasons is describing the goals of a separate order of the Governor, and the
26  specific sentence begins with the words "*If these goals are met*."  ARB RJN, Exh. B (ISOR) at II-
3.  In other words, the LCFS takes no position on those goals, and indeed is designed to let
27  market forces determine the low carbon fuel mix for California's future.  See Scheible Decl., at ¶¶
29-33.

28

1   sovereign territory" from the threats of rising seas and other impacts of global warming.  549 U.S.

2   at 519, 522.  "That these climate-change risks are 'widely-shared' does not minimize

3   [California's] interest" in reducing them.  *Id.* at 522.  California's purpose here is both legitimate

4   and local.

5          Perhaps recognizing that, plaintiffs suggest that the LCFS will have no impact on emissions

6   because of "fuel shuffling."  Plaintiffs' Br. at 10.  But, several features of the LCFS are expected

7   to reduce or eliminate fuel shuffling as a significant means of compliance.  *See* Scheible Decl. at ¶

8   73.  First, a plant that is incentivized by the LCFS to  develops new, lower carbon fuels or

9   improve its existing fuel production processes will not necessarily always sell all of its product

10  into California.  Thus, the reduced emissions recorded through the LCFS may only be a fraction

11  of the reductions incentivized by the program.  Scheible Decl., at ¶¶ 75-84.  Moreover, the LCFS

12  is complementing the incentives created by RFS2, providing additional incentives for incremental

13  reductions in emissions within RFS2 categories of fuels.  *Id.*

14

15          **2.     There Are No Reasonable Nondiscriminatory Alternatives.**

16          As discussed above, a lifecycle analysis is the only effective way to regulate emissions

17  from transportation fuels.  ARB Sep. Stmt. ¶ 32-33; *see also* Spatari Decl., at ¶¶ 7-8; Babcock

18  Decl., at ¶¶ 6-7.  Any other method – for example, a focus solely on tailpipe emissions – will miss

19  critical contributors to the lifecycle and may result in greater, rather than lower, emissions overall,

20  which is why California is not the only government entity to adopt this approach.  *See* CAA, 42

21  U.S.C. § 211(o)(1)(H) ("Lifecycle greenhouse gas emissions").  The alternative plaintiffs suggest

22  – abandoning the lifecycle approach – would make it impossible to achieve the desired 10 percent

23  reduction in carbon intensity and the resulting reductions in emissions.  *See* Plaintiffs' Br. at 10.

24  As discussed above, the LCFS takes a market-based approach with tradeable credits for

25  maximum flexibility.  *See* Background, *supra*; *see also* Scheible Decl., at ¶¶ 29-33.  Plaintiff RFA

26  has acknowledged as much.  RJN RFA comment on RFS2 p. 90.  Thus, the LCFS should survive

27  even strict scrutiny.

28

1

**III.   THE LCFS DOES NOT REGULATE EXTRATERRITORIAL COMMERCE.**

2

3

Courts invalidate state laws under the extraterritorial regulation aspect of the dormant

4

Commerce Clause doctrine when:  1) the regulation directly controls commerce taking place

5

wholly outside the state; 2) the regulation threatens economic Balkanization; and 3) the regulation

6

applies only to interstate commerce. *Healy v. Beer Institute*, 491 U.S. 324, 336-341 (1989).  As

7

set forth in Defendants' cross motion, as a matter of law the LCFS does not violate these

8

standards.  Regardless, plaintiffs' motion should be denied because it fails to demonstrate any

9

violation under this branch of the Commerce Clause doctrine.[17]

10

**A.    The LCFS Does Not Directly Regulate Wholly Out of State Activities.**

11

Plaintiffs' direct regulation argument boils down to essentially one question:  does the

12

LCFS directly regulate commerce wholly outside of California by including lifecycle greenhouse

13

gas emissions in its calculation of CI values?  Defendants submit that the answer is no.[18]

14

Plaintiffs' argument should be rejected because it mischaracterizes the purpose and effect of the

15

LCFS, misstates the facts, and is not supported by the case law.

16

First and foremost, plaintiffs rely on the mistaken assertion, which is repeatedly stated, that

17

the LCFS is directly "regulating" the activities that it takes into consideration in the determination

18

of CI values.  See, e.g., Plaintiffs' Br. at 11:24-25, 14:26-27.  However, consideration of the fuel

19

production and distribution activities that go into the CI metric does not equate with any purpose

20

or effect of regulating or otherwise controlling those activities either inside or outside of the

21

State.[19]  The LCFS creates a market based system, including a yearly average performance

22

[17]  Since plaintiffs state a facial challenge, it can prevail only if the LCFS must necessarily

23

be read as directly regulating interstate commerce.  The Court must construe the regulation narrowly and resolve any ambiguities in favor of the interpretation that most clearly supports constitutionality.  *S.D. Myers*, 253 F.3d at 468.

24

25

[18]  U.S. EPA has reached the same conclusion with respect to its consideration of indirect land use in the lifecycle analysis.  "Considering international emissions in determining the lifecycle GHG emissions of the domestically-produced or imported fuel does not change the fact that the actual regulation of the product involves its use solely inside the U.S."  RJN Exh. P (75 Fed. Reg. 14669, 14766).

26

27

28

[19]  The lifecycle analysis is conducted in accordance with recognized scientific principles

(continued…)

14

1  standard and the availability of trading for credits and debits.  In-state or out-of-state ethanol

2  producers with higher CI values are not required to reduce CI values or to make any changes in

3  production or distribution in order to sell in California.  ARB Sep. Stmt. ¶ 24; Scheible Decl., at

4  ¶¶ 29-33.  Nor are regulated parties prevented from purchasing fuels with higher CI values.

5  Scheible Decl., at ¶¶ 29-33. They have discretion to meet the yearly average standard with any

6  combination of fuels and credits/debits.  In short, any out of state effects of the LCFS are

7  indirect.[20]  *Id.* If fuel producers alter aspects of their business in order to reduce the CI value of

8  their fuels, they are doing so to compete for business in California, not because there is any legal

9  requirement.

10      As the Supreme Court has established, "[i]nterstate commerce is not subjected to an

11  impermissible burden simply because an otherwise valid regulation causes some business to shift

12  from one interstate supplier to another.  The Commerce Clause protects the interstate market, not

13  particular interstate firms, from prohibitive or burdensome regulations." *Exxon Corp. v.*

14  *Maryland*, 437 U.S. 117, 127-28 (1978).  The *Exxon* court rejected the plaintiff's argument that a

15  Maryland law prohibiting refiners from owning retail gasoline stations impermissibly changed the

16  market structure by weakening independent refiners.  The Court noted that "[s]ome refiners may

17  choose to withdraw entirely from the Maryland market, but there is no reason to assume that their

18  share of the entire supply will not be promptly replaced by other interstate refiners." 437 U.S. at

19  127.  That is analogous to the situation here: the LCFS which will change the market structure by

20  weakening the position of higher-CI producers relative to lower-CI producers, and some higher

21  CI producers may choose to withdraw.  But California should be allowed to pursue its legitimate

22  goal of reducing GHG emissions, so long as the interstate market in ethanol and other fuels is

23  protected, which it is.

24  (…continued)
   and is also used by U.S. EPA in the federal Renewable Fuel Program. 42 U.S.C. § 211(o)(1)(H).

25

26      [20]  "[T]he Commerce Clause . . . was never intended to cut States off from legislating on
   all subjects relating to health, life, and safety of their citizens, though the legislation might
   indirectly affect the commerce of the country." (internal quotations removed).  *Gen. Motors Corp.*

27  *v. Tracy*, 519 U.S. at 306 (rejecting Commerce Clause challenge to Ohio tax on natural gas
   purchases.)

