1   EDMUND G. BROWN JR.,
    Attorney General of California
2   ROBERT W. BYRNE,
    Supervising Deputy Attorney General
3   GAVIN G. MCCABE, State Bar No. 130864
    MARK POOLE, State Bar No. 194520
4   DAVID A. ZONANA, State Bar No. 196029
    Deputy Attorneys General
5     455 Golden Gate Avenue, Suite 11000
      San Francisco, CA  94102-7004
6   Telephone:  (415) 703-5524
    Fax:  (415) 703-5480
7   E-mail:  David.Zonana@doj.ca.gov
    *Attorneys for Defendants*
8   *James N. Goldstene et al.*

9                IN THE UNITED STATES DISTRICT COURT

10              FOR THE EASTERN DISTRICT OF CALIFORNIA

11                          FRESNO DIVISION

12

13  **ROCKY MOUNTAIN FARMERS**           LEAD CASE No.
14  **UNION, et al.,**                   1:09-CV-02234-LJO-DLB

15                        Plaintiffs,    *Consolidated With* Case No.:
                                         1:10-CV00163-LJO-DLB
16
         v.
17                                       **DEFENDANTS' RESPONSE TO RMFU**
    **JAMES GOLDSTENE, et al.,**         **PLAINTIFFS' STATEMENT OF**
18                                       **MATERIAL FACTS NOT SUBJECT TO**
                          Defendants.    **GENUINE DISPUTE; and**
19                                       **DEFENDANTS' STATEMENT OF**
                                         **DISPUTED FACTS**
20  And Related Consolidated Action.

21  -------------------------------------------------
                                         Date:       February 23, 2011
22  **NATIONAL PETROCHEMICAL &**         Time:       8:30 a.m.
    **REFINERS ASSOCIATION, et al.,**    Courtroom:  Four
23                                       Judge       The Honorable Lawrence J.
                        Plaintiffs,                  O'Neill
24                                       Trial Date:  TBD
         v.
25                                       **Action Filed: 12/23/2009**
    **JAMES GOLDSTENE, et al.,**
26
                          Defendants.
27

28

                                    1

**DEFENDANTS' RESPONSE TO RMFU PLAINTIFFS'
STATEMENT OF MATERIAL FACTS**

Pursuant to Rule 56(a) and (c) of the Federal Rules of Civil Procedure and Local Rule

260(b), defendants in Case No. 1: 09-CV-02234-LJO-DLB respectfully submit their response to

plaintiffs' statement of materials facts not subject to genuine dispute.

| | PLAINTIFF'S UNDISPUTED FACTS AND EVIDENCE | DEFENDANTS' RESPONSE AND EVIDENCE |
|---|---|---|
| 1. | Ethanol is an organic compound of hydrogen, carbon, and oxygen atoms structured as shown in the following flat representation: <br><br> $$H-\underset{\underset{H}{\vert}}{\overset{\overset{H}{\vert}}{C}}-\underset{\underset{H}{\vert}}{\overset{\overset{H}{\vert}}{C}}-O-H$$ <br><br> *See* Patterson & Heinen, *Emissions from Combustion Engines and their Control* (1972) at 53. | Undisputed. |
| 2. | The chemical identity and physical characteristics of ethanol used in motor vehicles in the United States does not depend on the location where it is produced, the method of production, or the feedstock used in production. <br><br> *See* CARB, *Initial Statement of Reasons in Support of Proposed Rulemaking -- Low-Carbon Fuel Standard* ("ISOR") at V-30. | Defendants object to plaintiffs' Statement No. 2 to the extent it is not a statement of fact but a statement of legal conclusion as to the limit of what constitutes a relevant "characteristic or component of a fuel" for purposes of section 211(c)(4)(A) of the Clean Air Act.  Without waiving that objection, defendants respond as follows: <br><br> Disputed. <br><br> While the chemical identity and physical properties of ethanol during its use in motor vehicles does not depend on the factors cited by plaintiffs, the "physical characteristics" of ethanol – such as the lifecycle emissions associated with ethanol – can depend on the factors cited. (Continued…) |

2

| | PLAINTIFF'S UNDISPUTED FACTS AND EVIDENCE | DEFENDANTS' RESPONSE AND EVIDENCE |
|---|---|---|
| | | 2. (Cont.)<br><br>Lifecycle analysis is a widely accepted technique for categorizing fuels according to their GHG emissions.  In addition to its use in the LCFS and RFS2 rulemakings, lifecycle analysis is widely used elsewhere in the world.<br><br>*See* RJN Exh. P, 75 FR 14669, 14765 (Mar. 2010); CAA sec. 211(o)(1)(H); Scheible Decl. at ¶¶ 14-18; Spatari Decl. at ¶¶ 7-8; Babcock Decl. at ¶ 7; Ellis Decl. at ¶ 13; Defendant-Intervenors' Request for Judicial Notice in Opposition to RMFU Plaintiffs' Motion for Summary Judgment (hereafter "RJN"), Exh. B, ISOR at ES-5 and Exh. AA, European Commission Report; *see also* http://lct.jrc.ec.europa.eu/. |
| 3. | The emissions produced when ethanol is burned in a motor vehicle engine do not vary based on (1) the feedstock used to make the ethanol, (2) the production of the feedstock, (3) the production of the ethanol, (4) the type or quantity of distillers grains produced along with the ethanol, or (5) the location of the ethanol production facility.<br><br>*See* ISOR at V-30; CARB, *Final Statement of Reasons -- Low-Carbon Fuel Standards* ("FSOR") at 951. | Undisputed. |

ARB'S STATEMENT OF DISPUTED FACTS IN OPP. TO RMFU MSJ  (No. 1:09-CV-02234-LJO-DLB)

| | PLAINTIFF'S UNDISPUTED FACTS AND EVIDENCE | DEFENDANTS' RESPONSE AND EVIDENCE |
|---|---|---|
| 4. | California's low-carbon fuel standard ("LCFS") regulation does not attribute any tailpipe carbon dioxide emissions to the use of ethanol.<br><br>*See* CARB, *Detailed California-Modified GREET Pathway for Corn Ethanol* ("CA GREET") at 5 & Table B. | Disputed.<br><br>In the LCFS, the tailpipe carbon dioxide emissions that result from the burning of ethanol as a transportation fuel are counted and then netted out by the absorption of carbon dioxide during the growth of the feedstock (such as corn). The crop absorption of carbon dioxide could have been used to offset emissions any emissions in the lifecycle (e.g., production, transportation, etc.) with the same effect on the resulting carbon intensity figures for different forms of ethanol. Netting crop absorption against the carbon dioxide emissions from the tailpipe is a common practice in lifecycle analyses.<br><br>*See* Scheible Decl. at ¶¶23; Babcock Decl. at ¶ 6. |
| 5. | One purpose of the LCFS regulation is to "incentivize the use of fuels that have lower carbon intensity," in the judgment of the California Air Resources Board ("CARB").<br><br>*See* FSOR at 148. | Undisputed. |

