1  EDMUND G. BROWN JR.
   Attorney General of California
2  ROBERT W. BYRNE
   Supervising Deputy Attorney General
3  GAVIN G. MCCABE, State Bar No. 130864
   MARK POOLE, State Bar No. 194520
4  DAVID A. ZONANA, State Bar No. 196029
   M. ELAINE MECKENSTOCK, State Bar No. 268861
5  Deputy Attorneys General
     455 Golden Gate Avenue, Suite 11000
6    San Francisco, CA  94102-7004
     Telephone:  (415) 703-5894
7    Fax:  (415) 703-5480
     E-mail:  Elaine.Meckenstock@doj.ca.gov
8  *Attorneys for Defendant Goldstene*

9               IN THE UNITED STATES DISTRICT COURT

10             FOR THE EASTERN DISTRICT OF CALIFORNIA

11                      FRESNO DIVISION

12

13

14  **ROCKY MOUNTAIN FARMERS**          LEAD CASE No.
    **UNION, et al.,**                  1:09-CV-02234-LJO-DLB

15                                      *Consolidated With* Case No.:
16                          Plaintiffs,  1:10-CV00163-LJO-DLB

17       v.                             **DEFENDANTS' MEMORANDUM OF**
                                        **POINTS AND AUTHORITIES IN**
18  **JAMES GOLDSTENE, et al.,**        **OPPOSITION TO PLAINTIFFS'**
                                        **MOTION FOR PRELIMINARY**
19                          Defendants. **INJUNCTION**

20  And Related Consolidated Action.

21  -----------------------------------------  Date:      February 23, 2011
                                             Time:       8:30 a.m.
22  **NATIONAL PETROCHEMICAL &**             Courtroom:  Four
    **REFINERS ASSOCIATION, *et al.*,**      Judge       The Honorable Lawrence J.
23                                                       O'Neill
                            Plaintiffs,      Trial Date:  TBD
24
                                            Action Filed:  12/23/2009
25       v.

26  **JAMES GOLDSTENE, *et al.*,**

27                          Defendants.

28

1

# TABLE OF CONTENTS

2

Page

3    INTRODUCTION ................................................................................................................ 1

4    BACKGROUND AND PROCEDURAL HISTORY ......................................................... 2

5    I.    The Air Resources Board Initiated The LCFS Rulemaking To Further The
           Goals of The Global Warming Solutions Act of 2006 ............................................ 2

6    II.   The LCFS is a Flexible Market-Based Regulation. .............................................. 2

     III.  Plaintiffs Initiated This Action in 2009 .................................................................. 4

7    ARGUMENT ..................................................................................................................... 4

8    I.    A Preliminary Injunction is an Extraordinary and Drastic Remedy. ..................... 4

9    II.   PLAINTIFFS HAVE NOT DEMONSTRATED A LIKELIHOOD OF
           SUCCESS ON THE MERITS OR RAISED "SERIOUS QUESTIONS" AS
10         TO THE MERITS OF THEIR CLAIMS. ................................................................ 5

11   III.  PLAINTIFFS HAVE NOT SHOWN A LIKELIHOOD OF
           IRREPARABLE INJURY IN THE ABSENCE OF A PRELIMINARY
           INJUNCTION. ......................................................................................................... 6

12         A.    The Presumption of Irreparable Harm Does Not Apply Where The
13               Alleged Injury From a Constitutional Violation is Purely Economic ......... 6

           B.    Plaintiffs Will Not Suffer Economic Injury If The LCFS Continues
14               In Effect .................................................................................................... 7

15               1.    Plaintiffs' Allegation That the Adoption of the LCFS
                       Reduced the Value of Their Investments is Inconsistent
16                     With the Facts and Speculative. ................................................... 7

17                     a.    Harden's Assumptions Are Contradictory ......................... 8

                       b.    Harden's Analysis Contradicts the Facts. .......................... 8

18                     c.    Harden Presumes a Market Response to the
19                           Compliance Scenarios Without Evidence. ......................... 9

                       d.    The Uncertainty of Ethanol Markets Adds to the
20                           Speculative Nature of Harden's Analysis. ...................... 12

21               2.    Plaintiffs' Cannot Demonstrate a Likelihood of Lost
                       Income. ....................................................................................... 13

22               3.    Restricted Financing ................................................................... 16

     IV.   The Balance of Hardships Tips in Favor of Defendant ....................................... 17

23   V.    The Public Interest Is Best Served by Denying the Injunction. ........................... 20

24   CONCLUSION ............................................................................................................... 24

25

26

27

28

i

1

# TABLE OF AUTHORITIES

2

<u>Page</u>

3

<span style="font-variant: small-caps;">Cases</span>

4

5

*ACLU v. Johnson*
   194 F.3d 1149 (10th Cir. 1999).............................................................................. 7

6

*Alliance for Wild Rockies v. Cottrell*
   622 F.3d 1045,1052 (9th Cir. 2010)..................................................................... 4

7

8

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*
   559 F.3d 1046 (9th Cir. 2009)............................................................................. 20

9

*American Library Association v. Pataki*
   969 F. Supp. 160 (S.D.N.Y. 1997)........................................................................ 6

10

11

*Caribbean Marine Services Co., Inc. v. Baldridge*
   844 F.2d 668 (9th Cir. 1988)............................................................................... 18

12

13

*Coal. for Econ. Equity v. Wilson*
   122 F.3d 718 (9th Cir. 1977)............................................................................... 18

14

*Colo. River Indian Tribes v. Town of Parker*
   776 F.2d 846 (9th Cir. 1985)............................................................................... 16

15

16

*Dymo Indus., Inc. v. Tapewriter, Inc.*
   326 F.2d 141 (9th Cir. 1964)................................................................................. 5

17

18

*Gen. Elec. Co. v. Am. Wholesale Co.*
   235 F.2d 606 (7th Cir. 1956)................................................................................. 5

19

*Golden Gate Restaurant Ass'n v. City and County of San Francisco*
   512 F.3d 1112 (9th Cir. 2008)....................................................................... 16, 23

20

21

*In re Excel Innovations, Inc.*
   502 F.3d 1086 (9th Cir. 2007)............................................................................... 7

22

23

*Int'l Modelers' & Allied Workers' Local Union No. 164 v. Nelson*
   799 F.2d 547 (9th Cir. 1986)................................................................................. 5

24

*Lands Council v. McNair*
   537 F.3d 981 (9th Cir. 2008) (en banc)............................................................... 21

25

26

*Mass. v. E.P.A.*
   549 U.S. 497 (2007)............................................................................................. 18

27

28

ii

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3

*Mayview Corp. v. Rodstein*

4
   480 F.2d 714 (9th Cir. 1973)............................................................................... 5

5
*Midgett v. Tri-County Metropolitan Transp. Dist. of Oregon*
   254 F.3d 846 (9th Cir. 2001)............................................................................... 5

6

7
*Monterey Mech. Co. v. Wilson*
   125 F.3d 702 (9th Cir. 1997)............................................................................... 7

8
*Morales v. Trans World Airlines, Inc.*
   504 U.S. 374 (1992)............................................................................................ 7

9

10
*Munaf v. Geren*
   553 U.S. 674 (2008)............................................................................................ 5

11
*Ne. Fla. Chapter of Ass'n of Gen. Contractors v. Jacksonville, Fla.*

12
   896 F.2d 1283 (11th Cir. 1990)........................................................................... 6

13
*Nelson v. NASA*
   530 F.3d 865 (9th Cir. 2008)............................................................................... 6

14

15
*Newsom v. Albemarle Cnty Sch. Bd.*
   354 F.3d 249 (4th Cir. 2003)............................................................................. 21

16
*Oakland Tribune, Inc. v. Chronicle Publ'g Co., Inc.*

17
   762 F.2d 1374 (9th Cir. 1985)............................................................................. 9

18
*Preminger v. Principi*
   422 F.3d 815 (9th Cir. 2005)............................................................................. 21

19
*Preston v. Thompson*

20
   589 F.2d 300 (7th Cir. 1978)............................................................................. 21

21
*Pub. Serv. Co. of N.H. v. Town of W. Newbury*

22
   835 F.2d 380 (1st Cir. 1987)............................................................................... 6

23
*Stormans, Inc. v. Selecky*
   586 F.3d 1109 (9th Cir. 2009)....................................................................... 5, 23

24

25
*Trans World Airlines, Inc. v. Mattox*
   897 F.2d 773 (5th Cir. 1990)............................................................................... 6

