EDMUND G. BROWN JR., State Bar No. 37100
Attorney General of California
ROBERT W. BYRNE, State Bar No. 213155
Supervising Deputy Attorney General
GAVIN G. MCCABE, STATE BAR No. 130864
MARK POOLE, STATE BAR No. 194520
DAVID A. ZONANA, STATE BAR No. 196029
M. ELAINE MECKENSTOCK, State Bar No. 268861
Deputy Attorneys General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA 94102-7004
  Telephone: (415) 703-5894
  Fax: (415) 703-5480
  E-mail: Elaine.Meckenstock@doj.ca.gov
*Attorneys for Defendants*
*James N. Goldstene et al.*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| **ROCKY MOUNTAIN FARMERS UNION, et al.,**<br><br>                              Plaintiffs,<br><br>    v.<br><br>**JAMES GOLDSTENE, et al.,**<br><br>                              Defendants.<br><br>And Related Consolidated Action.<br>----------------------------------------------------------<br><br>**NATIONAL PETROCHEMICAL & REFINERS ASSOCIATION, *et al.*,**<br><br>                              Plaintiffs,<br><br>    v.<br><br>**JAMES GOLDSTENE, *et al.*,**<br><br>                              Defendants. | LEAD CASE No.<br>1:09-CV-02234-LJO-DLB<br><br>*Consolidated With* Case No.:<br>1:10-CV00163-LJO-DLB<br><br>**DECLARATION OF MICHAEL SCHEIBLE IN SUPPORT OF OPPOSITION TO RMFU PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; IN SUPPORT OF OPPOSITION TO TO RMFU PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; IN SUPPORT OF OPPOSITION TO NPRA PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; AND IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date:          February 23, 2011<br>Time:          8:30 a.m.<br>Courtroom:   Four<br>Judge          The Honorable Lawrence J. O'Neill<br>Trial Date:   Not Set<br>Action Filed:  12/23/2009 |

1

I, Michael Scheible, declare and state as follows:

1. I am currently employed part time as a retired annuitant at the California Air Resources Board ("ARB"). I have worked in this capacity since my retirement from ARB on December 30, 2009. I make this declaration based on my professional experience and my personal knowledge of the facts set forth herein. I am willing and able to testify under oath if called as a witness before the Court.

2. Prior to retirement, I worked in a variety of progressively more responsible engineering and managerial positions at ARB for a total of 37 years, the last 17 of which I served as a Deputy Executive Officer. In that capacity, I oversaw several hundred employees in four ARB offices or divisions, including the Stationary Source Division which was responsible for the development and adoption of a broad array of transportation fuel related regulations, including the Low Carbon Fuel Standard.

3. During the adoption of the Low Carbon Fuel Standard ("LCFS"), I was the Deputy responsible for that program's development and reported directly to the Executive Officer James Goldstene. I was ARB's policy lead in the development of a cohesive state policy regarding the integration of alternative fuels into California's plan to reduce GHG emissions under Assembly Bill 32 ("AB 32"), the California Global Warming Solutions Act of 2006. I was directly responsible for the initial design of the LCFS, providing both technical and policy direction for the development and adoption of the LCFS as an ARB regulation. I was also responsible for evaluation of proposed and adopted federal energy legislation and implementing regulations related to the expanded use of alternative transportation fuels such as ethanol and other biofuels.

4. Additionally during my 17 year tenure as ARB's Deputy Executive Officer, I was responsible for the implementation and refinement of California's reformulated gasoline (CaRFG) and clean diesel fuel programs. This included ARB's rulemaking that required the elimination of MTBE from CaRFG resulting in its replacement with ethanol, rules establishing ethanol specifications, managing California's request to the U.S. Environmental Protection Agency ("EPA") for a waiver from Clean Air Act requirements that set minimum levels of oxygenates in reformulated gasoline, revising the CaRFG regulations to mitigate the emissions

2

impact due to increased permeation caused by ethanol, and development of policies to expand the use of non-petroleum transportation fuels in California. Many of the fuel regulations I worked on for ARB recognized that vehicle emission controls involve much more than tailpipe exhaust emissions. Conventional gasoline vehicles have both exhaust and evaporative emissions. California controls vehicle emissions both directly (exhaust limits at the tailpipe) and indirectly (fuel regulations). Regulating fuel can reduce either, or both, the exhaust and evaporative emissions, both on and off the vehicle. For example, California's gasoline is subject to benzene and aromatic content limits. These limits are designed to reduce both exhaust and evaporative emissions from the vehicle itself and to reduce evaporative emissions that occur as gasoline is transported from refinery to service station and delivered from the pump to the vehicle itself. Several other properties of gasoline and diesel fuel are regulated in similar ways. In California these include gasoline vapor pressure, olefin content, distillation points, sulfur content and oxygen content as well the diesel sulfur content and aromatics levels.

**The Global Warming Solutions Act and LCFS's Procedural History**

5. In 2006, the California State Legislature passed AB 32, the California Global Warming Solutions Act, and Governor Schwarzenegger signed it into law. As part of AB 32, the Legislature made extensive findings about the connection between greenhouse gas (GHG) emissions and global warming and about the threats global warming poses to California. Specifically, the Legislature identified rising sea levels, reduction in water quality and supply, environmental damage, public health risks, and harms to California's economy as threats posed by global warming.[1]

6. Although the Legislature recognized that California, by itself, could only make a modest contribution to curbing global warming, it decided to continue the State's long-standing history of environmental leadership and to do its part to reduce its GHG emissions.[2] In AB 32, the Legislature set a firm target of reducing the State's GHG emissions, including those attributable

---

[1] Cal. Health & Safety Code § 38501..
[2] Cal. Health & Safety Code § 38501.

3

to consumption of electricity and transportation fuels, to 1990 levels by 2020.[3]  The Legislature further indicated that it intended the State to make further GHG emissions reductions beyond 2020.[4]  In addition, the Governor, via Executive Order S-3-05, established California's goal to further reduce GHG emissions to 80% of 1990 levels by 2050.  Since it is anticipated that, between 1990 and 2020, the State's population will have grown 48% percent and its economy will have grown by more than 200%, and given that California's GHG emissions grew 12% percent from 1990 to 2004, these targets represents a significant reduction in State GHG emissions from current levels and on a per capita and per unit of economic output basis.

7. With AB 32, the California Legislature directed ARB to "adopt rules and regulations . . . to achieve the maximum technologically feasible and cost-effective greenhouse gas emissions reductions."[5]

8. In an Executive Order in 2007, the Governor noted that the transportation sector is the leading source of GHG emissions in California.[6]  By 2007, vehicular transportation sector GHG emissions had risen 24% from 1990 levels and were contributing about 38% of the State's total GHG emissions.  Thus, compliance with AB 32's emissions reduction goal will require significant reductions in GHG emissions from this sector.  To obtain the level of reductions required from this sector, ARB has adopted a multi-faceted approach that improves the efficiency of new vehicles (the "Pavley standards"),[7] lowers emissions associated with transportation fuels (the LCFS), and reduces vehicular miles traveled (SB 375).  In addition to increased efficiency standards across the board, the Pavley law also provides incentives for the sale of motor vehicles that use low carbon fuels.

**The Purposes of the LCFS**

9. In that same 2007 Executive Order, the Governor directed ARB to determine if a Low Carbon Fuel Standard – that would reduce the carbon intensity of California's transportation fuels

---

[3] Cal. Health & Safety Code § 38550.
[4] Cal. Health & Safety Code § 38551.
[5] Cal. Health & Safety Code § 38560.
[6] Exec. Order S-01-07.
[7] *See* Cal. Code of Reg., tit. 13, § 1961, *et seq.*

4

Declaration of Michael Scheible In Support of Opp. to Plaintiffs' Motion for P.I., of Opp to Plaintiffs' Motions for Summary Judgment and of Defendants' Motion for Summary Judgment  (1:09-CV-02234-LJO-DLB)

by at least 10 percent by 2020 – could be adopted as a discrete early action measure pursuant to AB 32. The LCFS that is the subject of these lawsuits represents ARB's response to its AB 32 mandate from the Legislature and to the Governor's Executive Order.

10. The primary purpose of the LCFS is to enable California to meet its GHG emissions reductions goals, established by the Legislature in AB 32. Another, inextricably related purpose of the LCFS is to spur the development, commercialization and mass introduction of the next generation of fuels – fuels with lower lifecycle GHG emissions. A further, and also related, purpose is to reduce California's dependence on oil which has the additional desirable effect of protecting the economy from the consequences of oil price shocks.

11. Central to all of these purposes is the development and marketing of lower carbon transportation fuels, including the development of new, advanced biofuels, improvements to conventional biofuel production processes, and the use electricity and hydrogen. Those are the mechanisms through which the LCFS achieves its goals of reducing emissions and reducing dependence on oil.

