1  KAMALA D. HARRIS,
   Attorney General of California
2  ROBERT W. BYRNE,
   Supervising Deputy Attorney General
3  MARK W. POOLE, State Bar No. 194520
   GAVIN G. MCCABE, State Bar No. 130864
4  DAVID A. ZONANA, State Bar No. 196029
   M. ELAINE MECKENSTOCK, State Bar No. 268861
5  Deputy Attorneys General
     455 Golden Gate Avenue, Suite 11000
6    San Francisco, CA  94102-7004
     Telephone:  (415) 703-5582
7    Fax:  (415) 703-5480
     E-mail:  Mark.Poole@doj.ca.gov
8  *Attorneys for Defendants*
   *James N. Goldstene, et al.*

9
                    IN THE UNITED STATES DISTRICT COURT
10
                  FOR THE EASTERN DISTRICT OF CALIFORNIA
11

12

13  **ROCKY MOUNTAIN FARMERS UNION;**        LEAD CASE No.
    **REDWOOD COUNTY MINNESOTA**             1:09-CV-02234-LJO-DLB
14  **CORN AND SOYBEANS GROWERS;**
    **PENNY NEWMAN GRAIN, INC.;**            *Consolidated With* Case No.:
15  **GROWTH ENERGY and the**                1:10-CV00163-LJO-DLB
    **RENEWABLE FUELS ASSOCIATION,**
16
                              Plaintiffs,
17                                           **DEFENDANTS AND DEFENDANT-**
                                             **INTERVENORS' SUPPLEMENTAL**
         v.                                  **MEMORANDUM OF POINTS AND**
18                                           **AUTHORITIES IN OPPOSITION TO**
                                             **RMFU'S MOTION FOR SUMMARY**
19  **JAMES N. GOLDSTENE, in his official**  **JUDGMENT**
    **capacity as Executive Officer of the**
20  **CALIFORNIA AIR RESOURCES BOARD,**      Date:      To Be Determined
                                             Time:
21                            Defendant.     Dept:      Four
                                             Judge      The Honorable Lawrence J.
22  _____                    O'Neill

23  **NATIONAL PETROCHEMICAL &**             Trial Date
    **REFINERS ASSOCIATION, et al.,**        Action Filed:   12/23/2009
24
                              Plaintiffs,
25       v.

26  **JAMES GOLDSTENE, et al.,**

27                            Defendants.

28
_____

1

**TABLE OF CONTENTS**

2

Page

3 INTRODUCTION ........................................................................................................ 1

4 ARGUMENT ............................................................................................................. 1

5 I. EVIDENCE OBTAINED IN DISCOVERY DEMONSTRATES THAT THERE IS NO COMMERCE CLAUSE VIOLATION IN THIS CASE. ........................................... 1

6 A. The LCFS Applies the Accepted Method of Reducing Emissions From Transportation Fuels and Does Not Facially Discriminate. .............. 2

7 B. Plaintiffs Have Acknowledged that the Purpose of The LCFS Is Not Discriminatory. ........................................................................................ 4

8

9 C. Plaintiffs' Discriminatory Effects and Undue Burden Claims Under the Commerce Clause Are Unripe. .............................................................. 4

10 D. The LCFS Is Not Causing Discriminatory Effects, and Allegations About Future Effects Are Speculative and Unripe. ................................... 6

11 1. Plaintiffs Have Provided No Evidence of Discriminatory Effects. ........................................................................................ 6

12 2. The Evidence Indicates that the LCFS Is Not Having Discriminatory Effects. ................................................................ 8

13

14 a. Investment Activity in the Midwest Ethanol Industry Is Robust. ..................................................................... 8

15 b. Midwest Ethanol Is Selling in California, and at a Premium Effects………………………………………………9

16 E. Midwest Ethanol Producers Are Obtaining Lower CI Values than California Producers. ............................................................................... 10

17

18 F. The LCFS Passes Strict Scrutiny, Even If the Court Were to Find a Commerce Clause Violation. .................................................................. 11

G. The LCFS Imposes No Burden on Interstate Commerce........................ 11

19 II. SUMMARY JUDGMENT AS TO PLAINTIFFS' CONFLICT PREEMPTION ARGUMENTS MUST BE DENIED........................................................................ 12

20

A. Plaintiffs Lack Standing to Pursue Their Preemption Claim. ................. 13

21 1. No Plaintiffs Have Established Standing to Bring Their Preemption Claim. ..................................................................... 13

22 2. Growth Energy and RFA Lack Associational Standing. .............. 15

23 B. Preemption Requires a Clear Expression of Congressional Intent. ......... 18

24 C. EPA's Approval of E15 Blends Fundamentally Alters the Landscape. .............................................................................................. 19

25 D. Plaintiffs Have Produced No Evidence of a Current Conflict with RFS2 and Discovery Demonstrates that Their Prediction of Future

26 Conflicts Is Speculative. ........................................................................ 21

27 E. Plaintiffs Cannot Demonstrate Causation. ............................................. 23

28

i

1

**TABLE OF CONTENTS**
(continued)

2
**Page**

3
      F.     RFS2 Does Not Establish an Obligation that California Consume
Any Particular Volume af Ethanol. ........................................................... 23

4
CONCLUSION ................................................................................................................... 24

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Def. and Def-Intervenors' Supp. Opposition to RMFU's Motion for Summ. Judgment  (1:09-CV-02234-LJO-DLB)

1

## TABLE OF AUTHORITIES

2

**Page**

3

CASES

4

*Abbott Labs v. Gardner*,
   387 U.S. 136 (1967) ...................................................................................... 5, 6

5

6

*American Baptist Churches in the USA v. Meese*,
   666 F. Supp. 1358 (N.D. Cal. 1987) ................................................................. 18

7

*Associated General Contractors of California, Inc., v. Coalition for Economic Equity, et al.*,

8

   950 F.2d 1401 (9th Cir. 1991).......................................................................... 17

9

*Black Star Farms LLC v. Oliver*,

10

   600 F.3d 1225 (9th Cir. 2010)........................................................................ 2, 6

11

*Bova v. City of Medford*,
   564 F.3d 1093 (9th Cir. 2009)........................................................................... 5

12

*Chandler v. State Farm Mut. Auto. Ins. Co.*,

13

   598 F.3d 1115 (9th Cir. 2010)........................................................................... 5

14

*Comm. for Reasonable Regulation of Lake Tahoe v. Tahoe Reg'l Planning Agency*,

15

   365 F. Supp. 2d 1146 (D. Nev. 2005) ......................................................... 16, 17

16

*Committee Concerning Community Improvement et al. v. City of Modesto, et al.*

17

   2011 U.S. Dist. LEXIS 3221 (E.D. CA Jan 13, 2011).......................................... 14

18

*Department of Commerce v. U.S. House of Representatives*,
   525 U.S. 316 (1999) ....................................................................................... 13

19

*Exxon Corp. v. Maryland*,

20

   437 U.S. 117 (1978)......................................................................................... 6

21

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*,

22

   528 U.S. 167 (2000) ....................................................................................... 13

23

*Gaeta v. Perrigo Pharmaceuticals Company, BASF*,
   2011 WL 198420 (9th Cir. Jan. 24, 2011) ................................................... 18, 19

24

*Harris v. McRae*,

25

   448 U.S. 297 (1980)....................................................................................... 17

26

*Hunt v. Washington Apple Advertising Commission*,

27

   432 U.S. 333 (1977)................................................................................... 15, 17

28

# TABLE OF AUTHORITIES
## (continued)

Page

*International Union, United Auto., Aerospace, and Agricultural Implement Workers of Am. v. Brock*,
477 U.S. 274 (1986) ............................................................................................................. 16

*Long Beach Area Chamber of Commerce v. City of Long Beach*,
603 F.3d 684 (9th Cir. 2010) .............................................................................................. 13

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ............................................................................................................. 13

*Lujan* v. *National Wildlife Federation*,
497 U.S. 871 (1990) ............................................................................................................. 13

*National Coalition Gov't of the Union of Burma v. Unocal*,
176 F.R.D. 329 (C.D. Cal. 1997) ....................................................................................... 17

*Or. Waste Sys., Inc. v. Dep't of Envtl. Quality of the State of Oregon.*,
511 U.S. 93 (1994) ................................................................................................................. 3

*Wolfson v. Brammer*,
616 F.3d 1045 (9th Cir. 2010) .............................................................................................. 5

*Wyeth v. Levine*,
--- U.S. ---, 129 S.Ct. 1187 (2009) ..................................................................................... 18

STATUTES

Energy Independence and Security Act of 2007 ...................................................................... 18

OTHER AUTHORITIES

Article III of the U.S. Constitution ................................................................................. 5, 13

