1  MARIE L. FIALA (CA Bar No. 79676)
   SIDLEY AUSTIN LLP
2  555 California Street, Suite 2000
   San Francisco, CA 94104-1715
3  Telephone: 415-772-1200
   Facsimile: 415-772-7400
4  mfiala@sidley.com

5  **Counsel For Plaintiffs**
   **In Consolidated**
6  **Case No. 1:10-CV-00163 LJO DLB**

7  [ADDITIONAL PARTIES AND COUNSEL
   SHOWN ON SIGNATURE PAGE]

8

9              UNITED STATES DISTRICT COURT

10            EASTERN DISTRICT OF CALIFORNIA

11                 FRESNO DIVISION

12

13 **ROCKY MOUNTAIN FARMERS UNION,**          ) LEAD CASE No. 1:09-CV-02234-LJO-DLB
   **et al.,**                               ) *Consolidated With Case* No. 1:10-CV-00163
14                                           ) LJO DLB
              Plaintiffs,                    )
15                                           )
       vs.                                   )
16                                           ) **PLAINTIFFS' JOINT RESPONSE TO**
   **JAMES GOLDSTENE, et al.,**              ) **DEFENDANTS' STATEMENT OF**
17                                           ) **MATERIAL FACTS NOT SUBJECT TO**
              Defendants.                    ) **GENUINE DISPUTE IN SUPPORT OF**
18                                           ) **CROSS-MOTION FOR SUMMARY**
   And Related Consolidated Action.          ) **JUDGMENT**
19 _____    )
   **NATIONAL PETROCHEMICAL &**              ) **Hearing Date:  TBD**
20 **REFINERS ASSOCIATION,** *et al.,*        ) **Hearing Time:  TBD**
                                             ) **Courtroom:     Four**
21            Plaintiffs,                    ) **Judge:         Hon. Lawrence J. O'Neill**
                                             )
22     vs.                                   )
                                             )
23 **JAMES GOLDSTENE,** *et al.,*             )
                                             )
24            Defendants.                    )
                                             )
25 _____    )

26

27

28

_____
PLAINTIFFS' JOINT RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS NOT SUBJECT TO
GENUINE DISPUTE IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT
LEAD CASE NO. 1:09-CV-02234-LJO-DLB

## INTRODUCTION AND SUMMARY

Pursuant to Local Rule 260(b), Plaintiffs in these consolidated actions submit the following response to Defendants' Statement of Undisputed Facts.

| | DEFENDANTS' UNDISPUTED FACTS AND EVIDENCE | PLAINTIFFS' RESPONSE AND EVIDENCE |
|---|---|---|
| 1. | The purpose of the LCFS regulation is to implement a low carbon fuel standard, which will reduce greenhouse gas emissions by reducing the full fuel-cycle, carbon intensity of the transportation fuel pool used in California, pursuant to the California Global Warming Solutions Act of 2006 (Health & Safety Code, section 38500 et seq.)<br><br>Title 17, Cal. Code Regs., § 95480; ISOR ES-1 ("In this rulemaking, the Air Resources Board (ARB/Board) staff is proposing to reduce emissions of greenhouse gases (GHG) by lowering the carbon content of transportation fuels used in California….The LCFS will reduce GHG emissions from the transportation sector in California by about 16 million metric tons (MMT) in 2020.  These reductions account for almost 10 percent of the total GHG emission reductions needed to achieve the State's mandate of reducing GHG emissions to 1990 levels by 2020.  In addition, the LCFS is designed to reduce California's dependence on petroleum, create a lasting market for clean transportation technology, and stimulate the production and use of alternative, low-carbon fuels in California.  Governor Schwarzenegger has identified all of these outcomes as important goals for California.") | Disputed and irrelevant.<br><br>Defendants have identified multiple purported purposes of the LCFS.  For example, according to Defendants, "[t]he LCFS is designed to reduce California's dependence on petroleum, create a lasting market for clean transportation technology, and stimulate the production and use of alternative, low-carbon fuels in California. Governor Schwarzenegger has identified all of these outcomes as important goals for California." Final Statement of Reasons (FSOR) at 457.  Defendants have stated that "reduc[ing] our dependence on foreign oil" is "[o]ne of the key advantages of the LCFS."  FSOR at 461.  Defendants have also stated that the LCFS is designed to do the following:  "reduce[e] the volume of transportation fuels that are imported from other states;" "keep more money in the State" by "[d]isplacing imported transportation fuels with biofuels produced in the State;" "provide needed employment, an increased tax base for the State, and value added to the biomass used as a feedstock" because of "[t]he biorefineries expected to be built in the State." FSOR at 479.<br><br>The Commerce Clause prevents a State from achieving even legitimate purposes in an improper manner.  *Philadelphia* v. *New Jersey*, 437 U.S. 617, 626 (1978) ("This dispute about ultimate legislative purpose need not be resolved, because its resolution would not be relevant to the constitutional issue to be decided in this case . . . . the evil of protectionism can reside in legislative means as well as legislative ends."). |
| 2. | California adopted the LCFS to reduce greenhouse gas emissions by reducing the full fuel-cycle, carbon intensity of the transportation fuel pool used in California, and to reduce California's reliance on petroleum and thereby reduce the consequences of oil price shocks, create a lasting market for clean transportation technology, and | Disputed and irrelevant.<br><br>*See* Plaintiffs' Response to ¶ 1, above.  The record reflects that the LCFS was designed to benefit local economic interests.  Defendants have stated that, as required by AB 32, they "developed the LCFS in a manner that minimizes costs and maximizes the total benefits to California" and that "[t]he LCFS compliance schedule allows time for |

PLAINTIFFS' JOINT RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS NOT SUBJECT TO GENUINE DISPUTE IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT
LEAD CASE NO. 1:09-CV-02234-LJO-DLB

| | | | |
|---|---|---|---|
| | | stimulate the production and use of alternative, low-carbon fuels in California.<br><br>See 17 C.C.R. § 95480; ISOR at ES-1; Exec. Order S-01-07; ARB Board Resolution 09-31, at p. 8. | future investments to be made in California-based biofuel technologies and related jobs."  FSOR at 476.<br><br>The Commerce Clause prevents a State from achieving even legitimate purposes in an improper manner.  *Philadelphia* v. *New Jersey*, 437 U.S. 617, 626 (1978) ("This dispute about ultimate legislative purpose need not be resolved, because its resolution would not be relevant to the constitutional issue to be decided in this case . . . . the evil of protectionism can reside in legislative means as well as legislative ends."). |
| | 3. | The LCFS is designed to prevent air pollution by significantly reducing emissions of greenhouse gasses such as carbon dioxide, methane, nitrous oxide, and other greenhouse gas contributors.<br><br>17 C.C.R. § 95480; ARB Board Resolution 09-31, at p. 9; Scheible Decl. at ¶10. | Disputed and irrelevant.<br><br>*See* Plaintiffs' Response to ¶ 1, above.  Defendants have stated that the LCFS is "highly likely" to lead to fuel shuffling of both crude oil and ethanol in a manner that does not reduce global greenhouse case emissions but that "obviously benefits" entities that produce low carbon transportation fuels.  FSOR at 241.  Defendants have stated that "[t]o the extent that California can produce more of its own transportation fuel, lower the amount of money spent on imported oil or petroleum products, and lower dependence on out-of-state biofuels, business competitiveness should be improved overall in the State."  FSOR at 474.<br><br>The Commerce Clause prevents a State from achieving even legitimate purposes in an improper manner.  *Philadelphia* v. *New Jersey*, 437 U.S. 617, 626 (1978) ("This dispute about ultimate legislative purpose need not be resolved, because its resolution would not be relevant to the constitutional issue to be decided in this case . . . . the evil of protectionism can reside in legislative means as well as legislative ends."). |
| | 4. | Emissions rose 12 percent as a result of the growth in population and economic activity between 1990 and 2004.<br><br>Scheible Decl. ¶ 6. | Disputed and irrelevant.<br><br>This statement is vague and does not identify what type of emissions or where the emissions are from.  Paragraph 6 to Michael Scheible's Declaration provides no support for his statement regarding the growth of GHG emissions in California.<br><br>In all events, the statement is irrelevant to Defendants' summary judgment motion. |
| | 5. | The LCFS regulates transportation fuel sold, supplied or offered for sale in California.  With respect to the fuels, | Undisputed that the LCFS imposes mandatory requirements on transportation fuels sold in California, LCFS § 95480.1(a), and that it permits |

| | | |
|---|---|---|
| | the LCFS applies, either on a compulsory or opt-in basis, to most types of fuels used for transportation in California, including:<br>• California reformulated gasoline;<br>• California diesel fuel;<br>• Compressed or liquefied natural gas;<br>• Electricity;<br>• Compressed or liquefied hydrogen;<br>• Any fuel blend containing hydrogen;<br>• Any fuel blend containing greater than 10 percent ethanol by volume;<br>• Any fuel blend containing biomass-based diesel;<br>• Neat denatured ethanol;<br>• Neat biomass-based diesel; and<br>• Any other liquid or non-liquid fuel not otherwise exempted from the regulation<br><br>Title 17, Cal. Code Regs., § 95480.1(A); LCFS public hearing notice, at http://www.arb.ca.gov/regact/2009/lcfs 09/ lcfsnot.pdf | some in-state entities to opt-in and thereby generate credits, *id.* § 95480.1(b).  Disputed insofar as this statement implies that the LCFS regulates *only* fuel sold in California; it also regulates the lifecycle of fuels sold in California. *See e.g.*, LCFS § 95481(a)(28); FSOR at 507. |
| 6. | The LCFS does not apply to transportation fuel sold, supplied or offered for sale outside of California.<br><br>Title 17, Cal. Code Regs., § 95840.1(a); ISOR at V-2; FSOR at 335; Scheible Decl., ¶ 33. | Undisputed that the LCFS does not explicitly apply to the sale, supply, or offering of transportation fuel outside of California.  Disputed that the LCFS does not practically apply to the production and transportation of fuel outside of California. *E.g.*, FSOR at 507; ISOR at IV-4-IV-5.<br><br>Irrelevant. *See, e.g., Brown-Forman Distillers Corp.* v. *N.Y. State Liquor Auth.*, 476 U.S. 573, 580 (1986) ("The mere fact that the effects of New York's ABC Law are triggered only by sales of liquor within the State of New York therefore does not validate the law if it regulates the out-of-state transactions of distillers who sell in-state."). |
| 7. | The LCFS does not prohibit any specific fuel from being sold, supplied or offered for sale in California. Rather, the regulation controls the aggregate carbon intensity of the transportation fuels offered for sale in California in a given year.  Each regulated party (e.g., producer or importer of transportation fuels sold, supplied or offered for sale in California) is responsible for ensuring that the overall carbon intensity of all | Disputed and irrelevant.<br><br>The LCFS imposes a barrier to the import of fuels based on origin, proxies for origin, and participating in interstate commerce. *See, e.g.*, FSOR at 508 ("individual pathways for corn ethanol in the Lookup Table are differentiated based on four factors; location of the production facility (California or Midwest), type of corn milling (wet or dry), type of distillers grains produced (wet or dry), and source of fuel for heat energy and co-generated electrical power (natural |

