**Exhibit A**

JONES HELSLEY PC
8365 North Fresno Street, Suite 310
PO Box 28340
Fresno, CA 93729
Telephone: (559) 233-4800
Facsimile: (559) 233-9330

Timothy Jones #119841
John P. Kinsey #215916

BINGHAM MCCUTCHEN LLP
2020 K Street N.W.
Washington, DC 20006
Telephone: (202) 373-6000
Facsimile: (202) 373-6001

Charles H. Knauss (*pro hac vice*)
Thomas R. Lotterman (*pro hac vice*)
Bryan M. Killian (*pro hac vice*)

Attorneys for Plaintiff Renewable Fuels Association

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROCKY MOUNTAIN FARMERS UNION; *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>JAMES N. GOLDSTENE, in his official capacity as Executive Director of the California Air Resources Board,<br><br>Defendant. | LEAD CASE NO.<br>1:09-CV-02234-LJO-DLB<br><br>*Consolidated with Case No.*<br>*1:10-CV-00163-LJO-DLB*<br><br><br><br>**PLAINTIFF RENEWABLE FUELS ASSOCIATION'S ANSWERS TO DEFENDANTS' FIRST SET OF INTERROGATORIES** |

**PROPOUNDING PARTY:**    All Defendants and Intervenors

**RESPONDING PARTY:**     Plaintiff Renewable Fuels Association

**SET NO.**               One

## OBJECTIONS AND ANSWERS

**INTERROGATORY NUMBER 1.** If YOU are an INDIVIDUAL PLAINTIFF, state whether YOU applied to ARB to use an alternative pathway under Method 2B of the LCFS.

**ANSWER:** RFA does not answer Interrogatory Number 1 because Interrogatory Number 1 is directed to individual plaintiffs.

**INTERROGATORY NUMBER 2.** If YOUR answer to Interrogatory No. 1 is no, state why YOU did not so apply.

**ANSWER:** RFA does not answer Interrogatory Number 2 because Interrogatory Number 2 is directed to individual plaintiffs.

**INTERROGATORY NUMBER 3.** If YOU are not an INDIVIDUAL PLAINTIFF, state which, if any, of YOUR members applied to ARB to use alternative pathways under Method 2B of the LCFS. For any of YOUR members who did not so apply, IDENTIFY the member and state the reasons why such application was not made.

**ANSWER:** RFA objects to this Interrogatory to the extent it implies that, under the LCFS, a Method 2B application is an application "to use alternative pathways." Subject to RFA's objections, RFA identifies <u>Archer Daniels Midland Company (4666 Faries Parkway, Decatur, IL 62526)</u> and <u>Parallel Products, Inc. (12281 Arrow Route, Rancho Cucamonga, CA 91739)</u>, as RFA members who, by January 24, 2011, had submitted Method 2B applications to CARB. RFA obtained this information from a CARB Internet website, dated January 25, 2011, listing Method 2B applicants (http://www.arb.ca.gov/fuels/lcfs/2a2b/2a-2b-apps.htm). Upon conducting a reasonable investigation and search of documents within RFA's possession, custody, and control, RFA states (1) RFA lacks sufficient knowledge to state whether other RFA members submitted Method 2B applications; (2) RFA lacks sufficient knowledge to identify RFA members who did

not submit Method 2B applications; and (3) RFA lacks sufficient knowledge to state the reasons why RFA members did not submit Method 2B applications. RFA is a trade association and, upon advice of counsel, generally does not learn, attempt to learn, or maintain records or files about individual RFA members' nonpublic business information, including any information about members' physical pathways (as that term is defined in the LCFS) or members' interactions with federal or state agencies. In the past, RFA has commissioned third parties to collect and analyze information from RFA members in aggregate and anonymously, as in 2007, when Argonne National Laboratory studied the efficiency of the U.S. ethanol industry. On January 2, 2011, RFA's counsel asked Defendants' and Intervenors' counsel whether they would accept answers to their interrogatories in aggregate and anonymously. Defendants and Intervenors said they would not.

