1

**IN THE UNITED STATES DISTRICT COURT**

2

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

3

4

ROCKY MOUNTAIN FARMERS UNION,
REDWOOD COUNTY MINNESOTA CORN

CASE NO. CV-F-09-2234 LJO GSA

5

AND SOYBEAN GROWERS, PENNY
NEWMAN GRAIN, INC., GROWTH ENERGY,

**ORDER ON DEFENDANTS'**

6

RENEWABLE FUELS ASSOCIATION, REX
NEDEREND, FRESNO COUNTY FARM

**SUMMARY JUDGMENT MOTION**
(Doc. 138)

7

BUREAU, NISEI FARMERS LEAGUE, and
CALIFORNIA DAIRY CAMPAIGN,

8

Plaintiffs,

9

vs.

10

JAMES N. GOLDSTENE, Executive Officer
of the California Air Resources Board,

11

Defendant.

12

13

*consolidated with*

14

NATIONAL PETROCHEMICAL &
REFINERS ASSOCIATION, AMERICAN

CASE NO. CV-F-10-163 LJO DLB

15

TRUCKING ASSOCIATION, CENTER
FOR NORTH AMERICAN ENERGY

**ORDER ON DEFENDANTS'**
**SUMMARY JUDGMENT MOTION**

16

SECURITY, and THE CONSUMER
ENERGY ALLIANCE,

(Doc. 138)

17

Plaintiffs,

18

vs.

19

20

JAMES GOLDSTENE, Executive Officer
of the California Air Resources Board,
MARY D. NICHOLS, DANIEL SPERLING,

21

KEN YEAGER, DORENE D'ADAMO,
BARBARA RIORDAN, JOHN R. BALMES,

22

LYDIA H. KENNARD, SANDRA BERG,
RON ROBERTS, RONALD O.

23

LOVERIDGE, member of the California
Air Resources Board; ARNOLD

24

SCHWARZENEGGER, Governor of the
state of California, and EDMUND BROWN,

25

Attorney General of the state of California,

26

Defendants.

27

and related intervenor actions and amici.

28

1

1

**INTRODUCTION**

2      To implement provisions of California Assembly Bill 32 ("AB 32"), California's Global Warming

3 Solutions Act of 2006, Cal. Health & Saf. Code, §38500 et seq., defendant California Air Resource Board

4 ("CARB") promulgated its Low Carbon Fuel Standard, Cal. Code Regs. tit. 17, §§95480-95490

5 ("LCFS").  Plaintiffs[1] initiated separate actions to challenge California's LCFS.  Plaintiffs challenge the

6 LCFS.  Plaintiffs assert that the LCFS is prohibited by the dormant Commerce Clause and is preempted

7 by federal law.

8      Defendants[2] seek summary judgment, pursuant to Fed. R. Civ. P. 56, that California's LCFS is

9 an authorized control of a motor vehicle fuel pursuant to 42 U.S.C. §7545(c)(4)(B) ("Section

10 211(c)(4)(B)") that is insulated from preemption and Commerce Clause challenges.  This Court addresses

11 Defendants' summary judgment motion first because, if meritorious, Defendants' arguments would

12 resolve this action.  Defendants contend that pursuant to Section 211(c)(4)(B) of the Clean Air Act, the

13 LCFS is an authorized control on carbon emissions associated with fuels.  Defendants rely on Section

14 211(c)(4)(B) to argue further that the LCFS is not preempted by the federal Clean Air Act and is insulated

15 from Commerce Clause scrutiny.

16      Having considered the parties' arguments, relevant legal authority, and the admissible exhibits

17 submitted, this Court finds that the LCFS is an authorized regulation pursuant to Section 211(c)(4)(B).

18 California's authority pursuant to Section 211(c)(4)(B), however, is not unfettered.  California regulations

19 that are exempt from preemption under Section 211(c)(4)(B) must still be considered according to

20 ordinary conflict preemption principles.  In addition, contrary to Defendants' repeated assertions, Section

21 211(c)(4)(B) does not insulate CARB from dormant Commerce Clause scrutiny.

---

[1] Plaintiffs in this consolidated action are Rocky Mountain Farmers Union, Redwood County Minnesota Corn and Soybean Growers, Penny Newman Grain, Inc., Growth Energy, Renewable Fuels Association, Red Nederend, Fresno County Farm Bureau, Nisei Farmers League, California Dairy Campaign, National Petrochemical & Refiners Association, American Trucking Association, Center for North American Energy Security, and the Consumer Energy Alliance.

[2] Defendants are James N. Goldstene, in his official capacity as Executive Director of the California Resources Board ("CARB"); Mary D. Nichols, Daniel Sperling, Ken Yeager, Dorene D'Adamo, Barbara Riordan, John R. Balmes, Lydia H. Kennard, Sandra Berg, Ron Roberts, John G. Telles, and Ronald O. Loveridge, in their official capacities as members of CARB; Arnold Schwarzenegger, in his official capacity as Governor of the State of California, and Edmund G. Brown, Jr., in his official capacity as California Attorney General.  Defendant-intervenors are Natural Resources Defendant Council, Sierra Club, Conservation Law Foundation  Defendants and defendant-intervenors shall be referred to collectively as "Defendants" or "CARB."

1    In addition to the arguments presented related to Section 211(c)(4)(B), Defendants' challenge
2    Plaintiffs' preemption and Commerce Clause claims on the merits.  Defendants argue that the Plaintiffs'
3    facial preemption claim fails *in toto*, because Defendants cannot establish that there are no set of
4    circumstances under which the LCFS would be valid.

5    Having considered the parties' arguments, the admissible evidence, and relevant case law, this
6    Court finds that Section 211(c)(4)(B) does not exempt California from preemption when applied to EISA.
7    California's Section 211(c)(4)(B) exempts California from federal regulations outlined in Section 211(c).
8    This Court must apply the ordinary preemption principles to determine whether the LCFS is preempted
9    by Section 211(o), a separate provision of the Clean Air Act.  In addition, this Court finds that Section
10   211(c)(4)(B) does not expressly remove the LCFS from Commerce Clause scrutiny.  As to the appropriate
11   standard of review on a facial preemption challenge, this Court finds that Defendants have failed to
12   establish that the "no set of circumstances" standard is the appropriate standard to address the current
13   preemption challenge.  For these reasons, this Court DENIES Defendants' summary judgment motion
14   on these issues.  This Court shall address Defendants' other affirmative arguments on the merits of
15   Plaintiffs' challenges in separate orders resolving Plaintiffs' summary judgment motions.

16                                          **BACKGROUND**

17                                          **Clean Air Act**

18   The Clean Air Act is comprehensive federal legislation governing air pollution prevention and
19   control, emissions standards, acid rain reduction, permits, and stratospheric ozone protection. *See*
20   *generally*, 42 U.S.C. ch. 85.  Congress approved the Clean Air Act "to protect and enhance the quality
21   of the Nation's air resources so as to promote the public health and welfare and the productive capacity
22   of its population." 42 U.S.C. §7401(b)(1).  Pursuant to the Clean Air Act, "[t]he direct regulation of
23   emissions from stationary sources is primarily left to the states.  On the other hand, the federal
24   government sets nationwide emissions standards for mobile sources." *Jensen Family Farms, Inc. v.*
25   *Monterey Bay Uni. Air Pollution Control Dist.*, 644 F.3d.  934, 938 (9th Cir. May 27, 2011) (citations
26   omitted). Although the Clean Air Act creates national standards and programs for mobile sources, it
27   "generally seeks to preserve state authority in the area of pollution." *Oxygenated Fuels Assoc., Inc. v.*
28   *Davis*, 331 F.3d 665, 670 (9th Cir. 2003) ("*Oxygenated Fuels*").

                                                  3

1   The Clean Air Act "encourage[s] or otherwise promote[s] reasonable Federal, State, and local

2   government actions, consistent with the provisions of this Act, for pollution prevention." 42 U.S.C.

3   §7401(c).  Under the Act, the "States and the Federal Government [are] partners in the struggle against

4   air pollution." *Gen. Motors Corp. v. United States*, 496 U.S. 530, 532 (1990).  Federal, state and local

5   governments work together to implement and enforce some provisions of the Clean Air Act.  For

6   example, the Clean Air Act grants the EPA the authority to set national ambient air quality standards, but

7   allows states to create plans to meet those standards. *Id*.  Pursuant to the Clean Act, the federal

8   government shares jurisdiction with states in some instances because "air pollution prevention...and air

9   pollution control at its source is the primary responsibility of States and local governments." 42 U.S.C.

10  §7401(a)(3).

11  Based on these principles, the Clean Air Act's savings clause provides a "substantial retention of

12  State authority." *Oxygenated Fuels*, 331 F.3d at 671.  42 U.S.C. §7416 provides:

13  Except as otherwise provided in sections 1857c-10(c), (e), and (f) (as in effect before
    August 7, 1977), 7543, 7545(c)(4), and 7573 of this title (preempting certain State

14  regulation of moving sources) **nothing in this chapter shall preclude or deny the right
    of any State or political subdivision thereof to adopt or enforce (1) any standard or**

15  **limitation respecting emissions of air pollutants or (2) any requirement respecting
    control or abatement of air pollution**; except that if an emission standard or limitation

16  is in effect under an applicable implementation plan or under section 7411 or section 7412
    of this title, such State or political subdivision may not adopt or enforce any emission

17  standard or limitation which is less stringent than the standard or limitation under such
    plan or section.

18

19  *Id*. (emphasis added).

20  **Federal Fuels Program**

21  Section 211 of the Clean Air Act, 42 U.S.C. §7545, sets forth the federal statutory framework for

22  regulating motor vehicle fuels and fuel additives.  Section 211 authorizes the United States Environmental

23  Protection Agency ("EPA") to regulate fuels to control vehicle emissions and to ensure a national market

24  for fuels. 42 U.S.C. §7545.  Section 211 contains numerous, diverse provisions.  Section 211(a) gives the

25  EPA the authority to require registration of any fuel or fuel additive.  Section 211(c) allows the EPA to

26  "control or prohibit" any fuel or fuel additive that is found to contribute to air pollution or water pollution.

27  Section 211(g) regulates the use of leaded gasoline.  Section 211(k) sets forth a fuels program for the

28  reformulation of gasoline.  Section 211(*l*) requires that gasoline contain detergent additives, pursuant to

4

1   federal specifications, to prevent the accumulation of engine and fuel supply deposits.  Section 211(m)

2   requires that, during the winter months, gasoline sold in certain areas have an oxygen content that equals

3   or exceeds 2.7 percent by weight.

