1

# IN THE UNITED STATES DISTRICT COURT

2

## FOR THE EASTERN DISTRICT OF CALIFORNIA

3

4  ROCKY MOUNTAIN FARMERS UNION,          CASE NO. CV-F-09-2234 LJO DLB
   REDWOOD COUNTY MINNESOTA CORN
5  AND SOYBEAN GROWERS, PENNY
   NEWMAN GRAIN, INC., GROWTH ENERGY,     **ORDER ON RMFU PLAINTIFFS'**
6  RENEWABLE FUELS ASSOCIATION, REX       **SUMMARY ADJUDICATION MOTION**
   NEDEREND, FRESNO COUNTY FARM           (Doc. 111)
7  BUREAU, NISEI FARMERS LEAGUE, and
   CALIFORNIA DAIRY CAMPAIGN,             **ORDER ON DEFENDANT'S RENEWED**
8                                         **FED. R. CIV. P. 56(D) MOTION** (Doc. 172)
                   Plaintiffs,
9                                         **ORDER ON RMFU PLAINTIFFS'**
          vs.                             **PRELIMINARY INJUNCTION MOTION**
10                                        (Doc. 115)
   JAMES N. GOLDSTENE, Executive Officer
11 of the California Air Resources Board,

          Defendant.
12 _____

13 *consolidated with*

14 NATIONAL PETROCHEMICAL &               CASE NO. CV-F-10-163 LJO DLB
   REFINERS ASSOCIATION, AMERICAN
15 TRUCKING ASSOCIATIONS, CENTER          **ORDER ON RMFU PLAINTIFFS**
   FOR NORTH AMERICAN ENERGY              **SUMMARY ADJUDICATION MOTION**
16 SECURITY, and THE CONSUMER             (Doc. 111)
   ENERGY ALLIANCE,
17
                   Plaintiffs,            **ORDER ON DEFENDANT'S RENEWED**
18                                        **FED. R. CIV. P. 56(D) MOTION** (Doc. 172)
          vs.
19                                        **ORDER ON RMFU PLAINTIFFS'**
   JAMES GOLDSTENE, Executive Officer     **PRELIMINARY INJUNCTION MOTION**
20 of the California Air Resources Board,  (Doc. 115)
   MARY D. NICHOLS, DANIEL SPERLING,
21 KEN YEAGER, DORENE D'ADAMO,
   BARBARA RIORDAN, JOHN R. BALMES,
22 LYDIA H. KENNARD, SANDRA BERG,
   RON ROBERTS, RONALD O.
23 LOVERIDGE, member of the California
   Air Resources Board; ARNOLD
24 SCHWARZENEGGER, Governor of the
   state of California, and EDMUND BROWN,
25 Attorney General of the state of California,

26                 Defendants.
   _____/
27
   and related intervenor actions and amici.
28 _____/

1

**INTRODUCTION**

Plaintiffs Rocky Mountain Farmers Union, Redwood County Minnesota Corn and Soybean Growers, Penny Newman Grain, Inc., Fresno County Farm Bureau, Nisei Farmers League, California Dairy Campaign, Rex Nederend, Growth Energy and the Renewable Fuels Association (collectively "Plaintiffs" or "Rocky Mountain Plaintiffs") seek summary judgment pursuant to Fed. R. Civ. P. 56 and an order enjoining enforcement of California's Low Carbon Fuel Standard, Cal. Code Regs. tit. 17, §§95480-95490 ("LCFS"), regulations promulgated by defendant California Air Resource Board ("CARB")[1] to implement provisions of California Assembly Bill 32 ("AB 32"), California's Global Warming Solutions Act of 2006, Cal. Health & Saf. Code, §38500 et seq.

Rocky Mountain Plaintiffs argue that the LCFS violates the Commerce Clause, U.S. Const. art. I, §8, cl. 3 and is preempted by federal law.  In this summary judgment motion, the Rocky Mountain Plaintiffs argue that the LCFS fails as a matter of law because it: (1) impermissibly discriminates against out-of-state corn ethanol; (2) impermissibly regulates commerce and the channels of interstate commerce; (3) excessively burdens interstate commerce without producing local benefits; and (4) is preempted by the Energy Independence and Security Act of 2007 ("EISA").

CARB argues that the Rocky Mountain Plaintiffs' motion improperly and prematurely seeks to adjudicate fact-based issues.  By separate motion, CARB moves to deny this motion pursuant to Fed. R. Civ. P. 56(d) as premature, because the parties have conducted only limited discovery, and as a sanction for the Rocky Mountain Plaintiffs' failure to produce certain requested and court-ordered discovery.  Moreover, CARB contends that the LCFS is authorized by 42 U.S.C. §7545(c)(4)(B) ("Section 211(c)(4)(B)"), precluding Plaintiffs' preemption claim.  Similarly, CARB argues that Section 211(c)(4)(B) authorizes California to violate the dormant Commerce Clause.  Finally, Defendants argue that the LCS neither violates the Commerce Clause nor is preempted by EISA as a matter of law and that the Rocky Mountain Plaintiffs lack standing to raise a preemption claim.

Having considered the parties' arguments, exhibits, and relevant case law, this Court finds that the LCFS impermissibly discriminates against out-of-state corn ethanol and impermissibly regulates

---

[1]  The defendant in this action is James N. Goldstene, in his official capacity as Executive Director of the California Air Resources Board ("CARB").

extraterritorially in violation of the dormant Commerce Clause and its jurisprudence. Accordingly, the Rocky Mountain Plaintiffs' summary judgment motion is GRANTED in part.[2] On its preemption claim, this Court finds that the Rocky Mountain Plaintiffs have failed to establish the appropriate standard of review. Accordingly, summary judgment is DENIED without prejudice on that issue. Because this Court's conclusions are based on arguments that are not subject to Defendants Fed. R. Civ. P. 56(d) motion, this Court DENIES that motion as moot. This Court further finds that because the Rocky Mountain Plaintiffs have established a likelihood of success on the merits of their Commerce Clause claim, and raise serious questions related to their preemption claim, likelihood of irreparable harm, and the balance of the equities so tips in their favor, this Court GRANTS the Rocky Mountain Plaintiffs' preliminary injunction motion and ENJOINS enforcement of the LCFS during the pendency of this litigation.

## BACKGROUND[3]

### Introduction

In enacting the Global Warming Solutions Act of 2006, AB 32, the California Legislature found, *inter alia*: "Global warming poses a serious threat to the economic well-being, public health, natural resources, and the environment of California." Cal. Health & Saf. Code, §38501. AB 32 set the goal of reducing green house gas ("GHG") emissions in California to 1990 levels by the year 2020. To attain these goals, AB 32 charged CARB to develop and implement regulations in a number of areas.

In January 2007, California's Governor issued Executive Order S-01-07 ("Executive Order"), setting a statewide goal to "reduce the carbon intensity of California's transportation fuels by at least 10 percent by 2020." In the Executive Order, the Governor called on CARB to "determine if [a low carbon fuel standard] can be adopted as a discrete early action measure pursuant to AB 32." *Id*. In June 2007, CARB adopted the low carbon fuel standard ("LCFS") as an early action measure. Public workshops

---

[2]This Court leaves unaddressed some arguments raised by the Rocky Mountain Plaintiffs. Because this Court finds that the LCFS discriminates against interstate commerce on its face, for example, this Court does not reach the Rocky Mountain Plaintiffs' arguments related to discriminatory effects or factors relevant to an analysis pursuant to *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142 (1970). In addition, because neither party has established an appropriate standard of review to determine the merits of the Rocky Mountain Plaintiffs' preemption claim, this Court does not reach the merits of that claim. This Court neither resolves nor asserts an opinion on these arguments, unless otherwise specified.

[3]This Court presents only the background facts that are relevant to this motion.

1   on the issue and formal rule-making procedures followed, culminating in the final adoption of the

2   regulation in April 2010. Cal. Code Regs. tit. 17, §§95480-95490.

3                                                   **LCFS**

4        Plaintiffs challenge the LCFS regulations in this action. The purpose of the LCFS is "to

5   implement a low carbon fuel standard, which will reduce greenhouse gas emissions by reducing the full

6   fuel-cycle, carbon intensity of the transportation fuel used in California." LCFS §95480.  The LCFS was

7   "designed to reduce California's dependence on petroleum" and "to stimulate and the production and

8   use of alternative, low-carbon fuels in California." CARB, *Final Statement of Reasons* ("FSOR") at 457;

9   FSOR at 461 ("One of the key advantages of the LCFS...is that it reduces our dependence on foreign

10  oil."). In preparing the LCFS, CARB identified several "impacts" the regulation would have, including:

11       Biofuels will displace some percent of petroleum-based transportation fuels.

12                                                   ***

13       Reducing the volume of transportation fuels that are imported from other states will
         reduce foreign imports of oil into the U.S.

14                                                   ***

15

16       The biorefineries to be built in the States will provide needed employment, an increased
         tax base for the States, and value added to the biomass used as feedstock.  These benefits
         will be more important in rural areas of the State that are short on employment but rich
17       in natural resources.

18       Displacing important transportation fuels with biofuels produced in the State keeps more
         money in the States.

19

20  FSOR at 479.  CARB estimated that under the LCFS, "[u]p to eighteen cellulosic ethanol and six corn

21  ethanol plants could be built [in California] by 2020 with a total annual capacity of 1.2 billion gallons."

22  FSOR at 419.  "The estimated capital investment for these new businesses is approximately $8.5

23  billion..." FSOR at 420.  CARB estimates that the LCFS will reduce emissions from the transportation

24  sector by about 16 million metric tons in 2020. CARB, *Initial Statement of Reasons* ("ISOR") at ES-1.

25       The LCFS regulates transportation fuels that are "sold, supplied, or offered for sale in California"

26  and "any person, who as a regulated party...is responsible for a transportation fuel in a calendar year."

27  LCFS §95480.1(a). California's LCFS focuses on the "carbon intensity" of fuels to estimate emissions

28  related to a fuel's lifecycle, including GHGs emitted when the fuel is extracted, refined, and transported

                                                    4

1   to California.  It establishes different standards for gasoline and diesel fuels, and provides for a gradual

2   implementation of the fuel standards for both, with a goal to reduce the carbon intensity of fuel by 10%

3   by the year 2020.  *See* LCFS §§95482(b), (c).

4   The LCFS requires providers to comply with reporting requirements which obligate them to

5   identify for fuels sold or imported into California, the type of fuels, whether the fuel is blended, and the

6   fuel's production process.  Providers are required to calculate the "carbon intensity" of each fuel

7   component to determine their score.  LCFS § 95486(a), and must compare it with the statewide average

8   carbon intensity level for that year.  If a party's score is below the statewide average level, the party may

9   generate credits, provided it has obtain credit-generation approval by CARB.  One obtains and maintains

10  approval depending on how that party produces, ships, delivers and distributes its fuels from the location

11  where the fuel is produced to where it ends up in California. LCFS § 95484(d)(2).  If the party's carbon

12  intensity score is above the statewide average level, the party will generate deficits, which must be

13  canceled either by retiring accumulated credits or purchasing credits from others. LCFS § 95485.

