1    **IN THE UNITED STATES DISTRICT COURT**

2    **FOR THE EASTERN DISTRICT OF CALIFORNIA**

3

4    ROCKY MOUNTAIN FARMERS UNION,          CASE NO. CV-F-09-2234 LJO DLB
     REDWOOD COUNTY MINNESOTA CORN
5    AND SOYBEAN GROWERS, PENNY
     NEWMAN GRAIN, INC., GROWTH ENERGY,     **ORDER ON NPRA PLAINTIFFS'**
6    RENEWABLE FUELS ASSOCIATION, REX       **SUMMARY ADJUDICATION MOTION**
     NEDEREND, FRESNO COUNTY FARM           (Doc. 125)
7    BUREAU, NISEI FARMERS LEAGUE, and
     CALIFORNIA DAIRY CAMPAIGN,
8
                    Plaintiffs,
9            vs.

10   JAMES N. GOLDSTENE, Executive Officer
     of the California Air Resources Board,
11
                    Defendant.
12   _____

13   *consolidated with*

14   NATIONAL PETROCHEMICAL &              CASE NO. CV-F-10-163 LJO DLB
     REFINERS ASSOCIATION, AMERICAN
15   TRUCKING ASSOCIATIONS, CENTER         **ORDER ON NPRA PLAINTIFFS**
     FOR NORTH AMERICAN ENERGY             **SUMMARY ADJUDICATION MOTION**
16   SECURITY, and THE CONSUMER            (Doc. 125)
     ENERGY ALLIANCE,
17
                    Plaintiffs,
18
             vs.
19
     JAMES GOLDSTENE, Executive Officer
20   of the California Air Resources Board,
     MARY D. NICHOLS, DANIEL SPERLING,
21   KEN YEAGER, DORENE D'ADAMO,
     BARBARA RIORDAN, JOHN R. BALMES,
22   LYDIA H. KENNARD, SANDRA BERG,
     RON ROBERTS, RONALD O.
23   LOVERIDGE, member of the California
     Air Resources Board; ARNOLD
24   SCHWARZENEGGER, Governor of the
     state of California, and EDMUND BROWN,
25   Attorney General of the state of California,

26                  Defendants.
     _____/
27
     and related intervenor actions and amici.
28   _____/

                                    1

**INTRODUCTION**

Plaintiffs National Petrochemical & Refiners Association, American Trucking Associations , the Center for North American Energy Security, and the Consumer Energy Alliance (collectively "Plaintiffs" or "National Petrochemical Plaintiffs") move for summary adjudication pursuant to Fed. R. Civ. P. 56 that the California's Low Carbon Fuel Standard, Cal. Code Regs. tit. 17. §§95480-95490 ("LCFS"), regulations promulgated by defendant California Air Resource Board ("CARB")[1] to implement provisions of California Assembly Bill 32 ("AB 32"), California's Global Warming Solutions Act of 2006, Cal. Health & Saf. Code, §38500 et seq., is unconstitutional.[2]  In this summary adjudication motion, the National Petrochemical Plaintiffs contend that the LCFS violates the dormant Commerce Clause because it: (1) impermissibly discriminates  in favor of California corn ethanol and against Midwest corn ethanol; (2) impermissibly discriminates in favor of California crude oil and against crude oils from outside of California; and (3) impermissibly regulates interstate and foreign commerce based on a fuel's "pathway," –i.e., its production and transport–that occurs outside of California.

Defendants oppose this motion by arguing that the LCFS applies evenhandedly to all ethanol pathways, does not discriminate in the crude oil market, and does not regulate extraterritorial activity directly.[3] In addition, Defendants contend that certain arguments are unripe for adjudication.

Having considered the parties' arguments and relevant legal authority, this Court finds that the LCFS discriminates against out-of-state and foreign crude oil while giving an economic advantage to in-state crude oil.  As explained in a separate order on the subject, this Court further agrees with the National Petrochemical Plaintiffs that the LCFS discriminates against out-of-state corn ethanol and

---

[1] Collectively, defendants are James N. Goldstene, in his official capacity as Executive Director of the California Resources Board ("CARB"); Mary D. Nichols, Daniel Sperling, Ken Yeager, Dorene D'Adamo, Barbara Riordan, John R. Balmes, Lydia H. Kennard, Sandra Berg, Ron Roberts, John G. Telles, and Ronald O. Loveridge, in their official capacities as members of CARB; Arnold Schwarzenegger, in his official capacity as Governor of the State of California, and Edmund G. Brown, Jr., in his official capacity as California Attorney General.   Defendants shall be referred to collectively as "Defendants" or "CARB."

[2] National Petrochemical Plaintiffs also claim that the LCFS is preempted by federal law.  The National Petrochemical Plaintiffs do not address their preemption claim in this motion.

[3] Defendants separately move for summary judgment, arguing that 42 U.S.C. §7545(c)(4)(B) ("Section 211(c)(4)(B)") authorizes California to violate the dormant Commerce Clause.  This Court rejects this notion in a separate order.

1   impermissibly controls extraterritorial conduct.   Moreover, Defendants fail to establish that no

2   alternative means exist to address their legitimate concerns of combating global warming.  Because the

3   LCFS discriminates against interstate and foreign commerce, and because Defendants failed to satisfy

4   their burden to establish the absence of adequate alternatives, this Court finds that the LCFS violates the

5   dormant Commerce Clause.  Accordingly, this Court GRANTS the National Petrochemical Plaintiffs'

6   summary adjudication motion.

7                                           **BACKGROUND**

8                                           **Introduction**

9        In enacting the Global Warming Solutions Act of 2006, AB 32, the California Legislature found,

10  *inter alia*: "Global warming poses a serious threat to the economic well-being, public health, natural

11  resources, and the environment of California." Cal. Health & Saf. Code, §38501.  AB 32 set the goal of

12  reducing green house gas ("GHG") emissions in California to 1990 levels by the year 2020.  To attain

13  these goals, AB 32 charged CARB to develop and implement regulations in a number of areas.

14       In January 2007, California's Governor issued Executive Order S-01-07 ("Executive Order"),

15  setting a statewide goal to "reduce the carbon intensity of California's transportation fuels by at least 10

16  percent by 2020."  In the Executive Order, the Governor called on CARB to "determine if [a low carbon

17  fuel standard] can be adopted as a discrete early action measure pursuant to AB 32." *Id*.  In June 2007,

18  CARB adopted the LCFS as an early action measure.  Public workshops on the issue, formal rulemaking

19  procedures following, culminated in the final adoption of the regulation in April 2010.  Cal. Code Regs.

20  tit. 17, §§95480-95490.  Plaintiffs challenge the LCFS regulations in this action.

21                                           **LCFS**

22       The purpose of the LCFS is "to implement a low carbon fuel standard, which will reduce

23  greenhouse gas emissions by reducing the full fuel-cycle, carbon intensity of the transportation fuel used

24  in California."  LCFS §95480.  The LCFS was "designed to reduce California's dependence on

25  petroleum" and "to stimulate and the production and use of alternative, low-carbon fuels in California."

