1
2
3
4

**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

5
6
7
8
9
10
11
12

| | |
|---|---|
| **AMERICAN FUELS & PETROCHEMICAL MANUFACTURERS ASSOCIATION, et al.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**RICHARD W. COREY, in his official capacity as Executive Officer of the California Air Resources Board, et al.,**<br><br>**Defendants.** | **Lead Case: 1:09-cv-2234-LJO-BAM**<br><br>**Consolidated with member case:**<br>**1:10-cv-163-LJO-BAM**<br><br>**ORDER RE DEFENDANTS' MOTION TO DISMISS AND MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. 326[1])** |

13
14
15
16

## I. INTRODUCTION

Currently before the Court is Defendants' and Defendant-Intervenors'[2] motion to dismiss certain

claims in Plaintiffs' First Amended Complaint, Doc. 325 ("the FAC").[3] Doc. 327. Defendants move to

17

18
19
20
21
22
23
24
25

[1] Unless otherwise indicated, all citations to the docket refer to the docket in *Rocky Mountain Farmers Union v. Goldstene*, 09-cv-2234-LJO-BAM.

[2] Defendants are Richard W. Corey, in his official capacity as Executive Officer of the California Air Resources Board ("CARB"); Mary D. Nichols, Daniel Sperling, Phil Serna, John Eisenhut, Barbara Riordan, John R. Balmes, Hector de la Torre, Sandra Berg, Ron Roberts, Alexander Sherriffs, John Gioia, and Judy Mithcell, in their official capacities as members of CARB; Edmund G. Brown, in his official capacity as Governor of the State of California; and Kamala Harris, in her official capacity as Attorney General of the State of California. Defendant-Intervenors are Natural Resources Defense Council, Inc., Conservation Law Foundation, Sierra Club, and Environmental Defense Fund (collectively, "Defendant-Intervenors"). Defendants and Defendant-Intervenors shall be referred to collectively as "Defendants."

[3] Plaintiffs are American Fuel & Petrochemical Manufacturers Association ("AFPM"), American Trucking Associations, and The Consumer Energy Alliance (collectively, "the AFPM Plaintiffs"). The parties refer to the other Plaintiffs in this case, who are not named as Plaintiffs in the FAC, as the Rocky Mountain Farmers Union (or "RMFU") Plaintiffs. Other plaintiffs involved in this litigation are no longer parties to this action. *See* Doc. 1 at 1 ("Plaintiffs Rocky Mountain Farmers Union, Redwood County Minnesota Corn and Soybean Growers, Penny Newman Grain, Inc., Growth Energy, and Renewable Fuels Association . . . ."). For clarity, the Court will refer to both sets of Plaintiffs collectively as "Plaintiffs" unless otherwise indicated.

1

dismiss the claims largely on the ground previous litigation in this case has resolved the claims or precludes Plaintiffs from asserting them. *See id.* at 2. In addition, Defendants move for judgment to be entered in their favor and against Plaintiffs on various aspects of Plaintiffs' claims. *See id.* The Court did not set a hearing for the motion and the parties did not request one. The Court finds it appropriate to rule on the motion without oral argument. *See* Local Rule 230(g). For the following reasons, the Court GRANTS IN PART and DENIES IN PART the motion.

## II. FACTUAL AND PROCEDURAL BACKGROUND

A.    **Abbreviated Facts and Procedural History.**

The Court incorporates by reference the summary of the extensive procedural history of this consolidated action contained in the Court's recent Memorandum Decision on Plaintiffs' motion to amend. *See Rocky Mountain Farmers Union v. Goldstene*, No. 1:09-cv-2234-LJO-BAM, 2014 WL 7004725, at *1-8 (E.D. Cal. Dec. 11, 2014) ("*RMFU Amendment*"). Only a brief recitation of the factual and procedural background necessary to resolve Defendants' motion to dismiss follows.

The RMFU Plaintiffs filed this consolidated action in December 2009 (Doc. 1), a first amended complaint on January 11, 2010 (Doc. 7), and a second amended complaint on January 28, 2010 (Doc. 11). Plaintiffs filed their complaint on February 2, 2010. *See* 1:10-cv-163-LJO-BAM, Doc. 1. The cases were consolidated on October 18, 2010. *See* 1:10-cv-163-LJO-BAM, Doc. 99.

Plaintiffs challenge the constitutionality of California's Low Carbon Fuel Standard ("the LCFS"), 17 Cal. Code Regs. §§ 95480–90.[4] *RMFU Amendment*, 2014 WL 7004725, at *1. The LCFS "is a collection of regulations promulgated by Defendant California Air Resources Board ('CARB') to implement provisions of California Assembly Bill 32 ('AB 32'), California's Global Warming Solutions Act of 2006." *Id.* (citations omitted). Plaintiffs challenged both the original LCFS regulations, which went into effect on January 1, 2011 ("the 2011 provisions" or "the Original LCFS"), as well as the LCFS's provisions pertaining to crude oil, which were amended in 2012 ("the Amended LCFS"). *See id.*

---

[4] All statutory references are to Title 17 of the California Code of Regulations unless otherwise indicated.

2

at *7.

The parties filed complex cross-motions for summary judgment, which the Court resolved in three separate orders, primarily in Plaintiffs' favor. *See RMFU Amendment*, 2014 WL 7004725, at *1 (citing *Rocky Mountain Farmers Union v. Goldstene*, 843 F. Supp. 2d 1042 (E.D. Cal. 2011) ("*Rocky Mountain Preemption*"); *Rocky Mountain Farmers Union v. Goldstene*, 843 F. Supp. 2d 1071 (E.D. Cal. 2011) ("*Rocky Mountain Ethanol*"); *Rocky Mountain Farmers Union v. Goldstene*, Nos. 09-cv-2334-LJO-DLB, 10-cv-163-LJO-DLB, 2011 WL 6936368 (E.D. Cal. Dec. 29, 2011) ("*Rocky Mountain Crude*"). Defendants timely appealed those orders. *See Rocky Mountain Farmers Union v. Goldstene*, 730 F.3d 1070, 1086 (9th Cir. 2014) ("*RMFU*"), *reh'g denied*, 740 F.3d 507, 508 (9th Cir. 2014), *cert. denied*, 134 S.Ct. 2875 (2014), 134 S.Ct. 2884 (2014).

### 1. *Rocky Mountain Crude*.

In *Rocky Mountain Crude*, this Court addressed Plaintiffs'[5] challenges to the crude oil provisions of the Original LCFS. 2011 WL 6936368. The Court found that those provisions "discriminate[d] against out-of-state and foreign crude oil while giving an economic advantage to in-state crude oil." *Id.* at *1. Specifically, the Court found that "[t]he design and practical effect of the LCFS [was] to favor California [high carbon intensity crude oils ('HCICOs')] and discriminate against foreign HCICOs and out-of-state and foreign existing crude sources." *Id.* at *12.[6]

The LCFS did so by giving California TEOR "an artificially favorable and lower carbon intensity value" while "all other existing crude sources [were] assigned higher carbon intensity values than the actual carbon intensity values for those crudes." *Id.* at *12. Similarly, the LCFS gave "California's HCICO favorable treatment by assigning it the baseline average carbon intensity value, a value that is substantially lower than its actual carbon intensity score; no other HCICOs receive[d] this

---

[5] The plaintiffs have changed between *Rocky Mountain Crude* and now. For clarity, however, the Court will refer to them collectively as "Plaintiffs" in its discussion of *Rocky Mountain Crude* and *RMFU*.

[6] Under the Original LCFS, "existing crude sources" were "[t]hose crude oil sources that made up more of the 2% California crude market in 2006." *Rocky Mountain Crude*, 2011 WL 6936368, at *6.

1   favorable treatment." *Id.* Conversely, "[c]rude oils from Alaska and foreign countries are disadvantaged

2   because they are assigned a carbon intensity value that is higher than the actual carbon intensity value

3   for those crudes." *Id.* at *14. The Court "included two tables that showed some of the crude oils in the

4   California market and compared their assessed carbon intensities with their individual carbon

5   intensities." *RMFU*, 730 F.3d at 1098 (citing *Rocky Mountain Crude*, 2011 WL 6936368, at *11 n.5,

6   *12 n.6). Based on these two tables, the Court observed that "California TEOR was treated favorably

7   compared to out-of-state sources based on a comparison of a fuel's individual carbon intensity to its

8   assigned carbon intensity." *Id.* at 1099.

9       The Court found that the "LCFS gives an economic advantage to California TEOR over foreign

10  HCICOs and assigns a mandatory economic disadvantage to out-of-state and foreign existing crude

11  sources." *Id.* at *17. Accordingly, the Court held that the LCFS discriminated against interstate

12  commerce by design and in practical effect because it was "designed to discourage the entry of foreign

13  HCICOs from entering the California market, while giving an advantage to California's HCICO,"

14  thereby giving "an economic advantage to an in-state interest." *Id.* at *14. "The LCFS' favorable

15  treatment of California's TEOR as compared to other HCICOs and other existing crude sources

16  violate[d] the Commerce Clause even though the distinctions drawn appear[ed] to be neutral." *Id.* at *13.

17      The Court found that even though the LCFS's crude oil provisions were "related to economic

18  protectionism," they served a legitimate local purpose. *Id.* at *15. Nonetheless, because the LCFS's goal

19  of reducing global warming could be achieved by other, nondiscriminatory alternatives, the Court found

20  that the LCFS's crude oil provisions were impermissibly discriminatory against interstate and foreign

21  commerce, in violation of the Commerce Clause. *Id.* at *16. The Court therefore struck down the LCFS

22  as unconstitutional. *Id.*

23      **2. *RMFU*.**

24      On appeal, the Ninth Circuit affirmed in part, reversed in part, vacated in part, and remanded the

25  case to this Court. *Id.* at 1077.

4

The Ninth Circuit disagreed with this Court's determination that the Original LCFS's crude oil provisions "treated crude oil in a facially neutral manner but . . . taken as a whole . . . discriminated against out-of-state crude oil in purpose and effect." *RMFU*, 730 F.3d at 1097. The Ninth Circuit held that this Court erred by failing to analyze "the full market" for crude oils in California. *See RMFU*, 730 F.3d at 1099.

The Ninth Circuit acknowledged that, according to the two tables relied on by this Court, the LCFS appeared to treat California TEOR favorably compared to other foreign crude oils. *See id.* at 1099. But the Ninth Circuit noted that those "tables left out several significant parts of the 2006 [crude oil] market," and "[t]he remainder—almost one quarter of the market—alters the impression of the" LCFS's crude oil provisions. *Id.* The Ninth Circuit provided the following table, which "show[ed] the full California crude-oil market in 2006":

| | % 2006 Market | Carbon Intensity | Assigned Carbon Intensity | Variance |
|---|---|---|---|---|
| CA TEOR | 14.8 | 18.89 | 8.07 | −10.82 |
| Gas Injection | 1.3 | 12.75 | 8.07 | −4.68 |
| Water Flood | 6.10 | 5.57 | 8.07 | +2.50 |
| California Primary | 16.5 | 4.31 | 8.07 | +3.76 |
| Alaska Light | 14.8 | 4.36 | 8.07 | +3.71 |
| Imported Light | 44.4 | 4.65 | 8.07 | +3.42 |
| Venezuela Heavy | 0.063 | 21.95 | 21.95 | — |

*Id.* Based on the data contained in this table, the Ninth Circuit concluded:

> Seen in context of the full market, the [LCFS's crude oil provisions] do not appear protectionist, though they do assess California TEOR a carbon intensity well below its individual value. California TEOR benefited from an assessed carbon intensity lower than its individual carbon intensity. But California Primary has the lowest individual carbon intensity in the market; it suffered more from the same arrangement than light crude from Alaska or abroad. Under the [LCFS's crude oil provisions], California Primary and Water Flood were both assessed carbon intensity values higher than their individual values. Those burdened sources together made up 22.6% of the 2006 market; the benefited California sources formed only 16.1%. This burden on "major in-state interests . . . is a powerful safeguard against legislative abuse."

*RMFU*, 730 F.3d at 1099 (citations omitted).

The Ninth Circuit observed that CARB's stated purposes for enacting the Original LCFS's crude oil provisions "were: (1) to prevent an increase in the carbon intensity of California's crude oil market;

(2) to avoid fuel shuffling; and (3) to direct innovation toward the development of alternative fuels rather than the search for more efficient methods of crude-oil extraction." *RMFU*, 730 F.3d at 1098. The Ninth Circuit that these stated purposes for enacting the Original LCFS were "genuine," *id.* at 1100, and therefore held that the LCFS's crude oil provisions had "no protectionist purpose, no aim to insulate California firms from out-of-state competition." *Id.*

The Ninth Circuit observed that "[h]aving found a protectionist purpose, which [the Ninth Circuit] conclude[d] was incorrect," this Court "did not discuss evidence of an actual adverse effect created by" the Original LCFS's crude oil provisions, "though [this Court] did hold that [those] provisions in design and practical effect" discriminated against out-of-state crude oils. *Id.* at 1100. In the Ninth Circuit's view, "[w]hen challenged by CARB to present such evidence in [their] brief," Plaintiffs "instead relied on [their] claim that the [Original LCFS's crude oil provisions] had a discriminatory purpose," and asked the Ninth Circuit "'to speculate and infer'" that those provisions necessarily had a discriminatory effect on out-of-state crude oils. *Id.* (quoting *Black Star Farms, LLC v. Oliver*, 600 F.3d 1225, 1232 (9th Cir. 2010)).

The Ninth Circuit observed that "[i]n cases such as this, where neither facial discrimination nor an improper purpose has been shown, the evidentiary burden to show a discriminatory effect is particularly high." *Id.* (citing *Black Star*, 600 F.3d at 1232). The Ninth Circuit found that Plaintiffs failed to meet that burden. *Id.* Instead, the Ninth Circuit recognized that Plaintiffs "ha[d] not presented the 'substantial evidence of an actual discriminatory effect' necessary 'in order to take advantage of heightened scrutiny and shift the burden of proof to the State.'" *Id.* (quoting *Black Star*, 600 F.3d at 1233) (citation and internal quotation marks omitted). The Ninth Circuit therefore (1) affirmed this Court's determination that the Original LCFS's crude oil provisions were not facially discriminatory, but (2) reversed this Court's holding that those provisions were discriminatory in purpose and effect, (3) directed this Court "to enter an order of partial summary judgment in favor of [Defendants] on those issues," *id.* at 1107, and (4) remanded for this Court "to consider whether [the Original LCFS's crude oil

provisions] placed an undue burden on interstate commerce under *Pike.*" *Id.* at 1100-01[7]; *see also id.* at

1107.

    The Ninth Circuit summarized its relevant holdings as follows:

The [Original LCFS's] ethanol provisions are not facially discriminatory, so we reverse that portion of the district court's decision and remand for entry of partial summary judgment in favor of CARB. We also reverse the district court's decision that the [Original LCFS] is an impermissible extraterritorial regulation and we direct that an order of partial summary judgment be entered in favor of CARB on those grounds. We remand the case for the district court to determine whether the ethanol provisions discriminate in purpose or effect and, if not, to apply the *Pike* [*v. Bruce Church, Inc.*, 397 U.S. 137 (1970)] balancing test.[8]

We affirm the district court's conclusion that the [Original LCFS's crude oil provisions] are not facially discriminatory, but we reverse its holding that [they] are discriminatory in purpose and effect, and we direct the district court to enter an order of partial summary judgment in favor of CARB on those issues.

*Id.*[9] The case is now on remand before this Court. *See RMFU Amendment*, 2014 WL 7004725, at *1.

**B.    Plaintiffs' First Amended Complaint.**

    After the Court granted in part and denied in part Plaintiffs' motion to amend, *see id.* at *18,

Plaintiffs filed a First Amended Complaint ("the FAC")—currently the operative complaint—on

January 9, 2015. Doc. 324.[10] "Plaintiffs seek injunctive and declaratory relief enjoining the

implementation and enforcement of the [LCFS] as promulgated and subsequently amended, and

declaring the LCFS unlawful under federal law." *Id.* at ¶ 2. Specifically, Plaintiffs bring three causes of

action in which they assert the LCFS violates the Commerce Clause in three discrete ways. *See id.* at 15-

---

[7] Plaintiffs have abandoned their *Pike* claims. *See RMFU Amendment*, 2014 WL 7004725, at *12.

