1  MARIE L. FIALA (CA Bar No. 79676)
   SIDLEY AUSTIN LLP
2  555 California Street, Suite 2000
   San Francisco, CA 94104-1715
3  Telephone: 415-772-1200
   Facsimile: 415-772-7400
4  mfiala@sidley.com

5  **Counsel For Plaintiffs**

6  [ADDITIONAL COUNSEL
   SHOWN ON SIGNATURE PAGE]
7

8  UNITED STATES DISTRICT COURT

9  EASTERN DISTRICT OF CALIFORNIA

10 FRESNO DIVISION

11 **AMERICAN FUELS & PETROCHEMICAL MANUFACTURERS ASSOCIATION**, **AMERICAN TRUCKING ASSOCIATIONS**, and **THE CONSUMER ENERGY ALLIANCE**,

   Plaintiffs,

   v.

   **RICHARD W. COREY**, in his official capacity as Executive Officer of the California Air Resources Board; **MARY D. NICHOLS, DANIEL SPERLING, PHIL SERNA, JOHN EISENHUT, BARBARA RIORDAN, JOHN R. BALMES, HECTOR DE LA TORRE, SANDRA BERG, RON ROBERTS, ALEXANDER SHERRIFFS, JOHN GIOIA, DEAN FLOREZ, DIANE TAKVORIAN,** and **JUDY MITCHELL,** in their official capacities as members of the California Air Resources Board; and **KAMALA HARRIS** in her official capacity as Attorney General of the State of California,

   Defendants.

Case No. 1:10-CV-00163-LJO-BAM

[Consolidated with Lead Case No. 1:09-CV-02234-LJO-BAM]

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND JURY DEMAND**

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND JURY DEMAND**

Come now Plaintiffs, American Fuels & Petrochemical Manufacturers Association (AFPM), American Trucking Associations (ATA), and the Consumer Energy Alliance (CEA) (collectively, Plaintiffs) by and through their attorneys, and state as follows:

**INTRODUCTION AND SUMMARY**

1. This is an action for declaratory, injunctive and other relief brought by Plaintiffs against Richard W. Corey, in his official capacity as the Executive Officer of the California Air Resources Board (CARB), and Mary D. Nichols, Daniel Sperling, Phil Serna, John Eisenhut, Barbara Riordan, John R. Balmes, Hector De La Torre, Sandra Berg, Ron Roberts, Alexander Sherriffs, John Gioia, Dean Florez, Diane Takvorian and Judy Mitchell, also in their official capacities as members of CARB, and California's Attorney General, Kamala Harris, in her official capacity as Attorney General of California.

2. Plaintiffs seek injunctive and declaratory relief enjoining the implementation and enforcement of the California Low Carbon Fuel Standard (LCFS) as promulgated and subsequently amended, and declaring the LCFS unlawful under federal law.

3. The LCFS is a California regulation designed to promote the local production of transportation fuels in California and to make it more difficult to import and use transportation fuels and fuel feedstocks in California that are produced outside of California.

4. The LCFS as promulgated and as amended violates the Commerce Clause of the United States Constitution.

5. First, the LCFS as promulgated (Original LCFS) violates the Commerce Clause because it has directly regulated interstate and foreign commerce and extraterritorial conduct, including the extraction, production and transport of transportation fuels and fuel feedstocks outside of California.

6. Second, the LCFS as amended in 2012 (2012 LCFS) and 2015 (2015 LCFS) violates the Commerce Clause and principles of interstate federalism embodied in the Federal structure of the United States Constitution because it directly regulates interstate and foreign commerce and

extraterritorial conduct, including the extraction, production and transport of transportation fuels and fuel feedstocks outside of California.

7. Third, the Original LCFS, and 2012 LCFS, and 2015 LCFS discriminate both on their face, and as applied, against transportation fuels and fuel feedstocks imported from outside of California with the intended effect of (i) promoting in-State production of transportation fuels, and (ii) "keep[ing] consumer dollars local by reducing the need to make fuel purchases from beyond [California's] borders," all in violation of the Commerce Clause of the United States Constitution.

## THE PARTIES

### Plaintiffs

8. Plaintiff AFPM is a national trade association of more than 400 companies. AFPM's members include virtually all United States refiners and petrochemical manufacturers. AFPM's members supply consumers nationwide with a wide variety of products and services used daily in their homes and businesses. These products include gasoline, diesel fuel, and the chemicals that serve as "building blocks" in making diverse products, such as plastics, clothing, medicine, and computers. Its members have terminals in the Fresno area through which millions of barrels of gasoline, diesel, and ethanol are transferred annually. Its members also own and brand multiple transportation fuel outlets in the Fresno area.

9. Plaintiff ATA is a federation of motor carriers, state trucking associations, and national trucking conferences created to promote and protect the interests of the trucking industry. Directly, and through its affiliated organizations, ATA encompasses over 37,000 companies and every type and class of motor carrier operation.