28

1    Plaintiffs' argument also fails because the case law reflects that for a state regulation to be

2    invalid as a direct regulation of interstate commerce, the regulation must apply to commerce

3    "wholly" outside the State.  *Healy*, 491 U.S. at 336.  That is simply not the case here.  As the text

4    of the LCFS reveals, it directly regulates only in-state transactions.  LCFS Section 95480.1(a).

5    The LCFS does not require any CI standard to be met by fuels sold in other states.  ARB Sep.

6    Stmt. ¶ 30.  Nor are fuels sold outside of California factored into any CI average in California,

7    even for a producer who sells fuel both inside and outside California.  LCFS Section

8    95480.1(a).[21]

9    For this reason, the cases relied on by plaintiffs provide it with no support.  In *Healy* and

10   the related price affirmation cases[22] the challenged state laws required the use of a scale of prices

11   or otherwise effectively controlled prices in commerce transacted entirely in another state.  *See*

12   *Healy*, 491 U.S. at 331-336.  There is no analogous requirement in the LCFS.[23] The LCFS does

13   not control the terms by which fuel producers sell their products in other states.

14   Finally, plaintiffs' argument should also be rejected because it is permeated by erroneous

15   factual assertions.  Plaintiffs assert that "[t]he LCFS regulation . . . penalizes out-of-state corn

16   ethanol producers who do not follow CARB's favored production methods, by assigning their

17

18   [21] *See S.D. Myers, Inc. v. City and County of SF*, 253 F.3d 461, 467 (9th Cir. 2001) (San Francisco's requirement for its contractors to provide domestic partner benefits was not an extraterritorial regulation.)

19

20   [22] *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 582 (1986)("[f]orcing a merchant to seek regulatory approval in one State before undertaking a transaction in another directly regulates interstate commerce"); *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511,

21   521 (1935) (New York has no power to project its legislation into Vermont by regulating the price to be paid in that state for milk acquired there.)

22

23   [23] Plaintiffs' reliance on *Nat'l Solid Wastes Mgmt. Ass'n v. Meyer*, 165 F.3d 1151, 1154 (7th Cir. 1999) is equally in error.  In that case, the Seventh Circuit struck down a Wisconsin

24   statute that required out-of-state communities to adopt Wisconsin's recycling standards before they could dispose of their waste in Wisconsin.  Here, there is not even an allegation that the LCFS requires out of state communities or sister states to adopt an LCFS before out of state

25   producers can sell fuels in California.  Plaintiffs' citation to *Edgar v. MITE Corp.*, 457 U.S. 624, 642-643 (1982) is also off the mark.  In that case an Illinois law regarding corporate takeovers,

26   which restricted communications by the bidder to Illinois shareholders, was written so broadly that it prevented the bidder from communicating with out of state shareholders, even in the

27   extreme case where not a single shareholder resided in Illinois.  No analogy to the LCFS can be drawn.

28

16

1  ethanol a worse carbon intensity score." (Plaintiffs Br. at 12:14-16.)  ARB has no "favored"

2  production methods.  CI values are established via a science-based methodology and numerous

3  out-of-state fuels have CI values below those of California fuels.  LCFS Section 95486.

4  Moreover, producers can request an adjusted CI value if they think the value assigned by ARB is

5  inaccurate.

6       Plaintiffs assert that "[t]he LCFS regulation goes beyond regulating the out-of-state

7  production processes for corn ethanol imported into California. It further penalizes corn ethanol

8  producers for their *entirely separate* business decision to dry distillers grains co-products, rather

9  than leave them wet, *after their ethanol fuel is produced*." Plaintiffs Br. at 13:9-12 (emphasis in

10  original).  In fact, the inclusion of distillers' grains in the CI value calculation provides ethanol

11  producers with a credit because the use of this co-product is assumed to offset GHG emissions.

12  Scheible Decl., at ¶ 22.

13       Plaintiffs assert that:  "CARB imposes a substantial penalty—more than 30% of the carbon

14  intensity score for corn ethanol—for what it calls "indirect land use . . ." Consideration of indirect

15  land use is not a "penalty," but a factor that is applied in the calculation of CI values for all fuels.

16  The indirect land use value for out of state corn ethanol is identical to the value for California

17  corn ethanol.  Indirect land use is part of U.S. EPA's lifecycle analysis in the federal Renewable

18  Fuels Program.  42 U.S.C. § 9545(o)(1)(H).  In summary, RMFU's direct regulation argument

19  has no merit. The LCFS imposes no requirements on out of state commerce as a precondition to

20  selling fuels in California or for any other purpose.

21      **B.**    **The LCFS Will Not Lead to Balkanization.**

22

23       Plaintiffs' claim that the LCFS "distorts" the market for interstate ethanol is based purely

   on plaintiffs' own misreading of the regulation.  This is precisely the type of claim that the

24  Supreme Court rejected in *Exxon v. Maryland, supra,* 437 U.S. at 127 (rejecting claim that a state

25  law "interfered 'with the natural functioning of the interstate market. . .'")[24] As a matter of law,

26

27      [24] Plaintiffs' reliance on *Cavel Int'l, Inc. v. Madigan*, 500 F.3d 551, 555 (7th Cir. 2007)
for this proposition is misplaced.  That case rejected the plaintiff's Commerce Clause claims

28                               (continued…)

**DEFENDANTS' MEMO. OF P & A's IN OPP. TO RMFU'S MOTION FOR SUMMARY JUDGMENT**
(No. 1:09-CV-02234-LJO-DLB)

1   the LCFS does not ban any type of ethanol from the California market, does not encourage

2   biofuels producers to relocate to California based on a "transportation penalty," and does not

3   require ARB approval of choices about transportation or other production matters.[25]  As set forth

4   below, plaintiffs' Balkanization argument is entirely insubstantial.

5           **1.      The LCFS Impose No Transportation Penalty and No Trade Barriers.**

6

7           Plaintiffs' assertions notwithstanding, Balkanization is neither the purpose nor the effect of

8   the LCFS.  The purpose of the LCFS is to reduce greenhouse gas emissions from fuels sold in

9   California.  ARB Sep. Stmt. ¶ 8.  The LCFS does not create a "menagerie of unique products"

10  and does not direct the flow of ethanol "based on how and where it is made." Plaintiffs' Br. at

11  15:28-16:1.  On the contrary, Refiners and blenders are free to buy ethanol and other fuels from

12  wherever they can find them, as long as they ultimately comply with the aggregate CI standard.

13  Plaintiffs offer two examples to support its Balkanization argument but neither example supports

14  the claim.

15          First, plaintiffs assert that ARB is raising a trade barrier in order to "'isolate' California

16  'from a problem,' like global climate change, 'common to the several States . . ."' Plaintiffs' Br. at

17  16:1-7 (citing *Chem. Waste Mgmt. Inc. v. Hunt*, 504 U.S. 334, 339-40 (1992) (invalidating

18  Alabama tax only on imported hazardous waste).  This assertion makes no sense.    As a market

19  based performance standard, the LCFS does not control what fuels will be used in any

20  compliance year.  Scheible Decl., at ¶ 33.  More importantly, greenhouse gasses are not like

21  hazardous waste, California cannot keep out emissions generated elsewhere, and it is effected by

22  those emissions.  Nonetheless, California can take steps to do its part to reduce greenhouse gas

23  emissions.  *See Mass. v. E.P.A.*, 549 U.S. 497, 524 (2007).

24  (…continued)
    against an Illinois animal slaughter regulation and included no holding about market distortion.