4

| | PLAINTIFF'S UNDISPUTED FACTS AND EVIDENCE | DEFENDANTS' RESPONSE AND EVIDENCE |
|---|---|---|
| 6. | The LCFS regulation assigns a higher carbon intensity value (or "score") to corn ethanol produced at a Midwest facility than to corn ethanol produced at a California facility using the same nominal process.<br><br>17 C.C.R. § 95486(b), Table 6. | Disputed and irrelevant.<br><br>Plaintiffs are using the term "nominal process" without defining it.  Assuming they mean something less than the full lifecycle, defendants respond as follows.<br><br>The difference in carbon intensity score for a Midwest facility and a California facility using the same milling (e.g., Dry), byproduct (e.g., DDGS) and boiler fuel (e.g., Nat. Gas) <u>are</u> due, in part, to differences in (a) the average efficiency of the equipment at facilities in the Midwest versus California, and (b) the average greenhouse gas emissions associated with the electricity used at the facilities in the Midwest and California, that may fit within someone's definition of "the nominal process."<br><br>See Scheible Decl. at ¶¶ 61, 63. |
| 7. | The LCFS regulation assigns "Midwest average" corn ethanol a carbon intensity score or value above that of the 2010 baseline California gasoline.<br><br>*See* 17 C.C.R. § 95486(b), Table 6. | Undisputed but irrelevant.<br><br>The "Midwest average" corn ethanol carbon intensity value is not intended for use by any individual ethanol facility.  It is an average of the different carbon intensity values for seven different Midwest ethanol pathways included in the original Table 6, four of which are below the value for the 2010 baseline.  The Midwest average can be used a "generic" number when the carbon intensity of an ethanol batch cannot be ascertained.<br><br>*See* Scheible Decl., at ¶ 39; Prop. Resolution 10-49 at pg. 5, available at: http://www.arb.ca.gov/board/books/2010/111810/prores1049.pdf |

5

| | | PLAINTIFF'S UNDISPUTED FACTS AND EVIDENCE | DEFENDANTS' RESPONSE AND EVIDENCE |
|---|---|---|---|
| | 8. | The LCFS regulation assigns corn ethanol produced from dry mills in the Midwest using natural gas and producing DDGS ("MW/ DM/ DDGS/ NG") a carbon intensity score or value above that of the 2010 baseline California gasoline.<br><br>*See* 17 C.C.R. § 95486(b), Table 6. | Undisputed that the carbon intensity value in Table 6 for MW/ DM/ DDGS/ NG is higher than the value for the 2010 baseline California gasoline.<br><br>Disputed that inclusion of this value in Table 6 "assigns" such a value to all such plants, given the ability of plants supporting a lower lifecycle to apply for an individualized carbon intensity value through Method 2A or 2B.<br><br>To date 3 facilities that are specifically MW/ DM/ DDGS/ NG have applied under Method 2A for an individualized carbon intensity value, and have been tentatively been given a value lower than the 2010 baseline for California gasoline.<br><br>*See* 17 C.C.R. 95486(c) and (d); Scheible Decl. at ¶¶ 57-64; RJN, Exh. H, ARB New Pathways, available at http://www.arb.ca.gov/fuels/lcfs/2a2b/2a-2b-apps.htm). |
| | 9. | Most corn ethanol produced in the United States is classified as MW DM/DDGS/NG under the LCFS regulation.<br><br>*See* CA GREET at 2. | Undisputed. |

6

| | PLAINTIFF'S UNDISPUTED FACTS AND EVIDENCE | DEFENDANTS' RESPONSE AND EVIDENCE |
|---|---|---|
| 10. | An analysis of the impact of the LCFS regulation completed for CARB in the spring of 2009 predicted that, from 2011 to 2020, corn ethanol production facilities in California will produce 300 million gallons of ethanol per year for use in California gasoline, but that corn ethanol produced at facilities in the Midwest will no longer be used in California gasoline by either 2017 or 2018.<br><br>*See* ISOR Appendix E, at E-1 to E-8. | Disputed, irrelevant and requiring discovery.<br><br>The compliance scenarios which plaintiffs refer to as "an analysis" and cite as the only evidence supporting this assertion "are not intended to predict or forecast the actual combination of fuels and vehicles that will be used." *See* RJN Exh. D, FSOR at 823.  Those scenarios are "what if" exercises designed to show several possible ways in which compliance with the LCFS would be possible. *See, e.g., id.* at 339 ("The compliance scenarios demonstrate compliance is possible, given what is currently known about the future availability of alternative fuels and vehicles."). In addition, the compliance scenarios were necessary for ARB staff to conduct economic, environmental and public health analyses required by California law.  *Id.* at 366 ("Because the standard is performance based, in which the specific pathways chosen by fuel producers are uncertain, the [required environmental and public health] analysis was based on various compliance scenarios."); *Id.* at 434 ("For *illustrative* purposes, we used eight *potential* compliance scenarios in the economic analysis.") (emphasis added).  *See also* Cal. Pub. Res. Code § 21000, *et. seq.* (CEQA) (requiring environmental analysis); Cal. Gov't Code § 11346.3 (requiring economic analysis).  The LCFS designed to let the market decide which fuels ultimately make up the transportation mix in a given year, within the constraints of the aggregate CI limit for that year.<br><br>The only Midwest corn ethanol pathway included in the scenarios was "Midwest average" which does not represent ethanol from any existing plant and has a high CI of 99.4.  The scenarios, therefore, cannot be understood to say anything about the future of lower-CI Midwest corn ethanol, including the Midwest corn ethanol represented by the five pathways below 99.4 and the new pathways developing under Methods 2A & 2B (described above). |

7

| | PLAINTIFF'S UNDISPUTED FACTS AND EVIDENCE | DEFENDANTS' RESPONSE AND EVIDENCE |
|---|---|---|
| 10. | | (Cont.)<br><br>Defendants also dispute that the scenarios predicted that California will produce 300 million gallons of ethanol per year, because that is simply the capacity and, as plaintiffs acknowledge, California has produced far less ethanol than that in recent years.<br><br>Any prediction of the impact of the LCFS on future sales in California of corn ethanol produced at facilities in the Midwest should be based on discovery and expert testimony.  (*See* Defendants' Rule 56(d) Motion to Defer or Deny Plaintiffs Motion for Summary Judgment.)<br><br>See RJN, Exh. D, FSOR at 71, 339, 366, 431, 433-34, 489, 823; see also Exh. P, 75 Fed. Reg., at p. 14746; Scheible Decl. at ¶¶ 33, 65-71; Title 17, Cal. Code Regs., section 95486, subds. (c) and (d); RJN Exh. B, ISOR at ES-14; RJN, Exh. S, RFA Comments to EPA at 56; RJN, Exh. H (ARB New Pathways, available at http://www.arb.ca.gov/fuels/lcfs/2a2b/2a-2b-apps.htm). |
| 11. | The same analysis predicts that the LCFS regulation will reduce the use of Midwest corn ethanol in California gasoline by more than 15% by the end of 2011 and by more than 50% by the end of 2015.<br><br>*See* ISOR Appendix E, at E-1 to E-8. | Disputed, irrelevant and requiring discovery.<br><br>ARB incorporates its Response (including citations to evidence) to Plaintiffs' Undisputed Fact No. 10 above. |