26
*Wash. Utils. & Transp. Com'n v. F.C.C.*

27
   513 F.2d 1142 (9th Cir. 1975), *overruled on other grounds by Nevada. v. Burford*, 918
   F.2d 854 (9th Cir. 1990)............................................................................. 10, 12

28

iii

1
2

### TABLE OF AUTHORITIES
#### (continued)

**Page**

3   *West Lynn Creamery, Inc. v. Healy*
4       512 U.S. 186 (1994) ............................................................................ 21

5   *Winter v. Natural Resources Defense Council, Inc.*
    129 S. Ct. 365 (2008) ..................................................................... 4, 5

6   **STATUTES**

7   42 United States Code

8
9   § 7545(o) ............................................................................................ 9

10  CAL. CODE REGS. Title 17

11  §§ 95480-95490 ................................................................................... 2
    § 95482 ..................................................................................... 2, 3, 4
12  § 95484(b)(3) ....................................................................................... 4
    § 95486 ............................................................................... 3, 11, 14
13  § 95486(c) and (d) ...................................................................... 3, 12

14  CAL. GOV'T CODE

15  § 11346.3 .......................................................................................... 10

16  CAL. HEALTH & SAFETY CODE

17  §§ 38500-38599 ................................................................................... 2
18  § 38501(a) ......................................................................................... 20
    § 38501(b) ......................................................................................... 20
19  § 38501(c) ......................................................................................... 20

20  CAL. PUB. RES. CODE

21  §§ 21000-21177 ................................................................................ 10

22  **OTHER AUTHORITIES**

23  75 Fed. Reg. 14746 ....................................................................... 9, 12
24  75 Fed. Reg. 14751 ........................................................................... 19
    75 Fed. Reg. 14761 ........................................................................... 15
25  75 Fed Reg. 14816 ........................................................................... 15

26  Executive Order S-010-07 .................................................................. 2

27
28

**INTRODUCTION**

Eighteen months after they allege their serious injuries began and ten months after they filed their complaint, plaintiffs Rocky Mountain Farmers Union et al. (hereafter "plaintiffs") now ask the court for the extraordinary remedy of a preliminary injunction enjoining enforcement of the California Low Carbon Fuel Standard ("the LCFS") until this matter is decided on the merits. Plaintiffs' delays reveal that their alleged irreparable injuries are manufactured and that the preliminary injunction should be denied.

To obtain a preliminary injunction, plaintiffs must show a likelihood of irreparable injury in the absence of the preliminary injunction. Plaintiffs erroneously invoke a presumption of irreparable harm to try to surmount this obstacle. That presumption, however, does not apply when, as here, the alleged injury is purely economic. Perhaps realizing they must actually demonstrate imminent, irreparable injury, plaintiffs submitted declarations purporting to establish three types of economic harm – reduced business value, lost income and restricted financing. But, plaintiffs fail to identify a single plant that has lost value or been unable to obtain financing as a result of the LCFS, despite claiming "the market" is reacting to actions ARB took in 2009 and early 2010. Nor can plaintiffs show a likelihood that in 2011 or 2012 the LCFS will cause a decline in the national price of ethanol. Rather, plaintiffs' "experts" ignore undisputed facts, misinterpret the LCFS and disregard its flexible nature, misconstrue ARB documents, offer economically flawed arguments and engage in rank speculation. As evidenced by the declarations of Michael Scheible and Bruce Babcock, and documents attached to a Request for Judicial Notice submitted by defendants, plaintiffs cannot demonstrate a likelihood of injury.

Moreover, plaintiffs cannot demonstrate – as they must – that they are likely to succeed on the merits, that the balance of equities tips in their favor or that a preliminary injunction of the LCFS would be in the public interest. As presented in defendants' Cross-Motion for Summary Judgment and in their Opposition to Plaintiffs' Motion for Summary Judgment, filed herewith, plaintiffs are not likely to succeed on the merits. Further, in this case, the equities tip decidedly in defendants' favor. The harm to defendants from enjoining an environmental regulation is cognizable and significant. Emissions that would have been avoided will flow into the

1

atmosphere and remain there for years, contributing to climate change.  Further, a delay in the start of the program endangers key features of this multiyear program, including employing a gradual start and providing incentives for investment in low carbon fuels that could take years to bring to market.  Finally, in addition to a presumption of public interest where declared in the form of a statute, here, the well-established public interest in preventing irreparable environmental impacts, such as greenhouse gas emissions.

Because plaintiffs have failed to make the requisite clear showing as to all four of the elements in the test for a preliminary injunction, the motion should be denied.

## BACKGROUND AND PROCEDURAL HISTORY

**I.   THE AIR RESOURCES BOARD INITIATED THE LCFS RULEMAKING TO FURTHER THE GOALS OF THE GLOBAL WARMING SOLUTIONS ACT OF 2006.**

Recognizing the serious threat posed by global warming, the California Legislature enacted the Global Warming Solutions Act of 2006, also known as Assembly Bill 32 ("AB 32").  *See* CAL. HEALTH & SAFETY CODE §§ 38500-38599.  AB 32 requires the California Air Resources Board ("ARB") to adopt regulations that reduce California's greenhouse gas ("GHG") emissions to 1990 levels by 2020.  *Id.* at §§ 33550, 38562(b).  In 2007, Governor Schwarzenegger signed Executive Order S-010-07 which, among other things, directed ARB to "determine if an LCFS [Low Carbon Fuel Standard] can be adopted as a discrete early action measure pursuant to AB 32."  *See* Defendants' Request for Judicial Notice ("RJN"), Exh. E.[1]  ARB initiated the LCFS rulemaking in June of 2007, and, after extensive public comment and analysis, the LCFS regulation was finalized in two phases, on January 12, 2010 and April 15, 2010.  CAL. CODE REGS. tit. 17, §§ 95480-95490 (2010) (hereafter "LCFS Section").

**II.   THE LCFS IS A FLEXIBLE MARKET-BASED REGULATION.**

The LCFS is a market-based performance standard that sets a maximum, average carbon intensity (CI) target for California's transportation fuels in the aggregate for each year beginning in 2011 and continuing through 2020.  LCFS Section 95482.  Under the LCFS, the average

---

[1] Defendants Request for Judicial Notice covers all pending motions in these consolidated actions.

2

carbon intensity of California's total pool of transportation fuels must decline each year, ultimately reaching a 10 percent carbon intensity reduction in 2020.  LCFS Section 95482; *see also* Declaration of Michael Scheible in Support of Defendant's Opposition to Plaintiffs' Motion for Preliminary Injunction (hereafter "Scheible Decl.") at ¶¶ 28-29.  Because transportation fuels are a major source of GHG emissions for California, that 10 percent reduction represents a significant contribution toward the goals of AB 32.  Scheible Decl., at ¶¶ 8-10.

The LCFS is designed to allow the market to determine the composition of California's transportation fuels based on the carbon intensity target for a given year.  Scheible Decl., at ¶ 33.  Because the carbon intensity target represents the aggregate of all fuels, some individual fuels may have higher or lower carbon intensities than the target.  *Id.* at ¶ 31.  Fuels with CIs higher than the target generate deficits; fuels with CIs lower than the target generate credits.  *Id.* at ¶ 29.  The LCFS allows regulated parties to trade credits, so that if one refiner or blender secures a lot of low carbon fuel, it may sell its credits (over the target) to other refiners or blenders who may not have reached the target with their own fuels.  *Id.* at ¶ 30.  This allows for substantial flexibility among the regulated parties, while achieving the statewide carbon intensity target and desired reductions in GHG emissions.  *Id.* at ¶ 31.

Consistent with scientific findings, the carbon intensity of a given transportation fuel is the lifecycle GHG emissions associated with that fuel.  Lifecycle emissions include all stages of a fuel's production as well as the combustion of the fuel.  *See* Scheible Decl., at ¶¶ 14-15.  As promulgated in early 2010, the LCFS included carbon intensity values for a number of fuel "pathways."  LCFS Section 95486 (Table 6); *see also* Scheible Decl., at ¶¶34-38.  Each pathway represents a different calculation of lifecycle emissions, based on production of the feedstock (*e.g.,* corn or sugarcane), energy sources used during refining, transportation of both feedstocks and fuels, and production processes and efficiencies, among other factors.  *Id.*  Importantly, the LCFS permits fuel producers, such as ethanol plants, to apply to add new pathways to the LCFS.  LCFS Section  95486(c) and (d) (Methods 2a and 2b); *see also* Scheible Decl., at ¶¶ 57-64.  In

3

1   fact, many fuel producers, including a number of corn ethanol producers from the Midwest, have

2   done so.  *Id.*; *see also* RJN, Exh. H (ARB New Pathways).