12. ARB designed the LCFS to complement the federal Renewable Fuels Standard 2 ("RFS2") that EPA has promulgated pursuant to the 2007 Energy Independence and Security Act ("EISA"). The LCFS has a broader focus, encompassing gasoline, diesel, hydrogen, natural gas and electricity as well as biofuels, whereas the RFS2 focuses exclusively on biofuels like ethanol and biodiesel. In addition, the RFS2 establishes minimum lifecycle reductions for each of its fuel categories, and then treats all biofuels within a category identically. The LCFS has neither categories nor minimum lifecycle reductions to qualify. Instead, the LCFS considers the carbon intensity of each fuel separately, rewarding all reductions in lifecycle emissions. One purpose, then, of the LCFS was to provide incentives for any fuel producer to lower the carbon intensity of the fuel, regardless of which RFS2 category the fuel might fit into.

13. In sum, the LCFS is designed to foster earlier development and use of a diverse array of advanced low carbon fuels than would otherwise be the case. In so doing, the LCFS will reduce GHG emissions attributable to motor vehicles in California.

**Lifecycle GHG Emissions**

5

14. To be effective, regulations to reduce GHG emissions associated with transportation fuels must be based on a lifecycle analysis ("LCA") of emissions. The lifecycle analysis approach to measuring and reducing emissions from transportation fuels is not only recommended by the scientific community but has been adopted by government entities ranging from the United States Congress to the European Union.

15. The scientifically accepted approach to calculating the lifecycle GHG emissions associated with the combustion of a quantity of transportation fuel considers the tailpipe emissions from combustion *and* the "upstream" emissions associated with the production and transportation of the fuel. Thus, for example, the energy consumed when fuel is produced or refineries operated and the fuel consumed by trucks and trains in the transportation of fuels or feedstocks are routinely factored into the lifecycle analysis. The lifecycle analysis is sometimes referred to as a "wells to wheels," "seed to wheels" or "fuel cycle" analysis.

16. As the plaintiffs have pointed out, all fuel ethanol emits similar amounts of carbon dioxide at the moment of combustion. Yet, the lifecycle GHG emissions associated with the use of ethanol with different production processes can vary widely based on multiple factors related to the feedstock (corn, sugar, etc.), the energy used to convert the feedstock into ethanol, the transportation of the feedstock and the ethanol itself, among other factors. Only a portion of the GHG emissions that inherently result from consuming fuel aboard a vehicle are emitted from the vehicle during its operation. This varies depending on the fuel. For gasoline-powered vehicles, about three-quarters of the GHG emissions occur when the fuel is combusted, the remaining quarter occur upstream, principally from fuel transport, crude extraction and oil refining. On the other hand, electric vehicles have negligible GHG emissions during vehicle operation, but result in substantial emissions when fossil fuels are used to generate electricity needed to power the vehicle.

17. In carrying out its directives from the Legislature and the Governor, it was imperative to provide for a method of measuring reductions in transportation fuel GHG emissions that had scientific integrity and that reflected the actual contributions of use of transportation fuels within the State to GHG emissions. Accordingly, ARB undertook extensive research into the lifecycle

6

GHG emissions of a wide range of transportation fuels, including oil-based gasoline and diesel, various biofuels (including ethanol and biodiesel), electricity, hydrogen and compressed and liquefied natural gas. This included assessments of the emissions associated with the absorption of atmospheric carbon dioxide ($CO_2$) by plants such as corn, sugarcane or soybeans (that serve as feedstocks for biofuels), with the production and transport of various biofuel feedstocks, with variability in efficiency among production facilities, with the type and source of energy used by various facilities to convert feedstocks to fuel, with the transport of finished fuel, and with the production of electricity (for plug-in vehicles and fuel production facilities). In addition, biofuel producers receive "credits" in the lifecycle analysis for emissions saved by the simultaneous production of "co-products" with the fuel.[8]

18. Fortunately, the Argonne National Laboratory has created and maintains a model known as GREET (the Greenhouse Gases, Regulated Emissions, and Energy Use in Transportation model) that incorporates massive amounts of data about the lifecycle GHG characteristics of many different kinds of fuels[9]. The GREET model has been used by government agencies in New York, Minnesota and Oregon to estimate emissions from alternative fuels and ethanol production, and the EPA used the GREET model in its rulemaking to implement RFS2 under EISA. In preparing the LCFS, ARB relied extensively on this model to produce a California specific version ("CA-GREET") that can, based on appropriate inputs, calculate the carbon intensities of various fuels. For example CA-GREET uses a California specific electricity mix for in-State fuel production reflecting the California mix of electricity generation which is quite different (and lower carbon) than the national average.

---

[8] A common co-product credit for ethanol production is explained in paragraph 22.
[9] The GREET model was first released in 1996 and has been updated and improved several times since. It was developed to enable the impact of transportation technologies - both vehicles and their fuels - to be comprehensively assessed on a lifecycle basis. The introduction to the 1996 report documenting the model clearly states the need for such an approach: "To completely evaluate the emissions and energy effects of ... transportation technologies, one must consider emissions and energy use from upstream fuel production processes as well as from vehicle operations. This is especially important for technologies that employ fuels with distinctly different primary energy sources and fuel production processes, for which upstream emissions and energy use can be significantly different." See: http://www.transportation.anl.gov/pdfs/TA/500.pdf for complete report

7

19. Lifecycle models, like GREET, often categorize emissions as either "direct" or "indirect." Direct emissions are those involved in the production, transportation, distribution and consumption of a fuel. Indirect emissions include the other effects that are connected to, but are not a direct part of, production, transportation, distribution and consumption of the fuel.

20. As an example of **indirect** emissions, scientists now realize that the increased production of crops such as corn or sugarcane for use as a feedstock for biofuel production leads to conversion of grasslands, rangeland or forests to production of these feedstocks. In other words, increased needs for crops like corn or sugarcane exert pressure to convert non-agricultural lands into crop production lands. That land conversion results in increased GHG emissions due to GHGs released through land clearing, soil exposure and to the loss of sequestration capacity provided by the prior vegetation. Thus, in order to paint a complete picture of the lifecycle GHG emissions associated with transportation fuels that use crops as feedstock, ARB concluded that it is appropriate to take emissions associated with this land use change into account. The EPA reached the same conclusion in its RFS2 rulemaking. Because the emissions that result from land use change are connected to a feedstock crop (e.g., corn or sugarcane), the carbon intensity value for land use change is the same for all ethanol derived from that feedstock crop. For example, under the LCFS, all U.S. corn-derived ethanol is assigned a carbon intensity of 30 grams of $CO_2$ equivalent per megajoule ($gCO_2e/MJ$) for land use changes. All Brazilian sugarcane ethanol is assigned 46 $gCO_2e/MJ$, reflecting the fact that it is a different crop with different land use implications.

21. Activities that comprise a **direct** emission lifecycle analysis for corn ethanol include growing the corn, transporting the corn to the ethanol plant, converting the corn into ethanol, transporting the ethanol from the plant to its destination for blending with gasoline and combustion of the ethanol in the vehicle.

22. In addition, corn ethanol producers receive a "co-product credit," as part of the direct emissions analysis. Ethanol producers simultaneously produce other products from the same corn, and they receive a "co-product credit" for doing so. The most common co-product from corn ethanol is distillers grains, which are a livestock feed. The emissions credit for co-products

8

is based on the component in the GREET model that recognizes that the use of distillers grains as livestock feed displaces other feed products and the emissions that would have resulted from their production.

23. One final point is that the GREET model nets the carbon dioxide emissions that occur when ethanol is combusted against the carbon dioxide that was absorbed by the feedstock crops as they grew. The EPA reached the same conclusion in its RFS2 rulemaking under EISA. This does not mean that combustion of ethanol produces no tailpipe emissions or that those tailpipe emissions are ignored in the LCFS lifecycle analysis. Rather, the tailpipe emissions are part of the final carbon intensity value, just as the credit for $CO_2$ absorbed by the crops is also part of the final carbon intensity value.

24. As is evident from Table 1 below, and the (brief) discussion above regarding land use changes, a lifecycle analysis of any fuel is a multi-factor calculation that considers all significant aspects of fuel production, transportation, distribution and consumption.

25. Taking both "direct" and "indirect" lifecycle emissions into account, one ends up with the carbon intensity of a given fuel.

**How The LCFS Reduces GHG Emissions From California's Use of Transportation Fuels**

26. The basic concept of the LCFS is to steadily reduce the average carbon intensity ("CI") of all vehicular transportation fuels consumed in California. The LCFS does so by establishing a baseline CI for 2010, based on the average gasoline and diesel fuels consumed in California. It then requires that each supplier of vehicular transportation fuels reduce its average CI from that baseline by set amounts each year between 2011 and 2020.

27. ARB assumed that the 2010 baseline would contain 10% ethanol by volume, so the baseline represents 90% CARBOB[10] and 10% ethanol.

28. The reductions from baseline CI begin with very modest increments, in recognition of the fact that it will take time to develop and produce large quantities of lower carbon fuels and bring them to market. In 2011, for example, the LCFS requires only a 0.25% reduction in

---

[10] *See* ¶ 37 for discussion of CARBOB.

9

average CI (to 95.61 gCO2e/MJ for gasoline). In 2012, a 0.5% reduction is required (to 95.37), and the reductions increase, culminating in 2020 with a 10.0% reduction (to 86.27), consistent with the goal set by Governor's Executive Order and in order to produce emissions reductions needed to comply with AB 32's overall emissions reduction mandate.[11]

29. The CI standard with which regulated parties (all primary suppliers of transportation fuels to the California market) must comply each year is an *average*. Each time such a party supplies fuel for use in California, that party will accumulate a credit, if the fuel has a CI lower than the CI standard for that year, or a deficit, if the fuel has a CI higher than the CI standard for the year[12]. In other words, the LCFS does not restrict regulated parties from purchasing any particular fuels. Rather, it establishes the CI standard to which the sum of the fuels supplied to the California market must average in a given year.