Def. and Def-Intervenors' Supp. Opposition to RMFU's Motion for Summ. Judgment  (1:09-CV-02234-LJO-DLB)

**INTRODUCTION**

Defendants James N. Goldstene, et al., and Defendant Intervenors, file this supplemental opposition to the motion for summary judgment by Plaintiffs' Rocky Mountain Farmers' Union, et al., based on this Court's order permitting discovery into the fact-dependent aspects of Plaintiffs' claims. Discovery has revealed a far different view of the LCFS than Plaintiffs claim. First, there is no evidence that a single one of the trade association Plaintiffs' members has been injured by the LCFS in any way. Second, documents produced by Plaintiffs show that the Midwest ethanol industry as a whole will not be injured by the LCFS in 2011 and beyond. In fact, the evidence obtained in discovery indicates that the ethanol industry is thriving. Third, the Midwest ethanol industry is increasing its efficiency and diminishing its carbon footprint and thus becoming more competitive, rather than less, both nationally and in California. Rising prices for Midwest ethanol in California and growing numbers of lower carbon intensity pathways submitted to ARB by Midwest ethanol plants are two indicators of this. Fourth, the non-California ethanol industry is investing in new facilities, which would not occur if industry was facing the doom claimed by Plaintiffs. Fifth, EPA's approval of E15, the increasing numbers of flex-fueled vehicles on the road (capable of using higher blends of ethanol up to E85), and the growth in exports of corn ethanol will expand the non-California ethanol market substantially. All of this confirms the arguments in Defendants' initial opposition brief.[1] As a result, Defendants respectfully request that the Court deny Plaintiffs' motions for summary judgment on both commerce clause and preemption, and instead, enter judgment for Defendants.

**ARGUMENT**

**I.   EVIDENCE OBTAINED IN DISCOVERY DEMONSTRATES THAT THERE IS NO COMMERCE CLAUSE VIOLATION IN THIS CASE.**

The information obtained from Plaintiffs through limited discovery and developments since the LCFS went into effect confirm that there is no basis for Plaintiffs' claims of discrimination

---

[1] In this supplemental brief, Defendants will not repeat the discussion of the factual and regulatory background and standards on motions for summary judgment but instead incorporate them by reference.

1

1  under the Commerce Clause.  "The party challenging the statute [or regulation] bears the burden

2  of showing discrimination."  *Black Star Farms LLC v. Oliver*, 600 F.3d 1225, 1230 (9th Cir.

3  2010) (citing *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979)).  Plaintiffs have not come close to

4  meeting this burden with respect to *any* of their discrimination claims, as discussed below.

5      **A.      The LCFS Applies the Accepted Method of Reducing Emissions from
              Transportation Fuels and Does Not Facially Discriminate.**

6

7      Plaintiffs base their claim that the LCFS facially discriminates against out-of-state ethanol

8  entirely on the table of carbon intensity values available under the LCFS.  RMFU Brief, 6:5-9

9  (ECF Doc. 112).  Plaintiffs' claim is directly contradicted by materials obtained in discovery.

10      First, both RFA and Growth Energy clearly understand that the lifecycle analysis

11  approach to regulating emissions from transportation fuels is proper and that a lifecycle analysis

12  includes all the emissions associated with production and distribution of the fuel.  For example, in

13  a "Policy Brief" about the LCFS, Growth Energy stated,

14      Currently, the carbon intensity of transportation fuels is determined through 'lifecycle
        analysis.'  So for corn-based ethanol, its carbon intensity is calculated from the time
15      the crop is planted and farmed until it is harvested, turned into ethanol and burned as
        an additive in gasoline.

16      Poole Decl. Exh. E, at RMFU-GRE-1715; *see also* Amend. Sep. Stmt., No. 40.  Nowhere

17  in this Policy Brief does Growth Energy question the inclusion of direct factors like plant

18  efficiency, fuel source, electricity usage, or transportation of the feedstock and fuel.  Indeed, RFA

19  and Growth Energy acknowledge that lifecycle analysis is the "internationally recognized"

20  approach to reduce GHG emissions.  *Id.* at RMFU-GRE-1719; s*ee also id.* at RMFU-GRE-1824

21  ("GHG emissions are universally measured through a process called life-cycle analysis….");

22  RFALCFS-0226 (criticizing several aspects of the LCFS but not the use of lifecycle analysis);

23  RFALCFS-0157 ("Numerous lifecycle analyses conducted by various government and university

24  researchers have been performed on biofuels in the last decade.");  *see also* Amend. Sep. Stmt.,

25  No. 40.  There is no question that, as Defendants asserted in their original arguments, lifecycle

26  analysis is widely accepted as the proper method by which to regulate fuel emissions.  Amend.

27  Sep. Stmt., No. 32; Defendants' Memorandum in Opposition to RMFU Plaintiffs' Motion for

28

2

Def. and Def-Intervenors' Supp. Opposition to RMFU's Motion for Summ. Judgment  (1:09-CV-02234-LJO-DLB)

1   Summary Judgment ("Defendants' Oppo."), at 10:12-17 (ECF Doc. 139).

2       The table of CI values in the LCFS distinguishes among ethanols on the basis of the

3   "internationally recognized" and "universally" applied factors.  For example, the table

4   differentiates among ethanols depending on whether the ethanol was produced using natural gas,

5   coal, biomass, or some mixture of fuels.[2]  The table also differentiates among ethanols based on

6   whether the co-product distiller grains are dried or not.[3]  And the table distinguishes among

7   ethanols based on the emissions involved in transporting feedstock and fuel, in electricity

8   production, and in plant efficiency.  *See* Defendants' Oppo., at 5 n.4, 9-10 (ECF Doc. 139).

9   Application of a universally and internationally recognized approach to emissions reduction is not

10  facial discrimination.

11      Second, Plaintiffs clearly understand that the initial table of CI values in the LCFS does

12  not assign California-produced ethanol the lowest values for any ethanol.[4]  As Growth Energy

13  stated, the LCFS gives "cane ethanol (produced outside the United States) a very significant

14  competitive advantage over California corn ethanol."  Poole Decl., Exh. E, at RMFU-GRE-0552;

15  *see also id.* at RMFU-GRE-0520; Poole Decl., Exh. B, at RFALCFS-0337; Amend. Sep.

16  Stmt., No. 42.  More favorable treatment of non-California producers is indisputably evident from

17  the face of the regulation and directly contradicts Plaintiffs' claims that the LCFS benefits in-state

18  interests and burdens out-of-state interests.  *See Or. Waste Sys., Inc. v. Dep't of Envtl. Quality of*

19  *the State of Or.*, 511 U.S. 93, 99 (1994).

20  
_____

21      [2] Several articles produced by Plaintiffs in discovery report that the choice of fuel for
    processing makes a significant difference in lifecycle emissions for ethanol.  Poole Decl. Exh. E,
22  at RMFU-GRE-0186 ("[G]reenhouse gas emission impacts can vary significantly – from a 3%
    increase if coal is the process fuel to a 52% reduction if wood chips are used."); Amend. Sep.
    Stmt., No. 41.
23      [3] Several articles produced by Plaintiffs in discovery indicate that drying distillers grains
    requires substantial energy and produces significant emissions.  Poole Decl. Exh. E, at RMFU-
24  GRE-0191 ("It is estimated that about one-third of the thermal energy used in ethanol plants is
    consumed by dryers used to dry DGS…."); RMFU-GRE-0146 (noting that obviating drying DGS
25  "saves energy and reduces GHG emissions").  Amend. Sep. Stmt., No. 41.
        [4] The market at issue here is the ethanol market, not some hypothetical market in corn
26  ethanol.  Plaintiffs themselves clearly understand the fungible nature of ethanol.  Poole Decl.,
    Exh. B, at RFALCFS-0183 (describing "The Ethanol Continuum" and noting that the "nature of
27  ethanol production . . . is not one of singular mind or vision.") and RFALCFS-0185-0188 (listing
    U.S. ethanol biorefinery capacities regardless of feedstock).
28

Finally, on its face, the LCFS includes procedures – referred to as "2A" and "2B" – by which fuel producers may obtain lower CI values.  Plaintiffs have not cited to a single case finding a Commerce Clause violation where the challenged law provided the ability for out-of-state entities to obtain more favorable treatment than in-state entities.  Indeed, Plaintiffs' facial discrimination arguments ignore the existence of these procedures, despite the fact that these procedures result in changes to the face of the regulation, specifically to the very table on which Plaintiffs' facial claims are based.  Plaintiffs' refusal to acknowledge these procedures is particularly dubious because Plaintiffs themselves asked for such procedures, and anticipated that many producers would utilize them.  Amend. Sep. Stmt., No. 43.