PLAINTIFFS' JOINT RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS NOT SUBJECT TO GENUINE DISPUTE IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT
LEAD CASE NO. 1:09-CV-02234-LJO-DLB

| | | |
|---|---|---|
| | the fuels in its fuel pool meets the carbon intensity standard established for a given year and may use any credits accrued from previous years or credits purchased.<br><br>Title 17, Cal. Code Regs., § 95482, 95483, 95486(b)(1); ISOR at IV-5; Scheible Decl., ¶ 33. | gas, coal, or biomass)").  The discriminatory barriers posed to the import of transportation fuels will make continued use of certain transportation fuels economically unviable.  For example, Defendants have stated that the LCFS will result in the elimination of corn ethanol produced using coal.  FSOR 521 (stating that Defendants do not "expect ethanol produced using coal power to be used in California under the LCFS").  Likewise, Defendants have stated that "the use of new sources of [high carbon intensity crude oil] HCICO would produce deficits, making it unlikely that California will see a significant increase in new HCICO use."  Defendants' Memorandum of Points and Authorities in Opposition to NPRA Plaintiffs' Partial Motion for Summary Judgment at 17 (ECF No. 146) (citing Scheible Decl. ¶¶ 88-98).<br><br>In all events, the Commerce Clause prohibits regulations that impose discriminatory barriers to the import of products, even if the products are not banned.  *See, e.g.*, *Camps Newfound/Owatonna, Inc.* v. *Town of Harrison*, 520 U.S. 564, 578 (1997); *New Energy Co. of Ind.* v. *Limbach*, 486 U.S. 269, 275 (1988). |
| 8. | The LCFS does not require the producer or importer of any transportation fuel to use a particular feedstock, feedstock production or distribution method, or fuel production, distribution or delivery method.<br><br>Title 17, Cal. Code Regs., § 95484; ISOR at ES-2, IV-5, V-1, V-2; FSOR at 317; Scheible Decl., ¶¶ 29-33. | Disputed and irrelevant.<br><br>The discriminatory barriers posed to the import of transportation fuels will make continued use of certain transportation fuels economically unviable.  For example, Defendants have stated that the LCFS will result in the elimination of corn ethanol produced using coal.  FSOR 521 (stating that Defendants do not "expect ethanol produced using coal power to be used in California under the LCFS").  Likewise, Defendants further have stated that "the use of new sources of HCICO would produce deficits, making it unlikely that California will see a significant increase in new HCICO use."  Defendants' Memorandum of Points and Authorities in Opposition to NPRA Plaintiffs' Partial Motion for Summary Judgment at 17 (ECF No. 146) (citing Scheible Decl. ¶¶ 88-98).<br><br>In all events, the Commerce Clause prohibits regulations that impose discriminatory barriers to the import of products, even if those products are not banned.   *See, e.g.*, *Camps Newfound/Owatonna, Inc.* v. *Town of Harrison*, 520 U.S. 564, 578 (1997); *New Energy Co. of Ind.* v. *Limbach*, 486 U.S. 269, 275 (1988). |

PLAINTIFFS' JOINT RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS NOT SUBJECT TO GENUINE DISPUTE IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT
LEAD CASE NO. 1:09-CV-02234-LJO-DLB

| 9. | It is up to the California fuel provider to provide a mix of fuels, augmented by any credits accrued or purchased, that meets its compliance obligation for that year.  A provider could buy a small volume of very low carbon fuel at a higher price and then buy a higher carbon fuel at a lower price to meet its overall obligation.<br><br>Scheible Decl. at ¶¶ 29-31. | Undisputed as to the first sentence.<br><br>The LCFS imposes an obligation (or burden) on a regulated party to ensure that the average carbon intensity assigned to its fuels meets the compliance obligation for that year.  LCFS § 95482.<br><br>Disputed as to the second sentence, which is too vague and too ambiguous to warrant a definitive response, except that Plaintiffs agree that fuel carbon intensity is generally linked with fuel price. The higher a fuel's carbon intensity, the lower the fuel's price.  *See, e.g.*, Waugh Decl. ¶ 8 (ECF No. 173-2). |
|  | Regulated parties are persons who, pursuant to section 95484(a), must meet the average carbon intensity requirements in section 95482 or 95483.<br><br>Title 17, Cal. Code Regs., § 95481(a)(39). | Undisputed, but incomplete and irrelevant.<br><br>With respect to the issue of direct regulation of interstate commerce, Defendants have acknowledged that "California has essentially assumed legal and political responsibility for emissions of carbon resulting from the production and transport, regardless of location, of transportation fuels actually used in California." Defendants' and Defendant-Intervenors' Memorandum in Support of Cross-Motion for Summary Judgment, or Partial Summary Judgment ("Defs' Cross-Motion") at 17 (ECF No. 138).<br><br>*See, e.g., Brown-Forman Distillers Corp.* v. *N.Y. State Liquor Auth.*, 476 U.S. 573, 583 (1986) ("That the ABC Law is addressed only to sales of liquor in New York is irrelevant if the 'practical effect' of the law is to control liquor prices in other States."). |
| 11. | The regulated party initially is always either the owner of the facility in California where the transportation fuel was produced, or the person who owns the transportation fuel brought from outside California when it is received at an import facility in California.<br><br>Title 17, Cal. Code Regs., §§ 95484(a), 95481(a)(36, 37), 95481(a)(23, 24). | Undisputed, but incomplete and irrelevant.<br><br>With respect to the issue of direct regulation of interstate commerce, Defendants have acknowledged that "California has essentially assumed legal and political responsibility for emissions of carbon resulting from the production and transport, regardless of location, of transportation fuels actually used in California." Defs' Cross-Motion at 17 (ECF No. 138).<br><br>*See, e.g., Brown-Forman Distillers Corp.* v. *N.Y. State Liquor Auth.*, 476 U.S. 573, 583 (1986) ("That the ABC Law is addressed only to sales of liquor in New York is irrelevant if the 'practical effect' of the law is to control liquor prices in |

| | | | |
|---|---|---|---|
| | | | other States."). |
| 12. | Subsequent transfers of ownership of the transportation fuel after its production in or importation to California but prior to consumption in California may or may not make the recipient of the fuel the regulated party, depending on the fuel being transferred or the terms of the transaction. Title 17, Cal. Code Regs., § 95484(a). | | Undisputed, but incomplete and irrelevant, as explained below. With respect to the issue of direct regulation of interstate commerce, Defendants have acknowledged that "California has essentially assumed legal and political responsibility for emissions of carbon resulting from the production and transport, regardless of location, of transportation fuels actually used in California." Defs' Cross-Motion at 17 (ECF No. 138). *See, e.g., Brown-Forman Distillers Corp.* v. *N.Y. State Liquor Auth.*, 476 U.S. 573, 583 (1986) ("That the ABC Law is addressed only to sales of liquor in New York is irrelevant if the 'practical effect' of the law is to control liquor prices in other States."). |
| 13. | The reductions in carbon content of fuel mandated by the LCFS are measured by assigning transportation fuels sold, supplied or offered for sale in California a "carbon intensity" value. Title 17, Cal. Code Regs., § 95480; Scheible Decl., ¶¶ 26-33. | | Disputed. The meaning of "carbon content" is vague and ambiguous to the extent that "carbon content" implies that carbon intensity is a physical property of a transportation fuel. Defendants have stated that the LCFS does not control the "chemical or physical properties" of fuel used in California, rather it regulates "*how* a fuel or blendstock was made." Initial Statement of Reasons (ISOR) at V-30 (emphasis in original). Similarly, Defendants have stated that "[c]arbon intensity is not an inherent chemical property of a fuel, but rather it is reflective of the process in making, distributing, and using that fuel." FSOR at 951. |
| 14. | "Carbon intensity" means the amount of lifecycle greenhouse gas emissions, per unit of energy of fuel delivered, expressed in grams of carbon dioxide equivalent per megajoule (gCO2E/MJ). Title 17, Cal. Code Regs., section 95481 (a)(11). | | Undisputed that this is the definition of carbon intensity provided by the LCFS. Disputed that the "carbon intensity" score applied to a given fuel actually reflects "the amount of lifecycle greenhouse gas emissions, per unit of energy of fuel delivered." With regard to crude oil, the LCFS assigns carbon intensities to crude oils "regardless of the actual carbon intensity of producing or transporting the specific crude oil used, or the specific refinery operations." FSOR 23, 63. For other fuels, such as corn ethanol, the LCFS requires that a regulated party use the pathways set forth in the LCFS that is closest to the |