**INTERROGATORY NUMBER 4.** If YOU are an INDIVIDUAL PLAINTIFF, state whether YOU applied to ARB to use an alternative pathway under Method 2A of the LCFS.

**ANSWER:** RFA does not answer Interrogatory Number 4 because Interrogatory Number 4 is directed to individual plaintiffs.

**INTERROGATORY NUMBER 5.** If YOUR answer to Interrogatory No. 4 is no, state why YOU did not so apply.

**ANSWER:** RFA does not answer Interrogatory Number 5 because Interrogatory Number 5 is directed to individual plaintiffs.

4

**INTERROGATORY NUMBER 6.** If YOU are not an INDIVIDUAL PLAINTIFF, state which, if any, of YOUR members applied to ARB to use alternative pathways under Method 2A of the LCFS. For any of YOUR members who did not so apply, IDENTIFY the member and state the reasons why such application was not made.

**ANSWER:** RFA objects to this Interrogatory to the extent it implies that, under the LCFS, a Method 2A application is an application "to use alternative pathways." Subject to RFA's objections, RFA identifies Louis Dreyfus Commodities (4800 Main Street, Suite 600, Kansas City, MO 64112) and KAAPA Ethanol, LLC (PO Box 238, 8450 KAAPA Lane, Minden, NE 68959) as RFA members who, by January 24, 2011, had submitted Method 2A applications to CARB. RFA obtained this information from a CARB Internet website, dated January 25, 2011, listing Method 2A applicants (http://www.arb.ca.gov/fuels/lcfs/2a2b/2a-2b-apps.htm). Upon conducting a reasonable investigation and search of documents within RFA's possession, custody, and control, RFA states (1) RFA lacks sufficient knowledge to state whether other RFA members submitted Method 2A applications; (2) RFA lacks sufficient knowledge to identify RFA members who did not submit Method 2A applications; and (3) RFA lacks sufficient knowledge to state the reasons why RFA members did not submit Method 2A applications. RFA is a trade association and, upon advice of counsel, generally does not learn, attempt to learn, or maintain records or files about individual RFA members' nonpublic business information, including any information about members' physical pathways (as that term is defined in the LCFS) or members' interactions with federal or state agencies. In the past, RFA has commissioned third parties to collect and analyze information from RFA members in aggregate and anonymously, as in 2007, when Argonne National Laboratory studied the efficiency of the U.S. ethanol industry. On January 2, 2011, RFA's counsel asked Defendants' and Intervenors' counsel whether they would

accept answers to their interrogatories in aggregate and anonymously. Defendants and Intervenors said they would not.

**INTERROGATORY NUMBER 7.** State a) the dates on which YOU or YOUR members commenced construction of their production facilities, b) the dates YOU or they began operating the plants, c) the permitted capacity of any plants under construction as of December 19, 2007, and d) IDENTIFY any acknowledgment by the U.S. EPA that ethanol from those plants qualifies as "renewable fuel" under EISA.

**ANSWER:** RFA objects to this Interrogatory on the grounds that the terms "commenced construction," "began operating," "permitted capacity," and "plants under construction as of December 19, 2007," are vague and ambiguous. RFA further objects that this Interrogatory is unduly burdensome. Upon conducting a reasonable investigation and search of documents within RFA's possession, custody, and control, RFA states (1) RFA lacks sufficient knowledge to state the dates on which RFA members commenced construction of their production facilities; (2) RFA lacks sufficient knowledge to state the dates RFA members began operating their plants; and (3) RFA lacks sufficient knowledge to state the permitted capacity of any RFA member plants under construction as of December 19, 2007. RFA is a trade association and, upon advice of counsel, generally does not learn, attempt to learn, or maintain records or files about individual RFA members' nonpublic business information.