4        In their complaints, Plaintiffs allege that the LCFS conflicts with and is preempted by Section

5   211(o).  The Energy Policy Act of 2005 modified Section 211 of the Clean Air Act by establishing a

6   national renewable fuel standard program ("RFS"), codified in 42 U.S.C. §7545(o) ("Section 211(o)").

7   The RFS established a renewable fuel volume mandate that requires 7.5 billion gallons of renewable

8   fuels, including ethanol, to be blended into gasoline by 2010.  The RFS was modified by the Energy

9   Independence and Security Act of 2007 ("EISA"), creating a second federal renewable fuel standard

10  program ("RFS2").  EISA modified the RFS in several ways.  For example, EISA significantly increased

11  the required volume of renewable fuels for sale in gasoline.  The required volumes include an incremental

12  increase from 2009 through 2022, with a goal of 36 billion gallons of biofuels used. Section 211(o)(2).

13  EISA also mandates that the majority of the renewable fuels produced by 2022 consist of "advanced

14  biofuels," with an emphasis on cellulosic ethanol. 42 U.S.C. §7545(o)(2)(B)(I-III).

15       EISA requires the EPA to set regulations to ensure the reduction of greenhouse gases ("GHGs").

16  In so doing, EISA mandates the EPA to consider lifecycle GHG emissions and to set lifecycle GHG

17  performance thresholds for biofuels.  EISA defines the term "lifecycle greenhouse gas emissions" as:

18      the aggregate quantity of greenhouse gas emissions (including direct emissions and significant indirect emissions such as significant emissions from land use changes), as

19      determined by the Administrator, related to the full fuel lifecycle, including all stages of fuel and feedstock production and distribution, from feedstock generation or extraction

20      through the distribution and delivery and use of the finished fuel to the ultimate consumer, where the mass values for all greenhouse gases are adjusted to account for their relative

21      global warming potential.

22  42 U.S.C. §7545(o)(1)(H).  To ensure that each category of renewable fuels emits fewer greenhouse gases

23  than the petroleum fuel it replaces, Section 211(o)(2) requires "that transportation fuel sold or introduced

24  into commerce in the United States...on an annual average basis, contains at least the applicable volume

25  of renewable fuel, advanced biofuel, cellulosic biofuel, and biomass-based diesel" mandated by EISA.

26  42 U.S.C. §7545(o)(2)(A)(i).

27       In addition, Section 211(o) requires renewable fuel facilities to achieve "at least a 20 percent

28  reduction in lifecycle greenhouse gas emissions compared to baseline lifecycle greenhouse gas

1  emissions." 42 U.S.C. §7545(o)(2)(A)(i).  Section 211(o) exempts certain United States corn ethanol

2  biorefineries from this provision.  Biorefineries that were either in production, or had completed

3  construction, at the time the provision was enacted were not required to comply with EISA's mandate to

4  reduce GHG lifecycle emissions by 20%. *Id*.

5      Plaintiffs argue that the LCFS is preempted by Section 211(o).  Plaintiffs contend that the LCFS

6  conflicts with the Section 211(o) to the extend that the LCFS requires renewable fuel facilities that are

7  exempted from Section 211(o) requirements to comply with the LCFS.  Defendants maintain that the

8  LCFS does not conflict with Section 211(o) and is authorized by Section 211(c)(4)(B).

9                                    **California and the Clean Air Act**

10     As the only state to have adopted emissions standards prior to March 30, 1966, California enjoys

11 special consideration under the Clean Air Act.  For example, although Section 209(a) of the Clean Air

12 Act, 42 U.S.C. §7543(a), prohibits states from adopting or enforcing standards related to the control of

13 emissions for new motor vehicles, Section 209(b) allows California to request a waiver from this

14 preemption provision.  Similarly, Section 211(c) "explicitly contemplates that California can, in some

15 instances, place restrictions on fuel additives." *Oxygenated Fuels*, 331 F.3d at 671.

16     CARB contends that Section 211(c)(4)(B) expressly authorizes California to control fuels, and

17 expressly authorizes the LCFS.  Section 211(c)(4)(B) is an exception to a preemption provision.  Section

18 211(c)(4)(A) contains the following preemption provision:

19          Except as otherwise provided in subparagraph (B) or (C), **no State (or political
            subdivision thereof) may prescribe or attempt to enforce, for purposes of motor
20          vehicle emission control, any control or prohibition respecting any characteristic or
            component of a fuel or fuel additive in a motor vehicle or motor vehicle engine**–
21          (i) if the Administrator has found that no control or prohibition of the characteristic or
            component of a fuel or fuel additive under paragraph (1) is necessary and has publishing
22          his finding in the Federal Register, or
            (ii) if the Administrator has prescribed under paragraph (1) a control or prohibition
23          application to such characteristic or component of a fuel or fuel additive, unless the State
            prohibition or control is identical to the prohibition or control prescribed by the
24          Administrator.

25 42 U.S.C. §7545(c)(4)(A).  Congress created an express exemption from this preemption for California,

26 as it refers to the Section 209(b) waiver:

27          Any state for which application of [Section 209(a)] has at any time been waived under
            [Section 209(b)] may at any time prescribe and enforce, for the purpose of motor vehicle
28          emission control, a control or prohibition respecting any fuel or fuel additive.

                                              6

1  42 U.S.C. §7545(c)(4)(B) ("Section 211(c)(4)(B)").   California is the only state that qualifies for the

2  Section 209 waiver or Section 211(c)(4)(A) preemption exemption.  *See, Davis v. EPA,* 348 F.3d 772,

3  777 n. 1 (9th Cir. 2003); *Engine Mftrs. Ass'n v. United States*, 88 F.3d 1075, 1079 n. 9 (D.C. Cir. 1996).

4  ### California's Fuels Program

5  California has a long-standing fuels program.   In some cases, California regulated fuel

6  components before the federal government.   For example, California regulated Reid vapor pressure and

7  lead content in gasoline prior to the federal government. *See W. Oil & Gas Ass'n v. Orange County Air*

8  *Pollution Control Dist*., 14 Cal.3d 411, 414 (1975).   In addition, California was a leader in prohibiting

9  lead in gasoline.  *See Motor Vehicle Mfrs. Ass'n v. N.Y. Dep't of Envtl. Conservation*, 17 F.3d 521, 529

10  (2d Cir. 1994).  California's Phase 2 reformulated gasoline regulations set standards for eight gasoline

11  specifications: sulfur, benzene, olefins, aromatic hydrocarbons, oxygen, Reid vapor pressure, and

12  distillation temperatures for the 50% and 90% evaporation points. *See* Cal. Code Regs., tit. 13 §§2250-72.

13  In 1999, CARB approved amendments to its reformulated gasoline regulations banning methyl tertiary

14  butyl ether ("MTBE") due to concerns over contamination of California's groundwater. *Oxygenated Fuels*

15  *Ass'n, Inc. v. Davis*, 163 F. Supp. 2d 1182, 1185-86 (E.D. Cal. 2001).   As a result, ethanol became the

16  primary oxygenate in California gasoline.   The federal government has not passed a federal LCFS.

17  ### AB32

18  In enacting the Global Warming Solutions Act of 2006, AB 32, the California Legislature found,

19  *inter alia*: "Global warming poses a serious threat to the economic well-being, public health, natural

20  resources, and the environment of California." Cal. Health & Saf. Code, §38501.  AB 32 set the goal of

21  reducing GHG emissions in California to 1990 levels by the year 2020.   To attain these goals, AB 32

22  charged CARB to develop and implement regulations in a number of areas.

23  In January 2007, California's Governor issued Executive Order S-01-07 ("Executive Order"),

24  setting a statewide goal to "reduce the carbon intensity of California's transportation fuels by at least 10

25  percent by 2020."  In the Executive Order, the Governor called on CARB to "determine if [an LCFS] can

26  be adopted as a discrete early action measure pursuant to AB 32."  *Id*.  In June 2007, CARB adopted the

27  LCFS as an early action measure.   Public workshops on the issue, formal rule-making procedures

28  followed, culminated in the final adoption of the regulation in April 2010.  LCFS §§95480-95490.

1   Plaintiffs challenge the LCFS regulations in this action.

2        The purpose of the challenged regulation "is to implement a low carbon fuel standard, which will
3   reduce greenhouse gas emissions by reducing the full fuel-cycle, carbon intensity of the transportation
4   fuel pool used in California[.]" LCFS §95380.  The LCFS "applies to any transportation fuel...that is sold,
5   supplied, or offered for sale in California, and to any person who, as a regulated party defined in [the
6   regulation] is responsible for a transportation fuel in a calendar year." LCFS §95480.1(a).

7        California's LCFS focuses on the "carbon intensity" of fuels to estimate emissions related to a
8   fuel's lifecycle, including GHGs emitted when the fuel is extracted, refined, and transported to California.
9   It establishes different standards for gasoline and diesel fuels, and provides for a gradual implementation
10  of the fuel standards for both, with a goal to reduce the carbon intensity of fuel by 10% by the year 2020.
11  *See,* LCFS §§95482(b), (c).  Reductions in the average carbon intensity were mandated to begin in 2011,
12  with the reduction requirement increasing through the year 2020.

13       The LCFS requires providers to comply with reporting requirements which obligate them to
14  identify for fuels sold or imported into California, the type of fuels, whether the fuel is blended, and the
15  fuel's production process.   Each year, a regulated party's overall carbon intensity for its pool of
16  transportation fuels must meet the applicable annual carbon intensity standards. LCFS §§95484(b)(1),
17  95485.  Fuel providers may meet carbon intensity standards either by blending low-carbon ethanol into
18  gasoline or buying credits generated from another fuel provider that has credits. LCFS §§95485,
19  95484(b)(1).

20                                      **Carbon Intensity**

21       "Carbon intensity is not an inherent chemical property of a fuel, but rather it is a reflective of the
22  process in making, distributing, and using that fuel." CARB, *Final Statement of Reasons* ("FSOR"), 951.
23  The "LCFS contains no requirements that dictate the exact composition of compliant transportation
24  fuels." FSOR at 442.  The LCFS does "not set[] a fuel standard," and it does not "establish any motor-
25  vehicle specifications." FSOR at 439, 442.

26       A gallon of ethanol made from corn grown and processed in the Midwest will, under a
         microscope or other analytical device, look identical in every material way to a gallon of
27       ethanol processed from sugar cane grown in Brazil.  Both samples of ethanol will have
         the same boiling point, the same molecular composition, the same lower and upper limits
28       of flammability–in other words, both will have identical physical and chemical properties

                                            8

because both products consist of 100% ethanol.  On the other hand, corn ethanol from the Midwest will have different carbon intensity than the sugar cane ethanol from Brazil.