14  Reductions in the average carbon intensity were mandated to begin in 2011, with the reduction

15  requirement increasing through the year 2020.

16  **Carbon Intensity**

17  "Carbon intensity is not an inherent chemical property of a fuel, but rather it is a reflective of the

18  process in making, distributing, and using that fuel." FSOR at 951.  The "LCFS contains no requirements

19  that dictate the exact composition of compliant transportation fuels." FSOR at 442.  The LCFS does "not

20  set[] a fuel standard," and it does not "establish any motor-vehicle specifications." FSOR at 439, 442.

21  A gallon of ethanol made from corn grown and processed in the Midwest will, under a
    microscope or other analytical device, look identical in every material way to a gallon of

22  ethanol processed from sugar cane grown in Brazil.  Both samples of ethanol will have
    the same boiling point, the same molecular composition, the same lower and upper limits

23  of flammability–in other words, both will have identical physical and chemical properties
    because both products consist of 100% ethanol.  On the other hand, corn ethanol from

24  the Midwest will have different carbon intensity than the sugar cane ethanol from Brazil.

25  ISOR V-30.

26  Carbon intensity is defined as "the amount of lifecycle greenhouse gas emissions, per unit of

27  energy of fuel delivered, expressed in grams of carbon dioxide per megajoule. LCFS §95481(a)(11).

28  "Lifecycle greenhouse gas emissions" are defined as the:

5

aggregate quantity of greenhouse gas emissions (including direct emissions and significant indirect emissions such as significant emissions from land use changes), as determined by the Executive Officer, related to the full fuel lifecycle, including all stages of fuel and feedstock production and distribution, from feedstock generation or extraction through the distribution and delivery and use of the finished fuel to the ultimate consumer, where the mass values for all greenhouse gases are adjusted to account for their relative global warming potential.

LCFS §95481(a)(28). The lifecycle analysis "includ[es] all stages of fuel and feedstock production and distribution, from feedstock generation or extraction through the distribution and delivery and use of finished fuel to the ultimate consumer." LCFS §95481(a)(28). In short, carbon intensity is an estimate of emissions related to a fuel's lifecycle that focuses on GHGs emitted when the transportation fuel is extracted, refined, and transported to California.

**CARB-Assigned Corn Ethanol Carbon Intensity Values**

The LCFS has assigned carbon intensity scores for gasoline and gasoline substitutes, embodied in the Table 6 of LCFS §95486(b), titled "Carbon Intensity Lookup Table for Gasoline and Fuels that Substitute for Gasoline" ("Table 6"). CARB, through Table 6, assigns different carbon intensity scores to different gasoline and gasoline substitutes, including gasoline, ethanol from corn, ethanol from sugar cane, compressed natural gas, liquified natural gas, electricity, and hydrogen. These carbon intensity values set a 2010 baseline carbon intensity value to each of the fuels and pathways. Within the "ethanol from corn" section, more than a dozen "pathways" are identified, each assigned a carbon intensity value. Numerous distinctions are drawn among different categories of corn ethanol producers.

Plaintiffs argue that the LCFS discriminates against out-of-state ethanol producers on its face, because the LCFS assigns more favorable carbon intensity values to California corn-derived ethanol than to Midwest corn-derived ethanol. The relevant section of Table 6 assigns the following values to the different corn-ethanol pathways[4]:

///

///

///

_____

[4]The LCFS assigns carbon-intensity scores for corn ethanol based on the "location of the production facility (California or Midwest)," the "type of corn milling (wet or dry)," the "type of distillers grains produced (wet or dry), and the "source of fuel for heat energy and co-generated electrical power (natural gas, coal, biomass)." FSOR at 508.

| Pathway Description | Carbon Intensity Values (gCO2e/MJ) | | |
|---|---|---|---|
| | Direct Emissions | Land Use or Other Indirect Effect | Total |
| Midwest Average; 80% Dry Mill; 20% Wet Mill; Dry DGS | 69.40 | 30 | 99.40 |
| California average; 80% Midwest Average; 20 % California, Dry Mill; Wet DGS; NG | 65.66 | 30 | 95.66 |
| California; Dry Mill; Wet SGS; NG | 50.70 | 30 | 80.70 |
| Midwest; Dry Mill; Dry DGS, NG | 68.40 | 30 | 98.40 |
| Midwest; Wet Mill, 60% NG, 40% Coal | 75.10 | 30 | 105.10 |
| Midwest; Wet Mill, 100% NG | 64.52 | 30 | 94.52 |
| Midwest; Wet Mill, 100% Coal | 90.99 | 30 | 120.99 |
| Midwest; Dry Mill, Wet, DGS | 60.10 | 30 | 90.10 |
| California; Dry Mill; Dry DGS, NG | 58.90 | 30 | 88.90 |
| Midwest; Dry Mill; Dry DGS, 80% NG; 20% Biomass | 63.60 | 30 | 93.60 |
| Midwest; Dry Mill, Dry DGS; 80% NG; 20% Biomass | 56.80 | 30 | 86.80 |
| California; Dry Mill, Dry DGS; 80% NG; 20% Biomass | 54.20 | 30 | 84.20 |
| California; Dry Mill; Wet DGS; 80% NG; 20% Biomass | 47.44 | 30 | 77.44 |

**Customized Carbon Intensity Values and Pathways**

In addition to the default assigned values contained in Table 6, CARB provides two methods for a facility to apply for a customized total carbon intensity value. *See* LCFS §§95486(c), (d). Under these mechanisms–named Method 2A and Method 2B in the LCFS–a facility may show that it has more efficient equipment or uses cleaner electricity to gain an individualized carbon intensity value. Under these methods, a facility may also propose its own pathway. "Producers whose energy use data are different from the values used in the development of the fuel pathways or producers whose process deviates substantially from that of the pathways represented in [Table 6] can propose their own pathways according to Methods 2A and 2B." FSOR at 508.

1    CARB submits that to date, 44 Midwest corn ethanol facilities have registered for pathways in

2    Table 6, with 25 indicating that they can produce ethanol lower than the 2010 baseline assigned in Table

3    6.  Five Midwest corn ethanol facilities have applied under Method 2A and Method 2B, with a total of

4    22 pathways, all of which tentatively have been granted a rating lower than the value for the 2010

5    baseline for that pathway.  Moreover, to date, three facilities that are Midwest; Dry Mill, Dry DGS, NG

6    have applied under Method 2A for an individualized carbon intensity value, and tentatively have been

7    given a value lower than the 2010 baseline for California gasoline.

8                **JUDICIAL NOTICE, OBJECTIONS, AND CONSIDERATION OF EVIDENCE AND ARGUMENTS**

9           In addition to the pending motion, the parties have submitted requests for judicial notice,

10   objections to evidence submitted, motions to strike, and other miscellany.  Moreover, this Court has

11   received multiple amici curiae briefs.  This Court carefully reviewed and considered the record,

12   including all evidence, arguments, points and authorities, declarations, testimony, statements of

13   undisputed facts and responses thereto, objections and other papers filed by the parties.  Omission of

14   reference to evidence, an argument, document, objection or paper is not to be construed to the effect that

15   this Court did not consider the evidence, argument, document, objection or paper.  This Court thoroughly

16   reviewed, considered and applied the evidence it deemed admissible, material and appropriate for

17   summary judgment.  This Court does not rule on objections in a summary judgment context, unless

18   otherwise noted.

19          Moreover, this Court will not address the request for judicial notice specifically, but notes the

20   following applicable standards.  To be judicially noticeable, a fact must not be subject to a reasonable

21   dispute because it must be either generally known within the territorial jurisdiction of the court or

22   "capable of accurate and ready determination by sources whose accuracy cannot reasonably be

23   questioned." Fed. R. Evid. 201.  "Judicial notice is appropriate for records and reports of administrative

24   bodies." *United States v. 14.02 Acres of Land More or Less in Fresno County*, 547 F.3d 943, 955 (9th

25   Cir. 2008).  This Court may not take judicial notice, however, of documents filed with an administrative

26   agency to prove the truth of the contents of the documents. The comments made by third parties that are

27   included in the ISOR or FSOR are subject to hearsay objections, and do not rise to the "high degree of

28   indisputability" required for judicial notice for their truth. *Jespersen v. Harrah's Operating Co.*, 444

8

1   F.3d 1104, 1110 (9th Cir. 2006) (citing Fed. R. Evid. 201 advisory committee's note).  If cited, these

2   statements may be considered for their existence, but not their truth.  *Id*.  In addition, this Court takes

3   judicial notice of public records not subject to reasonable dispute.  *See Hennessy v. Penril Datacomm*

4   *Networks, Inc*., 69 F.3d 1344, 1354-55 (7th Cir. 1995) (court properly refused to take judicial notice of

5   corporation's SEC form to determine disputed fact because "its contents were subject to dispute").

6   While this Court may take judicial notice of the legislative histories, the statements contained therein

7   may be subject to dispute.

8                                   **SUMMARY JUDGMENT MOTION**

9                                   **STANDARD OF REVIEW**

10          Fed. R. Civ. P. 56 permits a "party against whom relief is sought" to seek "summary judgment

11   on all or part of the claim."   In a summary judgment motion, a court must decide whether there is a

12   "genuine issue as to any material fact."  Fed. R. Civ. P. 56(c); *see also, Adickes v. S.H. Kress & Co.*, 398

13   U.S. 144, 157 (1970).  A party seeking summary judgment/adjudication bears the initial burden of

14   establishing the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317,

15   323 (1986).  The moving party may satisfy this burden by: (1) presenting evidence that negates an

16   essential element of the nonmoving party's case; or (2) demonstrating that the nonmoving party failed

17   to make a showing of sufficient evidence to establish an essential element of the nonmoving party's

18   claim, and on which the non-moving party bears the burden of proof at trial.  *Id*. at 322.  "The judgment

19   sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any

20   affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to

21   judgment as a matter of law." Fed. R. Civ. P. 56(c).  "If the party moving for summary judgment meets

22   its initial burden of identifying for the court those portions of the material on file that it believes

23   demonstrates the absence of any genuine issues of material fact," the burden of production shifts and the

24   nonmoving party must set forth "specific facts showing that there is a genuine issue for trial." *T.W. Elec.*

25   *Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quoting Fed. R. Civ. P.

26   56(e)).

27          To establish the existence of a factual dispute, the opposing party need not establish a material

28   issue of fact conclusively in its favor, but "must do more than simply show that there is some

                                                    9

metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat. Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968); *T.W. Elec. Serv.*, 809 F.2d at 631. The nonmoving party must "go beyond the pleadings and by her own affidavits, or by depositions, answer to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Fed. R. Civ. P. 56(e) requires a party opposing summary judgment to "set out specific facts showing that there is a genuine issue for trial." "In the absence of specific facts, as opposed to allegations, showing the existence of a genuine issue for trial, a properly supported summary judgment motion will be granted." *Nilsson, Robbins, et al. v. Louisiana Hydrolec*, 854 F.2d 1538, 1545 (9th Cir. 1988).