26  CARB, *Final Statement of Reasons* ("FSOR") at 457; FSOR at 461 ("One of the key advantages of the

27  LCFS...is that it reduces our dependence on foreign oil.").  In preparing the LCFS, CARB identified

28  several "impacts" the regulation would have, including:

                                            3

1   Biofuels will displace some percent of petroleum-based transportation fuels.

2   ***

3   Reducing the volume of transportation fuels that are imported from other states will reduce foreign imports of oil into the U.S.

4   ***

5

6   The biorefineries to be built in the States will provide needed employment, an increased tax base for the States, and value added to the biomass used as feedstock. These benefits will be more important in rural areas of the State that are short on employment but rich in natural resources.

7

8   Displacing important transportation fuels with biofuels produced in the State keeps more money in the States.

9

10   FSOR 479.  CARB estimated that under the LCFS, "[u]p to eighteen cellulosic ethanol and six corn

11   ethanol plants could be built [in California] by 2020 with a total annual capacity of 1.2 billion gallons."

12   FSOR at 419.  "The estimated capital investment for these new businesses is approximately $8.5

13   billion..." FSOR at 420.  CARB estimates that the LCFS will reduce emissions from the transportation

14   sector by about 16 million metric tons in 2020. CARB, *Initial Statement of Reasons* ("ISOR") at ES-1.

15   The LCFS regulates transportation fuels that are "sold, supplied, or offered for sale in California"

16   and "any person, who as a regulated party...is responsible for a transportation fuel in a calendar year."

17   LCFS §95480.1(a).  California's LCFS focuses on the "carbon intensity" of fuels to estimate emissions

18   related to a fuel's lifecycle, including GHGs emitted when the fuel is extracted, refined, and transported

19   to California.  It establishes different standards for gasoline and diesel fuels, and provides for a gradual

20   implementation of the fuel standards for both, with a goal to reduce the carbon intensity of fuel by 10%

21   by the year 2020.  *See* LCFS §95482(b), (c).  The LCFS requires providers to comply with reporting

22   requirements which obligate them to identify for fuels sold or imported into California, the type of fuels,

23   whether the fuel is blended, and the fuel's production process.  Providers are required to calculate the

24   "carbon intensity" of each fuel component.  Reductions in the average carbon intensity were mandated

25   to begin in 2011, with the reduction requirement increasing through the year 2020.  Fuel providers may

26   meet carbon intensity standards by blending low-carbon ethanol into gasoline or buying credits generated

27   from another fuel provider that has credits.

28   ///

4

**Carbon Intensity**

"Carbon intensity is not an inherent chemical property of a fuel, but rather it is a reflective of the process in making, distributing, and using that fuel." FSOR at 951. The "LCFS contains no requirements that dictate the exact composition of compliant transportation fuels." FSOR at 442. The LCFS does "not set[] a fuel standard," and it does not "establish any motor-vehicle specifications." FSOR at 439, 442.

> A gallon of ethanol made from corn grown and processed in the Midwest will, under a microscope or other analytical device, look identical in every material way to a gallon of ethanol processed from sugar cane grown in Brazil. Both samples of ethanol will have the same boiling point, the same molecular composition, the same lower and upper limits of flammability–in other words, both will have identical physical and chemical properties because both products consist of 100% ethanol. On the other hand, corn ethanol from the Midwest will have different carbon intensity than the sugar cane ethanol from Brazil.

ISOR V-30.

Carbon intensity is defined as "the amount of lifecycle greenhouse gas emissions, per unit of energy of fuel delivered, expressed in grams of carbon dioxide per megajoule. LCFS §95481(a)(11). "Lifecycle greenhouse gas emissions" are defined as the:

> aggregate quantity of greenhouse gas emissions (including direct emissions and significant indirect emissions such as significant emissions from land use changes), as determined by the Executive Officer, related to the full fuel lifecycle, including all stages of fuel and feedstock production and distribution, from feedstock generation or extraction through the distribution and delivery and use of the finished fuel to the ultimate consumer, where the mass values for all greenhouse gases are adjusted to account for their relative global warming potential.

LCFS §95481(a)(28). The lifecycle analysis "includ[es] all stages of fuel and feedstock production and distribution, from feedstock generation or extraction through the distribution and delivery and use of finished fuel to the ultimate consumer." LCFS §95481(a)(28). In short, carbon intensity is an estimate of emissions related to a fuel's lifecycle that focuses on GHGs emitted when the transportation fuel is extracted, refined, and transported to California.

**CARB-Assigned Corn Ethanol Carbon Intensity Values**

The LCFS has assigned carbon intensity scores for gasoline and gasoline substitutes, embodied in the Table 6 of LCFS §95486(b), titled "Carbon Intensity Lookup Table for Gasoline and Fuels that Substitute for Gasoline" ("Table 6"). CARB, through Table 6, assigns different carbon intensity scores to different gasoline and gasoline substitutes, including gasoline, ethanol from corn, ethanol from

1  sugarcane, compressed natural gas, liquified natural gas, electricity, and hydrogen.   These carbon

2  intensity values set a 2010 baseline carbon intensity value to each of the fuels and pathways.  Within the

3  "ethanol from corn" section, more than a dozen "pathways" are identified, each assigned a carbon

4  intensity value.  Numerous distinctions are drawn among different categories of corn ethanol producers.

5      Plaintiffs argue that the LCFS discriminates against out-of-state ethanol producers on its face,

6  because the LCFS assigns more favorable carbon intensity values to California corn-derived ethanol than

7  to Midwest corn-derived ethanol.  The relevant section of Table 6 assigns the following values to the

8  different corn-ethanol pathways:

| Pathway Description | Carbon Intensity Values (gCO2e/MJ) | | |
|---|---|---|---|
| | Direct Emissions | Land Use or Other Indirect Effect | Total |
| Midwest Average; 80% Dry Mill; 20% Wet Mill; Dry DGS | 69.40 | 30 | 99.40 |
| California average; 80% Midwest Average; 20 % California, Dry Mill; Wet DGS; NG | 65.66 | 30 | 95.66 |
| California; Dry Mill; Wet SGS; NG | 50.70 | 30 | 80.70 |
| Midwest; Dry Mill; Dry DGS, NG | 68.40 | 30 | 98.40 |
| Midwest; Wet Mill, 60% NG, 40% Coal | 75.10 | 30 | 105.10 |
| Midwest; Wet Mill, 100% NG | 64.52 | 30 | 94.52 |
| Midwest; Wet Mill, 100% Coal | 90.99 | 30 | 120.99 |
| Midwest; Dry Mill, Wet, DGS | 60.10 | 30 | 90.10 |
| California; Dry Mill; Dry DGS, NG | 58.90 | 30 | 88.90 |
| Midwest; Dry Mill; Dry DGS, 80% NG; 20% Biomass | 63.60 | 30 | 93.60 |
| Midwest; Dry Mill, Dry DGS; 80% NG; 20% Biomass | 56.80 | 30 | 86.80 |
| California; Dry Mill, Dry DGS; 80% NG; 20% Biomass | 54.20 | 30 | 84.20 |
| California; Dry Mill; Wet DGS; 80% NG; 20% Biomass | 47.44 | 30 | 77.44 |