[8] The *Pike* balancing test provides that where a statute or regulation "even-handedly . . . effectuate[s] a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." 397 U.S. at 142. Plaintiffs, however, have abandoned their *Pike* claims. *See RMFU Amendment*, 2014 WL 7004725, at *12.

[9] The Court acknowledges that these holdings do not represent the entire panel because Judge Murguia disagreed with the panel majority's conclusion that the Original LCFS's ethanol provisions were not facially discriminatory. *RMFU*, 730 F.3d at 1107-08 (Murguia, J., concurring in part and dissenting in part) ("While I agree with the majority's conclusions concerning the crude oil regulations and preemption under the Clean Air Act, I respectfully dissent from the majority's conclusion that the [Original LCFS's ethanol] ethanol regulations do not facially discriminate against interstate commerce.").

[10] Although the RMFU Plaintiffs filed a second and third amended complaint, the AMFU Plaintiffs did not file any amended complaint prior to the FAC.

1

19. Plaintiffs briefly summarized their claims as follows:

2

First, the LCFS as promulgated (Original LCFS) violates the Commerce Clause because it has directly regulated interstate and foreign commerce and extraterritorial conduct, including the extraction, production and transport of transportation fuels and fuel feedstocks outside of California . . . .

3

4

Second, the LCFS as amended (Amended LCFS) violates the Commerce Clause and principles of interstate federalism embodied in the Federal structure of the United States Constitution because it directly regulates interstate and foreign commerce and extraterritorial conduct, including the extraction, production and transport of transportation fuels and fuel feedstocks outside of California . . . .

5

6

7

Third, the Original LCFS and Amended LCFS discriminate both on their face, and as applied, against transportation fuels and fuel feedstocks imported from outside of California with the intended effect of (i) promoting in-State production of transportation fuels, and (ii) "keep[ing] consumer dollars local by reducing the need to make fuel purchases from beyond [California's] borders," all in violation of the Commerce Clause of the United States Constitution.

8

9

10

*Id.* at ¶¶ 4-7.

11

**C.      Defendants' Motions to Dismiss and for Summary Judgment.**

12

Defendants maintain that this Court should enter judgment on Plaintiffs' first claim and, in part,

13

on their third claim, and dismiss under Fed. R. Civ. P. 12(b)(6) Plaintiffs' second claim entirely and their

14

third claim in part. *See* Doc. 327 at 2. Defendants also argue that, if any part of the FAC survives,

15

Defendant Governor Brown should be dismissed as a defendant. *Id.*

16

Plaintiffs concede that partial summary judgment can be entered for Defendants on some aspects

17

of their first and third claims pursuant to *RMFU*. *See* Doc. 330 at 11, 18 (emphasis omitted). But

18

Plaintiffs contend that Defendants' motion to dismiss their second and third claims should be denied in

19

part. *See id.* at 12, 18.

20

**III. <u>STANDARDS OF DECISION</u>**

21

**A.      Motion to Dismiss.**

22

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is a challenge to the sufficiency of the

23

allegations set forth in the complaint. A 12(b)(6) dismissal is proper where there is either a "lack of a

24

cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory."

25

8

*Balisteri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990). In considering a motion to dismiss for failure to state a claim, the court generally accepts as true the allegations in the complaint, construes the pleading in the light most favorable to the party opposing the motion, and resolves all doubts in the pleader's favor. *Lazy Y. Ranch LTD v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).

To survive a 12(b)(6) motion to dismiss, the Plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility for entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a Plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). Thus, "bare assertions . . . amount[ing] to nothing more than a 'formulaic recitation of the elements' . . . are not entitled to be assumed true." *Iqbal*, 556 U.S. at 681. In practice, "a complaint . . . must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Twombly*, 550 U.S. at 562. To the extent that the pleadings can be cured by the allegation of additional facts, the Plaintiffs should be afforded leave to amend. *Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990) (citations omitted).

**B.    Summary Judgment.**

Summary judgment is appropriate when the pleadings, disclosure materials, discovery, and any

9

affidavits provided establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that may affect the outcome of the case under the applicable law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable trier of fact could return a verdict in favor of the nonmoving party."  *Id.*

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). The exact nature of this responsibility, however, varies depending on whether the issue on which summary judgment is sought is one in which the movant or the nonmoving party carries the ultimate burden of proof. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007); *Cecala v. Newman*, 532 F. Supp. 2d 1118, 1132 (D. Ariz. 2007). If the movant will have the burden of proof at trial, it must demonstrate, with affirmative evidence, that "no reasonable trier of fact could find other than for the moving party." *Soremekun*, 509 F.3d at 984. In contrast, if the nonmoving party will have the burden of proof at trial, "the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Id.* (citing *Celotex*, 477 U.S. at 323).

If the movant satisfies its initial burden, the nonmoving party must go beyond the allegations in its pleadings to "show a genuine issue of material fact by presenting *affirmative evidence* from which a jury could find in [its] favor." *FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009) (emphasis in original). "[B]ald assertions or a mere scintilla of evidence" will not suffice in this regard. *Id.* at 929; *see also Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.") (citation omitted). "Where the record as a

whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

In resolving a summary judgment motion, "the court does not make credibility determinations or weigh conflicting evidence." *Soremekun*, 509 F.3d at 984. That remains the province of the jury or fact finder. *See Anderson*, 477 U.S. at 255. Instead, "[t]he evidence of the [nonmoving party] is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* Inferences, however, are not drawn out of the air; the nonmoving party must produce a factual predicate from which the inference may reasonably be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987).

## IV. DISCUSSION

Plaintiffs filed the FAC on January 9, 2015. Doc. 324.[11] The FAC contains three claims.

### A.   Plaintiffs' First Claim – Original LCFS

Plaintiffs' first claim alleges that "[t]he Original LCFS violates the Commerce Clause of the United States Constitution by directly regulating interstate and foreign commerce and purporting to regulate conduct that occurs in other States and Nations." FAC at ¶ 84. Specifically, Plaintiffs allege

> [b]y regulating the 'fuel pathway' of transportation fuels – *i.e.*, the manner in which transportation fuels are produced and ultimately reach the California market – the Original LCFS impermissibly penalizes producers and importers based upon the manner in which their transportation fuels are produced and the manner in which they move in interstate and foreign commerce . . . . By design and in practical effect, the Original LCFS impermissibly regulates conduct occurring outside of California by making it more difficult to market and sell transportation fuels based upon where the fuels are produced, the manner in which they are produced, and the manner in which they reach the California market.

*Id.* at ¶¶ 86, 88.

Defendants assert they are entitled to the entry of judgment on Plaintiffs' first claim under the

---

[11] In light of the filing of the FAC, some Plaintiffs previously associated with this case apparently are no longer named as Plaintiffs. *See supra* note 3. The parties refer to those Plaintiffs as "the RMFU Plaintiffs" and refer to Plaintiffs named in the FAC as "the AFPM Plaintiffs." The Court will refer to the AFPM Plaintiffs as "Plaintiffs" unless otherwise indicated.

1   Ninth Circuit's decision in *RMFU*. Doc. 327 at 10. Defendants contend the "claim has been fully

2   litigated and was resolved against [Plaintiffs] by the Ninth Circuit" because that court "expressly

3   concluded that the LCFS does not control out-of-state conduct" and therefore "explicitly resolved

4   [Plaintiffs'] extraterritoriality claim as to the 'Original LCFS.'" *Id.*[12] Defendants assert that, "[u]nder the

5   rule of mandate, this Court may not 'vary [the Ninth Circuit's mandate], or examine it for any other

6   purpose than execution." *Id.* (quoting *United States v. Thrasher*, 483 F.3d 977, 981 (9th Cir. 2007)).

7   Defendants further assert that, "because the rule of mandate is jurisdictional, this Court lacks

8   jurisdiction, with respect to [Plaintiffs'] 'First Claim,' to do anything other than enter judgment for

9   Defendants." *Id.* at 11 (citing *Thrasher*, 483 F.3d at 982).

10         Plaintiffs do not dispute Defendants' assertions. *See* Doc. 330 at 11-12. Plaintiffs concede that

11   "under the Ninth Circuit's mandate, partial summary judgment can be entered for Defendants on the first

12   claim that the Original LCFS is extraterritorial in violation of the Commerce Clause." *Id.* at 11

13   (emphasis omitted). Plaintiffs acknowledge that the Ninth Circuit resolved their first claim, "holding that

14   the Original LCFS 'regulates only the California market,'" *id.* at 12 (quoting *RMFU*, 730 F.3d at 1101).

15   As Plaintiffs further acknowledge, the Ninth Circuit reversed this Court's "decision that the [Original

16   LCFS] is an impermissible extraterritorial regulation" and "direct[ed] that an order of partial summary

17   judgment be entered in favor of [Defendants] on those grounds." *Id.* (quoting *RMFU*, 730 F.3d at 1107).

18   Accordingly, "[p]ursuant to the Ninth Circuit's mandate, [Plaintiffs] submit[] that partial summary

19   judgment can be entered for [D]efendants on the First Claim that the Original LCFS is an extraterritorial

20   regulation in violation of the Commerce Clause." *Id.* (citing *Thrasher*, 483 F.3d at 981).

21         The Ninth Circuit has summarized the principles underlying the rule of mandate as follows:

22         "The rule of mandate is similar to, but broader than, the law of the case doctrine." *United States
          v. Cote*, 51 F.3d 178, 181 (9th Cir. 1995). A district court that has received the mandate of an
23         appellate court cannot vary or examine that mandate for any purpose other than executing it. *Id.*

---

24   [12] Defendants also argue that Plaintiffs' first claim can be dismissed on other grounds if this Court "declines to enter
     judgment for Defendants." *See* Doc. 327 at 11 n.5. For the reasons discussed below, the Court finds it appropriate to enter
25   judgment for Defendants on the claim, so the Court need not discuss whether the claim can or should be dismissed.

1

2

> At the same time, the rule of mandate allows a lower court to decide anything not foreclosed by the mandate. *Herrington v. Cnty. of Sonoma*, 12 F.3d 901, 904 (9th Cir. 1993). A district court is limited by our remand when the scope of the remand is clear. *Mendez–Gutierrez v. Gonzales*, 444 F.3d 1168, 1172 (9th Cir. 2006). Violation of the rule of mandate is a jurisdictional error. *United States v. Thrasher*, 483 F.3d 977, 982 (9th Cir. 2007).

3

4

*Hall v. City of Los Angeles*, 697 F.3d 1059, 1067 (9th Cir. 2012).

5

6

7

8

9

10

Here, the Ninth Circuit's mandate is explicit and unambiguous. That court held in *RMFU*: "We also reverse the district court's decision that the [Original LCFS] is an impermissible extraterritorial regulation and *we direct that an order of partial summary judgment be entered in favor of CARB on those grounds*." 730 F.3d at 1107 (emphasis added). Accordingly, Defendants' motion for partial summary judgment on Plaintiffs' first claim that the Original LCFS is an impermissible extraterritorial regulation in violation of the Commerce Clause is GRANTED.

11

**B.   Plaintiffs' Second Claim – Extraterritoriality as to the Amended LCFS.**

12

13

14

15

Plaintiffs' second claim contains largely the same allegations as the first claim, but pertains to the Amended LCFS, not the Original LCFS. *See* FAC at ¶¶ 92-98. That is, Plaintiffs' second claim alleges that the Amended LCFS is an impermissible extraterritorial regulation for essentially the same reasons as the Original LCFS. As with the Original LCFS, Plaintiffs claim that

16

17

18

19

20

21

> [b]y regulating the "fuel pathway" of transportation fuels – *i.e.*, the manner in which transportation fuels are produced and ultimately reach the California market – the Amended LCFS impermissibly penalizes producers and importers based upon the manner in which their transportation fuels are produced in other States and countries and the manner in which they move in interstate and foreign commerce . . . . By design and in practical effect, the Amended LCFS impermissibly regulates conduct occurring wholly outside of California by making it more difficult to market and sell transportation fuels based upon where the fuels are produced, the manner in which they are produced, and the manner in which they reach the California market . . . . The Amended LCFS improperly extends California's police power beyond its jurisdictional bounds by regulating conduct that lies within the regulatory jurisdiction of other States and countries.

22

23

24

25

*Id.* at ¶¶ 94, 96-97; *see also* SAC at ¶¶ 86, 88. Plaintiffs contend that, "[b]y regulating interstate and foreign commerce that occurs wholly outside of California," the Amended LCFS violates the Commerce Clause, as well as "principles of interstate federalism embodied in the Federal structure of the United States Constitution." *Id.* at ¶ 98.

Defendants move to dismiss the entire claim on the grounds that (1) it is barred by the law of the case and (2) therefore it fails to state a claim on which relief can be granted. Doc. 327 at 12. Defendants contend that *RMFU*'s holding that the Original LCFS is not an impermissible extraterritorial regulation forecloses Plaintiffs' claim that the Amended LCFS is such a regulation because the "claim asserts, as [Plaintiffs'] already-resolved extraterritoriality claim did, that the application of lifecycle analysis to fuels constitutes impermissible extraterritorial regulation of all aspects of the lifecycle." *Id.* According to Defendants, Plaintiffs have "not altered [their] main factual allegation concerning extraterritoriality" because they "still maintain[] that, by using lifecycle analysis to determine carbon intensity, the LCFS regulates all aspects of the lifecycle," which includes "'the manner in which transportation fuels are produced outside California, their movement in interstate commerce to California, and the manner in which they ultimately reach the California market.'" *Id.* (quoting FAC at ¶ 70). Defendants contend that "[a]lthough [Plaintiffs'] 'Second Claim' purports to challenge the [Amended LCFS], it alleges no facts about the 2012 crude provisions that could render them extraterritorial or could present issues other than those already decided by the Ninth Circuit." Doc. 327 at 12. Thus, Defendants maintain that Plaintiffs' second claim is barred by *RMFU* because the claim's "extraterritoriality challenge still relies on an argument that, through the lifecycle analysis, the [Amended] LCFS regulates something other than California's fuels market," and "[t]he Ninth Circuit has already held to the contrary." *Id.* at 13 (citing *RMFU*, 730 F.3d at 1103).

Plaintiffs oppose Defendants' motion to dismiss, contending that because "the Ninth Circuit considered extraterritoriality only in the context of the Commerce Clause," that court "did not expressly or implicitly decide a claim that the LCFS violates principals [*sic*] of federalism." Doc. 330 at 15. Plaintiffs "submit that [*RMFU*] does not control [their] challenge under principles of horizontal federalism," *id.*, for three primary reasons:

> *First*, the Ninth Circuit did not and could not address [Plaintiffs'] claim that the Amended LCFS regulates in an extraterritorial manner because it did not evaluate any challenges to the Amended LCFS . . . .

1    *Second*, although the Ninth Circuit did not expressly address the Amended LCFS, [Plaintiffs]
2    agree that the Ninth Circuit's prior ruling would govern [Plaintiffs'] claim that the Amended
     LCFS violates the prohibition on extraterritorial regulation *under the Commerce Clause* . . . .

3    *Finally*, the Ninth Circuit's ruling does not resolve [Plaintiffs'] claim that the Amended LCFS is
     impermissibly extraterritorial under principles of horizontal federalism reflected in the structure
4    of the Constitution.

5    *Id.* at 13-14 (emphasis in original).

6        **1. Law of the Case Doctrine.**

7        The law of the case doctrine generally precludes a court from "reconsidering an issue that

8    already has been decided by the same court, or a higher court in the identical case." *United States v.*

9    *Alexander*, 106 F.3d 874, 876 (9th Cir. 1997). "The United States Supreme Court and the Ninth Circuit

10   alike have recognized that an action brought following a reversal and remand for further proceedings in

11   the same litigation is the same case for purposes of application of the law of the case doctrine." *Ischay v.*

12   *Barnhart*, 383 F. Supp. 2d 1199, 1218 (C.D. Cal. 2005) (citing *Hartford Life Ins. Co. v. Blincoe*, 255

13   U.S. 129, 136 (1921); *Hansen & Rowland v. C.F. Lytle Co.*, 167 F.2d 998, 998-99 (9th Cir. 1948)).[13]

14   "For the doctrine to apply, the issue in question must have been decided explicitly or by necessary

15   implication in the previous disposition." *United States v. Lumni Nation*, 763 F.3d 1180, 1185 (9th Cir.

16   2014) (emphasis in original) (quoting *United States v. Lumni Indian Tribe*, 235 F.3d 443, 452 (9th Cir.