10. Plaintiff CEA is a nonprofit, nonpartisan organization with more than 125 affiliated organizations and tens of thousands of individual grassroots members that supports the thoughtful utilization of energy resources to help ensure improved domestic and global energy security and stable prices for consumers. The mission of CEA is to expand the dialogue between the energy and consuming sectors to improve overall understanding of energy security and the thoughtful development and utilization of energy resources to help create sound energy policy and maintain stable energy prices for consumers. CEA seeks to help improve consumer understanding of the

2

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND JURY DEMAND**
**LEAD CASE NO. 1:09-CV-02234-LJO-BAM**

nation's energy security, including the need to properly balance our energy needs with environmental and conservation goals and continue to diversify our energy resources. AFPM, ATA, and CEA bring this suit on behalf of their members. One or more of their members possesses standing to sue in its own right.

11. The regulation of the interstate market for transportation fuel is of vital concern to Plaintiffs' members.

12. Neither the claims asserted nor the relief sought in the Complaint requires the participation of any individual member of AFPM, ATA or CEA.

**Defendants**

13. Defendant Richard W. Corey is the Executive Officer of the California Air Resources Board (CARB). Defendant Corey (hereinafter, the Executive Officer) is responsible, directly and through CARB, for the promulgation, implementation, and, in substantial part, enforcement of the LCFS. Defendant Corey is sued in his official capacity only.

14. Defendants Mary D. Nichols, Daniel Sperling, Phil Serna, John Eisenhut, Barbara Riordan, John R. Balmes, Hector De La Torre, Sandra Berg, Ron Roberts, Alexander Sherriffs, John Gioia, Dean Florez, Diane Takvorian, and Judy Mitchell are members of CARB, and are sued in their official capacities only.

15. Defendant Kamala Harris is the Attorney General of the State of California. Defendant Harris (hereinafter, the Attorney General) is responsible for the enforcement of the LCFS and is sued in her official capacity only.

**JURISDICTION**

16. Subject matter jurisdiction is founded on 28 U.S.C. §§ 1331 and 1343 because this case arises under the Constitution of the United States.

17. The Court has authority to enjoin enforcement of the LCFS under 42 U.S.C. § 1983, and to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

## VENUE

18. Venue is proper in this Court under 28 U.S.C. § 1391(b). Defendants maintain their offices within this judicial district and the events giving rise to the claims herein occurred within this judicial district.

## FACTUAL BACKGROUND

### The California Low Carbon Fuel Standard

19. Then-Governor Arnold Schwarzenegger authorized the Low Carbon Fuel Standard (LCFS) by Executive Order S-01-07 (Jan. 18, 2007), which calls for a ten percent reduction in the carbon intensity of gasoline and diesel fuel by 2020.

20. Governor Schwarzenegger's White Paper on the LCFS asserts that the LCFS is designed to "[g]row California's clean energy industry" and "[r]educe California's dependence on imported oil and keep more money in the state." Office of the Governor, *The Role of a Low Carbon Fuel Standard in Reducing Greenhouse Gas Emissions and Protecting Our Economy* at 6-7 (Jan. 8, 2007).

21. Defendants have stated that the LCFS was designed to "stimulate the production and use of alternative, low-carbon fuels in California."

22. On June 21, 2007, CARB identified the LCFS as one of a set of proposed discrete early action measures pursuant to the California Global Warming Solutions Act of 2006.

23. In December 2008, CARB approved the Climate Action Scoping Plan, which included the LCFS as a discrete early action measure.

24. On April 23, 2009, CARB adopted an initial version of the LCFS, recognizing that additional work would be needed to complete and finalize the regulation.

25. On November 25, 2009, CARB submitted the LCFS regulation to the California Office of Administrative Law ("OAL").

26. On January 12, 2010, the OAL reviewed and approved the LCFS. The LCFS became effective on the same day when it was filed with the Secretary of State.

**Required Reductions in "Carbon Intensity"**

27. The LCFS called for a reduction in the "carbon intensity" of gasoline and diesel fuel by 2020. LCFS § 95482, Tables 1–2 (2010). The LCFS requires fuel providers (refiners, importers, and blenders of fuel) to reduce, by 2020, the average "carbon intensity" of the fuels they sell in California by 10%. *Id.*

28. The LCFS imposed reporting requirements beginning in 2010. Under the LCFS, beginning on May 31, 2010, all regulated parties had to submit quarterly progress reports to the Executive Officer. Each regulated party's report had to include, for each transportation fuel, (i) the type of fuel, (ii) whether the fuel is blended, (iii) the number of fuelstocks, (iv) the types of blendstocks, (v) Renewable Identification Numbers (RINs), (vi) blendstock feedstock, (vii) feedstock origin, (viii) production process, (ix) amount of each blendstock, (x) the carbon intensity of the fuel or blendstock, (xi) the amount of each fuel used as gasoline replacement, and (xii) the amount of each fuel used as diesel fuel replacement. LCFS § 95484(c)(3) (2010).