25

26  [25] As for plaintiffs' prediction that "[t]he regulation also will draw more advanced ethanol
    to California in the next 10 years, and away from other States, than would otherwise occur" (P&A
27  at 15:15-17), that will remain unknown for quite some time.  Other States may adopt LCFS rules
    and other forces may work to alter the market.  However, even if the prediction were to come
28  true, there is no Commerce Clause violation associated with that outcome.

1    Second, plaintiffs assert that "[t]he LCFS regulation's penalty on interstate shipping has the

2    Balkanizing purpose and effect of favoring local ethanol over out-of-state ethanol." (plaintiffs'

3    Br. at 16:8-9.)  This argument rehashes plaintiffs' flawed discrimination claim and fails for the

4    same reason:  the LCFS has no "transportation penalty" for Midwest corn ethanol.  Scheible

5    Decl., at ¶ 45.  Midwest ethanol production businesses will not want to relocate to California

6    when the effect would only be to boost the CI value of their fuels.  The Court should reject this

7    mistaken argument.

8               2.    **The LCFS Does Not Impermissibly Regulate Channels of Interstate**
                      **Commerce.**
9

10   Plaintiffs' final argument is that the requirements of the LCFS Registration Form and

11   requirements for recordkeeping and auditing in LCFS Section 95484(d)(2)(D) constitute direct

12   regulation of interstate commerce. Plaintiffs' Br. at 17.  As plaintiffs note, the information

13   required by the Registration Form and Section 95484(d)(2)(D) is used to verify the accuracy of

14   carbon intensity values.  Citing to the caveat that this information "is subject to ARB review and

15   validation," plaintiffs leap to the conclusion that ARB "purports to be the arbiter of interstate

16   transportation decisions."  plaintiffs' Br. at 17:21-22.  This argument is entirely without merit.

17   By seeking to verify the accuracy of components of CI values, ARB is simply trying to ensure the

18   efficacy of the LCFS system and the market that it creates.  Neither the Registration Form nor

19   Section 95484 (nor any other part of the LCFS) requires ARB approval of a party's transportation

20   choices.  The only requirement is that the party accurately reports the information about those

21   choices.  There is no analogy to the situation in *Brown Forman*, 476 U.S. 573, because no

22   "regulatory approval" is at issue.  The Court should reject this argument.

23   **IV.   ANY BURDEN IMPOSED ON INTERSTATE COMMERCE BY THE LCFS IS**
            **INCIDENTAL RELATIVE TO ITS LOCAL BENEFITS.**
24

25   Plaintiffs stretch both the facts and the law in their attempt to show that any burden

26   imposed on interstate commerce by the LCFS "is clearly excessive in relation to" its local

27   benefits.  *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).  Neither the facts nor the law are

28   elastic enough to sustain plaintiffs' claim.

19

**A.    Plaintiffs Balancing Claim is Not Appropriate for Summary Judgment.**

Application of the *Pike* balancing test is a fact-intensive inquiry, requiring evidence of the alleged burdens on interstate commerce. *E.g., Pac. Nw. Venison Producers v. Smitch*, 20 F.3d 1008, 1015 (9th Cir. 1994) (granting summary judgment to defendant because plaintiff failed to offer evidence of volumetric and financial impacts). Plaintiffs have provided none. Further, defendants have been provided with no opportunity for discovery to test plaintiffs' allegations of burden. Precisely because they are fact- and evidence-intensive, cases decided under the *Pike* test frequently require discovery. *See, e.g., United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 346 (2007) (noting that after *years* of discovery, no "disparate impact on out-of-state as opposed to in-state businesses" could be detected). Defendants have moved for discovery under Rule 56(d), and plaintiffs' motion should be denied or deferred on these grounds.

**B.    The Local Benefits of the LCFS are Well Established as a Matter of Law.**

Regarding local benefits of the LCFS, the Supreme Court has already ruled against plaintiffs' arguments. *Mass. v. E.P.A.*, 549 U.S. at 522 ("That these climate-change risks are 'widely-shared' does not minimize Massachusetts' interest [in regulation of emissions]."); *id.* at 524-26 (rejecting the argument that incremental steps to address climate change will have no impact). Plaintiffs' repeated refusal to recognize that environmental problems such as climate change may have *both* global and local dimensions is an oversimplification aimed at stripping California of its legitimate power to "preserve its sovereign territory," *Mass. v. E.P.A.*, 549 U.S. at 519, from the threats posed by climate change.

**C.    The Evidence Indicates No Burden on Commerce Let Alone an Excessive One.**

Plaintiffs sound the doomsday alarm yet again in an attempt to establish excessive burdens on interstate commerce. But plaintiffs have a different burden here – an evidentiary one – and their conjectures alone cannot meet that burden. *See Pac. Nw. Venison Producers*, 20 F.3d at 1015. Plaintiffs claim that the California market will be closed to Midwest corn ethanol, relying solely on the LCFS compliance scenarios. Plaintiffs' Br. at 20. As discussed above, there is no

20

1   reason, based on the rulemaking record or the facts on the ground, to accept the compliance

2   scenarios as prediction of *any* decline in Midwest corn ethanol in California.  *See* Part II. C.

3   *supra*. Plaintiffs also offer no evidence that the LCFS will "segment" the ethanol market.  The

4   evidence before the court indicates the opposite.  Forty-four out-of-state ethanol producers have

5   requested registration for existing CI pathways under the LCFS.  Scheible Decl., at ¶ 42.  Sixty

6   entities have approached ARB to discuss individualized CI values under the 2A and 2B

7   procedures, and ten ethanol producers have submitted final applications.  *Id*. at ¶ 61.  All of those

8   entities are out-of-state.  Scheible Decl., at ¶¶ 61-64; RJN Exhs. I and H (Published Pathways).

9   Clearly, many out-of-state ethanol producers, most of them from the Midwest, plan to sell ethanol

10  in California under the LCFS.  In fact, *Pike* should not even apply here, because there appears to

11  be *no* burden on interstate commerce.

12      Similarly, plaintiffs offer no evidence that their members will be subject to conflicting

13  requirements, and the cases they cite are inapplicable.  Only one of plaintiffs' cases even involves

14  an application of *Pike*.  And most of the case involve regulations that would require trains to

15  reconfigure along interstate routes due to differing rules.  *See, e.g., Union Pac. R.R. Co. v. Cal.

16  Pub. Utils. Comm'n*, 346 F.3d 851, 871 (9th Cir. 2003).  No such "immense" effect is even

17  imaginable here.

18      Finally, plaintiffs' claim that the LCFS will more heavily burden out-of-state interests fails

19  for the same reasons that their discrimination claims fail.  In light of the available CI values for

20  out-of-state ethanol, the flexibility provided by Methods 2A and 2B, and the numerous out-of-

21  state producers indicating plans to sell in California, "there is no reason to suspect that the gainers

22  will be [California] firms, or the losers out-of-state firms."  *Minn.v. Clover Leaf Creamery Co.*,

23  449 U.S. 456, 473 (1981).  Plaintiffs' summary judgment motion must be denied.

24  **V.    SUMMARY JUDGMENT AS TO PLAINTIFFS' CONFLICT PREEMPTION
       ARGUMENTS MUST BE DEFERRED OR DENIED.**

25

26

27      In support of their preemption claim, plaintiffs argue that the LCFS is in conflict with the

28  Congressional intent, goals and method embodied in the EISA.  Plaintiffs' argument is both

21

1    premature and without merit.  Summary judgment based on plaintiffs' preemption arguments is

2    not appropriate prior to a reasonable period of discovery concerning the disputed facts underlying

3    plaintiffs' motion, such as the purported effect of the LCFS on corn ethanol producers with

4    facilities that existed or had commenced construction by December 2007 (hereafter "existing

5    biorefineries" or "existing corn ethanol producers").  Even if, the Court does not defer or deny

6    plaintiffs' motion on the basis of defendants' need for discovery or its authority to promulgate the

7    LCFS (*see* ARB's Cross-Motion), the available evidence demonstrates Congress' intent to permit

8    and preserve, rather than to preempt, state environmental regulations such as the LCFS.