8

| | PLAINTIFF'S UNDISPUTED FACTS AND EVIDENCE | DEFENDANTS' RESPONSE AND EVIDENCE |
|---|---|---|
| 12. | In developing carbon intensity scores for the LCFS regulation, CARB assumed that the lifecycle greenhouse gas ("GHG") emissions for ethanol would be affected by "farming practices, crop collection and transportation, fuel production, co-product generation, and distribution of fuel."<br><br>*See* FSOR at 508; *see also id.* at 514-17 (carbon intensity scores for corn ethanol may be adjusted "to the extent that more sustainable farming practices are implemented on an industry-wide basis."). | Undisputed that CARB modeled these parts of the lifecycle in its calculation of carbon intensity values.<br><br>Disputed that CARB's modeling is properly characterized as an "assumption."  All definitions of lifecycle emissions in use today, including those used by the EPA and the EU model the emissions from "farming practices, crop collection and transportation, fuel production, co-product generation, and distribution of fuel."<br><br>*See* RJN Exh. P, 75 FR 14669, 14765 (Mar. 2010); CAA sec. 211(o)(1)(H); Scheibel Decl. at ¶¶ 14-25; Spatari Decl. at ¶¶ 7-8; Babcock Decl. at ¶ 6-7; RJN Exh. B, ISOR at ES-5 and Exh. AA, European Commission Report; see also http://lct.jrc.ec.europa.eu/. |
| 13. | CARB claims to have formulated the carbon intensity scores or values assigned to Midwest and California corn ethanol pathways based on an assumption that GHG emissions from the transportation of corn and corn ethanol increase along with the distance the corn and corn ethanol travel before use in California.<br><br>*See* FSOR at 64, 339, 713;  *see also* ISOR at IV-9 to IV-11;  CA GREET at 6, 43. | Undisputed that CARB used the California GREET Model to model the greenhouse gas emissions associated with transportation of feedstock and finished ethanol for both the Midwest and California corn ethanol pathways' carbon intensity scores listed in Table 6.<br><br>Disputed that CARB's modeling is an "assumption."  The data used for the California GREET Model is the best available scientific information.  GREET has been used by government agencies in New York, Minnesota and Oregon to estimate emissions from alternative fuels and ethanol production.  The EPA also used GREET in its RFS2 rulemaking under EISA. GREET separately calculates consumption of total energy, emissions of greenhouses gasses and emissions of six criteria pollutants.<br><br>*See* RJN Exh. B, ISOR at IV-9**;** Scheible Decl. at ¶¶ 14-25, 45; Spatari Decl. at ¶¶ 7-8; Babcock Decl. at ¶ 6-7; RJN Exh. F, Board Reso. 09-31 at 7-9. |

9

| | PLAINTIFF'S UNDISPUTED FACTS AND EVIDENCE | DEFENDANTS' RESPONSE AND EVIDENCE |
|---|---|---|
| 14. | CARB claims to have formulated the carbon intensity scores or values assigned to Midwest and California corn ethanol pathways based on the assumptions that (1) Midwest corn ethanol is produced using electricity generated in the Midwest, (2) California corn ethanol is produced using electricity generated in California, and (3) electricity generated in California has lower GHG emissions than electricity generated in the Midwest.<br><br>*See* FSOR at 64, 713, 860; *see also* ISOR at IV-19 to IV-11; CA GREET at 6, 43 | Undisputed that CARB used the California GREET Model to model the greenhouse gas emissions associated with electricity for the Midwest and California corn ethanol pathways' carbon intensity scores listed in Table 6, and that the greenhouse gas emissions per KWh in California were lower than for the Midwest.<br><br>Disputed that CARB's modeling is an "assumption." The data used for the California GREET Model is the best available scientific information.   See response to Fact No. 13, *supra*.<br><br>*See* RJN Exh. B, ISOR at IV-9**;** Scheible Decl. at ¶¶ 14-25, 47; Spatari Decl. at ¶¶ 7-8; Babcock Decl. at ¶ 6-7; RJN Exh. F, Board Reso. 09-31 at 7-9. |
| 15. | Nearly all corn ethanol currently produced in the United States is produced outside California.<br><br>*See* U.S. EPA, *Renewable Fuel Standard Program (RFS2) Regulatory Impact Analysis*, Feb. 2010 ("EPA RIA")*,* Table 1.5-6 at 135. | Undisputed. |
| 16. | There is virtually no corn grown in California to produce ethanol.<br><br>*See* EPA RIA at 14; FSOR at 351. | Undisputed. |

10

| | PLAINTIFF'S UNDISPUTED FACTS AND EVIDENCE | DEFENDANTS' RESPONSE AND EVIDENCE |
|---|---|---|
| 17. | In 2009, approximately 171 facilities in the United States produced corn-starch ethanol for use as a motor fuel.<br><br>*See* U.S. EPA, *Regulation of Fuel and Fuel Additives:  Changes to Renewable Fuel Standard Program -- Final Rule* 75 Fed. Reg. 14670, 14,744 (Mar. 25, 2010); EPA RIA at 130. | Undisputed that the number of facilities referenced is in this general range. |
| 18. | In a forecast that does not mention the LCFS regulation, the U.S. Environmental Protection Agency ("EPA") has predicted that domestic corn ethanol production will expand to more than half of the States as a result of the federal renewable fuels standard program ("RFS 2 program").<br><br>*See* EPA RIA at 141. | Disputed and irrelevant.<br><br>The LCFS is mentioned in the EPA RIA at 426. |