3   **III.   PLAINTIFFS INITIATED THIS ACTION IN 2009.**

4        Plaintiffs brought this action on December 23, 2009, prior to final enactment of the

5   regulations.  *See* Plaintiffs' Original Complaint.[2]  During most of the twelve months this litigation

6   has been pending, the LCFS has been operative, with 2010 being a "reporting" year.  Thus,

7   during 2010, the LCFS required regulated parties (suppliers of transportation fuels in California)

8   to track and report the carbon intensity of the fuels they sell in California.  LCFS Section 95482.

9   Starting January 1, 2011, and for each year thereafter, in addition to reporting, regulated parties

10  must meet the average carbon intensity requirements in the regulation using the flexible tools

11  available to them.  *Id.* Notably, for purposes of this motion, regulated parties that have a deficit of

12  less than 10 percent of their obligation at the end of 2011 have the option of carrying that deficit

13  over into 2012, without penalty.  LCFS Section 95484(b)(3).

14                                   **ARGUMENT**

15       Plaintiffs allege that the LCFS violates the dormant Commerce Clause and the Supremacy

16  Clause and they request the Court to enjoin the LCFS until those claims are adjudicated on the

17  merits.  For the reasons discussed below, plaintiffs have not demonstrated that a preliminary

18  injunction is warranted.  Thus, their motion should be denied.

19  **I.   A PRELIMINARY INJUNCTION IS AN EXTRAORDINARY AND DRASTIC REMEDY.**

20       To obtain a preliminary injunction, plaintiffs must show a likelihood of irreparable injury in

21  the absence of the preliminary injunction and that the preliminary injunction is in the public

22  interest.  *Winter v. Natural Resources Defense Council, Inc.*, 129 S. Ct. 365, 374 (2008).  In the

23  Ninth Circuit, Plaintiffs must also show either that the balance of the equities tips in their favor

24  and that they are likely to succeed on the merits,  or that they have raised serious questions as to

25  the merits of their claims and that the balance of equities tips sharply in their favor.  *Alliance for*

26  *Wild Rockies v. Cottrell*, 622 F.3d 1045,1052 (9th Cir. 2010).

27  ─────────────
         [2] On January 28, 2010, plaintiffs filed a Second Amended Compliant for Declaratory and
    Injunctive Relief (hereafter "RMFU Compl."), which is the operative complaint.

28

                                        4

1   "A preliminary injunction is an 'extraordinary and drastic remedy.'"  *Munaf v. Geren*, 553

2   U.S. 674, 689 (2008).  Moreover, a preliminary injunction "may only be awarded upon a clear

3   showing that the plaintiff is entitled to such relief."  *Winter*, 129 S. Ct. at 376.  Plaintiffs have not

4   met that burden.  In this case, plaintiffs' showing also must overcome the specific restraint

5   required of a federal court when it is asked to enjoin a non-federal government agency.  *See*

6   *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009); *Midgett v. Tri-County*

7   *Metropolitan Transp. Dist. of Oregon*, 254 F.3d 846, 851 (9th Cir. 2001).

8   In addition, "[i]n deciding a motion for a preliminary injunction, the district court 'is not

9   bound to decide . . . disputed questions of fact.'"  *Int'l Modelers' & Allied Workers' Local Union*

10  *No. 164 v. Nelson*, 799 F.2d 547, 551 (9th Cir. 1986) (quoting *Dymo Indus., Inc. v. Tapewriter,*

11  *Inc.*, 326 F.2d 141, 143 (9th Cir. 1964)).  Rather, in the presence of such crucial, disputed facts,

12  the court should deny the preliminary injunction and "the matter should proceed to trial on the

13  merits."  *Mayview Corp. v. Rodstein*, 480 F.2d 714, 719 (9th Cir. 1973); *see also Gen. Elec. Co.*

14  *v. Am. Wholesale Co.*, 235 F.2d 606, 608 (7th Cir. 1956) ("An injunction pendente lite should not

15  issue where the parties are in serious dispute on conflicting question of fact.").  In the present

16  case, defendants dispute many of the material facts on which plaintiffs rely for the argument they

17  are likely to prevail on the merits.  *See* Defendants Response to Plaintiffs Separate Statement of

18  Material Facts Not Subject to Dispute; and Defendants' Separate Statement of Disputed Facts.

19  Perhaps more significantly, defendants vigorously dispute the entire "factual" basis for plaintiffs'

20  allegations of likely irreparable injury.  The Court should not grant such an extraordinary remedy

21  under such circumstances.

22  **II.    PLAINTIFFS HAVE NOT DEMONSTRATED A LIKELIHOOD OF SUCCESS**
        **ON THE MERITS OR RAISED "SERIOUS QUESTIONS" AS TO THE**
23      **MERITS OF THEIR CLAIMS.**

24  Defendants incorporates by reference the arguments in their Opposition to RMFU

25  Plaintiffs' Motion for Summary Judgment, and Defendants' Affirmative Motion for Summary

26  Judgment and the facts set forth in Defendants' Statement of Material Facts.  For the reasons

27

28

1    discussed therein, plaintiffs are unlikely to succeed on the merits of any of their claims.  On that

2    basis alone, the motion for preliminary injunction should be denied.

3    **III.   PLAINTIFFS HAVE NOT SHOWN A LIKELIHOOD OF IRREPARABLE**
        **INJURY IN THE ABSENCE OF A PRELIMINARY INJUNCTION.**

4

5         **A.    The Presumption of Irreparable Harm Does Not Apply Where The Alleged**
               **Injury From a Constitutional Violation is Purely Economic.**

6

7         Plaintiffs allege that because their claims involve constitutional rights, their claimed injury

8    is "presumptively irreparable."  Plaintiffs' Memorandum of Points and Authorities in Support of

9    Motion for Preliminary Injunction ("Plaintiffs' Br.") at 5-6.  The only cases plaintiffs cite in

10   support of this allegation involve substantial non-economic injuries, even when the cause of

11   action is based on the Supremacy Clause or the Commerce Clause.  Thus, in *Trans World*

12   *Airlines, Inc. v. Mattox*, 897 F.2d 773, 784 (5th Cir. 1990), the court presumed an irreparable

13   injury where a Supremacy Clause violation caused non-economic damage by depriving airlines of

14   a federally created right.  Similarly, in *American Library Association v. Pataki*, 969 F. Supp. 160,

15   168-69 (S.D.N.Y. 1997), the court expressed concern that state regulation of the Internet might

16   cause non-economic damage by "jeopardiz[ing] the growth of the nation – and in particular, the

17   national infrastructure of communications and trade -- as a whole."  Neither court held that all

18   Supremacy Clause claims or  Commerce Clause claims, in and of themselves, entitle plaintiffs to

19   a presumption of irreparable harm.

20        All the cases cited by plaintiffs are consistent with the general principle that courts refuse

21   "to presume irreparable injury from allegations of [constitutional] violations when . . . the primary

22   damage that plaintiff asserted [was] 'chiefly, if not completely, economic.'"  *Ne. Fla. Chapter of*

23   *Ass'n of Gen. Contractors v. Jacksonville, Fla.*, 896 F.2d 1283 (11th Cir. 1990); *see also Pub.*

24   *Serv. Co. of N.H. v. Town of W. Newbury*, 835 F.2d 380, 382 (1st Cir. 1987) ("[The presumption

25   of irreparable injury is] almost entirely restricted to cases involving alleged infringements of free

26   speech, association, privacy or other rights as to which temporary deprivation is viewed of such

27   qualitative importance as to be irremediable by any subsequent relief."); *Nelson v. NASA*, 530

28

6

F.3d 865 (9th Cir. 2008) (right to privacy case); *Monterey Mech. Co. v. Wilson*, 125 F.3d 702 (9th Cir. 1997) (race- and sex-discrimination case).[3]

All of the harms plaintiffs allege in their Motion for Preliminary Injunction and in their Second Amended Complaint are economic.  Plaintiffs' Br. at pp. 6-8; Plaintiffs' Compl. at ¶¶ 62-64.  Therefore, plaintiffs may not rest on a "presumption" of irreparable harm, they must actually demonstrate a likelihood of harm.[4]

**B.      Plaintiffs Will Not Suffer Economic Injury If The LCFS Continues In Effect.**

Plaintiffs allege that the LCFS has caused, and will continue to cause, irreparable harm to their members' ethanol businesses in the absence of a preliminary injunction.  Plaintiffs' Br. at pp. 6-8.  As demonstrated by the declarations submitted herewith, as well as defendants' objections to the declarations of plaintiffs' witnesses,[5] all of plaintiffs' purported harms are speculative.  "Speculative injury cannot be the basis for a finding of irreparable harm."  *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007).  *See also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 382 (1992) ("[A] conjectural injury cannot warrant equitable relief.").