30. In addition, regulated parties may generate excess credits and trade such credits among themselves. Thus, if one party lowers the CI of its fuel, in the aggregate, to below the CI standard for the year, that party may sell its extra credits to other parties who did not meet the target. Regulated parties may also bank credits to be used in future years.

31. This approach ensures both that the carbon intensity reduction goals of the LCFS are met and that regulated entities have maximum flexibility in achieving those goals. For example, if very low carbon fuels are available but expensive, a regulated entity may comply with LCFS by purchasing smaller quantities of those expensive, very low carbon fuels (generating large credits) and then purchasing larger quantities of higher CI fuels that are cheaper.

32. Low carbon fuels obtain credits under the LCFS regardless of their state of origin. For example, use of low carbon cellulosic ethanol would produce significant credits under the LCFS, since cellulosic ethanol is likely to have a CI value at least 60 percent below the 2010 baseline gasoline. (The CI standard for 2020 is 86.27 gCO2e/MJ for fuels used in gasoline engines, and

---

[11] *See* Cal. Code Regs. tit. 17, § 95482 (also Exhibit A to this Declaration).
[12] *See* Cal. Code Regs. tit. 17, § 95485

use of any fuel with a CI lower than that generates a credit.) As recent data from both ARB and EPA indicates, most of the plants exploring cellulosic production are not in California.[13]

33. In sum, the LCFS is a performance-standard based on carbon intensity from lifecycle emissions. It is not a command-and-control regulation that mandates or prohibits certain fuels. Indeed, the LCFS imposes no constraints on what particular mix of fuels a regulated party may use – whether they are produced in California, in the Midwest, elsewhere in the United States, or in foreign countries. The only constraint is achieving the average carbon intensity, as measured on a lifecycle basis, of the fuel mix supplied to California. Market forces will ultimately determine which mix of fuels are used to meet the annual average carbon intensity requirement or "annual average standard."

**LCFS "Table 6" Carbon Intensity Values for Fuel Pathways**

34. Because a lifecycle analysis considers all the significant emissions-producing aspects of fuel production, almost every fuel-plant combination could theoretically have its own carbon intensity. Indeed, a single ethanol plant can produce ethanols with varying carbon intensities over the course of a single year, because the plant might use different sources of energy for thermal heat at different times, or the plant might sometimes produce wet distillers grain solids ("WDGS") and sometimes dry distillers grain solids ("DDGS"). Drying the distillers grains is far more energy intensive than selling them wet, so the lifecycle emissions for production cycles resulting in DDGS are significantly higher than those resulting in WDGS. With either process, however, production of the co-product still results in a credit.

35. In light of the large number of potential CI values and the multiplicity of variables involved in the lifecycle analysis, ARB could not possibly calculate or include all potential values in the LCFS rulemaking.[14] ARB, therefore, utilized aggregate data or averages where appropriate to develop a limited number of lifecycle "pathways" for several transportation fuels, including gasoline, natural gas, ethanol, hydrogen and electricity (when used to power vehicles). In

---

[13] *See* ISOR p. B-31-33; EPA RFS2 Rulemaking, 75 Fed. Reg. at 14749-50.
[14] Nor would it have made sense for ARB to do so, as it would result in ARB calculating CI values for fuels that might never be sold in California.

Declaration of Michael Scheible In Support of Opp. to Plaintiffs' Motion for P.I., of Opp to Plaintiffs' Motions for Summary Judgment and of Defendants' Motion for Summary Judgment (1:09-CV-02234-LJO-DLB)

addition, ARB included procedures in the LCFS that allow fuel producers to request individualized CI values for their specific fuel pathways. These procedures are described below in their own section.

36. One set of these pathways is set forth in Table 6 of the LCFS regulation, captioned "Carbon Intensity Lookup Table for Gasoline and Fuels that Substitute for Gasoline."[15] For convenience, it is included as Exhibit B to this Declaration. For each pathway, Table 6 includes a generalized "Pathway Description" and a Carbon Intensity Value. The CI value columns show the direct emissions, the land use and other indirect emissions, and a total. The total is the figure to be used by the regulated parties in determining if the fuel creates a credit or a deficit relative to the LCFS performance standard for the year.

37. Table 6 includes a CI for "CARBOB" the crude oil component of gasoline that is blended with an oxygenate such as ethanol and before it is sold at the pump.[16]

38. As promulgated, Table 6 contains CI values for 11 specific corn ethanol pathways (4 for production in California and 7 for production in Midwest). Table 6 also contains CI values for two "average" corn ethanol pathways – a "Midwest average" and a "California average." It also contains three pathways for Brazilian sugarcane ethanol.

39. The "Midwest average" pathway represents a volume-weighted mix of individual Midwest pathways using percentages that represent their relative production volumes. This pathway is intended to be used when an actual pathway CI value cannot be determined. This can occur when the actual production source is unknown or the ethanol is a mix of supplies from several facilities that have been commingled. Ethanol is designed to be fungible, so that it can be freely traded and used. Batches from different sources can be mixed and traded among suppliers several times before actually being procured by the final party that would be regulated under the LCFS.

---

[15] There is another table (Table 7) that provides pathways for Diesel and Fuels that Substitute for Diesel.
[16] Oxygenate blending refers **to adding** substances which increase the amount of oxygen in that gasoline blend. Ethanol is the by far the most common oxygenate used in U.S. gasoline.

12

40. The "California average" pathway was included because ARB needed to determine the anticipated CI of California gasoline in 2010 for use as a CI baseline from which percentage reductions would be calculated. The baseline reflects 90% CARBOB by volume made from crude oil in California refineries and 10% "California average" ethanol by volume on the assumption that most of the ethanol blended into California gasoline in 2010 would be from the Midwest.

41. Ethanol that corresponds to one of the specific pathways in Table 6 must use that specific pathway's CI value, unless the producer applies for and received an individualized CI value under Method 2A or 2B as described below.

42. ARB has provided a registration process on its website through which fuel producers can indicate the CI from Table 6 that best matches their fuel as a way of demonstrating their pathway. As of mid-December 2010, 47 ethanol producers, including 44 from out-of-state, have used this process and were listed on the ARB website using pathways from Table 6 as it was originally promulgated. The California facilities have been registered with a CI value of 80.7. Out-of-state corn ethanol facilities have been registered with a range of CI values from 86.8 gCO2e/MJ to 120.99. The registrations of the Brazilian sugarcane ethanol producers were not complete as of mid December 2010. Some Midwest natural gas-fired corn ethanol facilities have registered for two pathways – one for ethanol produced with wet DGS as a co-product (90.1 CI) and a second for dry DGS as a co-product (98.4 CI). Additionally, as explained below in detail, numerous other ethanol producers have applied for individualized, lower CI values.

**Factors in the Table 6 CI Values Challenged By Plaintiffs**

43. Plaintiffs correctly point out that the CI values of California and Midwest corn ethanols with similar pathway labels differ by 9.6 gCO2e/MJ. The scientific basis for this difference comes from three factors in the lifecycle analysis that are actually different for facilities in the two regions: 1) transportation, 2) electricity and 3) plant efficiency. Plaintiffs assert that these factors work to the disadvantage of Midwest ethanol producers relative to California producers. In fact, however, the transportation factor provides a net advantage to Midwest producers, while

13

the electricity and plant efficiency factors do the opposite. This is best illustrated by Table 1 below:

**Table 1**
**Comparison of Lifecycle Carbon Intensities from**
**Ethanol Production in Similar-Type[17] Midwest and California Plants**

| Lifecycle Component | Midwest Pathway[18] CI | California Pathway[19] CI |
|---|---|---|
| Growing of Corn | 35.8 | 35.8 |
| Transport Corn to Plant | 2.2 | 6.8 |
| Energy Use By Plant | | |
|     Natural Gas Use | 27.1 | 24.0 |
|     Electricity Use | 11.4 | 3.1 |
| Credit for Co-Products | - 11.5 | - 12.9 |
| Transport EtOH from Plant to Distribution Points in CA | 2.6 | 1.3 |
| Add Denaturant | 0.8 | 0.8 |
| Subtotal -"Direct Emissions" | 68.4 | 58.9 |
| GHGs from Land Use Change | 30 | 30 |
| Total Carbon Intensity | 98.4 | 88.9 |

44. Table 1 was created by ARB staff, extracting information from the Cal-GREET model to provide the breakdown of the Table 6 CI values. It shows that some elements of the lifecycle analysis are constant across Midwest and California corn ethanol. For example, the emissions involved in growing the corn and the emissions involved in adding a denaturant (which is done to ensure that fuel ethanol cannot be used as alcoholic spirits which must pay substantial federal taxes as high as $27.00 per gallon) are the same for all corn ethanols in Table 6.