**B.   Plaintiffs Have Acknowledged That The Purpose of the LCFS Is Not Discriminatory.**

In their motion for summary judgment, Plaintiffs allege that the LCFS "purposefully discriminates by closing California to Midwest corn ethanol while preserving a market for local corn ethanol."  Plaintiffs' Brief, 5:13-15 (ECF Doc. 112).  It is now obvious that Plaintiffs fully understand the true purpose of the LCFS -- to reduce GHG emissions from transportation fuels consumed in California.  For example, Growth Energy characterized the goal of the LCFS as lowering carbon intensity of transportation fuels by 10% by 2020.  Amend. Sep. Stmt., No. 44.

Much of the basis for Plaintiffs' claim of purposeful discrimination comes from the "compliance scenarios" prepared as part of the LCFS rulemaking.  Plaintiffs' Brief, 9:1-5 (ECF Doc. 112).  Yet, discovery reveals that Plaintiffs clearly understand these scenarios to be "assumptions," not predictions.  Amend. Sep. Stmt., No. 36.  Indeed, RFA found the compliance scenarios to be unreliable assumptions.  *Id.*; see Poole Decl. Exh. B, at RFALCFS-0328 ("We think none of these scenarios are likely.").  Plaintiffs' reliance on these same scenarios as the primary basis of their lawsuit is inexplicable and unjustified.  Thus, they cannot serve as either evidence of intent or as a factual basis for any of Plaintiffs' claims.

**C.   Plaintiffs' Discriminatory Effects and Undue Burden Claims Under the Commerce Clause Are Unripe.**

Plaintiffs' claims of discriminatory effects and impermissible burdens on interstate

4

commerce are predicated entirely on injuries that may or may not occur in the future.  Such claims are premature and unripe under Article III of the U.S. Constitution.  *Wolfson v. Brammer*, 616 F.3d 1045, 1057 (9th Cir. 2010).  "The central concern [of the ripeness inquiry] is whether the case involves uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122-23 (9th Cir. 2010) (modification in original, internal quotations omitted).  Plaintiffs' claims here present such concerns and should be denied for lack of Article III jurisdiction.

Plaintiffs allege potential injuries, such as a ban of Midwest ethanol from California.  None of these alleged injuries has occurred, nor is there any evidence that any is imminent.  Rather, all the evidence indicates that Midwest ethanol is flowing freely into California, and that the interstate (and international) market for ethanol is booming.  See Section D.2.b, *infra*.  The bleak picture of the future painted by Plaintiffs depends on multiple contingencies, none of which are likely, let alone certain, to occur in the manner required to produce Plaintiffs' hypothetical injuries.  If instead these contingencies unfold as Plaintiffs' themselves expect, Plaintiffs will sustain no injury.  These contingencies include:  1) continued reductions in carbon footprints of Midwest ethanol producers such that their fuels generate credits under the LCFS; 2) adoption of higher blends of ethanol (E15 and E85), resulting in larger markets for ethanol; 3) amendment of the indirect land use value in the LCFS; 4) shifts by existing ethanol producers to producing very low-carbon intensity cellulosic ethanol; and 5) continued expansion of the international export market for ethanol.  See ECF Doc. 151 at p. 2, n.1, Poole Decl., Exh. B at RFALCFS-266 (indirect land use); Poole Decl. Exh. E at RMFU-GRE-1822-23, Exh. B at RFALCFS-0155-56, 183  (cellulosic).  Most, if not all, of these contingencies would have to unfold against Plaintiffs' interests for Plaintiffs to demonstrate injury by the LCFS.  A claim based on two uncertain contingencies was held to be unripe in *Bova v. City of Medford*, 564 F.3d 1093, 1096-97 (9th Cir. 2009).  The numerous contingencies at issue here present the epitome of an unripe claim.

As to the prudential aspect of the ripeness doctrine, it is clear that these issues are not yet fit for judicial decision.  See *Abbott Labs v. Gardner*, 387 U.S. 136, 149 (1967).  This is true both because the alleged injuries are speculative and the future of the ethanol market and industry

5

Def. and Def-Intervenors' Supp. Opposition to RMFU's Motion for Summ. Judgment  (1:09-CV-02234-LJO-DLB)

notably difficult to predict, and because Defendants' attempt to obtain discovery as to these

alleged injuries was thwarted by Plaintiffs.  See Defendants' Renewed Fed. R. Civ. Proc. 56(d)

Motion filed concurrently herewith ("Renewed 56(d) Motion").  Further, given the hardiness of

the ethanol industry and RFA's optimism for its future, it is equally clear there is no hardship to

Plaintiffs from withholding court consideration.  See *Abbott Labs*, 387 U.S. at 149.

**D.     The LCFS Is Not Causing Discriminatory Effects, and Allegations about Future Effects Are Speculative and Unripe.**

**1.     Plaintiffs Have Provided No Evidence of Discriminatory Effects.**

Plaintiffs claim that the LCFS has discriminatory effects but offer no evidence to support

that claim.  A crucial factor in such a claim is whether or not market share is altered in favor of

in-state entities and to the disadvantage of out-of-state entities.  *Black Star Farms LLC v. Oliver*,

600 F.3d 1225, 1231 (9th Cir. 2010) (finding no discriminatory effects in the absence of evidence

of altered market share); *see also Exxon Corp. v. Maryland*, 437 U.S. 117, 126 n.16 (1978).  In

responding to interrogatories, both RFA and Growth Energy stated that they cannot identify any

ethanol-producing members that have lost market share as a result of the LCFS.  Amend. Sep.

Stmt., No. 37.

In addition, Plaintiffs produced no evidence showing actual discriminatory effects, or any

negative effects at all, on a single identified ethanol producer in response to Defendants'

discovery which sought evidence related to discriminatory effects generally, and to threats to

profits, business viability, and financing specifically.  Amend. Sep. Stmt., No. 37.  Plaintiffs RFA

and Growth Energy relied upon their status as trade associations, claiming they do not possess

and cannot obtain this information.  *Id.* The absence of such information is fatal to Plaintiffs'

claim.  *See Black Star Farms LLC*, 600 F.3d at 1232 (finding no discrimination where the record

was "devoid of any substantial evidence of an *actual* adverse effect").

In their summary judgment motion, Plaintiffs alleged that, if not enjoined, the LCFS

would have the effect of displacing Midwest ethanol with California ethanol.  Plaintiffs' Brief,

9:8-10 (ECF Doc. 112).  This claim is contradicted by previous statements by Plaintiffs.  First, as

discussed above, Plaintiffs' reliance on the compliance scenarios for their discriminatory effects

claim is unjustified.  Plaintiffs are aware that those scenarios are planning assumptions and

6

1    demonstrations of feasibility, not predictions.  Amend. Sep. Stmt., No. 36.  Second, RFA

2    characterized the alleged advantage conferred on California ethanol producers under the LCFS as

3    "slight."  Poole Decl., Exh. B, at RFALCFS-0308.  That characterization belies the doomsday

4    scenario Plaintiffs attempt to paint for the Court.

5         Third, Plaintiff Growth Energy characterized the possibility of a resurgence of

6    California's ethanol industry as "completely unrealistic" and "non-viable at the scale assumed by

7    ARB, and probably non-viable at any scale."  Poole Decl., Exh. E, at RMFU-GRE-0513, RMFU-

8    GRE-0554;  s*ee also id.*, at RMFU-GRE-0520 (describing the California corn ethanol industry as

9    "fragile" and "unlikely to be competitive" under the LCFS), RMFU-GRE-1744 (2010 USDA

10   report ranking the Midwest highest, and the West lowest, for potential expansion of ethanol

11   production); Amend. Sep. Stmt., No. 45.  RFA similarly noted significant "uncertainty" about any

12   increase in ethanol production in California.  Poole Decl., Exh. B, at RFALCFS-0392; *see also*

13   *id.*, at RFALCFS-0308 ("[I]t is highly unlikely that new corn ethanol plants will be built in

14   California" even under the LCFS); Amend. Sep. Stmt., No. 45.  There is, then, no basis for the

15   allegation that Midwest ethanol will be displaced by California ethanol under the LCFS.

16        In fact, in its analysis of ethanol supply in California, RFA concluded that the likely effect

17   of the LCFS would be a shortage of low carbon intensity ethanol in California unless a significant

18   price premium for such ethanol developed.  Amend. Sep. Stmt., No. 46.  This possible outcome

19   was not predicated on a displacement of Midwest ethanol by California ethanol, but rather on

20   uncertainty about premium pricing and the existence of "alternative marketing opportunities

21   outside of California," among other things.  *Id.*  In other words, RFA concluded that Midwest

22   ethanol would likely be unavailable in California unless California prices were high enough to

23   offset potential sales elsewhere.  If Midwest corn ethanol finds a more attractive market than

24   California and flows to that market, that might present shortage problems for California,[5] but it is

25        [5] As a matter of fact, there are now far more ethanol producers prepared to do business in

26   California than at the time of these RFA studies, proving RFA's prediction inaccurate.  *See*
     Defendants' Supplemental Request for Judicial Notice ("Supp. RJN"), Exhs. A, B.  Indeed, the
     current state of the ethanol spot market in California indicates that the analyses in these studies

27   were predicated on a number of flawed assumptions, including whether or not fuel blenders
     would buy deficit-producing fuel and the readiness of Midwest producers to deliver low carbon

28                                                                                      (continued…)

7

far from discrimination against out-of-state ethanol.