|  |  |  |
|---|---|---|
|  |  | transportation fuel.  LCFS § 95486(b)(2)(B); FSOR at 16-18.<br><br>Furthermore, the RMFU Plaintiffs submit that LCFS carbon intensity scores are based on CARB's own lifecycle analysis of the fuels' GHG emissions, which in many ways overestimates the amount of GHG emissions.  *See, e.g.*, CARB's Nov. 10 resolution ordering reconsideration of the indirect land use component of ethanol CI scores. |
| 15. | The carbon intensity assigned to a given fuel in the LCFS is determined using a lifecycle analysis.<br><br>Scheible Decl., ¶¶ 14-16, 24-25, 33-34; Spatari Decl. ¶¶ 7-8. | Disputed.<br><br>The carbon intensity assigned various fuels may, or may not, correspond to a lifecycle analysis for a particular fuel.<br><br>For example, the LCFS requires CARBOB, gasoline, and diesel fuel providers to use an average baseline carbon intensity if the fuel is derived from crude oil in the 2006 baseline or not a high carbon-intensity crude oil.  LCFS § 95486(b)(2)(A)(1).<br><br>Fuels derived from crude oils not within the 2006 baseline are either assigned the average carbon intensity, if they are not deemed high carbon-intensity crude oils, or must calculate their individual carbon intensities if they are deemed high carbon intensity crude oils.  LCFS § 95486(b)(2)(A)(2).<br><br>For other fuels and blendstocks, this statement is also incorrect because a regulated party is obligated to use the carbon intensity value on the Lookup Table that "most closely corresponds" to the party's fuel.  LCFS § 95486(b)(2)(B); FSOR at 16-18. |
| 16. | LCFS defines "lifecycle greenhouse gas emissions" as the "aggregate quantity of greenhouse gas emissions (including direct emissions and significant indirect emissions such as significant emissions from land use changes), as determined by the Executive Officer, related to the full fuel lifecycle, including all stages of fuel and feedstock production and distribution, from feedstock generation or extraction through the distribution and delivery and use of the finished fuel to the ultimate consumer, where the mass values for all greenhouse | Undisputed. |

7

| | | |
|---|---|---|
| | gases are adjusted to account for their relative global warming potential." 17 Cal. Code Regs., § 95481(a)(28). | |
| 17. | RFS2's definition is virtually identical, defining ''lifecycle greenhouse gas emissions'' as the "aggregate quantity of greenhouse gas emissions (including direct emissions and significant indirect emissions such as significant emissions from land use changes), as determined by the Administrator, related to the full fuel lifecycle, including all stages of fuel and feedstock production and distribution, from feedstock generation or extraction through the distribution and delivery and use of the finished fuel to the ultimate consumer, where the mass values for all greenhouse gases are adjusted to account for their relative global warming potential." 75 FR 14669, 14765 (Mar. 2010); 42 U.S.C. § 7545(o)(1)(H). | Disputed and irrelevant. The definitions in the LCFS and the RFS2 provide discretion to the Executive Officer and Administrator, respectively.  The Executive Officer is guided by different criteria than the Administrator. The Commerce Clause imposes limits on the ability of States to regulate interstate and foreign commerce that do not apply to the federal government.  *See, e.g.,  South-Central Timber Dev.* v. *Wunnicke,* 467 U.S. 82, 92 (1984) (striking down state law under the Commerce Clause even though it "appears to be consistent with federal policy"). |
| 18. | Life cycle analysis is a widely accepted technique for categorizing fuels according to their total GHG emissions. In addition to its use in the LCFS and RFS2 rulemakings, lifecycle analysis is widely used elsewhere in the world. Scheible Decl. ¶ 14;  Spatari Decl. ¶ 7 http://www.iso/iso/catalogue_detail ? csnumber =37456; http://ec.europa.eu/environment/ipp/pdf /eipro   report.pdf http://lct.jrc.ec.europa.eu/; http://www.transportation.anl.gov/mod eling_  simulation/ GREET/publications.html; http://www.epa.gov/nrmrl/lcaccess/. http://www.ghgenius.ca/; http://www.eenews.net/public/25/1207 2/  features/ documents/2009/08/10/document_cw_ 02.pdf | Disputed and irrelevant. Defendants have admitted that the "regulation of greenhouse gases is relatively new territory" and the LCFS is "the world's first low carbon fuel standard."  Defs' Cross-Motion at 1, 8 (ECF No. 138).  Furthermore, CARB's version of lifecycle analysis is unique; for instance, CARB created its own model, the CA-GREET model, for assessing direct emissions. FSOR at 16 (discussing modifications CARB made to the GREET model for assessing direct emissions); Scheible Decl. ¶ 18 (stating that "CA-GREET uses a California specific electricity mix for in-State fuel production reflecting the California mix of electricity generation which is quite different (and lower carbon) than the national average"). The Commerce Clause imposes limits on the ability of States to regulate interstate and foreign commerce that do not apply to the federal government.  *See, e.g.,  South-Central Timber Dev.* v. *Wunnicke,* 467 U.S. 82, 92 (1984) (striking down state law under the Commerce Clause even though it "appears to be consistent with federal policy"). |
| 19. | Lifecycle analysis is the best method | Disputed. |

| | | |
|---|---|---|
| | for accurately controlling fuel carbon.<br><br>Scheible Decl. ¶¶ 14-17; Spatari Decl. ¶ 8; Babcock Decl. ¶¶ 6-7. | Defendants have identified a number of policy options available for reducing greenhouse gas emissions associated with California's transportation sector. *See, e.g.,* Babcock Decl. ¶ 5 (explaining that reduction of greenhouse gas emissions associated with California's transportation sector can be accomplished by "adopt[ing] a tax on fossil fuels. A tax would increase the relative price of fossil fuels that would result in a cost advantage to alternative transportation methods that are reliant on renewable energy sources."). Further, Defendants have stated that they can reduce GHG emissions from transportation by "increasing vehicle efficiency" or "reducing the number of vehicle miles traveled." FSOR at 74.<br><br>Further, the LCFS is not a fuel control. FSOR at 439, 442 (stating that the LCFS "is not setting a fuel standard," "contains no requirements that dictate the exact composition of compliant transportation fuels," and "does not establish any motor-vehicle fuel specifications"). Additionally, the meaning of "fuel carbon" is vague and ambiguous to the extent that it implies that carbon intensity is a physical property of a transportation fuel. *See supra* Plaintiffs' Response to Defendants' Fact 13. |
| 20. | Carbon intensity values for particular fuel pathways are found in the lookup tables in Table 6 of the LCFS regulation for gasoline and fuels that substitute for gasoline and Table 7 for diesel and fuels that substitute for diesel.<br><br>Title 17, Cal. Code Regs., § 95486, Tables 6 and 7; Scheible Decl. ¶¶ 34-38. | Undisputed. |
| 21. | The pathways currently listed in the regulation do not represent all of the possible pathways for producing fuels. The LCFS also provides an alternative method for establishing customized carbon intensity values. In order to obtain a customized value, a regulated party may propose for the Executive Officer's approval a modification of an existing value or an entirely new pathway which is scientifically defensible and supported by | Disputed, in part.<br><br>According to the LCFS, regulated parties are required to use the values in the Lookup Tables unless and until a party applies for a Method 2A or 2B pathway, the Executive Officer provides written approval for the application, the application is published for public review, and the Executive Officer takes final action and updates the Lookup Table in accordance with the California Administrative Procedure Act. LCFS § 95486(f); FSOR at 16-18. Defendants have explained that "the carbon intensity values in the |

| | | |
|---|---|---|
| | appropriate data.<br><br>Title 17, Cal. Code Regs., section 95486(c); ISOR, p. ES-14; Scheible Decl. ¶¶ 57-64. | Lookup Table can only be amended or expanded by regulatory amendments."  FSOR at 18.<br><br>Furthermore, Methods 2A and 2B do not allow all fuel producers to obtain customized carbon intensity scores; for in addition to the process outlined above, CARB also will not entertain applications from small producers and applications that improve a CI score by less than 5 gCO2-e/MJ. *See* LCFS § 95486(e).<br><br>With regard to crude oil, there is no mechanism for obtaining an alternative pathway for transportation fuel derived from crude oil with a lower CI value than the baseline value assigned to crude oils that make up more than 2 percent of the 2006 California market.  LCFS § 94586(b)(2).<br><br>With regard to ethanol, the LCFS regulation requires demonstrations that an alternative pathway will in CARB's judgment achieve a minimum "5.0 grams CO2-eq/MJ less than the source-to-tank carbon intensity" compared to the assigned carbon intensity score in the Lookup Table.  LCFS §95486(e)(2)(A). |
| 22. | The carbon intensities for the fuel pathways are comprised of both direct emissions associated with transportation fuels and indirect emissions.  For corn ethanol, direct emissions include:  farming practices; crop yields; harvesting practices; collection and transportation of the crop; type of fuel production process; fuel used in the production process; energy efficiency of the production process; the value of co-products generated; transport and distribution of the fuel; and combustion of the fuel in vehicles.  The only significant source of indirect emissions for ethanol identified at this time is from land use change effects.  For ethanol from corn, this value, 30 gCO2e/MJ, is the same for all corn ethanol.  For ethanol from sugarcane, the value for indirect land use change is higher at 46 gCO2e/MJ.<br><br>ISOR at IV-4, IV-5, IV-17; Title 17, Cal. Code Regs., § 95486, Table 6; Scheible Decl. ¶¶ 19-21, 25. | Disputed, in part.  To the extent the first sentence suggests that CARB accurately accounts for transportation fuels' direct and indirect emissions in the assigned carbon intensity scores, this is incorrect.<br><br>For crude oils from Alaska and certain foreign countries, the LCFS assigns carbon intensity values greater than the direct and indirect emissions calculated for those fuels by Defendants.  FSOR at 23-24; ISOR, Vol. II, C-59 Table C12-6).  For high carbon intensity crude oil from California, the LCFS assigns a carbon intensity lower than the direct and indirect emissions calculated for those fuels by Defendants.  FSOR at 24; ISOR, Vol. II at C-59 Table C12-6. |
| 23. | ARB used CA-GREET, v. 1.8b, (Feb. | Disputed, in part.  Undisputed that CARB |