Subject to RFA's objections, RFA provides the following table, which (1) identifies (a) RFA members (in January 2011) whose facilities produce ethanol and (b) those facilities (Column 1); (2) states the year in which, or at least the year by which, it was publicly reported or announced that the member's facility or facilities had commenced construction or expansion (Column 2); (3) states the year in which, or at least the year by which, it was publicly reported or announced that the member's facility or facilities had begun operating (Column 3); (4) states the

publicly reported "nameplate capacity" (*i.e.*, the maximum rated output for which a plant was designed and built) of the member's facility or facilities in January 2011 (Column 4); and (5) states whether a member or its facility or facilities is listed on EPA's January 10, 2011, "RFS2 Registered Renewable Fuel Producer List" (http://www.epa.gov/otaq/regs/fuels/fuelsregistration.htm) (Column 5).  RFA collected the data for Columns 2 and 3 by comparing the 2003, 2004, 2005, 2006, 2007, 2008, 2009, and 2010 "RFA Ethanol Industry Outlook" [RFALCFS-0001–0209], each of which used only contemporaneous, publicly available information (*e.g.*, press releases, news articles, and conference presentations) and lists the status of ethanol facilities in the January of the year of publication.  By process of elimination, RFA has estimated the years in which, or at least the year by which, it was publicly reported or announced that the member's facility or facilities had commenced construction or expansion and had begun operating.  A member's facility or facilities, in fact, may not have commenced construction or expansion or may not have begun operating in the years RFA estimates.

| RFA Member | Commenced Construction or Expansion | Began Operating | Jan. 2011 Nameplate Capacity (mgy) | Acknowledgment by EPA that Member's Ethanol Qualifies as "Renewable Fuel" under EISA |
|---|---|---|---|---|
| Abengoa Bioenergy-Colwich, KS (16150 Main Circle Drive, Suite 300 Chesterfield, MO 63017-4689) | Prior to 2003 | Prior to 2003 | 25 | Yes |
| Abengoa Bioenergy-Mt. Vernon, IN (16150 Main Circle Drive, Suite 300 Chesterfield, MO 63017-4689) | 2008 | 2010 | 88 | Yes |
| Abengoa Bioenergy-Madison, IL (16150 Main Circle Drive, Suite 300 Chesterfield, MO 63017-4689) | 2008 | 2010 | 88 | Yes |

| RFA Member | Commenced Construction or Expansion | Began Operating | Jan. 2011 Nameplate Capacity (mgy) | Acknowledgment by EPA that Member's Ethanol Qualifies as "Renewable Fuel" under EISA |
|---|---|---|---|---|
| Osage Bioenergy-Hopewell, VA (4991 Lake Brook Dr # 250 Glen Allen, VA 23060-9292) | 2008 | 2010 | 65 | Yes |
| Penford Products Company-Cedar Rapids, IA (1001 First Street S.W. Cedar Rapids, IA 52404) | 2006 | 2008 | 45 | Yes |
| Range Fuels-Soperton, GA (11101 W. 120th Avenue, Suite 200 Broomfield, CO 80021) | 2007 | n/a | 10 | Yes |

**INTERROGATORY NUMBER 8.** For any plants under construction as of December 19, 2007, IDENTIFY each such plant that has applied to ARB for an individualized carbon intensity score under either Method 2A or Method 2B of the LCFS.

**ANSWER:** RFA objects to this Interrogatory to the extent it implies that Methods 2A and 2B of the LCFS allow plants to obtain an "individualized carbon intensity score." RFA objects to this Interrogatory on the ground that the term "plants under construction as of December 19, 2007" is vague and ambiguous. Subject to RFA's objections, upon conducting a reasonable investigation and search of documents within RFA's possession, custody, and control, RFA states that (1) RFA lacks sufficient knowledge to state the dates on which RFA members commenced construction of their production facilities; and (2) RFA lacks sufficient knowledge to identify whether RFA members other than Archer Daniels Midland Company, KAAPA Ethanol, LLC, Louis Dreyfus Commodities, and Parallel Products, Inc., submitted Method 2A or Method 2B applications to CARB. RFA is a trade association and, upon advice of counsel, generally does not learn, attempt to learn, or maintain records or files about individual RFA members' nonpublic business information.

RFA further states that, in light of its answer to Interrogatory Number 7, RFA believes that Archer Daniels Midland Company, KAAPA Ethanol, LLC, Louis Dreyfus Commodities, and Parallel Products, Inc., submitted Method 2A or Method 2B applications to CARB for facilities that had commenced construction before January 2008.