CARB, *Initial Statement of Reasons* ("ISOR") V-30.

Carbon intensity is defined as "the amount of lifecycle greenhouse gas emissions, per unit of energy of fuel delivered, expressed in grams of carbon dioxide per megajoule." LCFS § 95481(a)(11). "Lifecycle greenhouse gas emissions" are defined as the:

> aggregate quantity of greenhouse gas emissions (including direct emissions and significant indirect emissions such as significant emissions from land use changes), as determined by the Executive Officer, related to the full fuel lifecycle, including all stages of fuel and feedstock production and distribution, from feedstock generation or extraction through the distribution and delivery and use of the finished fuel to the ultimate consumer, where the mass values for all greenhouse gases are adjusted to account for their relative global warming potential.

LCFS §95481(a)(28).  The lifecycle analysis "includ[es] all stages of fuel and feedstock production and distribution, from feedstock generation or extraction through the distribution and delivery and use of finished fuel to the ultimate consumer." LCFS §95481(a)(28).  In short, carbon intensity is an estimate of emissions related to a fuel's lifecycle that focuses on GHGs emitted when the transportation fuel is extracted, refined, and transported to California.

**Procedural History**

As set forth above, Plaintiffs challenge the LCFS on two grounds.  First, Plaintiffs contend that the LCFS discriminates against interstate commerce, regulates transactions occurring outside of the state, and imposes substantial burdens on interstate commerce that clearly exceed any putative benefits. Second, Plaintiffs allege that the LCFS is preempted by federal law because it conflicts with and stands as an obstacle to the accomplishment of Congress' goals in Section 211(o), as modified by EISA.

Defendants moved to dismiss the complaints arguing, *inter alia*, that Section 211(c)(4)(B) immunizes them from (1) scrutiny under the Commerce Clause and (2) preemption by Section 211(o). This Court rejected these arguments as a matter of law. *See Rocky Mountain Farmers Union v. Goldstene*, 719 F. Supp. 2d 1170 (E.D. Cal. 2010) ("Motion to Dismiss Order").   As to the Commerce Clause, this Court explained that "a federal provision that exempts a state law from preemption under another federal statute is insufficient to exempt the state law from the requirements of the Commerce Clause." *Id*. at 1196 (citing *New England Power Co. v. New Hampshire*, 455 U.S. 331, 341 (1982)).  This Court further

rejected Defendants argument that ordinary preemption principles do not apply in this action. *Id*. at 1187-88.  Moreover, this Court found that Section 211(c)(4)(B) did not apply to authorize the LCFS.  Finally, the Court found that Plaintiffs stated a claim for preemption and a violation of the commerce clause.

Although only limited discovery was completed, there are four Fed. R. Civ. P. 56 motions and two preliminary injunction motions before this Court.  Although each motion contains some overlapping arguments, there are unique arguments, positions, and evidence submitted with each motion.  In addition, the burdens of proof and persuasion, and standards of review, differ with each motion.  Accordingly, this Court shall address each motion in a separately-filed order.  This order addresses and resolves Defendants' summary judgment motion (Doc. 138).

### JUDICIAL NOTICE, OBJECTIONS, AND CONSIDERATION OF EVIDENCE AND ARGUMENTS

In addition to the pending motion, the parties have submitted requests for judicial notice, objections to evidence submitted, motions to strike, and other miscellany.  Moreover, this Court has received multiple amici curiae briefs.  This Court carefully reviewed and considered the record, including all evidence, arguments, points and authorities, declarations, testimony, statements of undisputed facts and responses thereto, objections and other papers filed by the parties.  Omission of reference to evidence, an argument, document, objection or paper is not to be construed to the effect that this Court did not consider the evidence, argument, document, objection or paper.  This Court thoroughly reviewed, considered and applied the evidence it deemed admissible, material and appropriate for summary judgment.  This Court does not rule on objections in a summary judgment context, unless otherwise noted.

Moreover, this Court will not address the request for judicial notice specifically, but notes the following applicable standards.  To be judicially noticeable, a fact must not be subject to a reasonable dispute because it must be either generally known within the territorial jurisdiction of the court or "capable of accurate and ready determination by sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201.  "Judicial notice is appropriate for records and reports of administrative bodies." *United States v. 14.02 Acres of Land More or Less in Fresno County*, 547 F.3d 943, 955 (9th Cir. 2008).  This Court may not take judicial notice, however, of documents filed with an administrative agency to prove the truth of the contents of the documents. The comments made by third parties that are

10

1    included in the ISOR or FSOR are subject to hearsay objections, and do not rise to the "high degree of

2    indisputability" required for judicial notice for their truth. *Jespersen v. Harrah's Operating Co.*, 444 F.3d

3    1104, 1110 (9th Cir. 2006) (citing Fed. R. Evid. 201 advisory committee's note). If cited, these

4    statements may be considered for their existence, but not their truth. *Id*. In addition, this Court takes

5    judicial notice of public records not subject to reasonable dispute. *See Hennessy v. Penril Datacomm*

6    *Networks, Inc*., 69 F.3d 1344, 1354-55 (7th Cir. 1995) (court properly refused to take judicial notice of

7    corporation's SEC form to determine disputed fact because "its contents were subject to dispute"). While

8    this Court may take judicial notice of the legislative histories, the statements contained therein may be

9    subject to dispute.

10                                      **STANDARD OF REVIEW**

11          Fed. R. Civ. P. 56 permits a "party against whom relief is sought" to seek "summary judgment

12   on all or part of the claim." In a summary judgment motion, a court must decide whether there is a

13   "genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *see also, Adickes v. S.H. Kress & Co.*, 398

14   U.S. 144, 157 (1970). A party seeking summary judgment/adjudication bears the initial burden of

15   establishing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317,

16   323 (1986). The moving party may satisfy this burden in two ways: (1) by presenting evidence that

17   negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving

18   party failed to make a showing of sufficient evidence to establish an essential element of the nonmoving

19   party's claim, and on which the non-moving party bears the burden of proof at trial. *Id*. at 322. "The

20   judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and

21   any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled

22   to judgment as a matter of law." Fed. R. Civ. P. 56(c). "If the party moving for summary judgment meets

23   its initial burden of identifying for the court those portions of the material on file that it believes

24   demonstrates the absence of any genuine issues of material fact," the burden of production shifts and the

25   nonmoving party must set forth "specific facts showing that there is a genuine issue for trial." *T.W. Elec.*

26   *Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quoting Fed. R. Civ.

27   P. 56(e)).

28          To establish the existence of a factual dispute, the opposing party need not establish a material

                                                11

1   issue of fact conclusively in its favor, but "must do more than simply show that there is some

2   metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

3   574, 587 (1986).  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to

4   resolve the parties' differing versions of the truth at trial." *First National Bank of Arizona v. Cities Serv.*

5   *Co.*, 391 U.S. 253, 289 (1968); *T.W. Elec. Serv.*, 809 F.2d at 631.  The nonmoving party must "go beyond

6   the pleadings and by her own affidavits, or by depositions, answer to interrogatories, and admissions on

7   file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324.  Fed.

8   R. Civ. P. 56(e) requires a party opposing summary judgment to "set out specific facts showing that there

9   is a genuine issue for trial."  "In the absence of specific facts, as opposed to allegations, showing the

10  existence of a genuine issue for trial, a properly supported summary judgment motion will be granted."

11  *Nilsson, Robbins, et al. v. Louisiana Hydrolec*, 854 F.2d 1538, 1545 (9th Cir. 1988).

12                                      DISCUSSION

13         Defendants maintain and reassert their position that California has broad authority, pursuant to

14  Section 211(c)(4)(B), to regulate fuels.  In addition, Defendants maintain that, pursuant to Section

15  211(c)(4)(B), California's LCFS  is exempt from all preemption challenges and is insulated from

16  Commerce Clause challenges.  Defendants argue, inter alia, that (1) the LCFS is an authorized control

17  of motor vehicle fuel pursuant to Section 211(c)(4)(B); (2) California's authority pursuant to Section

18  211(c) is not restricted by Section 211(o); (3) the LCFS does not conflict with Section 211(o); (4) the

19  Supremacy Clause is not invoked between two provisions of federal law; and (5) Section 211(c)(4)(B)

20  insulates California fuel regulations from the Commerce Clause.   In addition, Defendants challenge

21  Plaintiffs' preemption and Commerce Clause claims, arguing that they fail as a matter of law.  This Court

22  first considers whether the LCFS is an authorized regulation pursuant to Section 211(c)(4)(B).  If the

23  LCFS is an authorized regulation of a motor fuel or fuel additive, the Court next considers the scope of

24  the Section 211(c)(4)(B) preemption exemption, including whether preemption principles apply to the

25  LCFS.  Next, the Court shall consider Defendants' substantive challenges to Plaintiffs' preemption claim.

26  Finally, the Court will turn to Defendants' challenges to Plaintiffs' Commerce Clause Claim.

27  **I.  Whether Section 211(c)(4)(B) Applies to the LCFS**

28         To be an authorized regulation pursuant to Section 211(c)(4)(B), the "LCFS must both regulate

a component of a fuel or a fuel additive and be for the purpose of motor vehicle emissions control." *Rocky Mountain Farmers Union*, 719 F. Supp. 2d at 1190, citing Section 211(c)(4)(B).  CARB argues that the LCFS fits squarely within this authorization.  Relying on this Court's Motion to Dismiss Order, Plaintiffs contend that Section 211(c)(4)(B) does not authorize the LCFS because the LCFS does not control a component of a fuel or a fuel additive and does not address motor vehicle emissions.

In its Motion to Dismiss Order, the Court ruled that "the LCFS does not regulate a component of a fuel or fuel additive, and was not passed for the purpose of regulating motor vehicle emissions." *Rocky Mountain Farmers Union*, 719 F. Supp. 2d at 1191.  Plaintiffs contend that this Court's prior ruling controls this motion.  Plaintiffs overstate this Court's ruling, particularly in light of the more stringent standard of review presented in this action.  In the Motion to Dismiss Order, this Court considered that "Plaintiffs have alleged that lifecycle analysis of the LCFS does not regulate a component of a fuel of a fuel additive...Based on these allegations, this Court concludes Plaintiffs have successfully pled that California's LCFS does not come within the Section 211(c)(4)(B) preemption exception." *Rocky Mountain Farmers Union*, 719 F. Supp. 2d at 1192.  Thus, the Court's conclusion was based in part on the plaintiffs' allegations. *Id*. at 1191.  Because this Court's ruling was based in part on the allegations of the complaint, and to the extent that this Court's prior ruling relied solely on Plaintiffs' allegations, that ruling must be reconsidered in this motion pursuant to Fed. R. Civ. P. 56 standards of review.  In addition, as set forth more fully below, this Court reconsiders questions of law reargued in this motion.