## DISCUSSION

### I.   Commerce Clause Challenges

The dormant Commerce Clause "directly limits the power of the States to discriminate against interstate commerce." *Wyoming v. Oklahoma*, 502 U.S. 437, 454 (1992); *NCAA v. Miller*, 10 F.3d at 633, 638 (9th Cir. 1993). "Discrimination simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 500 U.S. 330, 331 (2007). "The Commerce Clause...is in its negative aspect...a limitation on the regulatory authority of the states. Thus, although a state has power to regulate commercial matters of local concern, a state's regulations violate the Commerce Clause if they are discriminatory in nature or impose an undue burden on interstate commerce." *Shamrock Farms Co. v. Veneman*, 146 F.3d 1177, 1179 (9th Cir. 1998) (citations and internal quotations omitted).

### A.   Whether LCFS is Subject to Commerce Clause Challenge

Defendants contend that the LCFS is not subject to Commerce Clause challenge. This Court addresses Defendants' arguments by separate order. In short, this Court concluded Section 211(c)(4)(B) of the Clean Air Act provides no express or unambiguous authority for California to violate the Commerce Clause. Accordingly, the LCFS is subject to Commerce Clause scrutiny.

### B.   Applicable Standard of Review

In reviewing a dormant Commerce Clause challenge, the Court must first consider the applicable

1 standard of review.  If a law discriminates against out-of-state entities, or attempts to regulate beyond

2 a state's jurisdiction, then the Court applies a strict scrutiny standard.  *Healey v. Beer Inst.*, 491 U.S. 324,

3 336-37 (1989).  If a law regulates in-state and out-of-state entities evenly and attempts to regulate only

4 in-state activity, then the Court applies a balancing test.  *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142

5 (1970).  The strict scrutiny standard is difficult to satisfy, whereas the *Pike* balancing test is more

6 favorable to the state law.

7     The Rocky Mountain Plaintiffs contend that the LCFS is subject to strict scrutiny analysis

8 because it discriminates against out-of-state interests.  A law or regulatory scheme "can discriminate

9 against out-of-state interests in three different ways: (1) facially; (2) purposefully, or (3) in practical

10 effect.*" Nat'l Ass'n of Optometrists & Opticians Lenscrafters, Inc. v. Brown*, 567 F.3d 521, 525 (9th Cir.

11 2009).  The Rocky Mountain Plaintiffs argue that the LCFS discriminates in all three ways.  The Rocky

12 Mountain Plaintiffs assert that the LCFS: (1) facially discriminates because it assigns a higher carbon

13 intensity score to corn-derived ethanol from the Midwest than it assigns to corn-derived ethanol from

14 California; (2) practically discriminates because it purports to base carbon intensity scores on variables

15 that are intertwined with origin (transportation and electricity); and (3) purposefully discriminates by

16 closing California to Midwest corn ethanol while preserving a market for local corn ethanol.  The Rocky

17 Mountain Plaintiffs further argue that the LCFS impermissibly regulates out-of-state activity and is

18 subject to strict scrutiny analysis.  In the alternative, the Rocky Mountain Plaintiffs argue that the LCFS

19 also fails the *Pike* analysis because it excessively burdens interstate commerce without producing local

20 benefits.

21     Defendants counter that the strict scrutiny analysis is improper, because the LCFS is a neutral

22 law that applies evenly to all fuel-providers within the state of California.  Defendants further contend

23 that Defendants' arguments as to the burdens and effects of the LCFS are unripe and premature, and are

24 the subject of Defendants Fed. R. Civ. P. 56(d) motion.  Defendants move separately for judgment in

25 their favor, arguing that the LCFS does not burden interstate commerce and produces local benefits.

26 Defendants assert that the Rocky Mountain Plaintiffs provide no evidence of a negative effect on

27 interstate commerce or injury to any of the Rocky Mountain Plaintiffs or their members.  Defendants

28 submit that the Midwest ethanol industry is thriving, notwithstanding the LCFS and its application.

1  Defendants suggest that there is no danger of future harm to the Midwest ethanol industry, because it

2  is increasing its efficiency, diminishing its carbon footprint, and therefore, becoming more competitive

3  in California.  Finally, Defendants argue that the EPA's approval of E15, the increasing numbers of flex-

4  fueled vehicles on the road, and the growth of international exports of corn ethanol will expand the non-

5  California ethanol market substantially.  Based on these arguments, Defendants oppose the Rocky

6  Mountain Plaintiffs' summary judgment motion, and move for summary judgment in their favor.

7      To determine the appropriate standard of review, the Court must first consider whether the LCFS

8  overtly discriminates against interstate commerce or impermissibly regulates interstate commerce.  If

9  the answer is in the affirmative, then this Court shall address the remaining factors under the strict

10  scrutiny analysis.  If the Court finds that the LCFS is nondiscriminatory, then the Court shall address the

11  *Pike* balancing factors to analyze the Rocky Mountain Plaintiffs' dormant Commerce Clause challenge.

12      **C.    Strict Scrutiny Analysis**

13          **1.    Whether the LCFS facially discriminates against interstate commerce**

14      States may not "discriminate against an article of commerce by reason of its origin or destination

15  out of State." *C&A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 390 (1994).  "The central

16  rationale for the rule against discrimination is to prohibit state or municipal laws whose object is local

17  economic protectionism." *Id*. at 337-38.  A law is facially discriminatory when it "is not necessary to

18  look beyond the text of this statute to determine that it discriminates against interstate commerce."

19  *Camps Newfoundland/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 575-76 (1997).  In this

20  context "'discrimination' simply means differential treatment of in-state and out-of-state economic

21  interests that benefits the former and burdens the latter." *Oregon Waste*, 511 U.S. at 99.

22      Relying on LCFS §95486(b) and Table 6, Plaintiffs argue that the LCFS' discriminatory

23  treatment of physically and chemically identical fuels is reflected on the face of the LCFS.  Plaintiffs

24  point out that although corn ethanol produced in California and the Midwest have "identical physical

25  and chemical properties," ISOR V-30, Table 6 provides lower, more favorable carbon intensity scores

26  for corn ethanol produced in California than corn ethanol produced in the Midwest.  As reflected in the

27  table, *supra*, California corn-derived ethanol pathways are assigned 10% lower carbon intensity score

28  as compared to the Midwest counterpart pathways.  Plaintiffs contend that this difference reflects

1  "differential treatment of in-state and out-of-state economic interests that benefits the former and

2  burdens the latter." *Oregon Waste Sys. v. Dep't of Envtl. Quality*, 511 U.S. 93, 99 (1994).  By assigning

3  a higher carbon intensity score to the Midwest, the LCFS creates an "economic barrier against

4  competition with the products of another state." *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 527

5  (1935).

6          Plaintiffs point out that the LCFS assigns higher carbon intensity values to corn ethanol "based

7  on...[the] location of the production facility." FSOR at 508.  Plaintiffs contend that imposition of a

8  higher carbon intensity score based on the "location of the production facility" constitutes express

9  discrimination against Midwest corn-derived ethanol in favor of California corn ethanol.  Moreover,

10 Plaintiffs argue that CARB may not discriminate against out-of-state facilities based on transportation.

11 In creating the LCFS, CARB acknowledged that "the carbon intensities of some California produced

12 fuels...benefit from shorter transportation distances." FSOR at 521.  Plaintiffs argue, however, that

13 CARB may not impose a barrier to interstate commerce based on the distance that the product must

14 travel in interstate commerce.

15         Defendants maintain that the LCFS applies evenhandedly to all ethanol used as a fuel in

16 California.  Defendant explain that all ethanol sold as fuel in California will receive a carbon intensity

17 value based on its lifecycle GHG emissions analysis. LCFS §95483; Scheible Decl., ¶¶26, 34-42.  In so

18 stating, CARB admits one exception applies to a Midwest ethanol for which a specific source cannot

19 be identified.  In that event, the fuel may be assigned the Midwest average carbon intensity value.

20 Scheible Decl., ¶39.  Defendants explain that for all ethanol pathways, the carbon intensity value is

21 determined by the application of the same scientific modeling tool (CA-GREET). Scheible Decl., ¶¶15-

22 25.  Defendants conclude that because the LCFS applies the same emissions modeling tool and same

23 regulatory mechanism to all ethanol pathways sold in California, regardless of origin, the LCFS is not

24 discriminatory on its face.

25         Having considered the parties' arguments, relevant case law, and admissible evidence, this Court

26 finds that the LCFS and Table 6 explicitly differentiate among ethanol pathways based on origin

27 (Midwest vs. California) and activities inextricably intertwined with origin (electricity provided by

28 Midwest power companies vs. California power suppliers and interstate transportation).   When

comparing plants with the same feedstock and production process, the LCFS assigns a higher CI on the basis of origin alone. Although California applies the same CA-GREET formula to all pathways evenly, the variables within the formula favor California ethanol producers by assigning lower CI scores based on location. For at least four pathways identified on Table 6 that have identical production processes that create physically and chemically identical ethanol, the Lookup Table assigns a higher score to the ethanol produced in the Midwest and the lower score to the ethanol produced the same way in California. The following table, derived from Table 6, illustrates the comparison:

**Carbon Intensities Assigned to Midwest and California Corn Ethanol**

| Fuel | Fuel Pathway | Assigned Total Carbon Intensity (gCO2e/MJ) | Difference Between Carbon Intensities for Midwest and California Corn Ethanol (gCO2e/MJ) |
|---|---|---|---|
| Corn Ethanol | 1. Midwest; Dry Mill; Dry DGS; NG | 98.40 | 9.50 |
| | 1a. California; Dry Mill; Dry DGS; NG | 88.90 | -- |
| | 2. Midwest; Dry Mill; Wet DGS; NG | 90.10 | 9.40 |
| | 2a. California; Dry Mill; Wet DGS; NG | 80.70 | -- |
| | 3. Midwest; Dry Mill; Wet DGS; 80% NG; 20% Biomass | 86.80 | 9.36 |
| | 3a. California; Dry Mill; Wet DGS; 80% NG; 20% Biomass | 77.44 | -- |

Plaintiffs point out that the LCFS assigns Midwest ethanol over 10% higher carbon intensity over its California ethanol counterpart. For example, Midwest; Dry Mill; Dry DGS; NG is assigned a carbon intensity score of 98.40 gCO2e/MJ, whereas California; Dry Mill; Dry DGS, NG has a score of 88.90 gCO2e/MJ. The difference–9.50 gCO2e/MJ–is more than 10% of the value of the California fuel's assigned carbon intensity. Similar differences appear for the Dry Mill; Wet DGS; NG pathway and the

Dry Mill; Wet DGS; 80% NG; 20% Biomass corn-derived ethanol pathway.  The LCFS treats Midwest corn-derived ethanol differently than similar corn-derived ethanol made in California.  In assigning higher CI scores based on, *inter alia*, the location of the production facility and the distance the product travels, scores that ultimately will affect the price of the product, this Court concludes that the LCFS discriminates against out-of-state corn-derived ethanol on its face.