The LCFS assigns carbon intensity scores for corn ethanol based on the "location of the production

facility (California or Midwest)," the "type of corn milling (wet or dry)," the "type of distillers grains

produced (wet or dry), and the "source of fuel for heat energy and co-generated electrical power (natural

gas, coal, biomass)." FSOR at 508.  Plaintiffs contend that Table 6 impermissibly discriminates against

Midwest corn ethanol producers and favors California corn ethanol producers.  From Table 6, Plaintiffs

derive the following table:

**Carbon Intensities Assigned to Midwest and California Corn Ethanol**

| Fuel | Fuel Pathway | Assigned Total Carbon Intensity (gCO2e/MJ) | Difference Between Carbon Intensities for Midwest and California Corn Ethanol (gCO2e/MJ) |
|---|---|---|---|
| Corn Ethanol | 1. Midwest; Dry Mill; Dry DGS; NG | 98.40 | 9.50 |
| | 1a. California; Dry Mill; Dry DGS; NG | 88.90 | -- |
| | 2.  Midwest; Dry Mill; Wet DGS; NG | 90.10 | 9.40 |
| | 2a.  California; Dry Mill; Wet DGS; NG | 80.70 | -- |
| | 3.  Midwest; Dry Mill; Wet DGS; 80% NG; 20% Biomass | 86.80 | 9.36 |
| | 3a.  California; Dry Mill; Wet DGS; 80% NG; 20% Biomass | 77.44 | -- |

From this data, Plaintiffs point out that the LCFS assigns Midwest ethanol over 10% higher carbon

intensity over its California ethanol counterpart.  For example, Midwest; Dry Mill; Dry DGS; NG is

assigned a carbon intensity score of 98.40 gCO2e/MJ, whereas California; Dry Mill; Dry DGS, NG has

a score of 88.90 gCO2e/MJ.  The difference–9.50 gCO2e/MJ–is more than 10% of the value of the

California fuel's assigned carbon intensity. Similar differences appear for the Dry Mill; Wet DGS; NG

pathway and the Dry Mill; Wet DGS; 80% NG; 20% Biomass corn-derived ethanol pathway.

CARB attributes the difference in carbon intensity values to multiple factors, including

7

1 differences in GHG emissions in transportation and electricity sources. *See* FSOR at 713 ("The carbon

2 intensities of some California-produced fuels do benefit from shorter transportation distances and lower

3 carbon intensity electricity sources."). CARB considers GHG emissions from California inherently

4 lower than Midwest ethanol based on transportation of Midwest ethanol to California. *See* FSOR at 521

5 (Carbon intensity values "included [GHG] emissions associated with transporting ethanol from the

6 Midwest to California."). CARB further assumes that California corn ethanol producers have better

7 access to electricity produced from hydropower and nuclear power plants than Midwestern corn ethanol

8 producers, will be at least as efficient as Midwestern producers in the use of comparable electricity

9 sources, and will not use coal in their processes. *See* FSOR at 602 ("California biorefineries do not use

10 coal in their operation."); FSOR at 521 (CARB does not "expect ethanol produced using coal power to

11 be used in California under the LCFS.").

12                           **Customized Carbon Intensity Values and Pathways**

13          In addition to the default assigned values contained in Table 6, CARB provides two methods for

14 a facility to apply for a customized total carbon intensity value. *See* LCFS §§95486(c), (d). Under these

15 mechanisms–named Method 2A and Method 2B in the LCFS–a facility may show that it has more

16 efficient equipment or uses cleaner electricity to gain an individualized carbon intensity value. Under

17 these methods, a facility may also propose its own pathway. "Producers whose energy use data are

18 different from the values used in the development of the fuel pathways or producers whose process

19 deviates substantially from that of the pathways represented in [Table 6] can propose their own pathways

20 according to Methods 2A and 2B." FSOR at 508.

21          CARB submits that to date, 44 Midwest corn ethanol facilities have registered for pathways in

22 Table 6, with 25 indicating that they can produce ethanol lower than the 2010 baseline assigned in Table

23 6. Five Midwest corn ethanol facilities have applied under Method 2A and Method 2B, with a total of

24 22 pathways, all of which tentatively have been granted a rating lower than the value for the 2010

25 baseline for that pathway. Moreover, to date, three facilities that are Midwest; Dry Mill, Dry DGS, NG

26 have applied under Method 2A for an individualized carbon intensity value, and tentatively have been

27 given a value lower than the 2010 baseline for California gasoline.

28 ///

**Crude Oil Carbon Intensity Values**

California's LCFS also regulates crude oil through the assignment of carbon intensity values. The system of determining CI values for crude oil differs from the CI determination of ethanol. CARB asserts that the crude oil methodology was designed to ensure that GHG emissions from petroleum-based fuels do not increase dramatically under the LCFS and that emissions reductions would come from increased use of lower carbon alternative fuels. Under the LCFS, no credits can be generated from crude oil-derived fuels since they are all assigned the CARBOB[4] CI value or higher.

CARB submits that determination of crude oil's carbon intensity under the LCFS depends on two factors, neither of which depends on location. First, the LCFS considers whether the crude oil is a high carbon intensity crude oil ("HCICO"). An HCICO is defined as a crude oil with a CI value for extraction and transportation grater than 15.00 gCO2e/MJ. Scheible Decl., ¶95. HCICOs generate nearly twice as many emissions as the baseline average CI from extraction and transportation, according to CARB. Scheible Decl., ¶¶94-95.

If the crude oil is an HCICO, then the LCFS differentiates based on whether it is an "emerging fuel" or an "existing crude source." "The LCFS differentiates between crude oil sources that were used in significant quantities in California in 2006 (e.g. 'included in the 2006 California baseline crude mix') and those crude sources that were not used in significant quantities in 2006." FSOR at 233. "The two percent threshold is designed to differentiate established crude sources that made up a significant fraction of the California crude oil supply in 2006 from potential emerging crude sources that could be a significant part of the crude supply in the future[.]" FSOR at 24. Crude oils that made up less than 2% of the 2006 baseline crude mix are classified as "emerging crude sources." FSOR at 24. Those crude oil sources that made up more of the 2% California crude market in 2006 are "existing crude sources."

The LCFS requires emerging crude sources to be "evaluated individually" "to ensure that increased use of 'high carbon intensity crude oil' production methods are accurately accounted for within the regulation." FSOR at 235. Parties seeking to introduce HCICOs from outside California–from sources such as Canada or Venezuela–are required to demonstrate "that the carbon intensity for crude

_____

[4]CARBOB is California's reformulated gasoline blendstock for oxygenate blending. It is the feedstock to which ethanol is added to produce gasoline.