17   2000)). "An argument is rejected by necessary implication when the holding stated or result reached is

18   inconsistent with the argument." *United States v. Jingles*, 702 F.3d 494, 502 (9th Cir. 2012) (quoting

19   *United States v. Jordan*, 429 F.3d 1032, 1035 (11th Cir. 2005)).

20

21

22   _____

     [13] The law of the case doctrine has three exceptions that may permit departure from the law of the case when: (1) the original
     decision is clearly erroneous and its enforcement would work a manifest injustice, (2) intervening controlling authority
23   makes reconsideration appropriate, or (3) substantially different evidence was adduced at a subsequent trial. *Old Person v.*
     *Brown*, 312 F.3d 1036, 1039 (9th Cir. 2002). No party suggests that any of these exceptions applies here. *United States v.*
24   *Alexander*, 106 F.3d 874, 876 (9th Cir. 1997) ("A court may have discretion to depart from the law of the case where: 1) the
     first decision was clearly erroneous; 2) an intervening change in the law has occurred; 3) the evidence on remand is
     substantially different; 4) other changed circumstances exist; or 5) a manifest injustice would otherwise result.").

25

**2. Analysis.**

Plaintiffs' first argument as to whether the law of the case bars their claim—that the Ninth Circuit did not and could not have addressed whether the Amended LCFS regulates extraterritorially—misses the mark. That the Ninth Circuit did not consider the Amended LCFS does not necessarily mean that *RMFU*'s reasoning and conclusions do not apply to the Amended LCFS. In fact, Plaintiffs "agree that [*RMFU*] . . . would govern [their] claim that the Amended LCFS violates the prohibition on extraterritorial regulation *under the Commerce Clause*." Doc. 330 at 14 (emphasis in original). In other words, that *RMFU* did not address the Amended LCFS is not dispositive of whether the decision bars Plaintiffs' claim under the law of the case. Likewise, that *RMFU* addressed Plaintiffs' challenge to the LCFS only under Commerce Clause principles is not dispositive.

As this Court explained in *RMFU Amendment*, any allegations "concerning the alleged extraterritorial reach of the LCFS would require this Court to find that the [Original] LCFS regulates conduct outside of California, which directly conflicts with *RMFU*'s explicit holdings to the contrary, and this Court's duty to respect the decision of the Ninth Circuit." 2014 WL 7004725, at *14.[14] And as this Court held in *RMFU Amendment*, the Ninth Circuit's decision in *RMFU* "forecloses any claim that the LCFS is an impermissible extraterritorial regulation, regardless of the basis of the claim, because any extraterritorial regulation claim necessarily is contingent on a finding that the LCFS regulates extraterritorially." *Id.* at *14. Accordingly, any challenge to the *Amended* LCFS premised on the assertion that it impermissibly regulates extraterritorially is foreclosed by *RMFU* unless it regulates fuels in a different (*i.e.*, extraterritorial) way than does the Original LCFS such that *RMFU* did not address the Amended LCFS's regulatory method(s) either directly or indirectly.

With regard to extraterritoriality, Plaintiffs have not alleged facts that could support a finding that the Amended LCFS regulates fuels differently than does the Original LCFS. The basis for Plaintiffs'

---

[14] Plaintiffs explicitly state in their opposition that they disagree with this conclusion, but they provide no explanation for their disagreement. *See* Doc. 330 at 16.

1  claim that the Amended LCFS regulates extraterritorially is premised on its use of a life-cycle analysis

2  to determine a fuel's carbon intensity—the same basis for their challenge to the Original LCFS that the

3  Ninth Circuit rejected. *See* FAC at ¶¶ 86, 94; Doc. 330 at 14. Plaintiffs claim that "[t]he Amended

4  LCFS, *like the [O]riginal LCFS*, employs a 'life-cycle' analysis that determines a fuel's carbon intensity

5  based on economic activities that occur wholly outside of California." Doc. 330 at 14 (citing FAC at ¶

6  94) (emphasis added). Plaintiffs further claim that "[t]he Amended LCFS, *like the Original LCFS*,

7  continues to regulate physically-identical fuels based on the manner in which those fuels were produced

8  and brought through interstate commerce into the California market." *Id.* (citing FAC at ¶¶ 93-97)

9  (emphasis added). Plaintiffs contend that,

10     [e]ven if California's regulation of economic conduct – *i.e.*, the production and transport of crude oil outside of California – were insufficient to qualify as extraterritorial regulation under the Commerce Clause, California's application of its life-cycle analysis to regulate the production and transport of crude oils outside of California on its face regulates economic conduct occurring wholly outside of California and therefore is extraterritorial regulation that violates the structural limits on California's authority under the United States Constitution.

11

12

13  *Id.* at 16-17.

14       For the reasons explained more thoroughly in *RMFU Amendment*, the Ninth Circuit has resolved

15  with finality any claim that the Original LCFS is an impermissible extraterritorial regulation. *See* 2014

16  WL 7004725, at *13-14 (citations omitted). Any claim premised on the assertion that the Original LCFS

17  regulates outside of California therefore fails under *RMFU*. Plaintiffs "disagree[] with that conclusion,"

18  but provide no explanation of their disagreement. *See* Doc. 330 at 16.

19       As discussed in more detail below, the crude oil provisions of the Amended LCFS operate

20  differently than did those of the Original LCFS. But *with regard to extraterritoriality*, Plaintiffs have

21  alleged no facts and have provided no argument to support a finding that the the Amended LCFS

22  operates differently. In fact, Plaintiffs' extraterritoriality claim is premised solely on the LCFS's life-

23  cycle analysis, and Plaintiffs explicitly state that the Amended LCFS's life-cycle analysis is the same as

24  that contained in the Original LCFS. In other words, Plaintiffs effectively allege that the Amended

25

LCFS regulates extraterritorially in the exact same way as did the Original LCFS.

In sum, Plaintiffs have not alleged facts demonstrating that the Amended LCFS regulates fuels differently such that *RMFU*'s extraterritoriality analysis should not apply to bar Plaintiffs' challenge that the Amended LCFS also is an impermissible extraterritorial regulation. As such, the Court finds that Plaintiffs' claim that the Amended LCFS is an impermissible extraterritorial regulation contained in the Second Claim is barred by *RMFU* under the law of the case. *RMFU Amendment* gave Plaintiff ample warning of the need to allege facts that would distinguish the Amended LCFS in some way that would preclude dismissal of this claim. As the FAC contained no such distinguishing facts and because Plaintiffs do not here suggest any such facts could be alleged, further amendment appears futile. Accordingly, the Court GRANTS WITHOUT LEAVE TO AMEND Defendants' motion to dismiss Plaintiffs' Second Claim that the Amended LCFS is an impermissible extraterritorial regulation.

**C.    Plaintiffs' Third Claim – Violation of the Commerce Clause (Original LCFS and Amended LCFS)**

Plaintiffs' third claim alleges both the Original LCFS and the Amended LCFS impermissibly discriminate against interstate commerce in violation of the Commerce Clause. *See* FAC at ¶¶ 103-05. Specifically, Plaintiffs allege "[t]he Original LCFS and Amended LCFS violate the Commerce Clause . . . by discriminating against transportation fuels produced in other States and other countries" because they "treat chemically identical fuels and fuel feedstocks differently based, in part, on where they are produced." *Id.* at ¶¶ 103-04. Plaintiffs further allege that "[b]y assigning lower carbon intensities to California fuels and higher carbon intensities to fuels from outside California, the Original LCFS and Amended LCFS encourage the use of fuels produced in California as compared to chemically identical fuels produced outside of California." *Id.* at ¶ 104. Thus, Plaintiffs claim that "[t]he discrimination inherent in the Original LCFS and Amended LCFS is designed to provide an unfair competitive advantage to local economic interests and to promote the use of California fuels in California." *Id.* at ¶ 105.

18

**1. Defendants' Motions to Dismiss and for Summary Judgment on Plaintiffs' Third Claim.**

Defendants assert they are entitled to judgment on Plaintiffs' entire third claim under the rule of mandate and Fed. R. Civ. P. 12(b)(6). *See* Doc. 327 at 13, 14 ("None of the claims in [Plaintiffs'] 'Third Claim' should survive this motion."). Defendants claim this Court should enter judgment on Plaintiffs' discrimination claims against the Original LCFS because the Ninth Circuit in *RMFU* directed this Court to enter partial summary judgment in Defendants' favor on those claims on remand. Doc. 327 at 14 (citing *RMFU*, 730 F.3d at 1107). Defendants contend they are entitled to judgment "on all of the discrimination claims in [Plaintiffs'] 'Third Claim' that are directed at the 'Original LCFS' because [*RMFU*] resolved all of those claims." *Id.* at 14.

Defendants claim that "[w]hile the Ninth Circuit remanded the RMFU Plaintiffs' claim that [the LCFS's ethanol provisions] discriminate in purpose of effect," Plaintiffs "expressly disavowed that [their] challenge to the LCFS encompassed" claims concerning the Original LCFS's ethanol provisions when they moved for summary judgment. *Id.* Defendants also claim that Plaintiffs "asserted that the discovery Defendants sought was irrelevant to [their] discrimination claims because the discovery concerned ethanol and not petroleum fuels." *Id.* at 15 (citing Doc. 155 at 5 n.2). In Defendants' view, "[t]he Ninth Circuit resolved *all* discrimination claims concerning petroleum fuels *and* the facial discrimination claim concerning ethanol." *Id.* (emphasis in original). Accordingly, Defendants contend that the Ninth Circuit's order on remand for this Court "to consider whether [the Original LCFS's] ethanol provisions discriminate in purpose or in practical effect," *RMFU*, 730 F.3d at 1078, applies to the RMFU Plaintiffs only, and does not apply to Plaintiffs. Doc. 331 at 5.

In addition, Defendants move to dismiss Plaintiffs' discrimination claim against the crude oil provisions of the Amended LCFS under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. Doc. 327 at 15; Doc. 331 at 8. Defendants argue that Plaintiffs' "discrimination claims against the 2012 crude oil provisions are internally inconsistent and represent nothing more than a re-hash of the claims already decided by the Ninth Circuit." Doc. 331 at 10.

**2. Plaintiffs' Opposition.**

Plaintiffs agree with Defendants that, pursuant to the Ninth Circuit's mandate, partial summary judgment can be entered in Defendants' favor on Plaintiffs' (1) discrimination claim against the crude oil provisions of the Original LCFS, Doc. 330 at 18, and (2) on Plaintiffs' facial discrimination claim against the ethanol provisions of the Original LCFS. *Id.* at 21.

Plaintiffs, however, oppose Defendants' motion to dismiss in all other respects. Plaintiffs contend that the FAC "states a valid claim that the [Amended LCFS's] crude oil provisions violate the Commerce Clause by discriminating against interstate and foreign commerce," and are not barred by the law of the case "because these provisions were not at issue in [*RMFU*]." Doc. 330 at 19-20. Likewise, Plaintiffs contend their claim that the Original LCFS's ethanol provisions discriminate in purpose and effect should not be dismissed and are not barred by the law of the case because "the Ninth Circuit expressly left open this claim for this Court's consideration, holding that 'we remand the case for the district court to determine whether the ethanol provisions discriminate in purpose or effect.'" *Id.* at 22 (quoting *RMFU*, 730 F.3d at 1107). Plaintiffs argue that, contrary to Defendants' assertions, because they "never disavowed its claim that the ethanol provisions discriminate in purpose and effect," the "claim is properly before this Court now." *Id.* at 23.

**3. Analysis.**

**a. The Original LCFS's Crude Oil Provisions.**

The parties agree that Defendants are entitled to judgment on Plaintiffs' claim that the crude oil provisions of the Original LCFS are impermissibly discriminatory and that the ethanol provisions of the Original LCFS are facially discriminatory. Accordingly, Defendants' motion for partial summary judgment on Plaintiffs' claim that the crude oil provisions of the Original LCFS are impermissibly discriminatory either facially, purposefully, or in effect, and on Plaintiffs' claim that the ethanol provisions of the Original LCFS are facially discriminatory is GRANTED in Defendants' favor and against Plaintiffs.

20

**b. Whether the Original LCFS's Ethanol Provisions Discriminate in Purpose and Effect.**

The parties dispute whether Plaintiffs can state a claim that the Original LCFS's ethanol provisions discriminate in purpose and effect. Specifically, Defendants assert that Plaintiffs "expressly disavowed" its challenge to the Original LCFS's ethanol provisions. Doc. 327 at 15-16. Defendants claim Plaintiffs did so because they "asserted that [their] summary judgment motion encompassed *all* of [their] discrimination claims." *Id.* (emphasis in original).

The Court disagrees with Defendants' contention that Plaintiffs "disavowed" their claims that the Original LCFS discriminates in purpose and effect, much less that they did so "expressly." Defendants' argument that Plaintiffs "never suggested that it held back any discrimination claims" in their motion for partial summary judgment lacks support. Doc. 331 at 6. In moving for *partial* summary judgment, Plaintiffs explained "that the [Original] LCFS is preempted by federal law and violates the Commerce Clause in each of the ways described in Plaintiffs' Complaint. However, [Plaintiffs'] *partial* summary judgment motion focuses on two claims." Doc. 126 at 8 (emphasis in original).

There is no indication that Plaintiffs abandoned or disavowed their claim that the Original LCFS's ethanol provisions discriminated against interstate and foreign commerce in purpose and effect. Rather, Plaintiffs only moved for partial summary judgment on other claims. And as Defendants acknowledge, Doc. 327 at 14, the Ninth Circuit expressly remanded "the case for [this Court] to determine whether the [Original LCFS's] ethanol provisions discriminate in purpose or effect." *RMFU*, 730 F.3d at 1100. Because Plaintiffs' claims that the Original LCFS's ethanol provisions discriminate in purpose or effect remain pending, Defendants' motion to dismiss those claims is DENIED.

**c. The Amended LCFS's Crude Oil Provisions.**

The parties dispute whether Plaintiffs can and do state a claim that the Amended LCFS's crude oil provisions discriminate in purpose and effect. Defendants contend that Plaintiffs cannot do so because the FAC's pertinent allegations are internally inconsistent, Doc. 327 at 15, and, even if they

1   were consistent, *RMFU* bars them under the law of the case. *Id.* at 17.

2          Because the parties' initial briefs concerning the Amended LCFS's crude oil provisions were did

3   not clearly articulate the parties' positions on certain issues, the Court directed the parties to submit

4   supplemental briefs. Doc. 332. Specifically, the Court directed the parties to submit supplemental briefs

5   "outlin[ing] their understanding of how the Amended LCFS's crude oil provisions function . . . and

6   whether and why *RMFU* has precluded Plaintiffs' pending claims against them." *Id.* at 4 (footnote

7   omitted). In addition, Plaintiffs were directed to explain "[h]ow and why the Amended LCFS's crude oil

8   provisions are alleged to be impermissibly discriminatory" and whether the FAC sufficiently articulates

9   a claim (or claims) that are not barred by *RMFU*. *See id.* at 3. The parties timely complied with those

10  directives.

11         Defendants move to dismiss Plaintiffs' claim against the Amended LCFS's crude oil provision

12  for four primary reasons: (1) the claim's allegations are incoherent because they are internally

13  inconsistent and incorrectly alleges the crude oil provisions of the Amended LCFS apply to foreign and

14  out-of-state crude oils when, in fact, it applies only to "regulated parties"; (2) the claim is barred by

15  *RMFU* under the law of the case; and (3) the claim fails to state a claim under the Dormant Commerce

16  Clause. The Court addresses each argument in turn.

                   **(1) Summary of the Relevant Amended LCFS's Crude Oil Provisions.[15]**

17         The purpose of the LCFS is to "reduce greenhouse gas emissions by reducing the full fuel-cycle,

18  carbon intensity of the transportation fuel pool used in California." § 95480. Each year, regulated parties

19  "must meet the average carbon intensity requirements set forth" in section 95482 for the fuel for which

20  they are responsible. *See* § 95482(a)-(b).

21         Pursuant to the 2012 amendments to the LCFS, CARB adopted the "California Average

22  Approach" to "account for [greenhouse gas] emissions from all crude oil used by California refineries."

23  ─────────────────

24  [15] What follows is a summary and explanation of only the Amended LCFS's crude oil provisions relevant to Defendants' motion to dismiss. It is not intended to provide a thorough summary or explanation of the entire Amended LCFS.