29. In addition, for gasoline and diesel fuel, each regulated party began having to report (i) "[t]he carbon intensity value of each blendstock" calculated pursuant to LCFS § 95486 and (ii) the volume of each blendstock during the compliance period. LCFS § 95484(c)(3)(A) (2010).

30. Reductions in carbon intensity were mandated to begin in 2011, and the required reductions increase each year through 2020. LCFS § 95482, Tables 1–2 (2010).

31. Under the LCFS, providers of gasoline fuel must reduce the average carbon intensity of their fuels from the current average of 95.86 gCO2e/MJ to 86.27 gCO2e/MJ by 2020. LCFS § 95486(b), Table 6 (2010); LCFS § 95482, Table 1 (2010).

32. Similarly, diesel fuel providers must reduce the carbon intensity of their fuels from the average of 94.71 gCO2e/MJ in 2010 to 85.24 gCO2e/MJ in 2020. LCFS § 95486(b), Table 7 (2010); LCFS § 95482, Table 2 (2010).

33. CARB has stated that fuel providers may meet the LCFS's requirements by (i) "blend[ing] low-carbon ethanol into gasoline, or renewable diesel fuel in diesel fuel," or (ii) "purchas[ing] credits generated by other fuel providers to offset any accumulated deficits from their

own production," such as "credits generated from another fuel provider that has banked credits from using electricity in a plug-in hybrid vehicle."

**The LCFS Directly Regulates Interstate Commerce and Conduct Outside California**

34. The LCFS requires that "[t]o ensure that low-carbon fuels that are produced outside of California are actually the source fuels used in the State, regulated parties must establish physical pathway evidence for transportation fuels and fuel feedstocks subject to the LCFS" including a "demonstration that there exists a physical pathway by which the transportation fuels and fuel feedstocks are expected to arrive in California."

35. The LCFS assigns various "carbon intensity" values to transportation fuels and fuel feedstocks used in California based upon a "lifecycle" analysis, which includes estimates of greenhouse gas (GHG) emissions "related to the full fuel lifecycle, including all stages of fuel and feedstock production and distribution, from feedstock generation or extraction through the distribution and delivery and use of finished fuel to the ultimate consumer." LCFS § 95481(a)(28) (2010).

36. The LCFS defines "carbon intensity" as "the amount of lifecycle greenhouse gas emissions, per unit of energy of fuel delivered, expressed in grams of carbon dioxide equivalent per megajoule (gCO2E/MJ)." LCFS § 95481(a)(11) (2010).

37. The LCFS defines "lifecycle greenhouse gas emissions" as "the aggregate quantity of greenhouse gas emissions (including direct emissions and significant indirect emissions such as significant emissions from land use changes), as determined by the Executive Officer, related to the full fuel lifecycle, including all stages of fuel and feedstock production and distribution, from feedstock generation or extraction through the distribution and delivery and use of the finished fuel to the ultimate consumer, where the mass values for all greenhouse gases are adjusted to account for their relative global warming potential." LCFS § 95481(a)(28) (2010).

38. Under the LCFS, the "carbon intensity" of a transportation fuel is not only a measure of the GHGs emitted when a transportation fuel is used in California, but also an estimate of GHGs emitted when the transportation fuel is produced or extracted, refined and transported to California.

6

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND JURY DEMAND**
**LEAD CASE NO. 1:09-CV-02234-LJO-BAM**

39. Because "carbon intensity" is designed to account not only for a fuel's *physical characteristics*, but also the energy necessary to bring the transportation fuel to market in California, chemically identical fuels are assigned different carbon intensities under the LCFS. LCFS § 95486(b), Tables 6–7 (2010).

40. CARB classes transportation fuels based on their raw materials, geographic origin, manufacturing process, and the power source used to refine them. LCFS § 95486(b), Tables 6–7 (2010). CARB calls each class of such fuels a "fuel pathway." LCFS § 95486(b) (2010).

41. By regulating the "fuel pathway" of transportation fuels – *i.e.*, the manner in which transportation fuels are produced and ultimately reach the California market – the LCFS directly regulates interstate commerce and conduct occurring outside of California.

**The LCFS Burdens Interstate and Foreign Commerce**

42. CARB has recognized that, by itself, the LCFS will encourage regulated parties to engage in "fuel shuffling"— *i.e.*, shipping fuels and feedstocks that have been assigned high carbon intensities to other States and countries while shipping fuels with lower carbon intensities to California.