9    Plaintiffs' arguments to the contrary misread or ignore key provisions of RFS2 and EISA and rely

10   on case law that is readily distinguished.

11           **A.    Plaintiffs' Conflict Preemption Arguments Rest on Disputed Facts
                      Concerning the Effect of the LCFS on Existing Corn Ethanol Producers
12                    and the Intent of California.**

13           Fundamentally, plaintiffs premise their motion on the sweeping assertion that the LCFS

14   will "clos[e] California to ethanol produced by more than 150 'grandfathered' biorefineries."[26]

15   ARB disputes this fact.  The sole basis for plaintiffs' assertion is the "compliance scenarios" ARB

16   staff developed in 2009.    As discussed in Part II. C. below, there is no reason, based on the

17   rulemaking record or the facts on the ground, to accept the compliance scenarios as prediction of

18   *any* decline in Midwest corn ethanol in California.

19           To the extent a non-speculative prediction can be made about the effect of the LCFS on

20   Midwest plants five to ten years hence, such a prediction should be based on discovery and expert

21   testimony, and tested at trial.[27]

22           [26] See Plaintiffs' Br. at 22:26-27 (citing Plaintiffs' Sep. Stmt. ¶¶ 10-11, 17); *see also id.* at
     23:16-17 (citing Plaintiffs' Sep. Stmt. ¶¶ 10-11, 19); *id.* at 25:24-27 (citing Plaintiffs Sep. Stmt. ¶
23   19); *id.* at 28:4-7 (citing Plaintiffs Sep. Stmt. ¶¶ 10-11, 18-19, 34); Plaintiffs Sep. Stmt ¶ 36.

24           [27] It is also possible that even after discovery and expert analysis, the effect of the LCFS
     on existing corn ethanol facilities will be too speculative to support finding a conflict with federal
25   law. *See American Petroleum Institute v. Cooper*, 681 F.Supp.2d 635, 642 (E.D. North Carolina
     2010) (a "hypothetical or potential conflict" that is "insufficient to warrant the pre-emption of the
26   state statute") (quoting *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982)); *see also
     Hillsborough County, Florida v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 721 (1985)
27   (claims that a county ordinance would increase the cost of production and reduce the number of
     businesses found to be "too speculative to support pre-emption…").

28

                                             22

1

2
    **B.**    **The Presumption Against Preemption Requires That Plaintiffs**
3
        **Demonstrate a Clear and Manifest Purpose of Congress to Preempt the**
        **LCFS.**

4      Under the U.S. Constitution's Supremacy Clause, federal laws "shall be the supreme Law

5  of the Land ... any Thing in the Constitution or Laws of any State to the Contrary

6  notwithstanding." U.S. CONST. art. VI, cl. 2. Preemption is characterized as either (1) express,

7  (2) field or (3) conflict preemption. *See English v. General Elec. Co.*, 496 U.S. 72, 78-79 (1990).

8  In any preemption analysis, "the purpose of Congress is the ultimate touchstone.…" *Wyeth v.*

9  *Levine*, 129 S.Ct. 1187, 1194 (2009) (citations omitted); *see also Cippollone v. Liggett Group,*

10  *Inc.*, 505 U.S. 504, 516 (1992).

11      "In all preemption cases, and particularly in those in which Congress has 'legislated ... in a

12  field which the States have traditionally occupied,' ... we 'start with the assumption that the

13  historic police powers of the States were not to be superseded by the Federal Act unless that was

14  the clear and manifest purpose of Congress.'" *Wyeth*, 129 S.Ct. at 1194-95 (citations omitted);

15  *see also Pacific Gas & Elec. Co. v. State Energy Res. Conserv. and Dev. Comm'n*, 461 U.S. 190,

16  206 (1983) (citations omitted). If the court has "any doubt about congressional intent," the court

17  is "to err on the side of caution, finding no preemption." *Malabed v. North Slope Borough*, 335

18  F.3d 864, 869 (9th Cir. 2003). Further, "[i]n determining the construction of the federal and state

19  statutes, the court is obligated to attempt to harmonize them if reasonably possible." *Am.*

20  *Petroleum Inst.*, 681 F.Supp.2d 635, 641 (E.D. N.C. 2010) (citing *Anderson v. Babb*, 632 F.2d

21  300, 308 (4th Cir. 1980) and *Unical Corp. v. Kaabipour*, 177 F.3d 755, 769 (9th Cir. 1999)).

22  "[W]hen a statute is susceptible of two constructions, by one of which grave and doubtful

23  constitutional questions arise and by the other of which such questions are avoided, [the court's]

24  duty is to adopt the latter." *Harris v. United States*, 536 U.S. 545, 555 (2002).

25      In the present case, the state law at issue – the LCFS – concerns air pollution prevention

26  and control, an area that "is primarily the responsibility of States and local governments." ARB

27  Sep. Stmt. ¶ 10; *see also* 42 U.S.C. § 7401(a)(3); *Oxygenated Fuels Ass'n v. Davis*, 331 U.S. 665,

28  670-671 (9th Cir. 2003). There can be no dispute that "environmental regulation is an area of

23

1    traditional state control." *Oxygenated Fuels*, 331 F.3d at p. 673. "Air pollution falls under the

2    broad police powers of the states, which include the power to protect the health of citizens in the

3    state." *Exxon Mobil Corp. v. U.S. Envtl. Prot. Agency*, 217 F.3d 1246, 1255 (9th Cir. 2000).

4         Plaintiffs argue that the LCFS conflicts with federal law, not that it is expressly preempted

5    or that Congress intended to preempt the field of renewable fuels. Plaintiffs' Br. at 22-28. The

6    Supreme Court has long held that the presumption against pre-emption applies to claims of

7    implied conflict preemption such as those here. *Wyeth*, 129 S.Ct. at 1195, n.3 (citations omitted).

8    Further, "'[t]ension between federal and state law is not enough to establish conflict

9    preemption.'" *Nat'l Ass'n of Home Builders v. San Joaquin Valley Unified Air Pollution Control*

10   *District* No. CIV F 07-0820, 2008 WL 4330449, *9 (E.D. Cal. Sept. 19, 2008), *aff'd*, No. 08-

11   17309, 2010 WL 4948510 (Dec. 7, 2010 9th Cir.) (quoting *Incalza v. Fendi North America, Inc.*,

12   479 F.3d 1005, 1010 (9th Cir. 2007)). A "hypothetical conflict is not a sufficient basis for

13   preemption." *Total TV v. Palmer Commc'ns, Inc.*, 69 F.3d 298, 304 (9th Cir. 1995); *see also*

14   *Rice*, 458 U.S. at 659; *Hillsborough County*, 471 U.S. at 721.

### 1.   Congress Expressly Narrowed the Scope of Preemption in EISA to Allow for State Environmental Laws Such as the LCFS.

15

16        The presumption against preemption is bolstered here by clear indicia of congressional

17   intent:   instead of an express preemption provision like that found elsewhere in the Clean Air

18   Act, Congress included explicit savings clauses that indicate the RFS was not meant to impact

19   state and federal laws outside of section 211(o) that are more environmentally protective.

20   Through these savings clauses, Congress narrowed the preemptive scope of the statute to leave

21   the door open for states to adopt environmental laws.