11

| | **PLAINTIFF'S UNDISPUTED FACTS AND EVIDENCE** | **DEFENDANTS' RESPONSE AND EVIDENCE** |
|---|---|---|
| 19. | California is the largest single state market for corn ethanol fuel and annually consumes about 10% of the domestic market, which will eventually amount to about 1.5 billion gallons of ethanol.<br><br>*See* FSOR at 407 (explaining that CARB expects California would consume 1.5 billion gallons of corn ethanol, out of 15 billion gallons produced nationwide, if the LCFS regulation were not in place). | Defendants object to plaintiffs' Statement No. 19 to the extent it is not a statement of fact but a statement of legal conclusion that California or its residents have any obligation under RFS2 to consume a specific share of the domestic production of corn ethanol.  Without waiving that objection, defendants respond as follows:<br><br>Undisputed that in or about 2009 "California is the largest single state market for corn ethanol fuel and annually consumes about 10% of the domestic market."<br><br>Disputed that 10% of the domestic market "will eventually amount to about 1.5 billion gallons of ethanol."  This statement is speculative and vague.<br><br>Plaintiffs' characterization of the evidence (parenthetical) is also disputed.<br><br>*See* RJN Exh. D, FSOR at 407. |

ARB'S STATEMENT OF DISPUTED FACTS IN OPP. TO RMFU MSJ  (No. 1:09-CV-02234-LJO-DLB)

| | PLAINTIFF'S UNDISPUTED FACTS AND EVIDENCE | DEFENDANTS' RESPONSE AND EVIDENCE |
|---|---|---|
| 20. | Under the LCFS, the carbon intensity of corn ethanol depends in part on CARB's inferences about how the fuel is produced and distributed and the "sustainability" that CARB attributed to various "farming practices." <br><br> *See* ISOR at V-1 ("Carbon intensity is a measure of the direct and other GHG emissions associated with each of the steps in the full fuel-cycle of a transportation fuel"); *id.* at V-30 ("a fuel's carbon intensity is inferred from the various steps taken to produce that fuel and the relative impacts to climate change associated with each step (vis-à-vis the steps' carbon intensity)"); FSOR at 508 (claiming to have considered "farming practices, crop collection and transportation); *id.* at 514-17(general carbon intensity values for corn ethanol may be adjusted in later versions of the LCFS regulation "to the extent that more sustainable farming practices are implemented on an industry-wide basis."); *id.* at 951 ("Carbon intensity is not an inherent chemical property of a fuel, but rather it is reflective of the process in making, distributing, and using that fuel."). | Disputed. <br><br> ARB used CA-GREET, v. 1.8b, (Feb. 2009, updated Dec. 2009) and the GTAP Model (Feb. 2009) to conduct the full, fuel life-cycle analysis for all the fuel pathways listed in the Lookup Tables, it did not simply make "inferences." <br><br> Undisputed that the LCFS defines "lifecycle greenhouse gas emissions" as the "aggregate quantity of greenhouse gas emissions (including direct emissions and significant indirect emissions such as significant emissions from land use changes), as determined by the Executive Officer, related to the full fuel lifecycle, including all stages of fuel and feedstock production and distribution, from feedstock generation or extraction through the distribution and delivery and use of the finished fuel to the ultimate consumer, where the mass values for all greenhouse gases are adjusted to account for their relative global warming potential." <br><br> Also undisputed that the carbon intensities for the fuel pathways are comprised of both direct emissions associated with transportation fuels and indirect emissions. For corn ethanol, direct emissions include: farming practices; crop yields; harvesting practices; collection and transportation of the crop; type of fuel production process; fuel used in the production process; energy efficiency of the production process; the value of co-products generated; transport and distribution of the fuel; and combustion of the fuel in vehicles. <br><br> (Continued…) |

ARB'S STATEMENT OF DISPUTED FACTS IN OPP. TO RMFU MSJ  (No. 1:09-CV-02234-LJO-DLB)

| | PLAINTIFF'S UNDISPUTED FACTS AND EVIDENCE | DEFENDANTS' RESPONSE AND EVIDENCE |
|---|---|---|
| | | 20. (Cont.)<br><br>The only significant source of indirect emissions for ethanol identified at this time is from land use change effects.  For ethanol from corn, this value, 30 gCO2e/MJ, is the same for all corn ethanol.  For ethanol from sugarcane, the value for indirect land use change is higher at 46 gCO2e/MJ.<br><br>See  17 C.C.R. §§ 95486, Tables 6 and 7, section 95486(b)(1), 95481(a)(28); RJN Exh. B, ISOR at IV-4, IV-5, IV-17, V-24. |
| 21. | CARB predicts that compliance with the LCFS regulation will result in the establishment of up to 25 new biofuel facilities in California.<br><br>*See* FSOR at 427, 479, 499. | Disputed.<br><br>ARB estimated that 25 biorefineries <u>could</u> be built in California based on an assessment of potential feedstock availability, the effects of RFS2, and any effect of the LCFS.<br><br>*See* RJN Exh. B, ISOR at ES-26, VII-9, and Exh. D, FSOR at 427, 479, 499. |
| 22. | CARB predicts that the LCFS regulation will increase in-state employment, augment state tax resources, raise the value of biomass located in California, and keep more money in state by displacing imported transportation fuels.<br><br>*See* FSOR at 479. | Undisputed that ARB made these "assumptions" for purposes of the economic analysis mandated by its authorizing statute (AB 32).  Disputed that these were predictions.<br><br>See RJN Exh. D, FSOR at 479 (noting that "the economic effects of this regulation depend in large part on" responses from fuel producers); Cal. Health & Saf. Code, § 38562(b)(6). |

14

| | PLAINTIFF'S UNDISPUTED FACTS AND EVIDENCE | DEFENDANTS' RESPONSE AND EVIDENCE |
|---|---|---|
| 23. | There are two basic methods of producing ethanol from corn starch: a "dry mill" corn ethanol plant grinds the entire kernel of corn prior to fermentation, while "wet mill" plants separate the grain kernel prior to processing into its component parts.<br><br>*See* EPA RIA at 92. | Undisputed that EPA wrote that in early 2010. Disputed to the extent that it is assumed to remain so. Technology in the biofuel industry changes rapidly.<br><br>*See* Scheible Decl. at ¶ 82. |
| 24. | Dry-mill corn ethanol plants can produce a variety of "coproducts" in addition to ethanol, including (1) food-quality corn oil, (2) corn oil that can be used for industrial purposes, and (3) an animal nutrient called "distillers grains with solubles" (DGS).  None of those co-products are motor vehicle fuels.<br><br>*See* U.S. EPA, *Regulation of Fuel and Fuel Additives:  Changes to Renewable Fuel Standard Program -- Final Rule* 75 Fed. Reg. 14670, 14,744 (Mar. 25, 2010); EPA RIA at 92-94. | Undisputed. |
| 25. | The DGS coproduct is separated from ethanol in the ethanol production process as a wet paste or "wet cake," and in that form is called "wet DGS" (or WDGS).<br><br>*See* EPA RIA at 93. | Undisputed. |
| 26. | When dried to extend its shelf life and permit use at more distant locations, the DGS coproduct is called "dry DGS" or "DDGS."<br><br>*See* EPA RIA at 93-94. | Undisputed. |