**1.      Plaintiffs' Allegation That the Adoption of the LCFS Reduced the Value of Their Investments is Inconsistent With the Facts and Speculative.**

---

[3]  Plaintiffs other cases similarly do not support a presumptive injury in this case.  *See, e.g., ACLU v. Johnson*, 194 F.3d 1149, 1163 (10th Cir. 1999) (holding that "curtailment of . . . constitutionally protected *speech*" sufficed for irreparable injury) (emphasis added).

[4] The question of whether economic harm – when demonstrated – in an action against the state is "irreparable" is a separate question from whether harm may be presumed.  Here, the court need not reach the former issue, because plaintiffs' allegations of economic injury are speculative, hypothetical and seriously flawed.

[5] *See* Defendants' Objections to the Declarations of James M. Lyons, Robert M. Dinneen, Wesley Clark, Gerald A. Brian, Jesse David and Stuart H. Harden (filed concurrently herewith).  Defendants object to and move to strike substantial portions of plaintiffs' declarations because they contain inadmissible hearsay, lay opinion and legal conclusions, as well as irrelevant, unreliable testimony and violate the best evidence rule.

First, plaintiffs allege that "the LCFS regulation has already reduced the value of investments in the corn ethanol industry by more than $100 million." Plaintiffs' Br. at 6. This allegation is based entirely on the declaration of Stuart H. Harden.[6] Harden's analysis suffers from a number of fatal flaws. First, it suffers from logical inconsistencies because Harden's assumptions are contradictory. Second, it contradicts available evidence of the reality on the ground. Notably absent from plaintiffs' papers is any evidence of an actual loss in value to an identifiable plant. Third, it presumes – without evidence – that "the market" has interpreted ARB's compliance scenarios and ignored the flexibility of the LCFS in the same erroneous manner as plaintiffs do. Fourth, it obscures crucial baseline assumptions and ignores the inherent uncertainty of ethanol markets.

### a.     Harden's Assumptions Are Contradictory

Harden assumes that the first 10 plants he considers will produce the same amount of ethanol as they would without the LCFS and that the price per gallon will not change.[7] Harden Decl., at ¶ 15. The only explanation Harden provides for the mysterious decrease in cash flow he projects is that the plants' transportation costs will somehow rise. Harden Decl., at ¶ 14. *See also* Babcock Decl., at ¶¶ 68, 71. But that would be inconsistent with how commodity markets, like the ethanol market, function. Babcock Decl., at ¶¶ 71-76, 88. In such markets, the price received by the producer does not vary with transportation costs. Babcock Decl., at ¶ 76. Thus, there is no explanation for Harden's presumed declines in cash flow. *Id.*

### b.     Harden's Analysis Contradicts the Facts.

Harden's conclusions also contradict facts on the ground. Harden states that he has calculated the "estimated impact on the fair value of these [25] plants *from the adoption* of the LCFS regulations." *See* Harden Decl. ¶ 12 (emphasis added). He ties his analysis to scenarios

---

[6] Defendant objects to the Harden declaration in its entirety, as described in Defendant's Objections To The Declaration Of Stuart H. Harden.

[7] Notably, this assumption is precisely the opposite of the conclusion reached by plaintiffs' other declarants, Jesse David and Gerald Brian. Because these assumptions form the foundation for each of the three analyses, this fundamental inconsistency wholly undermines plaintiffs' claims of likely irreparable injury.

1  contained in ARB's staff report (the "ISOR").  Harden Decl., ¶ 12.  ARB publicly released the

2  ISOR for the LCFS in March 2009 and ARB held a Board meeting to vote on the LCFS on April

3  23, 2009, both over a year prior to Harden's declaration.[8]  Yet, Harden offers no evidence of the

4  effect of the intervening months on the ethanol plants he analyzed.  What we do know is that

5  between April 2009 and March 2010, "at least nine corn ethanol plants have come back online."

6  RJN Exh. P, EPA RFS2[9] Rulemaking, 75 Fed. Reg. 14746 (March 26, 2010).[10]  This resurgence

7  of the ethanol industry since ARB's publication of its scenarios and its Board meeting flies in the

8  face of Harden's analysis and plaintiffs' alleged injury.

9

10  Moreover, Harden's theory that the adoption of the LCFS has caused a loss in business

11  value is also called into doubt by plaintiffs' decision to wait more than 10 months from the date

12  they filed their initial complaint to pursue this preliminary injunction.  Plaintiffs have not

13  explained why, in the face of the substantial damages they allege occurred from the adoption of

14  the LCFS, they did not act immediately to request an injunction and to recover and preserve their

15  business values.  *See Oakland Tribune, Inc. v. Chronicle Publ'g Co., Inc.*, 762 F.2d 1374, 1377

16  (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of

17  urgency and irreparable harm.").[11]  Thus, none of the non-speculative facts before this Court

18  support Harden's conclusions.

19          **c.**    **Harden Presumes a Market Response to the Compliance
                   Scenarios Without Evidence.**

20  The third flaw in Harden's analysis is one that plaintiffs' repeat ad nauseum in their brief:

21  namely wholesale reliance on the compliance scenarios in ARB's staff report as "predictions" of

22  _____

23     [8] The LCFS was approved by California's Office of Administrative Law on April 15, 2010 and went into effect that same day.

24     [9] RFS2 refers to the Renewable Fuels Standard, as modified by the Energy Independence and Security Act of 2007.  See 42 U.S.C. § 7545(o).

25

26     [10]  More may have done so since the EPA commented on the matter in March of this year, but defendants would need discovery to establish this fact.

27     [11] Even plaintiffs' Declarant Wesley Clark provides no explanation for the long delay in requesting this preliminary injunction.

28

9

1    specific outcomes.  Harden Decl., at ¶ 12.  Without any evidence, plaintiffs baldly assert that "the

2    market anticipates that the LCFS regulation will close the California [market] to domestic corn

3    ethanol by 2018."  Plaintiffs' Br. 7.  But plaintiffs have supplied no evidence that "the market"

4    has, in fact, accepted ARB's compliance scenarios as likely future outcomes.  Nor is that

5    surprising, given the actual nature of the scenarios and the flexible nature of the LCFS.

6        The scenarios are "what if" exercises designed to show several possible ways in which

7    compliance with the LCFS would be possible.  *See* Scheible Decl., at ¶¶ 65-71; *see also* RJN Exh.

8    D, FSOR at 339 ("The compliance scenarios demonstrate compliance is possible, given what is

9    currently known about the future availability of alternative fuels and vehicles.").[12]  In addition,

10   the compliance scenarios were necessary for ARB staff to conduct economic, environmental and

11   public health analyses required by California law.  RJN Exh. D, FSOR at 366 ("Because the

12   standard is performance based, in which the specific pathways chosen by fuel producers are

13   uncertain, the [required environmental and public health] analysis was based on various

14   compliance scenarios."); *id.* at 434 ("For *illustrative* purposes, we used eight *potential*

15   compliance scenarios in the economic analysis.") (emphasis added); s*ee also* CAL. PUB. RES.

16   CODE §§ 21000-21177 (CEQA) (requiring environmental analysis); CAL. GOV'T CODE § 11346.3

17   (requiring economic analysis).  Given the purpose for their creation, it is clear that the LCFS

18   compliance scenarios are precisely the kind of "uncertain forecasts of future events" upon which

19   agency planning depends.  *Wash. Utils. & Transp. Com'n v. F.C.C.*, 513 F.2d 1142, 1160 (9th

20   Cir. 1975), *overruled on other grounds by Nevada. v. Burford*, 918 F.2d 854 (9th Cir. 1990).  The

21   compliance scenarios effectively served their purposes.  Plaintiffs carry them too far, however,

22   treating them as accurate predictions, or even facts, even in the face of clear statements from

23   ARB to the contrary.  *See, e.g.,* RJN Exh. D, FSOR at 823 ("The compliance scenarios are not

24   intended to predict or forecast the actual combination of fuels and vehicles that will be used.").

25   The LCFS is Extremely Flexible.

26        [12] *See also* RJN Exh. D, FSOR at 71, 431, 433 (describing the compliance scenario
     analysis as "conducted on a 'what if' basis."); *id.* at 489 (describing the compliance scenarios as
27   "hypothetical scenarios for lowering the carbon intensity of the entire motor vehicle fuel pool in
     California").