45. Some lifecycle factors are clearly different between the two pathways. For example, the emissions associated with transportation of corn to the plant are higher for the California pathway (6.8 gCO2e/MJ) than for the Midwest pathway (2.2). This accounts for the fact that corn used for ethanol is grown in the Midwest and must travel much farther to be used in a California plant than one in the Midwest. Once the ethanol is produced, of course, it has to travel less distance to get from a California plant to a California distribution point than does ethanol from a

---

[17] Both plants use a dry mill production process, use natural gas for thermal energy (for heating the corn) and produce dry distillers grain as a co-product.
[18] This pathway corresponds to ethanol row 4 in Table 6.
[19] This pathway corresponds to ethanol row 9 in Table 6.

14

Midwest plant. This results in a higher CI increment, 2.6, for ethanol transport for the Midwest pathway, compared to 1.3 for the California pathway. Taking both components of transportation into account, the total emissions from transportation for the Midwest pathway are 4.8, and for the California pathway 8.1. Thus, for transportation, the California pathway gets a CI value 1.69 times higher than that of the Midwest pathway. This is consistent, in general terms, with plaintiffs' assertion that transporting corn generates more emissions than transporting ethanol. *See* Lyons Decl. ¶ 34.

46. Another difference between the two pathways stems from emissions associated with the amount of energy used to produce the ethanol. California dry mill ethanol plants are, on average, more energy efficient than Midwest dry mill plants, on average. ARB had more data about the California plants, which were few in number and of newer designs than the mix of more than 100 Midwest plants. These facts required different inputs to the lifecycle analysis for the California facilities than could be estimated for plants nationwide. Natural gas use in California plants was estimated at 28,666 BTUs per gallon of ethanol produced, on average, compared to 32,328 BTUs per gallon for Midwest plants, on average. This difference is reflected in Table 1 in the Natural Gas Use row (27.1 gCO2e/MJ Midwest, 24.0 California).

47. Plant efficiencies are also reflected in the Electricity Use row. Electricity use is 0.66 Kilowatt-hour per gallon of ethanol produced in California plants, on average, compared to 1.08 in Midwest plants. In addition, the electricity consumed in the Midwest comes predominantly from coal-fired generation, resulting in more emissions per Kilowatt-hour of electricity than electricity in California which is principally from natural-gas fired generation.[20] Both of these factors – efficiency and source of electricity -- are reflected in Table 1 in the Electricity Use row (11.4 gCO2e/MJ, Midwest, 3.1 California).

48. The co-product credit for distillers grains is slightly higher (12.9 gCO2e/MJ) for California ethanol plants than Midwest plants (11.5) because distillers grains produced in

_____

[20] Electricity in California was attributed to a mix of 78.7 percent from natural gas and 21.3 percent from renewables. For the Midwest the mix was 33.5 percent from natural gas, 51.6 percent from coal with the remaining 14.9 percent from biomass or other renewables

15

California are currently all consumed in California, meaning there are fewer emissions involved in transporting the distillers grain from the plant to point of consumption. California is a large net importer of animal feed, including distillers grains.

49. In sum, while the pathway labels in Table 6 of the LCFS regulation may be "identical," the average plants represented by the pathways are not. Transportation pathways and electricity generation (and their associated emissions) are also far from identical for these two pathways. Accordingly, the differences in CI values simply reflect the proper application of lifecycle emissions modeling.

50. ARB recognized that not all plants are "average" in terms of efficiency and other factors relevant to the CI value. A plant with notably higher than average efficiency could use the 2A/2B Method described below to obtain an individualized CI value.

**Land Use Change**

51. Plaintiffs also raise a question about the indirect land use factor of 30 gCO2e/MJ for corn ethanol. As discussed above, this indirect land use factor is the same for any corn ethanol, whether it is produced in California or the Midwest. Most scientific experts concur that there are some positive GHG emissions associated with land conversion resulting from increased corn production. This evidence concerning these effects led to the EPA's inclusion of an indirect land use factor in its lifecycle emissions calculation under RFS2.

52. There is, however, considerable discussion among scientific experts on how to best quantify land use change effects and the method to assign, on a per unit of biofuel produced, an emissions value for land conversion. At the time of the LCFS' adoption, ARB resolved this uncertainty as best it could, based on the best available scientific evidence. It therefore adopted an indirect land use factor of 30 for U.S. corn ethanol and 46 for Brazilian sugarcane ethanol. Those factors apply equally to all ethanol produced from those feedstocks.

53. In addition, CARB set up an expert working group to continue to evaluate and refine the indirect land use factor. The workgroup has met eight times since February 2010, and nine subgroups have prepared draft recommendations to consider related to the treatment of land use change and other indirect effects. In November 2010 ARB staff presented the Board with a plan

16

to update the land use change and other indirect effects values in the Spring of 2011 or as expeditiously as practical. This process will determine if modifications related to modeling the emission impacts due to land use change are appropriate.

**California Ethanol vs. Non-California Ethanol in Table 6**

54. All ethanol to be used as fuel in California is subject to the LCFS regulation. And all of it will need to select a CI value either from Table 6 or through the individualized process described below . And all CI values for all pathways were determined based on appropriate inputs and by using the same model – CA-GREET.

55. Considering only the actual ethanol pathways in Table 6 (excluding the "average" pathways), there are 14 – four in California and ten out-of-state. The California pathways range in CI value from 80.70 gCO2e/MJ to 88.90. The non-California pathways range from 58.40 to 120.99.

56. Eleven of the fourteen non-average pathways, including four from the Midwest, have CI values below the 2011 compliance figure of 95.61 gCO2e/MJ, as well as below the 2012 and 2013 compliance values. Thus, a regulated party could generate compliance credits through 2013 by buying ethanol corresponding to any one of those 11 pathways (including the four from the Midwest).

**Fuel Producers May Request Additional Pathways with Individualized CI Values – Method 2A and 2B**

57. The pathways available in Table 6 are not static. ARB recognizes that the renewable fuels industries, including the ethanol industry, are neither static nor uniform. Reflecting this, the LCFS provides two alternative processes by which fuel producers can establish a new pathway with an individualized CI value. These two alternative processes are called the "Method 2A" and "Method 2B" processes, as designated in the regulation itself in § 95486(c) and § 95486(d), respectively.

58. The Method 2A process is available to facilities that produce fuel through established Table 6 pathways but can demonstrate that their fuel has a CI value at least 5 gCO2e/MJ lower than the closest existing pathway. The producer must also show that it can and expects to provide

17

more than 10 million gasoline gallon equivalents per year of its fuel to California. CI values lower than the related Table 6 pathway can result from variations in plant efficiencies, power sources, production processes, or co-products, among other factors.

59. The Method 2B process is available to facilities that produce fuel through a pathway that does not yet exist in Table 6. For example, ARB is currently considering a Method 2B application from a facility that produces ethanol from municipal solid waste.

60. When a new CI value is approved, through either Method 2A or 2B, it becomes a part of the regulation itself through inclusion in Table 6. Of course, amending the regulation in that way requires a rulemaking proceeding, including public review and comment. At least while the LCFS is in its startup year of 2011, ARB will allow a producer to use the draft CI value for its fuel, after it is published for public review but before it is adopted, even though that value is not yet officially included in Table 6.

61. As of mid-December, 60 entities have contacted ARB regarding Method 2A or 2B pathways. Of these, 5 have submitted final Method 2A applications for lower CI values for existing pathways, and 5 have submitted final Method 2B applications for CI values for entirely new pathways. Several applicants are seeking approval for multiple plants or pathways, A total of 25 requested pathways from Method 2A and 2B applicants were posted on the ARB website on December 14, 2010[21].

62. Most, if not all, of the Method 2A applications are for production facilities that were completed or under construction prior to December 19, 2007. The reasons these plants can qualify for a new 2A pathway are varied. For example some plants are similar to the Midwest natural-gas-fired plants described in the original Table 6 Midwest corn ethanol pathway, except that they are significantly more efficient.

63. The posted information on the Method 2A and 2B applications includes 22 pathways for corn ethanol and 3 related to Brazilian sugarcane ethanol. ARB will solicit public comment on the proposed draft CI values. The draft CI values for corn ethanol pathways range from the

---

[21] Available at: http://www.arb.ca.gov/fuels/lcfs/2a2b/2a-2b-apps.htm. Attached herein as Exhibit C.

18

73.2 gCO2e/MJ to 92.4, Once the proposed values are published for public review, the facilities may use them until the final number is adopted and included in Table 6.

64. Under Method 2B, ARB is considering applications for a number of new pathways. Several new feedstocks and processes are anticipated. For example, one Kansas ethanol plant uses a waste wheat slurry stream from a wheat processing plant in its feedstock mix and has applied for a CI value of 71.56 gCO2e/MJ. ARB anticipates that public comment will begin on some proposed pathways in December 2010, and the facilities may then use the published CI values until the final number is adopted after rulemaking.

**Compliance Scenarios**

65. As part of its Initial Statement of Reasons (ISOR) for the LCFS, ARB included four compliance scenarios demonstrating four possible ways ("what if" scenarios) in which regulated parties in California could comply with the CI reduction mandates between 2011 and 2020. As indicated in the ISOR, the primary purposes of the compliance scenarios were to demonstrate 1) that compliance with the LCFS was possible and 2) that compliance was not dependent on a narrow set of fuels or new alternative vehicles being available. In other words, the compliance scenarios were meant to put to rest feasibility concerns about the LCFS. In addition, the compliance scenarios were used as the basis for the environmental and economic analyses required of rulemakings under California law.