Moreover, there is every reason to expect out-of-state ethanol to compete favorably with California ethanol now and into the future. Significantly, Plaintiffs have not provided any analysis of the outcomes for low carbon intensity Midwest ethanol under the LCFS. RFA has conducted no analysis as to whether new plants with lower carbon footprints will be able to compete effectively under the LCFS in 2014, 2015 or 2020. Poole Decl., Exh. C, at 55:10-14; 59:2-13; *see also* Poole Decl., Exh. B, at RFALCFS-0177. These new plants will likely qualify for a lower carbon intensity values under the 2A or 2B procedures. Indeed, RFA told ARB to expect many 2A/2B applications. Amend. Sep. Stmt., No. 43. And numerous applications have been submitted and are being processed. *See* Supp. RJN, Exhs. A, B. The fact that Plaintiffs have offered no evidence to the contrary, and indeed have apparently not even analyzed this possibility, is fatal to their claim. They have not met their burden of showing discriminatory effects.

### 2. The Evidence Indicates that the LCFS Is Not Having Discriminatory Effects.

#### a. Investment Activity in the Midwest Ethanol Industry Is Robust.

The facts demonstrate that the future of the Midwest ethanol industry, even with the LCFS in effect, is not the doomsday scenario Plaintiffs paint for the Court. Plaintiffs claim that the LCFS will ban Midwest ethanol from the California market and that this will be a substantial loss because California represents approximately 10% of the national ethanol market. Plaintiffs' Brief, 9:4-5; 20:7-8 (ECF Doc. 112). Yet, in the face of this dire future, Midwest ethanol producers continue to build new plants, and investors continue to purchase existing Midwest plants. This is irreconcilable with Plaintiffs' allegations of the devastating effects of the LCFS.

According to RFA, as of November 2010, nine ethanol facilities were under construction and two facilities were expanding. Amend. Sep. Stmt., No. 47; *see also* Poole Decl., Exh. B, at RFALCFS-0177 (listing ethanol production capacity under construction by state). Most, if not all, of this investment is occurring in the Midwest. *See* Poole Decl., Exh. E, at RMFU-GRE-0235

(…continued)
intensity ethanol to California.

1   (showing 3 ethanol plants under construction, one permitted and one permit pending, all in

2   Kansas); RMFU-GRE-0236-0242 (list by state).[6]  Yet, Plaintiffs have not even attempted to

3   explain why investors would sink money into new plants, or expansions of existing plants, in the

4   Midwest, if there will be no opportunity to recoup those investments due to the effects of the

5   LCFS.  To the contrary, this investment activity indicates that the market anticipates a healthy

6   future for the Midwest ethanol industry, even with the LCFS in effect.

7                    **b.  Midwest Ethanol Is Selling in California, and at a Premium.**

8           Recently obtained evidence also indicates that many Midwest ethanol producers anticipate

9   selling ethanol in California, some of them at a premium price.  More than 40 Midwest ethanol

10   producers are registered to use existing CI values, and many other Midwest producers have

11   applied for an individualized CI value under the 2A and 2B procedures, as described below.  *See*

12   Exh. I to RJN submitted with Defendants' Oppo. (ECF No. 142); Supp. RJN, Exhs. A, B.

13           This interest in the California market is supported by current ethanol market data.  The

14   spot market tracks two distinct carbon intensity values (90.1 and 98.4) in the California market,

15   both for Midwest ethanol.  At a fundamental level, this indicates that Midwest ethanol is selling

16   in California.  But the data itself also demonstrates that Midwest ethanol is generally selling for

17   more in California than it would in the Phoenix or Pacific Northwest market.  Amend. Sep. Stmt.,

18   No. 48.  That is true regardless of whether the ethanol's carbon intensity is 98.4 (deficit-

19   producing under the LCFS) or 90.1 (credit-producing).  *Id.*  In other words, even deficit-

20   producing ethanol is not only selling in California, but it is selling for more than it could sell for

21   in other markets.

22           In addition, the 90.1 ethanol sells for more than the 98.4, indicating that lower carbon

23   intensity ethanol carries a price premium in the California market.  Amend. Sep. Stmt., No. 49.

24   Yet, the price of the 98.4 ethanol is still higher than it is in several other markets.  It is clear, then,

25   that producers of lower carbon intensity ethanol can benefit substantially from the LCFS, even if

26   those producers are located in the Midwest.  And that benefit is conferred without harming

27           [6] Notably, plaintiffs believe this construction boom is unlikely to spread to California.
    *See* Poole Decl., Exh. B, at RFALCFS-0308.

28

9

1   producers of higher carbon intensity ethanol, such as the 98.4.  This independent data on the

2   ethanol market demonstrates that the LCFS is not having discriminatory effects.

     **E.    Midwest Ethanol Producers Are Obtaining Lower CI Values Than**
3         **California Producers.**

4          On February 24, 2011, ARB will consider adding multiple new carbon intensity values to

5   the LCFS regulation as a result of the applications received under the Method 2A and 2B

6   procedures.  The proposed pathways include 22 new carbon intensity values for Midwest ethanol.

7   Amend. Sep. Stmt., No. 50; *See also* Supp. RJN, Exh. B (pathway numbers ETHC014-

8   ETHC035).  Of these, five have lower carbon intensities than the 80.70 value for which

9   California plants have registered.  *Id.*  In addition, ARB staff have reviewed still more

10  applications from other Midwest ethanol producers, which will be considered by the Board at a

11  later hearing.  *Id.*  In the meantime, the lower carbon intensity values reviewed by the ARB staff

12  are available for use.  Those carbon intensity values include 20 more Midwest ethanol pathways

13  that are lower than the California pathway.  *Id.*

14         The expansion of carbon intensity values for Midwest ethanol is expected to continue.

15  RFA indicated to ARB that it should expect a lot of 2A and 2B applications.  Amend. Sep. Stmt.,

16  No. 43.  And both RFA and Growth Energy laud the energy efficiency improvements their

17  members are making.  For example, Growth Energy asserts that by 2030 it may be possible to

18  eliminate *all* GHG emissions in ethanol production.  Amend. Sep. Stmt., No. 51; *see* Poole Decl.,

19  Exh. E, at RMFU-GRE-0108; s*ee also* RMFU-GRE-1818 ("Continued innovation in the ethanol

20  industry can further reduce emissions by as much as 67 percent.").  RFA has repeatedly asserted

21  in its "Outlook" reports that "the carbon footprint of ethanol production continues to shrink."

22  Poole Decl., Exh. B, at RFALCFS-0157; *see also* Poole Decl, Exh. B, at RFALCFS-0158,

23  RFALCFS-0176-77, RFALCFS-0183.

24         There is no way to predict how low carbon intensity values for Midwest ethanol will go,

25  but Plaintiffs' statements indicate they could be much lower than the current carbon intensity

26  values assigned to California ethanol.  Indeed, as discussed above, multiple Midwest producers

27  have already reached that mark.  There is no reason to expect these developments to end, and

28  there is, thus, no reason to anticipate that the LCFS will have discriminatory effects on Midwest

10

1    ethanol.[7]  For all of these reasons, the limited discovery provided by Plaintiffs plainly

2    demonstrates that Plaintiffs cannot prove the LCFS will have discriminatory effects.

3    **F.**    **The LCFS Passes Strict Scrutiny, Even If the Court Were to Find A Commerce Clause Violation.**

4

5    As discussed above, materials obtained through discovery reveal that Plaintiffs know very

6    well that an approach other than the lifecycle analysis would be ineffective at reducing emissions

7    from transportation fuels.  Amend. Sep. Stmt., No. 40.  As a result, Plaintiffs' assertion that ARB

8    should "focus on simply reducing in-state emissions" lacks merit.  Plaintiffs' Brief, at 10:18 (ECF

9    Doc. 112).

10    In addition, it is now clear that Plaintiffs believe the LCFS is a flexible approach to

11    regulating fuel emissions.  In a policy brief, Growth Energy stated,

12    California could allow biofuels producers to submit independent carbon intensity studies . . . based on the source of their feedstock and methods of production. . . .