| | | | |
|---|---|---|---|
| | | 2009, updated Dec. 2009) and the GTAP Model (Feb. 2009) to conduct the full, fuel life-cycle analysis for all the fuel pathways listed in the Lookup Tables.<br><br>Title 17, Cal. Code Regs., § 95486, Tables 6 and 7, section 95486(b)(1); ISOR, V-24; Scheible Decl. ¶¶ 18-19, 23. | purported to use those models for some fuels.<br><br>For CARBOB, gasoline, and diesel fuel, CARB has used an average for crude oil based on the "2006 California baseline crude mix."  FSOR at 24, 63.  As a result, Defendants assign crude oils from Alaska and other foreign countries with a carbon intensity greater than that calculated by Defendants.  FSOR at 23-24; ISOR, Vol. II, C-59 Table C12-6).  For high carbon intensity crude oil from California, the LCFS assigns a carbon intensity lower than the direct and indirect emissions calculated for those fuels by Defendants.  FSOR at 24; ISOR, Vol. II at C-59 Table C12-6. |
| | 24. | Both California and U.S.EPA recognize the importance of accounting for GHG emissions related to indirect land use changes.<br><br>Resolution 09-31, at 8;<br><br>75 FR 14669, 14767  [EPA is "confident that it is appropriate to consider indirect emissions, including those from both domestic and international land use changes, as 'related to' to the full fuel lifecycle based on the results of our modeling. These results form a reasonable technical basis for the linkage between the full fuel lifecycle of transportation fuels and indirect emissions, as well as for the determination that these emissions are significant."] | Disputed and irrelevant.<br><br>Undisputed that both California and U.S. EPA include indirect land-use changes as part of life-cycle analyses for some of the fuels subject to the LCFS.<br><br>The Commerce Clause imposes limits on the ability of States to regulate interstate and foreign commerce that do not apply to the federal government.  *See, e.g., South-Central Timber Dev.* v. *Wunnicke*, 467 U.S. 82, 92 (1984) (striking down state law under the Commerce Clause even though it "appears to be consistent with federal policy"). |
| | 25. | The Board found that GHG reductions from transportation fuels are best achieved using the LCFS' approach because, among several reasons, it ensures that the GHG emissions from the full fuel lifecycle are accounted for and reduced to the extent feasible. Further, the Board found that ARB staff performed the complete lifecycle analysis of the various fuels with assigned carbon intensity values under the LCFS, including but not limited to biofuels such as corn ethanol, and such carbon intensity values are scientifically defensible.  Moreover, the Board found that the LCFS regulation was developed using the best available | Disputed and irrelevant.<br><br>Defendants have identified a number of alternatives available for reducing greenhouse gas emissions associated with California's transportation sector.  *See, e.g.,* Babcock Decl. ¶ 5 (explaining that reduction of greenhouse gas emissions associated with California's transportation sector can be accomplished by "adopt[ing] a tax on fossil fuels.  A tax would increase the relative price of fossil fuels that would result in a cost advantage to alternative transportation methods that are reliant on renewable energy sources.").  Defendants also have stated that they can reduce GHG emissions from transportation by "increasing vehicle efficiency" or "reducing the number of vehicle |

| | | |
|---|---|---|
| | economic and scientific information and will achieve the maximum technologically feasible and cost-effective GHG emission reductions from transportation fuel used in California.<br><br>Resolution 09-31, at 7-9. | miles traveled." FSOR at 74.<br><br>Defendants have stated that "[w]ithout the wider adoption of fuel carbon-intensity standards, fuel producers are free to ship lower-carbon-intensity fuels to areas with such standards, while shipping higher-carbon-intensity fuels elsewhere. The end result of this fuel 'shuffling' process is little or no net change in fuel carbon-intensity on a global scale." FSOR at 477, 715. According to Defendants, "the potential for fuel shuffling is not limited to petroleum-based fuels. It is highly likely that supplies of ethanol with the lowest carbon intensity will be sent to California with the remaining 'high intensity' ethanol being sold outside of California. The LCFS does not account for this market-mediated effect which obviously benefits producers of low carbon intensity ethanol but does not result in reductions in greenhouse gas emissions on a global scale." FSOR at 241.<br><br>Finally, Defendants have stated that, under AB 32, they were constrained to develop the "LCFS in a manner that minimizes costs and maximizes the total benefits to California." FSOR at 476. |
| 26. | The ARB Board found that the proposed LCFS regulation was necessary in order to protect the public health by substantially reducing greenhouse gas emissions from the full fuel lifecycle of transportation fuels in California.<br><br>ARB Board Resolution 09-31, at p. 14. | Disputed.<br><br>Defendants have stated that "[w]ithout the wider adoption of fuel carbon-intensity standards, fuel producers are free to ship lower-carbon-intensity fuels to areas with such standards, while shipping higher-carbon-intensity fuels elsewhere. The end result of this fuel 'shuffling' process is little or no net change in fuel carbon-intensity on a global scale." FSOR at 477, 715. According to Defendants, "the potential for fuel shuffling is not limited to petroleum-based fuels. It is highly likely that supplies of ethanol with the lowest carbon intensity will be sent to California with the remaining 'high intensity' ethanol being sold outside of California. The LCFS does not account for this market-mediated effect which obviously benefits producers of low carbon intensity ethanol but does not result in reductions in greenhouse gas emissions on a global scale." FSOR at 241.<br><br>Defendants also have stated that California could have used a "tax on fossil fuels" as one "policy approach[] that could be undertaken to accomplish this objective" of reducing greenhouse gas emissions associated with California's transportation sector. Babcock Decl. ¶ 5. Defendants also have stated that they can reduce |

| | | | |
|---|---|---|---|
| | | | GHG emissions from transportation by "increasing vehicle efficiency" or "reducing the number of vehicle miles traveled."  FSOR at 74. |
| 27. | Not all vehicle emission controls involve solely tailpipe exhaust regulations.  Conventional gasoline vehicles have both exhaust and evaporative emissions.  California controls vehicle emissions both directly (exhaust limits at the tailpipe) and indirectly (fuel regulations).  Regulating the fuel controls either or both the exhaust and evaporative emissions.  For example, California's gasoline is subject to benzene and aromatic limits which are designed to reduce both exhaust and evaporative emissions from the vehicle and to reduce evaporative emissions during the transport of the fuel from the refinery and from delivery to the vehicle itself at the filling station.  Scheible Decl. ¶ 4. | | Disputed.  Defendants have stated the LCFS "is not setting a fuel standard," "contains no requirements that dictate the exact composition of compliant transportation fuels," and "does not establish any motor-vehicle fuel specifications."  FSOR at 439, 442.  The LCFS does not "purport to control the 'chemical or physical properties' of fuel used in California."  *Rocky Mountain Farmers Union* v. *Goldstene*, 719 F. Supp. 2d 1170, 1191 (E.D. Cal. 2010) (citing FSOR 951).  Defendants have stated that "[c]arbon intensity is not an inherent chemical property of a fuel, but rather it is reflective of the process in making, distributing, and using that fuel."  FSOR 951. |
| 28. | Greenhouse gases are a characteristic or component of motor vehicle fuels.  Scheible Decl. ¶¶ 14-16; Spatari ¶ 8. | | Disputed.  The statement is not supported by the sources identified.  According to Defendants, "[c]arbon intensity is not an inherent chemical property of a fuel, but rather it is reflective of the process in making, distributing, and using that fuel."  FSOR at 951.  Similarly, according to Defendants, the LCFS does not control the "chemical or physical properties" of fuel used in California, rather it regulates "*how* a fuel or blendstock was made."  ISOR at V-30 (emphasis in original). |
| 29. | California ethanol plants import the corn used to produce ethanol in California from the Midwest.  Scheible Decl. ¶¶ 43, 45. | | Undisputed that California corn ethanol plants currently import corn from the Midwest. |
| 30. | The value for the crude oil component of gasoline pathway, CARBOB, in Table 6 is 95.86, based on the average crude oil delivered to California refineries and the average California refinery efficiencies.  Title 17, Cal. Code Regs., § 95486, | | Undisputed. |

| | | |
|---|---|---|
| | Table 6; Scheible Decl. ¶¶ 26-27. | |
| 31. | Table 6 includes seven pathways for corn ethanol produced in the Midwest for sale in California and three pathways for corn ethanol produced in California for sale in California.  Four of the Midwest pathways in the Lookup Table have carbon intensities less than CARBOB and lower than the compliance requirements for years 2011-2013.<br><br>Title 17, Cal. Code Regs., § 95486(b)(1), Table 6; Scheible Decl. ¶¶ 55-56. | Undisputed. |
| 32. | Forty seven ethanol facilities, forty four of which are out-of-state, have registered carbon intensities with ARB for their products.   A number of these facilities have registered carbon intensity values less than CARBOB.<br><br>Scheible Decl. ¶ 42. | Undisputed at time of filing. |
| 33. | Using California's registration process, several Midwest corn ethanol producers have registered for carbon intensity values of between 86.8 and 90.10.<br><br>Scheible Decl. ¶ 42. | Disputed.<br>Based on a review of Defendants' website, a number of Midwest corn ethanol producers have registered with a carbon intensity score of 90.1, but that is the lowest carbon intensity score for any Midwest corn ethanol producer.  In contrast, producers of California corn ethanol have registered with a carbon intensity score of 80.7. *See* http://www.arb.ca.gov/fuels/lcfs/reportingtool/registeredfacilityinfo.htm. |
| 34. | As part of the lifecycle emissions calculation, the LCFS includes the emissions from transporting fuels, blendstocks and feedstocks sold, supplied or offered for sale in California whether the transport occurs inside or outside California or both.<br><br>Scheible Decl. ¶¶ 15, 19, 21, 24, 43, 45. | Undisputed. |
| 35. | The LCFS regulation requires documentation and a demonstration of how a regulated party's fuel or | Undisputed as to the first sentence. |