**INTERROGATORY NUMBER 9.** State the results of all internal studies or analyses in YOUR custody or control that RELATE TO the scope and/or pricing for the non-California ethanol market for the years 2011-2021 or any period therein.

**ANSWER:** RFA objects to this interrogatory on the grounds that "internal studies or analysis" and "scope and/or pricing for the non-California ethanol market" are vague and ambiguous. Subject to RFA's objections, RFA states that, pursuant to Fed. R. Civ. P. 33(d), RFA will produce the documents for which information sought in this Interrogatory may be ascertained [RFALCFS-0234–0269, RFALCFS-0291–0308, RFALCFS-0357–0365, RFALCFS-0375–0400, RFALCFS-407–408]. The documents include (a) documents estimating, under certain assumptions (*e.g.*, use of ethanol in E10 vs. use of ethanol in E15), the years in which certain pathways identified in the LCFS produce credits or deficits for LCFS compliance purposes; (b) documents estimating the nameplate capacity for certain pathways identified in the LCFS; (c) publicly available documents produced by the U.S. Energy Information Administration relating estimates about the size of the domestic ethanol market; and (d) documents estimating ethanol supply in 2011.

**INTERROGATORY NUMBER 10.** Do YOU contend that YOU (or any of YOUR members) will lose profits if the LCFS is not enjoined? If so, state the amount of lost profits that each of YOU (or YOUR members) claim and state all facts and IDENTIFY all DOCUMENTS on which these claims are based.

**ANSWER:** RFA objects to this Interrogatory to the extent it implies that RFA and its members claim lost profits in this case when, in fact, RFA seeks only declaratory and injunctive relief. RFA objects to this Interrogatory on the grounds that seeking discovery of RFA's contentions, and all documents and facts on which RFA's contentions are based, is unduly burdensome and improper for purposes of discovery under Rule 56(d). Subject to RFA's objections, RFA contends that one or more RFA members will be less profitable or will be unprofitable if the LCFS is not enjoined. RFA bases its contention on the following documents and facts:

1) the Declaration of Jesse David in Support of Plaintiffs' Motion for Preliminary Injunction (ECF #122), which finds that the LCFS will reduce demand for Midwest ethanol and thereby cause Midwestern producers of ethanol to lose several hundred million dollars of revenues and profits in the short term, with greater losses over time;

2) the text of the LCFS, which, by assigning high carbon-intensity scores, makes corn ethanol from some pathways undesirable for regulated parties and which therefore will reduce demand for that corn ethanol in California;

3) the text of the LCFS, which, by assigning high carbon-intensity scores, makes certain ethanol production decisions (including, *inter alia*, the decision to produce profitable co-products like dry distillers grains) less desirable, and therefore less profitable, for corn ethanol producers selling for the California market;

4) statements in the LCFS rulemaking documents, which make clear that the LCFS is designed to manipulate market incentives so as to reduce demand in California for Midwest corn ethanol, but not California corn ethanol, and thus reduce profits for sellers of Midwest corn ethanol fuel who sell or wish to sell in California. *E.g.*, FSOR 804 ("The LCFS is designed to influence the market for California fuels—not by designating specific fuels that are favored and not favored, but by establishing declining annual carbon intensity limits. The regulation provides fuel suppliers with the flexibility to meet that standard with any mix of fuels they find to be advantageous. It is true, however, that fuels with higher life-cycle carbon intensities will likely be less favored by fuel suppliers, and may face a competitive disadvantage. Although some individual producers of higher-carbon fuels may experience declining sales, the Board has found that the regulation will not have a significant negative impact on the economy of California (see Chapter VIII of the ISOR).")); FSOR 407 ("The market incentives to be created under the LCFS are designed to efficiently drive a transition away from fuels that are most likely to increase food prices. Lower carbon fuels—fuels that do not significantly influence food prices tend to be lower carbon fuels—earn credits under the LCFS. For fuels with carbon intensities below the annual LCFS carbon intensity limits, the number of credits earned increases as carbon intensity decreases. Because credits can be sold, they have value to fuel providers. The existence of this credit market will ensure that California transitions as quickly and efficiently as possible from higher-carbon, crop-based fuels, to lower-carbon fuels that are not produced from feedstocks that displace food crops");