**A.     Whether the LCFS is a control or regulation "for the purpose of motor vehicle emissions"**

California's regulation of fuel additives and components must be "for the purpose of motor vehicle emission control." *Rocky Mountain Farmers Union*, 719 F. Supp. 2d at 1190; *see also, Davis*, 348 F.3d at 777; Section 211(c)(4)(B).  In its Motion to Dismiss Order, this Court ruled: "Section 211(c)(4)(B) is inapplicable for the additional reason that the regulation was not passed for the purpose of motor vehicle emissions control." *Rocky Mountain Farmers Union*, 719 F. Supp. 2d at 1192.  This ruling was based, among other things, on Plaintiffs' well-pleaded allegations in the complaint.  As explained more fully above, in this Fed. R. Civ. P. 56 motion, this Court reconsiders this question pursuant to the applicable standards of review.  When reviewing the purpose of the LCFS, the Court

1   considers whether the LCFS specifically, rather than the entire statutory scheme under AB 32, was

2   enacted "for the purpose of motor vehicle emission control." *Oxygenated Fuels*, 331 F.3d at 669.

3        Defendants argue that the fundamental purpose of the LCFS is to reduce motor vehicle carbon

4   emissions.  Defendants point out that the purpose of the LCFS is codified at 17 Cal. Code. Regs., §95480,

5   which reads, in relevant part: "the purpose of the regulation is to implement a low carbon fuel standard,

6   which will reduce greenhouse gas emissions by reducing the full fuel-cycle, carbon intensity of the

7   transportation fuel pool used in California[.]"   In addition, Defendants contend that the LCFS was

8   developed by CARB pursuant to the Executive Order, which aimed to "reduce the carbon intensity of

9   California's transportation fuels by at least 10 percent by 2020."  Moreover, Defendants quote CARB

10  Board Resolution 09-31, wherein CARB resolved, in pertinent part:

11       Pursuant to Board Resolution 08-47, there are a number of reasons why GHG emission
    reductions from transportation fuels are best achieved using the proposed regulatory

12  approach, as identified below.  While California's cap-and-trade program is expected to
    include upstream coverage of transportation fuels beginning in 2015, a LCFS requirement

13  will complement this coverage, and will: (a) ensure that the GHG emissions from the full
    fuel lifecycle are accounted for and reduced to the extent feasible; (b) stimulate the

14  development of substantially lower-carbon transportation fuels more directly than
    including transportation fuels in the cap-and-trade program; (c) achieve long-term

15  reductions in GHG emissions from transportation fuels; (d) diversify the California fuel
    pool; and (e) reduce the State's dependence on petroleum;

16                                   ***

17

18       The proposed regulation is expected to significantly reduce emissions of GHGs, such as
    $CO_2$, methane, nitrous oxide, and other GHG contributors from the use of transportation

19  fuels subject to the LCFS; by 2020 the LCFS is expected to reduce GHG emissions from
    the combustion of transportation fuels in California by about 16 million metric tons of

20  carbon dioxide (16 MMT $CO_2e$) annually); the estimated GHG emissions reductions for
    the full fuel lifecycle, including fuel production through combustion are about 23 MMT

21  $CO_2e$ in 2020–a 10 percent reduction of the GHG emissions from the use of
    transportation fuel, compared to the expected 3 percent reduction in GHG emissions if
    only the federal RFS2 requirements were met.

22

23  ARB Board Resolution, 09-31, pp. 8-9.

24       Plaintiffs counter that LCFS does not control motor vehicle emissions, because the LCFS does

25  not control tailpipe combustion emissions.  Rather, the LCFS regulates the direct and indirect effects of

26  the process of making fuels, such as the land use, deforestation, conversion, and storage.  Moreover,

27  Plaintiffs point out that "[n]ew and existing fuels that comply with the LCFS regulation will be essentially

28  indistinguishable from comparable fuels that comply with other State and federal regulations."  FSOR

950; ISOR V-28-V-30. Thus, Plaintiffs conclude, the LCFS lifecycle approach–favoring certain pathways that grow and process feedstocks with less energy use–controls how a fuel is made and was passed for the purpose of controlling emissions generally, not for the purpose of reducing emissions from a motor vehicle specifically.

CARB contends that the term "motor vehicle emissions control" is not limited to emissions from tailpipe combustion. CARB argues that it is authorized to pass a "motor vehicle emissions control" that covers total California motor vehicle transportation emissions, including upstream emissions. Defendants maintain that the LCFS, which considers emissions from fuel manufacture and transport in addition to tailpipe combustion, was passed for the purpose of motor vehicle emission control.

Having considered the parties' arguments and evidence submitted in support thereof, this Court finds that Defendants have established that the LCFS was passed for the purpose of motor vehicle emission control. The LCFS was established pursuant to the Executive Order, which directed CARB to design a system what would reduce GHG emissions. The LCFS imposes standards on motor vehicle fuels, including CARBOB and diesel, aimed to reduce GHGs, air pollution and emissions. Although Plaintiffs correctly point out that the LCFS controls more than tailpipe combustion emissions, Plaintiffs fail to point out specific evidence to rebut the evidence submitted by Defendants that establishes that the *purpose* of the LCFS is to control motor vehicle emission. Accordingly, Defendants are entitled to summary adjudication that the LCFS was passed for the purpose of motor vehicle emissions control.

**B.      Whether the LCFS is a control or prohibition respecting any "characteristic or component of a fuel or fuel additive"**

In its Motion to Dismiss Order, this Court found that Section 211(c)(4)(B) was restricted by the language of Section 211(c)(4)(A), which reads:

> Except as otherwise provided in subparagraph (B) or (C), **no State (or political subdivision thereof) may prescribe or attempt to enforce, for purposes of motor vehicle emission control, any control or prohibition respecting any characteristic or component of a fuel or fuel additive in a motor vehicle or motor vehicle engine**–
> (i) if the Administrator has found that no control or prohibition of the characteristic or component of a fuel or fuel additive under paragraph (1) is necessary and has publishing his finding in the Federal Register, or
> (ii) if the Administrator has prescribed under paragraph (1) a control or prohibition application to such characteristic or component of a fuel or fuel additive, unless the State prohibition or control is identical to the prohibition or control prescribed by the Administrator.

42 U.S.C. §7545(c)(4)(A). This Court found that "Section 211(c)(4)(B) does not grant California unfettered authority to regulate fuels...Section 211(c)(4)(B) grants California an exemption from federal preemption in the area of fuel components and fuel additives regulation[.]" *Rocky Mountain Farmers Union v. Goldstene*, 719 F. Supp. 2d 1170, 1189 (E.D. Cal. 2010). In this motion, Defendants ask this Court to reconsider the Court's narrow construction of the Section 211(c)(4)(B) preemption exemption. The Court shall revisit its conclusion to determine the breadth and scope of Section 211(c)(4)(B).

The Court's conclusion, restricting the scope of the exemption to "fuel components and fuel additives," was based on *Davis v. EPA,* 348 F.3d 772 (9th Cir. 2003). In *Davis*, the Ninth Circuit rejected California's argument that Section 211(c)(4)(B) authorized California to disregard compliance with the requirements of different sections of the Clean Air Act, Section 211(k). In arriving at its conclusion, the *Davis* court reasoned:

> The structure of [Section 211(c)(4)] makes it clear that the sole purpose of [Section 211(c)(4)(B)] is to waive for California the express preemption provision found in [Section 211(c)(4)(A)]. It was not intended to allow California, at its sole discretion, to relieve refiners of their obligations to comply with federal fuel requirements such as the RFG program under [211(k)(2)(B)].

*Davis*, 348 F.3d at 786. This Court further relied on *Oxygenated Fuels Ass'n v. Davis,* 331 F.3d 665 (9th Cir. 2003), wherein the Ninth Circuit ruled that California has "substantial latitude in regulating, and choosing among, *fuel additives* under the (c)(4)(B) exemption." 331 F.3d at 669 (emphasis added). The Ninth Circuit made clear that Section 211(c)(4)(A) and Section (c)(4)(B) must be read together, and that the "two provisions are precisely coextensive." *Id.* The *Oxygenated Fuels* Court explained:

> The language of the Section 211(c)(4)(A) express preemption provision parallels the language of the (c)(4)(B) exemption. Under the (c)(4)(A) preemption provisions, other states may not enforce a fuel control provision *for the purpose of emission control*, but under the (c)(4)(B) exemption, California may. *See* 42 U.S.C. §7545(c)(4)(A)-(B).".

*Oxygenated Fuels*, 331 F.3d at 670 (emphasis in original). The Court rejected CARB's attempt to distinguish *Davis* and *Oxygenated Fuels*. While the *Oxygenated Fuels* Court found that the Clean Air Act "explicitly contemplates that California can, in some instances, place restrictions on fuel additives" *Id*. at 670-71, this Court rejected CARB's position that "by extension" California may regulate "fuels themselves." This Court concluded that preemption exception is also limited to fuel additives and components.

16

1    In this motion, CARB maintains that California's authority pursuant to Section 211(c)(4)(B) is

2  broader than the Section 211(c)(4)(A) preemption provision.  CARB points out that the limited scope of

3  Section 211(c)(4)(A), which limits a preemption to a "characteristic or component of a fuel or fuel

4  additive," was added to this Section in the 1990 Amendments to the Clean Air Act.  *See* H.R. Rep. No.

5  101-490, at 314 (1990) ("the revision clarifies that a Federal fuel or fuel additive regulation only preempts

6  a nonidentical State regulation governing the same component or characteristic of the fuel or fuel

7  additive.").  Defendants maintain that in adding this restriction, Congress intended to limit further the

8  federal preemption of state fuel regulations, but did not intend to restrict in any way California's authority

9  to regulate fuels.  Moreover, CARB contends that because Congress made no effort to replicate or

10  incorporate this terminology into Section 211(c)(4)(B), this Court should infer that California's power

11  to "control" should be as broad in scope as the EPA's power to control fuels pursuant to Section

12  211(c)(1).  Based on these premises, Defendants conclude that Section 211(c)(4)(B) provides California

13  broad authority to regulate fuels, unrestricted by the language of Section 211(c)(4)(A).  Based on these

14  arguments, this Court shall revisit its interpretation of Section 211(c)(4)(B).