CARB attributes the difference in carbon intensity values to multiple "scientific" factors that are not based on location.  These factors include differences in GHG emissions in transportation and electricity sources.  *See* FSOR at 713 ("The carbon intensities of some California-produced fuels do benefit from shorter transportation distances and lower carbon intensity electricity sources.").  Moreover, CARB considers GHG emissions from California inherently lower than Midwest ethanol based on transportation of Midwest ethanol to California.  *See* FSOR at 521 (Carbon intensity values "included [GHG] emissions associated with transporting ethanol from the Midwest to California.").  CARB further assumes that California corn ethanol producers have better access to electricity produced from hydropower and nuclear power plants than Midwestern corn ethanol producers, will be at least as efficient as Midwestern producers in the use of comparable electricity sources, and will not use coal in their processes. *See* FSOR at 602 ("California biorefineries do not use coal in their operation."); FSOR at 521 (CARB does not "expect ethanol produced using coal power to be used in California under the LCFS.").  While these factors may not overtly discriminate based on location, they do assign favorable assumptions to California while penalizing out-of-state competitors.  California is attempting to stop leakage of GHG emissions by treating electricity generate outside of the state differently than electricity generated inside its border.  This discriminates against interstate commerce.[5]  Moreover, tying carbon intensity scores to the distance a good travels in interstate commerce discriminates against interstate commerce.  *See* Tribe, 1 *Am. Constitutional Law* 1109 (3d ed. 000) (Discrimination against an "activity which is essential for an out-of-state enterprise but not essential or a competing local business" is

_____

[5] *See* Cheminsky, et al., "California, Climate Change, and the Constitution," 25 THE ENVIRONMENTAL FORUM 4, 50, 55 ("If California aims to stop leakage by treating electricity generated outside of the state differently than electricity generated inside its borders, the state will almost certainly lose when facing a lawsuit based on dormant Commerce Clause grounds.  This means that California should avoid making regulatory distinctions between in-state energy and out-of-state energy and create a process that is blind to the location of energy production.")

1   discrimination against interstate commerce.).  In addition, the overtly favorable assumptions (although

2   they may be true) related to the electricity powering the plants favors California producers and penalizes

3   out-of-state competitors.

4          The Court concludes that the LCFS offends the Commerce Clause after considering the unique

5   challenge presented.  This is not the quintessential dormant Commerce Clause challenge.  Clearly, a law

6   that compels the use of in-state products or forbids the use of out-of-state products would violate the

7   Commerce Clause.  *See, Alliance for Clean Coal v. Miller*, 44 F.3d 591, 596 (7th Cir. 1995).  So, too,

8   would a law that imposes a surcharge on an out-of-state product made in an identical fashion.  *See,*

9   *Oregon Waste*, 511 U.S. at 100.  While the ethanol made in the Midwest and California are physically

10  and chemically identical when ultimately mixed with petroleum, and while the pathways may be the

11  similar, this Court appreciates that the carbon intensities of these two otherwise-identical products are

12  different according to lifecycle analysis.  Indeed, the point of the LCFS is to penalize the differences

13  between the California and Midwest ethanol–the carbon emissions from the transportation, the different

14  farming methods used, and the different types of electricity provided to and used by the plants–to reduce

15  emissions.  Although CARB's goal to combat global warming may be "legitimate," however, it cannot

16  "be achieved by the illegitimate means of isolating the State rom the national economy."  *City of*

17  *Philadelphia v. New Jersey*, 437 U.S. 617, 626, 627 (1978).  Defendants admit that in California "there

18  is a price difference between the 90.1 CI corn ethanol and the 98.4 CI corn ethanol." Waugh Decl. at ¶11.

19  Because of the transportation, electricity and other penalties assigned to Midwest corn ethanol will affect

20  the price of the Midwest ethanol in the California market, the LCFS makes the higher CI corn-ethanol

21  undesirable to purchase or use.  But the price differential is based on transportation and out-of-state

22  electricity–both factors that discriminate based on location.  In addition, the pressure the LCFS puts on

23  out-of-state competitors to reduce its CI score to become equal to those scores in California "make[s]

24  doing business in the state...more costly for out-of-state companies relative to in-state firms." *Biohazard*

25  *Waste and Gen. Ecology Consultants, Inc. v. Nelson*, 48 F.3d 391, 398 (9th Cir. 1995).  CARB may not

26  impose a barrier to interstate commerce based on the distance that the product must travel in interstate

27  commerce.  *See Dean Milk Co. v. Madison*, 340 U.S. 349, 354 n.4 (1951) (striking down local

28  requirement that required milk sold in the city to be pasteurized within five miles of the city lines); *see*

*also West Lynn Creamery v. Healy*, 512 U.S. 186, 202 (1994) ("the imposition of a differential burden on any part of the stream of commerce...is invalid, because a burden placed at any point will result in a disadvantage to the out-of-state producer."). Accordingly, the LCFS discriminates against out-of-state commerce and is subject to strict scrutiny analysis.

The LCFS facially discriminates against interstate commerce notwithstanding the fact that it may also benefit some out-of-state interests or burden some in-state interests. Under the LCFS, Brazilian sugarcane ethanol has a lower CI score than some in-state corn ethanol pathways. Because the LCFS makes production process, feedstock and origin relevant, comparing pathways with different production processes or feedstocks is a red herring. As set forth above, when comparing pathways with the same feedstock and production processes, the LCFS discriminates on the basis of origin. Moreover, a facial discrimination challenge is not defeated simply because other out-of-state interests may benefit. *See Daghlian v. DeVry Univ., Inc.*, 582 F. Supp. 2d 1231, 1243-44 (C. D. Cal. 2007) (California law's exception for Hawaiian entities did not defeat facial discrimination claim); *Limbach*, 486 U.S. at 274 ("explicitly depriv[ing] certain products of generally available beneficial tax treatment because they are made in certain other States" discriminates even though "some out-of-state manufacturers" benefitted). Similarly, while in-state providers are penalized for transporting corn from out-of-state, strict scrutiny still applies. "[L]egislation favoring in-state economic interests is facially invalid under the dormant Commerce Clause, even when such legislation also burdens some in-state interests or includes some out-of-state interests in the favored classification." *Daghlian v. DeVry Univ.*, 58 F.Supp.2d 1231, 1243 (C.D. Cal. 2007) (internal quotes omitted).

Moreover, the Method 2A and Method 2B procedures in the LCFS do not alter this Court's conclusion that the LCFS discriminates on its face against out-of-state corn ethanol. Method 2A and Method 2B set forth administrative procedures through which a regulated party may seek to amend the LCFS Lookup Tables to add additional fuel pathways. LCFS §§95486(c)-(f). It is no defense to describe methods that *might* allow amendment of the LCFS in a manner that *might* ameliorate the discriminatory impact of the regulation. Approval of the new pathways is solely within CARB's discretion. Moreover, these methods underscore the discrimination inherent in the CLFS. For example, Defendants treat the "newer" California dry mill ethanol plants presumptively as being more energy efficient than the "mix

of more than 100 MidWest plants," resulting in a differential of 3.1 gCO2e/MJ in favor of California. Scheible Decl at ¶46.  By contrast, a Midwest ethanol plant cannot seek to amend its fuel pathway even if it could show that its ethanol plant was as efficient as a newer California plant because the LCFS requires any regulated party to show that its proposal is "at least 5.00 grams CO2eq/MJ less than the [carbon intensity] for the fuel as calculated under Method 1." LCFS §95486(e)(2)(A).  Accordingly, even these methods treat California ethanol plants more favorably than Midwest plants.

For the foregoing reasons, this Court finds that the LCFS impermissibly discriminates on its face against out-of-state entities.[6]

## 2.     Whether the LCFS Controls Extraterritorial Conduct

As an alternative argument, the Rocky Mountain Plaintiffs contend that strict scrutiny also applies to the LCFS if it attempts to "control conduct beyond the boundary of the state." *Healy v. Beer Inst.*, 491 U.S. 324, 336-37 (1989).  Under this doctrine, the "Commerce Clause...precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Edgar v. MITE Corp.*, 457 U.S. 624, 642-43 (1982). The Commerce Clause also forbids a state "statute that directly controls commerce occurring wholly outside the boundaries of a State" as that statute "exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature." *Healy*, 491 U.S. at 336.  "The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." *Id*. (citing *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 579 (1986)).  This Court evaluates the practical effect of the statute "not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation." *Id*. "Generally speaking, the Commerce Clause protects against inconsistent legislation arising from the projection of one state

---

[6]Because this Court found that the LCFS discriminates against interstate commerce on its fact, this Court declines to address the Rocky Mountain Plaintiffs' alternative argument related to the alleged discriminatory effects and purpose of the LCFS.

1  regulatory regime into the jurisdiction of another State." *Id*.

2    The Rocky Mountain Plaintiffs argue that the LCFS controls conduct that occurs wholly outside

3  of California.  The Rocky Mountain Plaintiffs point out that most of the production of corn ethanol

4  occurs entirely outside of California.  In addition, that production has no impact on the chemical or

5  physical properties of the corn ethanol ultimately used in California or the tailpipe emissions of motor

6  vehicles that will use the ethanol in California.  The Rocky Mountain Plaintiffs contend that, in addition

7  to regulating emissions in California, the ambitious LCFS calibrates CI scores so that they regulate,

8  among other things, deforestation in South America, how Midwest farmers use their land, and how

9  ethanol plants in the Midwest produce animal nutrients.  The Rocky Mountain Plaintiffs contend that

10  the LCFS not only regulates the out-of-state production processes for corn ethanol imported into

11  California, but it goes beyond by penalizing corn ethanol producers for their entirely separate business

12  decision to dry distillers grains co-products after the ethanol is produced.  Moreover, CARB imposes

13  a substantial penalty–more than 30% of the CI score for corn ethanol–for "indirect land use."  That

14  penalty is used to discourage farmers around the world from converting nonagricultural land into

15  farmland to enter the corn market.

16    Defendants argue that the Rocky Mountain Plaintiffs rely on the mistaken assertion that the

17  LCFS is "regulating" the activities that it takes into consideration to determine CI values.  Defendants

18  explain that the LCFS creates a market-based system which includes a yearly average performance

19  standard and the availability of trading for credits and debits.  In-state and out-of-state producers with

20  higher CI values are not required to reduce CI values or to make changes in production or distribution

21  in order to sell their ethanol in California.  Nor are regulated parties prevented from purchasing fuels

22  with higher CI values.  Based on this system, Defendants submit, any out-of-state effects are indirect,

23  rather than direct regulations.  Moreover, Defendants argue that the Commerce Clause protects the

24  ethanol market, not individual particular interstate firms.  Defendants admit that the LCFS structure will

25  shift the market by weakening the position of the higher-CI producers relative to lower-CI producers

26  causing some higher-CI producers may choose to withdraw from the California market.  Defendants

27  maintain, however, that these market forces do not regulate commerce outside of California's

28  boundaries.