9

production and transport has been reduced to no more than 15.00 gCO2e/MJ–through technologies such as carbon capture and sequestration." FSOR at 24; LCFS §95486(b)(2)(A)(2)(a)(ii). If a regulated party meets that burden, then the HCICO "would qualify for the default carbon intensity values based on overall averages." FSOR at 24. If not, then "the actual carbon intensity from production and transport of the crude would have to be used." *Id*. Plaintiffs note that California crude oil produced using thermal enhanced oil recovery processes ("TEOR") is the only HCICO that "qualifies for the default average carbon intensity values." FSOR at 22.

By contrast, existing HCICOs–and all other existing crude sources that were within the 2006 California baseline mix–are assigned a single average baseline CI value. LCFS §95486(b)(2)(A); FSOR at 23. Under the LCFS, "regulated parties must use these single carbon intensity values for all California CARBOB and diesel fuel regardless of the actual carbon intensity of producing or transporting the specific crude oil use, or the specific refinery operations." FSOR at 23; *see also*, LCFS §95486(b)(2)(A)(1).

Under this regime, Defendants admit that the use of new sources of HCICO would produce deficits, making it unlikely that California will see a significant increase in new HCICO use. According to Defendants, the LCFS was designed to discourage emerging HCICO use, since an increase in HCICOs would be counterproductive to the LCFS' objectives to reduce GHG emissions. Scheible Decl., ¶¶88-98. Credits must come from lower carbon alternatives to petroleum, the development of which is the primary objective of the LCFS. *Id.*

The National Petrochemical Plaintiffs argue that the LCFS treats crude oil from California more favorably than crude oil from outside of California in two respects. First, Plaintiffs argue that the LCFS discriminates against emerging crude sources of HCICO by treating them less favorably than HCICO from California. Second, the LCFS requires that all existing crude sources be assigned the same carbon intensity value even though, according to Defendants, HCICO from California has a higher carbon intensity than other low carbon intensity crude oils from Alaska and foreign countries. In both cases, the National Petrochemical Plaintiffs submit, the LCFS provides less favorable treatment for crude oils from outside California and from foreign countries.

///

10

1    **JUDICIAL NOTICE, OBJECTIONS, AND CONSIDERATION OF EVIDENCE AND ARGUMENTS**

2    In addition to the pending motion, the parties have submitted requests for judicial notice,

3    objections to evidence submitted, motions to strike, and other miscellany.  Moreover, this Court has

4    received multiple amici curiae briefs.  This Court carefully reviewed and considered the record,

5    including all evidence, arguments, points and authorities, declarations, testimony, statements of

6    undisputed facts and responses thereto, objections and other papers filed by the parties.  Omission of

7    reference to evidence, an argument, document, objection or paper is not to be construed to the effect that

8    this Court did not consider the evidence, argument, document, objection or paper.  This Court thoroughly

9    reviewed, considered and applied the evidence it deemed admissible, material and appropriate for

10   summary judgment.  This Court does not rule on objections in a summary judgment context, unless

11   otherwise noted.

12   Moreover, this Court will not address the request for judicial notice specifically, but notes the

13   following applicable standards.  To be judicially noticeable, a fact must not be subject to a reasonable

14   dispute because it must be either generally known within the territorial jurisdiction of the court or

15   "capable of accurate and ready determination by sources whose accuracy cannot reasonably be

16   questioned." Fed. R. Evid. 201.  "Judicial notice is appropriate for records and reports of administrative

17   bodies." *United States v. 14.02 Acres of Land More or Less in Fresno County*, 547 F.3d 943, 955 (9th

18   Cir. 2008).  This Court may not take judicial notice, however, of documents filed with an administrative

19   agency to prove the truth of the contents of the documents. The comments made by third parties that are

20   included in the ISOR or FSOR are subject to hearsay objections, and do not rise to the "high degree of

21   indisputability" required for judicial notice for their truth. *Jespersen v. Harrah's Operating Co.*, 444

22   F.3d 1104, 1110 (9th Cir. 2006) (citing Fed. R. Evid. 201 advisory committee's note).  If cited, these

23   statements may be considered for their existence, but not their truth.  *Id*.  In addition, this Court takes

24   judicial notice of public records not subject to reasonable dispute.  *See Hennessy v. Penril Datacomm

25   Networks, Inc.*, 69 F.3d 1344, 1354-55 (7th Cir. 1995) (court properly refused to take judicial notice of

26   corporation's SEC form to determine disputed fact because "its contents were subject to dispute").

27   While this Court may take judicial notice of the legislative histories, the statements contained therein

28   may be subject to dispute.

1                                    **STANDARD OF REVIEW**

2          Fed. R. Civ. P. 56 permits a "party against whom relief is sought" to seek "summary judgment

3   on all or part of the claim."   In a summary judgment motion, a court must decide whether there is a

4   "genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *see also, Adickes v. S.H. Kress & Co.*, 398

5   U.S. 144, 157 (1970).   A party seeking summary judgment/adjudication bears the initial burden of

6   establishing the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317,

7   323 (1986).   The moving party may satisfy this burden in two ways: (1) by presenting evidence that

8   negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving

9   party failed to make a showing of sufficient evidence to establish an essential element of the nonmoving

10  party's claim, and on which the non-moving party bears the burden of proof at trial. *Id*. at 322.  "The

11  judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and

12  any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled

13  to judgment as a matter of law." Fed. R. Civ. P. 56(c).  "If the party moving for summary judgment

14  meets its initial burden of identifying for the court those portions of the material on file that it believes

15  demonstrates the absence of any genuine issues of material fact," the burden of production shifts and the

16  nonmoving party must set forth "specific facts showing that there is a genuine issue for trial." *T.W. Elec.*

17  *Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quoting Fed. R. Civ.

18  P. 56(e)).

19          To establish the existence of a factual dispute, the opposing party need not establish a material

20  issue of fact conclusively in its favor, but "must do more than simply show that there is some

21  metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

22  574 at 587 (1986).  It is sufficient that "the claimed factual dispute be shown to require a jury or judge

23  to resolve the parties' differing versions of the truth at trial."  *First National Bank of Arizona v. Cities*

24  *Serv. Co*., 391 U.S. 253, 289 (1968); *T.W. Elec. Serv.*, 809 F.2d at 631.  The nonmoving party must "go

25  beyond the pleadings and by her own affidavits, or by depositions, answer to interrogatories, and

26  admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477

27  U.S. at 324. Fed. R. Civ. P. 56(e) requires a party opposing summary judgment to "set out specific facts

28  showing that there is a genuine issue for trial."  "In the absence of specific facts, as opposed to

                                                   12

allegations, showing the existence of a genuine issue for trial, a properly supported summary judgment motion will be granted." *Nilsson, Robbins, et al. v. Louisiana Hydrolec*, 854 F.2d 1538, 1545 (9th Cir. 1988).