25

                                            22

CARB, Initial Statement of Reasons for Proposed Rulemaking, Proposed Amendments to the Low Carbon Fuel Standard (2011) ("2011 ISOR") at 56, *available at* http://www.arb.ca.gov/regact/2011/lcfs2011/lcfsisor.pdf. Under this scheme, the annual average carbon intensity value for gasoline and diesel fuels that a regulated party must meet, sometimes referred to as "the compliance target," decreases each year. § 95482(b). If a regulated party's fuel is below the annual average carbon intensity value, then that party receives "credits"; if it is above the annual average carbon intensity value, the party receives "deficits." *See* § 95485(b)(3); CARB, Low Carbon Fuel Standard, "Question and Answer Guidance Document (Version 1.0)" ("CARB Q&A") at 4 ("Credits are generated when a regulated party's fuel has carbon intensity that is less than the CI standard. Conversely, a deficit occurs when a regulated party's fuel has carbon intensity that is higher than the CI standard."); *available at* http://www.arb.ca.gov/fuels/ lcfs/LCFS_Guidance_(Final_v.1.0).pdf. In general, a party complies with the LCFS if its credits are greater than or equal to its deficits. § 95488(a).

With regard to Plaintiffs' challenge to the Amended LCFS's crude oil provisions, this litigation concerns how those credits/deficits are calculated for crude-oil-based fuels. Specifically, this case concerns how CARB assesses regulated parties' compliance with the LCFS vis-à-vis the credit/deficit scheme contained in the Amended LCFS's crude oil provisions. The parties and the Court agree that scheme operates in a two-step process. That scheme is similar to the Original LCFS's crude oil provisions "in that it will continue to require refiners to account for both a 'baseline deficit' and an 'incremental deficit,'" but it differs from the Original LCFS "in several ways," discussed below. CARB, Updated Informative Digest, Amendments to the Low Carbon Fuel Standard ("Amended LCFS Digest"), at 5, *available at* http://www.arb.ca.gov/regact/2011/lcfs2011/uidrev.pdf.

### a. Step One – Base Deficits.

At the first step, CARB calculates a regulated party's "base deficits." A regulated party's base deficits are calculated, in part, by taking into consideration (1) the amount of CARBOB or Ultra Low Sulfur Diesel ("ULSD") the regulated party uses and (2) the difference between the carbon intensity

value assigned to CARBOB[16] or ULSD and the annual average carbon intensity. *See* § 95846(b)(2)(A)1;

*see also* 2011 ISOR at 80 ("Regulated parties would only calculate and be subject to the Base Deficit for

all CARBOB and diesel regardless of the crude oil used for refining.").

The full equation for calculating base deficits is: $Deficits_{Base}^{XD}\ (MT) = (CI_{Standard}^{XD} - CI_{BaselineAve}^{XD}) \times E^{XD} \times C$ .

§ 95486(b)(2)(A)1.[17] "$CI^{XD}_{standard}$" stands for the compliance target average, which is the required annual

average carbon intensity that gasoline and diesel fuels must meet. *See id.* Section 95846(b)(2)(A)1

defines $CI^{XD}_{standard}$ as having the "same meaning as specified in section 95485(a)(3)(A)," which, in turn,

defines $CI^{XD}_{standard}$ as "the average carbon intensity requirement of either gasoline (XD = 'gasoline') or

diesel fuel (XD = 'diesel') for a given year as section 95482(b) and (c), respectively." Sections 95482(b)

and (c) thus provides the compliance targets for gasoline and diesel fuels, respectively, for each calendar

year from 2011 through "2020 and subsequent years." *See* § 95482(a).

"Starting January 1, 2011 and for each year thereafter, a regulated party must meet the average

carbon intensity requirements set forth in Table 1 and Table 2 [in section 95482] for its transportation

gasoline and diesel fuel, respectively, in each calendar year." *Id.* As memorialized in sections 95482(b)

and (c), the compliance targets for CARBOB and ULSD decrease annually until 2020. The compliance

target for gasoline began at 95.61 gCO2e/MJ in 2011 and will reduce incrementally each year until

2020, where it will remain at 89.06 gCO2e/MJ "for subsequent years." *See* § 95482(b). Similarly, the

compliance target for diesel began at 94.47 gCO2e/MJ in 2011 and will reduce incrementally each year

until 2020, where it will remain at 88.23 gCO2e/MJ "for subsequent years." *See* § 95842(c).

"$CI^{XD}_{BaselineAvg}$" stands for the Baseline Average carbon intensity values for either CARBOB or

ULSD, which are set forth in their respective "Carbon Intensity Lookup Tables." § 95486(b)(2)(A)1.

The Baseline Average replaced categories in the Original LCFS concerning HCICOs/non-HCICOs and

---

[16] "CARBOB" stands for California Reformulated Gasoline Blendstock for Oxygenate Blending.

[17] "$E^{XD}$ is the amount of fuel energy, in MJ, from CARBOB . . . or diesel . . . either produced in California or imported into California during a specific calendar year." § 95486(b)(2)(A)(1). "C is a factor used to convert credits to units of metric tons of gCO2E." § 95485(a)(2)((3)(A).

existing/emerging sources. *See* Amended LCFS Digest at 5.

The Carbon Intensity Lookup Table for CARBOB is found in section 95486(b), Table 6 ("Table 6"), and provides a carbon intensity value of 99.18 gCO2e/MJ for CARBOB. The Carbon Intensity Lookup Table for ULSD is found in section 95486(b), Table 7 ("Table 7"), and provides a carbon intensity value of 98.03 gCO2e/MJ for ULSD. These "Look-Up Table values for CARBOB and diesel [will] not be updated," 2011 ISOR at ES-10, and represent the average carbon intensity for CARBOB/ULSD. *See* CARB, "Updated Informative Digest: Amendments to the Low Carbon Fuel Standard" ("Amended LCFS Digest") at 4, *available at* http://www.arb.ca.gov/regact/2011/lcfs2011/uidrev.pdf.

How, exactly, CARB calculates the Baseline Average carbon intensity values for CARBOB and ULSD is not entirely clear based on either the LCFS regulations themselves or the current record. But it appears the complicated processes through which their "pathways"[18] (*i.e.*, their resultant carbon intensity values) are determined are thoroughly explained in CARB documents that are "incorporated . . . by reference" into section 95486. *See* § 95486(b)(A)-(Z).

The Amended LCFS "explicitly accounts for and tracks the overall average [carbon intensity] for the transport and production of crudes used by California refineries." 2011 ISOR at 82. Section 95486(b)(A) incorporates by reference a CARB document entitled "(Feb. 27, 2009, v.2.1), 'Detailed California-Modified GREET Pathway for California Reformulated Gasoline Blendstock for Oxygenate Blending (CARBOB) from Average Crude Refined in California,' Pathway CBOB001" ("the CARBOB Pathway Document").[19] That document "provides detailed calculations, assumptions, input values and other information required to calculate the energy use and [greenhouse gas] emissions for the CARBOB pathway," and explains that the CARBOB pathway "includes crude recovery, transport, [and] refining of

---

[18] Under the LCFS, a fuel's "pathway" is, in effect, its ultimate carbon intensity value, which accounts for "all aspects of the production, refining, and transportation of a fuel." *RMFU*, 730 F.3d at 1081.

[19] *Available at* http://www.arb.ca.gov/fuels/lcfs/022709lcfs_carbob.pdf.

crude in a typical California refinery and transport of finished product (CARBOB)." CARBOB Pathway

Document at 2-3.

Similarly, section 95486(b)(C) incorporates by reference a CARB document entitled "(February 28, 2009, v.2.1), 'Detailed California-Modified GREET Pathway for Ultra Low Sulfur Diesel (ULSD) from Average Crude Refined in California,' Pathway ULSD001" ("the ULSD Pathway Document").[20] Like the CARBOB Pathway Document, the ULSD Pathway Document also "provides detailed calculations, assumptions, input values and other information required to calculate the energy use and [greenhouse gas] emissions for the ULSD pathway," and explains that the ULSD pathway also "includes crude recovery, transport, refining of crude in a typical California refinery and transport of finished product (ULSD)." ULSD Pathway Document at 2-3.

Plaintiffs claim that the carbon intensity values for CARBOB and ULSD, as contained in Table 6 and Table 7, respectively, "are based on the 'baseline crude average' for production and transport included in Table 8." Doc. 333 at 8. Put another way, Plaintiffs assert that the 2010 Baseline Crude Average of 11.39 gCO2e/MJ memorialized in Table 8 was used to determine the carbon intensity values of CARBOB contained in Table 6 (99.18 gCO2e/MJ) and of ULSD in Table 7 (98.03 gCO2e/MJ). Defendants provide no argument or explanation addressing this issue.

Table 8 contains the carbon intensity values associated with only "the production and transport of the crude oil supplied to California refineries." As discussed above, the extensive process by which CARB determined the pathways for CARBOB and ULSD (*i.e.*, their total carbon intensity values as memorialized in Tables 6 and 7) are outlined in the CARBOB Pathway Document and the ULSD Pathway Document, respectively. *See* §§ 95486(b)(A)(A.1), (C). In calculating those pathways, CARB took into account the carbon intensity values associated with the recovery and transportation of CARBOB and ULSD. In 2012, CARB determined a supplement to both the CARBOB Pathway

---

[20] *Available at* http://www.arb.ca.gov/fuels/lcfs/022709lcfs_ulsd.pdf.

Document and ULSD Pathway Document was necessary because Table 8 originally was based on data from 2006, but needed to be updated to reflect data from 2010.[21] Accordingly, CARB substituted the 2010 Baseline Crude Average of 11.39 gCO2e/MJ for the lower 8.07 gCO2e/MJ carbon intensity value associated with crude recovery and transport contained in the CARBOB Pathway Document and the ULSD Pathway Document.[22] Simply put, Plaintiffs appear to be correct that the Baseline Crude Average in Table 8 (11.39 gCO2e/MJ) was the carbon intensity value related to production and transport used to determine the pathways (*i.e.*, overall carbon intensity) for CARBOB contained in Table 6 (99.18 gCO2e/MJ) and for ULSD contained in Table 7 (98.03 gCO2e/MJ).

Base deficits are calculated, in part, by determining the difference between CARBOB's or ULSD's carbon intensity value, which remains constant, and the applicable compliance target average, which decreases annually.[23] For instance, when determining base deficits for CARBOB in 2011, CARBOB's carbon intensity value of 99.18 would be subtracted from the compliance target average of 95.61 gCO2e/MJ. That difference of -3.57 gCO2e/MJ is then input into the remaining base deficit calculation, meaning that, in 2011, CARBOB produced base deficits because its carbon intensity value was 3.57 gCO2e/MJ above the 2011 compliance target.[24] Because CARBOB's and ULSD's carbon intensity values remain constant while the compliance targets remain at lower values and decrease each year, regulated parties always will accrue increasing base deficits, by volume, for the CARBOB and

---

[21] *See* § 95486(b)(A.1); § 95486(b)(C.1) "(Supplement Version 2.0 (September 12, 2012) to Stationary Source Division, Air Resources Board (February 28, 2009, v.2.1), 'Detailed California-Modified GREET Pathway for Ultra Low Sulfur Diesel (ULSD) from Average Crude Refined in California,'" ("ULSD Pathway Document Supplement") at 2, *available at* http://www.arb.ca.gov/regact/2011/lcfs2011/ulsd.pdf; CARBOB Pathway Document Supplement at 2.

[22] *See* CARBOB Pathway Document Supplement at 2 ("The Baseline Average carbon intensity value for CARBOB, 99.18 gCO2/MJ, was determined by substituting the 2010 Baseline Crude Average carbon intensity value discussed above for the crude recovery (6.93 gCO2/MJ) and crude transport (1.14 gCO2/MJ) values reported in the CARBOB pathway document."); ULSD Pathway Document Supplement at 2 ("The Baseline Average carbon intensity value for ULSD, 98.03 gCO2/MJ, was determined by substituting the 2010 Baseline Crude Average carbon intensity value discussed above for the crude recovery (6.93 gCO2/MJ) and crude transport (1.14 gCO2/MJ) values reported in the ULSD pathway document.").

[23] *See supra* n. 16 (explaining remaining factors used in the base deficit calculation).

[24] If the difference is a negative value, the party incurs deficits; if it is a positive value, the regulated party incurs credits. *See* § 95486(b)(2)(A)(1) ("*Deficits$^{XD}_{Base}$(MT) and Deficits$^{XD}_{Incremental20XX}$* mean the amount of LCFS deficits incurred (a negative value)").

27

1

ULSD they use, and must produce sufficient credits to off-set those deficits through the use of other

2

fuels with lower carbon intensities. *See* Doc. 334 at 3-4 (Defendants explaining that because "crude-oil-

3

based fuels, such as CARBOB or conventional diesel, generally produce only deficits . . . the credits

4

needed to comply with the LCFS . . . must come from lower-carbon alternative fuels"). Further, because

5

of the annually increasing difference between CARBOB's and ULSD's carbon intensity values and the

6

annual compliance target average, CARBOB and ULSD will produce more base deficits by volume each

7

year.

### b. Step Two – Incremental Deficits.

8

9

At the second step, CARB calculates a regulated party's "incremental deficits," which are used

10

to mitigate increases in the carbon intensity of the California crude oil market. *See* § 95846(b)(2)(A)1.

11

This step was intended "to ensure that the LCFS benefits are not diminished due to increases in

12

[greenhouse gas] emissions from higher carbon intensity crude supplies," Amended LCFS Digest at 4,

13

and replaced the Original LCFS's use of a "bright line" value of 15.00 gCO2e/MJ used "for

14

differentiating between HCICOs and non-HCICOs." *Id.* at 5. Accordingly, "an incremental deficit is

15

applied to all companies [only] if the average crude slate refined in California becomes more carbon

16

intensive over time." 2011 ISOR at 78. "This allows for an individual company to shift its crude slate and not

17

be required to mitigate increased emissions as long as the average [carbon intensity] of the California crude

18

slate used by the industry as a whole does not increase over time relative to the baseline year." 2011 ISOR at

19

78. According to CARB, "[t]here is likely greater flexibility to purchase worldwide crude supplies than [the

20

Original LCFS's] approach as oil companies have the discretion to shift among crude sources without

21

incurring an incremental deficit, as long as the overall California average [carbon intensity] does not

22

increase." *Id.* at 82.

23

To determine if incremental deficits will be assessed for regulated parties, CARB determines each

24

year if the "California average crude oil carbon-intensity value . . . attributed to the production and transport

25

of the crude oil supplied . . . to California refineries" (the "Annual Crude Average") is greater than the

28

"California average crude oil carbon-intensity value . . . attributed to the production and transport of the crude oil supplied . . . to California refineries during the baseline calendar year, 2010" (the "Baseline Crude Average"). *See* § 95486(b)(2)(A)1. "[I]f the annual crude average [carbon intensity] in a given year is greater than the baseline crude average [carbon intensity], the incremental [carbon intensity will] be used in the following year to calculate the additional deficits to be incurred by regulated parties that supply CARBOB and ULSD." 2011 ISOR at 35.

For purposes of calculating incremental deficits for CARBOB and diesel fuel, the Baseline Crude Average is the "Baseline Crude Average carbon intensity value set forth in the Lookup Table." § 95486(b)(2)(A)1. Although not explicitly stated, this refers to the "Lookup Table" found at section 95486(b), Table 8 ("Table 8"), which provides a "Baseline Crude Average" of 11.39 gCO2e/MJ. That value remains constant because it is "[b]ased on production and transport of crude oil supplied to California refineries during the baseline calendar year, 2010." Table 8 at *. The remaining data in Table 8 shows the average carbon intensity values of various crude oils from around the world, including California (12.90 gCO2e/MJ), based on data from 2010.[25]

Like the Baseline Crude Average, the Annual Crude Average is "[b]ased on production and transport of the crude oil supplied to California refineries." Table 8 at **. The Annual Crude Average, however, "will be first calculated for calendar year 2012 and subsequently updated annually using data for crude oil supplied to California refineries during the specified calendar year or years." *Id.*[26] Each time the Annual Crude Average must be recalculated, CARB produces a document that shows "a breakdown of the sources of crude oil supplied to California refineries during [the relevant year] and the carbon intensity values assigned to

---

[25] CARB initially used data from 2006, but updated Table 8 in 2012 based on data from 2010. *See* CARB, "Supplement Version 2.0 to: 'Detailed California-Modified GREET Pathway for California Reformulated Gasoline Blendstock for Oxygenate Blending (CARBOB) from Average Crude Refined in California,'" (Sept. 12, 2012) at 2 ("CARBOB Pathway Document Supplement"), *available at* http://www.arb.ca.gov/regact/2011/lcfs2011/carbob.pdf.