43. The shuffling of billions of gallons of transportation fuels and fuel feedstocks in and out of California will impose significant burdens on plaintiff's members in connection with their conduct of interstate commerce.

44. CARB has admitted that, because no other states have adopted a similar standard, "fuel producers are free to ship lower-carbon-intensity fuels to areas with such standards, while shipping higher-carbon-intensity fuels elsewhere." CARB, *California's Low Carbon Fuel Standard: An Update on the California Air Resources Board's Low Carbon Fuel Standard Program* (Oct. 2009) at 1.

45. According to CARB, "[t]he end result of this fuel 'shuffling' process is little or no net change in fuel carbon-intensity on a global scale." *Id*.

46. In fact, the "fuel shuffling" promoted by the LCFS likely will lead to an overall increase in GHG emissions, because it will mean redirecting fuels and feedstocks destined for

California to other states through less efficient and redundant supply lines. *Id.*; *see also* CARB, *Final Statement of Reasons* (Dec. 2009) at 234–35.

**Discrimination Against Out-of-State Fuels**

47. As promulgated, the LCFS assigned different carbon intensities to physically identical in-state and out-of-state fuels, even when the fuels are produced by the same processes. LCFS § 95486(b), Tables 6-7 (2010). The "carbon intensity" assigned by CARB to a transportation fuel was based not solely on the amount of greenhouse gases ("GHGs") emitted in California, but also on CARB's assessment of conduct that occurs entirely outside of California.

48. CARB has admitted that it has assigned certain transportation fuels produced in California lower carbon intensities than physically identical fuels produced through the same production process outside of California in light of "shorter transportation distances and lower carbon intensity electricity sources."

49. For example, CARB assigned "Ethanol from Corn; California; Dry Mill; Dry DGS, NG" a carbon intensity of 88.90 gCO2E/MJ. CARB assigned the same fuel produced outside of California in the Midwest ("Ethanol from Corn; Midwest; Dry Mill; Dry DGS [Distillers Grains Plus Solubles], NG [Natural Gas]") with a carbon intensity of 98.40 gCO2E/MJ, more than 10% greater than its in-state California counterpart. LCFS § 95486(b), Table 6 (2010).

50. Likewise, CARB assigned "Ethanol from Corn; California; Dry Mill; Wet DGS; NG" with a carbon intensity of 80.70 gCO2E/MJ. The same fuel produced outside California in the Midwest ("Ethanol from Corn; Midwest; Dry Mill; Wet DGS") was assigned a carbon intensity of 90.10 gCO2E/MJ, more than 10% greater than its in-state California counterpart. LCFS § 95486(b), Table 6 (2010).

51. The LCFS requires regulated parties to reduce the average "carbon intensity" of their transportation fuels sold in California by, for example, blending gasoline with various or different forms of ethanol which are assigned a lower carbon intensity than that of the current baseline gasoline.

52. By way of example, by 2011, regulated parties had to reduce the average carbon intensity of their products to 0.25% below the current baseline. Under the LCFS, the gasoline

8

baseline, 95.86 gCO2E/MJ, is a mixture of California Reformulated Gasoline Blendstock for Oxygenate Blending and 10% ethanol ("80% Midwest Average; 20% California; Dry Mill; Wet DGS; NG"). Regulated parties that sold gasoline could have *reduced* the "carbon intensity" of their fuel, for example, by reducing their use of Midwestern ethanol and replacing it with a California ethanol from corn that uses the "Dry Mill; Dry DGS; NG" production process. This ethanol was assigned a "carbon intensity" of 88.90 gCO2E/MJ, and thus had a lower "carbon intensity" than the baseline.

53. In contrast, a regulated party would have *increased* the carbon intensity of its gasoline if it instead replaced its ethanol with the same corn ethanol from the "Midwest," which was created by the same production process, but for which CARB had assigned a markedly higher "carbon intensity" value of 98.40 gCO2E/MJ, and which had a greater carbon intensity than the baseline.

54. On its face, the LCFS creates an incentive for regulated parties to use California corn ethanol instead of physically identical corn ethanol produced outside of California in the Midwest. The LCFS creates regulatory disincentives for using corn ethanol produced in the Midwest.

55. Similarly, although "credits" generated under the LCFS can be exported to other carbon-permitting programs outside California, credits cannot be imported into California from other States. *See* LCFS § 95485(c)(1)(C), (2)(A) (2010).

56. The LCFS also created a barrier to the sale of transportation fuel derived from oil extracted by certain processes, and in certain regions, including Canada, labeling it "High Carbon Intensity Crude Oil (HCICO)" LCFS § 95486(b)(2). LCFS § 95486(b), Table 6 (2010). Upon information and belief, the barrier to HCICO oil was designed, as a practical matter, to make it economically infeasible to import HCICO to California.