22        First, in Section 3 of EISA, Congress stated its intent with regard to other laws as follows:

23
     Except to the extent expressly provided in this Act or an amendment made by this
24   Act, nothing in this Act or an amendment made by this Act supersedes, limits the
     authority provided or responsibility conferred by, or authorizes any violation of any
25   provision of law (including a regulation), including any energy or environmental law
     or regulation.
26
     Second, in section 204(b) of EISA, Congress reinforced the limited scope of preemption by
27
     adding the following caveat regarding the effect of the RFS:
28

24

(b) Effect on Air Quality and Other Environmental Requirements. – Except as provided in section 211(o)(12) of the Clean Air Act, nothing in the amendments made by this title to section 211(o) of the Clean Air Act shall be construed as superseding, or limiting, any more environmentally protective requirement under the Clean Air Act, or under any other provision of State or Federal law or regulation, including any environmental law or regulation. (Emphasis added.)

Third, Congress further reinforced this specifically for the regulation of greenhouse gases. In section 210(b) of the EISA, Congress added the following provision to the RFS:

(12) Effect on Other Provisions. – Nothing in this subsection, or regulations issued pursuant to this subsection, shall affect or be construed to affect the regulatory status of carbon dioxide or any other greenhouse gas, or to expand or limit regulatory authority regarding carbon dioxide or any other greenhouse gas, for purposes of other provisions (including section 165 [42 U.S.C. § 7475]) of this Act. The previous sentence shall not affect implementation and enforcement of this subsection.

42 U.S.C. § 7545(o)(12) (emphasis added). Plaintiffs do not argue that this section preempts the LCFS or provides any indication of Congressional intent to preempt.

In their brief, plaintiffs fail to address these sections of EISA. Since California's authority to adopt the LCFS derives from its special status as described in 211(c)(4)(B) of the CAA, section 211(o)(12) expresses that nothing in 211(o), including therefore the so-called "grandfathering" provisions, "may be construed" to "limit" California's regulatory authority regarding CO2 under another provision of the CAA, namely, 211(c)(4)(B). Congress could not have made it clearer there is no conflict between 211(o) and the LCFS because it has specifically authorized both to operate concurrently without limitation on California's regulatory authority. In addition, clearly the LCFS is a state environmental regulation. ARB Sep. Stmt. ¶ 10-11. Furthermore, the LCFS is more environmentally protective than section 211(o) of the Clean Air Act. ARB Sep. Stmt. ¶ 12. Thus, the LCFS fits squarely within the savings clauses. Moreover, these congressional enactments provide "a reliable indicium of congressional intent with respect to state authority" and "severely limit[s]" the pre-emptive effect of EISA. *See Cal. Fed. Sav. & Loan Ass'n*, 479 U.S. 272, 282 (1987).

1

2. **Congress's Silence Concerning the LCFS Belies a Clear and Manifest Purpose to Preempt State Law.**

2

3   In addition to the congressional intent not to preempt state environmental laws evidenced

4   by the savings clauses, Congress' silence regarding the LCFS specifically is telling.  Where

5   Congress is aware of state laws in a field where it is acting, Congress's silence as to preemption is

6   "powerful evidence that Congress did not intend" to preempt the states.  *Wyeth*, 129 S.Ct. at p.

7   1200.  In *Wyeth*, plaintiff brought a state tort action for "failure to warn" after defendant's drug

8   caused the loss of one of her limbs.  *Id.* at 1191.  Defendant argued that the state tort action

9   created an unacceptable obstacle to federal drug labeling legislation, "because it substitutes the

10  lay jury's decision about drug labeling for the expert judgment of the FDA."  *Id.* at 1193-94.  In

11  light of Congress' awareness of failure-to-warn claims under state law, "[i]ts silence" on

12  preempting those claims "is powerful evidence that Congress did not intend FDA oversight to be

13  the exclusive means of ensuring drug safety and effectiveness."  *Id.* at 1200.[28]

14  Plaintiffs cannot dispute that Congress was fully aware of California's clear progress

15  toward adoption of the LCFS.  In January 2007, the Governor issued an Executive Order and

16  White Paper which set forth the goal of reducing the lifecycle greenhouse gas emissions of

17  California's transportation fuels by 10 percent by 2020.  RJN Exh. O.   In the same Senate

18  statement cited by plaintiffs, Senator Obama specifically cited to California's LCFS and

19  "applauded" the Governor for his leadership.  See 153 Cong. Rec. S7704 (daily ed., June 14,

20  2007); *cf.* Plaintiffs Br. at 24, n.15.[29]   In June 2007, in a publicly noticed meeting, ARB voted to

21  approve the LCFS as an "early action" emissions reduction measure.  ARB Sep. Stmt. ¶ 13.  That

22

---

23  [28] Similarly, in *California Federal Savings & Loan*, 479 U.S. at p. 287-288, 291 n.30, the Court rejected appellants' conflict preemption argument, finding it "significant that Congress was aware of state laws similar to California's," prohibiting sex discrimination on the basis of

24  pregnancy, acknowledged their existence, but then failed to evince the requisite "clear and manifest purpose" to supersede them.  See also *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 491 (1996).

25

26  [29] *See also* 153 Cong. Rec. H14451-02 (daily ed., June 14, 2007) (statement of Rep. Lee) ("this bill takes the right steps forward to reduce our dependence on foreign oil, to save our constituents money, and to fight global warming. Most importantly, it echoes the innovative steps

27  that have already been taken by individual cities, States and districts like my district in the East Bay of California….").

28

year, during consideration of EISA, members of both Houses introduced bills proposing a national LCFS that, like California's announced program, would reduce lifecycle greenhouse gas emissions from transportation fuels.  The proposed national LCFS programs were patterned on California's proposed program, in some cases targeting the exact same level of reductions in greenhouse gas emissions by 2020.  ARB Sep. Stmt. ¶¶ 14-15.[30]  Indeed, the Congressional Research Service concluded that Congress derived a key definition for EISA (the definition of "lifecycle greenhouse gas emissions") from California's work on the LCFS.  ARB Sep. Stmt. ¶ 16.  Given Congress' acute awareness of the LCFS and its approach to regulating emissions of transportation fuels, Congress's failure to provide any indication of an intent to preempt state LCFS programs is powerful evidence of the lack of the requisite "clear and manifest purpose" to supersede them.

### 3.   EPA Views RFS2 as Compatible With Parallel State LCFS Programs.

The arguments plaintiffs present in this lawsuit are virtually identical to those they presented to EPA during its rulemaking for RFS2.  ARB Sep. Stmt. ¶ 17.  In particular, in comments during EPA's rulemaking, the Renewable Fuels Association argued that "under a low carbon fuel standard, States are making judgment calls that Congress expressly placed in the hands of EPA." *Id.*  Yet, plaintiffs fail to cite any statement by EPA that remotely indicates a judgment on the agency's part that the LCFS should be preempted by RFS.

Rather, statements by the EPA demonstrate that the agency has been working with the State of California to ensure compatibility of the two parallel programs.  Thus, for example, the U.S. EPA stated that "[d]ialogue with the State of California and the European Union on their parallel on-going efforts on GHG lifecycle analysis also helped inform EPA's methodology."  RJN Exh. P (75 Fed. Reg. 14670, 14764).  In addition, in its Summary of Analysis and Comments for the RFS2, EPA stated that:

---

[30] See also 153 Cong. Rec. S7680, S7704 (daily ed. June 14, 2007) (statement of Sen. Obama) ("Today, I rise to suggest that it is time for us to establish a national low carbon fuel standard for the entire transportation fuel pool in the country….").