15

| | **PLAINTIFF'S UNDISPUTED FACTS AND EVIDENCE** | **DEFENDANTS' RESPONSE AND EVIDENCE** |
|---|---|---|
| 27. | DDGS is frequently shipped long distances and is widely used as a high-protein ingredient in beef and dairy cattle, swine, poultry and fish diets.<br><br>*See* EPA RIA at 94, 146. | Disputed.<br><br>DDGS appears to face significant barriers to <u>widespread</u> adoption as a replacement for corn and soybean meal.<br><br>See RJN Exh. B, ISOR at IV-46, C-54. |
| 28. | Approximately 63% of DGS produced at U.S. corn ethanol plants is sold as DDGS.<br><br>*See* 75 Fed. Reg. at 14,786. | Undisputed that the EPA has made such a statement.  If relevant, defendants would require discovery to confirm the truth of the statement. |
| 29. | Under the LCFS regulation, if a corn ethanol production facility produces DDGS as an ethanol co-product, the carbon intensity score or value assigned to the facility's pathway is greater than if the facility did not dry the distillers grains.<br><br>*See* 17 C.C.R. § 95486(b), Table 6; FSOR at 508; 825. | Undisputed that when ethanol plants dry distillers grains, the energy used to do so is factored into the lifecycle analysis.  Disputed to the extent plaintiffs indicate that drying distillers grains causes a penalty under the LCFS.  Production of co-products like distillers grains generates a credit to the lifecycle emissions, regardless of whether the grains are dried.<br><br>*See* Scheible Decl. at ¶ 34. |
| 30. | The LCFS regulation does not take into account when an ethanol production facility entered operation or began construction.<br><br>*See* FSOR at 11, 746-47 | Undisputed. |

16

| | PLAINTIFF'S UNDISPUTED FACTS AND EVIDENCE | DEFENDANTS' RESPONSE AND EVIDENCE |
|---|---|---|
| 31. | The LCFS regulation does not provide market security for corn ethanol and does not "protect investments in fuel production technologies" based on when the investment was made.<br><br>*See* FSOR at 746-47, 822. | Disputed.<br><br>The sections of the FSOR cited by plaintiffs do not establish the fact they contend is undisputed.<br><br>The first part of plaintiffs "fact" states that "The LCFS regulation does not provide market security for corn ethanol…." The FSOR does not say one way or the other whether the LCFS does or does not, and further, the FSOR only speaks of the RFS2 providing "market security for [multiple] biofuels in aggregate."<br><br>*See* RJN Exh. D, FSOR at 822 ("The California LCFS does not affect the volumes of corn ethanol, biodiesel, cellulosic and other advanced biofuels mandated under the federal Renewable Fuels Standard. The Renewable Fuel Standard volume mandates guarantee market security for these biofuels in aggregate. That is, additional volumes of advanced biofuels can be credited towards corn to ethanol volumes. The California LCFS only provides an additional incentive to produce biofuels for the California market with the lowest possible carbon intensity.").<br><br>See also *id.* at 825 ("The LCFS is structure to provide corn ethanol producers with a transition period in which to develop lower carbon fuels to market").<br><br>The second part of plaintiffs "fact" states that the LCFS "does not 'protect  investments in fuel production technologies' based on when the investment was made." The relevant section of the FSOR states that "The LCFS does not contain any provisions that protect investments in fuel production technologies *by locking in carbon intensity values*." FSOR at 746 (emphasis added).<br><br>(Continued …) |

17

| | PLAINTIFF'S UNDISPUTED FACTS AND EVIDENCE | DEFENDANTS' RESPONSE AND EVIDENCE |
|---|---|---|
| | | 31. (Cont.)<br><br>ARB made this statement in response to a commentor that stated, in relevant part, "To provide certainty for investors so that the necessary *investments in advanced biofuels* will be made, the regulations  should specifically state that CI values are to be grandfathered for the 15 to 20 year life of a project."  FSOR at 745 (emphasis added).<br><br>"Any inferences drawn from the underlying facts must be viewed in a light most favorable to the party opposing the motion."  *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).<br><br>See RJN Exh. D, FSOR at 745-46, 822, 825. |
| 32. | According to CARB, "GHG emission reductions by the LCFS alone will not result in significant climate change."<br><br>*See* FSOR at 342. | Undisputed that plaintiffs have accurately quoted an excerpt of the FSOR.  However, defendants object to the partial quote is misleading.  The full quote of ARB's statement in response to comment is as follows:<br><br>"ARB recognizes that GHG emission reductions by the LCFS alone will not result in significant climate change. As discussed in Chapter I of the Staff Report (ES-35 to ES-39) and in the Scoping Plan, California is the fifth largest emitter of greenhouse gases on the planet and contributes approximately two percent of the total worldwide GHG emissions.<br><br>(Continued…) |

| PLAINTIFF'S UNDISPUTED FACTS AND EVIDENCE | DEFENDANTS' RESPONSE AND EVIDENCE |
|---|---|
| | 32. (Cont.) <br><br> The LCFS program is only one of several GHG reduction measures that comprise California's Climate Change program discussed in the Scoping Plan. The Scoping Plan identifies a comprehensive and coordinated set of GHG emission reduction strategies throughout the economy.  The LCFS program is expected to reduce GHG emissions approximately 16 million metric tons per year in California, contributing approximately 10 percent of California's expected GHG reductions identified in the Scoping Plan to achieve the long term goal of reducing California's GHG emissions by 80 percent by 2050. California's strategy is consistent with the recommendations of the IPCC, which points out that in order to avoid a future catastrophic increase in global mean surface temperature, GHG emission reductions should apply to all major GHG emitters globally and should not rely on a single policy. Indeed, as discussed in the Scoping Plan, California recognizes that, despite any uncertainties in our understanding of climate change, the steady buildup of GHGs in the atmosphere poses significant long-term environmental and public health risks." <br><br> See RJN Exh. D, FSOR at 342. |

ARB'S STATEMENT OF DISPUTED FACTS IN OPP. TO RMFU MSJ  (No. 1:09-CV-02234-LJO-DLB)

| | PLAINTIFF'S UNDISPUTED FACTS AND EVIDENCE | DEFENDANTS' RESPONSE AND EVIDENCE |
|---|---|---|
| 33. | Under the LCFS regulation, carbon intensity scores for corn ethanol are based in part on CARB's view that expanding acreage for agricultural production supports increased biofuel production, which CARB believes releases GHG emissions.<br><br>*See* ISOR at IV-1, IV-17;  FSOR at 633 ("Biofuel-induced land-use change can occur as a primary impact (land is converted directly to biofuel crops), a secondary impact (biofuel crops displace other crops, which must be cultivated elsewhere), a tertiary impact (displaced crops displace other crops), and so on."). | Undisputed that ARB holds the view shared by many that land-use effects must be taken into account in a lifecycle analysis.<br><br>See Scheible Decl., at ¶¶ 14-25. |