28

1    As discussed above, the LCFS is a flexible market-based regulation.  See Background,

2    Section II, *supra*.  The very fact that ARB produced five scenarios related to gasoline and fuels

3    that substitute for it indicates that there are myriad possibilities that might unfold under the LCFS.

4    ARB never claimed, nor would there be any reason for the market to accept, that these five

5    scenarios are the only ways compliance with the LCFS might be obtained.  In the absence of any

6    evidence that the market has accepted the scenarios as likely forecasts, Harden's conclusions lack

7    foundation.

8    The LCFS is designed to allow regulated parties – California refiners and blenders – to

9    meet the carbon intensity target for a given year however they choose.  Scheible Decl., at ¶¶ 29-

10   31.  Thus, the actual mix of fuels and alternative vehicles that make up California's transportation

11   picture in any given year will depend on the carbon intensity and price, among other factors, of

12   the various fuels available to refiners and blenders.  Id. at ¶ 33; *see also* RJN Exh. D, FSOR at

13   804 ("The LCFS is designed to influence the market for California fuels—not by designating

14   specific fuels that are favored and not favored, but by establishing declining annual carbon

15   intensity limits.  *The regulation provides fuel suppliers with the flexibility to meet that standard*

16   *with any mix of fuels they find to be advantageous.*") (emphasis added).[13]

17   Further, the range of carbon intensities of ethanol available in the market remains to be

18   seen.  Fourteen specific (non-average) ethanol pathways were included in Table 6 when the LCFS

19   was promulgated.  LCFS Section 95486 (Table 6); *see also* Scheible Decl., at ¶¶ 34-40.  But,

20   importantly, the LCFS permits fuel producers, such as ethanol plants, to apply to add new

21

22   [13] *See also* RJN Exh. D, FSOR at 75 ("[T]he fuel and fuel choices are based on market
     responses to the cost and availability of the fuel and vehicle technology."); *id.* at 91 ("[T]he
23   market . . . decides what roles the various fuels will play."); *id.* at 242 ("In summary, the LCFS is
     designed not to dictate which fuels can or cannot be used but rather is designed to introduce the
24   additional consideration of lifecycle greenhouse gas emissions into the decision-making
     process."); *id.* at 330 ("[T]he LCFS does not dictate to a fuel producer how to make a compliant
25   fuel and what components to put into it; the LCFS simply puts a cap on the carbon intensity of all
     the fuels that producer introduces into the California market and let's the producer determine the
26   best way to do that as provided in the regulation."); *id.* at 487-88 ("The LCFS does not specify
     which combination of fuels the regulated parties must provide to comply with the standards.); *id.*
27   at 899 ("[The scenarios] are intended to show that compliance with the LCFS is possible and
     feasible. As the development of low carbon intensity fuels advances, it is possible that other
28   compliance pathways and strategies . . . will be utilized.").

pathways to the LCFS.  LCFS Section  95486(c) and (d) (Methods 2a and 2b); *see also* Scheible

Decl., at ¶¶ 57-64.  Twenty-five additional ethanol pathways have been published for comment to

be added to Table 6, almost all of them from Midwest facilities.  Scheible Decl., at ¶ 61; RJN

Exh. H (ARB New Pathways).  And those published pathways may be used until the final CI

value is determined.  Scheible Decl., at ¶ 63.  Taken together, ethanol pathways available for use

at the time of briefing range in CI value from 58.4 to 120.99, including 26 Midwest ethanol

pathways with CI values lower than the 2011 carbon intensity target.  LCFS Section 95486 (Table

6); RJN Exh. H(Table 6 & ARB New Pathways).  And more new pathways are anticipated.[14]

Scheible Decl., at ¶¶ 57-64.

"Uncertain forecasts of future events" such as agencies routinely use for planning purposes

cannot form the basis of a clear showing of likely irreparable injury as required for a preliminary

injunction.  *See Wash. Utils.,* 513 F.2d at 1160.  Plaintiffs' use of these scenarios is thus fatal to

their motion because their alleged injuries cannot be anything other than speculative given the

flexibility of the LCFS.

### d.   The Uncertainty of Ethanol Markets Adds to the Speculative Nature of Harden's Analysis.

Both the carbon intensity and price of fuels that will be available on the California market

are unknown even with respect to 2011, let alone for 2020.  This unpredictability is clear even

when focusing, as plaintiffs do, on ethanol alone, rather than on the entire breadth of

transportation fuels and vehicles covered by the LCFS.  Over the course of a year, ethanol prices

---

[14] Even in the absence of incentives from the LCFS, the economics of ethanol production are driving and will continue to drive ethanol producers toward more efficient and more environmentally-friendly technologies.  *See* RJN Exh. P, EPA RFS2 Rulemaking, 75 Fed. Reg. 14746 ("Forecasted fuel prices are projected to drive corn ethanol producers to transition from conventional boiler fuels to biomass feedstocks.  In addition, fossil fuel/electricity prices will likely drive a number of ethanol producers to pursue CHP technology.").  Plaintiff RFA agrees, noting that ethanol plants "are likely to continue to seek further efficiencies and change energy sources to reduce GHG emissions."  RJN Exh. S, RFA's Comments On RFS2 at 56.  Producers who make such changes may apply for an individualized carbon intensity pathway if the changes reduce lifecycle GHG emissions by at least 5%.  Scheible Decl., at ¶ 58.  Further, the LCFS is designed to incentivize the development and commercialization of low carbon advanced biofuels, the CI values of which cannot yet be determined.  Scheible Decl., at ¶ 10; Declaration of Sabrina Spatari, ¶ 11.  ARB anticipates requests for new pathways for these next-generation fuels as well. Scheible Decl., at ¶¶ 61-62.

1  can fluctuate by as much as $1.00 - 1.50  per gallon and is expected to similarly fluctuate in the

2  future based on oil prices, corn prices, and various government policies.  Declaration of Bruce

3  Babcock ("Babcock Decl."), at ¶¶  77-84 Figure 2, p. 13.  The impact of the LCFS on the

4  relationship between price and carbon intensity remains to be seen.  More significantly, the

5  market will determine how compliance is obtained, and the market cannot currently be accurately

6  predicted in light of the number of variables and the degree of uncertainty about key factors.

7  Babcock Decl., at ¶¶ 77-84.   Of course, Harden makes clear none of his assumptions about any

8  of these key factors.  Babcock Decl., at ¶ 89.  Speculation based on conjecture and hidden

9  assumptions about a highly unpredictable market do not constitute the "clear showing" required

10  for a preliminary injunction.[15]

11            **2.      Plaintiffs' Cannot Demonstrate a Likelihood of Lost Income.**

12        Plaintiffs also allege that the LCFS will result in losses of millions of dollars over the next

13  two years.  Plaintiffs' Br. at 7.  This allegation is based entirely on the declaration of Jesse

14  David.[16]  David's fundamental assumption is that demand for Midwestern corn will decline in

15  2011 by 195 million gallons and in 2012 by 310 million gallons, based on ARB's compliance

16  scenarios.  David Decl. ¶ 14.  At best, that assumption is speculative, for the same reasons

17  discussed above.  David misinterprets Table 6, misconstrues the likely effect of California not

18  being able to produce 300 million gallons of corn ethanol in 2011 or 2012, and ignores overall

19  trends in ethanol demand.  Further, even assuming a decline in ethanol demand, David's

20  economic analysis cannot be credited, as explained below.

21        First, David's assumption is undermined by the fact that the LCFS carbon intensity targets

22  for 2011 and 2012 could be met entirely with Midwestern corn ethanol.  Scheible Decl., at ¶ 71.

23  Plaintiffs and their experts improperly assume that "Midwest average" corn ethanol is the same as

24        [15] Of course, even if Harden's conclusions were accurate, a decline in business value
    alone is not inherently an irreparable injury.  If the decline is due solely to the LCFS, as plaintiffs
25  allege, those values will recover if plaintiffs prevail and the LCFS is ultimately struck down.
    Plaintiffs have provided no evidence that the decline in business value has actually irreparably
26  harmed any entity, or is likely to, in the absence of an injunction.