66. The compliance scenarios do not represent predictions by ARB about what *will* happen.[22] As ARB acknowledged in the ISOR, a wide variety of other compliance paths are possible, because the LCFS does not mandate or prohibit any particular fuels or vehicles. In addition, of course, one of the primary purposes of the LCFS is to encourage and incent innovation in advanced, lower carbon intensity fuels. No one, including the staff at ARB, knows when the next breakthrough will come or what shape it will take, so the possibilities for compliance in the future are many, varied and uncertain.

---

[22] *See* ISOR, at p. IV-4.

19

67. The compliance scenarios show the utilization of "Midwest average" (labeled "MW Avg. Corn EtOH") beginning to decline in California in 2011. The four scenarios also show no utilization of "Midwest average" corn ethanol beginning in either 2017 or 2018 (depending on the scenario). "Midwest average" corn ethanol in the compliance scenarios corresponds to the "Midwest average" corn ethanol in Table 6 and has a CI value of 99.40 gCO2e/MJ. As described above, the "Midwest average" corn ethanol pathway is intended to be used only when the specific pathway for Midwest ethanol cannot be identified. In other words, "Midwest average" is just that, an average of the corn ethanol produced by plants in the Midwest. It is not representative of ethanol from a specific plant, which would have a CI value based on the lifecycle emissions associated with its particular pathway.

68. The compliance scenarios also show utilization of 300 million gallons of California "low-CI" corn ethanol (labeled "CA Low-CI Corn EtOH") in each year from 2010 through 2020. This California corn ethanol corresponds to the "California; Dry Mill; Wet DGS; NG" row in Table 6 with a CI value of 80.70 gCO2e/MJ. The 300 million gallons figure was based on California's existing and permitted production capacity in 2008. It was not assumed that additional, new California corn ethanol plants would be built. In reality, as plaintiffs note, California plants have not produced anywhere close to 300 million gallons of ethanol in recent years. Whether the California plants will reach that production level or not will be determined by market conditions. The LCFS does not mandate or guarantee that California consume 300 million gallons of California corn ethanol. The compliance scenarios simply assumed that if California plants produced at capacity that the fuel would remain in California.[23]

69. The compliance scenarios also show varying degrees of utilization of low-CI corn ethanol, presumed to be from Midwest plants (labeled "Fed. New Renew. Biofuels")[24]; Brazilian sugarcane ethanol; advanced renewable biofuels; cellulosic ethanol; flex-fuel vehicles ("FFVs") that can run on higher blends of ethanol; electric vehicles; and other

[23] It is worth noting that all of the existing California ethanol plants were either built, under construction or in the permitting process when Congress passed EISA in December 2007.
[24] This fuel was expected to be corn ethanol that could meet the 20% reduction requirement under RFS2 to qualify as renewable fuel. *See* ISOR, Appendix E, p. E-3. Since

(continued...)

Declaration of Michael Scheible In Support of Opp. to Plaintiffs' Motion for P.I., of Opp to Plaintiffs' Motions for Summary Judgment and of Defendants' Motion for Summary Judgment (1:09-CV-02234-LJO-DLB)

transportation fuels and vehicles. Again, the purpose of the scenarios was to demonstrate precisely what they show – that compliance is possible through a wide variety of means.

70. Because the compliance scenarios' principal purpose was to demonstrate feasibility, they were kept simple by utilizing the assumptions described above regarding "Midwest average" corn ethanol and California corn ethanol. It was always recognized that market forces would determine what fuels would actually be used in California under the LCFS, based on carbon intensities, price, availability and other market conditions such as the availability of excess LCFS credits. Thus, there was no reason to develop a multitude of scenarios involving all the Table 6 pathways in varying degrees. In addition, of course, ARB could not predict how many additional pathways would be added through the Method 2A and 2B processes (described above), or when such pathways might develop, so actually predicting the future fuel mix would have been extremely difficult, if not impossible in any case.

71. It is possible, of course, to develop other scenarios that produce the carbon intensity reductions required by the LCFS. For example, through 2012, compliance would be possible if the only ethanol purchased in California was "Midwest; Dry Mill; Wet DGS" with a CI value of 90.10 gCO2e/MJ. Refiners using 90% CARBOB and 10% of that ethanol (the ratio of gasoline to ethanol required in California) would obtain an average CI of 95.28. Of course, as Midwest ethanol producers apply for and obtain additional, lower-CI pathways through the Method 2A process, the possibilities for compliance using Midwest ethanol only expand. With many 2A and 2B ethanol pathways well below the LCFS standard for 2020, scenarios involving Midwest ethanol become more likely well into the future, including through 2020. In the end, of course, how compliance occurs will be determined by market conditions – principally the cost and availability of competing lower CI fuels. If low-CI Midwest ethanol is cost-competitive with low-CI California ethanol and other comparable fuels on the market, it will likely be utilized in California.

_____

(…continued)
most of the corn ethanol in the United States comes from the Midwest, this fuel was presumed to come from there.

21

**Fuel Shuffling**

72. In the LCFS rulemaking ARB acknowledged the possibility that some fuel "shuffling" may occur under the LCFS. Shuffling would occur if, for example, low-CI ethanol from existing sources was used in California to generate LCFS credits while the displaced high-CI ethanol was simply directed to other markets that did not regulate carbon intensity. If that were to occur as the predominate method of compliance with the LCFS, significantly fewer emission reductions than anticipated would be achieved. This is of most concern in the early years when the required percentage improvement in the gasoline CI standard ramps up slowly, and the deficits that must be offset due to CARBOB use are relatively small.

73. However, several features of the LCFS are expected to greatly reduce or eliminate fuel shuffling as a significant means of compliance, These features help ensure that the LCFS will create the desired emissions reductions, in two primary ways. First, the incentives that the LCFS creates for the development of new fuels and for improvements to existing processes will likely have impacts that result in reduced emissions associated with biofuel production nationwide. It is reasonable to assume that many producers will want to make their fuels more competitive in California by producing the lowest CI fuels possible. We have already seen this dynamic in the corn ethanol industry's production capacity which has exceeded demand since mid-2008. More efficient plants produce ethanol less expensively and thus compete more effectively in those market conditions, providing incentives for producers to become more efficient. Thus, it seems highly likely that some lower CI fuels, further incented by the LCFS, will be sold outside of California, resulting in lower emissions than would otherwise have occurred. For another thing, most of the capacity needed to meet the ramped up volume mandates of the RFS2 still must be built. With the LCFS in place, new plants being built to fill those mandates have an additional incentive to reduce their CI beyond the RFS2 threshold. Incremental reductions in emissions have value under the LCFS in a way that they do not under the RFS2. Thus, the LCFS will likely have a positive impact on new plant construction, again reducing emissions beyond what they otherwise would have been.

74. Second, with the LCFS, ARB has established a model program that can be copied to other entities. As noted in the FSOR, a regional consortium of eleven Northeastern and Mid-Atlantic States, Oregon, and the European Union have all expressed interest in adopting a regulation like the LCFS. If other states or regions were to follow California's lead, the market incentives for lower CI fuels would expand and the likelihood of compliance mainly through fuel shuffling would be greatly reduced. California has a history of environmental leadership like this. For example, California pioneered comprehensive programs to recover gasoline vapors emitted during vehicle fueling that were subsequently copied in much of the nation, and California has established progressively tighter vehicle standards, which have also been widely adopted by other states.

**Relationship Between the LCFS and the Federal RFS2**

75. The LCFS and the EPA's RFS2 rules both use lifecycle GHG emissions associated with transportation fuels to evaluate fuels regulated under the programs. The two programs use different incentives to drive fuels innovation, reduce GHG emissions, and decrease dependence on oil. In addition to sharing those goals, the two approaches are, in fact, compatible and complementary.

76. The RFS2 establishes four categories of fuel: conventional renewable biofuel, advanced biofuel, cellulosic biofuel, and biomass-based diesel. Each category has threshold emissions reduction levels (based on lifecycle emissions relative to petroleum fuels) required to qualify. For example, a fuel cannot qualify as an advanced biofuel unless it reduces lifecycle GHG emissions by at least 50% over the baseline.

77. The RFS2 establishes minimum volume mandates for the three categories with the lowest lifecycle emissions (advanced biofuel, cellulosic biofuel and biomass-based diesel). The RFS2 also establishes a mandate for a total volume of renewable fuels. Because the volume mandates for the lowest emitting categories are minimums, conventional renewable biofuels are expected to fill whatever gap remains between the total volume mandate and the quantities provided by those other three categories. For example, if advanced biofuels were consumed in quantities larger than their volume mandate, it would decrease the amount of conventional

23

renewable biofuels used to comply with RFS2. The RFS2's volume mandates are national, and the RFS2 does not require that any state or other region consume a particular quantity of any category of renewable fuels.

78. As intended by Congress, the RFS2 provides incentives for development of lower carbon intensity biofuels by specifying the minimum quantities for renewable biofuels in general, and for the three lowest carbon categories specifically.