13    Already many ethanol producers use methane from landfills and cogeneration or biomass boilers to power their plants, but currently the draft [LCFS] rule only

14    recognizes two types of ethanol production. . . .

15    Poole Decl., Exh. E, at RMFU-GRE-1719.  The 2A and 2B procedures, built into the LCFS,

16    provide exactly this flexibility; flexibility which numerous members of RFA and Growth Energy

17    have taken advantage of.  Amend. Sep. Stmt., No. 50.

18    **G.**    **The LCFS Imposes No Burden on Interstate Commerce.**

19    As the above discussion makes clear, there is no evidence that the LCFS imposes a burden

20    on interstate commerce that is "clearly excessive in relation to the putative local benefits."

21    Plaintiffs' Brief, at 18:3-4 (ECF Doc. 112) (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137,

22    142 (1970)).  The spot market for ethanol shows that Midwest ethanol is entering the California

23    market without a problem, and, in fact, some Midwest ethanol is selling for a premium price.

24

---

25    [7]  Moreover, there is no basis for Plaintiffs' claim that the LCFS has, or will have, discriminatory effects on interstate commerce due to the inclusion of emissions from two stages of a fuel's lifecycle – the electricity used in the ethanol plant and the transportation of ethanol to

26    California from the Midwest.  Plaintiffs' Brief, at 7-8 (ECF Doc. 112).  As described above, Plaintiffs are well versed in the scientific validity of the lifecycle analysis approach to emissions

27    regulation and are also well aware that the lifecycle of a fuel includes emissions from electricity and transportation.  Amend. Sep. Stmt., No. 40.

28

1   Amend. Sep. Stmt., Nos. 46, 48, 49.  The evidence does not show that the LCFS imposes any

2   burden on interstate commerce, let alone a substantial one as alleged by Plaintiffs.

3       The California market is not closed to ethanols from out-of-state.  Contrary to Plaintiffs'

4   assertions, there is no evidence of ethanol producers or corn growers having trouble complying

5   with any "inconsistent and conflicting regulatory regimes."  Plaintiffs' Brief, at 19:19-21 (ECF

6   Doc. 112).  Plaintiffs have produced no evidence of burdens from the LCFS despite direct

7   requests for this information.  Rather, the evidence leads inescapably to the opposite conclusion.

8   Moreover, Plaintiffs' assertion that the LCFS's "*potential* burdens are substantial" has no merit.

9   *Id*. (emphasis added).  A *potential* burden on interstate commerce does not constitute a

10  Commerce Clause violation.  Plaintiffs' argument that these *potential* burdens will become real in

11  the future is entirely speculative and insufficient to support a finding of a constitutional violation.

12      None of plaintiffs' Commerce Clause claims have a basis in fact or law.  The LCFS does

13  not burden or discriminate against interstate commerce, nor does it regulate extraterritorially.  Its

14  approach is validated scientifically, and the ethanol market is booming even with the LCFS now

15  in effect.  Accordingly, the Court should deny Plaintiffs' claims and, instead, grant summary

16  judgment in favor of Defendants.

17  **II.    SUMMARY JUDGMENT AS TO PLAINTIFFS' CONFLICT PREEMPTION ARGUMENTS
          MUST BE DENIED.**

18

19      The limited discovery provided by Plaintiffs to date also reveals numerous flaws and

20  factual disputes concerning their argument that the LCFS "stands as an obstacle to

21  accomplishment and execution of the full purposes and objectives of Congress."  Plaintiffs' Brief,

22  at 23:8-10 (ECF Doc. 112).  First, with recent EPA approvals of E15 blends in model year 2001

23  and newer vehicles, Plaintiff RFA has told Wall Street that the potential domestic market for corn

24  ethanol will exceed the 15 billion gallon/year maximum for credits under the RFS by several

25  billion gallons.  Second, Plaintiffs have failed to produce any evidence of a decline in California's

26  imports of Midwest corn ethanol.  Instead, Plaintiffs' evidence of a steady march of technological

27  improvements, and increasing numbers of Method 2A/2B applications from Midwest producers

28  render their predictions of the future impacts of LCFS entirely speculative.  Third, documents

12

Def. and Def-Intervenors' Supp. Opposition to RMFU's Motion for Summ. Judgment  (1:09-CV-02234-LJO-DLB)

1  produced by Plaintiffs confirm that even if they could produce evidence of a decline in the

2  fortunes of corn ethanol producers they could not demonstrate that such harm was caused by the

3  LCFS, as opposed to changes in corn and gasoline prices.  Fourth, testimony by RFA's President,

4  Robert Dinneen – confirming that the RFS does not establish a uniform national market –

5  undermines any legal basis for plaintiffs' argument that the LCFS conflicts with the RFS.  As a

6  threshold matter, however, Defendants address how the evidence revealed through discovery

7  indicates that Plaintiffs do not have standing pursue their preemption claims in the first place.

8        **A.**    **Plaintiffs Lack Standing To Pursue Their Preemption Claim.**

9        Discovery has revealed that Plaintiffs lack standing to pursue their preemption claim.

10  Article III standing requires a plaintiff to show that (1) it has suffered an "injury in fact" that is (a)

11  concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the

12  injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed

13  to merely speculative, that the injury will be redressed by a favorable decision.  *Friends of the*

14  *Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc*., 528 U.S. 167, 180-181 (2000),  citing

15  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992).  Moreover, at the summary

16  judgment stage, "the party moving for summary judgment must establish that there exists no

17  genuine issue of material fact as to justiciability." *Department of Commerce v. U.S. House of*

18  *Representatives*, 525 U.S. 316, 319 (1999) (internal quotation omitted).  Mere allegations are

19  insufficient.  *Id.*  These three elements of standing are "an indispensable part of the plaintiff's

20  case," and thus Plaintiffs must support each element "with the manner and degree of evidence

21  required at the successive stages of the litigation." *Lujan, 504 U.S. at 561.*  Based on the limited

22  discovery obtained by Defendants, it has become clear that Plaintiffs cannot meet these

23  requirements.

24        **1.**    **No Plaintiffs Have Established Standing to Bring Their Preemption Claim.**

25        The establishment of injury in fact at the summary judgment stage requires specific facts

26  to be adduced by sworn testimony.  *Lujan, supra*  504 U.S. at 561, citing to *Lujan* v. *National*

27  *Wildlife Federation*, 497 U.S. 871, 888-889, (1990); *Long Beach Area Chamber of Commerce v.*

28

13

*City of Long Beach*, 603 F.3d 684, 690 (9th Cir. 2010).[8]  RMFU Plaintiffs do not provide specific

facts by sworn testimony.  Plaintiffs' asserted injury on their preemption claim boils down to

speculation, not grounded in fact, that the LCFS will drive down the market for "grandfathered"

corn ethanol.  RMFU Brief, at 23:16-18 (ECF Doc. 112.)  Plaintiffs rest this assertion entirely on

the compliance scenarios from the LCFS rulemaking, scenarios that, outside of this litigation,

Plaintiffs themselves characterized as unrealistic.  Amend. Sep. Stmt, No. 36; Poole Decl., Exh.

B, at RFALCFS-0328.  Plaintiffs have provided no credible evidence of actual or imminent injury

to any party or third party arising from the LCFS.[9]

Plaintiffs' failure to respond to the Rule 56(d) discovery requests, along with evidence

produced in discovery confirm the lack of actual or imminent injury necessary to establish

standing.  Amend. Sep. Stmt., Nos. 37, 38.  Defendants asked Plaintiffs to provide evidence that

the LCFS has caused or will cause economic injuries to them or their members, including going

out of business, losing profits, losing market share, and being unable to obtain financing.  These

are the injuries from which Plaintiffs claim Congress intended to protect "grandfathered" ethanol

plants.  Plaintiffs Growth Energy and RFA both failed to identify a single member who has

suffered or is likely to suffer such injury, and they refused to provide any specific evidence to

back up their claim.[10]  Amend. Sep. Stmt. No. 37.  The other seven Plaintiffs all declined even to

answer the interrogatories, much less provide any evidence of injury.  *Id.* at No. 38.

To the extent that Plaintiffs intend to rely on an imminent injury for standing, the facts on

the ground, and indeed Plaintiffs' own optimistic picture of the future market for ethanol, make

---

[8] As this Court has observed, "[s]tanding 'injury in fact' generally requires a showing that
plaintiff has suffered actual loss, damage or injury, or is threatened with impairment of his or her
own interests."  *Committee Concerning Community Improvement et al. v. City of Modesto, et al.*
2011 U.S. Dist. LEXIS 3221 at *9 (E.D. CA Jan 13, 2011).