| | | | |
|---|---|---|---|
| | | blendstock is transported to California. The regulation does not prohibit or otherwise restrict any method of fuel transport to California or within the State.<br><br>17 Cal. Code Regs., §95485(d)(2). | Disputed and irrelevant, as to the second sentence.<br><br>The discriminatory barriers posed to the import of transportation fuels may effectively make continued use of certain transportation fuels economically unviable.  For example, Defendants have stated that the LCFS will result in the elimination of corn ethanol produced using coal. FSOR 521 (stating that Defendants do not "expect ethanol produced using coal power to be used in California under the LCFS").  Likewise, Defendants further have stated that "the use of new sources of HCICO would produce deficits, making it unlikely that California will see a significant increase in new HCICO use." Defendants' Memorandum of Points and Authorities in Opposition to NPRA Plaintiffs' Partial Motion for Summary Judgment at 17 (ECF No. 146).  Moreover, the failure to document and demonstrate transportation takes away a regulated party's ability to generate valuable LCFS credits. LCFS § 95484(d)(2)(D).<br><br>In all events, the Commerce Clause prohibits regulations that impose discriminatory barriers to the import of products, even if those products are not banned.  *See, e.g., Camps Newfound/Owatonna, Inc.* v. *Town of Harrison*, 520 U.S. 564, 578 (1997); *New Energy Co. of Ind.* v. *Limbach*, 486 U.S. 269, 275 (1988). |
| 36. | | For corn ethanol, the transportation factor in the carbon intensity value actually provides a benefit to Midwest produced ethanol because the emissions are lower for transportation of the finished product from the Midwest than transportation of the corn from the Midwest for production in California ethanol plants.<br><br>Scheible Decl. ¶¶ 43, 45. | Disputed, in part, because the statement is incomplete as a description of the relevant regulatory process.<br><br>The GHG emissions calculated by Defendants for the single example provided in the Declaration of Mr. Scheible reflect that the emissions assigned for the transport of ethanol from the Midwest (2.6g CO2e/MJ) are greater than the emissions for transport of ethanol from California (1.3g CO2e/MJ).  Scheible Decl. at 14 & ¶ 45.<br><br>Defendants have stated that "[t]he carbon intensities of some California-produced fuels do benefit from shorter transportation distances and lower carbon intensity electricity sources."  FSOR at 713.<br><br>Separately, in the example provided, the emissions assigned for the transport of corn to the ethanol plant for LCFS for Midwest ethanol (2.2 gCO2e/MJ) is lower than for the transport of corn to a plant in California (6.8 gCO2e/MJ).  Scheible |

| | | |
|---|---|---|
| | | Decl. at 14 & ¶ 45.  By doing so, the LCFS encourages the use of California fuel feedstocks by imposing a higher carbon intensity when a producer uses a feedstock from outside California.  Defendants have stated that, as a result of the LCFS, biorefineries are "expected to be built in the State" that "will provide needed employment, an increased tax base for the State and value added to the biomass used as feedstock.  These benefits will be more important in rural areas of the State that are short on employment but rich in natural resources."  FSOR at 479. |
| 37. | Many Midwest corn ethanol plants are less efficient than more recently constructed California plants and the electricity used is more carbon-intense as a significant portion of it comes from coal-fired generation.<br><br>Scheible Decl. ¶¶ 46-47. | Disputed.<br><br>The declaration of Mr. Scheible does not support the statement in paragraph 37.  That declaration states that "California dry mill ethanol plants are, on average, more energy efficient than Midwest dry mill plants, on average."  Scheible Decl. ¶ 46.  Further, Mr. Scheible explained that his statement is based on limited data regarding Midwest ethanol plants. *Id.* |
| 38. | The federal EPA is required to undertake a lifecycle emissions analysis in promulgating the rules under the Renewable Fuels Standard.  This includes emissions related to the "distribution and delivery" of the fuel.<br><br>42 U.S.C. § 7545(o)(1)(H); 17 Fed. Reg. 14669, 14765. | Undisputed, but irrelevant to Plaintiffs' Commerce Clause claims.<br><br>With respect to Plaintiffs' Commerce Clause claims, the content of federal regulations governing interstate and foreign commerce are irrelevant.  The Commerce Clause imposes limits on the ability of States to regulate interstate and foreign commerce that do not apply to the federal government.  *See, e.g., South-Central Timber Dev.* v. *Wunnicke*, 467 U.S. 82, 92 (1984) (striking down state law under the Commerce Clause even though it "appears to be consistent with federal policy"); *Prudential Ins. Co.* v. *Benjamin*, 328 U.S. 408, 423 (1946) ("The commerce clause is in no sense a limitation upon the power of Congress over interstate and foreign commerce.").  Plaintiffs also note that this statement does not appear in Volume 17 of the Federal Register. |
| 39. | For ethanol produced from sugarcane, Table 6 contains pathways with carbon intensities ranging from 58.40 to 73.40, lower than all the corn ethanol carbon intensity values.<br><br>Title 17, Cal. Code Regs., § 95486, Table 6. | Undisputed. |

| 40. | The majority of the world's sugarcane ethanol supply is currently produced in Brazil.<br><br>ISOR III-4. | Undisputed. |
|---|---|---|
| 41. | Currently, 10 applications have been submitted pursuant to the Method 2A/2B process.<br><br>Scheible Decl. ¶¶ 61-64. | Undisputed that the statement was accurate as of December 17, 2010, and irrelevant.<br><br>Whether or how many applications have been filed is not relevant to Defendants' cross motion for summary judgment because the ability to seek the amendment of a regulation is no defense to a claim that the regulation violates the Commerce Clause or is preempted by federal law. *See Patsy* v. *Fla. Bd. of Regents*, 457 U.S. 496, 516 (1982); *Clark* v. *Yosemite Cmty. Coll. Dist.*, 785 F.2d 781, 790 (9th Cir. 1986) ("[I]n an action under § 1983, a plaintiff need not exhaust state administrative remedies"). |
| 42. | From those 10 applications, 25 new pathways, 22 for corn ethanol, with draft CI values ranging from 73.2 - 92.4, were publicly posted by ARB.<br><br>Scheible Decl. ¶¶ 61-64. | Undisputed and irrelevant.<br><br>Whether or how many applications have been filed is not relevant to Defendants' motion for summary judgment because the ability to seek amendment of a regulation is no defense to a claim that the regulation violates the Commerce Clause or is preempted by federal law. *See Patsy* v. *Fla. Bd. of Regents*, 457 U.S. 496, 516 (1982); *Clark* v. *Yosemite Cmty. Coll. Dist.*, 785 F.3d 781, 790 (9th Cir. 1986) ("[I]n an action under § 1983, a plaintiff need not exhaust state administrative remedies"). |
| 43. | EPA does not regulate the carbon intensity of gasoline, diesel, CNG, LNG, electricity, and hydrogen, or any other non-biofuel.<br><br>75 Fed. Reg. 14669, 14674. | Disputed, but irrelevant to Plaintiffs' Commerce Clause claims.<br><br>The statement is not supported by the citation provided by Defendants.<br><br>With respect to Plaintiffs' Commerce Clause claims, the content of federal regulations governing interstate and foreign commerce are irrelevant. The Commerce Clause imposes limits on the ability of States to regulate interstate and foreign commerce that do not apply to the federal government. *See, e.g., South-Central Timber Dev.* v. *Wunnicke*, 467 U.S. 82, 92 (1984) (striking down state law under the Commerce Clause even though it "appears to be consistent with federal policy"); *Prudential Ins. Co.* v. *Benjamin*, 328 U.S. 408, 423 (1946) ("The commerce clause is in no sense a limitation upon the power of Congress |

| | | over interstate and foreign commerce."). |
|---|---|---|
| 44. | The amount of emissions in a carbon intensity that come from a particular phase in the lifecycle (production, transportation, and combustion) varies with each fuel.  For example, 75% of the emissions from gasoline are from combustion and emitted through the tailpipe.<br><br>Scheible Decl. ¶ 16. | Disputed.<br><br>As to the first sentence, the LCFS assigns carbon intensity scores to crude oils within the 2006 baseline without regard to the emissions from the production or transportation of individual fuels. FSOR at 23 ("regulated parties must use these single carbon intensity values for all California CARBOB and diesel fuel regardless of the actual carbon intensity of producing or transporting the specific crude oil used, or the specific refinery operations.").<br><br>As to the second sentence, according to Defendants, the emissions associated with the production and transport of crude oils vary for each crude oil.  As a result, it is incorrect to state that 75% of the emissions come from combustion. FSOR at 235 ("carbon intensities for mainstream crude oil production methods range from about 4 to more than 20 gCO2e/MJ") |
| 45. | There are three major contributing components to transportation greenhouse gas emissions:  vehicle or engine efficiency, vehicle use and the carbon intensity of fuels.<br><br>ISOR ES-36; Scheible Decl. ¶ 8. | Disputed as too vague and ambiguous to enable a response. |
| 46. | The largest source of GHG emissions in California is from the combustion of transportation fuels.<br><br>Scoping Plan at 11; Scheible Decl. ¶ 8. | Undisputed and irrelevant.<br><br>The "life-cycle" analysis at the core of the LCFS is not necessary to address, and regulates more than, the GHG emissions associated from the combustion of transportation fuels in California. |
| 47. | California is the fifteenth largest emitter of GHGs on the planet and contributes approximately two percent of total worldwide GHG emissions.<br><br>Scoping Plan at 11. | Undisputed and irrelevant.<br><br>Defendants have acknowledged that they can address GHG emissions through means other than the LCFS.  Defendants have identified a number of policy options available for reducing greenhouse gas emissions associated with California's transportation sector.  See, e.g., Babcock Decl. ¶ 5 (explaining that reduction of greenhouse gas emissions associated with California's transportation sector can be accomplished by "adopt[ing] a tax on fossil fuels.  A tax would increase the relative price of fossil fuels that would result in a cost advantage to alternative |

| | | transportation methods that are reliant on renewable energy sources."). Further, Defendants have stated that they can reduce GHG emissions from transportation by "increasing vehicle efficiency" or "reducing the number of vehicle miles traveled." FSOR at 74.