5) Defendants' and Intervenors' Statement of Disputed Fact #24, which admits that having a relatively higher carbon-intensity score will negatively affect a fuel's price and, thus, the profits of a producer of that fuel: "A [California fuel] provider could buy a small volume of very low carbon fuel at a higher price and then buy a higher carbon fuel at a lower price to meet its overall obligation [under the LCFS]";

6) the fact that the LCFS will make Midwest corn ethanol increasingly undesirable for purposes of LCFS compliance eliminate, so as to eliminate it from California, currently the largest state market for corn ethanol in the United States.

RFA is a trade association and, upon advice of counsel, does not learn, attempt to learn, or maintain records or files about individual RFA members' nonpublic business information. RFA lacks sufficient knowledge to state the amount of lost profits that each RFA member will suffer if the LCFS is not enjoined.

**INTERROGATORY NUMBER 11.** Do YOU contend that YOU (or any of YOUR members) will go out of business if the LCFS is not enjoined? If so, state all facts and IDENTIFY all DOCUMENTS upon which these claims are based.

ANSWER: RFA objects to this Interrogatory on the grounds that the term "go out of business" is vague and ambiguous. RFA objects to this Interrogatory on the grounds that seeking discovery of RFA's contentions, and all documents and facts on which RFA's contentions are based, is unduly burdensome and improper for purposes of discovery under Rule 56(d). Subject to RFA's objections, RFA does not contend that the association will cease to operate if the LCFS is not enjoined. RFA contends that one or more RFA members will cease to operate corn ethanol production facilities if the LCFS is not enjoined. RFA bases its contention on the following documents and facts:

1) the text of the LCFS and statements in the LCFS rulemaking documents, which state that the LCFS is designed to "transition" away "from corn ethanol"; to "displace higher-carbon fuels" like corn ethanol; and otherwise bring about the demise of the domestic corn ethanol industry, particularly corn ethanol assigned a relatively high carbon intensity score, by causing buyers and regulated parties in California to demand fuels with relatively low carbon intensity scores. *E.g.*, FSOR 395 ("The LCFS, by being back-loaded (i.e., modest requirements in the earlier years), is designed for a reasonable transition from conventional ethanol, such as corn ethanol, to the next generation of ethanol made from biomass and waste products."); FSOR 410-411 ("The low-carbon fuels the LCFS is designed to incentivize are fuels which—because they induce little or no land use change—do not compete significantly with food crops for land. These lower-carbon fuels will steadily displace higher-carbon fuels, including those with the potential to contribute to food price increases."); FSOR 573 ("Although higher-carbon alternative fuels, such as corn ethanol, will have a short-term presence in the California market, the role of non-crop-based fuels (such as those produced from agricultural and municipal waste streams) will increase.");

2) the Declarations of Jesse David (ECF #122), Stuart Harden (ECF #124), and Gerald Brian (ECF #121) in Support of Plaintiffs' Motion for Preliminary Injunction, which find that (a) the LCFS will cause ethanol producers to lose substantial revenue and profits and will effectively eliminate Midwest corn ethanol from the California market, and (b) as a result of those harms, corn ethanol businesses will lose substantial value and will be unable to raise needed money (as through loans) to operate production facilities.

**INTERROGATORY NUMBER 12.** Do YOU or YOUR members contend that the LCFS has discriminatory effects on non-California corn ethanol producers and/or suppliers? If so, state all facts and IDENTIFY all DOCUMENTS on which this contention is based.