15    Statutory construction must begin with the language employed by Congress and the assumption

16  that the ordinary meaning of that language accurately expresses the legislative purpose."  *Park 'N Fly,*

17  *Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985).  In addition,

18  when considering the scope of Section 211(c)(4)(B), this Court is mindful that it fits as an exception to

19  a preemption statute.  "As a result, any understanding of the scope of a pre-emption statute must rest

20  primarily on 'a fair understanding of congressional purpose.'" *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485-

21  486, 116 S.Ct. 2240 (1996).  "Evidence of pre-emptive purpose is sought in the text and structure of the

22  statute at issue. . . . If the statute contains an express pre-emption clause, the task of statutory construction

23  must in the first instance focus on the plain wording of the clause, which necessarily contains the best

24  evidence of Congress' pre-emptive intent."  *CSX Trans., Inc. v. GTE Sylvania, Inc.*, 447 U.S. 102, 108,

25  113 S.Ct. 1732 (1993).  "Nonetheless, "[p]reemption provisions are narrowly and strictly construed."

26  *Montalvo v. Spirit Airlines*, 508 F.3d 464, 474 (9th Cir. 2007).

27    To determine the meaning and scope of Section 211(c)(4)(B), then this Court first considers the

28  plain language of the statute.  Section 211(c)(4)(B) reads, in pertinent part:

17

1      Any state for which application of [Section 209(a)] has at any time been waived under
2  [Section 209(b)] may at any time prescribe and enforce, for the purpose of motor vehicle
   emission control, *a control or prohibition respecting any fuel or fuel additive*.

3  *Id*. (emphasis added).  The plain language of Section 211(c)(4)(B) is broader in scope than the preemption

4  language of Section 211(c)(4)(A), which preempts any "control or prohibition respecting *any*

5  *characteristic or component of a fuel or fuel additive* in a motor vehicle or motor vehicle engine."

6  Pursuant to a plain reading of the statute, then, California would be not be preempted in the field of *fuels*

7  *and fuel additives* for the purpose of motor vehicle emission control.

8      This broader reading of Section 211(c)(4)(B) is supported by the structure of Section 211(c).

9  Section 211(c)(1) grants EPA broad authority to:

10      control or prohibit the manufacture, introduction into commerce, offering for sale, or sale
        of any fuel or fuel additive for use in a motor vehicle...if, in the judgment of the [EPA],
11      any fuel or fuel additive or any emission product of such fuel or fuel additive causes, or
        contributed to air pollution or water pollution...that may reasonably be anticipated to
12      endanger the public health or welfare[.]

13  Section 211(c)(2) sets forth the procedures EPA must follow before it can control or prohibit a "fuel or

14  fuel additive."  Section 211(c)(4)(A) presents an express preemption, prohibiting states from prescribing

15  or attempting to enforce "any control or prohibition respecting any characteristic or component of a fuel

16  or fuel additive in a motor vehicle" if (i) the EPA has found no control or prohibition of the characteristic

17  or component of a fuel or fuel additive is necessary; or (ii) the EPA has prescribed a control or prohibition

18  applicable to such characteristic or component of a fuel or fuel additive.  Section 211(c)(4)(B), as quoted

19  above, provides a broader exemption from express preemption, to allow California to prescribe and

20  enforce, for the purpose of motor vehicle emission control, a control or prohibition respecting any fuel

21  or fuel additive.  Finally, Section 211(c)(4)(C) allows all states to "prescribe and enforce, for purposes

22  of motor vehicle emission control, a control or prohibition respecting the use of a fuel or fuel additive in

23  a motor vehicle" if the applicable implementation plan for that state so provides or the EPA so approves.

24  Instead, pursuant to Section 211(c), the EPA  asserts a field preemption over fuels and fuel additives in

25  Section 211(c)(1), an express preemption over components of fuels and fuel additives in Section

26  211(c)(4)(A), exempts California from field preemption over fuels and fuel additive regulations for the

27  purpose of motor vehicle emission control, and sets forth ways in which other states may prescribe and

28  enforce controls or prohibitions of fuel or fuel additives for purpose of motor vehicle emission control.

1  When considered in context of the broader statutory scheme, Section 211(c)(4)(A) and Section

2  211(c)(4)(B) are not precisely coextensive for all purposes.

3       Moreover, a broader reading of Section 211(c)(4)(B) comports with Congressional purposes.

4  Through the Clean Air Act, Congress has a general purpose to preserve the police powers to the states

5  except where explicitly preempted.  "Because it is assumed that Congress does not cavalierly decide to

6  override state authority, there is a general presumption against preemption in areas traditionally regulated

7  by states." *Davis*, 331 F.3d at 668.  The Court begins "with the assumption that the historic police powers

8  of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose

9  of Congress." *Rice v. Santa Fe Elevator Corp*., 331 U.S. 218, 230 (1947).  Moreover, in granting

10  California a special exemption from the express preemption, Congress "clearly intended to allow

11  California substantial latitude in regulating" fuels. *Oxygenated Fuels*, 331 F.3d at 669.  A broader reading

12  of the Section 211(c)(4)(B) allows California this broader latitude to regulate fuels for the purpose of

13  emissions control.

14       Defendants continue to assert that Section 211(c)(4)(B) applies only to controls relating to

15  "components or characteristics of fuels or fuel additives."  Defendants rely on this Court's Motion to

16  Dismiss Order and *Oxygenated Fuels*, wherein the Ninth Circuit explained that Section 211(c)(4)(A) and

17  Section (c)(4)(B) must be read together, and that the "two provisions are precisely coextensive."

18  *Oxygenated Fuels*, 331 F.3d at 670.

19       Defendants argue that this Court cannot reconsider the legal conclusions set forth in its Motion

20  to Dismiss Order because those legal conclusions are the law of the case.  The law of the case doctrine,

21  however, is not an absolute bar to revisiting issues of law.  The law of the case doctrine "merely expresses

22  the practice of courts generally to refuse to reopen what has been decided, not to a limit on their power."

23  *Messenger v. Anderson*, 225 U.S. 436, 444 (1912) (Holmes, J.) (quoted with approval in *United States*

24  *v. Miller*, 822 F.2d 828, 832 (9th Cir. 1987).  The law of the case doctrine does not impinge on a district

25  court's power to reconsider its own interlocutory order so long as the court has not been divested of

26  jurisdiction over that order by commencement of appeal." *City of Los Angeles v. Santa Monica*

27  *BayKeeper*, 254 F.3d 882, 888-89 (9th Cir. 2001).  Accordingly, this Court may reconsider its prior legal

28  conclusions to the extent they are argued in this motion.

1    Having reconsidered the context and meaning of Section 211(c)(4)(B), this Court finds that the

2    language in *Oxygenated Fuels* is distinguishable from the question presented here, and does not control

3    this analysis.  In *Oxygenated Fuels*, the court considered whether a fuel control made for the purpose of

4    preventing groundwater contamination fell within the Section 211(c)(4)(B) preemption exception.  The

5    court found that the regulation was not expressly exempted from preemption, because it was not enacted

6    for the purpose of emission control.  In so ruling the court explained:

7          The language of the Section 211(c)(4)(A) express preemption provision parallels the
           language of the (c)(4)(B) exemption.  Under the (c)(4)(A) preemption provisions, other
8          states may not enforce a fuel control provision *for the purpose of emission control*, but
           under the (c)(4)(B) exemption, California may.  *See* 42 U.S.C. §7545(c)(4)(A)-(B)."

9

10   *Id*. (emphasis in original).  Thus, the court considered the two provisions with respect to whether the

11   purpose of the control or prohibition was for motor vehicle emission control and ruled that these sections

12   are "precisely co-extensive" to the extent that they apply to "fuel control provision[s] for the purpose of

13   emission control." *Id*.  The court did not consider whether the plain language of these provisions were

14   parallel in other respects.  Indeed, as set forth above, the plain language of Section 211(c)(4)(B) parallels

15   the other provisions of Section 211(c), whereas the "characteristics and components" restriction in

16   Section 211(c)(4)(A) is unique and deviates from all other provisions.

17   Preemption analysis requires a close examination of the particular statutes and regulations at issue.

18   "Each case turns on the peculiarities and special features of the federal regulatory scheme in question."

19   *City of Burbank v. Lockheed Air Terminal, Inc*., 411 U.S. 624, 638 (1973).  Considering the plain

20   language of the statute, the statutory context, and the regulatory scheme in question, this Court finds that

21   Section 211(c)(4)(B) exempts California from federal preemption with respect to any control respecting

22   *any fuel or fuel additive* for the purpose of emission control.

23        **C.      Whether the LCFS is a control respecting any fuel or fuel additive**

24   Plaintiffs argue that the LCFS is not exempt from preemption pursuant to Section 211(c)(4)(B),

25   because it does not regulate a component of a fuel or a fuel additive.  Plaintiffs allege that carbon intensity

26   "is not an inherent chemical property of a fuel, but rather it is reflective of the process in making,

27   distributing, and using that fuel." FSOR at 951.  Thus, the LCFS does not purport to control the "chemical

28   or physical properties" of fuel used in California.   As CARB explained:

> A fuel's carbon intensity is inferred from the various steps taken to produce that fuel and the relative impacts to climate change associated with each step.... Thus, the relevant question for the LCFS is exactly the opposite of the above examples of actual fuel specifications: Exactly how was the product made, since the process for producing and distributing the product is what affects the product's carbon intensity?

> A gallon of ethanol made from corn grown and processed in the Midwest will, under the microscope or other analytical device, look identical in every material way to a gallon of ethanol processed from sugar cane grown in Brazil. Both samples of ethanol will have the same boiling point, the same molecular composition, the same lower and upper limits of flammability–in other words, both will have identical physical and chemical properties because both products consist of 100% ethanol. On the other hand, the corn ethanol made from the Midwest will have different carbon intensity than the sugar cane ethanol from Brazil.

ISOR, V-30 (Mar. 2009). Defendants argue that while the LCFS regulates "how a fuel or blendstock was made," it does not regulate a component or characteristic of a fuel or fuel additive.

Undisputedly, the LCFS is a control respecting fuels. Indeed, it controls several motor fuels, including the components of CARBOB and diesel, and the many reformulations of those fuels. In addition, the LCFS controls fuel carbon. As set forth above, however, this Court finds that Section 211(c)(4)(B) applies to a control respecting any fuel or fuel additive. Based on these undisputed facts, this Court finds that the LCFS is a control respecting a fuel or fuel additive within the meaning of Section 211(c)(4)(B).