1    Ostensibly, the LCFS regulates only fuel-providers in California.  This fact, however, does not

2  resolve the issue.  Defendants' arguments improperly focus on whether or not the LCFS directly

3  regulates the out-of-state entities.  As set forth above, the "critical inquiry is whether the practical effect

4  of the regulation is to control conduct beyond the boundaries of the State." *Healy*, 491 U.S. at 336.  By

5  using the lifecycle analysis approach to reducing GHG emissions, California is attempting to account

6  for–and reduce–emissions from the entire pathway.  Differences in CI scores are based on CARB's

7  assessment of Midwest states '"[f]arming practices (e.g. frequency and type of fertilizer used); [c]rop

8  yields; [h]arvesting practices; [and] [c]ollection and transportation of the crop." ISOR IV-4 to IV-5.  In

9  addition, the LCFS includes a "land use change" component, with higher scores given to the Midwest

10  and Brazil.  LCFS §95486(b); Table 6.  According to CARB, the LCFS assigns carbon intensity based

11  on these activities to provide an "incentive for regulated parties to adopt production methods which

12  result in lower emissions." FSOR at 84.  Defendants cannot dispute that the "practical effect" of the

13  regulation would be to control this conduct–occurring wholly outside of California.  Indeed, the aim of

14  the LCFS is to change these practices to reduce GHG emissions.  But in penalizing these practices to

15  "incentive regulated parties to change" their conduct (including conduct occurring wholly outside of the

16  state), the LCFS impermissibly attempts to "control conduct beyond the boundary of the state." *Healy*,

17  491 U.S. at 336-37.

18    Defendants admit that, in enacting the LCFS, "California has essentially assumed legal and

19  political responsibility for emissions of carbon resulting from the production and transport, regardless

20  of location, of transportation fuels actually used in California." Defs. Mem. In Support of Cross-Motion

21  for Summary Judgment, p. 17.  Defendants cannot regulate interstate or foreign commerce occurring

22  outside of California, however, because, under the Commerce Clause, "States and localities may not

23  attach restrictions to...imports in order to control commerce in other States." *Carbone*, 511 U.S. at 393.

24  Doing so would "extend the [State's] police power beyond its jurisdictional bounds." *Id*.; *see also*,

25  *Baldwin v. G.A.F. Seelig, Inc*., 294 U.S. 511 (1935).  Defendants cannot take "legal and political

26  responsibility" of commerce occurring outside of California, even if the products of that commerce

27  ultimately are sold in California.

28    Moreover, the LCFS impermissibly regulates the channels of interstate commerce.  Before a party

20

can generate credits under the LCFS regulation, for example, it must produce maps and other documentation to prove to CARB how its fuel or feedstock is transported to California. See LCFS §95484(d)(1). Any "material change" to the transportation–including changes to out-of-state legs of the transportation, such as replacing "rail with truck or ship transport," LCFS §95484(d)(2)(D)–must be approved by CARB or else the party loses its right to generate credits. The registration form CARB requires ethanol producers to submit "entails providing facility information that supports the identification of Carbon Intensity (CI) values and an Initial Demonstration of the Physical Pathway (how the fuel arrives to California) for the fuel(s) produced at [the registrant's] facility." Dinneen Decl. Exh. 1 ("California Air Resources Board Low Carbon Fuel Standard Biofuel Producer Registration Form"). This Court agrees with Rocky Mountain Plaintiffs that this type of regulation "forc[es] a merchant to seek regulatory approval in one State before undertaking a transaction in another," causing the LCFS to "directly regulate[] interstate commerce." *Brown*, 476 U.S. at 582.

The Court further considers "how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation." *Healy*, 491 U.S. at 336. "The purpose of the Commerce Clause is to protect the nation against economic Balkanization." *Pac. Nw. Venison Producers*, 20 F.3d at 1015. The Rocky Mountain Plaintiffs submit that the LCFS would Balkanize the ethanol market, because if every state adopted such a regime, they would plainly "interfere[] with free trade" in ethanol and ethanol production. *See Armco Inc. v. Hardesty*, 467 U.S. 638, 644 (1984). Defendants counter that because the cost of ethanol production and plants is so high, the LCFS would not Balkanize the ethanol production market.

If every State were to adopt legislation based on a lifecycle analysis of fuels, one of two outcomes may occur. First, the ethanol market would become Balkanized, since a producer would have strong incentives to either relocate its operations in the State of largest use, or sell only locally to avoid transportation and other penalties. This would interfere with the "maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce." *Healy*, 491 U.S. at 335-36. Second, there is a danger that inconsistent legislation, if adopted by sister states, would cause significant problems to the ethanol market. Ethanol producers and suppliers in any State would be hard-pressed to satisfy the requirements of 50 different LCFS regulations which may required 50 different levels of

1  reductions over 50 different time periods. Moreover, as amicus for the Plaintiffs point out, California's

2  regulation seeks to reach beyond its borders to interfere with those States' decisions related to their

3  individual electricity policies. "Generally speaking, the Commerce Clause protects against inconsistent

4  legislation arising from the projection of one state regulatory regime into the jurisdiction of another

5  State." *Healy*, 491 U.S. at 336. Based on these considerations, this Court concludes that the LCFS

6  impermissibly controls conduct outside of its borders.

### 3. Whether the LCFS serves a legitimate local purpose

8      Once a state law is shown to discriminate against interstate commerce "either on its face or in

9  practical effect," or to exercise extraterritorial control, the burden falls on the State to demonstrate *both*

10 that the statute "serves a legitimate local purpose," *and* that this purpose could not be served as well by

11 available nondiscriminatory means. *Hughes v. Oklahoma*, 441 U.S. at 336; *see also, e. g., Sporhase v.*

12 *Nebraska ex rel. Douglas*, 458 U.S. 941, 957 (1982); *Hunt v. Washington State Apple Advertising*

13 *Comm'n*, 432 U.S. 333, 353 (1977); *Dean Milk Co. v. Madison*, 340 U.S. 349, 354 (1951).

14     The Rocky Mountain Plaintiffs submit that the LCFS serves no local purpose. They point out

15 that the purported goal is to combat *global* climate change, which serves either a national or international

16 purpose, not a local purpose. The Rocky Mountain Plaintiffs contend that instead of focusing on local

17 GHG emissions, like smog in the Central Valley, the LCFS has a purpose and aim that is broader than

18 its territory.

19     Defendants argue that the LCFS serves the legitimate and local purpose to reduce the risks of

20 global warming. Defendants' correctly point out that in *Massachusetts v. EPA*, 549 U.S. 497 (2007),

21 the Supreme Court recognized that a state has a "well-founded desire to preserve its sovereign territory"

22 from the threats of rising seas and other impacts of global warming. *Id*. at 519, 522. "That these climate-

23 change risks are 'widely-shared' does not minimize [California's] interest" in reducing them. *Id*. at 522.

24     Significantly, in *Massachusetts v. EPA*, the Supreme Court held that states have standing to ask

25 the federal government to regulate GHG emissions. 549 U.S. 497. Nevertheless, the Court explained

26 in dicta that a state has a local and legitimate interest in reducing global warming. Based on this

27 authority, this Court finds that the LCFS serves a local and legitimate interest.

28 ///

1        **4.      Whether that purpose could be served through other nondiscriminatory means**

2        The final consideration in the strict scrutiny analysis is whether California has established that

3 the goal of reducing global warming cannot be adequately served by nondiscriminatory alternatives.

4 California has failed to establish this fact.  While this Court recognizes that the lifecycle analysis is a

5 widely-accepted approach nationally and internationally to reduce GHG emissions, Defendants have

6 failed to establish that they could not achieve this goal through other nondiscriminatory means.  The

7 Rocky Mountain Plaintiffs suggest several nondiscriminatory alternatives.  For example, an LCFS that

8 does not contain the discriminatory components may be effective in reducing GHG emissions.  In

9 addition, Defendants' expert concedes that California could "adopt a tax on fossil fuels" to "reduce

10 greenhouse gas emissions associated with California's transportation sector." Babcock Decl. ¶5.

11 Addressing another alternative–regulating only tailpipe GHG emissions in California–Defendants

12 speculate that it "may result in greater..emissions overall," though CARB stated that GHG emissions

13 could be reduced by "increasing vehicle efficiency" or "reducing the number of vehicle miles traveled."

14 FSOR at 74.  Although these approaches may be less desirable, for a number of reasons, Defendants

15 have failed to establish there are no nondiscriminatory means by which California could serve its

16 purpose of combating global warming through the reduction of GHG emissions. *See Dean Milk Co. v.*

17 *City of Madison*, 340 U.S. 349 (1951) (suggesting the use of national standards or expanding city

18 inspections to achieve health-motivated regulation).[7]

19        **5.      Conclusion**

20        Defendants and their amicus defend the use of lifecycle analysis as "internationally recognized,"

21 and the lifecycle factors to be "universally applied."   Defendants further suggest that the federal

22 government could permissibly use a lifecycle analysis approach in federal regulations on carbon

23 intensity.  This position highlights the Rocky Mountain Plaintiffs' challenge.  The dormant Commerce

24 Clause enshrines the principle that the federal government can regulate commerce in ways that the States

25 cannot. *See Prudential Ins. Co. v. Benjamin*, 38 U.S. 408, 43 (1946).   Undoubtedly, the federal

26

27            [7] The Rocky Mountain Plaintiffs further argue that the LCFS would not reduce GHG emissions and that any assertion that it would combat global warming is "mere speculation" and too tenuous. *See, e.g., Granholm v. Heald*, 544 U.S. 460 (2005) (striking down a law prohibiting the sale of wine out-of-state over the Internet to avoid underage drinking was "mere speculation" and too tenuous).  This Court does not reach this argument.

28

government may pass similar legislation if it choose.[8]   In passing the LCFS, however, California impermissibly treads into the province and powers of our federal government, reaches beyond its boundaries to regulate activity wholly outside of its borders, and offends the dormant Commerce Clause.

**II.     Preemption Claim**

    **A.     Introduction**

        Rocky Mountain plaintiffs argue that the LCFS stands as an obstacle to the accomplishment of the full purposes and objectives of Congress when it enacted EISA.  Rocky Mountain plaintiffs contend that EISA reflects Congress' judgment that:

> the production of transportation fuels from renewable energy would help the United states meet rapidly growing domestic and global energy demands, reduce the dependence of the United States on energy imported from volatile regions of the world that are politically unstable, stabilize the cost and availability of energy, and safeguard the economy and security of the United States.

Pub. L. 110-140 §806(a)(4), 121 Stat. 1492, 1722 (2007).  Rocky Mountain plaintiffs assert that Congress adopted EISA to serve two purposes: (1) to enhance energy independence and security and to protect pre-existing investment by mandating the use of renewable fuels, and is so mandating; (2) to help the United States contribute to global efforts to reduce GHG emissions.  To further those dual goals, Rocky Mountain plaintiffs contend that Congress struck a balance:  Biorefineries, including corn ethanol biorefineries, that were either in production, or had completed construction, at the time the provision was enacted were not required to comply with EISA's mandate to reduce GHG lifecycle emissions by 20%.  See 42 U.S.C. §7545(o)(2)(A)(i).  Rocky Mountain plaintiffs argue that the LCFS "disrupts Congress' balance by closing California to ethanol produced by more than 150 'grandfathered' biorefineries."  In addition, Rocky Mountain plaintiffs contend that the LCFS frustrates EISA's effectiveness.  Rocky Mountain plaintiffs point out that in this Court's Motion to Dismiss Order, this Court concluded that if Plaintiffs' factual allegations were assumed to be true, "implementation of California's LCFS would 'frustrate [] the full effectiveness of federal law." *Rocky Mountain Farmers Union*, 719 F. Supp. 2d 1170, 1195 (E.D. Cal. 2010) (quoting *Perez v. Campbell*, 402 U.S. 637, 652 (1971)).  Rocky Mountain plaintiffs maintain that because they rely on the statute, statutory history, and Defendants' own

---

[8]Indeed, the federal government has adopted a lifecycle analysis in its RFS2, part of which is the subject of Plaintiffs' preemption claim, discussed below.