#### DISCUSSION

The dormant Commerce Clause "directly limits the power of the States to discriminate against interstate commerce." *Wyoming v. Oklahoma*, 502 U.S. 437, 454 (1992); *NCAA v. Miller*, 10 F.3d at 633, 638 (9th Cir. 1993). "Discrimination simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 333 (2007). "The Commerce Clause...is in its negative aspect...a limitation on the regulatory authority of the states. Thus, although a state has power to regulate commercial matters of local concern, a state's regulations violate the Commerce Clause if they are discriminatory in nature or impose an undue burden on interstate commerce." *Shamrock Farms Co. v. Veneman*, 146 F.3d 1177, 1179 (9th Cir. 1998) (citations and internal quotations omitted).

**A.     Whether LCFS is Subject to Commerce Clause Challenge**

Defendants contend that the LCFS is not subject to Commerce Clause challenge. This Court addresses Defendants' arguments by separate order. In short, this Court concluded Section 211(c)(4)(B) of the Clean Air Act provides no express or unambiguous authority for California to violate the Commerce Clause. Accordingly, the LCFS is subject to Commerce Clause scrutiny.

**B.     Applicable Standard of Review**

The Commerce Clause provides that "Congress shall have Power..[t]o regulate Commerce with foreign Nations, and among the several states." U.S. Const. Art. I, §8, cl. 3. This grant of power has "a 'negative' aspect" that "denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 98 (1994). "No State may attempt to isolate itself from a problem common to several States by raising barriers to the free flow of interstate trade." *Chemical Waste Mgmt., Inc. v. Hunt*, 504 U.S. 334, 339-40 (1992). Rather, the Commerce Clause adopts "the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division." *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 523 (1935).

In reviewing a dormant Commerce Clause challenge, the Court must first consider the applicable standard of review.  If a law discriminates against out-of-state entities, or attempts to regulate beyond a state's jurisdiction, then the Court applies a strict scrutiny standard.  *Healey v. Beer Inst.*, 491 U.S. 324, 336-37 (1989).  If a law regulates in-state and out-of-state entities evenly and attempt to regulate only in-state activity, then the Court applies a balancing test.  *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).  The strict scrutiny standard is difficult to satisfy, whereas a balancing test is more favorable to the state law.

The National Petrochemical Plaintiffs submit that this Court should apply strict scrutiny to analyze the LCFS because it discriminates "on its face, and in its practical effect, in favor of California transportation fuels and against transportation fuels from other States and Countries."  In addition, the National Petrochemical Plaintiffs argue that the LCFS is subject to strict scrutiny because it impermissibly regulates commerce beyond California's borders.  The National Petrochemical Plaintiffs contend that the LCFS violates the dormant Commerce Clause as a matter of law because it discriminates against and regulates out-of-state and foreign transportation fuels, is rooted in economic protectionist, and there are alternative, nondiscriminatory means to achieve the goal of reducing GHG emissions in California.

CARB argues that the National Petrochemical Plaintiffs' motion is based on a misunderstanding and a mischaracterization of the LCFS.  CARB maintains that the LCFS is facially neutral and does not regulate activity occurring wholly outside the state of California.  Alternatively, CARB asserts that even if the LCFS is discriminatory, the LCFS survives strict scrutiny analysis because the LCFS has several legitimate local purposes and there are no reasonable nondiscriminatory alternatives to achieve its goals.

## C.    Strict Scrutiny Analysis

Plaintiffs argue that the LCFS discriminates against out-of-state and foreign ethanol and crude oil in favor of California corn-derived ethanol and California existing crude oils.  Plaintiffs contend that because the LCFS discriminates on the face of the regulation, it is per se invalid.  The Court considers Plaintiffs arguments related to ethanol and crude oils separately.

### 1.    Whether the LCFS Discriminates Against Out-of-State Corn-Derived Ethanol

Relying on LCFS Section 95486(b) and Table 6, Plaintiffs argue that the LCFS' discriminatory

1   treatment of physically and chemically identical fuels is reflected on the face of the LCFS.  Plaintiffs

2   point out that although corn ethanol produced in California and the Midwest have "identical physical

3   and chemical properties" ISOR V-30, Table 6 provides lower, more favorable carbon intensity scores

4   for corn ethanol produced in California than corn ethanol produced in the Midwest.  As reflected in the

5   table, supra, California corn-derived ethanol pathways are assigned 10% lower carbon intensity score

6   as compared to the Midwest counterpart pathways.  Plaintiffs contend that this difference reflects

7   "differential treatment of in-state and out-of-state economic interests that benefits the former and

8   burdens the latter." *Oregon*, 511 U.S. at 99.  By assigning a higher carbon intensity score to the Midwest,

9   the LCFS creates an "economic barrier against competition with the products of another state." *Baldwin*,

10  294 U.S. at 527.

11      In a separate order, this Court concluded that the LCFS discriminates against out-of-state corn-

12  derived ethanol on its face and impermissibly regulates extraterritorially based on the ethanol pathways.

13  Because this Court has addressed these issues in the Order on the Rocky Mountain Plaintiffs' Summary

14  Judgment motion, and resolved those issues as a matter of law, this Court shall not address the additional

15  arguments related to corn-derived ethanol presented in this motion.  This Court does address the

16  National Petrochemical Plaintiffs' arguments in that separate order, however, and GRANTS the National

17  Petrochemical Plaintiffs' summary adjudication motion to the extent they argue that the LCFS

18  discriminates against out-of-state corn-derived ethanol and impermissibly regulates conduct outside of

19  California.

20      **2.      Whether the LCFS Discriminates Against Out-of-State and Foreign Crude Oils**

21      States may not "discriminate against an article of commerce by reason of its origin or destination

22  out of State." *C&A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 390 (1994).  "The central

23  rationale for the rule against discrimination is to prohibit state or municipal laws whose object is local

24  economic protectionism." *Id*. at 337-38.  A law or regulatory scheme "can discriminate against out-of-

25  state interests in three different ways: (1) facially; (2) purposefully, or (3) in practical effect." *Nat'l Ass'n*

26  *of Optometrists & Opticians Lenscrafters, Inc. v. Brown*, 567 F.3d 521, 525 (9th Cir. 2009).  A law is

27  facially discriminatory when it "is not necessary to look beyond the text of this statute to determine that

28  it discriminates against interstate commerce." *Camps Newfoundland/Owatonna, Inc. v. Town of*

*Harrison*, 520 U.S. 564, 575-76 (1997).  In this context "'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste*, 511 U.S. at 99.

Defendants argue that the LCFS does not discriminate against foreign and out-of-state crude oil producers and suppliers because "a crude oil's carbon intensity under the LCFS involves two factors, neither of which is origin."  Those two factors, according to Defendants, is (1) whether the crude oil is an HCICO and (2) whether the crude oil is from an emerging crude source or an existing crude source.  If a crude is an HCICO, and was not an existing crude source in 2006, then it must use its actual CI.  All other fuels use the baseline average, labeled as CARBOB on Table 6.  Defendants summarize the LCFS' treatment of crude oils as a neutral scheme in which all crude oils use the same CI unless they are an HCICO that was not part of the 2006 baseline.