[26] "$CI^{XD}_{2012CrudeAvg}$ will be calculated using data for crude oil supplied to California refineries during the calendar year 2012. $CI^{XD}_{2013CrudeAvg}$ will be calculated using data for crude oil supplied to California refineries during the calendar years 2012 and 2013. $CI^{XD}_{2014CrudeAvg}$ will be calculated using data for crude oil supplied to California refineries during the calendar years 2012, 2013, and 2014. All subsequent updates to $CI^{XD}_{20XXCrudeAvg}$ will be calculated using data for crude oil supplied to California refineries during the most recent three calendar years." § 95486(b)(2)(A)(1).

29

those crude sources," as well as the resulting Annual Crude Average. *See, e.g.*, CARB, Calculation of 2012 Crude Average CI Value ("2012 CI Calculation Table"), *available at* http://www.arb.ca.gov/fuels/lcfs/crude-oil/2012-crude-ave-ci.pdf.[27] If the Annual Crude Average is greater than the Baseline Crude Average, then all regulated parties will receive incremental deficits; if the Annual Crude Average is less than or equal to the Baseline Crude Average, then incremental deficits are not incurred. *See* § 95486(b)(2)(A)1; *see also* CARB, Final Statement of Reasons, Amendments to the Low Carbon Fuel Standard Regulation (2012) ("2012 FSOR"), at 29 ("Incremental deficits are earned, however, when the California [Crude] Average rises."), *available at* http://www.arb.ca.gov/regact/2011/lcfs2011/lcfsfsor.pdf.

Incremental deficits are calculated, in part, by subtracting the corresponding Annual Crude Average, which is recalculated annually or every three years, starting in 2014, from the Baseline Crude Average, which remains constant at 11.39 gCO2e/MJ. Because this calculation only occurs when the Annual Crude Average is greater than the Baseline Crude Average, the result is always a negative value, which represents a deficit. Because the Annual Crude Average was 11.36 gCO2e/MJ in 2012 and 2013, and 11.35 gCO2e/MJ in 2014 (*i.e.*, below the Baseline Crude Average of 11.39 gCO2e/MJ), it appears that incremental deficits were not assessed for the corresponding years. *See* § 95486(b)(2)(A)1 (incremental deficits formula providing that if the Annual Crude Average is less than or equal to the Baseline Crude Average, then the annual incremental deficits assessed are equal to zero).

### (2) Whether Plaintiffs Challenge Both Steps in the FAC.

After a review of the initial briefs and a first round of supplemental briefing on Defendants' motion to dismiss, the Court ordered the parties to file a second round of supplemental briefs concerning the first step of the regulatory process of the Amended LCFS's crude oil provisions. Doc. 335 at 3.

---

[27] *See also* CARB, Calculation of 2014 Crude Average CI Value ("2014 CI Calculation Table"), *available at* http://www.arb.ca.gov/fuels/lcfs/crude-oil/2014-crude-ave-ci.pdf; CARB, Calculation of 2013 Crude Carbon Intensity Value ("2013 CI Calculation Table), *available* at http://www.arb.ca.gov/fuels/lcfs/crude-oil/2013-crude-ave-ci.pdf (collectively, "the CI Calculation Tables"). The Court takes judicial notice of the 2012, 2013, and 2014 CI Calculation Tables as matters of public record not subject to reasonable dispute. *See* Fed. R. Evid. 201(b); *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001); *MGIC Idem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986) ("On a motion to dismiss, we may take judicial notice of matters of public record outside the pleadings.") (citations omitted).

1   Among other things, the Court directed Plaintiffs "to explain . . . which allegations in the FAC

2   demonstrate that Plaintiffs challenge the first step." Doc. 335 at 3. The Court found this necessary

3   because it was not clear from the FAC (or Plaintiffs' briefs) whether Plaintiffs challenged the first step.

4   *Id.* at 2.

5       Plaintiffs confirmed they intended to challenge the first step in the FAC. Doc. 336 at 5. Plaintiffs

6   contend that "paragraphs 73 through 76 [of the FAC] describe the process used to assign base deficits,

7   and paragraphs 81 to 82, 102, and 103, allege that this first step discriminates against out-of-state and

8   foreign crude oils, and in favor of California crude oils." *Id.* at 9. Plaintiffs acknowledge that paragraphs

9   73-76 "do not use the specific term 'base deficits,' but they explain that carbon intensity scores for crude

10  oil are assigned using the baseline 'California average' from 2010, rather than the individual carbon

11  intensities of the particular crude oils that a regulated party uses." *Id.* Further, Plaintiffs assert "the 'base

12  deficits' and 'incremental deficits' unconstitutionally discriminate in the same manner," which is why

13  the FAC "does not have separate allegations of discrimination covering the two types of deficits;

14  instead, its allegations of discrimination include both kinds of deficits." Doc. 336 at 9-10.

15      The Court finds (and Defendants do not dispute) that the FAC contains a claim against step one.

16  *See generally* Doc. 337. Although not entirely clear, paragraphs 74 through 76 of the FAC sufficiently

17  describe step, and paragraph 81 sufficiently explains Plaintiffs' challenge to step one, albeit in a very

18  truncated fashion.

19              **(3) Whether the FAC's Allegations Are Inconsistent with the
                    Amended LCFS.**

20      Defendants argue Plaintiffs' third claim should be dismissed because the FAC's allegations are

21  inconsistent both internally and with the Amended LCFS, and therefore do not accurately describe the

22  Amended LCFS. *See* Doc. 327 at 5. Specifically, Defendants assert that the following allegations in the

23  FAC are inconsistent: (1) Plaintiffs' allegation "that, under the 2012 crude provisions, [C]ARB will

24  recalculate the average carbon intensity of California's crude slate each year" and (2) Plaintiffs'

25

1   allegation "that [C]ARB will assign the same 'average baseline CI score,' rather than individualized

2   'scores,' to numerous crude oils including 'California HCICO' and 'Alaskan and foreign crude oils."

3   Doc. 327 at 15; *see also* Doc. 334 at 8 (same).

4          These allegations are not inconsistent with the Amended LCFS. As explained above, CARB

5   recalculates the Annual Crude Average each year (or every three years, starting in 2014) by averaging

6   the individualized carbon intensity values of every crude oil in the California market. That average is

7   then used to determine whether incremental deficits are assessed for *all* regulated parties—if the Annual

8   Crude Average carbon intensity value is higher than the Baseline Crude Average carbon intensity value,

9   then the difference between the two is used to determine a regulated party's incremental deficits. *See* §§

10  95486(b)(2)(A)1-2.a-b.

11         Thus, CARB calculates "individualized carbon intensity values for each crude, but then assigns

12  deficits based on the average carbon intensity of all crude oils used in California, regardless of the

13  individualized carbon intensity of the crude oils that a particular party actually uses." Doc. 330 at 19

14  (citations omitted). As explained in the 2012 FSOR: CARB "agree[s] that the potential for a few refiners

15  driving up the Annual Crude Average carbon intensity and incurring an incremental deficit that will be

16  applied to all refiners is a disadvantage of the [Amended LCFS]." 2012 FSOR at 45. Because of that

17  concern, CARB evaluated (and will continue to evaluate) "an option for individual regulated parties to

18  have their deficits for gasoline and diesel determined on a refinery-specific basis that accounts for the

19  carbon intensity of domestic and imported crudes, intermediate products, and finished fuels." *Id.* at 46.

20  Plaintiffs' allegations that Defendants contend are inconsistent in fact are consistent with the Amended

21  LCFS's crude oil provisions. Accordingly, the Court DENIES Defendants' motion to dismiss on that

22  ground.

23         Defendants also argue—in their reply only—that the FAC is inconsistent with the Amended

24  LCFS because the Amended LCFS regulates only "regulated parties" (*e.g.*, refiners), not crude oils or

25  their producers, yet Plaintiffs incorrectly alleges that the Amended LCFS discriminates against crude

1   oils because they are subjected to average carbon intensities instead of their actual, individualized

2   carbon intensity values. *See* Doc. 331 at 10.[28] Generally, a "district court need not consider arguments

3   raised for the first time in a reply brief," *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007), but the

4   Court has the discretion to do so. *Lane v. Dep't of Interior*, 523 F.3d 1128, 1140 (9th Cir. 2008).

5        As noted, the Court directed the parties to submit two rounds of supplemental briefs. Doc. 332.

6   For the first set of briefs, the Court directed the parties to explain "[h]ow the relevant portions of the

7   Amended LCFS's crude oil provisions operate to regulate crude oil in California" and whether *RMFU*

8   barred their claims against those provisions. *See id.* at 3-4.

9        Defendants were directed to submit their supplemental brief after Plaintiffs submitted theirs. *Id.*

10   at 4. Although not directed to do so, Defendants expanded on their argument that Plaintiffs' claim

11   against the Amended LCFS's crude oil provisions "is incorrect both because it is regulated refiners and

12   blenders, not out-of-state crude oil producers, who incur deficits." Doc. 334 at 7. Defendants further

13   argued the FAC's allegations are internally inconsistent because "[a]t one point, [Plaintiffs] allege[] that

14   'crude-oil providers' incur the deficits, while at another point [they] allege[] that 'regulated parties that

15   provide [refined fuels like] gasoline or diesel' incur the deficits." *Id.* at 7-8 (citing FAC at ¶¶ 74, 79)

16   (footnote omitted).

17        The Court again asked for supplemental briefs. Doc. 335. Plaintiffs were directed to file a brief

18   "declaring whether or not they challenge the first step of the Amended LCFS's crude oil provisions,"

19   and, if so, Plaintiffs were directed to explain "how the first step operates; which allegations in the FAC

20   demonstrate that Plaintiffs challenge the first step; and how the first step impermissibly discriminates in

21   favor of crude oils from California." *Id.* at 2. Because Plaintiffs confirmed in their second supplemental

22   brief that they challenge the first step, Defendants were permitted to file "a responsive supplemental

23   brief." *See id.* at 3.

24        Although Plaintiffs submitted two additional briefs after Defendants' reply, the Court limited the

25   ─────────────────────

[28] The Court will refer to this argument as "Defendants' regulated parties argument."

1    scope of the issues Plaintiffs were permitted to address in those briefs. The Court did not request or

2    provide Plaintiffs the opportunity to address the argument in Defendants' reply that the FAC incorrectly

3    alleges to whom (or what) the Amended LCFS applies. The Court therefore is inclined to disregard

4    Defendants' regulated parties argument as it was raised for the first time in the reply and Plaintiffs did

5    not have an adequate chance to address it.

6            Defendants, however, are correct that the LCFS applies only to entities deemed to be regulated

7    parties. Under the LCFS, a regulated party is "a person who, pursuant to section 95484(a), must meet the

8    average carbon intensity requirements in section 95482 or 95483."[29] As discussed above, section 95482

9    provides the annual compliance target, which is used, among other things, to calculate a regulated

10   party's base deficits. Section 95484(a) provides "the criteria by which a regulated party is determined."

11   To put it simply, those criteria are complex and provide numerous ways through which an entity may be

12   deemed a regulated party subject to the LCFS. But Defendants are correct that regulated parties

13   generally are in-state fuel refiners and blenders and are not out-of-state entities.[30]

14           Further, it may be that out-of-state crude oil providers and crude oils are not regulated parties

15   under the Amended LCFS, and therefore not subject to its credit/deficit scheme, but that is not material

16   to Plaintiffs' claim—that the Amended LCFS's regulation of regulated parties nonetheless discriminates

17   against out-of-state crude oil providers and refiners and their crude oils. Although the FAC may lack

18   some precision with regard to whom or what the Amended LCFS's crude oil provisions apply, the

19   FAC's allegations are not so incompatible with those provisions so as to justify dismissal of Plaintiffs'

20   claim against them. More importantly, Defendants cannot argue credibly that they are not on notice of

---

21   [29] Section 95483 is inapplicable here, as it applies to regulated parties that provide "alternative fuels."

22   [30] *See* CARB Q&A at 2 ("Each fuel provider (generally the fuel's producer or importer, a.k.a. 'regulated party') is required to
     ensure that the overall CI score for its fuel pool meets the annual carbon intensity target for a given year."), 24 ("If you do not

23   own the fuel in California, you do not have any reporting requirements under the LCFS."); 2011 ISOR at ES-3 ("[S]everal
     out-of-state fuel producers and some in-state fuel suppliers expressed the desire to opt into the program as regulated parties.

24   The current regulation does not confer regulated party status to these out-of-state entities because of jurisdictional concerns
     . . . . Staff is proposing regulatory amendments that would permit such entities to voluntarily elect to become regulated

25   parties and become subject to California jurisdiction.").

1    the basis and nature of Plaintiffs' claim. The Court therefore DENIES Defendants' motion to dismiss on

2    the ground the FAC's allegations are internally inconsistent and contradict the Amended LCFS's crude

3    oil provisions.

### (4) Whether the Amended LCFS's Crude Oil Provisions Are Unconstitutionally Discriminatory.

5    Briefly summarized, Plaintiffs' challenge to the Amended LCFS's crude oil provisions focuses

6    on the "state-wide average carbon intensity scores [that] must be used by all regulated parties under the

7    LCFS . . . without regard to the individual carbon intensities of the particular crude oils that the

8    individual regulated party actually uses." Doc. 336 at 8. Specifically, Plaintiffs assert "[t]he first step

9    and the second step of the Amended LCFS's crude oil provisions unconstitutionally discriminate in the

10   same manner: they assign deficits based upon an average carbon intensity, rather than the individual

11   carbon intensities of the particular crude oils used." Doc. 336 at 19.

12   Plaintiffs claim this discrimination occurs because the California market-wide average carbon

13   intensity values (*i.e.*, the Baseline Crude Average and the Annual Crude Average) that a regulated party

14   must use when assessing its LCFS deficits/credits do not take into account the actual carbon intensity of

15   the fuel(s) that a regulated party uses, which results in an inaccurate and artificial deficit/credit

16   calculation. These averages, Plaintiffs claim, benefit in-state California interests while burdening out-of-

17   state interests.

18   According to Plaintiffs, "the Amended LCFS discriminates in favor of crude oils from California

19   which are assigned the 2010 baseline crude average market-wide carbon intensity for production and

20   transport," in spite of the fact that "CARB has calculated that the carbon intensity for the production and

21   transport of crude oils from California . . . is higher than the baseline crude average." *Id.* at 8 (citing 17

22   CCR § 95486(b), Table 8). Plaintiffs contend that, "by assigning a single average for the production and

23   transport for all crudes oil used in California," the LCFS "discriminates (1) in favor of California crudes,

24   which CARB calculated had a higher carbon intensity for production and transport than the statewide

25

average and (2) against crudes imported into California for which CARB calculated carbon intensities that are lower than the statewide average." *Id.* at 5. "By imposing a single baseline average, CARB protects California crudes (*e.g.*, California [thermally enhanced oil recovery ('TEOR')]) from generating significant deficits, and prevents low carbon intensity crudes from generating credits (or lesser deficits) if assigned their actual carbon intensities." Doc. 333 at 8.

Plaintiffs point out, for instance, that when determining a regulated party's incremental deficits, a party that uses California TEOR will benefit from the use of the Baseline Crude Average (11.39 gCO2e/MJ) because it is lower than CARB's determined actual carbon intensity average for the production and transport of crude oils from California (12.90 gCO2e/MJ). Doc. 336 at 11 (citing Table 8). On the other hand, a regulated party that uses foreign crude oils may be discriminated against under the Amended LCFS at the incremental deficit step because the Baseline Crude Average is higher than the actual average carbon intensity of those foreign oils. *Id.* ("For instance, crude oils from Saudi Arabia are assigned the baseline crude average for production and transport of 11.39 gCO2e/MJ even though their individual production and transport carbon intensities are 6.86 and 6.75 gCO2e/MJ.") (citing Table 8).

As to the second step, Plaintiffs assert "[t]he Amended LCFS . . . discriminates by 'mitigating' any market-wide increases in carbon intensity by imposing 'incremental deficits' to *all* market participants if 'the average crude slate refined in California becomes more carbon intensive.'" Doc. 333 at 8-9 (emphasis in original) (quoting 2011 ISOR at 40-41). When the annual average carbon intensity of crude oils used in California increases, "market participants are assessed an incremental deficit based not on the average carbon intensity of the fuels they marketed, but based on the volume of transportation fuel that they sold." *Id.* at 9 (citing section 95486(b)(2)(A)2); *see also* Doc. 330 at 19.