57. The LCFS allowed the use of HCICO in two situations: 1) if "the regulated party" "propose[s] a new pathway for its HCICO and obtain[s] approval from the Executive Officer for the resulting pathway's carbon intensity;" or 2) if "the GHG emissions from the fuel's crude production and transport steps are subject to control measures, such as carbon capture-and-sequestration (CCS) or other methods, which reduce the crude oil's production and transport carbon-intensity value to

9

15.00 grams CO2e/MJ or less, as determined by the Executive Officer." LCFS § 95486(b)(2)(A)(2)(a)(ii) (2010).

58. These differences in "carbon intensity" set forth in the LCFS discriminate against identical out-of-state fuels and were designed to promote the use of California fuels over their out-of-state counterparts. By assigning lower carbon intensities to California fuels, the LCFS discourages the use of the same fuels produced outside of California.

59. The discrimination inherent in the LCFS was designed to provide a competitive advantage to local economic interest.

60. The Executive Order authorizing the LCFS states that it will "provide economic development opportunities" by encouraging production of alternative fuels. Executive Order S-01-07.

61. According to CARB, as a result of the LCFS, "over 25 new biofuel facilities will have to be built and will create more than 3,000 new jobs, mostly in the state's [California's] rural areas," and this "[p]roduction of fuels within the state will also keep consumer dollars local by reducing the need to make fuel purchases from beyond its borders." CARB, *California Adopts Low Carbon Fuel Standard* (Apr. 23, 2009).

62. The LCFS promotes economic balkanization by creating a transportation fuel standard that favors transportation fuels and fuel feedstocks produced in California and creates barriers to the import of identical transportation fuels and feedstocks produced outside California.

63. By discriminating against interstate and foreign commerce, Defendants are imposing significant burdens on importers who would bring fuel into the State and encouraging retaliation from other States.

64. Moreover, this discrimination, as California admits, will not decrease, and will likely increase, global emissions of GHGs. CARB, *California's Low Carbon Fuel Standard: An Update on the California Air Resources Board's Low Carbon Fuel Standard Program* (Oct. 2009) at 1.

### Regulation of Other States' Energy Policies and Discrimination Against States with Different Energy Policies

65. The LCFS also assigns high-carbon intensities to out-of-state transportation fuels when they are produced using different energy sources than those available in California.

66. For example, "Ethanol from Corn; Midwest; Wet Mill, 100% NG" was assigned a carbon intensity of 94.52 gCO2e/MJ, "Ethanol from Corn; Midwest; Wet Mill, 60% NG, 40% coal was assigned a carbon intensity of 105.10 gCO2e/MJ, and "Ethanol from Corn; Midwest; Wet Mill, 100% coal" was assigned a carbon intensity of 120.99 gCO2e/MJ. LCFS § 95486(b), Table 6 (2010).

67. The LCFS imposes a significant barrier to the use of corn ethanol produced in these manners because producers and importers are required to meet a standard of 86.27 gCO2e/MJ for gasoline by 2020 (LCFS § 95482(b) (2010)), and the carbon intensity for each of these corn ethanol fuels is far in excess of that requirement.

68. The LCFS creates a significant barrier to the importation of ethanol from the Midwest because regulated entities that intend to import ethanol from these States will need to purchase vast quantities of other fuels that California has assigned very low carbon intensities or to purchase "credits" accumulated by other entities subject to the LCFS.

69. No part of California's regulation can be salvaged by severance because the LCFS is designed, as a whole, to regulate interstate commerce directly. The LCFS is designed to regulate each transportation fuel's "fuel pathway," *i.e.*, the manner in which transportation fuels are produced outside California, their movement in interstate commerce to California, and the manner in which they ultimately reach the California market.

### 2012 Amendments to the LCFS

70. After the Original LCFS was adopted, CARB altered the crude-oil provisions of the LCFS. In December 2010, before the LCFS even went into effect, CARB issued a regulatory advisory which provided that "during the initial implementation year of 2011," regulated parties could use the average carbon-intensity value of 8.07 gCO2e/MJ for production and transportation of

11

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND JURY DEMAND**
**LEAD CASE NO. 1:09-CV-02234-LJO-BAM**

any HCICO under contract by June 30, 2011, and delivered by September 30, 2011. Regulatory Advisory 10-04, at 1, 3 (2011). Under this advisory California HCICO would continue to receive a lower-than-calculated carbon-intensity score, while Alaskan and other imported crude oils would continue to receive higher-than-calculated carbon-intensity scores. *Id.*

71. In July 2011, CARB issued a second regulatory advisory extending its December 2010 advisory to crude oils under contract by December 31, 2011, and delivered by March 31, 2012. Regulatory Advisory 10-04A at 2 (2011). This advisory continued to favor California HCICO over imported Alaskan and foreign crude oils. The July 2011 advisory also separately favored California HCICO over foreign HCICO because California HCICO, which was part of the 2006 California baseline mix, generated "no incremental deficits." *Id.* at 3. In contrast, imported crude oils deemed by CARB to be HCICOs generated "incremental deficits" based on the application of a carbon-intensity value "approved by the Executive Office" or "determined by [C]ARB staff analysis." *Id.* at 4.