1   EPA through the RFS2 final rule is implementing the Renewable Fuel Standards
    program as required by Congress through EISA.  Issues associated with State LCFS
2   programs, and potential future Federal fuel standards, are not germane to the final
    RFS program.  However, where possible we have attempted to structure the RFS2
3   program so as to be compatible with existing State LCFS programs, including
    coordination on lifecycle modeling."  RJN Exh. R at 13-15.
4
   **C.   The LCFS Does Not Conflict With Congress' Intent, Goals or Methods.**
5
        In their preemption argument, the plaintiffs' blend concepts of congressional intent, goals
6
   and methods.  Because different legal standards and specific material facts apply to each,
7
   defendants address each of plaintiffs' arguments in turn.
8
        **1.   The LCFS Compliments the Energy Security Intent and Goals of
9            Congress in EISA.**

10
        The first ground on which plaintiffs seek to manufacture a conflict between EISA and the
11
   LCFS is in their effect on energy security.  Plaintiffs' Br. at 22, 26.  Plaintiffs base their argument
12
   on erroneous assertions that: (i) the CAA "protects" corn-ethanol from foreign competition; (ii)
13
   the LCFS treats imported sugarcane ethanol favorably, whereas RFS2 does not; and (iii) that the
14
   Sense of Congress expressed in EISA was to restrict imported ethanol.  *Id.*
15
        At their hearts, EISA and RFS2 are designed to enhance energy security by reducing
16
   reliance on foreign oil.[31]  Indeed, both the EPA and plaintiff Renewable Fuels Association cite the
17
   reduction in foreign oil (not foreign ethanol) as the "energy security" goal of RFS.  ARB Sep.
18
   Stmt. ¶¶ 18-19.  The LCFS complements Congress's goal by "reduc[ing] California's dependence
19
   on petroleum."  ARB Sep. Stmt. ¶ 20.
20
        Moreover, plaintiffs largely ignore the other main goal of the RFS which is to encourage a
21
   dramatic increase in the production of advanced biofuels.  Members of congress were emphatic
22

23        [31]  *See* 153 Cong. Rec. H9722-03 at H9723 (August 4, 2007) (statement of Speaker
    Pelosi) ("Congress has created this bill with four principles in mind. We must strengthen our
24   national security by reducing our dependence on foreign oil; lower energy costs with greater
    efficiency, cleaner energy, and smarter technology; create new and good-paying American jobs,
25   and reduce global warming."); *id.* at H9743 (Statement of Rep. DeLauro) ("It is time to reduce
    our reliance on foreign oil-an addiction that threatens our environment, our economy, and our
26   national security."); *id.* at H9744 (Statement of Rep. Conyers) ("This landmark Energy
    Independence legislation will help make our nation more secure by reducing our dependence on
27   foreign oil …").

28
                                                    28

1  about this purpose in the debate over the EISA.[32]  While the focus of the LCFS is not exclusively

2  biofuels, it also complements the RFS in this regard by creating an incentive for increased

3  production of advanced, alternative fuels.  ARB Sep. Stmt. ¶¶ 8-9.

4       Plaintiffs' argument rests initially on section 211(o)(2)(A)(i) of the CAA, which they assert

5  Congress enacted in order to protect domestic corn ethanol producers from imported renewable

6  fuels.  Plaintiffs Br. at 23-24.  The relevant clause does not distinguish between domestic and

7  foreign corn ethanol producers.  *See* CAA, § 211(o)(2)(A).  Any protection Congress affords the

8  domestic corn ethanol industry from foreign competition, comes from an entirely separate statute:

9  namely, the $0.54 per gallon tariff on imported ethanol.    It is the about-to-expire tariff on

10  imported ethanol, *not* RFS2, that Senator Thune refers to in the statements quoted by plaintiffs.

11  *Cf.* Plaintiffs' Br. at 26:3-5; 153 Cong. Rec. S7680, S7694 (daily ed. June 14, 2007). [33]

12       Plaintiffs also argue that LCFS will cause corn-ethanol consumption to be replaced with

13  imported sugarcane ethanol consumption, and that such an outcome conflicts with Congress'

14  energy security goals.  Plaintiffs Br. at 24, n.15 and 26:2-5.  Plaintiffs' argument raises disputed

15  facts and is inconsistent with the text of EISA.  The only evidence plaintiffs offer regarding the

16  effect of the LCFS are the "compliance scenarios."  *Id.*  As discussed above, those scenarios are

17  not predictions, and even if they were, as predictions they would need to be adjusted in light of

18  energy efficiency improvements being made by corn-ethanol producers, some of which we cannot

19  know about absent discovery.  *See* Part V.A. *supra.*  Furthermore, Congress' treatment of

20

21      [32]  *See* 153 Cong. Rec. H14434-02, at H1440 (statement of Rep. Stark) ("I am troubled
    that we are continuing to subsidize and ratchet up corn-based ethanol production…. Fortunately,
22  this bill includes some environmental safeguards and directs future production toward advanced
    bio-fuels.");  153 Cong. Rec. E2665-01, at E2666 (daily ed. Dec. 18, 2007) (statement of Rep.
23  Dingell) ("[S]everal concerns have been raised with the viability of relying on corn-based ethanol
    as our primary renewable fuel…. To address these concerns, this bill before us places an
24  emphasis on the use of cellulosic biomass as a means of producing ethanol.")

25      [33] *See* 153 Cong. Rec. H16651-02, at H16655 (statement of Rep. G. Green) ("There is no
    shortage of literature detailing the negative environmental impacts of corn based ethanol, its
26  questionable greenhouse gas reductions, its reduced fuel efficiency, and its effect on food and
    energy prices."); see also 153 Cong. Rec. H14434-02, at H1440 (statement of Rep. Stark); 153
27  Cong. Rec. E2665-01, at E2666 (daily ed. Dec. 18, 2007) (statement of Rep. Dingell); 153 Cong.
    Rec. at E2631 (statement of Rep. Davis) ("Placing a limit on the amount of corn ethanol eligible
28  to be applied in meeting the RFS is a necessary step.").

1    sugarcane ethanol in the RFS evidences an intent to place the emphasis on greenhouse gas

2    reduction, rather than the locus of production.  Based on its significantly lower lifecycle

3    greenhouse gas emissions, Congress allowed sugarcane ethanol – which is predominately

4    produced abroad – to qualify as an "Advanced Biofuel."  *See* Clean Air Act § 211, subd.

5    (1)(B)(ii)(II).  This gives sugarcane ethanol a distinct advantage, because RFS sets a guaranteed

6    volume for Advanced Biofuels, consistent with Congressional aims to dramatically increase

7    production of low greenhouse gas biofuels.  *Id.* at § 211, subds. (2)(B)(i)(I) and (2)(B)(i)(II).

8         Finally, plaintiffs' argue that the LCFS is in conflict with the Sense of Congress set forth in

9    EISA section 806(a)(4).  Plaintiffs' Br. at 22, 25.  For the reasons stated above, however,

10   plaintiffs cannot link Congress' concern regarding "energy imported from volatile regions of the

11   world that are politically unstable" with sugarcane ethanol imports from a stable democracy such

12   as Brazil.  In fact, in 2007, the United States and Brazil achieved new levels of cooperation on

13   biofuels.  ARB Sep. Stmt. ¶ 21.  Moreover, by diversifying the sources of transportation fuel

14   away from oil, the LCFS compliments Congress' goal of "stabilizing the cost and availability of

15   energy, and safeguard[ing] the economy and security of the United States."  See EISA §

16   806(a)(4); see also ARB Sep. Stmt. ¶ 20.