ARB'S STATEMENT OF DISPUTED FACTS IN OPP. TO RMFU MSJ  (No. 1:09-CV-02234-LJO-DLB)

| | PLAINTIFF'S UNDISPUTED FACTS AND EVIDENCE | DEFENDANTS' RESPONSE AND EVIDENCE |
|---|---|---|
| 34. | One purpose and effect of the LCFS regulation is to attract more non-corn-starch ethanol to California than would occur under the RFS2 regulation while "transition[ing] away" from corn ethanol to an extent that transition would not occur under federal law and regulation.<br><br>*See* FSOR at 407, 474. | Disputed.<br><br>One of the purposes of the LCFS is to attract lower-carbon intensity fuels, of any type, including corn ethanol.  What <u>effect</u> the LCFS will have on corn ethanol is speculative, given that (a) the LCFS does not mandate or prohibit the use of any fuel, and (b) corn ethanol producers are already making efficiency improvements (for economic reasons) that will lead to lower carbon intensity values.<br><br>Facilities have the option of using the carbon intensity values from the relevant, specific pathway, or applying for an individualized pathway if they qualify pursuant to Method 2A or 2B in the LCFS.  Method 2A and 2b provide a means for any facility, including Midwest facilities, that can show their ethanol has lower lifecycle emissions than the applicable Table 6 value.<br><br>To date 44 Midwest corn ethanol facilities have registered for pathways in Table 6, with 25 facilities indicating they can produce ethanol with a carbon intensity lower than the 2010 baseline. In addition, 5 Midwestern corn facilities have applied under Method 2A and 2B with a total of 22 pathways all of which have tentatively been given a rating lower than the value for the 2010 baseline. Pathway list is at http://www.arb.ca.gov/fuels/lcfs/2a2b/121410pathways-sum.pdf<br><br>*See* 17 C.C.R. 95486(c) and (d); Scheible Decl. at ¶¶ 39, 42, 61-63, 67; RJN, Exh. H (ARB New Pathways, available at http://www.arb.ca.gov/fuels/lcfs/2a2b/2a-2b-apps.htm). |

21

| | PLAINTIFF'S UNDISPUTED FACTS AND EVIDENCE | DEFENDANTS' RESPONSE AND EVIDENCE |
|---|---|---|
| 35. | The LCFS regulation assigns carbon intensity scores to ethanol produced from sugar cane in Brazil that are more than 30 percent lower than the scores assigned to the Midwest corn ethanol pathway with the lowest carbon intensity score.<br><br>*See* 17 C.C.R. § 95486(b), Table 6. | Disputed.<br><br>Table 6 on which plaintiffs rely for this assertion is changing based on applications pursuant to Methods 2A and 2B by Midwest corn ethanol facilities for customized carbon intensity values, some of which have closed the gap.  There are now two published Midwest corn ethanol pathways with CI scores close or equal to a Brazilian pathway.<br><br>Furthermore, the ARB Board in Resolution 10-49 has directed staff to update the land use change and other indirect effects values in the Spring of 2011 or soon afterward. The update will consider modifications that reflect the Group 2 land use modeling conducted by Purdue University. Although the land use number has yet to be finalized and adopted via the rulemaking process, the expectation is that it will be lower than the current number.<br><br>See RJN Exh. G (Resolution 10-49); RJN, Exh. H (ARB New Pathways, available at http://www.arb.ca.gov/fuels/lcfs/2a2b/2a-2b-apps.htm). |
| 36. | The analysis of the impact of the LCFS regulation completed for CARB in the spring of 2009 predicted that the use of Brazilian sugar cane ethanol could equal that of California corn ethanol within three years, while sales of Midwest corn ethanol will drop to zero by 2017 or 2018.<br><br>*See* ISOR, Appendix E, at E-6 to E-7. | Disputed, irrelevant and requiring discovery.<br><br>ARB incorporates its Response (including citations to evidence) to Plaintiffs' Undisputed Fact No. 10 above. |

22

# DEFENDANTS' STATEMENT OF DISPUTED FACTS

Pursuant to Rule 56(a) and (c) of the Federal Rules of Civil Procedure and Local Rule 260(b), defendants respectfully submit their statement of disputed facts.

| | DEFENDANTS' DISPUTED FACTS | EVIDENCE |
|---|---|---|
| 1. | The compliance scenarios in the ISOR "are not intended to predict or forecast the actual combination of fuels and vehicles that will be used." | *See* RJN Exh. D, FSOR at 823; RJN Exh. C, ISOR Appendix E, at E-1 to E-8; Scheible Decl. at ¶ 66. |
| 2. | The compliance scenarios in the ISOR are "what if" exercises designed to show several possible ways in which compliance with the LCFS would be possible. | *See* RJN Exh. D, FSOR at 339 ("The compliance scenarios demonstrate compliance is possible, given what is currently known about the future availability of alternative fuels and vehicles."); RJN Exh. C, ISOR Appendix E, at E-1 to E-8; Scheible Decl. at ¶¶ 65-71. |
| 3. | The compliance scenarios in the ISOR were necessary for ARB staff to conduct economic, environmental and public health analyses required by California law. | *See* RJN Exh. D, FSOR at 366 ("Because the standard is performance based, in which the specific pathways chosen by fuel producers are uncertain, the [required environmental and public health] analysis was based on various compliance scenarios."); FSOR at 434 ("For *illustrative* purposes, we used eight *potential* compliance scenarios in the economic analysis.") (emphasis added).  *See also* Cal. Pub. Res. Code § 21000, *et. seq.* (CEQA) (requiring environmental analysis); Cal. Gov't Code § 11346.3 (requiring economic analysis);  RJN Exh. C,  ISOR Appendix E, at E-1 to E-8; Scheible Decl. at ¶ 65. |
| 4. | The compliance scenarios in the ISOR used only the "average Midwest corn ethanol" carbon intensity value. | RJN Exh. C, ISOR Appendix E, at E-1 to E-8; Scheible Decl. at ¶ 67. |