27        [16] Defendant objects to the David Declaration in its entirety, as described in Defendant's
    Objections to the Declaration of Jesse David.
28

1  *all* Midwest corn ethanol.  To the contrary, Table 6 demonstrates five pathways for Midwest corn

2  ethanol that have lower CI values than "Midwest average."  LCFS Section 95486 (Table 6); *see*

3  *also* Scheible Decl., at ¶ 67.  In addition, more pathways for Midwest corn ethanol are being

4  added with CI values lower than "Midwest average," as described above. *Id.* at ¶¶ 61-64.  The

5  number of possible combinations which would result in compliance in 2011 and 2012 using only

6  currently-available Midwestern corn ethanol is continually expanding.   *See* Scheible Decl., at ¶

7  71; RJN, Exh. H (ARB New Pathways).  David's analysis of market demand and price effects are

8  fatally flawed by ignoring these realities.

9      Second, the likelihood of Midwest ethanol's continued presence in the California market,

10  particularly in the near term, is supported by plaintiffs' information.  As David notes, ARB's

11  compliance scenarios assume California will consume 300 million gallons of corn ethanol

12  produced in California. *Id.* at ¶ 14 n.11. California presently produces less than 100 million

13  gallons of ethanol, *id.*, and a September 2010 update from plaintiff Renewable Fuels Association

14  estimated California production at 60 million gallons, *id.* at ¶ 5 n.5.  If California produces 60

15  million gallons of ethanol instead of 300 in 2011, that will leave a gap of 240 million gallons.

16  Less production from California producers does not mean less demand from California

17  consumers.  Given that ethanol is currently the primary renewable fuel that can substitute for

18  gasoline and that the Midwest produces most of the ethanol in the United States, it is probable

19  that any gap between California's demand and its actual production would be filled by Midwest

20  ethanol.[17]  While David notes that California production is lower than the figure in the

21  compliance scenarios, he does not adjust his analysis accordingly.

22      Third, David's assumed decline in demand is unlikely to occur.  To the contrary, evidence

23  supports a *rise* in overall demand for Midwest ethanol in 2011 and 2012.  Global demand for

24  ethanol is rising, and the United States is well-positioned to supply at least some of that growing

25  demand.  In fact, ethanol exports from the U.S. have expanded dramatically in the last year.

26  _____

27  [17] *See* RJN Exh. P, U.S.EPA RFS2 Rulemaking, 75 Fed. Reg. at 14745.  The West Coast, including California, in comparison contains only 0.8% of the United States' ethanol production capacity.

28

14

1   Babcock Decl., ¶ 81.  And the amount of ethanol blended with gasoline appears to be on the rise

2   as well, from several sources including EPA's approval of the use of E15 (a blend of gasoline and

3   15% ethanol) for cars produced from 2007 onwards and states' promotion of Flex Fuel Vehicles

4   ("FFVs") that run on E85 (a blend of 85% ethanol and only 15% gasoline).  RJN Exh. P, EPA

5   RFS2 Rulemaking, 75 Fed. Reg. 14761.

6        Finally, even assuming there is a decline in demand attributable to the LCFS – which

7   plaintiffs' have not shown – David's economic analysis is seriously flawed.  First, he failed to

8   control for changes in price over time when building his supply curve, such that it is not, in fact, a

9   supply curve.  Babcock Decl., at ¶¶ 11-23.  The curve, then, cannot support David's conclusions.

10  *Id.*  Second, after speculating that demand will decline, David concludes that ethanol producers

11  will lose revenue because the price of corn ethanol will go down commensurate with this

12  decreased demand.  This overly simplistic analysis assumes that the price of corn will remain

13  constant even if the price of ethanol declines.  In reality, if the demand for ethanol declines, the

14  price of corn will also decline to offset any decline in ethanol price.  Babcock Decl., at ¶¶ 24-35;

15  *see also*  RJN Exh. P, 75 Fed Reg. 14816 ("[T]he cost of ethanol production is most sensitive to

16  the prices of corn and the primary co-product, DDGS.").[18]  In other words, even if the price of

17  ethanol declined by the amount David asserts, the ethanol producers will pay that much less for

18  their primary input, corn.  This decrease in production costs would offset the lost revenue, and

19  there would be no net loss to the ethanol producers from the price decrease suggested by David.

20  Babcock Decl., at ¶ 35.  Third, David's analysis based on capacity utilization is undermined by

21  the uncertainty of the predicate fact required for capacity utilization shifts to matter.  Babcock

22  Decl., at ¶ 36-51.  That is, the effect David asserts is only relevant to profitability if the industry

23  drops out of a high capacity utilization rate.  *Id.*  But the industry has not been in such a state

24  since mid-2008 and it cannot be predicted with any certainty that it will reach that state in 2011 or

25  2012.  *Id.* at ¶ 51.  That analysis, then, is inherently speculative.

26  _____
       [18] Plaintiffs' submission of the David Declaration is particularly strange, since plaintiffs
27  themselves are aware of the fundamental connection between the price of corn and the price of
    ethanol.  RFA's Comments on RFS2 p. 48 ("Oil prices and corn prices will be the ultimate driver
28  of ethanol production….").

1    In sum, to assume that demand for Midwestern ethanol will decline *at all* in 2011 is mere

2    speculation.  Even if demand declined slightly as a result of LCFS, the price of corn would

3    similarly decline leaving ethanol producers no worse off.  And David's economic analysis is

4    fundamentally flawed.  Thus, David's conclusions that LCFS will result in lost sales or lost

5    profits in 2011 and 2012 cannot establish a clear showing of irreparable injury.

6              **3.    Restricted Financing**

7    Plaintiffs allege that the LCFS will impose "an imminent threat of 'restrict[ed] financing

8    options.'"  Plaintiffs' Br. at 7.  To reach this conclusion, plaintiffs rely on an analysis of a subset

9    of financing options available to hypothetical ethanol plants that assumes the price of ethanol will

10   decrease under the LCFS.  As described above, the conclusions that ethanol prices will change in

11   2011 and 2012 due to the LCFS is flawed.  In addition, Brian's analysis of plant finances suffers

12   from the same fundamental flaw as David's.  If the price of ethanol were to drop, the price of corn

13   would also fall, and the financial condition and creditworthiness of these plants would be little

14   changed.  Babcock Decl., at ¶ 61.  Accordingly, the conclusion that ethanol plants will have more

15   difficulty obtaining capital under LCFS is similarly flawed and unfounded.

16   Market response to new regulation is difficult to predict.  The Ninth Circuit has recognized

17   that the inherently speculative nature of such predictions should not form the basis of a

18   preliminary injunction.  For example, when challengers to a new San Francisco health care

19   ordinance alleged that it would drive away businesses and consumers, the court responded:

20

21       It is possible that some covered San Francisco employers may elect to move
         elsewhere to avoid the costs of compliance, and some consumers may choose to visit
22       restaurants and other establishments outside the City, where goods and services may
         be less expensive.  But the degree to which these possibilities may become reality is
23       speculative.

24   *Golden Gate Restaurant Ass'n v. City and County of San Francisco*, 512 F.3d 1112, 1126 (9th

25   Cir. 2008).  *See also Colo. River Indian Tribes v. Town of Parker*, 776 F.2d 846 (9th Cir. 1985)

26   (finding allegations of lost sales tax revenues speculative because the market could adjust to

27   accommodate the challenged regulation).  This case is no different.  The degree to which the

28   injuries alleged by plaintiffs may become reality is extremely speculative.  Plaintiff Renewable

1   Fuels Association underscored this point in another context:  "[A]gricultural markets in the real

2   world frequently contradict economic theory and highlight the need to exercise caution when

3   interpreting the results of economic models."  RJN Exh. S, RFA comments on RFS2 at 22.

4       Notably, plaintiffs have produced no evidence of an actual plant that has had trouble

5   obtaining financing.  And even if they had, any arguable effect from the LCFS would be difficult

6   to distinguish from more generalized market conditions.  *See* RJN Exh. V*, RFA's 2010 Ethanol

7   Industry Outlook p. 4 (noting that the ethanol industry in 2009 experienced "frozen credit markets

8   and volatile commodity markets").

9       In addition, Brian's sweeping conclusion that LCFS "would restrict financing options for

10  Midwest ethanol plants" is inconsistent with his own analyses of individual hypothetical plants.

11  Brian discusses five scenarios of unidentified ethanol plants with varying degrees of efficiency

12  and finds that the status of only one type of plant – the "marginal plant" – would go from being

13  approved for financing (from some lenders) to being "not likely" to be approved.  *See* Brian Decl.

14  ¶¶ 8-12.  In Brian's analysis, the other plants that got financing before the LCFS would get

15  financing after the LCFS.  *Id.*

16      Both because the underlying assumptions are simply wrong and because the detailed

17  analysis does not support his overall conclusion, Brian's declaration does not constitute the

18  requisite clear showing of irreparable injury required for the extraordinary remedy plaintiffs'

19  seek.  The motion should be denied.