79. The LCFS, as described above, is not based on categories of fuel with distinct "bins." Nor does the LCFS contain any minimum emissions reductions requirements to qualify for a specific fuel category. In addition, the LCFS is not limited to renewable biofuels but, rather, covers the full range of transportation fuels.

80. The LCFS complements and reinforces the RFS2's incentives by rewarding fuel producers for every incremental emissions reductions. To illustrate, consider an existing corn ethanol plant that qualifies as a conventional renewable fuel under RFS2. If that plant is able to reduce its lifecycle GHG emissions to, say, 30% below the baseline of gasoline, the LCFS will reward that plant's producer with a larger credit than it would have otherwise received.[25] That is an additional incentive not provided by the RFS2. Under the LCFS, in contrast, there are rewards for each incremental reduction of 5g/MJ over an existing pathway. At that level, a producer can request an individualized CI value, increasing the value of its product in the market, because the lower the CI, the larger a credit it generates.

81. The additional and complementary incentives provided by the LCFS will help achieve the objectives of the Energy Security Independence Act of 2007. The LCFS will augment the investment incentives provided by EISA to help drive the development and commercialization of advanced fuels as envisioned by EISA.

82. In addition, the LCFS serves an additional complementary purpose: to incentivize improvements to existing processes such as those that produce corn ethanol. Recent updates to the Argonne National Laboratory's GREET model indicate that the average energy efficiency of

_____

[25] It is likely this plant would qualify for an individualized CI under Method 2A or 2B, as described in Paragraphs 57 through 64.

24

ethanol facilities in the US is improving significantly.   This reflects both newer, more efficient plants being built and upgrades to existing plants.  This trend demonstrates that firms have been making investments and using technology to increase the efficiency of their operations. Undoubtedly, these investments are driven, in large part, by the economic savings associated with energy savings.  As discussed above, the LCFS rewards such improvements, thus providing an additional incentive for firms to move to more energy efficient production methods.

83.  The pathways initially published in Table 6 were based on  average efficiencies prior to the rulemaking. Many plants can likely take advantage of the 2A/2B process to obtain an individualized CI value, because they have lifecycle emissions at least 5 gCO2e/MJ lower than the established pathway.  This is consistent with the 2A/2B applications ARB is receiving.

84.  The financial incentive mechanism in the LCFS thus complements and reinforces the federal RFS2.  Both serve the purposes of reducing GHG emissions and our dependence on oil by fostering low carbon fuel technological development.

**The RFS2 and the LCFS Are Only Part Of The Picture**

85.  Even in light of EISA and the RFS2, states exercise significant control over fuels consumed therein.  For example, each state independently establishes which oxygenates may be blended with gasoline, as evident from ARB's and other state's decisions to prohibit MTBE. States can also set minimum and maximum oxygenate limits for gasoline, up to the EPA's established limits, and they can establish limits and or mandates related to biodiesel.  For example, states may not exceed EPA's maximum blend of 10% ethanol with gasoline (recently increased to 15% for some vehicles).  But states may blend lower percentages, and some do.

86. Many states also provide tax credits and other incentives that are highly relevant to the mix and cost of transportation fuels in their states.  For example, states offer incentives for the purchase of flex-fuel vehicles that can run on E85 (fuel that is 85% ethanol) and for the deployment of pumps that can dispense E85.

87.  In summary, the volume of ethanol and other biofuels consumed in a given state in a given year is subject to a complex set of local regulations and factors, only one of which is the RFS2.

25

**Crude Oil Component of Gasoline Lifecycle Emissions**

88. The construction and purpose for the lifecycle analysis for crude oil and its resulting petroleum-based transportation fuels is somewhat different under the LCFS than that for alternative fuels, as explained below. The reason for this is that the focus of the LCFS is to reduce GHG emissions largely by driving the development and use of lower carbon *alternative* fuels.

89. Crude oil extraction has been occurring for a very long time. The easier-to-extract resources have been depleted or are currently in production. As new sources of crude oil emerge, then, it is likely they will involve harder-to-extract resources which tend to require larger amounts of energy and thus produce more GHG emissions during extraction. For example, the Canadian Association of Petroleum Producers estimated that extraction from Canadian oil sands had doubled between 2000 and 2006, and would double again between 2006 and 2011. On average, producing a gallon of crude oil from oil sands requires several times more energy input than the extraction of more conventional crude oil.

90. Petroleum based fuels have a well-established, global market, and demand for them as transportation fuels is increasing, particularly with growing demand in countries like China and India with large populations and rapidly growing economies. These markets provide sufficient incentives to bring new sources of crude oil to the market. Alternative transportation fuels, in contrast, currently provide only a small percent of the energy used in vehicles. Indeed, many of the fuels of the future do not currently exist in commercial production. The LCFS is designed to provide incentives for these emerging technologies and products.

91. In light of these facts and the objectives of the LCFS to drive development of low carbon alternatives to fuels derived from crude oil, ARB adopted an approach to petroleum based fuels with the following goals: 1) to ensure that GHG emissions associated with the use of petroleum based fuels in California do not increase dramatically and 2) to ensure that focus for emissions reductions remains on low carbon, alternative fuels.

92. To meet those goals, ARB began by assessing the baseline GHG emissions attributable to the crude oil used to produce gasoline consumed in California using the most recent year for

26

which data was available -- from the California Energy Commission's 2006 report "California Crude Oil Production and Imports (April 2006)". In 2006, the average CI attributable to extraction and transportation of crude oil used in California was 8.07 gCO2e/MJ.[26] Additional lifecycle emissions are associated with the refining process, transport of finished fuel, and fuel combustion, resulting in the CARBOB CI value of 95.86. The emissions associated with refining are generally the same regardless of the source of the crude oil, hence the focus of plaintiffs' argument and this declaration is on the CI of extraction and transportation. Those are the contributors to CI for crude-oil-based fuels that generally vary the most from fuel source to fuel source.

93. About 40% of the 2006 baseline was crude oil from California, with another 16% from Alaska. The remainder was from foreign sources.[27]

94. All gasoline from crude oil sources that, by country or state of origin, constituted 2% or more of California's crude oil supplies in 2006 will use a CI for CARBOB that includes the average 8.07 value for the portion of their CI attributable to extraction and transportation to California refineries. This group of sources captures the significant sources of crude oil used in California.

95. Crude oil sources that did not constitute 2% of more of California's crude in 2006 are treated in one of two ways depending on their CI value for extraction and transportation. If the crude oil's CI from extraction and transport is 15.0 gCO2e/MJ or less, the resulting CARBOB is assigned the same, average value as sources that did constitute at least 2% of 2006 California crude. If the crude oil's CI from extraction and transport is higher than 15, the resulting CARBOB must use the actual CI value associated with its extraction and transport pathway.

[26] The FSOR (page 23) indicates that a CI value of 6.93 gCO2e/MJ was the average carbon intensity of extracting and transporting crude oil to California refineries. This statement is in error, and 6.93 represents only the emissions associated with crude extraction. The actual component of the CI for CARBOB in Table 6 attributable to the carbon intensity of extracting and transporting crude oil is 8.07 gCO2e/MJ. This same error occurred in Appendix C of the ISOR (page C-59, Table C12-6). Because of this error, the numbers in Table C12-6 should not be relied upon, although in relative magnitudes they are representative of the differences in the CI of crude oil from different sources.

[27] See Table C12-2 in Exhibit E for detail of foreign sources in 2006 baseline. It is page C-56 from the Initial Statement of Reasons (ISOR) of the LCFS.

27

Fuels that fall into the latter category are referred to as "high carbon intensity crude oils" ("HCICOs"), and they may not use the baseline average value of 8.07.

96. This approach meets the objectives of the LCFS with respect to crude oil in several important respects. First, because CARBOB derived from crude oils with CI values significantly higher than the average from 2006 must use their actual CI values, any movement by California refiners to rely on high carbon intensity crude oils will be accounted for, through the system of deficits and credits, by the aggregate CI under the LCFS. This mechanism of accounting ensures that the emissions reductions achieved under the LCFS by greater use of low carbon alternative fuels will not be wiped out by increased emissions associated with HCICOs.

97. Second, the LCFS' approach to CI values for fuels from crude oil ensures that regulated parties will focus their efforts to obtain reductions in carbon intensity through greater use of lower CI alternative fuels since most crude oils will be assigned the same, average CI under the LCFS (with some crude oils higher),   In addition, because of the global demand for crude oil, if regulated parties could meet their CI reduction targets by switching sources of crude oil, there would simply be fuel shuffling in the highly liquid crude oil market, with higher CI crudes going elsewhere. The ability to shuffle fuel is great due to the fact that California consumes only about 2% of the world's crude oil production. The shuffling of crude oil would result in no emissions reductions worldwide. Simultaneously, it would reduce the incentives to develop and deploy lower carbon alternative fuels which is the primary mechanism by which the LCFS reduces GHG emissions.

98. Third, this approach allows both ARB staff and regulated parties to avoid the tremendous amount of effort required to develop and analyze applications for CI values for all sources of crude. This is a significant reduction in burden, given that the sources of crude oil are far more numerous and geographically-dispersed than for biofuels. Determination of CI values for every pathway for crude oil, and tracking every delivery of crude, would be counterproductive for both ARB staff and the regulated parties, when the focus of the LCFS is on lower carbon, alternative fuels.