[9] In their discovery responses, RFA and Growth Energy indicated that their claims of
economic harm to their members are based, in part, on the analysis performed by their declarants
in support of their motion for a preliminary injunction.  Plaintiffs have not submitted those
declarations as evidence in support of their motion for summary judgment, and, regardless,
defendants object to those declarations on a number of grounds.  *See* ECF Docs. 140 at pp. 12-22,
140-5, 140-8, 140-10, and 140-11.

[10] RFA deponent Robert Dinneen was also unable to identify any RFA member who has
suffered or will suffer injury.  Growth Energy and RFA claim no injury to themselves as they are
trade associations.

1   an imminent injury not only hypothetical but simply unbelievable.  In addition, even if Plaintiffs

2   had provided evidence of actual or imminent injury to a specific plant, Plaintiffs would then have

3   to demonstrate causation.  In light of the highly competitive nature of the ethanol industry and its

4   historic, pre-LCFS ups-and-downs (caused by various factors), Plaintiffs would have an uphill

5   battle, to say the least, to establish that the LCFS is the cause of any economic injury to which

6   plaintiffs might point.  Poole Decl., Exh. E, at RMFU-GRE- 0172-0174.  Of course, Plaintiffs

7   have not even crossed the first of these steps, which is to establish an actual or imminent injury.

8   The Court should therefore find that Plaintiffs do not have standing to pursue their preemption

9   claim.  Indeed, Plaintiffs' failure to demonstrate injury-in-fact provides a basis for the Court to

10  dismiss this case in its entirety.

11          **2.      Growth Energy and RFA Lack Associational Standing.**

12          Even if the Court were to consider Growth Energy and RFA's claims despite the lack of

13  specific evidence of injury to their members, these association Plaintiffs fail to satisfy the

14  requirements for associational standing.  Growth Energy and RFA claim no injury from the LCFS

15  to themselves as associations, but assert injury to their members.  These organizations consist of

16  competitors in a highly competitive market.  For this reason, these trade associations have refused

17  to obtain or provide specific information about the impact of the LCFS on their members.[11]  See

18  Renewed 56(d) Motion.  This failure demonstrates that these trade associations are inappropriate

19  plaintiffs under the doctrine of associational standing, which holds that an association lacks

20  standing where the claim asserted requires participation by the association's individual members.

21          In order for an organization to have standing on behalf of its members, it must meet the

22  three-pronged test of *Hunt v. Washington Apple Advertising Commission*, 432 U.S. 333, 343

23  (1977).  *Hunt* requires that the organization establish that (a) its members would otherwise have

24  standing to sue in their own right; (b) the interests it seeks to protect are germane to the

25  organization's purpose; and (c) *neither the claim asserted nor the relief requested requires the*

26  *participation of individual members in the lawsuit. Id.* (emphasis added).  Not only does the

27          [11]  The other seven plaintiffs are not fuel producers and/or do not have fuels producers as
    members. Second Amended Complaint at ¶¶ 4-10.

28

15

1    conflict preemption claim asserted by Growth Energy and RFA fail the first prong—because, as

2    discussed above, the associations have not shown that any of their members have suffered an

3    injury in fact—but it also fails the third prong.

4         Plaintiffs may argue that because they are seeking injunctive relief, participation by the

5    individual Growth Energy and RFA members is not required.   This does not end the inquiry,

6    however.  *See, e.g., Comm. for Reasonable Regulation of Lake Tahoe v. Tahoe Reg'l Planning*

7    *Agency*, 365 F. Supp. 2d 1146, 1163 (D. Nev. 2005) ("seeking equitable relief does not *per se*

8    overcome the prudential prong of associational standing").  Rather, the Court must determine

9    whether the "claim asserted" requires individualized participation or rather is simply "a pure

10   question of law." *International Union, United Auto., Aerospace, and Agricultural Implement*

11   *Workers of Am. v. Brock*, 477 U.S. 274, 287 (1986).  The conflict preemption claim asserted here

12   is not a pure question of law.  The parties vigorously dispute the effects the LCFS will have, and

13   that factual dispute is central to Plaintiffs' claim.[12]

14        Growth Energy and RFA allege that the LCFS conflicts with the federal Renewable Fuel

15   Standard Program (RFS), set forth in Section 211(o) of the Clean Air Act.  In order to prevail on

16   their conflict claim, Growth Energy and RFA must offer evidence that demonstrates that the

17   LCFS has unlawfully presented an obstacle to the accomplishment of Congressional objectives

18   expressed in the RFS.  Plaintiffs argue that the LCFS does this by "driving down the demand for

19   grandfathered corn ethanol."  Plaintiffs' Brief, 23:17-18 (ECF Doc. 112).  In order to prove this

20   alleged conflict, Plaintiffs would have to introduce evidence of how the regulation affects

21   competition in the ethanol industry, generally, and "grandfathered" plants, specifically.  They do

22   not.  Neither RFA's nor Growth Energy's discovery responses provide any information about the

23   impact of the LCFS on their members, let alone on specified "grandfathered" members, and

24

25

26        [12]  Defendants' Cross Motion for Summary Judgment seeks dismissal of the Clean Air Act
     Preemption claim insofar as it is construed as a facial claim. Cross Motion (ECF Doc. 138) at pp.
27   23-25.  This associational standing argument applies to the extent that Plaintiffs argue that their
     Clean Air Act Preemption claim is an as-applied claim.
28

1   neither organization even attempted to obtain such information because of their antitrust law

2   concerns.  See Renewed 56(d) Motion; McCabe Decl. at ¶¶ 2-3.

3        RFA and Growth Energy thus concede the key point:  they are incapable of fulfilling their

4   role as litigants in this case because their members compete with each other and the Clean Air Act

5   preemption claim requires proof that intrudes into the forbidden zone of competitive impacts.

6   The competitive impacts among members are likely to be diametrically opposite (i.e. producers

7   with lower carbon intensity values may benefit, while those with higher carbon intensity values

8   may not), thus requiring individualized proof of injury.  However, RFA and Growth Energy

9   simply refuse to provide that proof.  See Renewed 56(d) Motion.  RFA and Growth Energy have

10  thus disqualified themselves from litigating the preemption claim in this case.[13]

11       Associational standing is only appropriate where the "claims proffered *and* relief

12  requested do not demand individualized proof on the part of [the association's] members."

13  *Associated Gen. Contractors of Cal., Inc v. Coalition for Economic Equity*, 950 F.2d 1401, 1408

14  (9th Cir. 1991) (emphasis added).  Thus, courts repeatedly have held that claims requiring

15  individualized participation cannot support associational standing under *Hunt*'s third prong.  *See,*

16  *e.g., Harris v. McRae,* 448 U.S. 297, 321 (1980) ("the participation of individual members of the

17  Women's Division is essential to a proper understanding and resolution of their free exercise.");

18  *Comm. for Reasonable Regulation of Lake Tahoe*, 365 F. Supp. 2d at 1163 ("While [the plaintiff]

19  might be correct that the equitable relief that it requested does not require the participation of its

20  members, it must also demonstrate that the *claim itself* does not require the participation of its

21  members.") (emphasis added); *Nat'l Coalition Gov't of the Union of Burma v. Unocal*, 176

22  F.R.D. 329, 344 (C.D. Cal. 1997) ("even [the association]'s claim for injunctive relief fails to

23  satisfy the third prong of the *Hunt* test. . . . The [association] is simply not a suitable proxy.");

24  _____

25       [13] Defendants are not contending here that there is a conflict among the members of
     RFA or Growth Energy.  In the Ninth Circuit, such a conflict is not relevant to *Hunt*'s

26   third prong of associational standing.  *Associated General Contractors of California, Inc., v.
     Coalition for Economic Equity, et al.*, 950 F.2d 1401,1408-09 (9th Cir. 1991).  Rather, the task

27   before the Court is simply to "determine [whether] individualized proof [is] required."  *Id.* at
     1409.

28

                                          17

1    *American Baptist Churches in the USA v. Meese*, 666 F. Supp. 1358, 1364 (N.D. Cal. 1987).

2    　　　In sum, Growth Energy and RFA are inappropriate plaintiffs here. The need for

3    individualized proof is unavoidable in this case, yet they refuse to provide evidence on the key

4    issues requiring that proof.  The members of Growth Energy and RFA include large corporations

5    fully capable of asserting and litigating their own claims.  Thus, Growth Energy and RFA lack

6    associational standing.

7    　　　**B.     Preemption Requires a Clear Expression of Congressional Intent.**

8    　　　The recent Ninth Circuit opinion in *Gaeta v. Perrigo Pharmaceuticals Company, BASF*,

9    2011 WL 198420 (9th Cir. Jan. 24, 2011), indicates that plaintiffs' preemption claim should be

10   denied. *See* Defendants Oppo., at 26:1-27:11 (ECF Doc. 139).  In *Gaeta*, defendants argued that

11   state law requiring an additional warning on generic drugs would conflict with the objectives of

12   the Hatch-Waxman Amendments to the Federal Food, Drug and Cosmetic Act (FDCA) to deliver

13   low cost generic drugs to consumers.  *Id.* at *11.