Defendants have stated that "[w]ithout the wider adoption of fuel carbon-intensity standards, fuel producers are free to ship lower-carbon-intensity fuels to areas with such standards, while shipping higher-carbon-intensity fuels elsewhere. The end result of this fuel 'shuffling' process is little or no net change in fuel carbon-intensity on a global scale." FSOR at 477, 715. According to Defendants, "the potential for fuel shuffling is not limited to petroleum-based fuels. It is highly likely that supplies of ethanol with the lowest carbon intensity will be sent to California with the remaining 'high intensity' ethanol being sold outside of California. The LCFS does not account for this market-mediated effect which obviously benefits producers of low carbon intensity ethanol but does not result in reductions in greenhouse gas emissions on a global scale." FSOR at 241.

Finally, according to Defendants, through the LCFS, "California has essentially assumed legal and political responsibility for emissions of carbon resulting from the production and transport, regardless of location, of transportation fuels actually used in California." Defs' Cross-Motion at 17 (ECF No. 138). |
| 48. | Transportation activities are responsible for 38 percent of the GHG emissions in California – or 182 MMTCO2e in 2004.

Scoping Plan at C-55

Resolution 09-31, at 7; Scheible Decl. ¶ 8. | Undisputed and irrelevant.

The declaration of Mr. Scheible makes a statement about GHG emissions in California in 2007, not 2004.

Further, the Scoping Plan refers to GHG emissions from the actual combustion of fuel used in California, rather than a "life-cycle" analysis.

Defendants have acknowledged that they can address GHG emissions through means other than the LCFS. Defendants have identified a number of policy options available for reducing greenhouse gas emissions associated with California's transportation sector. See, e.g., Babcock Decl. ¶ 5 (explaining that reduction of greenhouse gas emissions associated with California's transportation sector can be accomplished by "adopt[ing] a tax on fossil fuels. A tax would |

19

| | | | |
|---|---|---|---|
| | | | increase the relative price of fossil fuels that would result in a cost advantage to alternative transportation methods that are reliant on renewable energy sources.")  Further, Defendants have stated that they can reduce GHG emissions from transportation by "increasing vehicle efficiency" or "reducing the number of vehicle miles traveled."  FSOR at 74.<br><br>Defendants have stated that "[w]ithout the wider adoption of fuel carbon-intensity standards, fuel producers are free to ship lower-carbon-intensity fuels to areas with such standards, while shipping higher-carbon-intensity fuels elsewhere. The end result of this fuel 'shuffling' process is little or no net change in fuel carbon-intensity on a global scale."  FSOR at 477, 715.  According to Defendants, "the potential for fuel shuffling is not limited to petroleum-based fuels. It is highly likely that supplies of ethanol with the lowest carbon intensity will be sent to California with the remaining 'high intensity' ethanol being sold outside of California. The LCFS does not account for this market-mediated effect which obviously benefits producers of low carbon intensity ethanol but does not result in reductions in greenhouse gas emissions on a global scale."  FSOR at 241.<br><br>Finally, according to Defendants, through the LCFS, "California has essentially assumed legal and political responsibility for emissions of carbon resulting from the production and transport, regardless of location, of transportation fuels actually used in California."  Defs' Cross-Motion at 17 (ECF No. 138). |
| 49. | The LCFS is estimated to reduce GHG emissions for the combustion of transportation fuels by about 16 million metric tons (MMT) CO2e by 2020.<br><br>ISOR at ES-24, VII-1. | Disputed.<br><br>Defendants have stated that "[w]ithout the wider adoption of fuel carbon-intensity standards, fuel producers are free to ship lower-carbon-intensity fuels to areas with such standards, while shipping higher-carbon-intensity fuels elsewhere. The end result of this fuel 'shuffling' process is little or no net change in fuel carbon-intensity on a global scale."  FSOR at 477, 715.  According to Defendants, "the potential for fuel shuffling is not limited to petroleum-based fuels. It is highly likely that supplies of ethanol with the lowest carbon intensity will be sent to California with the remaining 'high intensity' ethanol being sold outside of California. The LCFS does not account for this market-mediated effect which obviously benefits producers of low carbon intensity ethanol | |

| | | | |
|---|---|---|---|
| | | | but does not result in reductions in greenhouse gas emissions on a global scale." FSOR at 241. |
| | 50. | The two primary strategies for reducing transportation sector greenhouse gases, the Pavely Program and the LCFS, will collectively reverse the upward trend in transportation-related greenhouse gas emissions in California.<br><br>Bd. Transcript at 34; Scheible Decl. ¶ 8. | Disputed.<br><br>Defendants have stated that "[w]ithout the wider adoption of fuel carbon-intensity standards, fuel producers are free to ship lower-carbon-intensity fuels to areas with such standards, while shipping higher-carbon-intensity fuels elsewhere. The end result of this fuel 'shuffling' process is little or no net change in fuel carbon-intensity on a global scale." FSOR at 477, 715. According to Defendants, "the potential for fuel shuffling is not limited to petroleum-based fuels. It is highly likely that supplies of ethanol with the lowest carbon intensity will be sent to California with the remaining 'high intensity' ethanol being sold outside of California. The LCFS does not account for this market-mediated effect which obviously benefits producers of low carbon intensity ethanol but does not result in reductions in greenhouse gas emissions on a global scale." FSOR at 241. |
| | 51. | Unlike the RFS, the LCFS is a specific control on greenhouse gases from transportation fuels.<br><br>RFS2 Summary and Analysis of Comments, 7-1, EPA, Feb. 2010. (While these [the RFS2] thresholds do not constitute a specific control on greenhouse gases for transportation fuels (such as a low carbon fuel standard), they do require that the volume mandates be met through the use of renewable fuels that meet certain lifecycle GHG reduction thresholds."); RFS2 Final Regulatory Impacts Analysis at 457, 459, Feb. 2010. | Disputed and irrelevant.<br><br>Disputed because the statement is vague and ambiguous with regard to the term "specific control on greenhouse gases." |
| | 52. | Combustion of ethanol in a gasoline engine results in the emissions of $CO_2$ and other GHGs like methane ($CH_4$) and nitrous oxide ($N_2O$). For a given vehicle and fuel system, GREET separately calculates, among other things, emissions of $CO_2$, $CH_4$ and $N_2O$.<br><br>ISOR at IV-9, 11. | Undisputed, but the statement is not supported by the citation provided by Defendants. |

21

| 53. | Some transportation fuels, such as electricity, have zero emissions from use of the fuel in the vehicle.<br><br>Scheible Decl, ¶ 16. | Disputed.<br><br>The declaration of Mr. Scheible states that "electric vehicles have negligible GHG emissions during vehicle operation, but result in substantial emissions when fossil fuels are used to generate electricity to power the vehicle" Scheible Decl. ¶ 16. |
|---|---|---|
| 54. | USEPA has stated that, for the RFS2 regulation, "including international indirect emissions in EPA's lifecycle analysis, does not exercise regulatory authority over activities that occur solely outside the U.S., nor does it raise questions of extra-territorial jurisdiction. EPA's regulatory action involves an assessment of products either produced in the U.S. or imported into the U.S.…Considering international emissions in determining the lifecycle GHG emissions of the domestically-produced or imported fuel does not change the fact that the actual regulation of the product involves its use solely inside the U.S."<br><br>75 FR 14669, 14766 | Undisputed and irrelevant.<br><br>The statement is an accurate quotation. The statement is irrelevant because the Commerce Clause imposes limits on the ability of States to regulate interstate and foreign commerce that do not apply to the federal government. *See, e.g., South-Central Timber Dev.* v. *Wunnicke,* 467 U.S. 82, 92 (1984) (striking down state law under the Commerce Clause even though it "appears to be consistent with federal policy"); *Prudential Ins. Co.* v. *Benjamin,* 328 U.S. 408, 423 (1946) ("The commerce clause is in no sense a limitation upon the power of Congress over interstate and foreign commerce."). Thus, the U.S. EPA's statements regarding the RFS2 regulation are not germane to whether the LCFS violates the Commerce Clause.<br><br>The statement is also a legal conclusion to which no response is required. |
| 55. | Many corn ethanol plants in the Midwest have made investments to increase the efficiency of their production in order to compete better in the marketplace and maximize profit.<br><br>Scheible ¶ 82; RFA Comment on RFS p. 56, 83, 86. EPA RFS2 75 Fed. Reg, 14670, 14746 (March 26, 2010). | Undisputed that some undetermined number of corn ethanol plants in the Midwest have made such investments; otherwise, disputed as too vague and ambiguous to enable a response. |
| 56. | Production volumes from the corn ethanol industry are nearing the cap for credits under the RFS.<br><br>RFA Ethanol Industry Update, December 2010. | Plaintiffs cannot assess this statement because it is vague and ambiguous. Based on the source cited by Defendants, the meaning of "cap for credits" is vague and ambiguous. |
| 57. | Ethanol production has increased dramatically in the last five years from 5 billion gallons to almost 14 billion gallons annually.<br><br>RFA Ethanol Industry Update, | Undisputed that domestic ethanol production has increased in the last five years from 5 billion gallons to almost 14 billion gallons. |