**ANSWER:** RFA objects to this Interrogatory on the grounds that seeking discovery of RFA's contentions, and all documents and facts on which RFA's contentions are based, is unduly burdensome and improper for purposes of discovery under Rule 56(d). Subject to RFA's objections, RFA contends that the LCFS has discriminatory effects on non-California corn ethanol producers and/or suppliers. RFA bases its contention on the following documents and facts:

1) the text of the LCFS, including Table 6, which assigns higher carbon-intensity scores to corn ethanol produced out-of-state;

2) statements in the LCFS rulemaking documents (including the CA-GREET model CARB claims to have used to calculate the carbon-intensity scores it assigns corn ethanol fuel), which confirm that the LCFS practically discriminates against interstate commerce by assigning higher carbon-intensity scores (a) to producers the farther they ship their corn ethanol (and the farther they ship inputs, like corn); and (b) to producers who use electricity generated outside California (*e.g.*, FSOR at 64, 339, 713, 860; ISOR at IV-9 to IV-11; CA GREET at 6, 43);

3) statements in the LCFS rulemaking documents that the LCFS is designed to close California to Midwest corn ethanol while preserving a market for local corn ethanol (*e.g.*, ISOR Appendix E, at E-1 to E-8);

4) CARB's response to Plaintiffs Statement of Material Fact 6, which admits that the LCFS assigns higher carbon-intensity scores to Midwest corn ethanol producers based on CARB's belief that Midwest corn ethanol production facilities are, on

20

average, less efficient than California corn ethanol production facilities ("The difference in carbon intensity score for a Midwest facility and a California facility using the same milling (e.g., Dry), byproduct (e.g., DDGS) and boiler fuel (e.g., Nat. Gas) *are* due in part to differences in (a) the average efficiency of the equipment at facilities in the Midwest versus California, and (b) the average greenhouse gas emissions associated with the electricity used at the facilities in the Midwest and California ....");

5) documents in RFA's possession, custody, and control, for which the information sought in this Interrogatory can be ascertained and which, pursuant to Fed. R. Civ. P. 33(d), RFA will produce [RFALCFS-0210–0239, RFALCFS-0245–0290, RFALCFS-0296–0374, RFALCFS-0401–0406, RFALCFS-0409–0413]. The documents include (a) documents making certain assumptions (*e.g.*, use of ethanol in E10 vs. use of ethanol in E15) and showing that California corn ethanol fares better than Midwest corn ethanol under the LCFS; and (b) documents showing that CARB's carbon-intensity modeling, including the CA-GREET model, inherently discriminate against Midwest corn ethanol.

Upon conducting a reasonable investigation and a reasonable search of documents within RFA's possession, custody, and control, RFA states that it lacks sufficient information to answer whether RFA members contend that the LCFS has discriminatory effects on non-California corn ethanol producers and/or suppliers.

**INTERROGATORY NUMBER 13.** Describe any energy efficiency improvements that YOU or YOUR members have made since 2007.

**ANSWER:** RFA objects to this Interrogatory on the grounds that the term "energy efficiency improvements" is vague and ambiguous. Subject to RFA's objections, RFA states that,

upon conducting a reasonable investigation and search of documents within RFA's possession, custody, and control, it does not know about energy efficient improvements made by its members since 2007. RFA knows that corn ethanol producers regularly modify their facilities to use less electricity and less energy. The May 4, 2010 "Detailed Report: 2008 National Dry Mill Corn Ethanol Survey" by Steffen Mueller, PhD (University of Illinois at Chicago), available at http://www.erc.uic.edu/PDF/mueller/ethanol_survey_report.pdf, which examined data collected from 66% of the installed dry mill ethanol capacity during the year 2008, stated that "the energy efficiency of ethanol plants has been consistently increasing over time" and found that "... ethanol produced [by dry mills] in 2008 require[d] 28% less thermal energy per gallon and 32.1% less electricity per gallon but produce[d] 5.3% more ethanol per bushel..." than in 2001.

**INTERROGATORY NUMBER 14.** Identify all ethanol production facilities owned or operated by YOU or YOUR members which have suffered a loss of market share as a result of the LCFS.