**D. Conclusion**

To fit within the Section 211(c)(4)(B) preemption exemption, the LCFS must be a control respecting a fuel or fuel additive enacted for the purpose of emissions control. For the reasons set forth above, this Court finds that the LCFS is a control respecting a fuel or fuel additive and was enacted for the purpose of emissions control. Accordingly, the Section 211(c)(4)(B) preemption exemption authorizes to the LCFS. That is, the LCFS is excused expressly from a preemption challenge based on federal fuels regulations set forth in Section 211(c).[3]

**II.     Defendants' Challenges to Plaintiffs' Preemption Claim**

**A.     Whether Section 211(c)(4)(B) Exempts the LCFS from Preemption Analysis**

Defendants re-assert an argument that this Court rejected in its Motion to Dismiss order; namely,

---

[3]As this Court explains below, however, this preemption exception does not allow California unfettered authority to conflict with other federal laws, including Section 211(o).

1  that preemption principles do not apply in this action.  Defendants argue that because this action involves

2  an alleged conflict between two federal statutes or statutory provisions, the Supremacy Clause is not

3  implicated.  As this Court explained in its Motion to Dismiss Order, Defendants argument:

> is an attempt to reframe the issue presented by plaintiffs.  In their complaints, plaintiffs clearly allege that California's LCFS conflicts with Section 211(o) of the Clean Air Act.  In their motion to dismiss, defendants contend that "plaintiffs' claim actually involves two provisions within section 211 of the Clean Air Act"; namely, Section 211(c)(4)(B) and Section 211(o).  Defendants make this statement after acknowledging the "remarkable omission of any reference to section 211(c)(4)(B) in plaintiffs' complaint."  Defendants' position ignores impermissibly the allegations of plaintiffs' complaints and erroneously implies that plaintiffs challenge Section 211(c)(4)(B)...

> This Court agrees with plaintiffs that the preemption exemption of Section 211(c)(4)(B) does not transform a California regulation into federal law for Supremacy Clause purposes and "does not bar the ordinary working of conflict pre-emption principles." *Geier*, 529 U.S. at 869.

11  719 F. Supp. 2d. at 1187-88.  For these reasons, this Court rejects Defendants' argument.

12  **B.    Scope of Section 211(c)(4)(B), EISA's Savings Clause, and Conflict Preemption Principles**

14      Although this Court finds that the LCFS is authorized pursuant to Section 211(c)(4)(B), this Court

15  rejects Defendants' arguments to the extent that they assert that Section 211(c)(4)(B) allows unfettered

16  authority to enact fuels regulations without being subject to conflict preemption scrutiny.  For the reasons

17  set forth below, this Court finds that Section 211(c)(4)(B) does not authorize California to enact and

18  enforce fuel standards that conflict with federal laws, including other provisions of the Clean Air Act such

19  as EISA, Section 211(o).

20      Section 211(c)(4)(B) "must be read in conjunction with" other Section 211 provisions. *Davis*, 348

21  F.3d at 786.  Federal preemption, and California's preemption exceptions, differ under each Section 211

22  subsection.  For example, while California has an exemption from preemption of motor vehicle fuel

23  components and additives for the purpose of motor vehicle emissions under Section 211(c), California

24  must request a waiver from the federal oxygen fuel requirements under Section 211(k).  In *Davis*, the

25  Court rejected California's position that Section 211(c)(4)(B) granted California authority broader than

26  Section 211(c)(4)(A), and ruled that Section 211(c)(4)(B) does not allow California to ignore other

27  provisions of Section 211; namely Section 211(k).  This Court agrees that Section 211(c)(4)(B) permits

28  "California to impose its own controls in addition to, rather than in lieu of" federal Clean Air Act

1  provisions. *Davis*, 348 F.3d at 786.

2        Thus, while California is exempt from Section 211(c) preemption, the Section 211(c)(4)(B)

3  exemption preemption does not grant California the authority to enact a regulation that conflicts with the

4  RFS2, as set forth in Section 211(o).  This conclusion recognizes that Section 211(c) and Section 211(o)

5  regulate different aspects of fuels, and gives full effect to each of Section 211's provisions.  "[W]hen two

6  statutes are capable of co-existence, it is the duty of the courts...to regard each as effective." *Radzanower*

7  *v. Touche Ross & Co.*, 426 U.S. 148, 155 (1976).  Moreover, this conclusion comports with *Davis*, in

8  which the court found that Section 211(c)(4)(B) allows California, in certain instances, "to impose its own

9  controls in addition to, rather than in lieu of" other provision of the Clean Air Act. 348 F.3d at 786.

10 Accordingly, this Court must consider the preemption question to determine whether the LCFS is an a

11 permissible additional control or whether the LCFS impermissibly conflicts with Section 211(o).

12        As this Court ruled in its Motion to Dismiss Order, "state laws that fall within a savings clause

13 and are therefore not expressly preempted are still subject to the 'ordinary working of conflict pre-

14 emption principles.'" *Chicanos Por La Causa, Inc. v. Napolitano*, 558 F.3d 856, 866 (9th Cir. 2009)

15 (quoting *Greir*, 529 U.S. at 869)).  Thus, the LCFS is subject to conflict preemption scrutiny

16 notwithstanding EISA's savings clause, which reads:

17        Except as otherwise provided in Section 211(o)(12) of the Clear Air Act, nothing in the
          amendments made by this title to section 211(o) of the Clean Air Act shall be construed
18        as superceding, or limiting, any more environmentally protective requirement under the
          Clean Air Act, or under any other provision of State or Federal law or regulation,
19        including any environmental law or regulation.

20 Pub.L. 110-140, 121 Stat. 1492, 1529, 204(b). According to this savings clause, CARB argues, none of

21 the provisions of Section 211(o) limits or supercedes any more environmentally protective requirements

22 of the Clean Air Act, including Sections 209(b), 211(c)(1), and 211(c)(4)(B), or state law or regulation,

23 including the LCFS, unless Section 211(o)(12) provides otherwise. In addition, CARB submits that

24 nothing in Section 211(o)(12) provides otherwise.  Section 211(o)(12) provides: "Nothing in this

25 subsection, or regulations issues pursuant to this subsection , shall affect or be construed...to expand or

26 limit regulatory authority regarding carbon dioxide or any other greenhouse gases, for purposes of other

27 provisions (including section 7475 of this title) of this chapter." 42 U.S.C. §7475(o)(12). Based on these

28 provisions, CARB concludes that "nothing in 211(o), including the provisions regarding what plaintiffs

23

1   refer to as the 'grandfathered' corn ethanol facilities, may be construed to limit the regulatory authority

2   that both EPA and California have under" the Clean Air Act.  "Even where Congress has not completely

3   displaced state regulation in a specific area, state law is nullified to the extent it actually conflicts with

4   federal law." *Fid. Fed. Sav. & Loan Assn. v. de la Cuesta*, 458 U.S. 141, 153 (1982).  Accordingly, this

5   Court considers the LCFS under conflict preemption analysis, notwithstanding EISA's savings clause.

6        Defendants argue at length that the Congressional intent is to preserve states' authority in the area

7   of air pollution and the preserve California's unique position as a leader in fuels regulations.  Defendants

8   contend that because of the history of California's fuels program and California's special status under the

9   Clean Air Act, Congressional intent is clear that the LCFS is not preempted by Section 211(o).  In

10  addition, Defendants contend that Congress made clear that Section 211(o) is a self-contained program

11  that does not affect what other federal agencies or states could do under other provisions of the Clean Air

12  Act or state laws are regulations.

13       Defendants arguments related to the history of the Clean Air Act, its statutory scheme and EISA's

14  savings clause relate to the *scope* of preemption. *See Engine Mfrs. Assn. v. South Coast Air Quality

15  Management Distr.*, 498 F.3d 1031, 1039-40 (9th Cir. 2007).  These principles do not establish, however,

16  that there is no conflict between the LCFS and EISA.  Moreover, these principles do not bar Plaintiffs'

17  claim that the LCFS impermissibly conflicts with EISA.  "Under the Supremacy Clause, from which our

18  pre-emption doctrine is derived, 'any state law, however clearly within a State's acknowledged power,

19  which interferes with or is contrary to federal law, must yield.'" *Gade v. Nat'l Solid Wastes Management

20  Ass'n*, 505 U.S. 88, 108 (1992) (quoting *Felder v. Casey*, 487 U.S. 131, 138 (1988)) (citation omitted);

21  *see also De Canas v. Bica*, 424 U.S. 351, 357 (1976) ("Even state regulation designed to protect vital

22  state interests must give way to paramount federal legislation").  Accordingly, this Court denies

23  Defendants' motion to the extent they argue that either Section 211(c)(4)(B) or the EISA savings clause

24  demonstrates that there is no conflict preemption.

25      **C.**    **Whether the LCFS Conflicts with Section 211(o)**

26       This Court turns now to Defendants' argument that there is no conflict between Section 211(o)

27  and the LCFS.  Plaintiffs contend that the LCFS is preempted to the extent that it conflicts with Section

28  211(o), as modified by EISA.  Defendants argue that Plaintiffs' preemption argument fails as a matter of

1  law, because there is no prima facie conflict between EISA and the LCFS.

2          **1.**        **EISA and LCFS**

3        Section 211(o) authorizes the federal RFS program, which sets volumetric mandates that are

4  designed to assure that an increasing portion of biofuels have lifecycle carbon intensities at least 20%

5  below those of gasoline, and that an increasing portion of advanced biofuels, such as cellulosic fuels, with

6  lifecycle carbon intensities of less than half of those with gasoline.  In creating the RFS2, Congress

7  provided that corn ethanol made from plants that were constructed before December 19, 2007 (when

8  Congress enacted EISA) could qualify for inclusion in those volumes even if some of those plants did not

9  meet the 20% lifecycle carbon intensity reduction threshold. 42 U.S.C. §7454(o)(2)(A)(i).

10        Defendants assert that the LCFS and RFS, while authorized by different sections of the Clean Air

11  Act and state law, are complementary policies with several similarities.  Both policies include a lifecycle

12  accounting of GHG emissions.  Both incorporate emissions resulting from indirect land use change.  And

13  both policies emphasize use of advanced fuels over petroleum.