1    statements regarding the LCFS, the undisputed evidence establishes that the LCFS frustrates the goals

2    and purposes of EISA and, therefore, is invalid.

3          Defendants oppose Rocky Mountain plaintiffs' motion on a number of grounds.  Defendants

4    argue first that Rocky Mountain plaintiffs lack standing to pursue their preemption claim.  Next,

5    Defendants argue that preemption requires clear Congressional intent to preempt California in the area

6    of air pollution, which does not exist.  Third, Defendants contend that the EPA's approval of E15 blends

7    fundamentally alters the landscape of plaintiffs' preemption claim.  Fourth, Defendants argue that

8    Plaintiffs produce no evidence of a conflict between the LCFS and RFS2.  Fifth, Defendants submit that

9    the Rocky Mountain plaintiffs cannot establish causation.  The Court considers the parties' arguments

10   in turn.

11   **B.     Standing**

12         Defendants argue that discovery has revealed that the Rocky Mountain plaintiffs lack standing

13   to pursue their preemption claim.  This Court's Article III jurisdiction"depends on the existence of a

14   'case or controversy.' " *GTE California, Inc. v. Federal Communications Commission*, 39 F.3d 940, 945

15   (9th Cir.1994).  "To enforce Article III's limitation of federal jurisdiction to 'cases and controversies,

16   Plaintiffs must demonstrate ... standing....' " *Nelson v. National Aeronautics and Space Admin.*, 530 F.3d

17   865, 873 (9th Cir.2008).  To satisfy the Constitution's standing requirement, "a plaintiff must show (1)

18   it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not

19   conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; (3)

20   and (3) it is likely, as opposed to merely speculative, that there injury will be redressed by a favorable

21   decision." *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs., Inc*., 528 U.S. 167, 180-81 (2000); *Lujan*

22   *v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *Nelson v. NASA*, 530 F.3d 865, 873 (9th Cir.2008).

23         As the parties seeking to invoke federal jurisdiction, Rocky Mountain plaintiffs bear the burden

24   of demonstrating that they have standing in this action.  *Lujan*, 504 U.S. at 561.  Rocky Mountain

25   plaintiffs must demonstrate standing "for each claim [they] seek[ ] to press" and for "each form of relief

26   sought." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (quoting *Laidlaw*, 528 U.S. at 185,

27   120 S.Ct. 693). "The plaintiff bears the burden of proof to establish standing 'with the manner and

28   degree of evidence required at the successive stages of the litigation.' " *Oregon v. Legal Servs. Corp*.,

552 F.3d 965, 969 (9th Cir.2009) (quoting *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130).  In addition to these Article III standing requirements, a federal court's exercise of jurisdiction is limited to prudential considerations. *Bennett v. Spear*, 520 U.S. 154, 162 (1997).

The Rocky Mountain plaintiffs represent groups that have an interest in protecting the corn ethanol industry.  Plaintiffs are corn growers (California and out-of-state farmers), users, merchants and marketers of distillers grain (a by-product created during the corn-to-ethanol process that is fed to cows), producers of corn ethanol, and importers of ethanol into California from other states.  This Court has described the Rocky Mountain plaintiffs in its Motion to Dismiss Order:

*"Farmer Plaintiffs"*

Rocky Mountain Farmers Union is a cooperative association representing family farmers and ranchers in Wyoming, Colorado, and New Mexico.  Its members include farmers who grow No. 2 corn for use in producing ethanol nationwide.

Redwood County Minnesota Corn and Soybean Growers is a not-for-profit corporation whose members, located in Redwood County, Minnesota, include farmers who grow No. 2 corn for use in producing ethanol nationwide.

Penny Newman Grain, Inc. ("Penny Newman") is a leading merchant in the market for grains and feed by-products in the southern San Joaquin Valley and worldwide. Penny Newman is headquartered in Fresno, California and has other offices in California and Tennessee and commodities handling and storage facilities in Hanford and Bakersfield.

Rex Nederend is a farmer and rancher who owns a dairy near Tipton, California and ranches near Wasco and Lemoore, California.  He purchases and uses distillers' grains at his dairy and he grows No. 2 corn that, when market conditions permit him to do so, he would attempt to sell to biorefineries for use in producing ethanol.

Fresno County Farm Bureau ("Farm Bureau") is a non-profit membership organization that advocates for farmers and farming interests in Fresno County.  Its members include corn growers who, when market conditions permit them to do so, would attempt to sell to biorefineries for use in producing ethanol.  Farm Bureau's members also include dairies that purchase and use distillers grains.

Nisei Farmers League ("Nisei") is an organization committed to serving the needs of California agriculture.  With over 1000 members, the organization is headquartered in Fresno, California.  Nisei members include corn growers located in Modesto and Tulare who, when conditions permit them to do so, would attempt to sell to biorefineries for use in producing ethanol.  Nisei's members also include dairies in Kings, Tulare, and Fresno counties that purchase and use distillers' grains.

California Dairy Campaign ("CDC") represents the views and interests of California Dairy Farmers.  Headquartered in Turlock, CDC has approximately 300 members.  Its members include dairy farms located in Madera, Kings, Fresno, Tulare, and Kern Counties that purchase and use distillers grains.  Because the milk price is heavily regulated, CDC members are sensitive to the prices of commodities.  CDC

1   members are concerned that the LCFS and its impact on gasoline prices will increase the costs of their inputs.

2   *"Corn Ethanol Industry Plaintiffs"*

3       Growth Energy in a non-profit corporation committed to the promise of agriculture and growing America's economy through cleaner, greener energy.  Formed in 2009, Growth Energy and its members include firms that produce ethanol in motor fuels sold in Fresno County and other partes of the state as well as companies who provide equipment and technology used to produce ethanol from corn.

6       Renewable Fuels Association is a trade association whose members include a broad cross-section of businesses, individuals, and organizations dedicated to the expansion of the fuel ethanol industry in the United States.  Its members include producers of ethanol for use in motor vehicle fuels sold in Fresno County and other parts of California; importers of ethanol into California from other states; growers of corn for use in the production of ethanol; and marketers of distillers grains and other feed co-products in California.

10  *Rocky Mountain Farmers Union*, 719 F.Supp.2d 1170, 1180 (E.D. Cal. 2010).

11      Defendants originally argued that this summary judgment motion should be denied as premature,

12  pursuant to Fed. R. Civ. P. 56(d), because the parties had not yet conducted discovery.  In response, this

13  Court allowed Defendants to conduct limited discovery on the issue of standing and to file a

14  supplemental opposition to this motion.  Some discovery was conducted.  Defendants sent out a set of

15  interrogatories and took the deposition of Robert Dinnen ("Mr. Dinnen"), Chief Executive Officer of,

16  and the Fed. R. Civ. P. 30(b)(6) person most knowledgeable for, plaintiff Renewable Fuels Association

17  ("RFA").  Defendants then filed a supplemental opposition to this motion, and renewed their Fed. R.

18  Civ. P. 56(d) motion to deny the motion as premature.

19      The limited discovery conducted on the Rocky Mountain plaintiffs produced limited results.

20  Defendants assert that in their responses to the interrogatories, the "farmer plaintiffs" filed only

21  objections, failing to identify a single plaintiff or plaintiff's member who had suffered economic injury.

22  The Rocky Mountain plaintiffs dispute this characterization, contending that after the objections were

23  filed, the farmer plaintiffs filed supplemental responses identifying injury.  The Rocky Mountain

24  plaintiffs provide no citation to, or quotations from, those responses.  Nevertheless, this Court's review

25  of these documents reveals that the farmer plaintiffs objected on a number of grounds to the

26  interrogatories.  In response to each interrogatory, the farmer plaintiffs explained that the question  was

27  "not reasonably calculated to lead to the discovery of admissible evidence, as these Responding Plaintiffs

28  are not fuel providers."  The farmer plaintiffs similarly responded to Defendants' requests for production

27

1    of documents.

2        As to the "industry plaintiffs," Defendants assert that both Growth Energy and RFA failed to

3    identify a single member who had suffered economic injury, claiming that as trade associations, they

4    cannot have this information.  RFA argues that it provided the information that it had in response to the

5    interrogatories.  RFA agrees that its status as a trade association precludes it from actively seeking out

6    such information from its members.  Moreover, RFA submits that it would have disclosed any such

7    information if RFA had any.  Growth Energy, on the other hand, provided a declaration from an outside

8    expert, Stuart Harden ("Mr. Harden"), who received and analyzed confidential business information

9    (provided direction from Growth Energy members, and not provided to other Growth Energy members,

10   officers, or staff) that identified harm to specific members of Growth Energy.  Growth energy also

11   provided from its files non-confidential analyses of the adverse impacts it projects the LCFS to have on

12   the U.S. corn ethanol producers in response to defendants' discovery requests.

13       The farmer plaintiffs have failed to carry their burden to establish that they have standing to

14   pursue the preemption claim.  While this Court does not expect the Rocky Mountain plaintiffs to provide

15   all documents necessary to establish standing as to the farmer plaintiffs, the Rocky Mountain plaintiffs

16   have a burden to establish standing "'with the manner and degree of evidence required at the successive

17   stages of the litigation.' " *Legal Servs. Corp*., 552 F.3d at 969(quoting *Lujan*, 504 U.S. at 561, 112 S.Ct.

18   2130).  At this stage, this Court allowed, and the parties conducted, limited discovery on the standing

19   issue.  Thus, as this stage of the litigation, the Rocky Mountain plaintiffs were required to submit some

20   evidence to establish standing.  Here, they provided none.

21       Although the LCFS regulates fuel providers, the farmer plaintiffs were not precluded from

22   asserting standing.  "When the plaintiff is not himself the object of the government action or inaction

23   he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish."

24   *Lujan*, 504 U.S. at 562 (quoting *Warth v. Seldin*, 422 U.S. 490, 505 (1975)).  The farmer plaintiffs could

25   have established standing.  The farmer plaintiffs could establish the injury in fact requirement by

26   showing that "absent the [LCFS], there is a substantial probability that they would [not be injured] and

27   that, if the court affords the relief requested, the [injury] would be removed." *Warth*, 422 U.S. at 504.

28   Through their interrogatories, Defendants asked the farmer plaintiffs whether the LCFS has caused or

1    will cause economic injuries to them or their members, including going out of business, losing profits,

2    losing market share, and being unable to obtain financing.  Although the questions were not limited to

3    fuel providers specifically, the farmer plaintiffs objected to those questions on the grounds that there

4    were not fuel providers.  In addition, although they bear the burden, the farmer plaintiffs provided no

5    evidence to establish standing in response to the Defendants standing challenge.  Indeed, the Rocky

6    Mountain plaintiffs appear to concede this point, as the reply papers focus exclusively on the alleged

7    harm to "grandfathered ethanol plants."  None of the farmer plaintiffs appears to be a grandfathered

8    ethanol plant.  Accordingly, this Court finds that the farmer plaintiffs lack standing to assert a

9    preemption claim.