The National Petrochemical Plaintiffs maintain that the LCFS discriminates against foreign and out-of-state crude oils in two ways.  First, the LCFS discriminates against foreign HCICOs and favors California HCICO.  Second, the LCFS discriminates against all foreign existing crude sources while favoring California's existing crude source.  The National Petrochemical Plaintiffs argue that based on these distinctions, the LCFS violates the Commerce.  The Court sets forth the National Petrochemical Plaintiffs' arguments of discrimination below.  After explaining the arguments, the Court moves on to analyze them.

### A.    HCICOs

The National Petrochemical Plaintiffs argue that the LCFS discriminates against HCICOs made outside of California and favors HCICO from California.  Between existing and emerging fuels, California's TEOR receives favorable treatment, whereas foreign HCICOs do not.  Plaintiffs present the following table to illustrate the point[5]:

---

[5]The data in this table differs slightly from the data relied on by the National Petrochemical Plaintiffs.  Plaintiffs state that the CI assigned to California HCICO is 6.93.  Defendants point out that 6.93 represents the CI for production only.  When including transportation, the CA-GREET assigns a baseline of 8.07, not 6.93. *See* Declaration of Scheible at ¶92.  This Court adopts the appropriate baseline as used in the CA-GREET to use in the National Petrochemical Plaintiffs' illustrative tables.

| Crude Oil (Percent of California Crude Market in 2006) | Carbon Intensity Calculated for Fuel Production and Transport | Carbon Intensity Assigned by LCFS for Fuel Production and Transport | Difference Assigned and Calculated Carbon Intensity Values |
|---|---|---|---|
| California TEOR (14.80%) | 18.89 | 8.07 | 10.82 |
| Venezuela Crude Oil (.063%) | 21.95 | 21.95 | – |

The National Petrochemical Plaintiffs explain that there is no dispute that application of the "two factors" identified by Defendants results in the following: (1) California's HCICO is assigned a CI value with less than half of the GHG emissions associated with its production and transport; (2) California's HCICO is the only HCICO to qualify for this favorable treatment; and (3) All HCICOs from outside of California are required to account for all of the GHG emissions associated with their production and transportation. Defendants admit that the only "HCICO that qualifies for the default carbon intensity values," i.e. favorable treatment, "is California crude oil produced using TEOR." The National Petrochemical Plaintiffs argue that Defendants "gerrymandered the criteria to reach this outcome," which establishes that the purpose and design of the LCFS is to discriminate against out-of-state and foreign HCICOs.

**B.    Existing Sources**

The National Petrochemical Plaintiffs further contend that California TEOR receives favorable treatment among other existing crude sources, while foreign existing sources receive less favorable treatment. As set forth above, the LCFS  assigns a single average carbon intensity value to existing crude sources. FSOR at 23; LCFS §95486(b)(2)(A)(1).  Under the LCFS, existing crude sources "regulated parties *must* use these single carbon intensity values for all California CARBOB and diesel fuel regardless of the actual carbon intensity of producing or transporting the specific crude oil use, or the specific refinery operations." FSOR at 23.

California TEOR is the only HCICO that "qualifies for the default average carbon intensity values." FSOR at 22. California TEOR benefits in using the assigned baseline average carbon intensity

1 rather than its actual carbon intensity value for production and transportation by a high margin.  That is,

2 the actual carbon intensity value of California TEOR is much higher than the baseline average.

3 Nevertheless, the LCFS disregards California TEOR's actual carbon intensity value and assigns it the

4 baseline average to use in calculating credits and deficits under the system.

5       By contrast, the LCFS assigns existing crude sources from outside of California them an average

6 carbon intensity that is higher than their actual carbon intensity values, as calculated by CARB.  These

7 foreign crude oil producers are required to use the assigned baseline average for existing fuels that is

8 equal to CARBOB.  The baseline average is higher than the actual carbon intensity for production and

9 transportation for these fuels.

10       In requiring all existing fuels to use the baseline average, the National Petrochemical Plaintiffs

11 contend that the LCFS is designed to give California TEOR an advantage while discriminating against

12 all other foreign existing crude sources.  The following table illustrates the point[6]:

| Existing Crude Oils within California's 2006 Baseline Mix (Percent of California crude market in 2006) | Carbon Intensity Calculated for Production and Transportation | Carbon Intensity Assigned by LCFS for Production and Transportation | Difference Between Assigned and Calculated Carbon Intensity Values |
|---|---|---|---|
| California TEOR (14.80%) | 18.89 | 8.07 | -10.82 |
| Alaskan Light Crude (16.10%) | 4.36 | 8.07 | +3.71 |
| Imported Light Crude (44.4%) | 4.65 | 8.07 | +3.42 |

22 By requiring all existing fuels to use the baseline average, California TEOR is assigned a carbon

23 intensity value that is *less than half* of the actual GHG emissions association with this fuel, whereas out-

24 of-state and foreign existing crude sources are assigned a carbon intensity score that is nearly double that

25 actual carbon intensity for those crudes.

26 ///

27

28       [6]Similar to the table above, this Court has used the baseline average of 8.07 to the CI assigned by the LCFS and to calculate the differences between the assigned and calculated CI Values.

1        **C.       Discussion**

2        The design and practical effect of the LCFS is to favor California HCICO and discriminate

3    against foreign HCICOs and out-of-state and foreign existing crude sources.  Although the two variables

4    (HCICOs vs. non-HCICOs and emerging sources vs. existing sources) appear to be neutral facially, these

5    variables were designed to protect California's TEOR by giving that fuel an artificially favorable and

6    lower carbon intensity value.  State law need not "be drafted explicitly along state lines in order to

7    demonstrate its discriminatory design." *Amerada Hess Corp. v. N.J. Dep't of Treasury*, 490 U.S. 66, 76

8    (1989).  The LCFS gives California's HCICO favorable treatment by assigning it the baseline average

9    carbon intensity value, a value that is substantially lower than its actual carbon intensity score; no other

10   HCICOs receive this favorable treatment.   In addition, while California's TEOR benefits from

11   application of the baseline average, all other existing crude sources are assigned higher carbon intensity

12   values than the actual carbon intensity values for those crudes.  Based on the design and practice effect

13   of the LCFS, this Court finds that it violates the Commerce Clause because the Commerce Clause

14   forbids discrimination, whether forthright or ingenious." *West Lynn Creamery*, 512 U.S. at 201 (quoting

15   *Best & Co. v. Maxwell*, 311 U.S. 454, 455-56 (1940)).

16       The discriminatory design of the LCFS' favorable treatment of California's TEOR as compared

17   to other HCICOs and other existing crude sources violates the Commerce Clause even though the

18   distinctions drawn appear to be neutral.  In *Bacchus*, the Supreme Court addressed a similar situation.

19   A Hawaiian statute exempted two alcohol products from a 20% excise tax–"okolehao" and "pineapple

20   wine"–but did not exempt other "[l]ocally produced sake and fruit liqueurs." 468 U.S. at 263.  The

21   record reflected that "neither okloehao nor pineapple wine is produced elsewhere [i.e., outside Hawaii]."