Thus, "the Amended LCFS imposes the incremental deficit burden on all providers of crude oil without regard to whether the crude oils they used were responsible for the incremental deficit." Doc. 333 at 9 n.4. "By mitigating increases 'in the aggregate,' CARB again protects California TEOR's

36

1   position in the California market by insulating it from its full responsibility for any increases in carbon

2   intensity attributable to the continued use of California TEOR in the California market." *Id.*

3        Plaintiffs correctly observe that, per CARB's calculations, in 2009 California crude had a carbon

4   intensity value for production and transport of 12.08 gCO2e/MJ, which is higher than the weighted

5   average of all crude oils in California (9.72 gCO2e/MJ). Doc. 336 at 6-7 (citing 2011 ISOR at 40).

6   Plaintiffs further note that "[c]rude oils produced in several other locations had scores lower than the

7   [Baseline Crude] [A]verage." *Id.* at 7. "[F]or instance, CARB calculated that crude oils produced in

8   Saudi Arabia had a carbon intensity for production and transport of 6.37 gCO2e/MJ, and crude oil

9   produced in Peru had a carbon intensity for production and transport of 5.52 gCO2e/MJ." *Id.* (citing

10  2011 ISOR at 40 (2009 data)).

11       Plaintiffs argue that this process "protects California crudes . . . from generating significant

12  deficits, thus protecting their market share." Doc. 336 at 11. According to Plaintiffs, if "CARB allowed

13  deficits (or credits) to be assigned based on the individual carbon intensities of each type of crude oil

14  used, then regulated parties would be economically incentivized to purchase the crude oils with the

15  lowest individual carbon intensities" and "disincentivized from purchasing crude oils with high carbon

16  intensities." Doc. 336 at 12.

17       Defendants argue that, even assuming Plaintiffs' allegations are consistent, they fail to state a

18  claim because the "allegations that the [Amended LCFS's] crude provisions assign the same carbon

19  intensity value to numerous crude oils are, in fact, the very same allegations [Plaintiffs] made against the

20  [Original LCFS's] crude provisions." Doc. 327 at 16 (citing *RMFU*, 730 F.3d at 1098-1100); *see also*

21  Doc. 337 at 3 (Plaintiffs' position "is identical to the one [they] asserted in [their] challenge to the

22  original crude provisions."). In other words, Defendants contend that *RMFU* has resolved Plaintiffs'

23  claims against the Amended LCFS's crude oil provisions because Plaintiffs' allegations concerning the

24  discriminatory nature of Amended LCFS's crude oil provisions are the same as Plaintiffs' prior

25  allegations against the Original LCFS's crude oil provisions, Doc. 331 at 8-9, and "the Ninth Circuit has

1    already rejected [Plaintiffs'] claim that the use of an average value discriminates against out-of-state

2    crude oils." Doc. 334 at 8.

3         In addition, Defendants contend that even if *RMFU* has not resolved Plaintiffs' claim against the

4    Amended LCFS's crude oil provisions, the claim fails for two primary reasons. First, Defendants assert

5    that Plaintiffs' claims against those provisions "are built on a false premise that is unsupported by any

6    allegations that can be accepted as true" because they are based on an incorrect understanding of how

7    the Amended LCFS's crude oil provisions operate and, in turn, are internally inconsistent. *See* Doc. 334

8    at 7.

9         According to Defendants, "the crux of [Plaintiffs'] claim—that all crude oils 'receive' the

10   baseline average carbon intensity value—is incorrect" because "it is regulated refiners and blenders, not

11   out-of-state crude oil producers, who incur deficits based on the average baseline value and because

12   crude oils 'receive' individualized carbon intensity values in the second step of the two-step process."

13   Doc. 334 at 7. Defendants point out that Plaintiffs allege "that 'crude-oil providers' incur the deficits"

14   while also alleging that "'regulated parties that provide [refined fuels like] gasoline or diesel' incur the

15   deficits." *Id.* at 7-8 (quoting FAC at ¶¶ 74, 79) (footnote omitted).

16        Defendants also assert that Plaintiffs contradictorily "allege[] that every year [C]ARB will

17   'recalculate the average carbon intensity' of California's crude oil pool," which "requires individualized

18   carbon intensity values," but Plaintiffs also allege "that all crude oils 'receive' the same baseline average

19   value." *Id.* at 8 (citing FAC at ¶¶ 74, 79). In Defendants' view, Plaintiffs' only allegations consistent

20   with the Amended LCFS's crude oil provisions are those "asserting that regulated refiners and blenders

21   receive deficits based on the baseline average value and that crude oils are assigned their individualized

22   values as part of the second-step recalculation of average carbon intensity." *Id.* (footnote omitted). Put

23   more bluntly, Defendants argue "[t]hose allegations cannot support the false premise of [Plaintiffs']

24   discrimination claim [against the Amended LCFS's crude oil provisions] because they directly

25   contradict it." *Id.* In other words, Defendants assert that Plaintiffs' "fundamental premise fails both

38

1  because it misstates *who* incurs deficits through the use of the baseline average value and because it

2  disregards the second step in the two-step process—the step at which individual values are assigned to

3  crude oils." *Id.* at 4.

4      Defendants correctly point out that Plaintiffs make no mention of "all [of the] lower-carbon

5  crude oils produced in California," Doc. 337 at 4, and explain that "there were more than 60 California

6  crude oils with lower carbon intensities than the lowest Saudia Arabian crude oil . . . an out-of-state

7  crude oil [Plaintiffs] complain[] is treated unfavorably." Doc. 334 at 8. Defendants note that "California-

   produced crude oils range from . . . 'White Wolf' at 1.65 [gCO2e/MJ] to . . . 'Placerita' at 31.66

8  [gCO2e/MJ]." Doc. 337 at 5 (citing 2014 CI Calculation Tables). Defendants therefore assert that

9  Plaintiffs cannot allege facts showing that the Amended LCFS's crude oil provisions are discriminatory

10 "because judicially noticeable facts establish that there remain many low-carbon California crude oils

11 that are 'burdened' . . . by the use of an average that is higher than their actual values, and many high-

12 carbon out-of-state crude oils that 'benefit' . . . from the use of an average that is lower than their actual

13 values." Doc. 334 at 8.

14     Defendants therefore argue that, for purposes of Plaintiffs' claims, the Amended LCFS's crude

15 oil provisions effectively operate in the same manner as those of the Original LCFS, which the Ninth

16 Circuit held were not discriminatory. Defendants note that the Ninth Circuit "held that the use of

17 average carbon intensity values for crude oil resulted in more 'burden' to low-carbon California crude

18 oils than to out-of-state crude oils and could not, therefore, be deemed discriminatory." *Id.* at 8-9 (citing

19 *RMFU*, 730 F.3d at 1099-1100). Defendants further note that "the Ninth Circuit also held that the use of

20 an average value did not 'insulate California firms from out-of-state competition.'" *Id.* (quoting *RMFU*,

21 730 F.3d at 1099). Accordingly, Defendants argue that Plaintiffs "make[] the same error that [they]

22 made before" because they only compare "'higher carbon intensity crude oils from California [with] . . .

23 lower carbon intensity crude oils from other states and other countries,' leaving out the rest of

24 California's market." *Id.* at 9 (quoting FAC at ¶ 82).

25

1
2
3
4
5
6
7
8
9
10

"As to discriminatory effects," Defendants maintain that Plaintiffs will not be able to adduce evidence to support their claims. *Id.* at 9. Defendants assert that Plaintiffs have "alleged nothing about the effects of the [Amended LCFS's] crude oil provisions on the market share of in-state and out-of-state crudes." *Id.* at 10. Rather, Plaintiffs only make "conclusory allegations that the [Amended LCFS's] crude oil provisions provide some unspecified 'competitive advantage' to in-state crude oils, even though the Ninth Circuit has already held that the use of an average carbon intensity value does not do so." *Id.* at 10 (citations omitted). Defendants argue that "express decision that the original crude provisions were not purposefully discriminatory provides a powerful reason to reject [Plaintiffs'] conclusory allegations, given that the [Amended LCFS's] crude provisions were adopted for the same purpose." Doc. 337 at 10.

11
12
13
14
15
16
17
18
19
20
21
22
23

Finally, Defendants argue this Court should reject as unreasonable Plaintiffs' "inference" that "because the [Amended] LCFS assigns deficits based on averages, refines and blenders have no incentives under the [Amended] LCFS to select lower-carbon crude oils." Doc. 337 at 6 (citing Doc. 336 at 7-8). In Defendants' view, "this inference entirely disregards the second step—the step at which a new average is calculated using the very 'individual carbon intensities' [Plaintiffs] claim[] are necessary to create economic incentives 'to purchase crude oils with the lowest individual carbon intensities.'" *Id.* (quoting Doc. 336 at 7-8). And that step provides "incentives [that] are not origin-specific" because regulated parties can "mitigate the risk of incremental deficits by purchasing for example, Australian 'Pyrenees' crude oil at 5.96 [gCO2e/MJ], Brazilian 'Ostra' crude oil at 5.71 [gCO2e/MJ], or Californian crude oils 'Wilmington' at 6.36 [gCO2e/MJ] or 'Cat Canyon' at 5.09 [gCO2e/MJ]." *Id.* (footnote omitted). On the other hand, "regulated parties create similar risk of incremental deficits when they choose, for example, Canadian 'Suncor Synthetic' as 24.49 [gCO2e/MJ], Venezuelan Petrozuata at 23.58 [gCO2e/MJ] or Californian 'Kern Front' at 25.06 [gCO2e/MJ]." *Id.* at 9-10 (footnote omitted).

24
25

40

1

2

**a. Whether the FAC States a Claim Under the Dormant**
**Commerce Clause.**

3

**i. The Dormant Commerce Clause.**

4

The Commerce Clause provides: "The Congress shall have Power ... [t]o regulate Commerce ...

5

among the several States." U.S. Const. Art. I, § 8, cl. 3. "The Supreme Court has interpreted the

6

Commerce Clause 'to have a 'negative' aspect that denies the States the power unjustifiably to

7

discriminate against or burden the interstate flow of articles of commerce.'" *Black Star Farms, LLC v.*

8

*Oliver*, 600 F.3d 1225, 1230 (9th Cir. 2010) (quoting *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality of*

9

*State of Or.*, 511 U.S. 93, 98 (1994)). This doctrine is known as "the dormant Commerce Clause." *Id.*

10

"'The modern law of what has come to be called the dormant Commerce Clause is driven by

11

concern about 'economic protectionism—that is, regulatory measures designed to benefit in-state

12

economic interests by burdening out-of-state competitors.'" *RMFU*, 730 F.3d at 1087 (quoting *Dep't of*

13

*Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008) (internal quotation marks omitted)). "This principle

14

ensures that state autonomy over 'local needs' does not inhibit 'the overriding requirement of freedom

15

for the national commerce.'" *Sam Francis Foundation v. Christies, Inc.*, 784 F.3d 1320, 1333 (9th Cir.

16

2015) (quoting *Great Atl. & Pac. Tea Co. v. Cottrell*, 424 U.S. 336, 371 (1976)). "The primary purpose

17

of the dormant Commerce clause is to prohibit statutes that discriminate against interstate commerce by

18

providing benefits to in-state interests while burdening out-of-state competitors." *Ass'n des Eleveurs de*

19

*Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 947 (9th Cir. 2013) (internal quotation marks and

20

citations omitted).

21

Because "[n]o State may attempt to isolate itself from a problem common to the several States by

22

raising barriers to the free flow of interstate trade," *Chem. Waste Mgmt., Inc. v. Hunt*, 504 U.S. 334,

23

339-40 (1992) (footnote omitted), "[s]tate laws that discriminate against interstate commerce face 'a

24

virtually *per se* rule of invalidity.'" *Granholm v. Heald*, 544 U.S. 460, 476 (2005) (quoting *Philadelphia*

25

*v. New Jersey*, 437 U.S. 617, 624 (1978)). Thus, "[w]hen a statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests," the Supreme Court has "generally struck down the statute without further inquiry." *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986). But when "a statute has only indirect effects on interstate commerce and regulates evenhandedly," courts must "examine[] whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." *Id.*

The Ninth Circuit recently summarized the applicable principles for dormant Commerce Clause challenges in *Black Star*:

> Two levels of scrutiny exist for analyzing state statutes challenged under the dormant Commerce Clause. *Maine v. Taylor*, 477 U.S. 131, 138 (1986). The higher level of scrutiny applies to a state statute that "discriminate[s] against interstate commerce 'either on its face or in practical effect.'" *Id.* (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979)). For the purposes of the dormant Commerce Clause, "'discrimination' simply means *differential treatment* of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Or. Waste*, 511 U.S. at 99 (emphasis added). Of course, the "differential treatment" must be as between persons or entities who are similarly situated. *See Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298-99 (1997); *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 525, 527 (9th Cir. 2009).[31] A court must analyze such a statute under the "strictest scrutiny." *Hughes*, 441 U.S. at 337. That is, such a statute is unconstitutional unless it "'serves a legitimate local purpose,' and . . . this purpose could not be served as well by available nondiscriminatory means." *Taylor*, 477 U.S. at 138 (quoting *Hughes*, 441 U.S. at 336). The party challenging the statute bears the burden of showing discrimination. *Hughes*, 441 U.S. at 336.

600 F.3d at 1230 (emphasis in original). "The crucial inquiry . . . must be directed to determining whether [the challenged statute] is basically a protectionist measure or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental." *Philadelphia*, 437 U.S. at 624.

Briefly put, "[i]f a statute discriminates against out-of-state entities on its face, in its purpose, or in its practical effect, it is unconstitutional unless it 'serves a legitimate local purpose, and this purpose could not be served as well by available nondiscriminatory means.'" *RMFU*, 730 F.3d at 1087 (quoting

---

[31] "Entities are similarly situated for constitutional purposes if their products compete against each other in a single market." *RMFU*, 730 F.3d at 1088 (citing *Tracy*, 519 U.S. at 298).

1

2

3

4

*Taylor*, 477 U.S. at 138). If the party challenging the statute establishes that it impermissibly discriminates, the burden then shifts to the state to prove that the state cannot achieve its objections through a different, nondiscriminatory regulation. *See Black Star*, 600 F.3d at 1233; *New Energy Co. v. Limbach*, 486 U.S. 269, 278 (1988).

5

6

7

8

9

10

11

12

13

The Court need not determine whether the Amended LCFS's crude oil provisions are facially discriminatory because Plaintiffs do not allege that they are. *See* FAC at ¶¶ 102-10; Doc. 330 at 18 (Plaintiffs arguing they "have shown . . . the crude oil provisions of both the Original and Amended LCFS discriminate in their purpose and effect, while the ethanol provisions . . . discriminate facially as well as in purpose and effect"). Plaintiffs only assert that the Amended LCFS's crude oil provisions discriminate in purpose and effect. *See id.*; *see also* Doc. 333 at 6 ("Nothing in the Ninth Circuit's decision purports to preclude the AFPM Plaintiffs from showing that the Amended LCFS discriminates in its purpose and in its effect in favor of California crude oils and against crude oils from outside of California."); Doc. 336 at 13 (same).

14

### ii. Purposeful Discrimination.

15

16

17

18

19

20

21

22

23

24

25

To determine whether state legislation purposefully discriminates against interstate commerce, the Court first must examine the actual language in the statute because "[t]here is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation." *Perry v. Commerce Loan Co.*, 383 U.S. 392, 400 (1966). The Court then must examine the relevant legislative materials, if necessary. *See Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270-71 (1984); *Sporhase v. Nebraska ex rel. Douglas*, 458 U.S. 941, 960 (1982). The Court must assume the stated purposes of legislation are genuine "unless an examination of the circumstances forces" a conclusion that they "could not have been a goal of the legislation." *Clover Leaf Creamery*, 449 U.S. at 463 n.7. Plaintiffs bear the burden of demonstrating that the Amended LCFS is purposefully discriminatory. *See Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979).

The stated purpose of the LCFS "is to implement a low carbon fuel standard, which will reduce greenhouse gas emissions by reducing the full fuel-cycle, carbon intensity of the transportation fuel pool used in California." § 95480. No other provision in the LCFS sheds any light on its underlying purposes. Plaintiffs do not and cannot dispute that, on its face, the stated purpose of the LCFS is non-discriminatory. *See RMFU*, 730 F.3d at 1106-07.