72. In December 2011, CARB issued a third regulatory advisory stating that CARB had proposed amendments to the LCFS. The December 2011 advisory states that for 2012, all crude oils (whether HCICO, potential HCICO, or non-HCICO) would use the average carbon-intensity value of 8.07 gCO2e/MJ for production and transportation through December 31, 2012. Regulatory Advisory 10-04B at 1 (2011).

73. In the December 2011 regulatory advisory, CARB stated that, under the proposed amendments to the LCFS, CARB would adopt a baseline "California Average" carbon intensity based on all the crude oil processed in California refineries in 2010. Every year, starting in 2013, CARB would recalculate the average carbon intensity for crude oil and compare it to that initial baseline. If the new average exceeds the baseline, then all crude-oil providers would incur an incremental deficit that they must offset.

74. In the December 2011 regulatory advisory, CARB confirmed that under its proposed amendments, California HCICO would again receive an average baseline "CI score" well below the actual carbon intensity CARB calculated for it, while Alaskan and foreign crude oils would be

12

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND JURY DEMAND**
**LEAD CASE NO. 1:09-CV-02234-LJO-BAM**

burdened with a carbon-intensity score that is higher than those calculated by CARB for these crude oils.

75. On November 26, 2012, California approved amendments to the LCFS's crude-oil provisions described in the December 2011 advisory, effective January 1, 2013.

76. In the administrative record developed in connection with CARB's adoption of the 2012 amendments, CARB confirmed that the LCFS, as amended, "is designed to reduce California's dependence on petroleum, create a lasting market for clean transportation technology, and stimulate the production and use of low-carbon fuels in California." Final Statement of Reasons, Amendments to the Low Carbon Fuel Standard Regulation at 1 ("FSOR, 2012 LCFS").

77. In the 2012 amendments, with regard to crude oil, CARB adopted a "California Average" approach under which a "current" California average carbon intensity would be calculated for crude oil slate refined in California during a prior year. LCFS § 95486(b)(2) (2014).

78. Under the California Average approach, if the "current" California average carbon intensity of crude oil to California is greater than the "baseline" California average carbon intensity, then a revised incremental carbon intensity would be established, and all regulated parties that provide gasoline or diesel would incur incremental deficits. The incremental deficits incurred by a provider would be proportional to the amount of fuel it supplied and would be based on the difference between the current carbon intensity and the baseline carbon intensity. LCFS § 95486(b)(2)(A) (2014).

79. Under this approach, an incremental deficit is applied to all companies if the average crude oil slate refined in California becomes more carbon intensive over the baseline.

80. Under CARB's amended approach to carbon intensity for crude oil, an individual company that uses a crude oil slate that includes imported crude oils with carbon intensities assigned by CARB for production and transport that are *lower* than the California Average nevertheless would be assigned the *higher* California Average carbon intensity for purposes of compliance with the LCFS. Further, under the 2012 amendments, individual companies cannot obtain any incremental credits if CARB determines that the new California Average is below the prior "baseline" California Average carbon intensity.

13

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND JURY DEMAND
LEAD CASE NO. 1:09-CV-02234-LJO-BAM

81. The 2012 amendments discriminate in favor of higher carbon intensity crude oils from California and against lower carbon intensity crude oils from other states and other countries.

**2015 Amendments to the LCFS**

82. On November 16, 2015, California "re-adopt[ed]" the LCFS, with "revisions to the original regulation," effective January 1, 2016. Air Resources Board, *Initial Statement of Reasons for Proposed Rulemaking: Proposed Re-Adoption of the Low Carbon Fuel Standard*, at ES-3 (Dec. 2014) ("ISOR, 2015 LCFS").

83. As CARB recognized, the "core principles and policies of the LCFS regulation remain" in the amended 2015 LCFS. ISOR, 2015 LCFS at I-5. The 2015 LCFS "will maintain the basic framework of the [2012] LCFS regulation, including: declining carbon intensity targets; use of life cycle analyses; inclusion of indirect land use change effects; quarterly and annual reporting requirements; and credit generation and trading." ISOR, 2015 LCFS, at ES-3. Indeed, according to CARB, "[t]he re-adopted LCFS regulation" only "differs slightly from the 2010 LCFS." Air Resources Board, *Final Statement of Reasons for Rulemaking, Including Summary of Comments and Agency Response*, at 2 ("FSOR, 2015 LCFS").