17        **2.    The LCFS Does Not Conflict With Congress' Goals With Respect to
               Existing Corn Ethanol Plants.**

18

19        Plaintiffs argue that section 211(o)(2)(A)(i) reflects a goal of Congress to guarantee

20   "market certainty" to existing corn ethanol producers to protect existing investment and

21   encourage investment in new biofuels, and that the LCFS destroys that goal by "ending the

22   California market for corn ethanol from grandfathered plants in the Midwest."[34]   As discussed

23   above, plaintiffs' assertions about the effect of the LCFS on the market for Midwest corn ethanol

24   in California are disputed and should be the subject of discovery.  *See* Part V.A., *supra*.  This

25   issue alone precludes summary judgment based on plaintiffs' section 211(o)(2)(A)(i) argument.

26   _____

27        [34] Plaintiffs Br. at 26:24-26 (citing Plaintiffs Sep. Stmt. ¶¶ 30-31); *see also id.* at 22:26-27
     (citing Plaintiffs Sep. Stmt. ¶¶ 10-11, 17); *id.* at 23:16-17 (citing Plaintiffs Sep. Stmt. ¶¶ 10-11,

28   19); *id.* at 25:24-27 (citing Plaintiffs Sep. Stmt. ¶ 19); Plaintiffs Sep. Stmt ¶ 36.

1    Further, plaintiffs' contention regarding the goal of section 211(o)(2)(A)(i) of the CAA is

2    incorrect.  The negative implication of this section is that existing renewable fuel facilities and

3    those that commenced construction prior to adoption do not have to demonstrate a 20 percent

4    reduction in lifecycle greenhouse gas emissions *to qualify under RFS2*.

5        All that Congress did in the above section was provide existing or recently constructed corn

6    ethanol facilities  the opportunity to qualify under the RFS at the conventional biofuel level.  This

7    is far from a guarantee of "market certainty."  Corn ethanol is still required to compete

8    economically with other transportation fuels.  Indeed, given that ethanol producers compete

9    primarily on <u>price</u>, and the newer more energy efficient plants (with lower lifecycle greenhouse

10   gas emissions) produce ethanol at a lower price per gallon, existing plants have no guarantee of

11   market certainty.  That's why it is the older less efficient ethanol plants that are idled when there

12   is excess capacity in the market.   David Decl. at ¶ 21.

13       Other provisions of RFS2 also show that there is no guaranteed volume for any corn

14   ethanol producers.  *See* Clean Air Act, § 211(o)(2)(B).  As the EPA stated in its rulemaking: "It

15   should be noted, however, that there is no specific 'corn ethanol' mandated volume, and that any

16   advanced biofuel produced above and beyond what is required for the advanced biofuel

17   requirements could reduce the amount of corn ethanol needed to meet the total renewable fuel

18   standard." ARB Sep. Stmt. ¶ P (EPA p. 14723; see also p. 14709 (emphasis added)).

19       The LCFS, on the other hand, has no 20 percent threshold for ethanol or any other fuel to

20   meet prior to that fuel being eligible for sale in California.  ARB Sep. Stmt. ¶ 23.  Put another

21   way, the LCFS does not require a 20 percent reduction of greenhouse gases in order to be sold in

22   California.  In fact, any fuel can be sold in California.  *Id.*  It is up to the California fuel provider

23   to provide a mix of fuels, augmented by any credits accrued or purchased, that meets its

24   compliance obligation for that year.  *Id.* at ¶ 24.  For example, a provider could buy a small

25   volume of very low carbon fuel at a higher price and then buy a higher carbon fuel at a lower

26   price to meet its overall obligation.  *Id.*

27       As to incentivizing investment in new biorefineries, plaintiffs contend that Congress' goal

28   was to ensure that "the existing corn ethanol industry" would have "capital for new technologies."

**DEFENDANTS' MEMO. OF P & A's IN OPP. TO RMFU'S MOTION FOR SUMMARY JUDGMENT**
(No. 1:09-CV-02234-LJO-DLB)

1    Plaintiffs' Br. at 23-24.  Congress, however, expressed no intention to grant existing corn ethanol

2    producers a monopoly on investment capital for the next generation of biofuels.  In fact, in

3    section 223 of EISA, Congress purposely directed research grants to "states with low rates of

4    ethanol production."  *See also* EISA §§ 207 (grants for production of "advanced biofuels"), 230

5    (grant program for research in cellulosic ethanol and biofuels).  In fact, Congress intended to

6    incentivize investment by all potential investors in the next generation of biofuels, and the LCFS

7    is entirely consistent with that goal.[35]

8        Finally, if Congress intended by way of section 211(o)(2)(A)(i) to "protect" existing corn

9    ethanol producers from the LCFS, "its failure to even hint at it is spectacularly odd, particularly

10   since Members of both Houses were acutely aware of" California's development of the LCFS.

11   *See Medtronic*, 518 U.S. at 491.[36]

12                **3.    RFS2 Does Not Give Rise to a Method Conflict with The LCFS.**

13       Plaintiffs argue that even though RFS2 and the LCFS share at least one goal – reduction of

14   greenhouse gasses – the LCFS is nonetheless preempted because it interferes with the method

15   chosen by Congress.  Plaintiffs' Br. at 25-27.  Specifically, plaintiffs argue that Congress

16   intended that RFS2 set a uniform standard that vested ethanol producers with the flexibility to sell

17   corn ethanol in any state in quantities they determined.  *Id.*  Plaintiffs' argument overreaches.

18   The "method conflict" cases cited by plaintiffs are inapplicable to refiners, who face a patchwork

19   of state laws affecting ethanol production and consumption.

20       The overriding principle in the "method conflict" cases relied on by plaintiffs is that

21   Congress and/or the relevant agency involved developed a single scheme to address an issue.

22   Thus, for example, courts have found conflict method preemption where federal statutes and

23   regulations establish a single set of rules for (i) student loan servicing (*Chae v. SLM Corp.*, 593

24       [35] Notably, plaintiff Growth Energy asserted in comments that U.S. EPA had the authority
25   under RFS to adopt a credit program for corn ethanol plants that reduce emissions beyond the
     20% threshold for new plants, which is very similar to what the LCFS does.  ARB Stmt. ¶ 26.

26       [36] The mere fact that a Congressional statute provides support for a particular industry is
27   not enough to create a conflict with State regulation in areas of traditional authority – such as
     environmental regulation.  See *Pacific Gas & Elec.*, 461 U.S. at 206-207.

28

**DEFENDANTS' MEMO. OF P & A's IN OPP. TO RMFU'S MOTION FOR SUMMARY JUDGMENT**
(No. 1:09-CV-02234-LJO-DLB)

1   F.3d 936, 944 (2010)), (ii) auto passenger restraint systems(*Grier v. Am. Honda Motor Co.*, 529

2   U.S. 861 (2000)), (iii) marine engine emissions (*Pac. Merch. Shipping Ass'n v. Cackette*, No.

3   CIV S-06-2791, 2007 WL 2492681 *5 (E.D. Cal. Aug. 30, 2007), *aff'd*, 517 F.3d 1108 (9th Cir.

4   2008)), (iv) hazardous waste worker training (*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S.

5   88, 92 (1992)), and (v) water permitting (*Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987)).

6   Method preemption does not apply in every case where Congress has acted and a federal agency

7   regulates.  *See Ting v. AT&T*, 319 F.3d 1126, 1143 (9th Cir. 2003).

8        In the present case, EISA and RFS2 did not establish a single set of rules for transportation

9   fuels generally, or for renewable fuels specifically.  Rather, Congress imposed a volumetric

10  mandate on biofuels only and left in place a complete lack of uniformity in the regulation of

11  ethanol and its production as a fuel.  To begin with, each state sets its own blend requirement for

12  ethanol, up to the 10 percent maximum for older vehicles and 15 percent for vehicles model years

13  2007 and after.  *See, e.g.,* ARB Sep. Stmt. ¶ 27.  Other states have chosen to encourage

14  consumers to buy flex fuel vehicles, which could result in the consumption of more ethanol.  *Id.*

15  at ¶ 28.  Some states have offered tax incentives for ethanol or advanced biofuel plants inside

16  their state.  *Id.* at ¶ 29.  As a result, here, as in *Ting*, the ability to attain Congress' goal to increase

17  renewable fuels production generally depends on complimentary state laws, and there is no

18  reason to imply a conflict with the LCFS.