23

| | | DEFENDANTS' DISPUTED FACTS | EVIDENCE |
|---|---|---|---|
| | 5. | The "average Midwest corn ethanol" carbon intensity value is higher than five of the seven specific Midwest pathways for corn ethanol. | RJN Exh. C, ISOR Appendix E, at E-1 to E-8; 17 C.C.R. § 95486(b), Table 6. |
| | 6. | The range of carbon intensity values corresponding to existing corn ethanol plants includes four Midwest corn ethanol and four California corn ethanol pathways with carbon intensity values lower than the 2010 baseline California gasoline. | 17 C.C.R. § 95486(b), Table 6. |
| | 7. | Through the LCFS's mechanism for obtaining individualized carbon intensity ratings, several existing  Midwest corn ethanol facilities may currently use carbon intensity values  lower that the corresponding value from Table 6 as initially promulgated. | ARB RJN, Exhs. H and I; see also Scheible Decl. at ¶¶ 60-62. |
| | 8. | California adopted the LCFS to reduce greenhouse gas emissions by reducing the full fuel-cycle, carbon intensity of the transportation fuel pool used in California, and to reduce California's reliance on petroleum and thereby reduce the consequences of oil price shocks, create a lasting market for clean transportation technology, and stimulate the production and use of alternative, low-carbon fuels in California. | *See* 17 C.C.R. § 95480; RJN Exh. B, ISOR at ES-1; RJN Exh. E, Exec. Order S-01-07; RJN Exh. F, ARB Board Resolution 09-31, at p. 8. |
| | 9. | California's LCFS is designed to complement the federal RFS2. | *See* RJN Exh. B, ISOR at ES-5; Scheible Decl. at ¶¶ 12, **[75-84]**. |

| | DEFENDANTS' DISPUTED FACTS | EVIDENCE |
|---|---|---|
| 10. | The LCFS is designed to prevent air pollution by significantly reducing emissions of greenhouse gasses such as carbon dioxide, methane, nitrous oxide, and other greenhouse gas contributors. | 17 C.C.R. § 95480; RJN Exh. F, ARB Board Resolution 09-31, at p. 9; Scheible Decl. at ¶10. |
| 11. | The ARB Board found that the proposed LCFS regulation was necessary in order to protect the public health by substantially reducing greenhouse gas emissions from the full fuel lifecycle of transportation fuels in California. | RJN Exh. F, ARB Board Resolution 09-31, at p. 14. |
| 12. | The LCFS is more environmentally protective than RFS2, because it is estimated the LCFS will incentivize greater reductions in greenhouse gas emissions from the transportation fuels used in California. | RJN Exh. F, ARB Board Resolution 09-31, at p. 9; RJN Exh. B, ISOR, at ES-5. |
| 13. | At a publicly noticed meeting on June 21, 2007, the ARB Board took action approving development of the LCFS as an early action measure. | RJN Exh. M, ARB Public Meeting Agenda for June 21-22, 2007, at p. 2; RJN Exh. N, Staff Report: Proposed Early Actions to Mitigate Climate Change in California, dated April 20, 2007, at pp. 13-14. |
| 14. | In 2007, Members of both Houses of Congress introduced bills proposing a national LCFS patterned after California's announced program. | H.R. 2215 (Inslee); H.R. 2809 (Inslee); S. 1324 (Obama); S. 2192 (Boxer); S. 1073 (Feinstein); S. 1297 (Boxer); see also RJN Exh. Z, Brent D. Yacobucci, CRS Report for Congress: A Low Carbon Fuel Standard: State and Federal Legislation and Regulations, dated December 23, 2008, at p. 9. |

| | DEFENDANTS' DISPUTED FACTS | EVIDENCE |
|---|---|---|
| 15. | At least one of the bills proposed in Congress targeted the same level of reductions in lifecycle greenhouse gas emissions for 2020 as California. | S. 1324 (Obama). |
| 16. | Researchers at the Congressional Research Service concluded that Congress lifted a key definition for EISA (the definition of "lifecycle greenhouse gas emissions") from California's work on the LCFS. | RJN Exh. Y, Memorandum from Brent Yacobucci and Beth A. Roberts, Congressional Research Service to Hon. Ken Salazar re: Legislative History of Lifecycle Greenhouse Gas Definition in Energy Independence and Security Act of 2007, dated October 27, 2008, at p. 1. |
| 17. | Plaintiff Renewable Fuels Association presented arguments that California's LCFS regulation is preempted by EISA  to the U.S. EPA in the rulemaking for RFS2, including the argument that "under a low carbon fuel standard, States are making judgment calls that Congress expressly placed in the hands of EPA." | RJN Exh. S, Comments of Renewable Fuels Association re REGULATION OF FUELS AND FUEL ADDITIVES: CHANGES TO RENEWABLE FUEL STANDARD PROGRAM; NOTICE OF PROPOSED RULEMAKING, 74 FED. REG. 24,904 (MAY 26, 2009), submitted September 25, 2009 (hereafter "RFA 9/29/09 Comments"). |
| 18. | U.S. EPA cites the reduction in foreign oil, not foreign ethanol, as the energy security goal of RFS2. | RJN Exh. P, 75 FR 14670-01 (March 26, 2010), at pp. 14839-14842. |
| 19. | In its comments during the U.S. EPA's rulemaking for RFS2, plaintiffs Renewable Fuels Association stated that: "The purpose of the EISA was to increase the use of renewable fuels to reduce this country's dependence on foreign oil." | RJN Exh. S, RFA 9/29/09 Comments, at p. 3; see also id. at p. 1 ("The RFS program is a vital part of the energy policy of this country as it moves toward less dependence on foreign oil."); id. at p. 3 ("The purpose of the EISA was to increase the use of renewable fuels to reduce this country's dependence on foreign oil."). |
| 20. | The LCFS is designed to reduce California's dependence on petroleum  to help protect California's economy from the consequences of oil price shocks. | RJN Exh. E, Executive Order S-01-07;  RJN Exh. B, ISOR, at p. ES-01; Scheible Decl. at ¶ 10. |

26

| | DEFENDANTS' DISPUTED FACTS | EVIDENCE |
|---|---|---|
| 21. | On March 9, 2007, the United States and Brazil signed an agreement to (1) advance research and development bilaterally, (2) help build domestic biofuels industries in third countries, and (3) work multilaterally to advance the global development of biofuels. | RJN Exh. X, "Memorandum of Understanding Between the United States and Brazil to Advance Cooperation on Biofuels," U.S. Department of State, Office of the Spokesman, March 9,2007, available at [http://www.state.gov/r/pa/prs/ps/2007/mar/81607.htm]. |
| 22. | USEPA stated in its rulemaking: "It should be noted, however, that there is no specific 'corn ethanol' mandated volume, and that any advanced biofuel produced above and beyond what is required for the advanced biofuel requirements could reduce the amount of corn ethanol needed to meet the total renewable fuel standard." | RJN Exh. P, 75 FR 14670-01 (March 26, 2010), at p. 14723. |
| 23. | LCFS does not require a 20 percent reduction of greenhouse gases in order to be sold in California.  Any fuel can be sold in California. | Scheible Decl. at ¶¶ 12, 79-80. |
| 24. | It is up to the California fuel provider to provide a mix of fuels, augmented by any credits accrued or purchased, that meets its compliance obligation for that year.  A provider could buy a small volume of very low carbon fuel at a higher price and then buy a higher carbon fuel at a lower price to meet its overall obligation. | Scheible Decl. at ¶¶ 29-31. |