20  **IV.   THE BALANCE OF HARDSHIPS TIPS IN FAVOR OF DEFENDANT.**

21      For the reasons discussed above, plaintiffs have not clearly shown that *any* hardship will

22  befall them before the merits of this case can be adjudicated.  By contrast, the hardship to

23  defendant and the State and people of California is clear: enjoining the LCFS will prevent

24  reductions in emissions and will derail the incentives the LCFS provides to spur the development,

25  commercialization and mass introduction of low carbon fuels.  Scheible Decl., at ¶ 10;

26  Declaration of Dan Adler, at ¶¶ 6-9; Declaration of Todd Ellis, at ¶¶ 7, 8, 10-12, 16.  Plaintiffs

27  attempt to make much of an isolated statement in the FSOR that recognizes that the LCFS on its

28

17

1   own "will not result in significant climate change."  Plaintiffs RJN Exh. D, FSOR at 342.  In the

2   same paragraph, however, ARB staff note that the LCFS "is expected to reduce GHG emissions

3   approximately 16 million metric tons per year in California, contributing approximately 10

4   percent of California's expected GHG reductions."  *Id.*  In other words, the LCFS is a crucial

5   piece in California's overall strategy to reduce emissions.  Whether the LCFS standing alone will

6   *significantly* impact global climate change is not the question.  *See Mass. v. E.P.A.*, 549 U.S. 497,

7   522 (2007).

8       The Supreme Court has recognized, specifically in the climate change context, that

9   incremental steps toward resolving massive problems are legitimate and expected.  *Id*. at 524.

10  The Court has also recognized that small, somewhat localized reductions efforts are still

11  worthwhile, even if it is global emissions that ultimately determine the planet's fate.  *Id.* at 526

12  ("A reduction in domestic emissions would slow the pace of global emissions increases, no matter

13  what happens elsewhere.").  There is, thus, no basis for plaintiffs' argument that defendant will be

14  entirely unharmed if the LCFS is enjoined merely because the immediate impact on climate

15  would not be dramatic.  Under *Mass v. E.P.A.*, rather, what matters is that defendant and the State

16  of California will lose an opportunity to reduce emissions in the future as a result of delays

17  imposed now upon innovation and developments of the new, cleaner technologies.

18      Indeed, the harm to defendants' and California is very real.  Defendants will suffer a

19  hardship if the LCFS is preliminarily enjoined, because the injunction will likely prevent him

20  from fulfilling the AB 32 mandate.  The government's inability to fulfill a legislative mandate is a

21  cognizable hardship for a preliminary injunction.  *Caribbean Marine Services Co., Inc. v.*

22  *Baldridge*, 844 F.2d 668, 676-77 (9th Cir. 1988) (holding that district court erred by failing to

23  consider an agency's inability to enforce a mandate in preliminary injunction hardship analysis).

24  Enjoining an act of a state is a particularly clear form of this cognizable hardship.  *See Coal. for*

25  *Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1977) ("[I]t is clear that a state suffers

26  irreparable injury whenever an enactment of its people or their representatives is enjoined.").

27

28

1     In the present case, even a one-year delay would make it difficult for California to

2 implement its 2012 targets and immediately be back on track.  Technology-driving regulations

3 like the LCFS require gradual ramp-ups to an ultimate goal.  Depriving California of that gradual

4 ramp-up at the outset will delay the end objective, even if the regulation is re-instated later.  The

5 success of the LCFS depends on the development of more advanced technologies (both in fuels

6 and in cars).  Any delay in implementation harms California because it causes uncertainty in the

7 capital markets and, thus, a delay in investments and developments.  Spatari Decl., at ¶¶  10-11;

8 Adler Decl., at ¶¶ 6-9; Ellis Decl., at ¶¶ 7, 8, 10-12, 16 *See also* RJN Exh. P, EPA Rulemaking,

9 75 Fed. Reg. 14751 (noting that "lack of available funding," rather than technology itself, is

10 "delaying commercialization" of cellulosic biofuel).[19]  In other words, a preliminary injunction

11 now means California will have to wait that much longer for the advances it needs to meet its

12 emissions reduction goals.  Plaintiff Growth Energy recognized precisely this harm when it urged

13 EPA to implement RFS2 under the Energy Independence and Security Act ("EISA") as soon as

14 possible.  Growth Energy quoted the statements of several Senators on the importance of moving

15 forward immediately with the innovation-driving policy.  Growth Energy then wrote, "As these

16 statements and others like them make clear, Congress fully understood that delay in

17 implementation of EISA's provisions would postpone the significant gains in energy

18 independence, environmental improvement and economic benefits promised through EISA."

19 RJN Exh. T, Comments of Growth Energy on RFS2 Rulemaking, p. 57-58.  Plaintiffs should not

20 now prevail on the opposite argument – that a similar delay to the implementation of the LCFS,

21 which is also designed to have innovation-driving impacts, causes no hardship at all.

22     To achieve the significant greenhouse gas reductions mandated by AB 32, California must

23 reduce emissions from all sectors of the economy, including transportation fuels.  Plaintiffs argue

24 that any hardship to California "is minimized" because enjoining the LCFS will not affect

25 California's other measures to combat climate change.  California's ability to take other actions to

26 _____
   [19] Plaintiff RFA agrees.  It urged EPA to adopt a streamlined process by which ethanol
27 producers could obtain recognition of a new pathway with a unique GHG emissions reduction
   factor because "potential delay in EPA action would discourage investment in new, more efficient
28 ethanol facilities."  RJN Exh. S, RFA's Comment on RFS2 Rulemaking at 88.

1    reduce emissions is irrelevant here.  The goal of LCFS is to reduce GHG emissions *associated*

2    *with transportation fuels.*  This is not a case where the state has measures in place "designed to

3    alleviate" the same problem as the challenged measure.  *Am. Trucking Ass'ns, Inc. v. City of Los*

4    *Angeles*, 559 F.3d 1046, 1059 (9th Cir. 2009).  California has no other regulation, either in place

5    or on the ARB docket, that specifically targets emissions from fuels.

6         If California is unable to meet its emissions reductions goals, it will be unable to make its

7    contribution to mitigating climate change.  The emissions that occur while California is forced to

8    wait cannot later be removed from the atmosphere.  The damage is irreparable.  The damage is

9    also long-lasting, because those emissions will remain in the atmosphere for decades, continuing

10   to melt sea ice (threatening California's coast with sea level rise) and continuing to reduce the

11   Sierra snowpack (threatening water shortages statewide).  When it adopted AB 32, the California

12   Legislature found that "[g]lobal warming poses a serious threat to the economic well-being,

13   public health, natural resources, and the environment of California."  CAL. HEALTH & SAFETY

14   CODE § 38501(a).  The Legislature also found that global warming "will have detrimental effects

15   on some of California's largest industries, including agriculture, wine, tourism, skiing,

16   recreational and commercial fishing and forestry."  CAL. HEALTH & SAFETY CODE § 38501(b).

17   Finally, the legislature found that global warming will also increase the strain on California's

18   ability to supply needed electricity.  *Id.*  California established reductions targets in an attempt to

19   mitigate these effects directly, as well as indirectly by encouraging other governments to act.

20   CAL. HEALTH & SAFETY CODE § 38501(c).  As noted above, the LCFS is an important component

21   (10%) of California's comprehensive strategy to meet the objectives of AB 32.  Enjoining the

22   LCFS, then, will prevent California from achieving its climate change goals outlined in AB 32.

23        Because plaintiffs have not made a clear showing of any hardship to them or their members

24   and because defendant and the State of California will be harmed if an injunction issues, the

25   injunction should be denied.

26   **V.    THE PUBLIC INTEREST IS BEST SERVED BY DENYING THE INJUNCTION.**

27

28

                                         20

1    Plaintiffs argue that the public interest supports enjoining the LCFS.  First, plaintiffs assert

2    that "the public interest in adhering to the Constitution . . . favors issuing a preliminary

3    injunction."  Plaintiffs' Br. 9.  For the reasons discussed in defendants' opposition and affirmative

4    briefs regarding summary judgment, the LCFS adheres to the Constitution and this argument

5    provides no basis to enjoin the regulation.  Plaintiffs again cite to cases that involve non-

6    economic rights and damages.  Plaintiffs cite first to two First Amendment cases that are

7    particularly irrelevant as the public interest in First Amendment freedoms is not implicated in this

8    case.  *See Newsom v. Albemarle Cnty Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003); *Preminger v.*

9    *Principi*, 422 F.3d 815, 826 (9th Cir. 2005).  Plaintiffs' other cited case is equally irrelevant as it

10   involved a prisoner's due process rights to shower access and yard time.  *Preston v. Thompson*,

11   589 F.2d 300 (7th Cir. 1978).  As with plaintiffs' attempt to establish a presumption of irreparable

12   injury, those cases have no bearing on this one.  The rights asserted by plaintiffs here are not

13   comparable to freedom of speech or the personal due process rights of prisoners.