Declaration of Michael Scheible In Support of Opp. to Plaintiffs' Motion for P.I., of Opp to Plaintiffs' Motions for Summary Judgment and of Defendants' Motion for Summary Judgment  (1:09-CV-02234-LJO-DLB)

99. Finally, there is neither a need nor a point to "protecting" California's crude oil producers, as plaintiffs allege California is doing with its treatment of the CI of crude oil in the LCFS. With or without the LCFS, global prices for crude oil will be high enough to incent as much production as possible from existing California oil fields. While California refineries are the most efficient and logical facilities to utilize this production, California crude could be marketed elsewhere given the high world price for petroleum. Additionally, California's oil production peaked some time ago and is waning. California crude represented about 39% of the 2006 baseline, a large drop from about 50% in 2000. Foreign supplies increased dramatically in this same period, rising from about 25% in 2000 to about 45% by 2006. These trends will continue during the implementation of the LCFS, and the LCFS will do nothing to increase the volume of crude oil available for extraction in the state. That volume is declining and will make up a diminishing market share in years to come, with or without the LCFS.

I declare under penalty of perjury that the foregoing is true and correct based on my personal knowledge. Executed this *17* day of December, 2010 at *Sacramento*, *CA*

*Michael Scheible*

Michael Scheible

SF2010400011
40473510.doc

29

# EXHIBIT A
# Declaration of Micheal Scheible

LEAD CASE No.
1:09-CV-02234-LJO-DLB

Consolidated with Case No.:
1:10-CV00163-LJO-DLB

**Section 95482.  Average Carbon Intensity Requirements for Gasoline and Diesel**

(a)    Starting January 1, 2011 and for each year thereafter, a regulated party must meet the average carbon intensity requirements set forth in Table 1 and Table 2 of this section for its transportation gasoline and diesel fuel, respectively, in each calendar year.  For 2010 only, a regulated party does not need to meet a carbon intensity requirement, but it must meet the reporting requirements set forth in section 95484(c).

(b)    *Requirements for gasoline and fuels used as a substitute for gasoline.*

Table 1. LCFS Compliance Schedule for 2011 to 2020 for Gasoline and
Fuels Used as a Substitute for Gasoline.

| Year | Average Carbon Intensity (gCO2E/MJ) | % Reduction |
|---|---|---|
| 2010 | Reporting Only | |
| 2011 | 95.61 | 0.25% |
| 2012 | 95.37 | 0.5% |
| 2013 | 94.89 | 1.0% |
| 2014 | 94.41 | 1.5% |
| 2015 | 93.45 | 2.5% |
| 2016 | 92.50 | 3.5% |
| 2017 | 91.06 | 5.0% |
| 2018 | 89.62 | 6.5% |
| 2019 | 88.18 | 8.0% |
| 2020 and subsequent years | 86.27 | 10.0% |

(c)    *Requirements for diesel fuel and fuels used as a substitute for diesel fuel.*

Table 2. LCFS Compliance Schedule for 2011 to 2020 for Diesel Fuel and
Fuels Used as a Substitute for Diesel Fuel.

| Year | Average Carbon Intensity (gCO2E/MJ) | % Reduction |
|---|---|---|
| 2010 | Reporting Only | |
| 2011 | 94.47 | 0.25% |
| 2012 | 94.24 | 0.5% |
| 2013 | 93.76 | 1.0% |
| 2014 | 93.29 | 1.5% |
| 2015 | 92.34 | 2.5% |
| 2016 | 91.40 | 3.5% |
| 2017 | 89.97 | 5.0% |
| 2018 | 88.55 | 6.5% |
| 2019 | 87.13 | 8.0% |
| 2020 and subsequent years | 85.24 | 10.0% |

NOTE: Authority cited: Sections 38510, 38560, 38560.5, 38571, 38580, 39600, 39601, 41510, 41511, Health and Safety Code; and *Western Oil and Gas Ass'n v. Orange County Air Pollution Control District*, 14 Cal.3rd 411, 121 Cal.Rptr. 249 (1975).  Reference cited:  Sections 38501, 38510, 38560, 38560.5,

# EXHIBIT B

# Declaration of Micheal Scheible

LEAD CASE No.
1:09-CV-02234-LJO-DLB

Consolidated with Case No.:
1:10-CV00163-LJO-DLB

*Table 6. Carbon Intensity Lookup Table for Gasoline and Fuels that Substitute for Gasoline.*

| Fuel | Pathway Description | Carbon Intensity Values (gCO$_2$e/MJ) | | |
|---|---|---|---|---|
| | | Direct Emissions | Land Use or Other Indirect Effect | Total |
| Gasoline | CARBOB – based on the average crude oil delivered to California refineries and average California refinery efficiencies | 95.86 | 0 | 95.86 |
| Ethanol from Corn | Midwest average; 80% Dry Mill; 20% Wet Mill; Dry DGS | 69.40 | 30 | 99.40 |
| | California average; 80% Midwest Average; 20% California; Dry Mill; Wet DGS; NG | 65.66 | 30 | 95.66 |
| | California; Dry Mill; Wet DGS; NG | 50.70 | 30 | 80.70 |
| | Midwest; Dry Mill; Dry DGS, NG | 68.40 | 30 | 98.40 |
| | Midwest; Wet Mill, 60% NG, 40% coal | 75.10 | 30 | 105.10 |
| | Midwest; Wet Mill, 100% NG | 64.52 | 30 | 94.52 |
| | Midwest; Wet Mill, 100% coal | 90.99 | 30 | 120.99 |
| | Midwest; Dry Mill; Wet DGS | 60.10 | 30 | 90.10 |
| | California; Dry Mill; Dry DGS, NG | 58.90 | 30 | 88.90 |
| | Midwest; Dry Mill; Dry DGS; 80% NG; 20% Biomass | 63.60 | 30 | 93.60 |
| | Midwest; Dry Mill; Wet DGS; 80% NG; 20% Biomass | 56.80 | 30 | 86.80 |
| | California; Dry Mill; Dry DGS; 80% NG; 20% Biomass | 54.20 | 30 | 84.20 |
| | California; Dry Mill; Wet DGS; 80% NG; 20% Biomass | 47.44 | 30 | 77.44 |
| Ethanol from Sugarcane | Brazilian sugarcane using average production processes | 27.40 | 46 | 73.40 |
| | Brazilian sugarcane with average production process, mechanized harvesting and electricity co-product credit | 12.40 | 46 | 58.40 |
| | Brazilian sugarcane with average production process and electricity co-product credit | 20.40 | 46 | 66.40 |
| Compressed Natural Gas | California NG via pipeline; compressed in CA | 67.70 | 0 | 67.70 |
| | North American NG delivered via pipeline; compressed in CA | 68.00 | 0 | 68.00 |
| | Landfill gas (bio-methane) cleaned up to pipeline quality NG; compressed in CA | 11.26 | 0 | 11.26 |
| | Dairy Digester Biogas to CNG | 13.45 | 0 | 13.45 |

| | | | | |
|---|---|---|---|---|
| Liquefied Natural Gas | North American NG delivered via pipeline; liquefied in CA using liquefaction with 80% efficiency | 83.13 | 0 | 83.13 |
| | North American NG delivered via pipeline; liquefied in CA using liquefaction with 90% efficiency | 72.38 | 0 | 72.38 |
| | Overseas-sourced LNG delivered as LNG to Baja; re-gasified then re-liquefied in CA using liquefaction with 80% efficiency | 93.37 | 0 | 93.37 |
| | Overseas-sourced LNG delivered as LNG to CA; re-gasified then re-liquefied in CA using liquefaction with 90% efficiency | 82.62 | 0 | 82.62 |
| | Overseas-sourced LNG delivered as LNG to CA; no re-gasification or re-liquefaction in CA | 77.50 | 0 | 77.50 |
| | Landfill Gas (bio-methane) to LNG liquefied in CA using liquefaction with 80% efficiency | 26.31 | 0 | 26.31 |
| | Landfill Gas (bio-methane) to LNG liquefied in CA using liquefaction with 90% efficiency | 15.56 | 0 | 15.56 |
| | Dairy Digester Biogas to LNG liquefied in CA using liquefaction with 80% efficiency | 28.53 | 0 | 28.53 |
| | Dairy Digester Biogas to LNG liquefied in CA using liquefaction with 90% efficiency | 17.78 | 0 | 17.78 |
| Electricity | California average electricity mix | 124.10 | 0 | 124.10 |
| | California marginal electricity mix of natural gas and renewable energy sources | 104.71 | 0 | 104.71 |
| Hydrogen | Compressed $H_2$ from central reforming of NG (includes liquefaction and re-gasification steps) | 142.20 | 0 | 142.20 |
| | Liquid $H_2$ from central reforming of NG | 133.00 | 0 | 133.00 |
| | Compressed $H_2$ from central reforming of NG (no liquefaction and re-gasification steps) | 98.80 | 0 | 98.80 |
| | Compressed $H_2$ from on-site reforming of NG | 98.30 | 0 | 98.30 |
| | Compressed $H_2$ from on-site reforming with renewable feedstocks | 76.10 | 0 | 76.10 |