14   　　　The Ninth Circuit disagreed, finding "no indication that when Congress passed the Hatch-

15   Waxman Amendments it intended the goal of delivering low cost generic drugs to supplant the

16   FDCA's *overall* goal of providing consumers with safe effective drugs." *Id.* (emphasis added).

17   The Ninth Circuit noted that "Congress took care to preserve state law." *Id.*  Following Supreme

18   Court precedent, the court observed that "had Congress considered state-law suits to be an

19   obstacle to its objectives, 'it surely would have enacted an express preemption provision at some

20   point during the FDCA's 70-year history.'" *Id.* at n. 11 (citing *Wyeth v. Levine*, --- U.S. ---, 129

21   S.Ct. 1187 (2009)).  The court also found that defendants' asserted harms were "purely

22   speculative." *Id.* at *12.

23   　　　Because Congress was aware of the LCFS, just as it was aware of state law in *Gaeta* and

24   *Wyeth*, its intent to preempt must be expressed clearly.  Here, the Energy Independence and

25   Security Act of 2007, which included the RFS, does not contain any indication of congressional

26   intent to preempt state environmental laws.  To the contrary, several sections of the statute

27   indicate Congress's intent to preserve state environmental laws.  See EISA, §§ 3, 204(b) and

28   210(b); see also Defendants Oppo., at 24:16-25:25.  In addition, just as Congressional intent to

18

1    facilitate generic medicines is not enough to override a general purpose to protect the public

2    health, Congressional intent to facilitate the growth of renewable fuels production in RFS2 does

3    not override the general purpose of the Clean Air Act to reduce air pollution.

4        Finally, as discussed in more detail below, Plaintiffs' assertions of harm in the present case

5    are as speculative as those of the generic manufacturers in *Gaeta*.  Tellingly, the manufacturers in

6    this case and in *Gaeta* both claimed that Congress intended to give them an advantage over

7    competitors and that any impact by state law on that balance was preempted.  As the Ninth

8    Circuit did in *Gaeta*, this Court should reject Plaintiffs' mistaken assertions of "purpose"

9    preemption here.

10       **C.    EPA's Approval of E15 Blends Fundamentally Alters the Landscape.**

11       In the last several months, the U.S. EPA has issued approvals that, by Plaintiffs' own

12   calculations, could increase potential U.S. sales of corn ethanol by at least 5 billion gallons, to a

13   total of 19 billion gallons per year.  Amend. Sep. Stmt., No. 52 (Dinneen Depo. at 38:1-9; *see*

14   *also*, ECF Doc. 137-1 at p.35 of 66 (RFA Ethanol Industry Update, Dec. 2010.)  In short, EPA's

15   actions now clear the way for states to approve blending of up to 15% ethanol in every gallon of

16   gasoline sold (E15) for use in vehicles manufactured after 2001.[14]  This represents a potential

17   50% increase in ethanol per gallon of gasoline.  While E15 is still subject to some technical and

18   state regulatory hurdles, RFA's President testified that "E15 will likely be available for

19   commercial sales sometime this summer."[15]  Amend. Sep. Stmt., No. 54 (Dinneen Depo. at 41:2-

20   9).

21       U.S. EPA's approval of E15, if followed by states' adoption of E15 in any significant way,

22   provides refiners with additional flexibility to meet the conventional biofuels credit ceiling under

23   RFS2.  Even accepting plaintiffs' extreme (and disputed) argument that the LCFS would close the

24   California market to Midwest corn ethanol and reduce demand for conventional biofuels in

25   _____

26       [14] Model year 2001 and newer vehicles represent approximately 65 % of the national fleet
     today.  Amend. Sep. Stmt, No. 53 (Dinneen Depo., at 38:16-18).  That figure will rise over time
     as older vehicles are retired and more newer vehicles are sold.

27       [15] Even at 65% of the vehicle fleet, basic math calculations indicate that the increase in the
     market will be several billion gallons of ethanol (5 billion gallons x .65 = 3.25 billion gallons).

28

                                      19

California by 1 billion gallons per year, such a reduction would present no obstacle to achieving the volumetric goals of the RFS.

In addition, under the RFS refiners will have a strong incentive to purchase advanced or cellulosic biofuels for use in E15 blends.  Rather than exceed the RFS2 ceiling for conventional biofuel, refiners are much more likely to use an "advanced biofuel" in order to generate credits under RFS2.  Amend. Sep. Stmt, No. 52; ECF Doc. 137-1, at 35 of 66.  Again, even accepting Plaintiffs' argument, a shift in California to more advanced and cellulosic biofuels would *complement* a shift already being driven by the RFS2.

Moreover, the potential exists for future expansion to even higher level blends.  As indicated by Mr. Dinneen, while "E30 is not currently allowed today, [] when this was prepared, neither was E15."  Amend. Sep. Stmt, No. 55 (Dinneen Depo., 46:5-7; see also 52:4-6.).  And Plaintiffs' projections appear not to account for the use of E85.  E85 is already approved for millions of flexible fuel vehicles on the roads today with the auto industry committed to producing millions more.  Amend. Sep. Stmt, No. 55.  As stated by Mr. Dinneen, "U.S. automakers have pledged that as much as 50 percent of the vehicles that they will produce in the future will be flex fuel technology." *Id.* (Dinneen Depo. at 52:7-16).  There are already thousands of E85 pumps in use today at gas stations across the country, as well as more than a thousand blender pumps that allow consumers to select the blend they desire. *Id.* (Dinneen Depo. at 50:13-51:8.).  These developments represent tens of millions of gallons of additional ethanol that can be used by flexible fuel vehicles at E85 or lower, mid-level blends.

In addition to the expected expansion of the domestic market, exports of ethanol are dramatically on the rise.  Amend. Sep. Stmt., No. 56.  In fact, ethanol exports are at all time highs. *Id.*  A recent report indicates that "U.S. ethanol exports ended 2010 on a high note" with 2010 surpassing all other years on record.  Declaration of Michael Waugh, Exh. B.  As RFA's president testified, "we're exporting today to Brazil, to the Middle East, and to the European Union."  Amend. Sep. Stmt., No. 56 (Dinneen Depo, 30:20-22.)  This developing export market will only serve to enhance the already thriving domestic ethanol market.

1    In sum, U.S. EPA's approvals to date for use of E15, existing E85 infrastructure and

2    vehicles, other initiatives being pursued by plaintiffs, and the booming export market render their

3    obstacle preemption argument entirely speculative.

4        **D.    Plaintiffs Have Produced No Evidence of a Current Conflict With RFS2**
         **and Discovery Demonstrates That Their Prediction of Future Conflicts is**
5        **Speculative.**

6        In their opening brief, Plaintiffs asserted that the LCFS is in conflict with RFS2 in part

7    because it "severely penalizes corn ethanol, by starting to eliminate a large market next year

8    [2011] …" in California.  Plaintiffs' Br. at 25:24-27.  As described above, Plaintiffs' responses to

9    discovery tell a far different story; one of no specific injury and even industry-wide

10   generalizations that indicate no injury in 2011, none likely through 2014 and any asserted injury

11   thereafter as highly speculative.  *See* Amend. Sep. Stmt., No. 37, 38.

12       The responses to discovery reveal that Plaintiffs' contention that the LCFS will close the

13   fuels market in California to Midwest corn ethanol is not credible.  Multiple studies and industry

14   reports provided by Plaintiffs in discovery attest to a steady improvement in the efficiency of corn

15   ethanol production from at least 2001 (prior to the existence of the LCFS) to the present.  A 2007

16   study by the Argonne National Laboratory based on information provided by Plaintiff RFA,

17   concluded that from 2001-2006, total energy use per gallon of denatured ethanol produced in dry

18   mills had declined by 21.8 percent, and grid electricity use for the same plants by 15.7 percent.

19   Amend. Sep. Stmt., No. 57; Poole Decl, Exh. B, at RFALCFS-0158; Poole Decl., Exh. E, at

20   RMFU-GRE-0093, RMFU-GRE-1818.  A similar study cited by plaintiff RFA in its response to

21   Interrogatory No. 13 concludes that compared to 2001 survey results for dry mill plants, "ethanol

22   produced in 2008 requires 28% less thermal energy per gallon and 32.1 % less electricity per

23   gallon but produces 5.3 % more ethanol per bushel."  *Id.*; Poole Decl., Exh. F, at p. iii; *see also*,

24   Poole Decl., Exh A, at 22:3-7.

25       This march towards increased efficiency improvements, presumably spurred by market

26   forces, continues today.  A separate report published in the Journal of Industrial Ecology in 2008

27   estimated that within one to two years, facilities built since 2004 would represent 75 percent of

28

21

1    production capacity.  *Id.* at No. 57; Poole Decl., Exh. E, at RMFU-GRE-0146.[16]  In a 2010

2    analysis produced in discovery by plaintiff Growth Energy, U.S. EPA states that "[i]ncreasing

3    energy efficiency is a priority in many ethanol plants as i[t] can dramatically increase profitability

4    by reducing energy costs, the second highest cost of ethanol production behind raw materials."