22

| | | December 2010 | |
|---|---|---|---|
| | 58. | Most of the United States now blends ethanol at 10 percent.  The US EPA recently approved an increase to 15 percent blend of ethanol in gasoline for newer cars.  This will open even more markets to ethanol.<br><br>RFA Ethanol Industry Update, December 2010 | Undisputed as to the first two sentences.<br><br>Disputed as to the third sentence, which is too ambiguous and too vague to permit a response. Moreover, Defendants have acknowledged that U.S. EPA's approval of E15 does not, by itself, affect the market.  *See* Defs' Supp. Opp'n to RMFU Summ. J. at 19 ("U.S. EPA's approval of E15, *if followed by states' adoption of E15 in any significant way*, provides refiners with additional flexibility to meet the conventional biofuels credit ceiling under RFS2."). |
| | 59. | RFA expects the ethanol industry to increase exports of ethanol to foreign counties to at least 250 million gallons in 2010.<br><br>RFA Ethanol Industry Update, December 2010 | Undisputed and irrelevant. |
| | 60. | EPA views the RFS and LCFS as compatible programs.<br><br>US EPA Summary of Analysis and Comments for the RFS2, at 13-15 ("EPA through the RFS2 final rule is implementing the Renewable Fuel Standards program<br><br>as required by Congress through EISA. Issues associated with State LCFS programs, and potential future Federal fuel standards, are not germane to the final RFS program.  However, where possible we have attempted to structure the RFS2 program so as to be compatible with existing State LCFS programs, including coordination on lifecycle modeling.");<br><br>See also 75 Fed. Reg. 14670, 14764 ("Dialogue with the State of California and the European Union on their parallel on-going efforts on GHG lifecycle analysis also helped inform EPA's methodology."). | Disputed and irrelevant.<br><br>The source cited by Defendants provides no support for a conclusion regarding EPA's "views" on whether the programs *are* compatible.<br><br>The quoted statement says that EPA has structured programs to be compatible "where possible." Moreover, RFS2 was adopted before the LCFS was adopted. |
| | 61. | California's LCFS is designed to complement the federal RFS2. | Disputed.<br><br>The LCFS is designed to close the market for |

| | | | |
|---|---|---|---|
| | | *See* ISOR at ES-5; Scheible Decl. at ¶¶ 12, 75-84. | Midwest corn ethanol. *See, e.g.*, ISOR, Vol. II, App. E, E-3 to E-9 (compliance scenarios developed by Defendants all showing Midwest corn ethanol use in California dropping to zero gallons); *see generally* RMFU's Statement of Undisputed Facts ¶¶ 10-11, 17, 18-19, 30-31, 34 (addressing the conflict between the LCFS and RFS2). |
| | 62. | The LCFS will incentivize greater reductions in greenhouse gas emissions from the transportation fuels used in California.<br><br>ARB Board Resolution 09-31, at p. 9; ISOR, at ES-5. | Disputed.<br><br>Defendants have stated that "[w]ithout the wider adoption of fuel carbon-intensity standards, fuel producers are free to ship lower-carbon-intensity fuels to areas with such standards, while shipping higher-carbon-intensity fuels elsewhere. The end result of this fuel 'shuffling' process is little or no net change in fuel carbon-intensity on a global scale."  FSOR at 477, 715.   Further, according to Defendants, "the potential for fuel shuffling is not limited to petroleum-based fuels. It is highly likely that supplies of ethanol with the lowest carbon intensity will be sent to California with the remaining 'high intensity' ethanol being sold outside of California. The LCFS does not account for this market-mediated effect which obviously benefits producers of low carbon intensity ethanol but does not result in reductions in greenhouse gas emissions on a global scale."  FSOR at 241.  Moreover, the LCFS is not limited to "greenhouse gas emissions from the transportation fuels used in California"; it attempts to reduce greenhouse gas emissions from activities all over the world where fuels and fuel feedstocks are produced.  *See, e.g.*, LCFS § 95486, Table 6 (assigning carbon intensity scores based on different sugarcane production processes occurring in Brazil); Scheible Decl. ¶¶ 14-16; Defs' Cross-Motion at 17 (claiming "assumed legal and political responsibility for emissions of carbon resulting from the production and transport, regardless of location, of transportation fuels actually used in California."). |
| | 63. | LCFS does not require a 20 percent reduction of greenhouse gases in order to be sold in California.  Any fuel can be sold in California.<br><br>Scheible Decl. at ¶¶ 12, 79-80. | Disputed.<br><br>Defendants have stated that the LCFS will result in the elimination of corn ethanol produced using coal.  FSOR 521 (stating that Defendants do not "expect ethanol produced using coal power to be used in California under the LCFS").<br><br>Likewise, Defendants further have stated that "the use of new sources of HCICO would produce deficits, making it unlikely that California will see |

PLAINTIFFS' JOINT RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS NOT SUBJECT TO GENUINE DISPUTE IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT
LEAD CASE NO. 1:09-CV-02234-LJO-DLB

| | | | |
|---|---|---|---|
| | | | a significant increase in new HCICO use." Defendants' Memorandum of Points and Authorities in Opposition to NPRA Plaintiffs' Partial Motion for Summary Judgment at 17 (ECF No. 146). |
| | 64. | In 2007, Members of both Houses of Congress introduced bills proposing a national LCFS patterned after California's announced program.<br><br>H.R. 2215 (Inslee); H.R. 2809 (Inslee); S. 1324 (Obama); S. 2192 (Boxer); S. 1073 (Feinstein); S. 1297 (Boxer); see also Brent D. Yacobucci, CRS Report for Congress: A Low Carbon Fuel Standard: State and Federal Legislation and Regulations, dated December 23, 2008, at p. 9. | Disputed in that the statement is vague and ambiguous as to how a proposed national LCFS that was never adopted was "patterned after" the California LCFS, which was not adopted for another two years.<br><br>The legal standards that apply to a federal law or regulation are different than those that apply to the states.  In addition, proposed federal legislation has no bearing on the constitutionality of the LCFS.  *See, e.g., South-Central Timber Dev.* v. *Wunnicke*, 467 U.S. 82, 92 (1984) (striking down state law under the Commerce Clause even though it "appears to be consistent with federal policy"); *Prudential Ins. Co.* v. *Benjamin*, 328 U.S. 408, 423 (1946) ("The commerce clause is in no sense a limitation upon the power of Congress over interstate and foreign commerce."). |
| | 65. | At least one of the bills proposed in Congress targeted the same level of reductions in lifecycle greenhouse gas emissions for 2020 as California.<br><br>S. 1324 (Obama). | Disputed.  The proposed bill, which was never enacted into law, does not support this statement.<br><br>Irrelevant.  Proposed federal legislation has no bearing on the constitutionality of the LCFS. *Prudential Ins. Co.* v. *Benjamin*, 328 U.S. 408, 423 (1946) ("The commerce clause is in no sense a limitation upon the power of Congress over interstate and foreign commerce."). |
| | 66. | U.S. EPA cited the reduction in foreign oil as the energy security goal of RFS2.<br><br>75 FR 14670-01 (March 26, 2010), at pp. 14839-14842. | Undisputed and irrelevant that EPA cited reduction in foreign oil as an energy security goal of RFS2.  The legal standards that apply to a federal regulation are different than those that apply to the states.  *See, e.g., South-Central Timber Dev.* v. *Wunnicke*, 467 U.S. 82, 92 (1984) (striking down state law under the Commerce Clause even though it "appears to be consistent with federal policy");  *Prudential Ins. Co.* v. *Benjamin*, 328 U.S. 408, 423 (1946) ("The commerce clause is in no sense a limitation upon the power of Congress over interstate and foreign commerce.").<br><br>Disputed that reduction in foreign oil was the only energy security goal of RFS2. |

| 67. | In the RFS2 rulemaking, EPA further described the purpose of the RFS as "promoting the development of emerging technologies to produce clean alternatives to petroleum-based fuels, and to further U.S. energy independence" and "promoting energy independence and the reduction of GHG emissions from transportation fuels."<br><br>75 FR 14670-01 (March 26, 2010), at p. 14691, 14705. | Undisputed and irrelevant.<br><br>The legal standards that apply to a federal regulation are different than those that apply to the states. *See, e.g., South-Central Timber Dev.* v. *Wunnicke*, 467 U.S. 82, 92 (1984) (striking down state law under the Commerce Clause even though it "appears to be consistent with federal policy"); *Prudential Ins. Co.* v. *Benjamin*, 328 U.S. 408, 423 (1946) ("The commerce clause is in no sense a limitation upon the power of Congress over interstate and foreign commerce."). |
|---|---|---|
| 68. | In its comments during the U.S. EPA's rulemaking for RFS2, plaintiffs Renewable Fuels Association stated that: "The purpose of the EISA was to increase the use of renewable fuels to reduce this country's dependence on foreign oil."<br><br>Comments of Renewable Fuels Association re REGULATION OF FUELS AND FUEL ADDITIVES: CHANGES TO RENEWABLE FUEL STANDARD PROGRAM; NOTICE OF PROPOSED RULEMAKING, 74 FED. REG. 24,904 (MAY 26, 2009), submitted September 25, 2009 (hereafter "RFA 9/29/09 Comments"), at p. 3; see also *id.* at p. 1 ("The RFS program is a vital part of the energy policy of this country as it moves toward less dependence on foreign oil."); *id.* at p. 3 ("The purpose of the EISA was to increase the use of renewable fuels to reduce this country's dependence on foreign oil."). | Undisputed and irrelevant that EPA made the quoted statement.  The legal standards that apply to a federal regulation are different than those that apply to the states. *See, e.g., South-Central Timber Dev.* v. *Wunnicke*, 467 U.S. 82, 92 (1984) (striking down state law under the Commerce Clause even though it "appears to be consistent with federal policy"); *Prudential Ins. Co.* v. *Benjamin*, 328 U.S. 408, 423 (1946) ("The commerce clause is in no sense a limitation upon the power of Congress over interstate and foreign commerce.").<br><br>Disputed that reduction in foreign oil was the only energy security goal for RFS2. |
| 69. | The LCFS is designed to reduce California's dependence on petroleum to help protect California's economy from the consequences of oil price shocks.<br><br>Executive Order S-01-07; ISOR, at p. ES-01; Scheible Decl. at ¶ 10. | Disputed, in part.<br><br>The statement is an incomplete paraphrase of the Executive Order, which states that "diversification of the sources of transportation fuel will help protect our jobs and economy from the consequences of oil price shocks."  Office of the Governor Arnold Schwarzenegger Exec. Order S-01-07 (Jan. 18, 2007).<br><br>In addition, the Executive Order also states that "alternative fuels can provide economic development opportunities and reduce emissions of greenhouse gases, criteria pollutants, and toxic |

26

air contaminants."

Defendants have identified multiple purposes of the LCFS. According to Defendants, "[t]he LCFS is designed to reduce California's dependence on petroleum, create a lasting market for clean transportation technology, and stimulate the production and use of alternative, low-carbon fuels in California. Governor Schwarzenegger has identified all of these outcomes as important goals for California." Final Statement of Reasons (FSOR) at 457; *see* NPRA Plaintiffs' SUF ¶ 39.