**ANSWER:** RFA does not own or operate ethanol production facilities. Upon conducting a reasonable investigation and search of documents within RFA's possession, custody, and control, RFA states that it cannot identify any ethanol production facilities owned or operated by RFA members which have suffered a loss of market share as a result of the LCFS. RFA is a trade association and, upon advice of counsel, does not learn, attempt to learn, or maintain records or files about individual RFA members' nonpublic business information, including their market share.

**INTERROGATORY NUMBER 15.** Identify all ethanol production facilities owned or operated by YOU or YOUR members which have been unable to obtain financing as a result of the LCFS.

**ANSWER:** RFA owns or operates no ethanol production facilities. Upon conducting a reasonable investigation and search of documents within RFA's possession, custody, and control, RFA states that it cannot identify any ethanol production facilities owned or operated by RFA members which have been unable to obtain financing as a result of the LCFS. RFA is a trade association and, upon advice of counsel, does not learn, attempt to learn, or maintain records or files about individual RFA members' nonpublic business information, including their ability to obtain financing.

**INTERROGATORY NUMBER 16.** Do YOU or YOUR members contend that the LCFS will not have any effect on the results of climate change in California? If so, state all facts and IDENTIFY all DOCUMENTS on which this contention is based.

**ANSWER:** RFA objects to this Interrogatory on the ground that "results of climate change in California" is vague and ambiguous. RFA objects to this Interrogatory on the grounds that seeking discovery of RFA's contentions, and all documents and facts on which RFA's contentions are based, is unduly burdensome and improper for purposes of discovery under Rule 56(d). Subject to RFA's objections, RFA contends that the LCFS will not have any significant effect on the results of global climate change in California (*e.g.*, (a) snow, ice, or frozen ground in California; (b) the mean temperature and level of water bodies in California; (c) wild animal populations in California; (d) the mean length of the growing season in California; (e) the mean temperature and level of ocean water in California; and (f) weather in California). RFA bases its contention on the following documents and facts:

　　1) statements in the LCFS rulemaking documents that "GHG emission reductions by the LCFS alone will not result in significant climate change" (FSOR 342);

2) statements in the LCFS rulemaking documents that "[w]ithout the wider adoption of fuel carbon-intensity standards" there will be "little or no net change in fuel carbon-intensity on a global scale" (FSOR 477, 715);

3) the fact that CARB, in the LCFS rulemaking documents, did not describe the LCFS as likely to, or as designed to, prevent, delay, or otherwise affect the results of climate change in California;

4) the fact that climate change is a global phenomenon, which means that a reduction in greenhouse gas emissions from one place has no greater or lesser effect on global climate change than an identical reduction of greenhouse gas emissions from anywhere else in the world;

5) the April 8, 2009 report entitled "Preliminary Review of the CARB Staff Analysis of the Proposed Low Carbon Fuel Standard (LCFS)," by Thomas C. Austin *et al.*, of Sierra Research, Inc., which found that, according to the Model to Assess Greenhouse-gas Induced Climate Change, the LCFS impact on climate change will be "smaller than our observational systems are able to measure" and will, therefore, be "undetectable"; furthermore, the report noted that it was "unrealistic" to assume that the LCFS will not drive demand to higher carbon fuels, which would lead to "less of a reduction in GHG emissions" (http://www.ab32ig.com/documents/LCFSSRReview0409.pdf).

Upon conducting a reasonable investigation and a reasonable search of documents within RFA's possession, custody, and control, RFA states that it lacks sufficient information to answer whether RFA members contend that the LCFS will not have any effect on the result of climate change in California.

As to objections:

*[signature: Bryan M. Killian]*

Charles H. Knauss (*pro hac vice*)
Thomas R. Lotterman (*pro hac vice*)
Bryan M. Killian (*pro hac vice*)
BINGHAM MCCUTCHEN LLP
2020 K Street, NW
Washington, DC 20006-1806
(202) 373-6000

Timothy Jones #119841
John P. Kinsey #215916
JONES HELSLEY PC
8365 North Fresno Street, Suite 310
PO Box 28340
Fresno, CA 93729
Telephone: (559) 233-4800
Facsimile: (559) 233-9330

Attorneys for Renewable Fuels Association

DATED: January 26, 2011