14        Defendants also point out the differences between the LCFS and the RFS2.  For example, while

15  the RFS regulates biofuels only, the LCFS applies to all transportation fuels.  In addition, while the RFS

16  regulates biofuels nationally, the LCFS applies to transportation fuels sold or offered for sale in

17  California.  Moreover, while the RFS2 includes a volumetric mandate, the LCFS does not mandate a

18  specific increase in biofuel use (although that result is anticipated).  Instead, the LCFS encourages the use

19  of cleaner fuels through a market system of credits and caps.

20        Another difference between the national and California fuels policies, relevant to this litigation,

21  is that the RFS has a threshold requirement for biofuels to qualify for the volumetric mandate.  For newly

22  constructed facilities making "conventional biofuels"–as opposed to advanced or cellulosic biofuels, and

23  the only category into which corn ethanol applies–that threshold is a 20 percent reduction in GHG

24  emissions. 42 U.S.C. §7454(o)(2).  As mentioned above, corn ethanol made from existing plants were

25  not required to meet the 20% lifecycle carbon intensity reduction threshold . 42 U.S.C. §7454(o)(2)(A)(i).

26  In contrast, the LCFS has no threshold requirement.  Under the LCFS, all fuel providers are required to

27  comply with the obligations set forth for that year across their entire product supply.

28  ///

## 2.   Applicable Standards

Under the U.S. Constitution's Supremacy Clause, the U.S. Constitution and federal laws "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. Art. VI, cl. 2.   Under the Supremacy Clause, "Congress has the authority, when acting pursuant to its enumerated powers, to preempt state and local law." *Oxygenated Fuels*, 331 F.3d at 667.   When considering the scope of preemption, the Court considers Congressional purpose, which is the "ultimate touchstone of preemption analysis." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541 (2001) (internal quotations omitted).

A "state law is invalid to the extent it 'actually conflicts with a . . . federal statute.'" *Int'l Paper v. Ouellette*, 479 U.S. 481, 491-92 (1987). Such a conflict can result in preemption where it is impossible for a private party to comply with both the state and federal requirements. *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990). "Tension between federal and state law is not enough to establish conflict preemption." *Incalza v. Fendi North America, Inc.*, 479 F.3d 1005, 1010 (9th Cir. 2007). A court finds preemption only in "those situations where conflicts will necessarily arise." *Goldstein v. California*, 412 U.S. 546, 554, 93 S.Ct. 2303 (1973). A "hypothetical conflict is not a sufficient basis for preemption." *Total TV v. Palmer Communications, Inc.*, 69 F.3d 298, 304 (9th Cir. 1995). Conflict preemption can also be found where "the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Int'l Paper*, 479 U.S. at 491-92 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

## 3.   Discussion

Plaintiffs allege the LCFS fails based on the second type of conflict preemption; to wit, that the LCFS is preempted by Section 211(o), because the LCFS "stands as an obstacle to the accomplishment and execution of the full purposes and objective of Congress." Plaintiffs allege that the LCFS and EISA share a common goal–to reduce GHG emissions–and that EISA has an additional goal to protect energy independence and security. Plaintiffs further allege that the LCFS and EISA use conflicting methods to achieve the goal of reducing GHG emissions that are vastly different in their treatment of corn ethanol. Plaintiffs argue that the LCFS frustrates the purposes of Section 211(o), as revised by EISA. Moreover, Plaintiffs allege that to further the goals of energy independence and security, EISA provided the

26

1  exemption for existing corn ethanol facilities, and those under construction in December 2007, from the

2  need to demonstrate compliance with GHG reductions.  Plaintiffs allege that EISA was passed to protect

3  historical business investments that were made prior to the enactment of EISA; specifically, the first

4  generation of corn ethanol producers.  Plaintiffs contend that while the protection of the first generation

5  of United States corn ethanol producers serves EISA's purposes of energy security and protection from

6  foreign energy independence, the LCFS frustrates this purpose by threatening to shut down the first

7  generation corn ethanol producers.  In addition, plaintiffs allege that preserving the United States corn

8  ethanol industry furthers Congress' goal to reduce GHG emissions, because the national corn ethanol

9  industry is investing millions of dollars annually to research and develop cleaner fuels.  Plaintiffs

10 conclude that Section 211(o) preempts the LCFS, because the practical effects of the LCFS "interfere[]

11 with the methods by which the federal statute was designed to reach [its] goal." *Gade v. Nat'l Solid*

12 *Wastes Mgmt. Ass'n.*, 505 U.S. 88, 103 (1992).

13     Defendants contend that Plaintiffs' facial preemption challenge fails as a matter of law because

14 parts of the LCFS do not conflict with Section 211(o).  "A facial challenge to a [statute] is . . . the most

15 difficult challenge to mount successfully, since the challenger must establish that no set of circumstances

16 exists under which the [statute] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).  "In

17 particular, a generally applicable statute is not facially invalid unless the statute 'can *never* be applied in

18 a constitutional manner.'" *United States v. Kaczynski*, 551 F.3d 1120, 1124-25 (9th Cir. 2009) (quoting

19 *Lanier v. City of Woodburn*, 518 F.3d 1147, 1150 (9th Cir. 2008) (drug testing policy not facially invalid

20 because the challenger failed to provide a reason why the policy could not be constitutionally applied to

21 applicants for certain types of jobs)) (emphasis in original).

22     Defendants assert that Plaintiffs cannot meet these high standards because the LCFS regulates

23 fuels that the federal law does not purport to reach.  Plaintiffs' preemption claim is based on Section

24 211(o) of the Clean Air Act, which limits its scope to renewable fuels, whereas the LCFS applies to

25 multiple transportation fuels that are not regulated by the RFS2.  Because the list of fuels covered by the

26 LCFS is broader than the fuels regulated by the RFS2, and because Plaintiffs' preemption claim is based

27 on one sub-category of renewable fuel (corn ethanol), Defendants contend that the LCFS' regulation of

28 fuels that fall outside of renewable fuels cannot conflict with Section 211(o).  Based on the assertion that

1  some provisions of the LCFS do not conflict with Section 211(o), Defendants conclude that this Court

2  is compelled to enter judgment in their favor pursuant to the stringent *Salerno* standard.

3          The Court must first determine the appropriate standard of review.  Defendants assert that *Salerno*

4  compels this Court to reject Plaintiffs' facial challenge *in toto* if any provision of the LCFS can be valid

5  under any set of circumstances.  The *Salerno* formulation, however, has been criticized and questioned

6  by Supreme Court, which rarely applies the "no set of circumstances" test to facial challenges.  *See, e.g.,*

7  *City of Chicago v. Morales*, 527 U.S. 41, 55 n.22 (1999) ("To the extent we have consistently articulated

8  a clear standard for facial challenges, it is not the *Salerno* formulation, which has never been the decisive

9  factor in any decision of this Court, including *Salerno* itself.").  Morever, to the extent that the *Salerno*

10 "no set of circumstances" test has been applied to facial challenges, those challenges are to a *federal* law

11 that infringes on either a First or Fourth Amendment right.  Plaintiffs do not establish that the *Salerno*

12 formulation is applicable to facial challenges to a *state* law based on a theory of conflict preemption.[4]

13         Moreover, Defendants fail to establish that there are "no set of circumstances" under which the

14 LCFS does not frustrate the purpose of Section 211(o).  Plaintiffs' argument focuses on the lack of an

15 actual conflict between the LCFS' regulation of non-renewable fuels and Section 211(o), which only

16 regulates renewable fuels.  Plaintiffs' claim, however, that the LCFS acts as an obstacle to the full

17 purpose and effect of Section 211(o).  Thus, Defendants do not challenge Plaintiffs' claim in this motion.

18         While this Court is not convinced that the *Salerno* standard applies to a facial challenge of a state

19 regulation that is alleged to frustrate the purposes and goals of a federal statute, Plaintiffs rely on a case

20 that discusses the *Salerno* standard in relation to a preemption challenge to a state regulation.  In *Engine*

21 *Mfrs. Ass'n v. South Coast Air Quality Management Dist.*, 498 F.3d 1031 (9th Cir. 2007), the Ninth

22 Circuit reversed the district court's decision to find a set of regulations invalid *in toto* because at least one

23  _____

24         [4] Although quoted often, the *Salerno* formulation is not applied frequently and, in some cases, is rejected.  *See, e.g.,*
   *Planned Parenthood v. S. Ariz. v. Lawall*, 307 F.3d 783, 786 & n. 1 (9th Cir. 2002) ("To the extent that the district court

25 relied upon the standard of review in [*Salerno*], it was incorrect.") (rejecting *Salerno* and adopting an "undue burden" test
   in a facial challenge to an abortion statute).  *See also*, Richard H. Fallon, Jr., "Fact and Fiction About Facial Challenges,"

26 99 Cal. L. Rev. 915, 930, 948-50 (2011); Michael C. Dorf, "Facial Challenges to State and Federal Statutes," 64 Stan. L.
   Rev. 235 (1993-94).  The undue burden test may be more appropriate under the circumstances of this action.  "A finding of

27 an undue burden is shorthand for the conclusion that a *state regulation has the purpose or effect of placing a substantial*
   *obstacle in the path* of a [woman's federal right, as defined by the Supreme Court]." *Planned Parenthood v. Casey*, 505 U.S.

28 833, 877 (1992) (emphasis added).

provision of the multi-faceted regulation was valid.  Although the Ninth Circuit did not apply the "no set of circumstances" principle, the Court explained that "*Salerno* does not requires a plaintiff to show that every provision within a particular multifaceted enactment is invalid." *Id.* at 1049.  To the contrary, under *Salerno*, "some of the provisions might be facially invalid, and [some] might not." *Id.*  Plaintiffs argue that based on this interpretation, it is no defense to Plaintiffs' preemption claims that provisions of the LCFS that do not regulate renewable fuel might not conflict with Section 211(o).  Plaintiffs conclude that even if a statute is alleged to be invalid facially in its entirety, a Court must make a determination whether each "particular challenged provision" is preempted first. *Id.*  Plaintiffs argue further that severability is a separate issue, to be considered after the court determines whether each provision is preempted.

According to *Engine Mfrs.*, this Court must first determine whether the LCFS is a regulation made up of multiple provisions or whether it is a single, unseverable provision.  If the LCFS is made up of multiple provisions, then this Court must consider Plaintiffs' preemption challenge as to each provision offending provision separately.   If, on the other hand, the LCFS is a single, unseverable provision, this Court must reject the LCFS in toto if the offending section of the LCFS conflicts with Section 211(o).[5] The Ninth Circuit explained:

> Where a plaintiff challenges an enactment as prima facie invalid, *Salerno* requires the plaintiff to show that there can be no valid application of a particular challenged provision.  However, *Salerno* does not require a plaintiff to show that every provision within a particular multifaceted enactment is invalid.  When a statute contains unobjectionable provisions that are separable from those found to be unconstitutional, a court reviewing the statute should maintain the statute is no far as it is valid.  In other words, some of the provisions might be facially invalid, and might not.