10          The industry plaintiffs argue that they have individual and associational standing.  Growth

11   Energy and RFA argue that they LCFS indisputably regulates the GHG emissions their members, "most

12   of whom are grandfathered ethanol plants."  They argue that the LCFS imposes burdens and requires

13   conduct that would not be required in the absence of the regulation; it constrains and conditions

14   members' ability to sell corn ethanol to California refiners.  In addition, Growth Energy and RFA argue

15   that CARB assigns their members a CI score that cannot be altered unless the members affirmatively

16   prove to CARB that a far lower score should be assigned.  The industry plaintiffs submit that these facts

17   are "more than enough" to meet Article III's standing requirement of a concrete, particularized, and

18   actual or imminent injury.

19          The industry plaintiffs fail to establish that they have individual standing to pursue the

20   preemption claim.  The industry plaintiffs argue that they have standing because they are the "object of

21   the [government] action" at issue.  *Lujan*, 504 U.S. at 561.  They argue that "there is ordinarily little

22   question that the [government] action...has caused [the plaintiff] injury, and that a judgment

23   preventing...the [government] action will dress it.  *Id.* at 561-62.; *see also, United States v. City of*

24   *Arcata*, 629 F.3d 986, 989-90 (9th Cir. 2009) (finding standing where plaintiff was "target of the

25   challenged government action" and the challenged action "require[d plaintiffs] to alter their conduct."

26   The industry plaintiffs' own arguments, however, explain why they lack standing.  The industry plaintiffs

27   point out that their members–grandfathered ethanol plants-- are the target of the LCFS.  They also point

28   to the alleged harm to their members.  There is no evidence to suggest, however, that the associations

29

1   are targets of the LCFS.  And the industry plaintiffs failed to submit evidence that the association would

2   be injured.  Accordingly, the industry plaintiffs lack individual standing to raise the preemption claim.

3       "Even in the absence of injury to itself, an association may have standing solely as the

4   representative of its members." *Warth*, 422 U.S. at 511.  To establish associational standing, each

5   industry plaintiffs must establish the following three prongs: (1) its members would otherwise have

6   standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's

7   purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual

8   members in the lawsuit. *Hunt v. Washington Apple Advertising Commission*, 432 U.S. 333, 343 (1977).

9   Defendants challenge the industry plaintiffs' associational standing on multiple grounds.  Defendants

10  argue that the industry plaintiffs fail the first prong, because: (1) the associations have failed to

11  demonstrate that any of their members have suffered an injury in fact; and (2) even if evidence of actual

12  or imminent injury to a specific plant were introduced, plaintiffs would be unable to establish that the

13  LCFS caused any economic injury.  Defendants argue that the industry plaintiffs fail the third *Hunt*

14  prong, because the preemption claim requires the participation of individual members in the lawsuit.

15  The Court considers each argument.

16      The first prong requires the industry plaintiffs to establish the "irreducible constitutional

17  minimum" requirements of injury; namely that at least one of its members:

18      suffered an "injury in fact"–an invasion of a judicially cognizable interest which is (a)
        concrete and particularized and (b) actual or imminent, not conjectural or hypothetical;
19      (2) that there be a causal connection between the injury and the conduct complained
        of–the injury must be fairly traceable to the challenged action of the defendant, and not
20      the result of the independent action of some third part not before the court; and (3) that
        it be likely, as opposed to merely speculative, that the injury will be redressed by a
21      favorable decision.

22  *Bennett v. Spear*, 520 U.S. 154, 167 (1997).  To establish associational standing, the industry plaintiffs

23  must "submit affidavits...showing, through specific facts...that one or more of their members would...be

24  'directly affected' by the allegedly illegal activity." *Summers v. Earth Island Inst.*, 129 S.Ct. 1142, 1151-

25  52 (2009) (quoting *Lujan*, 504 U.S. 563).

26      Although the industry plaintiffs fail to point directly to the specific facts submitted that one or

27  more members of the association may qualify for standing in response to this motion, the Court notes

28  that the record as a whole contains affidavits that contain those facts.  For example, the declaration of

30

1   Stuart H. Harden ("Mr. Harden"), filed on November 1, 2010, in support of the Rocky Mountain

2   plaintiffs' preliminary injunction motion, concludes that "real and present harm to corn ethanol

3   producers in the Midwest as a result of the LCFS regulations can be demonstrated by the effects on fair

4   value of each of the plants noted herein."  Mr. Harden based his conclusion on confidential business

5   information–filed under seal–from 25 members of Growth Energy.  Similarly, the second declaration

6   of Robert Whiteman, filed under seal on May 12, 2011, identifies specific plants and the alleged injuries

7   suffered thereto based on the first quarter of the LCFS.  Based on these and other affidavits, this Court

8   is satisfied that the industry plaintiffs satisfy the first prong of the standing inquiry.

9        Next, the Court considers whether the industry plaintiffs establish the third *Hunt* prong; namely,

10   that "neither the claim asserted nor the relief requested requires the participation of individual members

11   in the lawsuit." 432 U.S. at 343.  Although the requested injunctive relief may not require the

12   participation of the individual members, the industry plaintiffs must also establish that the "claim

13   asserted" does not require the participation from individual members.  A claim asserted does not require

14   the participation from individual members if it "raises a pure question of law." *Int'l Union, United Auto.,*

15   *Aerospace, and Agricultural Implement Workers of Am. v. Brock*, 477 U.S. 274, 288 (1986).

16        Defendants assert that the industry plaintiffs fails to establish that their as-applied preemption

17   claim is a pure question of law.  Defendants argue that to establish their claim, Growth Energy and RFA

18   must offer evidence that demonstrates that the LCFS has unlawfully presented an obstacle to the

19   accomplishment of Congressional objectives expressed in RFS2. Plaintiffs argue that the LCFS presents

20   and obstacle to the Congressional objectives by "driving down the demand for grandfathered corn

21   ethanol." Defendants argue that to prove this alleged conflict, plaintiffs would be required to introduce

22   evidence of how the regulation affects competition in the ethanol industry, generally, and grandfathered"

23   plants, specifically.  Defendants submit that the industry plaintiffs failed to provide any information

24   about the impact of the LCFS on their members, including specified grandfathered members.

25        As to RFA, Defendants' arguments are meritorious.  RFA has no access to its members' business

26   information.  RFA failed to identify any of its members as a grandfathered ethanol plant.  In addition,

27   RFA failed to establish than any of its members suffered an injury in fact.  Thus, RFA would be unable

28   to establish, on its own, the claim asserted.  "Because [RFA] has not identified a single member who was

1  or would be injured by [the challenged action], it lacks standing to raise this challenge." *Chamber of*

2  *Commerce of the United States v. EPA*, 642 F.3d 192, 200 (D.C. Cir. 2011).

3          RFA's "flaw is inconsequential, however, because [RFA's co-plaintiff] ha identified allegedly

4  injured members." *Id.*  As discussed more fully above, the record demonstrates that Growth Energy has

5  submitted declarations that contain the information Defendants identified.  Defendants challenge both

6  Growth Energy and RFA, arguing: "Growth Energy and RFA are inappropriate plaintiffs here.  The need

7  for individualized proof is unavoidable in this case, yet their refuse to provide evidence on the key issues

8  requiring that proof."  Although  Growth  Energy  disappointingly  failed  to  submit or  cite these

9  declarations in this motion, these and other declarations are part of the record, having been filed to

10 support the concurrently-filed preliminary injunction motion.  Based on these facts, this Court finds that

11 Growth Energy established associational standing.

12     **C.     Substantive Challenges**

13         **1.     Applicable Law**

14          Rocky Mountain Plaintiffs argue that the LCFS is preempted by EISA, codified in relevant part

15 in Section 211(o), which modified the RFS2.  Under the U.S. Constitution's Supremacy Clause, the U.S.

16 Constitution and federal laws "shall be the supreme Law of the Land . . . any Thing in the Constitution

17 or Laws of any State to the Contrary notwithstanding."  U.S. Const. Art. VI, cl. 2.  Under the Supremacy

18 Clause, "Congress has the authority, when acting pursuant to its enumerated powers, to preempt state

19 and local law."  *Oxygenated Fuels*, 331 F.3d at 667.  When considering the scope of preemption, the

20 Court considers Congressional purpose, which is the "ultimate touchstone of preemption analysis."

21 *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541 (2001) (internal quotations omitted).

22          A "state law is invalid to the extent it 'actually conflicts with a . . . federal statute.'" *Int'l Paper*

23 *v. Ouellette*, 479 U.S. 481, 491-92 (1987).  Such a conflict can result in preemption where it is

24 impossible for a private party to comply with both the state and federal requirements.  *English v. Gen.*

25 *Elec. Co.*, 496 U.S. 72, 79 (1990). "Tension between federal and state law is not enough to establish

26 conflict preemption."  *Incalza v. Fendi North America, Inc.*, 479 F.3d 1005, 1010 (9th Cir. 2007).  A

27 court finds preemption only in "those situations where conflicts will necessarily arise."  *Goldstein v.*

28 *California*, 412 U.S. 546, 554, 93 S.Ct. 2303 (1973).  A "hypothetical conflict is not a sufficient basis

for preemption." *Total TV v. Palmer Communications, Inc.*, 69 F.3d 298, 304 (9th Cir. 1995). Conflict preemption can also be found where "the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Int'l Paper*, 479 U.S. at 491-92 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

## 2.    Standard of Review

In Defendants' separate summary judgment motion, Defendants assert that this Court must reject Plaintiffs' facial preemption challenge in toto if any provision of the LCFS can be valid under any set of circumstances. "A facial challenge to a [statute] is . . . the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the [statute] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). "In particular, a generally applicable statute is not facially invalid unless the statute 'can *never* be applied in a constitutional manner.'" *United States v. Kaczynski*, 551 F.3d 1120, 1124-25 (9th Cir. 2009) (quoting *Lanier v. City of Woodburn*, 518 F.3d 1147, 1150 (9th Cir. 2008) (drug testing policy not facially invalid because the challenger failed to provide a reason why the policy could not be constitutionally applied to applicants for certain types of jobs)) (emphasis in original).

In opposition, Plaintiffs relied on *Engine Mfrs. Ass'n v. South Coast Air Quality Management Dist.*, 498 F.3d 1031 (9th Cir. 2007), in which the Ninth Circuit reversed a district court's decision to find a set of regulations invalid in toto because at least one provision of the multi-faceted regulation was valid. According to *Engine Mfrs.*, however, this Court must employ several considerations to determine whether the LCFS is preemption. First, this Court must determine whether the LCFS is a regulation made up of multiple provisions or whether it is a single, unseverable provision. If the LCFS is made up of multiple provisions, then this Court must consider Plaintiffs' preemption challenge as to each provision offending provision separately. If, on the other hand, the LCFS is a single, unseverable provision, this Court must reject the LCFS in toto if the offending section of the LCFS conflicts with Section 211(o). The Ninth Circuit explained:

> Where a plaintiff challenges an enactment as prima facie invalid, *Salerno* requires the plaintiff to show that there can be no valid application of a particular challenged provision. However, *Salerno* does not require a plaintiff to show that every provision within a particular multifaceted enactment is invalid. When a statute contains unobjectionable provisions that are separable from those found to be unconstitutional,

1    a court reviewing the statute should maintain the statute is no far as it is valid.  In other
     words, some of the provisions might be facially invalid, and might not.