22   Id. at 269.  The Court held that the "exemption is clearly discriminatory, in that it applies only to locally

23   produced beverages, even though it does not apply to all such products." *Id*. at 271; *see also*, *Amerada*

24   *Hess*, 490 U.S. at 75-76 (describing "discriminatory design" of an ostensibly facially neutral statute in

25   *Bacchus*).  Similarly, under the LCFS, all foreign HCICOs (e.g., from Canada and Venezuela) are treated

26   less favorably than California HCICO.  Just as Hawaii impermissibly granted preferential treatment to

27   two local products in Bacchus, Defendants discriminate in favor of California HCICO and against

28   HCICOs from outside California.

1    Defendants argue that this "narrow comparison" between HCICOs "would be proper if only

2    HCICO producers competed against each other." As the National Petrochemical Plaintiffs point out,

3    however, "as long as there is some competition between locally produced exempt products and non-

4    exempt products from outside the State, there is a discriminatory effect." *Bacchus*, 468 U.S. at 271.

5    Defendants acknowledge that California HCICO competes against foreign HCICOs because "crude oil

6    is fungible and competes in a global, highly liquid market." Discrimination that favors a specific in-state

7    interest, such as California HCICO, and disfavors specific out-of-state interests, such as foreign

8    HCICOs, "makes protectionist effect of the ordinance more acute." *Carbone*, 511 U.S. at 392.

9    Defendants further argue that the LCFS' treatment of crude oils cannot be discriminatory because

10   they predict an "inevitable decline of California crude oil" under the LCFS. This projected "inevitable

11   decline" does not effect this Court's analysis. "[I]t does not matter whether the challenged regulation

12   actually increases the market share of local producers or whether it merely mitigates a projected decline."

13   *West Lynn Creamery*, 512 U.S. at 196 n.12; *see also, Bacchus*, 468 U.S. at 272 ("[W]e perceive no

14   principle in Commerce Clause jurisprudence supporting a distinction between thriving and struggling

15   enterprises..."). The LCFS is designed to eliminate competition by new entrants by "making it unlikely

16   that California will see a significant increase in new HCICO use." While admitting that new HCICO

17   use is unlikely because of the high actual carbon intensity values associated with those fuels, the LCFS

18   protects the use California's TEOR by assigning it an artificially low carbon intensity value. This

19   constitutes discrimination against foreign and out-of-state interest.

20   Similarly, California's favorable treatment of California TEOR when compared to other existing

21   crude sources discriminates against out-of-state and foreign crude oil sources. Only California HCICO

22   is advantaged by receiving a carbon intensity value that is lower than its actual carbon intensity value.

23   Crude oils from Alaska and foreign countries are disadvantaged because they are assigned a carbon

24   intensity value that is higher than the actual carbon intensity value for those crudes. Defendants

25   recognize that from "plaintiffs' perspective, producers who get a CI value higher than their actual CI are

26   disadvantaged, and producers who get a CI value lower than their actual CI are advantaged. They

27   explain that the LCFS is designed this way to "reduce the incentive for regulated parties to comply with

28   the LCFS by shifting to less carbon-intensive crude oils or refining operations." However, in giving

1   California TEOR a favorable CI score while assigning a higher score to out-of-state and foreign existing

2   crude sources, the LCFS gives an economic advantage to an in-state source while penalizing

3   economically out-of-state and foreign existing crude sources.

4        Moreover, Defendants fail to explain how giving California TEOR a substantially lower CI score

5   promotes the goal of the LCFS.  Defendants contend that CARB adopted this methodology to ensure that

6   GHG emissions from petroleum-based fuels do not increase dramatically under the LCFS and to ensure

7   that emissions reductions would come from lower carbon alternative fuels.  Scheible Decl., ¶¶88-98.

8   That the LCFS is designed to discourage the entry of foreign HCICOs from entering the California

9   market, while giving an advantage to California's HCICO, demonstrates that the LCFS gives an

10   economic advantage to an in-state interest.  This discriminates against interstate commerce by design

11   and in practical effect.

12        **3.**      **Whether the LCFS serves a legitimate local purpose**

13        Once a state law is shown to discriminate against interstate commerce "either on its face or in

14   practical effect," or to exercise extraterritorial control, the burden falls on the State to demonstrate *both*

15   that the statute "serves a legitimate local purpose," *and* that this purpose could not be served as well by

16   available nondiscriminatory means. *Hughes v. Oklahoma*, 441 U.S. at 336; *see also, e. g., Sporhase v.*

17   *Nebraska ex rel. Douglas*, 458 U.S. 941, 957 (1982); *Hunt v. Washington State Apple Advertising*

18   *Comm'n*, 432 U.S. 333, 353 (1977); *Dean Milk Co. v. Madison*, 340 U.S. 349, 354 (1951).

19        Defendants argue that the LCFS serves the legitimate and local purpose to reduce the risks of

20   global warming.  Defendants' correctly point out that in *Massachusetts v. EPA*, 549 U.S. 497 (2007),

21   the Supreme Court recognized that a state has a "well-founded desire to preserve its sovereign territory"

22   from the threats of rising seas and other impacts of global warming. *Id*. at 519, 522.  "That these climate-

23   change risks are 'widely-shared' does not minimize [California's] interest" in reducing them. *Id*. at 522.

24        Significantly, in *Massachusetts v. EPA*, the Supreme Court held that states have standing to ask

25   the federal government to regulate GHG emissions. 549 U.S. 497.  Nevertheless, the Court explained

26   in dicta that a state has a local and legitimate interest in reducing global warming.  Based on this

27   authority, this Court finds that the LCFS serves a local and legitimate interest.

28        The National Petrochemical Plaintiffs contend that Defendants must also establish that the goals

of the LCFS are unrelated to economic protectionism. *See New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 274 (1988) (To survive strict scrutiny of a discriminatory law, defendants must show that the discrimination is "demonstrably justified by a valid factor unrelated to economic protectionism."). The National Petrochemical Plaintiffs argue that the Defendants fail to establish that the LCFS is unrelated to economic protectionism because the LCFS: (1) encourages "fuel shuffling" of ethanol when it serves to benefit local interests; (2) discourages "fuel shuffling" that would benefit Alaskan and imported crude oils; and (3) encourages "fuel shuffling" of foreign HCICOs to prevent them from competing against California HCICO.

This Court agrees that the LCFS is related to economic protectionism. As set forth above, the LCFS was designed in part to "decrease dependent on foreign oil" and to "keep more money in the State" by "displacing imported transportation fuels with biofuels produced in the State." Although the LCFS was designed, in part, to protect and promote California's ethanol, crude oil, and energy markets, Defendants have established that it is justified by a valid factor unrelated to economic protectionism; to wit, the preservation of the environment by reducing GHG emissions. As set forth above, that is a legitimate local purpose.