The only pertinent legislative materials cited in the FAC to support their claim against the Amended LCFS's crude oil provisions are CARB's Regulatory Advisories 10-04, 10-04A, and 10-04B, FAC at ¶¶ 74-75[32], and a single sentence from the 2012 FSOR which states that the Amended LCFS "is designed to reduce California's dependence on petroleum, create a lasting market for clean transportation technology, *and stimulate the production and use of low-carbon fuels in California*." *Id.* at ¶ 77 (quoting 2012 FSOR at 1) (emphasis added).

Plaintiffs argue this single sentence from the 2012 FSOR supports their contention that the Amended LCFS was adopted for discriminatory reasons. Doc. 330 at 20. But these were the *exact same* purposes of the Original LCFS's crude oil provisions the Ninth Circuit held were non-discriminatory. As CARB explained *in the first paragraph* of the Final Statement of Reasons for the Original LCFS: "the LCFS is designed to reduce California's dependence on petroleum, create a lasting market for clean transportation technology, and stimulate the production and use of low-carbon fuels in California." CARB, California's Low Carbon Fuel Standard, Final Statement of Reasons (Dec. 2009) ("2009 FSOR"), at 61, *available at* http://www.arb.ca.gov/regact/2009/lcfs09/lcfsfsor.pdf. Moreover, Plaintiffs pointed to this language from the 2009 FSOR in their brief on appeal, and the Ninth Circuit held that it did not demonstrate a discriminatory purpose behind the Original LCFS. *See* Brief for Plaintiffs-Appellees, *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070 (9th Cir. 2013) (Nos. 12-15131, 12-15135), 2012 WL 3342552, at *3. Thus, as a matter of law, that single sentence from the 2012 FSOR

---

[32] Plaintiffs, however, provide no argument or explanation as to how these Regulatory Advisories support their claim that the Amended LCFS is purposefully discriminatory.

44

1    cannot support Plaintiffs' claim that the Amended LCFS is purposefully discriminatory.

2           In spite of being granted leave to amend, filing the 17-page FAC, and filing three briefs totaling

3    approximately 40 pages, Plaintiffs have failed to point to a single piece of the Amended LCFS or its

4    legislative history that indicates the regulation was passed for discriminatory purposes. Further, the

5    Court has spent an inordinate amount of time scouring the pertinent record—namely, the 2011 ISOR and

6    the 2012 FSOR, the two primary CARB documents that explain CARB's purposes and reasoning

7    underlying the Amended LCFS—and cannot locate anything that suggests a discriminatory purpose

8    behind the regulation.[33] Accordingly, and in light of the previous opportunity to amend, the Court

9    GRANTS WITHOUT LEAVE TO AMEND Defendants' motion to dismiss Plaintiffs' claim that the

10   Amended LCFS's crude oil provisions are purposefully discriminatory.

### iii. Discriminatory Effect.

12          Nonetheless, the Court is not bound by a law's stated purposes when determining if its effects

13   are impermissibly discriminatory. *RMFU*, 730 F.3d at 1098 (citation omitted). "Supreme Court cases

14   considering whether laws have the effect of discriminating against interstate commerce have produced a

15   wide variety of results, and the language of these cases at times appears inconsistent." *Puppies 'N Love*

16   *v. City of Phoenix*, __ F. Supp. 3d __, 2015 WL 4532586, at *9 (D. Ariz. July 27, 2015). In assessing

17   whether a statute's effects are impermissibly discriminatory, "the critical consideration is the overall

18   effect of the statute on both local and interstate activity." *Brown-Forman*, 476 U.S. at 579. "The fact that

19   the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim

20   of discrimination against interstate commerce," *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117,

21   126 (1978).

22   _____

23   [33] Because this case is at the motion to dismiss stage, the Court has limited its review to only judicially noticeable materials.
     *See* Fed. R. Evid. 201(b)(2), (d); *Arce v. Douglas*, __ F.3d __, 2015 WL 4080837, at *6 n.4 (9th Cir. July 7, 2015) ("We take
24   judicial notice of legislative history materials pursuant to Federal Rules of Evidence Rule 201(b)."). To the extent the parties
     have relied on the Amended LCFS's legislative history and related CARB documents without requesting that they be
25   judicially noticed, the Court will treat those "citations as requests for judicial notice and [will] grant the requests." *Aramark
     Facility Servs. v. Serv. Employees Int'l Union, Local 1877, AFL CIO*, 530 F.3d 817, 826 n.4.

1

2    As noted, the basic principle underlying the dormant Commerce Clause is that states may not

3    discriminate against interstate commerce, where "'discrimination' simply means differential treatment

4    of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon

5    Waste*, 511 U.S. at 99. Thus, the dormant Commerce Clause prohibits "regulatory measures designed to

6    benefit in-state economic interests *by burdening* out-of-state competitors." *Davis*, 553 U.S. at 338. A

7    plaintiff challenging a state statute on the ground it has a discriminatory effect on interstate commerce

8    must provide substantial evidence that the law (1) "creates a burden that alters the proportional share of

9    the [relevant] market in favor of instate" market participants; (2) has an "effect on the flow of interstate

10   commerce"; or (3) "creates a system under which local goods constitute a larger share, and goods with

11   an out-of-state source constitute a smaller share, of the total sales in the market." *Black Star*, 600 F.3d at

12   1231.

13           The Court notes at the outset that step two of the Amended LCFS's crude oil provisions currently

14   cannot form the basis for a discriminatory effects claim for the simple reason that incremental deficits

15   have not been assessed. As discussed above, the 2014 CI Calculation Table (issued on June 16, 2015)

16   indicates that the Annual Crude Average has remained below the Baseline Crude Average (11.39

17   gCO2e/MJ) in 2012, 2013, and 2014—the Annual Crude Average for those years were 11.35

18   gCO2e/MJ, 11.37 gCO2e/MJ, and 11.19 gCO2e/MJ, respectively. Because incremental deficits have not

19   been assessed, the Court necessarily could not assess whether step two has the practical effect of

20   discriminating against interstate commerce. And because the determination of whether incremental

21   deficits are assessed is highly data-specific and varies each year, the Court cannot now speculate about

22   the *potential* discriminatory effects caused by step two because doing so would be entirely speculative,

23   if not impossible. "Courts examining a 'practical effect' challenge must be reluctant to invalidate a state

24   statutory scheme . . . simply because it *might* turn out down the road to be at odds with our constitutional

25   prohibition against state laws that discriminate against Interstate Commerce." *Black Star*, 600 F.3d at

     1232 (emphasis in original). "'[C]onjecture . . . cannot take the place of proof.'" *Id.* (quoting *Cherry Hill*

1
2
3

*Vineyard, LLC v. Baldacci*, 505 F.3d 28, 26 (1st Cir. 2007)). The Supreme Court has "never deemed a hypothetical possibility of favoritism to constitute discrimination that transgresses constitutional commands." *Associated Indus. of Missouri v. Lohman*, 511 U.S. 641, 654 (1994).

4
5
6
7
8
9
10

As explained above, section 95486 provides that base deficits are calculated, in part, by subtracting the applicable Baseline Average from the applicable compliance target. The Baseline Average is either CARBOB's carbon intensity value, as contained in Table 6 (99.18 gCO2e/MJ), or ULSD's carbon intensity value, as contained in Table 7 (98.03 gCO2e/MJ). Those figures remain constant and were determined, in part, by the Baseline Crude Average contained in Table 8 (11.39 gCO2e/MJ). In addition, those figures are averages "based on the average crude oil supplied to California refineries and average California refinery efficiencies." § 95486, Table 6 & 7.

11
12
13
14
15
16

The Baseline Crude Average is the average carbon intensity value associated with the production and transport of all crude oils supplied to California refineries in 2010. As indicated in Table 8, the average carbon intensity value associated with the production and transport of California crudes in 2010 was 12.90 gCO2e/MJ—higher than the Baseline Crude Average. This suggests that, had California's *actual* production and transportation average been used to determine pathways for CARBOB and ULSD, their respective pathway values would have been higher.

17
18
19
20
21
22
23
24
25

Although some California crudes necessarily would have had production and transportation carbon intensity values lower than 12.90 gCO2e/MJ, some necessarily would have been higher, thereby benefitting from the lower average assigned to them. Likewise, given that the California production and transportation average (12.90 gCO2e/MJ) is higher than the Baseline Crude Average (11.39 gCO2e/MJ), it appears that, *on average*, CARBOB and ULSD derived from California crudes appear to have benefitted from being assigned the Baseline Crude Average to determine their respective pathways. This is because CARBOB and ULSD derived from California crudes were assessed pathway values that seemingly would have been higher if the actual average carbon intensity values associated with their production and transport (12.90 gCO2e/MJ) were used instead of the lower Baseline Crude Average

47

(13.39 gCO2e/MJ). Although some California crudes seemingly were burdened by the use of the Baseline Crude Average to calculate the pathways for CARBOB and ULSD, when viewed *as a whole*, the *average* California crude apparently benefitted from its use.

With regard to foreign oils, the results are analogous. As Table 8 indicates, 27 foreign crudes had production and transport carbon intensity values below the 11.39 gCO2e/MJ Baseline Crude Average. CARBOB and ULSD derived from those crudes seemingly were burdened by the use of the Baseline Crude Average. But 15 foreign crude oils had production and transport carbon intensity values above 11.39 gCO2e/MJ. CARBOB and ULSD derived from those crudes seemingly benefitted from the use of the Baseline Crude Average. Thus, it appears that step one benefits and burdens some, *but not all* California and foreign crude oils via the use of the CARBOB and ULSD pathways, which were determined, in part, by the Baseline Crude Average.

The scenario presented by the Amended LCFS—where a state regulation apparently harms *some* in-state producers of a commodity but nonetheless provides an overall benefit to in-state producers of that commodity *as a whole* (*i.e.*, on average) while benefitting *some* out-of-state producers and harming others—does not fit neatly, if at all, into dormant Commerce Clause precedent. None of the cases on which Plaintiffs rely suggests that Plaintiffs can state a discriminatory effects claim against the Amended LCFS given the unique factual circumstances it presents.  The Court is unable to locate any case in which a court addressed a discriminatory effects challenge to a state law that simultaneously burdened and benefitted both in-state and out-of-state interests. A review of cases where a state law was held impermissibly discriminatory in violation of the dormant Commerce Clause reveals a common thread: in every case, the challenged state law burdened *only* out-of-state interests.[34] *See Town of Southold v. Town of East Hampton*, 477 F.3d 38, 49 (2d Cir. 2007) ("an important feature common to those regulations that previously have been found to violate the dormant Commerce Clause . . . [they]

---

[34] Further, in all but *Family Winemakers of Calif. v. Jenkins*, 592 F.3d 1 (1st Cir. 2010), the challenged state law provided benefits to in-state interests only.

confer a competitive advantage upon local business vis-a-vis out-of-state competitors").

In *RMFU*, the Ninth Circuit found a number of cases on which Plaintiffs relied were inapplicable to their challenge to the Original LCFS because they involved the Supreme Court striking "down local-processing requirements that privileged local entities over both state-wide and out-of-state interests." 730 F.3d at 1100 (discussing *C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 391 (1994); *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Nat. Res.*, 504 U.S. 353 (1992); *Dean Milk Co. v. City of Madison*, 340 U.S. 349 (1951)). Those cases are not applicable to Plaintiffs' challenge here because the Amended LCFS applies state-wide. *Id.*

*Oregon Waste*, 511 U.S. 93, is not applicable here because it concerned a facially discriminatory Oregon statute that the Supreme Court struck down without assessing the practical effect, if any, it had on interstate commerce. *Chemical Waste*, 504 U.S. 334, also is inapplicable because it concerned a facially discriminatory Alabama statute that "plainly discouraged" and overly burdened interstate commerce by imposing a higher fee on out-of-state waste than the fee imposed on waste produced in-state. *Id.* at 342.

Similarly, *Bacchus Imports*, another case the Ninth Circuit held was inapplicable to Plaintiffs' challenge to the Original LCFS, *id.*, is not applicable to Plaintiffs' challenge to the Amended LCFS. In that case, the Supreme Court struck down a Hawaiian statute that provided a tax exemption exclusively for Hawaiian-made liquor for the undisputed and explicit purpose of "encourag[ing] development of the Hawaiian liquor industry." *Bacchus Imports*, 468 U.S. at 265. The Supreme Court further held that even if the Hawaiian legislature's discriminatory intent was not apparent, the challenged law had an impermissible discriminatory effect on interstate commerce because "Hawaii chose to support a uniquely local industry at the expense of one in which it held no particular advantage." *Id.*

*Healy* and *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 519 (1935), three seminal Supreme Court discriminatory effects cases that Plaintiffs cite in their briefs, concerned states' "price-affirmation statutes that had the effect of preventing producers from pricing products independently in neighboring

states." *Chinatown v. Neighborhood Ass'n v. Harris*, __ F.3d __, 2015 WL 4509284, at *6 (9th Cir. July 27, 2015). The Supreme "Court has held that *Healy* and *Baldwin* are not applicable to a statute that does not dictate the price or a product and does not 't[ie] the price of its in-state products to out-of-state prices.'" *See Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 951 (9th Cir. 2013) (quoting *Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 669 (2003)).[35] Those cases are not applicable here. Likewise, *Brown-Forman* is inapplicable here because it also concerned New York price affirmation statute. *See* 476 U.S. at 572. Simply put, Plaintiffs have not provided any authority that suggests they can state a discriminatory effects claim against step one of the Amended LCFS.[36]

The Court's review of additional precedent likewise does not support Plaintiffs' position. In *Granholm v. Heald*, 544 U.S. 460, 465 (2005), the Supreme Court struck down state laws in Michigan and New York because the "effect of the laws are the same: to allow in-state wineries to sell wine directly to consumers in that State but to prohibit out-of-state wineries from doing so, or, at the least, to make direct sales impractical from an economic standpoint." The Michigan statute imposed "a complete ban on direct shipment" into the state, *id.* at 474, while the New York statute required out-of-state producers to "open a branch office and warehouse in New York," *id.* at 475, both of which violated the dormant Commerce Clause. *Id.* at 466.

---

[35] The final dormant Commerce Clause case Plaintiffs cite is *Nat'l Ass'n of Optometrists & Opticians Lenscrafters, Inc. v. Brown*, 567 F.3d 521 (9th Cir. 2009). Plaintiffs only cite it for general Commerce Clause principles and, in any event, it is difficult to see how it could support their claim given that the case involved a factually distinguishable California statute the Ninth Circuit upheld as non-discriminatory. *See id.* at 529.

[36] *See Black Star Farms, LLC v. Oliver*, 544 F. Supp. 2d 913, 922-23 (D. Ariz. 2008), *aff'd*, *Black Star*, 600 F.3d at 1225 ("Like *Granholm*, most of the other cases that Plaintiffs refer to involved State regulations that—unlike the Arizona scheme at issue here—manifestly discriminated against *all out-of-state goods or products*. *New Jersey*, 437 U.S. 617 (1978) (prohibition on the importation of waste generated outside the state); *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263 (1984) (excise tax applied to imported liquor, but not to local pineapple wine); *Chemical Waste Management, Inc. v. Hunt*, 504 U.S. 334 (1992) (surcharge placed on in-state disposal of all hazardous waste generated outside the state); *West Lynn Creamery*, 512 U.S. 186 (nondiscriminatory tax coupled with subsidy only to in-state businesses that were affected by the tax); *Or. Waste Sys.*, 511 U.S. 93 (surcharge placed on in-state disposal of waste generated outside the state); *C & A Carbone*, 511 U.S. 383 (ordinance requiring all of town's waste to be processed at town's transfer station); and *Associated Indus. of Mo. v. Lohman*, 511 U.S. 641 (1994) (use tax applied only to out-of-state goods sold in the state)") (emphasis added); *see also id.* at 923 (explaining that the North Carolina statute at issue in *Hunt* was unconstitutional because it "not only burdened interstate sales of Washington apples, but also discriminated against Washington apple growers because the statute raised the cost of doing business in North Carolina for all Washington apple growers while leaving their in-state counterparts unaffected").