84. As with the Original and 2012 LCFS, "[c]arbon intensities are calculated under the [2015] LCFS on a full life cycle basis." ISOR, 2015 LCFS, at ES-5. "This means that the CI value assigned to each fuel reflects the GHG emissions associated with that fuel's production, transport, storage, and use," including GHGs generated "indirectly, via intermediate market mechanisms." *Id.*

85. The 2015 LCFS also continues to use a "California Average" approach to calculating carbon intensities for crude oil. LCFS § 95489, Table 8 (2016). It amends the California Average approach from the 2012 LCFS by calculating the California Average based on the carbon intensities of the crude oil produced in and offshore California, rather than the carbon intensities of the crude oil refined in California. LCFS § 95489(c)(3) (2016); ISOR, 2015 LCFS, at ES-8.

86. The 2015 LCFS allows small refineries to opt out of the California Average approach to incremental deficits; large refineries must use the California Average approach. LCFS § 95489(e) (2016); ISOR, 2015 LCFS, at II-15 to II-16.

87. The 2015 LCFS continues to use fundamentally the same "life cycle" carbon intensity model for ethanol as the Original LCFS and 2012 LCFS, which has the same purpose and effect of discriminating against Midwest ethanol and in favor of physically-identical California ethanol, including by being designed to burden Midwest ethanol with higher "carbon intensity." LCFS § 95488(c)(3) (2016); *see* ISOR, 2015 LCFS at III-23 to III-30.

88. For example, an applicant under Tier 1 must provide information about a fuel's "feedstock transport modes and distances, fuel production energy use, electrical generation energy mixes, and finished fuel transport modes and distances." LCFS § 95488(c)(3)(A)(1). Further, "[a]ll applicants using grid electricity must choose electrical generation energy mixes from among 26 subregions in the ninth edition of U.S. EPA's Emissions and Generation Resource Integrated Database (eGRID)." *Id.* EPA's eGRID assigns emission rates for grid electricity based on geography. Thus, as of October 2015, California is assigned a value of 650.31 pounds of $CO_2$ per Megawatt hour ($lbCO_2$/MWh) whereas the Midwest is assigned significantly higher values (e.g., 1,425.15 $lbCO_2$/MWh for the upper Midwest). *See* eGRID2012 GHG Annual Output Emission Rates, *available at* http://www.epa.gov/sites/production/files/2015-10/documents/egrid2012_ghgoutputrates_0.pdf.

89. Credits obtained under the Original and 2012 LCFS can be used to comply with the 2015 LCFS. ISOR, 2015 LCFS at ES-2 to ES-3; LCFS § 95486(a)(1) (2016).

90. Although the differences between the 2012 LCFS and 2015 LCFS are slight, CARB styled the 2015 LCFS as "a new LCFS regulation," which "replace[d the 2012 LCFS] in its entirety," rather than as an amendment to the 2012 LCFS. ISOR, 2015 LCFS, at ES-2.

## CLAIMS FOR RELIEF

## FIRST CLAIM

### Violation of the Commerce Clause (Original LCFS)

91. The prior paragraphs of the Complaint are incorporated by reference.

92. The Original LCFS violates the Commerce Clause of the United States Constitution by directly regulating interstate and foreign commerce and purporting to regulate conduct that occurs in other States and Nations.

15

93. The Original LCFS violates the Commerce Clause by regulating, on its face and in its practical effect, the channels of interstate and foreign commerce and the use of these channels of interstate and foreign commerce.

94. By regulating the "fuel pathway" of transportation fuels – *i.e.*, the manner in which transportation fuels are produced and ultimately reach the California market – the Original LCFS impermissibly penalizes producers and importers based upon the manner in which their transportation fuels are produced and the manner in which they move in interstate and foreign commerce.

95. The Original LCFS imposes significant burdens on Plaintiffs' members in connection with their conduct of interstate commerce.

96. By design and in practical effect, the Original LCFS impermissibly regulates conduct occurring outside of California by making it more difficult to market and sell transportation fuels based upon where the fuels are produced, the manner in which they are produced, and the manner in which they reach the California market.

97. Defendants are purporting to act within the scope of their authority under state law in enforcing and implementing the Original LCFS.

98. Defendants are liable to Plaintiffs for proper redress under 42 U.S.C. § 1983 because the Original LCFS deprives Plaintiffs' members of the rights, privileges, and immunities secured by the Commerce Clause of the United States Constitution.

99. Plaintiffs have no adequate remedy at law.

## SECOND CLAIM

**Impermissible Extraterritorial Regulation (2012 LCFS and 2015 LCFS)**

100. The prior paragraphs of the Complaint are incorporated by reference.

101. The 2012 LCFS and the 2015 LCFS violate the United States Constitution by directly regulating interstate and foreign commerce and purporting to regulate conduct that occurs in other States and countries.