19       In addition, in the cases plaintiffs cite in support of their "method preemption" argument,

20  the courts have relied heavily on the presence of either: (1) an express preemption provision[37]; (2)

21  a statutory requirement for states to obtain a waiver[38]; (3) a federal agency's clear expression of

22       [37] *See* Plaintiffs Br. at 26-27 (citing *Engine Mfrs. Ass'n v. South Coast Air Quality
    *Management District*, 541 U.S. 246, 255 (2004) (state vehicle fleet restrictions constitute a

23  "standard" expressly preempted by section 209(a) of the Clean Air Act)).  Plaintiffs erroneously
    equate the "right to sell" the Court found in *Engine Manufacturer's Association* with the present

24  case.  Plaintiffs' Br. at 27.  EISA, however, contains no applicable express preemption provision
    establishing a "right to sell" renewable fuels.

25

26       [38] See Plaintiffs Br. at 26 (citing *Pac. Merch. Shipping Ass'n v. Cackette*, No. CIV S-06-
    2791, 2007 WL 2492681 *5 (E.D. Cal. Aug. 30, 2007), *aff'd*, 517 F.3d 1108 (9th Cir. 2008) (state

27  marine vessel rules constitute a "standard" that was preempted by section 209(e)(2) of the Clean
    Air Act absent EPA authorization ); *Gade v. Nat'l Solid Waste Mgmt. Ass'n*, 505 U.S. 88, 97-99

28  (1992) (statute required states to submit a plan for the U.S. Secretary of Labor if it wishes to
                                                                         (continued…)

33

1  preemption in its regulation or in the litigation[39]; or (4) a state regulation or cause of action that

2  acts as an immediate and complete ban on the activity sanctioned by federal law.[40]  In the present

3  case, not one of these factors is present.

4       Finally, in the first reported case involving the new RFS, the Federal District Court in the

5  Eastern District of North Carolina addressed a similar issue and rejected refiners "method"

6  preemption argument.  *See Am. Petroleum Inst. v. Cooper*, 681 F.Supp.2d 635 (E.D. N.C. 2010).

7  A North Carolina law required importers of gasoline to give North Carolina distributors and

8  retailers the option of purchasing gasoline that is not preblended with ethanol.  *Id.* at 645.  The

9  court rejected refiners' argument that the law stood as an obstacle to the "flexible method

10  Congress chose to give refiners to comply with renewable fuel production mandates."  *Id.* at 642,

11  646-47.  The LCFS provides even fewer obstacles to the method adopted by Congress, since it,

12  like the RFS2, leaves the choice of fuel up to the refiner/blender.

13       **D.     Contrary to Plaintiffs' Argument, EISA Bars EPA From Restricting
              Geographic Markets in order to Leave Room for State Regulation.**

14

15       Plaintiffs final preemption argument is that 42 U.S.C. § 7545(o)(2)(A)(iii)(II)(aa), reflects a

16  decision by Congress that the market for renewable fuels should be "national, not regionally

17  balkanized."  *See* Plaintiffs' Br. at 27-28.  In that section, titled "Provisions of regulations,"

18  Congress set certain rules for EPA's regulations.  In subdivisions (II)(aa) and (II)(bb), Congress

19  wrote that the EPA Administrator shall not "restrict geographic areas in which renewable fuel

20  (...continued)
    assume responsibility" for occupational health and safety standards).

21

22       [39] *See* Plaintiffs Br. at 27 (citing *Grier v. Am. Honda Motor Co.*, 529 U.S. 861 (2000)
    (Court considered 'a "complex and extensive' regulatory history and background" in which the
    agency explained how the state law interfered with its regulation); *see also Wyeth,* 129 S.Ct. at p.

23  1203 (distinguishing *Grier*); *see also* Plaintiffs' Br. at 27 (citing *Chae v. SLM Corp.*, 593 F.3d

24  936, 944 (2010) (Court of appeal gave deference to the agency's interpretation of its regulations
    as preempting state law).

25       [40] See Plaintiffs Br. at 27 (citing *Young v. Colma-Agaran*, 340 F.3d 1053, 1057 ("the ban

26  completely excludes the plaintiffs from conducting their federally licensed tour-boat
    business..."); *Grier*, 593 F.3d at 881 (state tort action would effectively require all cars in the

27  state have a passive restraint system); *Chae*, 590 F.3d at 946 (state contract and tort action
    challenging federal student loan servicer's fees and practices)).

28

34

1    may be used," or "impose any per-gallon obligation for the use of renewable fuel."   As written,

2    these statutory directives are not imposed on the states.  Moreover, the restriction against the EPA

3    setting "*any per-gallon obligation for the use of renewable fuel*" directly contradicts plaintiffs'

4    argument that Congress intended a single uniform rate of ethanol consumption across the nation.

5    If anything, Congress appears to have been protecting an area of traditional state authority: the

6    determination of blend levels.  This is logical, given the effect of fuel blends on local air quality

7    issues.  In addition, the credit trading program built into the RFS envisions refiners and others

8    transferring credits, such that compliance does not hinge on the rate of consumption of ethanol or

9    any other renewable fuel in a particular part of the country.  *See* 42 U.S.C. § 7545(o)(5) ("Credit

10   Program").  As the court in *API* noted, the tradable nature of the RINs allow refiners to comply

11   even if they are not blending ethanol.  *API*, 681 F.Supp.2d at p. 646.  As with many of plaintiffs'

12   arguments, this argument also depends on plaintiffs false and disputed contention that the effect

13   of the LCFS is a "unilateral opting-out" of the RFS.  *See* Part V.A., *supra*.

**CONCLUSION**

15        For the foregoing reasons, defendants respectfully request that the Court deny plaintiffs'

16   motion for summary judgment.

17

18

19

20

21

22

23

24

25

26

27

28

**DEFENDANTS' MEMO. OF P & A's IN OPP. TO RMFU'S MOTION FOR SUMMARY JUDGMENT**
(No. 1:09-CV-02234-LJO-DLB)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated:  December 17, 2010

Respectfully Submitted,

EDMUND G. BROWN JR.
Attorney General of California
ROBERT W. BYRNE
Supervising Deputy Attorney General


   /s/ David A. Zonana
DAVID A. ZONANA
Deputy Attorney General
*Attorneys for Defendants*
*James N. Goldstene et al.*

NATURAL RESOURCES DEFENSE
COUNCIL


By:    /s/ David Pettit
       DAVID PETTIT

Attorneys for Defendant-Intervenor,
Natural Resources Defense Council, Inc.

SIERRA CLUB


By:    /s/ Pat Gallagher
       PAT GALLAGHER

Attorney for Defendant-Intervenor,
Sierra Club


CONSERVATION LAW FOUNDATION


By:    /s/ Jane West
       JANE WEST

Attorney for Defendant-Intervenor,
Conservation Law Foundation

ENVIRONMENTAL DEFENSE FUND


By:    /s/ James T.B. Tripp
       JAMES T.B. TRIPP
Attorney for Defendant-Intervenor,
Environmental Defense Fund

36

1

SF2010400011
20383451.doc

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEFENDANTS' MEMO. OF P & A's IN OPP. TO RMFU'S MOTION FOR SUMMARY JUDGMENT**
(No. 1:09-CV-02234-LJO-DLB)