27

| | DEFENDANTS' DISPUTED FACTS | EVIDENCE |
|---|---|---|
| 25. | In response to comments regarding the exemption for existing corn ethanol plants, U.S. EPA stated that it:<br><br>"believes that the Act should not be interpreted as allowing unlimited expansion of exempt facilities for an indefinite time period, with all volumes exempt, as suggested by the commenter. Such an approach would likely lead to a substantial increase in production of fuel that is not subject to any GHG limitations, which EPA does not believe would be consistent with the objectives of the Act." | RJN Exh. P, 75 FR 14670-01 (March 26, 2010), at p. 14689. |
| 26. | Plaintiff Growth Energy asserted in comments that U.S. EPA had the authority under RFS to adopt a credit program for corn ethanol plants that reduce emissions beyond the 20% threshold for new plants. | RJN Exh. T, Growth Energy Comments on EPA RFS2 Rulemaking, at p. 18. |
| 27. | States influence levels of ethanol consumption though laws concerning the blending of ethanol with gasoline. | *See, e.g.,*<br><br>A.R.S. § 41-2123 (Area A's Sale of Gasoline: Oxygenate Content)<br><br>C.R.S.A. § 25-7-133.5<br><br>F.S.A. § 526.06 (Sale of Liquid Fuels) |

28

| | DEFENDANTS' DISPUTED FACTS | EVIDENCE |
|---|---|---|
| 28. | States influence levels of ethanol consumption through the decision to adopt or not adopt flexible fuel programs. | *See, e.g.,*<br><br>Ga. Code Ann. § 50-8-170 (Legislative Finding and Declaration; E85 Projects, Grant Program Rules and Regulations)<br><br>H.R.S. § 196-9 (Energy Efficiency and Environmental Standards for State Facilities, Motor Vehicles and Transportation Fuels) |
| 29. | States influence levels of ethanol consumption through the use of selective tax incentives. | *See, e.g.,*<br><br>K.R.S. § 141.4244 (Non-refundable credit for production of cellulosic ethanol)<br><br>MD Code Tax – General § 10-726 (Cellulosic Ethanol Technology Tax Credit)<br><br>N.C.G.S.A. § 143-58.4 (Energy Credit Banking and Selling Program). |
| 30. | The LCFS does not apply to transportation fuel sold, supplied or offered for sale outside of California. | Title 17, Cal. Code Regs., § 95840.1(a) |
| 31. | In discussing its consideration of indirect land use in the lifecycle analysis for GHG emissions under the Renewable Fuel Program, U.S. EPA has stated: "Considering international emissions in determining the lifecycle GHG emissions of the domestically-produced or imported fuel does not change the fact that the actual regulation of the product involves its use solely inside the U.S." | 75 Fed. Reg. 14669, 14766.<br><br>Attached as Exhibit P to Defendants' RJN. |

ARB'S STATEMENT OF DISPUTED FACTS IN OPP. TO RMFU MSJ  (No. 1:09-CV-02234-LJO-DLB)

| | DEFENDANTS' DISPUTED FACTS | EVIDENCE |
|---|---|---|
| 32. | Lifecycle analysis is a widely accepted technique for categorizing fuels according to their total GHG emissions.  In addition to its use in the LCFS and RFS2 rulemakings, lifecycle analysis is widely used elsewhere in the world. | http://www.iso.org/iso/catalogue_detail?csnumber=37456; http://ec.europa.eu/environment/ipp/pdf/eipro_report.pdf http://lct.jrc.ec.europa.eu/; http://www.transportation.anl.gov/modeling_simulation/ GREET/publications.html; <br><br> http://www.epa.gov/nrmrl/lcaccess/. http://www.ghgenius.ca/; http://www.eenews.net/public/25/12072/features/documents/2009/08/10/document_cw_02.pdf Scheible Decl. at ¶ 14; Spatari Decl. at ¶ 7-8; Babcock Decl. at ¶ 6-7. |
| 33. | When EPA adopted the lifecycle approach to regulation of biofuel emissions, NPRA commended EPA "for its scientific approach and diligence in examining the full gamut of potential impacts from the production and use of various biofuels." | NPRA RFS2 comments, p. 2; *see also* p. 21 Exhibit U to Defendants RJN. |
| 34. | For corn ethanol, the transportation factor in the carbon intensity value actually provides a benefit to Midwest produced ethanol compared to California produced ethanol because the emissions are greater for transportation of the finished product from the Midwest than transportation of the raw material from the Midwest for production in California ethanol plants. | Scheible Decl. ¶ 45. ; GREET model |
| 35. | ARB has stated that it is aware that measures similar to the LCFS are under consideration at the regional, national, and international levels. | FSOR at 715, attached as Exhibit U to the Defendants' RJN. |

ARB'S STATEMENT OF DISPUTED FACTS IN OPP. TO RMFU MSJ  (No. 1:09-CV-02234-LJO-DLB)

1    Dated:  December 17, 2010                          Respectfully submitted,

2                                                       EDMUND G. BROWN JR.
                                                        Attorney General of California
3                                                       ROBERT W. BYRNE
                                                        Supervising Deputy Attorney General
4

5                                                         __/s/ David A. Zonana_____
6                                                       DAVID A. ZONANA
                                                        Deputy Attorney General
7                                                       *Attorneys for Defendants*
                                                        *James N. Goldstene et al.*
8
                                                        NATURAL RESOURCES DEFENSE
9                                                       COUNCIL

10

11                                                      By:    /s/ David Pettit_____
                                                               DAVID PETTIT
12
                                                        Attorneys for Defendant-Intervenor,
13                                                      Natural Resources Defense Council, Inc.

14                                                      SIERRA CLUB

15

16                                                      By:    /s/ Pat Gallagher_____
                                                               PAT GALLAGHER
17
                                                        Attorney for Defendant-Intervenor,
18                                                      Sierra Club

19
                                                        CONSERVATION LAW FOUNDATION
20

21
                                                        By:    /s/ Jane West_____
22                                                             JANE WEST

23                                                      Attorney for Defendant-Intervenor,
                                                        Conservation Law Foundation
24
                                                        ENVIRONMENTAL DEFENSE FUND
25

26
                                                        By:    /s/ James T.B. Tripp_____
27                                                             JAMES T.B. TRIPP
                                                        Attorney for Defendant-Intervenor,
28                                                      Environmental Defense Fund

                                              31

1  SF2010400011
   20381822.doc
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ARB'S STATEMENT OF DISPUTED FACTS IN OPP. TO RMFU MSJ  (No. 1:09-CV-02234-LJO-DLB)