14   Plaintiffs citation to *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186 (1994), is equally

15   off-point.  *Healy* did not involve a preliminary injunction.  The footnote to which plaintiffs cite

16   simply states that "environmental preservation" as a purpose cannot save a regulation the Court

17   has found to discriminate against interstate commerce.  *Id.* at 205 n.20.  *Healy* says nothing about

18   whether the public interest in "environmental preservation" should factor into this court's analysis

19   of the preliminary injunction test.  The Ninth Circuit has made it clear that environmental impacts

20   *are* relevant to the public interest in the preliminary injunction context.  *See e.g., Lands Council v.*

21   *McNair*, 537 F.3d 981, 1005 (9th Cir. 2008) (en banc) ("[P]reserving environmental resources is

22   certainly in the public's interest.").

23   Unbelievably, plaintiffs also argue that enjoining the LCFS will actually reduce greenhouse

24   gas emissions and therefore is in the public interest in protecting the environment.  Plaintiffs' Br.

25   10.  Plaintiffs come to this conclusion by focusing on a single aspect of the lifecycle emissions –

26   transportation – and ignoring the rest of the lifecycle.  *Id.*  Plaintiffs argue that if the LCFS

27   increases the amount of ethanol produced in California that will lead to an increase in

28

1   transportation of Midwest corn and a decrease in transportation of Midwest ethanol.  This,

2   plaintiffs argue, leads to greater transportation emissions because corn is heavier per unit of final

3   product, and thus plaintiffs conclude enjoining the LCFS will lower greenhouse gas emissions.

4   But, plaintiffs' analysis completely ignores all other elements of the lifecycle analysis, which is

5   what determines whether carbon emissions from transportation fuels consumed in California rises

6   or falls.  Spatari Decl., at ¶¶ 7-8; Babcock Decl., at ¶¶ 6-7.  Plaintiffs also completely ignore the

7   long-term delays in technological innovation that will occur as a result of the interruption of

8   capital investment.   Spatari Decl., at ¶¶  10-11; Adler Decl., at ¶¶ 6-9; Ellis Decl., at ¶¶ 7, 8, 10-

9   12, 16.  While it may not be known for certain whether the effect of the LCFS will be to increase

10  the amount of ethanol produced in California, what is certain is that the LCFS's market-based

11  mechanism will lower the average lifecycle carbon intensity of the fuels consumed in California

12  in a given year.

13       Plaintiffs also assert that enjoining the LCFS is in the public interest because Congress

14  intended to protect the investments of plaintiffs' members and the LCFS "threatens the 'continued

15  existence' of some ethanol producers."  Plaintiffs' Br. 10.  Defendant disputes both assertions.

16  The intent underlying Congress' enactment of EISA is a substantial part of the dispute in this

17  case.  Plaintiffs themselves assert that "[c]ongressional purpose is the 'ultimate touchstone' of

18  preemption analysis."  Plaintiffs' Motion for Summary Judgment, at 23.  As explained in

19  Defendant's Opposition to Plaintiffs' Motion for Summary Judgment ("Defendants' Opp. to

20  MSJ"), Congress neither intended to provide, nor did provide, plaintiffs with any guarantees.  *See*

21  Defendants' Opp. to MSJ, at pp. 30-31.   EISA contains no guaranteed market for corn ethanol.

22  ARB Stmt. at ¶ 71.  And EISA contains no guarantee that each and every "grandfathered" ethanol

23  plant shall operate indefinitely and return money continuously to its investors.  *Id.*  Even under

24  EISA, plaintiffs' members are subject to competition from each other and any newcomers to the

25  renewable fuels market.[20]  As explained more thoroughly in defendant's opposition brief, the

26  LCFS does not contravene Congress' intent.

27  _____
    [20] Plaintiff RFA has previously recognized the limitations of EISA's protections and the
    possibility that corn ethanol might be eclipsed by advanced biofuels.  *See* RJN, Exh. S at 49 (RFA

28                                                                                      (continued…)

1    Further, as discussed above in the context of irreparable injury, plaintiffs have provided no

2    evidence of an actual, imminent threat to the ethanol industry from LCFS.  Any harm that may

3    occur to members of plaintiffs' associations is speculative now and likely to occur, if at all, well

4    after this case is decided on the merits.  There is, therefore, no need to issue a preliminary

5    injunction and no public interest in doing so.

6    In contrast, there is a strong public interest in avoiding irreparable environmental injury, as

7    discussed above.  That weighs in favor of denying the injunction.  In addition, the court must

8    presume that defendant acted in the public interest in adopting the LCFS.  *See Stormans, Inc. v.*

9    *Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009) ("[T]he district court should give due weight to the

10   serious consideration of the public interest in this case that has already been undertaken by the

11   responsible state [agency] officials."); *Golden Gate Restaurant Ass'n*, 512 F.3d at 1126-27

12   (presuming that "responsible public officials" considered the public interest in adopting city

13   ordinance).  That presumption is likely especially strong when, as here, public officials acted

14   under clear statutory instructions.  *Golden Gate Restaurant Ass'n.*, 512 F.3d at 1127 ("The public

15   interest may be declared in the form of a statute.") (internal citation omitted).

16   If there were any doubt as to the public interest in reaching the goals of AB 32, the dismal

17   failure of Proposition 23 should resolve that doubt with finality.   The people of California spoke

18   through their legislature when it adopted AB 32; they spoke again in November when they

19   soundly rejected Proposition 23.  The LCFS is a crucial piece of the measures required to reach

20   AB 32's goals.  It would unquestionably be against the public interest to enjoin it.

21

22

23

24

25

26

27   (…continued)
     Comments on RFS2 ("Merely because corn-based ethanol may end . . .")).
28

23

1

## CONCLUSION

2       Plaintiffs have alleged irreparable injuries that are speculative, at best.  Plaintiffs are

3   unlikely to succeed on the merits of their claims.  The balancing of the hardships tips sharply in

4   favor of denying the injunction, especially since plaintiffs have not shown any hardship will

5   befall them before this case may be heard on its merits.  Finally, the public interest clearly

6   supports denying the injunction.  Plaintiffs have not carried their burden to make a "clear

7   showing" that they are entitled to such an "extraordinary remedy" as a preliminary injunction.

8   For the reasons discussed in detail above, defendant respectfully requests that the court deny the

9   motion for a preliminary injunction.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendant's Opposition to Motion for Preliminary Injunction (No. 1:09-CV-02234-LJO-DLB)

1    Dated:  December 17, 2010                          Respectfully Submitted,

2                                                       EDMUND G. BROWN JR.
                                                        Attorney General of California
3                                                       ROBERT W. BYRNE
                                                        Supervising Deputy Attorney General

4

5

6                                                       /s/ M. Elaine Meckenstock
                                                        M. ELAINE MECKENSTOCK
7                                                       Deputy Attorney General
                                                        *Attorneys for Defendant Goldstene*

8

9                                                       NATURAL RESOURCES DEFENSE
                                                        COUNCIL

10

11                                                      By:    /s/ David Pettit
                                                               DAVID PETTIT
12

13                                                      Attorneys for Defendant-Intervenor,
                                                        Natural Resources Defense Council, Inc.

14                                                      SIERRA CLUB

15

16                                                      By:    /s/ Pat Gallagher
                                                               PAT GALLAGHER
17

18                                                      Attorney for Defendant-Intervenor,
                                                        Sierra Club

19

20                                                      CONSERVATION LAW FOUNDATION

21

22                                                      By:    /s/ Jane West
                                                               JANE WEST
23

24                                                      Attorney for Defendant-Intervenor,
                                                        Conservation Law Foundation

25                                                      ENVIRONMENTAL DEFENSE FUND

26

27                                                      By:    /s/ James T.B. Tripp
                                                               JAMES T.B. TRIPP
28                                                      Attorney for Defendant-Intervenor,
                                                        Environmental Defense Fund

                                              25

SF2010400011
40471105.doc

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Defendant's Opposition to Motion for Preliminary Injunction (No. 1:09-CV-02234-LJO-DLB)