# EXHIBIT C

# Declaration of Micheal Scheible

LEAD CASE No.
1:09-CV-02234-LJO-DLB

Consolidated with Case No.:
1:10-CV00163-LJO-DLB

## Draft Summary: Method 2A/2B Applications and Internal Priority Pathways

| Applicant | Fuel/Feedstock | Method 2A or 2B | Posting Date | Proposed Pathways | | Carbon Intensity (gCO$_2$e/MJ; Direct + Land Use Change) |
|---|---|---|---|---|---|---|
| Archer Daniels Midland Company; Columbus, NE | Corn Ethanol | 2B | 12/14/2010 | Midwestern Dry Mill; Plant not fully optimized. Biomass process fuel consists of waste seed and some agricultural waste. | 1) Plant energy use not to exceed a value the applicant classifies as confidential; 2) No grid electricity use; 3) Coal use not to exceed 64% of fuel use (by energy); 4) Coal carbon content not to exceed 48%. | 90.2 |
| | | | | Use of these pathways is subject to the conditions appearing in the next column | 1) Plant energy use not to exceed a value the applicant classifies as confidential; 2) No grid electricity use; 3) Biomass must be at least 5% of the fuel use (by energy); 4) Coal use not to exceed 58% of fuel use (by energy); 5) Coal carbon content not to exceed 48%. | 88.29 |
| | | | | | 1) Plant energy use not to exceed a value the applicant classifies as confidential; 2) No grid electricity use; 3) Biomass must be at least 10% of the fuel use (by energy); 4) Coal use not to exceed 52% of fuel use (by energy); 5) Coal carbon content not to exceed 48%. | 86.37 |
| | | | | | 1) Plant energy use not to exceed a value the applicant classifies as confidential; 2) No grid electricity use; 3) Biomass must be at least 15% of the fuel use (by energy); 4) Coal use not to exceed 46% of fuel use (by energy); 5) Coal carbon content not to exceed 48%. | 84.45 |
| | | | | Midwestern Dry Mill; Plant fully optimized. Biomass process fuel consists of waste seed and some agricultural waste | 1) Plant energy use not to exceed a value the applicant classifies as confidential; 2) No grid electricity use; 3) Coal use not to exceed 68% of fuel use (by energy); 4) Coal carbon content not to exceed 48%. | 89.31 |
| | | | | Use of these pathways is subject to the conditions appearing in the next column | 1) Plant energy use not to exceed a value the applicant classifies as confidential; 2) No grid electricity use; 3) Biomass must be at least 5% of the fuel use (by energy); 4) Coal use not to exceed 62% of fuel use (by energy); 5) Coal carbon content not to exceed 48%. | 87.36 |
| | | | | | 1) Plant energy use not to exceed a value the applicant classifies as confidential; 2) No grid electricity use; 3) Biomass must be at least 10% of the fuel use (by energy); 4) Coal use not to exceed 56% of fuel use (by energy); 5) Coal carbon content not to exceed 48%. | 85.42 |
| | | | | | 1) Plant energy use not to exceed a value the applicant classifies as confidential; 2) No grid electricity use; 3) Biomass must be at least 15% of the fuel use (by energy); 4) Coal use not to exceed 50% of fuel use (by energy); 5) Coal carbon content not to exceed 48%. | 83.47 |
| Elkhorn Valley Ethanol LLC, c/o Louis Dreyfus Corporation | Corn Ethanol | 2A | 12/14/2010 | Midwest dry mill, dry DGS, Natural gas | Use of this pathway is subject to energy use conditions the applicant has classified as confidential | 87.2 |
| Green Plains Central City LLC | Ethanol/Corn | 2A | 12/14/2010 | Midwest dry mill, dry DGS, Natural gas | Use of this pathway is subject to energy use conditions the applicant has classified as confidential | 84.29 |
| Green Plains Holdings II LLC, Lakota, Iowa plant | Ethanol/Corn | 2A | 12/14/2010 | Midwest dry mill, dry DGS, Natural gas | Use of this pathway is subject to energy use conditions the applicant has classified as confidential | 90.8 |

| Applicant | Fuel/Feedstock | Method 2A or 2B | Posting Date | Proposed Pathways | | Carbon Intensity (gCO₂e/MJ; Direct + Land Use Change) |
|---|---|---|---|---|---|---|
| POET LLC | Corn Ethanol | 2A | 12/14/2010 | Dry mill, Dry DGS<br><br>Use of these pathways is subject to energy use conditions the applicant has classified as confidential | Raw starch hydrolysis | 92.4 |
| | | | | | Raw starch hydrolysis/ combined heat and power | 88.50 |
| | | | | | Raw starch hydrolysis/biomass & landfill gas fuels | 88.50 |
| | | | | | Raw starch hydrolysis/corn fractionation | 91.70 |
| | | | | | Conventional cook/combined heat and power | 90.50 |
| | | | | | Raw starch hydrolysis/biogas process fuel | 74.70 |
| | | | | Dry mill, Wet DGS<br><br>Use of these pathways is subject to energy use conditions the applicant has classified as confidential | Raw starch hydrolysis | 83.70 |
| | | | | | Raw starch hydrolysis/ combined heat and power | 79.80 |
| | | | | | Raw starch hydrolysis/biomass & landfill gas fuels | No wet DGS version |
| | | | | | Raw starch hydrolysis/corn fractionation | 80.70 |
| | | | | | Conventional cook/combined heat and power | 80.50 |
| | | | | | Raw starch hydrolysis/biogas process fuel | 73.20 |
| Trinidad Bulk Traders Limited | Ethanol/Cane (CBI pathway) | 2B | 12/14/2010 | Hydrous Brazilian sugar cane ethanol dehydrated in Trinidad and shipped to California (under the Caribbean Basin Iniative). Adds 5.54 gCO2e/MJ to the existing Brazilian sugar cane pathways | Use of this pathway is subject to the condition that thermal process power must be supplied by natural gas only | 78.94<br>63.94<br>71.94 |
| ARB Internal Priority Pathway | Used Cooking Oil/Biodiesel | N/A | 12/14/2010 | Fuel produced in the Midwest from local feedstocks and transported to CA | No cooking required; | 13.53 |
| | | | | | Cooking required; | 18.44 |
| ARB Internal Priority Pathway | Sorghum/Ethanol | N/A | 12/14/2010 | | Midwest dry mill, Sorghum, Dry DGS, Natural gas | 92.22 |
| | | | | | Midwest dry mill, Sorghum, Wet DGS, Natural gas | 84.36 |
| ARB Internal Priority Pathway | Canola/Biodiesel | N/A | 12/14/2010 | | North American canola biodiesel produced from oil extracted in Canada from Canadian-grown canola. FAME biodiesel production ocurs in or near Washington State. Finished fuel is shipped to California | Direct: 31.99<br>EPA LUC: 31*<br>Sum: 62.99 |
| ARB Internal Priority Pathway | Corn Oil as an corn ethanol co-product | N/A | 12/14/2010 | | Corn oil extracted from distillers grains prior to the drying process. All corn oil extraction credits and none of the corn farming or ethanol production emissions accrue to the biodiesel. This value applies only to plants in which DGS is dried. The value for plants producing wet DGS would be higher | 5.9 |

* The land use change impacts of canola biodiesel have not yet been estimated. In the interim, ARB will use the EPA estimate of 31 gCO2e/MJ

# EXHIBIT E

# Declaration of Micheal Scheible

LEAD CASE No.
1:09-CV-02234-LJO-DLB

Consolidated with Case No.:
1:10-CV00163-LJO-DLB

**Table C12-1**
**Breakdown of Crude Supplied to California Refineries**

| Source of Crude | Grade of Crude | Crude Recovery Method | % of CA Crude | CA Total % |
|---|---|---|---|---|
| CA | Heavy | TEOR | 14.80% | 38.7% |
| | Light to Medium | Water Flood | 6.10% | |
| | Medium | Gas Injection | 1.30% | |
| | Light | Primary | 16.50% | |
| Imported | Alaska Light | Primary | 16.10% | 61.2% |
| | Venezuela Heavy | TEOR like | 0.63% | |
| | Other Imported Light | Primary | 44.44% | |

**Table C12-2**
**Imported Crude into California in 2006 by Country(21)**

| | Barrels | % of total imports | % of total CA crude |
|---|---|---|---|
| SAUDI ARABIA | 86,976,000 | 29.45% | 13.27% |
| ECUADOR | 71,174,000 | 24.10% | 10.86% |
| IRAQ | 56,163,000 | 19.02% | 8.57% |
| BRAZIL | 17,938,000 | 6.07% | 2.74% |
| MEXICO | 15,473,000 | 5.24% | 2.36% |
| ANGOLA | 14,979,000 | 5.07% | 2.29% |
| COLOMBIA | 9,362,000 | 3.17% | 1.43% |
| OMAN | 6,326,000 | 2.14% | 0.97% |
| VENEZUELA | 4,120,000 | 1.40% | 0.63% |
| ARGENTINA | 3,484,000 | 1.18% | 0.53% |
| Others: | 9,311,000 | 3.15% | 1.42% |
| **Total Foreign Sources** | **295,306,000** | **100%** | **45.1%** |

The analysis presented here calculates the carbon intensity of crude recovery for the various crudes used in California.  It then calculates a weighted average carbon