5    *Id.* at No. 58; Poole Decl., Exh. E, at RMFU-GRE-0746.  Further, another study relied on by

6    plaintiff Growth Energy purports to show a dramatic decline in the GHG footprint of ethanol

7    production from 1995 to 2008 – again all pre-LCFS – and forecasts a steady continuation of that

8    pattern, as "scientists predict that it is possible to eliminate all greenhouse gas emissions in

9    ethanol production."  *Id.*; Poole Decl., Exh. E, at RMFU-GRE-0108.  The 2010 U.S. EPA study

10    produced by Growth Energy concurs, finding that "[t]he projected energy savings from energy

11    efficiency improvements to units used in conventional ethanol plants in 2022 relative to 2007 is

12    32.1%."  *Id.*; Poole Decl., Exh. E, at RMFU-GRE-0746.  Thus, the evidence produced in

13    discovery to date indicates a steady rate of improvement in efficiency and reduction of GHG

14    emissions per gallon of corn ethanol and predicts that this trend will continue (without reference

15    to the LCFS).  Amend. Sep. Stmt., Nos. 57-58 (Dinneen Depo at 54:20-55:14).

16        Further, as described in section II.E, above, the Method 2A/2B process provides a means

17    for facility level carbon intensity ratings that reflect improvements in energy efficiency, natural

18    gas usage and other innovations that reduce greenhouse gas emissions.  Amend. Sep. Stmt., No.

19    50.  Multiple members of plaintiffs Growth Energy and RFA have applied for lower carbon

20    intensity figures, including for plants exempt from demonstrating GHG reductions under the RFS.

21    *Id.* at Nos. 48-50.

22        The undisputed evidence indicates that Plaintiffs have not carried their burden to

23    demonstrate a conflict.  Indeed, Plaintiffs refused to provide the information necessary to do so.

24    At a minimum, there are sufficient facts obtained in discovery to demonstrate that this question is

25    subject to factual dispute, and speculative.  As a result, Plaintiffs' motion should be denied.

26            [16] One example of this is Green Plains Renewable Energy, Inc., which in 2011 reported

27    substantial reductions in natural gas use per gallon of ethanol and a 7 percent reduction in
electricity use over a two year period.  Amend. Sep. Stmt., No. 59; Poole Decl., Exh. E, at
RMFU-GRE-0081.

28

**E.     Plaintiffs Cannot Demonstrate Causation.**

Moreover, the documents produced in discovery confirm that factors unrelated to the LCFS or even RFS2 play a dominant role in the profitability of corn ethanol producers.

According to an April 2009 report by the Congressional Budget Office:

> The economic viability of producing corn ethanol – whether manufacturers can show a profit – is intrinsically linked to the price of gasoline (for which ethanol is a substitute) and to the price that ethanol producers pay for corn. The Congressional Budget Office's (CBO's) analysis of current technologies and prices suggests that, without subsidies for producing ethanol, the 'break-even ratio' of the price per gallon of retail gasoline to the price per bushel of corn is currently about 0.9. In other words, when the price of a gallon of gasoline is more than 90 percent of the price of a bushel of corn, it is profitable to produce ethanol.

Amend. Sep. Stmt., No. 61; Poole Decl, Exh. E, at RMFU-GRE-0172. Given these economics, the CBO report goes on to state that:

> It is unlikely that, on average, ethanol producers over the past several decades would have turned a profit if they had not received production subsidies. The average ratio of a gallon of gasoline to the price of a bushel of corn fluctuates substantially from year to year and has exceeded 0.9 only once, in 2005…. Uncertainty about future corn and gasoline prices makes it hard for corn ethanol producers to predict what their profits or losses will be and to determine whether they should plan on expanding their business or reducing production.

Amend. Sep. Stmt., No. 62.

The relevance of the LCFS to the profitability of the industry is also called into question by the President of RFA's recent presentation to and meeting with Wall Street, in which he elected not to even mention the LCFS. Amend. Sep. Stmt., No. 63. In fact, he did not consider the LCFS to be a "burning issue" at the time, only a month prior to the LCFS becoming effective. Rather, RFA's President responded to what Wall Street "clearly wanted to hear about": the E15 ruling by EPA and the status of the ethanol tax subsidy. *Id.* at 64 (Dinneen Depo. at 17:14-18:8). Thus, in addition to the absence of any proof of harm to ethanol producers, there is substantial evidence that plaintiffs would not be able to prove such harm was caused by the LCFS.

**F.     RFS2 Does Not Establish an Obligation that California Consume Any Particular Volume of Ethanol.**

Finally, testimony by RFA's President confirmed the role of states in the regulation of ethanol consumption in their traditional role of protecting the environment for their citizens.

23

1  Amend. Sep. Stmt., No. 65 (Dinneen Depo. at 41:10-42:16); *see* Defendants Oppo., at 35:2-6

2  (ECF Doc. 139).  Mr. Dinneen noted in his presentation to Wall Street that even with U.S. EPA's

3  approval of E15, state regulatory issues remained to be worked out.  Amend. Sep. Stmt., No. 65.

4  He went on to explain that "[c]ertain states just have regulations for whether or not fuel contains

5  ethanol, and they are now looking at whether or not they need to amend those regulations to

6  specify the volume," while other states have "volatility regulations" or "labeling regulations" that

7  would have to be amended to permit the sale of E15.  *Id.*  The existence of these state regulations

8  directly affecting the portion of ethanol blended in gasoline, and thus, the statewide level of

9  ethanol consumption, directly contradict Plaintiffs' assertion that Congress intended the RFS to

10  compel California to consume a specific quantity of ethanol.

11                                    **CONCLUSION**

12          Based on the limited discovery obtained in this case, it has become apparent that Plaintiffs

13  cannot prevail on their claims of conflict preemption and violations of the commerce clause.

14  Plaintiffs have utterly failed to present any credible evidence of injury and thwarted Defendants'

15  attempts to probe Plaintiffs' bare allegations of injury.  Plaintiffs' failure leads to the conclusion

16  that Plaintiffs lack standing to pursue their preemption claim and that their commerce clause

17  claim is unripe for judicial review.  Instead of confirming Plaintiffs' doomsday predictions, the

18  evidence produced indicates that the ethanol industry is thriving, that Midwest corn ethanol is

19  flowing to California, and that the overall future for the ethanol industry is bright.  For all of the

20  above reasons, Defendants respectfully request that the Plaintiffs' motion for summary judgment

21  be denied.

22

23

24

25

26

27

28

24

1    Dated:  February 18, 2011                    Respectfully Submitted,

2                                                 KAMALA D. HARRIS
                                                  Attorney General of California
3                                                 ROBERT W. BYRNE
                                                  Supervising Deputy Attorney General
4

5                                                 /s/ Mark Poole
6                                                 MARK POOLE
                                                  Deputy Attorney General
7                                                 *Attorneys for Defendants*
                                                  *James N. Goldstene, et al.*
8
                                                  NATURAL RESOURCES DEFENSE
9                                                 COUNCIL

10
                                                  By:    /s/ David Pettit
11                                                        DAVID PETTIT

12                                                Attorneys for Defendant-Intervenor,
                                                  *Natural Resources Defense Council, Inc.*
13
                                                  SIERRA CLUB
14

15
                                                  By:    /s/ Pat Gallagher
16                                                        PAT GALLAGHER

17                                                Attorney for Defendant-Intervenor,
                                                  *Sierra Club*
18
                                                  CONSERVATION LAW FOUNDATION
19

20
                                                  By:    /s/ Jane West
21                                                        JANE WEST

22                                                Attorney for Defendant-Intervenor,
                                                  *Conservation Law Foundation*
23
                                                  ENVIRONMENTAL DEFENSE FUND
24

25                                                By:    /s/ James T.B. Tripp
                                                         JAMES T.B. TRIPP
26                                                Attorney for Defendant-Intervenor,
                                                  *Environmental Defense Fund*
27

28   SF2010400011/20408659.doc

                                      25
─────────────────────────────────────────────────────────────
       Def. and Def-Intervenors' Supp. Opposition to RMFU's Motion for Summ. Judgment  (1:09-CV-02234-LJO-DLB)