Defendants have stated that "reduc[ing] our dependence on foreign oil" is "[o]ne of the key advantages of the LCFS." FSOR at 461; NPRA Plaintiffs' SUF ¶ 40.

Defendants have also stated that the LCFS is designed to do the following: "reduce[e] the volume of transportation fuels that are imported from other states;" "keep[] more money in the State" by "[d]isplacing imported transportation fuels with biofuels produced in the State;" "provide needed employment, an increased tax base for the State, and value added to the biomass used as a feedstock" because of "[t]he biorefineries expected to be built in the State." FSOR at 479; NPRA Plaintiffs' SUF ¶¶ 42-44.

In all events, the Commerce Clause prevents a State from achieving even legitimate purposes in an improper manner. *Philadelphia* v. *New Jersey*, 437 U.S. 617, 626 (1978) ("This dispute about ultimate legislative purpose need not be resolved, because its resolution would not be relevant to the constitutional issue to be decided in this case . . . . the evil of protectionism can reside in legislative means as well as legislative ends.").

| 70. | USEPA stated in its rulemaking:<br><br>"It should be noted, however, that there is no specific 'corn ethanol' mandated volume, and that any advanced biofuel produced above and beyond what is required for the advanced biofuel requirements could reduce the amount of corn ethanol needed to meet the total renewable fuel standard."<br><br>75 FR 14670-01 (March 26, 2010), at p. 14743. | Disputed on the grounds that it states a legal conclusion.<br><br>With respect to Plaintiffs' Commerce Clause claims, this statement is also irrelevant because the legal standards that apply to federal government regulation are different than those that apply to the states. *See, e.g., South-Central Timber Dev.* v. *Wunnicke*, 467 U.S. 82, 92 (1984) (striking down state law under the Commerce Clause even though it "appears to be consistent with federal policy"); *Prudential Ins. Co.* v. *Benjamin*, 328 U.S. 408, 423 (1946) ("The commerce clause is in no sense a limitation upon the power of Congress over |

| | | |
|---|---|---|
| | | interstate and foreign commerce."). |
| 71. | Not only is there no guaranteed volume of corn ethanol in the RFS, EPA has also made it clear that the corn ethanol industry will have to compete economically stating "Although there is not a set corn ethanol requirement, EISA allows for 15 billion gallons of the 36 billion gallon renewable fuel standard to be met by conventional biofuels. We expect that corn ethanol will fulfill this requirement, provided it is more cost competitive than imported ethanol or cellulosic biofuel in the marketplace."<br><br>75 FR 14670-01 (March 26, 2010), at p. 14746. | Disputed on the grounds that it states a legal conclusion, not an undisputed fact.<br><br>With respect to Plaintiffs' Commerce Clause claims, this statement is also irrelevant because the legal standards that apply to federal government regulation are different than those that apply to the states. *See, e.g., South-Central Timber Dev.* v. *Wunnicke*, 467 U.S. 82, 92 (1984) (striking down state law under the Commerce Clause even though it "appears to be consistent with federal policy"); *Prudential Ins. Co.* v. *Benjamin*, 328 U.S. 408, 423 (1946) ("The commerce clause is in no sense a limitation upon the power of Congress over interstate and foreign commerce."). |
| 72. | EPA also stated that "Implementation of EISA will undoubtedly benefit the domestic agriculture sector as a whole, with some components benefiting more than others depending in part on the lifecycle GHG emissions associated with the products to be made from individual feedstocks. If Congress had sought to promote all biofuel production without regard to GHG emissions related to the full lifecycle of those fuels, it would not have specified GHG reduction thresholds for each category of renewable fuel for which volume targets are specified in the Act."<br><br>75 FR 14670-01 (March 26, 2010), at p. at 14766. | Undisputed that this is an accurate quotation.<br><br>With respect to Plaintiffs' Commerce Clause claims, this statement is also irrelevant because the legal standards that apply to federal government regulation are different than those that apply to the states. *See, e.g., South-Central Timber Dev.* v. *Wunnicke*, 467 U.S. 82, 92 (1984) (striking down state law under the Commerce Clause even though it "appears to be consistent with federal policy"); *Prudential Ins. Co.* v. *Benjamin*, 328 U.S. 408, 423 (1946) ("The commerce clause is in no sense a limitation upon the power of Congress over interstate and foreign commerce."). |
| 73. | During the debate over the EISA, numerous members of Congress expressed concern about the expansion of corn-based ethanol and urged an emphasis in the RFS2 on advanced biofuels, including cellulosic biofuels.<br><br>153 Cong. Rec. E2665 (Rep. Dingell stated "[t]o address these competing concerns [about corn ethanol], the [EISA] places an emphasis on the use of cellulosic biomass as a means of producing ethanol."; 153 Cong. Rec. E2631 (Rep. Davis stated "Placing a | Undisputed that particular members made the quoted statements, but irrelevant.<br><br>With respect to Plaintiffs' Commerce Clause claims, this statement is also irrelevant because the legal standards that apply to federal government regulation are different than those that apply to the states. *See, e.g., South-Central Timber Dev.* v. *Wunnicke*, 467 U.S. 82, 92 (1984) (striking down state law under the Commerce Clause even though it "appears to be consistent with federal policy"); *Prudential Ins. Co.* v. *Benjamin*, 328 U.S. 408, 423 (1946) ("The commerce clause is in no sense a limitation upon the power of Congress over |

| | | |
|---|---|---|
| | limit on the amount of corn ethanol eligible to be applied in meeting the RFS is a necessary step. Yet, I have doubts as to whether that limit is too high and whether more should be done to ensure the development of other biofuels."); 153 Cong. Rec. E2529; 153 Cong. Rec. H14434-02, at H1440 (Rep. Stark "I am troubled that we are continuing to subsidize and ratchet up corn-based ethanol production. A simple shift from gasoline to ethanol will do nothing to reduce greenhouse gas emissions, but it will eat up open space and continue to drive up food prices. Fortunately, this bill includes some environmental safeguards and directs future production toward advanced bio-fuels"); 153 Cong. Rec. H16651-02, at H16655 (Rep. Green stating "[t]here is no shortage of literature detailing the negative environmental impacts of corn based ethanol, its questionable greenhouse gas reductions, its reduced fuel efficiency, and its effect on food and energy prices." | interstate and foreign commerce."). |
| 74. | In response to comments regarding the exemption for existing corn ethanol plants, U.S. EPA stated that it:<br><br>"believes that the Act should not be interpreted as allowing unlimited expansion of exempt facilities for an indefinite time period, with all volumes exempt, as suggested by the commenter. Such an approach would likely lead to a substantial increase in production of fuel that is not subject to any GHG limitations, which EPA does not believe would be consistent with the objectives of the Act."<br><br>75 FR 14670-01 (March 26, 2010), at p. 14689. | Undisputed and irrelevant.<br><br>With respect to Plaintiffs' Commerce Clause claims, this statement is also irrelevant because the legal standards that apply to federal government regulation are different than those that apply to the states. *See, e.g., South-Central Timber Dev.* v. *Wunnicke*, 467 U.S. 82, 92 (1984) (striking down state law under the Commerce Clause even though it "appears to be consistent with federal policy"); *Prudential Ins. Co.* v. *Benjamin*, 328 U.S. 408, 423 (1946) ("The commerce clause is in no sense a limitation upon the power of Congress over interstate and foreign commerce."). |
| 75. | California's crude oil industry is declining because the resources available for extraction are diminishing.<br><br>Scheible Decl., ¶ 99. | Undisputed. |

| 76. | RFA and Growth Energy have indicated that many of their members, most of whom are located in the Midwest, are well-situated to convert their corn ethanol plants to cellulosic processes when the latter becomes commercially viable.<br><br>Defendants' RJN, Exhs. S and T. | Disputed and irrelevant.<br><br>The LCFS increases the costs to Midwest ethanol plants of doing business in California, which constitutes harm under the Commerce Clause. *See, e.g., Hunt* v. *Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 351 (1977).  The Commerce Clause prohibits regulations that impose discriminatory barriers to the import of products, even if the products are not banned.  *See, e.g., Camps Newfound/Owatonna, Inc.* v. *Town of Harrison*, 520 U.S. 564, 578 (1997); New Energy Co. of Ind. v. Limbach, 486 U.S. 269, 275 (1988). |

DATED:  March 14, 2011

SIDLEY AUSTIN LLP

By:  /s/ Roger R. Martella, Jr.
Roger R. Martella, Jr.
*Counsel for Plaintiffs*

Roger R. Martella, Jr. (DC Bar No. 976771)
Paul J. Zidlicky (DC Bar No. 450196)
James W. Coleman (DC Bar No. 986626)
*Pro Hac Vice*
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C.  20005
Telephone:  202-736-8000
Facsimile:  202-736-8711
rmartella@sidley.com
pzidlicky@sidley.com
jcoleman@sidley.com
*Counsel for Plaintiffs*

Kurt E. Blase (DC Bar No. 288779)
Holland & Knight, LLP
2099 Pennsylvania Avenue, NW
Suite 100
Washington, DC  20006
Telephone:  (202) 469-5141
Facsimile:  (202) 955-5564
Kurt.blase@hklaw.com
*Counsel for Plaintiff Center for North American Energy Security*

Timothy Jones #119841
John P. Kinsey #215916
JONES HELSLEY PC
8365 North Fresno Street, Suite 310
PO Box 28340
Fresno, CA  93729
*Attorneys for all RMFU plaintiffs*

Stuart A. C. Drake
John C. O'Quinn
(*Admitted Pro hac vice*)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Washington, DC  20005
(202) 879-5000
*Attorneys for plaintiff Growth Energy*

Charles H. Knauss
Thomas R. Lotterman
Bryan M. Killian
(*Admitted Pro hac vice*)
BINGHAM McCUTCHEN LLP
2020 K Street, NW
Washington, DC  20006-1806
(202) 373-6000
*Attorneys for plaintiff Renewable Fuels Association*

PLAINTIFFS' JOINT RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS NOT SUBJECT TO
GENUINE DISPUTE IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT
LEAD CASE NO. 1:09-CV-02234-LJO-DLB