> Each Fleet Rule contains multiple provisions, placing restrictions on specific lists of public or private entities.  Those provisions within the Rules that constitute state proprietary action are valid *provisions*, not valid applications of a single, unseverable provision.

498 F.3d  at 1049-50 (emphasis in original) (internal quotations and citations omitted).  The Court then

---

[5]Within facial challenge jurisprudence, there is an presumption of severability.  The issue of severability of a state statute, however, is not a matter of constitutional law.  In addition, a "court does not sever a statute prior to determining whether it is facially valid. Rather, a court will sever a statute when a portion of it is found unconstitutional and that portion can be excised from the statute without altering the statute's intended purpose." *United States v. Kaczynski*, 551 F.3d 1120, 1125 (9th Cir. 2009).  Nevertheless, this Court must determine whether the LCFS contains multiple provisions, or whether it is a single, unseverable provision pursuant to *Engine Mfrs. Ass'n v. South Coast Air Quality Management Dist.*, 498 F.3d 1031 (9th Cir. 2007).  Moreover, Defendants' motion fails because they failed to challenge that portion of the state which may or may not be excised.

1   remanded the action to the district court "to decide in the first instance whether the remaining provisions

2   of the [regulation] are preempted by the Clean Air Act." *Id.*

3        Under this standard, Defendants fail to establish that the LCFS is valid *in toto* because some

4   provisions of the LCFS do not conflict with Section 211(o).  Defendants do not raise the issue of non-

5   severability and fail to challenge the offending provision of the LCFS as invalid in their moving papers.

6   Although Defendants argue that LCFS is not a series of severable restrictions on dissimilar entities, but

7   a single, integrated market-based compliance mechanism that applies to all fuel providers in the

8   California market in their reply, Plaintiffs did not have the ability to respond to this argument in their

9   opposition.  Defendants point out that Plaintiffs made no attempt in their opposition to isolate the

10   offending portion; however, Defendants do isolate the offending portions of the LCFS in their complaint,

11   whereas, Defendants made no attempt in their moving papers to establish that the offending portion was

12   invalid.  For this reason, Defendants' argument fails.

13        In addition, this Court rejects Defendants' position that the LCFS is more similar to other cases

14   wherein the Ninth Circuit rejected a facial challenge to a statute because "a generally applicable statute

15   is not facially invalid unless that statute can never be applied in a constitutional manner." *United States*

16   *v. Kaczynski*, 551 F.3d 1120, 1125(9th Cir. 2009).  As set forth above, those cases are facial challenges

17   of simple federal statues based on the First or Fourth Amendment.  Defendants have failed to establish

18   that the *Salerno* standard applies to the Plaintiffs' conflict preemption challenge to the LCFS.

19   **IV.**      **Whether Section 211(c)(4)(B) Insulates Defendants from Commerce Clause Scrutiny**

20        Defendants again rely on Section 211(c)(4)(B) to argue that the Section 211(c)(4)(B) insulates the

21   LCFS from the Commerce Clause.  Defendants contend that the plain language of Section 211(c)(4)(B)

22   authorizes California to adopt fuels regulations that burden interstate commerce.  Defendants argue that

23   Section 211(c)(4)(B) expressly authorizes California to regulate "all fuels and fuel additives for the

24   purposes of motor vehicle emissions control."  Defendants submit that in enacting Section 211(c)(4)(B),

25   Congress "explicitly conferr[ed] on California the authority to regulate fuels sold in California but

26   manufactured both inside and outside of California," and that as a result "Congress directly authorized

27   California to regulate a significant aspect of interstate commerce."  Defendants argue that Section

28   211(c)(4)(B) authorizes what would otherwise be a Commerce Clause violation, and that in enacting

Section 211(c)(4)(B), "Congress was keenly aware that allowing, and in fact, encouraging California to set stricter emission standards would affect interstate commerce." Defendants assert that "Congress explicitly granted California the authority to regulate fuels knowing full well that it would have effects on interstate commerce." Defendants conclude that Section 211(c)(4)(B) authorizes California to adopt regulations that violate the Commerce Clause. Plaintiffs' arguments fail for the following reasons.

"The Commerce Clause...is in its negative aspect...a limitation on the regulatory authority of the states. Thus, although a state has power to regulate commercial matters of local concern, a state's regulations violate the Commerce Clause if they are discriminatory in nature or impose an undue burden on interstate commerce." *Shamrock Farms Co. v. Veneman*, 146 F.3d 1177, 1179 (9th Cir. 1998) (citations and internal quotations omitted). "[F]or a state regulation to be removed from the reach of the dormant Commerce Clause, congressional intent must be unmistakably clear." *South-Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 91 (1984). As a result, to authorize a Commerce Clause violation, Congress must do more than simply authorize a State to regulate in an area, it must "affirmatively contemplate otherwise invalid state legislation," *id.*, and clearly express its intent to "remove federal Constitutional constraints." *Sporhase v. Nebraska ex rel. Douglas*, 458 U.S. 941, 960 (1982). Defendants bear the burden of "demonstrating [this] clear and unambiguous intent." *Wyoming v. Oklahoma*, 502 U.S. 437, 458 (1992). According to these standards, Plaintiffs' Commerce Clause claims fails as a matter of law if Defendants establish that Congress expressly, unmistakably, and unambiguously authorized California to violate the Commerce Clause.

In its Motion to Dismiss Order, this Court rejected Defendants' argument that Section 211(c)(4)(B) insulated Defendants from Commerce Clause scrutiny:

> Under *Lewis*, *New England Power*, and *Wyoming*, a federal provision that exempts a state law from preemption under another federal statute is insufficient to exempt the state law from the requirements of the Commerce Clause. In addition, under *Davis*, this Ninth Circuit made clear that the "sole purpose of [211(c)(4)(B)] is to waive for California the express preemption provision found in [211(c)(4)(A)]. 348 F.3d at 786. Just as California is not, by virtue of Section 211(c)(4)(B), "authorized to negate the requirements imposed by Congress" in provisions other than Section 211(c)(4)(A), *id.* at 787, defendant likewise may not rely upon Section 211(c)(4)(B) to violate the requirements imposed by the Commerce Clause.

*Rocky Mountain Farmers Union*, 719 F. Supp. 2d at 1196. "A federal statute that merely exempts state law from the preemptive effect of another federal provision does not authorize a violation of the

1 Commerce Clause." *Id*. (citing *New England Power Co. v. New Hampshire*, 455 U.S. 331, 341 (1982)).

2 Nothing in the text or history of the Clean Air Act that clearly evidences Congress' intent in Section

3 211(c)(4)(b) to "extend to [California] new powers...that [it] would not have possessed absent the federal

4 legislation." *Lewis v. BT Inv. Managers, Inc*., 447 U.S. 27, 49 (1980).

5        Moreover, the savings clauses of the Clean Air Act and the EISA do not authorize defendants to

6 violate the Commerce Clause. *See Wyoming*, 502 U.S. at 458; *Sporhase*, 458 U.S. 960; *New England*

7 *Power*, 455 U.S. at 434; *Lewis*, 447 U.S. at 48-49.  In each of these cases, the Supreme Court held that

8 federal statutes that exempted state law from express preemption under a specific federal statute merely

9 "define the extent of the federal legislation's preemptive effect on state law" and do not "alter the state

10 power otherwise imposed by the Commerce Clause." *New England Power*, 455 U.S. at 341.  This rule

11 applies even where a savings clause was intended to allow State regulation "more restrictive than federal

12 law." *Lewis*, 447 U.S. at 48-49.

13        For these reasons, Defendants fail to bear their burden to establish by clear and unmistakable

14 evidence that Congress intended to exempt the LCFS from scrutiny under the Commerce Clause.  Section

15 211(c)(4)(B) provides no express or unambiguous authority for California to violate the Commerce

16 Clause.  Section 211(c)(4)(B) exempts California from federal preemption in regulating fuels and fuel

17 additives for the purposes of motor vehicle emissions control only.  That statute provides no explicit

18 authority to regulate interstate and foreign commerce through a fuels provision.  Defendants have failed

19 to demonstrate that when it adopted Section 211(c)(4)(B), Congress "affirmatively contemplated" and

20 authorized California (i) to discriminate against other states; (ii) engage in extraterritorial regulation of

21 conduct outside of California; and (iii) impose burdens on interstate and foreign commerce that clearly

22 outweigh local benefits.  *Wunnicke*, 467 U.S. at 91.  Similarly, Defendants have failed to establish that

23 the savings clauses demonstrate express exemption from Commerce Clause scrutiny.  Accordingly,

24 Defendants fail to support their position that "there is no limitation whatsoever as to any extraterritorial

25 impact of a California fuels regulation."  This Court denies summary adjudication on this issue.

26 **V.        Defendants Other Challenges on the Merits of Plaintiffs' Claims**

27        Defendants further move for judgment in their favor on the merits of Plaintiffs' claims.

28 Defendants argue that as a matter of law, the LCFS' treatment of ethanol or crude oil does not

discriminate facially against out-of-state ethanol entities.  In addition, Defendants argue that the LCFS does not regulate extraterritorially and does not have a discriminatory purpose.  To the extent this Court reaches this arguments to resolve these cross-motions, this Court shall address Defendants' arguments in Plaintiffs' separate summary judgment motions.

### CONCLUSION AND ORDER

For the foregoing reasons, this Court:

1.   GRANTS Defendants' summary adjudication motion to the extent that this Court finds that the LCFS is a control or prohibition respecting a fuel or fuel component, as defined by Section 211(c)(4)(B) of the Clean Air Act;

2.   DENIES Defendants' summary adjudication motion to the extent that Defendants argue that Section 211(c)(4)(B) insulates the LCFS from preemption or Commerce Clause challenges;

3.   DENIES without prejudice Defendants' summary adjudication motion to the extent Defendants' argue that the LCFS does not conflict with, and is not preempted by, Section 211(o) of the Clean Air Act, because no party has addressed the appropriate standard of review for this preemption challenge; and

4.   RESERVES judgment on Defendants' remaining arguments, which shall be addressed in the Plaintiffs' separate summary judgment motions to the extent this Court reaches those arguments.

IT IS SO ORDERED.

Dated:    December 29, 2011                          /s/ Lawrence J. O'Neill
                                                                   UNITED STATES DISTRICT JUDGE