2

3    Each Fleet Rule contains multiple provisions, placing restrictions on specific lists of
     public or private entities.  Those provisions within the Rules that constitute state
     proprietary action are valid provisions, not valid applications of a single, unseverable
4    provision.

5    498 F.3d  at 1049-50 (emphasis in original) (internal quotations and citations omitted).  The Court then

6    remanded the action to the district court "to decide in the first instance whether the remaining provisions

7    of the [regulation] are preempted by the Clean Air Act." Id.

8        Neither party addresses this standard in their separate motions.  In their separate summary

9    judgment motion, Defendants failed to establish that the LCFS is valid in toto because some provisions

10   of the LCFS do not conflict with Section 211(o).  In this motion, Defendants fail to isolate the offending

11   portions of the LCFS.  Neither party addresses the issue of severability.  Neither party explains

12   sufficiently their position of whether the LCFS is a series of severable restrictions on dissimilar entities

13   or  single, integrated market-based compliance mechanism that applies to all fuel providers in the

14   California market.

15       In a footnote under the Commerce Clause challenge arguments, the Rocky Mountain Plaintiffs

16   assert that in Defendants' separate summary judgment motion, Defendants mischaracterize Rocky

17   Mountain Plaintiffs' "facial discrimination" claim as a "facial challenge."   A law is facially

18   discriminatory, as opposed to facially nondiscriminatory, when "it is not necessary to look beyond the

19   ext of this statute to determine that it discriminates against interstate commerce." *Camps*

20   *Newfoundland/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 575-76 (1997). A challenge is facial,

21   as opposed to as-applied, when the "claim and the relief that would follow...reach beyond the particular

22   circumstances" of the plaintiffs. *Doe v. Reed*, 130 S.Ct. 2811, 2817 (2010).

23       The characterization of the challenge is important to understand the appropriate standard of

24   review.  Defendants oppose the Rocky Mountains' facial discrimination claim under the Commerce

25   clause in this action, whereas they oppose Plaintiffs' "facial challenge" to the preemption claim in their

26   separate motion.  In this motion, Defendants oppose an "as applied" preemption challenge in opposition

27   to this motion.  The Rocky Mountain Plaintiffs fail to address whether their preemption challenge is

28   facial or as applied and make no attempt to set forth the applicable standard of revie w for either.  Thus,

1    the parties' arguments are, at times, like two ships passing in the night.

2         This Court cannot determine the merits of the preemption claim until the parties brief further the

3    standard of review.  For failing to set forth an applicable standard of review, the Rocky Mountain

4    Plaintiffs have failed to establish that they are entitled to judgment as a matter of law on this claim.

5    Accordingly, this Court DENIES without prejudice the Rocky Mountain Plaintiffs' summary judgment

6    motion related to its preemption claim.[9]

7                              **PRELIMINARY INJUNCTION MOTION**

8                                    **STANDARD OF REVIEW**

9         A "preliminary injunction is an extraordinary and drastic remedy." *Munaf v. Geren*, 128 S. Ct.

10   2207, 2219 (2008).  As such, the Court may only grant such relief "upon a clear showing that the

11   plaintiff is entitled to such relief."  *Winter v. Nat'l Res. Def. Council, Inc.*, 129 S.Ct. 365, 375 (2008).

12   To prevail, the moving party must show : (1) a likelihood of success on the merits; (2) a likelihood that

13   the moving party will suffer irreparable harm absent a preliminary injunction; (3) that the balance of

14   equities tips in the moving party's favor; and (4) than an injunction is in the public interest. *Id*. at 374.

15   In considering the four factors, the Court "must balance the competing claims of injury and must

16   consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 129

17   S.Ct. at 376 (quoting *Amoco Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531 542 (1987)); *Indep. Living*

18   *Ctr. of S. Cal., Inc. v. Maxwell-Jolly*, 572 F.3d 644, 651 (9th Cir. 2009).  Alternative, a "preliminary

19   injunction is appropriate when a plaintiff demonstrates…that serious questions going to the merits were

20   raised and the balance of hardships tips sharply in the plaintiff's favor." *Alliance for the Wild Rockies*

21   *v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011).

22                                       **DISCUSSION**

23                              **Likelihood of Success on Merits**

24        Pursuant to *Winter*, Plaintiffs must make a "clear showing" that they are "likely to succeed on

25   the merits." 129 S.Ct. at 375-76; *Stormans Inc. v. Selecky*, 571 F.3d 960, 978 (9th Cir. 2009).  For the

26

27        [9] Additionally, resolution of this issue, if re-filed, may require further briefing on the issue of its impact on the
     grandfathered ethanol plants in light of EPA's change from E10 to E15 during the pendency of this motion.
28

1   reasons set forth above, this Court found that the LCFS violates the Commerce Clause.  In addition, this

2   Court finds the Rocky Mountain Plaintiffs' preemption claim raises "serious questions" as to whether

3   the LCFS conflicts with Section 211(o) of the Clean Air Act.  Accordingly, this factor strongly favors

4   injunctive relief.

5                          **Irreparable Injury Absent an Injunction**

6           Next, the Court considers whether Plaintiffs will suffer irreparable injury absent an injunction.

7   "Preliminary injunctive relief is available only if plaintiffs 'demonstrate that irreparable injury is *likely*

8   in the absence of an injunction.'" *Johnson v. Couturier*, 572 F.3d 1067, 1081 (9th Cir. 2009) (quoting

9   *Winter*, 129 S.Ct. At 375) (noting that the Supreme Court in *Winter* rejected the Ninth Circuit's

10  "possibility of irreparable harm" test).  "Typically, monetary harm does not constitute irreparable harm."

11  *Cal Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 851 (9th Cir. 2009).  "Economic damages are

12  not traditionally considered irreparable because the injury *can later be remedied by a damage award*."

13  *Id*. at 852 (emphasis in original).  However, constitutional violations are presumptively irreparable.

14  Monterey Mech. Co. V. Wilson, 125 F.3d 702, 715 (9th Cir. 1997).  When "an alleged deprivation of

15  a constitutional right is involved, most courts hold that no further showing of irreparable injury is

16  necessary." 11A Wright, et al., Federal Practice & Procedure, 2948.1, pp. 160-61 (1995).  In addition,

17  Commerce Cause violations cause irreparable injuries and entitle a party to equitable relief.  See

18  American Liberty Ass'n v. Pataki, 969 F. Supp. 160, 168 (S.D.N.Y. 1997) (commerce clause).  Because

19  this Court found the LCFS to violate the Commerce Clause, the application of the LCFS to the Rocky

20  Mountain Plaintiffs would cause the irreparable Constitutional harm.  Accordingly, this factor strongly

21  favors injunctive relief.

22                          **Harm to Defendants/ Balance of Equities**

23          The purpose of a preliminary injunction is to preserve the status quo if the balance of equities

24  so heavily favors the moving party that justice requires the court to intervene to secure the positions until

25  the merits of the action are ultimately determined. *University of Texas v. Camenisch*, 451 U.S. 390, 395,

26  101 S.Ct. 1830 (1981).  According to Plaintiffs, "status quo" means the last uncontested status that

27  preceded the pending controversy. *See, GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th

28  Cir. 2000).  In this case, this Court cannot preserve the status quo, since the LCFS came into force on

36

1    January 1, 2011, after these motions were filed but before the parties finished briefing these motions and

2    before these motions were resolved.  Because the LCFS is incremental, however, this Court can preserve

3    the status quo to enjoin defendants from enforcing the LCFS further.

4        Defendants are concerned that failure to enforce the LCFS will harm the public by increasing

5    GHGs.  The Rocky Mountain Plaintiffs counter that those concerns are too attenuated within this

6    context.  In addition, the Rocky Mountain Plaintiffs submit that the LCFS will cause real, concrete harm

7    to the United States ethanol industry that tips the balance of equities in their favor.  This Court agrees.

8                                    **Public Interest**

9        As a final factor, the Court considers the public interest.  "In exercising their sound discretion,

10   courts of equity should pay particular regard for the public consequences in employing the extraordinary

11   remedy of injunction."  *Winter*, 129 S. Ct. at 376-77 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S.

12   305, 312 (1982)).  "The public interest analysis for the issuance of a preliminary injunction requires [the

13   Court] to consider whether there exists come critical public interest that would be injured by the grant

14   of preliminary relief."  *Indep. Living*, 572 F.3d at 659.  Here, the public has an interest in protecting

15   Constitutional rights.  That is, it is in the public interest to enjoin enforcement of a state regulation that

16   offends federal law.  California also argues that the public has an interest to enforce a regulation that

17   would reduce GHG emissions.  This Court agrees, but only if the enforcement is done legally.  Such is

18   not the case here.  Accordingly, this factor narrowly tips in favor of enforcement.

19                                    **Conclusion**

20       As set forth above, Plaintiffs make a "clear showing" that they are likely to succeed on the merits

21   of dormant Commerce Clause claim and their preemption claim raises "serious questions"as to whether

22   the LCFS conflicts with Section 211(o) of the Clean Air Act.  In addition, the Rocky Mountain Plaintiffs

23   establish that they are suffering irreparable harm.  Having considered the public's interest, the balance

24   of equities, and other relevant factors, and for the reasons set forth above, this Court grants the Rocky

25   Mountain Plaintiffs' preliminary injunction motion.

26                              **CONCLUSION AND ORDER**

27       For the foregoing reasons, this Court:

28       1.        GRANTS judgment in favor of the Rocky Mountain Plaintiffs and DENIES Defendants'

summary judgment motion on the Rocky Mountain Plaintiffs' dormant Commerce Clause claim.   Using a strict scrutiny analysis, this Court finds that the LCFS discriminates against out-of-state corn-derived ethanol while favoring in-state corn ethanol and impermissibly regulates extraterritorial conduct.   In addition, Defendants have failed to establish that there are no alternative methods to advance its goals of reducing GHG emissions to combat global warming;

2.     DENIES judgment without prejudice on the Rocky Mountain Plaintiffs' preemption claim for failure to address the standard of review;

3.     DENIES as moot Defendants' Fed. R. Civ. P. 56(d) motion, because this Court does not reach the subject of that motion;

4.     GRANTS the Rocky Mountain Plaintiffs motion for a preliminary injunction;

5.     ENJOINS Defendants from further enforcing the LCFS during the pendency of this litigation; and

6.     CERTIFIES judgment on Plaintiffs' dormant Commerce Clause claim pursuant to Fed. R. Civ. P. 54(b), even though there is an outstanding claim for relief based on the claim of preemption.   Because the LCFS is unenforceable in that it violates the Commerce Clause, there is no just reason for delay in these proceedings; and

7.     DIRECTS the clerk of court to enter judgment in favor of the Rocky Mountain Plaintiffs and against Defendants on the Plaintiffs' dormant Commerce Clause claim.

IT IS SO ORDERED.

**Dated:    December 29, 2011            /s/ Lawrence J. O'Neill         **
                                   UNITED STATES DISTRICT JUDGE