**4.     Whether that purpose could be served through other nondiscriminatory means**

The final consideration in the strict scrutiny analysis is whether California has established that the goal of reducing global warming cannot be adequately served by nondiscriminatory alternatives. *Carbone*, 511 U.S. at 392 (defendants must establish that they "had no other means to advance a legitimate local interest). California has failed to establish this fact. While this Court recognizes that the lifecycle analysis is a widely-accepted approach nationally and internationally to reduce GHG emissions, Defendants have failed to establish that they could not achieve this goal through other nondiscriminatory means.

The National Petrochemical Plaintiffs establish that Defendants have failed to meet their burden of proving that no reasonable alternatives exist to adequately address the purpose of reducing GHG emission. Defendants' expert concedes that California could "adopt a tax on fossil fuels" to "reduce greenhouse gas emissions associated with California's transportation sector." Babcock Decl. ¶5. According to Dr. Babcock, "[a] tax would increase the relative price of fossil fuels that would result in

1  a cost advantage to alternative transportation methods that are reliant on renewable energy sources. Id.

2          Defendants argue that a fuel tax is an inadequate alternative because the suggestion of a fuel tax

3  "willfully ignores the political reality of the difficulty of passing a tax measure in the current economic

4  climate."  That the tax would be difficult to pass does not establish that it is an unreasonable alternative

5  to the LCFS.  As the National Petrochemical Plaintiffs' point out, the reason the Commerce Clause

6  prohibits discrimination against interstate commerce is because discrimination always will be the more

7  "attractive" option because it "benefits local producers by burdening out-of-state competitors." *West*

8  *Lynn Creamery*, 512 U.S. at 193; *see also Wunnicke*, 467 U.S. at 92.

9          Defendants further argue that a fuel tax is inadequate because it would not address the lifecycle

10  emissions from fuels.  To the extent that Defendants seek to address GHGs emitted during the

11  production and transport of fuels, CARB may regulate production facilities, refineries and farms in

12  California with an LCFS that does not shift the burden to out-of-state and foreign entities or

13  impermissibly regulate out-of-state activities.  To the extent that Defendants argue that alternative

14  approaches do not allow them to control of leakage outside of California's borders, Defendants are

15  reminded that they may not regulate GHG emissions from fuel production and transportation outside of

16  California. Defendants may not "extend...[California's] police power beyond its jurisdictional bounds."

17  *Carbone,* 511 U.S. at 393.

18          The National Petrochemical Plaintiffs further argue that the LCFS itself is an inadequate to

19  achieve Defendants' goals of reducing GHG emissions and to combat global warming.  The National

20  Petrochemical Plaintiffs explain that the LCFS creates an incentive for shuffling transportation fuels,

21  whereby regulated parties transport high carbon intensity fuels away from California and transport low

22  carbon intensity fuels to California.  The National Petrochemical Plaintiffs submit that this "fuel

23  shuffling" would result in less efficient fuel distribution routes in which transportation fuels travel

24  further distances, resulting in higher GHG emissions nationally.  *See* Hogan Decl. ¶8.  Although this

25  Court agrees that the effects of the LCFS on global warming are speculative at best, the National

26  Petrochemical Plaintiffs' arguments do not address the relevant inquiry.  The Court does not consider

27  whether the LCFS will address adequately Defendants' goals of combating global warming.  The Court

28  considers whether Defendants have established that no adequate alternatives exists.

1    Although alternative approaches may be less desirable for a number of reasons, Defendants have

2    failed to establish there are *no* nondiscriminatory means by which California could serve its purpose of

3    combating global warming through the reduction of GHG emissions. *See Dean*, 340 U.S. 349(suggesting

4    the use of national standards or expanding city inspections to achieve health-motivated regulation).

5    Because other, nondiscriminatory means exist to combat global warming in California, the LCFS must

6    be struck down.

7        **5.      Conclusion**

8        If a "restriction on commerce is discriminatory, it is virtually per se invalid." *Oregon Waste*, 511

9    U.S. at 99; *see also Miller*, 10 F.3d at 638.  A discriminatory state law must be struck down unless the

10   defendant can "demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate

11   local interest." *Carbone*, 511 U.S. at 392; *see also, United Haulers*, 550 U.S. at 357; *Conservation*

12   *Force, Inc. v. Manning*, 301 F.3d 985, 995 (9th Cir. 2002).  Even if a State is purporting to advance a

13   legitimate end, it may not do so through invalid "legislative means." *Chemical Waste*, 504 U.S. at 340.

14   Moreover, where, as here, the discrimination implicates foreign commerce, the State regulation is

15   "subjected to more rigorous and searching scrutiny." *South-Central Timber Dev. v. Wunnicke*, 467 U.S.

16   82, 100 (1984), because "discriminatory treatment of foreign commerce may create problems, such as

17   the potential for international retaliation, that concern the Nation as a whole." *Kraft Gen. Foods, Inc.*

18   *v. Iowa Dep't of Revenue & Fin.*, 505 U.S. 71, 79 (1992).

19       California's LCFS gives an economic advantage to California TEOR over foreign HCICOs and

20   assigns a mandatory economic disadvantage to out-of-state and foreign existing crude sources.  While

21   regulating GHG emissions to combat global warming may be a legitimate end, California may not do

22   so through the use of invalid legislative means. *See Or. Waste Sys. Inc. v. Dep't of Envtl. Quality of Or.*,

23   511 U.S. 93, 100 (1994) (The "purpose of, or justification for, a law has no bearing on whether it is

24   facially discriminatory.").  Moreover, the discrimination implicates foreign commerce, which makes it

25   the subject of a more rigorous scrutiny.  Because Defendants have failed to establish that no alternative,

26   nondiscriminatory means exist to address their legitimate purpose, this Court finds that the LCFS

27   violates the dormant Commerce Clause.

28   ///

24

**CONCLUSION AND ORDER**

For the foregoing reasons, this Court:

1. GRANTS the National Petrochemical Plaintiffs' summary adjudication motion to the extent that National Petrochemical Plaintiffs argue that the LCFS violates the dormant Commerce Clause by impermissibly discriminating against out-of-state and foreign crude oil sources;

2. GRANTS the National Petrochemical Plaintiffs' summary adjudication motion to the extent that they argue that the LCFS violates the dormant Commerce Clause by discriminating against out-of-state corn ethanol producers and suppliers and impermissibly regulates extraterritorially (for the reasons explained in the Order on Rocky Mountain Plaintiffs' Summary Judgment Motion);

3. CERTIFIES judgment on this claim pursuant to Fed. R. Civ. P. 54(b), even though there is an outstanding claim for relief based on the claim of preemption. Because the LCFS is unenforceable because it violates the dormant Commerce Clause, there is no just reason for delay in these proceedings; and

4. DIRECTS clerk of court to enter judgment in favor of the National Petrochemical Plaintiffs and against Defendants on the dormant Commerce Clause claim.

IT IS SO ORDERED.

**Dated:   December 29, 2011**              **/s/ Lawrence J. O'Neill**
                                   UNITED STATES DISTRICT JUDGE