50

1

2          Similarly, in *Family Winemakers of Calif. v. Jenkins*, 592 F.3d 1 (1st Cir. 2010), the First Circuit

held that a Massachusetts law regulating wineries in the state had an impermissible discriminatory

3    effect. The Massachusetts law conferred an undisputed benefit on "small" wineries and an undisputed

4    burden on "medium" or "large" wineries. *See id.* at 11-12. All thirty-one of Massachusetts's wineries

qualified as "small" wineries, *id.* at 16, but less than 1% of out-of-state wineries obtained "small" status

5    while the rest were deemed the less-favored "medium" or "large." *See id.* at 11, 11 n.12. The

6    Massachusetts law therefore provided "a clear competitive advantage to 'small' wineries, which

7    includes all Massachusetts's wineries, and creates a comparative disadvantage for 'large' wineries, none

8    of which are in Massachusetts." *Id.* at 11 (citation omitted). Accordingly, the First Circuit held that the

9    Massachusetts law had an impermissible discriminatory effect on interstate commerce in violation of the

10    dormant Commerce Clause. *Id.* at 13.[37]

11

12          The Sixth Circuit struck down a similar Kentucky statutory scheme regulating "small farm

wineries" in *Cherry Hill Vineyards, LLC v. Lilly*. 553 F.3d 423, 426 (6th Cir. 2008). Under that scheme,

13    "small" wineries could obtain a license to ship their wine directly into Kentucky only if it was purchased

14    by the customer in person at the winery. *Id.* at 428. The plaintiffs, out-of-state wine producers, argued

15    that this "in-person" requirement had the practical effect of impermissibly discriminating against

16    interstate commerce. *Id.* at 426. The Sixth Circuit held that "out-of-state wineries [were] clearly

17    burdened by Kentucky's regulatory scheme," finding that the "in-person requirement makes it

18    economically and logistically infeasible for most consumers to purchase wine from out-of-state small

19    farm wineries" because "[i]t is impractical for customers to travel hundreds or thousands of miles to

20    purchase wine in-person." *Id.* at 433. The Sixth Circuit held that the plaintiffs had met their burden

21    under Sixth Circuit precedent of "showing 'both how local economic actors are favored by the

22    legislation, and how out-of-state actors are burdened by the legislation." *Id.* (quoting *E. Ky. Res. v.*

23

24    [37] The First Circuit rejected Massachusetts's argument that the challenged law was non-discriminatory because it benefited
some out-of-state wineries because it was undisputed that the law burdened exclusively out-of-state wineries. *See* 592 F.3d at
25    13.

*Fiscal Court of Magoffin Cnty., Ky.*, 127 F.3d 532, 543 (6th Cir. 1997)).

In *Cloverland-Green Spring Dairies, Inc. v. Penn. Milk Marketing Bd.*, 298 F.3d 201 (3d Cir. 2002), the Third Circuit held Pennsylvania's "milk law" violated the dormant Commerce Clause. The milk law mandated minimum prices (a.k.a. "price floors") that were above those set by the federal government. *Id.* at 205. "The wholesale and retail price floors, which [were] designed to 'best protect the milk industry of the Commonwealth,' [were] fixed according to in-state milk dealers' and retailers' costs to guarantee them desirable profits." *Id.* The Third Circuit held there were genuine questions of material fact as to whether out-of-state competitors had a competitive advantage over Pennsylvania milk producers (*i.e.*, whether they could profitably sell milk in Pennsylvania below the price floors set by the milk law) and whether the milk law's price floors eliminated that advantage. *Id.* at 213-14. Thus, the Third Circuit concluded that a reasonable jury could find that the milk law benefitted only Pennsylvania milk producers while burdening only out-of-state milk producers. *See id.* at 214.

The Fourth Circuit struck down a number of North Carolina laws as violative of the dormant Commerce Clause in *Beskind v. Easley*, 325 F.3d 506, 515 (4th Cir. 2003). A series of North Carolina's alcohol-regulating laws had "the undoubted effect of benefiting the in-state manufacturers [of wine] and burdening the out-of-state manufacturers." This was so because the latter were required to "sell their products to a licensed wholesaler in [North Carolina] and have that wine distributed only through North Carolina's three-tiered structure" while North Carolina wineries were able to sell their wine directly to consumers without distributing it through the state's three-tiered structure. *Id.* "[T]his differential treatment ha[d] the economic effect of favoring in-state wine manufacturers and burdening out-of-state wine manufacturers and shippers." *Id.*

In *Alliance for Clean Coal v. Miller*, 44 F.3d 591 (7th Cir. 1995), the Seventh Circuit invalidated an Illinois statute that was facially neutral and, according to Illinois, only "encouraged" the use of Illinois coal. The Seventh Circuit held that "[b]y 'encouraging' the use of Illinois coal, the [statute] discriminate[d] against western coal [*i.e.*, coal mined west of the Rocky Mountains] by making it a less

viable compliance option for Illinois [electric] generating plants." *Id.* at 596. Thus, the Illinois statute

violated the dormant Commerce Clause because it had a discriminatory impact on western coal

producers. *Id.*

These cases all stand for the straightforward proposition articulated by the Supreme Court in

*Oregon Waste*: in the context of the Commerce Clause, impermissible "'discrimination simply means

differential treatment of in-state and out-of-state economic interests that *benefits the former and burdens

the latter*." 511 U.S. at 99 (emphasis added). Contrary to Plaintiffs' assertion, the crude oil provisions of

the Amended LCFS are not discriminatory under the Commerce Clause because *on their face* they

burden and benefit California interests and out-of-state interests alike through the use of the Baseline

Crude *Average* and the CARBOB and ULSD pathways, all of which represent an *average* of *all* crude

oils supplied to California refineries in 2010. The provisions do not confer an across-the-board benefit to

California crude oils at the expense of foreign crude oils. Nor do they burden only foreign crude oils;

they also burden California crude oils. Although no case explicitly prohibits the type of dormant

Commerce Clause proposed by Plaintiff's here, it is not the role of this district court to extend existing

precedent to permit such a claim. Accordingly, the Court concludes Plaintiffs cannot state a

discriminatory effects claim against the Amended LCFS's crude oil provisions. The Court therefore

GRANTS WITHOUT LEAVE TO AMEND Defendants' motion to dismiss Plaintiffs' claim that the

Amended LCFS's crude oil provisions discriminate in purpose and effect.

**D.      Whether Governor Brown Should Be Dismissed.**

Defendants maintain that any claims against Governor Brown are barred by the Eleventh

Amendment, which renders him immune from Plaintiffs' suit. Doc. 327 at 18. Defendants contend that,

because Governor Brown is entitled to Eleventh Amendment immunity, Plaintiffs' claims against him

should be dismissed with prejudice. *Id.* at 19.

Defendants assert that the *Ex Parte Young* exception to Eleventh Amendment immunity does not

apply to Governor Brown with regard to the LCFS. Doc. 327 at 18-19. Specifically, Defendants assert

1  that Governor Brown's "only relationship to enforcement of the LCFS is his generalized duty to enforce

2  all California law" and that "[s]uch a generalized duty is insufficient to subject [him] to suit." *Id.* at 19

3  (citing *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 943 (9th Cir. 2013);

4  *Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 846-47 (9th Cir. 2002)).

5          Plaintiffs assert that "under the *Ex Parte Young* doctrine, the Governor is not immune because

6  the suit seeks only 'prospective, non-monetary relief.'" Doc. 330 at 24 (quoting *North East Med. Servs.,*

7  *Inc. v. Calif. Dep't of Health Care Servs.*, 712 F.3d 461, 466 (9th Cir. 2013)). Plaintiffs argue that the

8  actions of former Governor Arnold Schwarzenegger "show that the Governor has been directly and

9  personally involve with the LCFS." Doc. 330 at 25. Specifically, the Governor

10          required the adoption of the LCFS in Executive Order S-01-07, which set a statewide goal to
           "reduce the carbon intensity of California's transportation fuels by at least 10 percent by 2020,"
11          and called on CARB to "determine if an LCFS can be adopted as a discrete early action measure
           pursuant to AB 32." Executive Order S-01-07 (Jan. 18, 2007); *see* 2009 [California's Low
12          Carbon Fuel Standard, Final Statement of Reasons] at 457 ("Governor Schwarzenegger has
           identified" the "outcomes" of "reduc[ing] California's dependence on petroleum" and
13          "stimulat[ing] the production and use of alternative, low-carbon fuels in California" as
           "important goals for California"). Governor Schwarzenegger also promulgated a White Paper on
14          the LCFS, which asserts that the LCFS is designed to "[g]row California's clean energy
           industry" and "[r]educe California's dependence on imported oil and keep more money in the
15          state." Office of the Governor, The Role of a Low Carbon Fuel Standard in Reducing
           Greenhouse Gas Emissions and Protecting Our Economy at 6-7 (Jan. 8, 2007).

16  *Id.* Thus, according to Plaintiffs, "[t]hese direction actions by the Governor show that the Governor has

17  more than a 'generalized' connection with the law." *Id.* (footnote omitted). Finally, Plaintiffs "note that

18  the inclusion or dismissal of the Governor as a defendant would have no practical impact upon this suit,

19  because there is no dispute that the remaining defendants are proper parties to the suit." *Id.* at n.12.

20          The Eleventh Amendment generally "prohibit[s] federal courts from hearing suits brought by

21  private citizens against state governments without the state's consent." *Sofamor Danek Group, Inc. v.*

22  *Brown*, 124 F.3d 1179, 1183 (9th Cir. 1997). "A state's sovereign immunity from suit in federal court

23  normally extends to suits against its officers in their official capacities." *Cardenas v. Anzai*, 311 F.3d

24  929, 934 (9th Cir. 2002).

25

54

1    Under *Ex Parte Young*, however, "a plaintiff may maintain a suit for prospective relief against a

2    state official in his official capacity, when that suit seeks to correct an ongoing violation of the

3    Constitution or federal law." *Id.* at 934-35 (citing *Ex Parte Young*, 209 U.S. 123, 159-60 (1908)). The

4    Ninth Circuit summarized the *Ex Parte Young* exception to Eleventh Amendment immunity as follows:

5        An exception under *Ex Parte Young*, 209 U.S. 123 (1908), however, allows citizens to sue state
         officers in their official capacities "for prospective declaratory or injunctive relief . . . for their
6        alleged violations of federal law." *Coal. to Defend Affirmative Action* [*v. Brown*, 674 F.3d 1128,
         1134 (9th Cir. 2012)]. The state official "'must have some connection with the enforcement of
7        the act.'" *Id.* (quoting *Ex parte Young*, 209 U.S. at 157). That connection "must be fairly direct; a
         generalized duty to enforce state law or general supervisory power over the persons responsible
8        for enforcing the challenged provision will not subject an official to suit." *Id.* (quoting *L.A. Cnty.
         Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992)).

9    *Ass'n des Eleveurs*, 729 F.3d at 943.

10       In *Ass'n des Eleveurs*, for instance, the plaintiffs sought to enjoin the enforcement of a California

11   statute prohibiting the sale of products made as a "result of force feeding a bird," naming Governor

12   Brown as a defendant. *Id.* at 942-43 (citing Cal. Health & Saf. Code § 25982). The Ninth Circuit held

13   that "Governor Brown [was] entitled to Eleventh Amendment immunity because his only connection to

14   [that statute was] his general duty to enforce California law." *Id.* at 943 (citing *Nat'l Audubon Soc'y,*

15   *Inc. v. Davis*, 307 F.3d 835, 846-47 (9th Cir. 2002)).

16       Likewise, the Ninth Circuit held that the Governor of California was immune from suit under the

17   Eleventh Amendment in *National Audubon Society*. 307 F.3d at 847. In that case, the plaintiffs brought

18   suit against the Governor of California and various other California government officials in an attempt

19   to enjoin the enforcement of a California law, known as "Proposition 4," which placed restrictions on

20   trapping animals and on the sale of their fur, among other things. *Id.* at 845. Noting that *Ex Parte Young*

21   and its progeny "address the question of whether a named state official has direct authority and practical

22   ability to enforce the challenged statute," *id.* at 846, the Ninth Circuit held that the plaintiffs' "suit [was]

23   barred against the Governor . . . as there is no showing that [he had] the requisite enforcement

24   connection to Proposition 4." *Id.* at 847. Conversely, "the Eleventh Amendment d[id] not bar suit

25

1  against the Director of the California Department of Fish & Game, who ha[d] direct authority over and

2  principal responsibility for enforcing Proposition 4." *Id.*

3         Plaintiffs have not alleged any specific facts concerning Governor Brown's involvement with the

4  enforcement of the LCFS. Plaintiffs only allege that, as Governor of California, he "is responsible for

5  the enforcement of the LCFS" and therefore is "sued in his official capacity." FAC at ¶ 15. The FAC

6  contains no other allegations concerning Governor Brown's role, if any, in enforcing the LCFS.

7  Although Plaintiffs cite to various legislative materials in their opposition, *see* Doc. 330 at 25, those

8  materials do not concern the Governor's *enforcement* of the LCFS.[38] As such, Plaintiffs have

9  demonstrated Governor Brown's involvement with the LCFS is only "a generalized duty to enforce state

10 law," which is insufficient to invoke the *Ex Parte Young* exception. *L.A. Cnty. Bar Ass'n*, 979 F.2d at

11 704. Accordingly, the Court GRANTS WITH LEAVE TO AMEND Defendants' motion to dismiss

12 Governor Brown.

13                        **V.     CONCLUSION AND ORDER**

14         For the foregoing reasons, the Court:

15     1. GRANTS Defendants' motion for summary judgment on Plaintiffs' claim that the Original
          LCFS is an impermissible extraterritorial regulation in Defendants' favor and against Plaintiffs;

16     2. GRANTS WITHOUT LEAVE TO AMEND Defendants' motion to dismiss Plaintiffs' Second
          Claim;

17
18     3. GRANTS Defendants' motion for summary judgment on Plaintiffs' claim that the Original
          LCFS's ethanol provisions are facially discriminatory in Defendants' favor and against
          Plaintiffs;
19
20     4. GRANTS Defendants' motion for summary judgment on Plaintiffs' claim that the Original
          LCFS's crude oil provisions are discriminatory on their face, in their purpose, or in their effect in

21  ─────────────────

22  [38] Defendants do not state explicitly the authority under which they move to dismiss Plaintiffs' claims against Governor
    Brown, *see* Doc. 327 at 18-19; however, "a party may move to dismiss on Eleventh Amendment sovereign immunity grounds
    pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction." *Boston v. Harris*, Nos. 11-cv-1872-PSG, 11-cv-
23  1873-PSG, 2012 WL 1029395, at *1 (citing *Proctor v. United States*, 781 F.2d 752,753 (9th Cir. 1986)). Because Defendants
    assert that Governor Brown is entitled to Eleventh Amendment immunity and should be dismissed with prejudice, the Court
24  construes Defendants' motion to dismiss Governor Brown to have been brought under Fed. R. Civ. P. 12(b)(1). Accordingly,
    the Court finds it appropriate to consider Plaintiffs' proffered evidence contained outside of the FAC in ruling on Defendants'
    motion to dismiss Governor Brown. *See Green v. United States*, 630 F.3d 1245, 1248 n.3 (9th Cir. 2011) (citing *Corrie v.
25  Caterpillar, Inc.*, 503 F.3d 974, 980 (9th Cir. 2007)).

Defendants' favor and against Plaintiffs;

5. DENIES Defendants' motion to dismiss Plaintiffs' claim that the Original LCFS's ethanol provisions discriminate in purpose and effect;

7. GRANTSWITHOUT LEAVE TO AMEND Defendants' motion to dismiss Plaintiffs' claims that the Amended LCFS's crude oil provisions discriminate in purpose and effect; and

8. GRANTS WITH LEAVE TO AMEND Defendants' motion to dismiss the Governor.

Any further amended complaint shall be filed on or before September 18, 2015.

A tremendous amount of judicial resource has been provided in this Order. The Court expects that counsel for both sides will invest at least as much resource into reading the Order, following its directives, and making wise and prudent decisions when providing an amended pleading, and thereafter in determining whether it is necessary to attack that next pleading. The Court has provided sufficient law for counsel to arrive at a satisfactory pleading that all counsel can understand and not attack. Should the unfortunate circumstance occur that the Court is again called upon to rewrite pleadings, the subsequent Order will be substantially shorter and lighter on research and detail.

IT IS SO ORDERED.

Dated:   **August 13, 2015**          ____**/s/ Lawrence J. O'Neill**____
                                                        UNITED STATES DISTRICT JUDGE

57