102. By regulating the "fuel pathway" of transportation fuels – *i.e.*, the manner in which transportation fuels are produced and ultimately reach the California market – the 2012 LCFS and

16

the 2015 LCFS impermissibly penalize producers and importers based upon the manner in which their transportation fuels are produced in other States and countries and the manner in which they move in interstate and foreign commerce.

103. The express purpose and practical effect of the 2012 LCFS and the 2015 LCFS is to control commerce conducted in other States and countries by attaching restrictions to imported transportation fuels that are produced and transported in a manner that California disfavors.

104. By design and in practical effect, the 2012 LCFS and the 2015 LCFS impermissibly regulate conduct occurring wholly outside of California by making it more difficult to market and sell transportation fuels based upon where the fuels are produced, the manner in which they are produced, and the manner in which they reach the California market.

105. The 2012 LCFS and the 2015 LCFS improperly extend California's police power beyond its jurisdictional bounds by regulating conduct that lies within the regulatory jurisdiction of other States and countries.

106. The 2012 LCFS and the 2015 LCFS regulate, on their face and in their practical effect, the channels of interstate and foreign commerce and the use of these channels of interstate and foreign commerce. By regulating interstate and foreign commerce that occurs wholly outside of California, the 2012 LCFS and the 2015 LCFS violate the Commerce Clause of the United States Constitution and principles of interstate federalism embodied in the Federal structure of the United States Constitution.

107. Defendants are purporting to act within the scope of their authority under State law in enforcing and implementing the 2012 LCFS and the 2015 LCFS.

108. Defendants are liable to Plaintiffs for proper redress under 42 U.S.C. § 1983 because the 2012 LCFS and the 2015 LCFS deprive Plaintiffs' members of the rights, privileges, and immunities secured by the Commerce Clause of the United States Constitution and principles of interstate federalism embodied in the Federal structure of the United States Constitution.

109. Plaintiffs have no adequate remedy at law.

17

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND JURY DEMAND
LEAD CASE NO. 1:09-CV-02234-LJO-BAM

## THIRD CLAIM
### Violation of the Commerce Clause (Original LCFS, and 2012 LCFS, and 2015 LCFS)

110. The prior paragraphs of the Complaint are incorporated by reference.

111. The Original LCFS, 2012 LCFS, and 2015 LCFS violate the Commerce Clause of the United States Constitution by discriminating against transportation fuels produced in other States and other countries.

112. The Original LCFS, 2012 LCFS, and 2015 LCFS treat chemically identical fuels and fuel feedstocks differently based, in part, on where they are produced. By assigning lower carbon intensities to California fuels and higher carbon intensities to fuels from outside California, the Original LCFS, 2012 LCFS, and 2015 LCFS encourage the use of fuels produced in California as compared to chemically identical fuels produced outside of California.

113. The discrimination inherent in the Original LCFS, 2012 LCFS, and 2015 LCFS is designed to provide an unfair competitive advantage to local economic interests and to promote the use of California fuels in California.

114. The Original LCFS, 2012 LCFS, and 2015 LCFS impose significant burdens on Plaintiffs' members in connection with their conduct of interstate commerce.

115. The Original LCFS, 2012 LCFS, and 2015 LCFS are not justified by any valid public welfare, consumer protection, or pro-competitive purpose unrelated to economic protectionism.

116. Defendants are purporting to act within the scope of their authority under State law in enforcing and implementing the Original LCFS, 2012 LCFS, and 2015 LCFS.

117. Defendants are liable to Plaintiffs for proper redress under 42 U.S.C. § 1983 because the Original LCFS, 2012 LCFS, and 2015 LCFS deprive Plaintiffs' members of the rights, privileges, and immunities secured by the Commerce Clause of the United States Constitution.

118. Plaintiffs have no adequate remedy at law.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request the following relief:

|  |  |  |
|---|---|---|
| 1 | A. | A declaratory judgment, pursuant to 28 U.S.C. § 2201, that the LCFS, as originally enacted and as amended in 2012 and 2015, violates the United States Constitution and is unenforceable; |
| 4 | B. | A preliminary and permanent injunction enjoining the Defendants from implementing or enforcing the LCFS; |
| 6 | C. | An order awarding plaintiffs their costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and |
| 8 | D. | Such other and further relief as the Court deems just and proper. |

### DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury in this action of all issues so triable.

DATED: June 24, 2016                    SIDLEY AUSTIN LLP

                                        By:  /s/ Roger R. Martella, Jr.
                                             Roger R. Martella, Jr.

                                        *Counsel for Plaintiffs*

[ADDITIONAL COUNSEL OF RECORD]

Roger R. Martella, Jr. (DC Bar No. 976771)
Paul J. Zidlicky (DC Bar No. 450196)
Admitted *Pro Hac Vice*
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: 202-736-8000
Facsimile: 202-736-8711

rmartella@sidley.com
pzidlicky@sidley.com