**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **ROCKY MOUNTAIN FARMERS UNION, et al.,**<br><br>                **Plaintiffs,**<br><br>        v.<br><br>**RICHARD W. COREY, in his official capacity as Executive Officer of the California Air Resources Board, et al.,**<br><br>                **Defendants.** | **Lead Case: 1:09-cv-2234-LJO-BAM**<br><br>**Consolidated with member case: 1:10-cv-163-LJO-BAM[1]**<br><br>**MEMORANDUM DECISION AND ORDER RE DEFENDANTS' MOTIONS TO DISMISS (Docs. 378, 380)** |

## I.      INTRODUCTION

Two sets of Plaintiffs, the "RMFU Plaintiffs"[2] and the "AFPM Plaintiffs,"[3] challenge the constitutionality of California's Low Carbon Fuel Standard ("LCFS"), Cal. Code Regs. Tit. 17, §§ 75480-90. Defendants[4] move to dismiss all four claims in the RMFU Plaintiffs' Third Amended Complaint ("TAC"), Doc. 374. Doc. 378. Defendants move for judgment on the pleadings on the AFPM Plaintiffs' claims in their Second Amended Complaint ("SAC"), Doc. 373, concerning the now-repealed version of the LCFS, and move to dismiss the remaining claims against the currently operative LCFS. Doc. 380-1.

---

[1] Unless otherwise indicated, all citations to the docket ("Doc.") refer to the docket in *Rocky Mountain Farmers Union v. Corey*, 1:09–cv–2234–LJO–BAM.

[2] The RMFU Plaintiffs are Rocky Mountain Farmers Union, Redwood County Minnesota Corn and Soybeans Growers; Penny Newman Grain, Inc.; Fresno County Farm Bureau; Nisei Farmers League; California Dairy Campaign; Rex Nederend; and Growth Energy.

[3] The AFPM Plaintiffs are American Fuels & Petrochemical Manufacturers; American Trucking Associations; and the Consumer Energy Alliance.

[4] Defendants are various official capacity defendants, who are joined by various environmental groups as intervenors. For brevity's sake, the Court will refer to Defendants and Defendant-Intervenors collectively as "Defendants."

The Court took the matter under submission on the papers pursuant to Local Rule 230(g). Doc. 388. For the following reasons, the Court GRANTS IN PART and DENIES IN PART Defendants' motions.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

This case concerns Plaintiffs' years-long and complex challenge to the LCFS.[5] After the Ninth Circuit remanded the case to this Court in 2014, *see Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070 (9th Cir. 2013) ("*RMFU*"), the Court granted in part and denied in part the AFPM Plaintiffs' motion to amend the complaint. *Rocky Mountain Farmers Union v. Goldstene*, No. 1:09-cv-2234-LJO-BAM, 2014 WL 7004725, at *1 (E.D. Cal. Dec.11, 2014) ("*RMFU Amendment*"). In August 2015, the Court granted in part and denied in part Defendants' motion to dismiss certain of the AFPM Plaintiffs' claims. *See Am. Fuels & Petrochemicals Mfrs. Ass'n v. Corey*, No. 1:09-cv-2234-LJO-BAM, 2015 WL 5096279, at *1 (E.D. Cal. Aug. 28, 2015) ("MTD Order"). In June 2016, the Court granted Plaintiffs' second motion to amend their pleadings. *See Rocky Mountain Farmers Union v. Corey*, No. 1:09-cv-2234-LJO-BAM, 2016 WL 3277018 (E.D. Cal. June 15, 2016) ("*RMFU Amendment II*"). The Court incorporates by reference the summary of the extensive procedural history of this consolidated action contained in *RMFU Amendment*, 2014 WL 7004725, at *1-8, and the MTD Order, 2015 WL 5096279, at *1-5. Only an abbreviated recitation of the complex factual and procedural background follows; the Court discusses the relevant aspects of the facts and prior proceedings in more detail in its analysis below.

The California Air Resources Board ("CARB") promulgated and adopted the LCFS[6] in 2009 and 2010. TAC ¶ 37. The regulation went into effect in 2011 ("the Original LCFS"), and CARB amended it

---

[5] Briefly summarized and oversimplified, the LCFS is a California state-law scheme that regulates the amount of carbon contained in transportation fuels consumed in California. *See generally Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1080 (9th Cir. 2013) ("*RMFU*").

[6] The specifics of the LCFS are discussed in detail in the Court's prior orders and the Ninth Circuit's decision in *RMFU*, all of which the Court incorporates by reference. *See* MTD Order, at *14-19; *Rocky Mountain Farmers Union v. Goldstene*, 843 F.2d 1071, 1079-1082 (E.D. Cal. 2011); *RMFU*, 730 F.3d at 1080-1091.

in 2012 ("the 2012 LCFS"). SAC ¶ 75. CARB repealed the LCFS in 2015 after the California Court of Appeal held that CARB made errors when adopting it. *See POET, LLC v. Cal. Air. Res. Bd.*, 218 Cal. App. 4th 681 (2013); *see also* Doc. 379-1, Ex. A. CARB adopted a new LCFS in 2015 ("the 2015 LCFS"), which went into effect in 2016, and remains the operative version of the regulation. *See* Doc. 379-1, Ex. A, at 1-6.

The AFPM Plaintiffs now bring claims against all three versions of the LCFS; the RMFU Plaintiffs bring claims against only the 2015 LCFS. As explained in more detail below, the LCFS regulates both ethanol and crude oil. The RMFU Plaintiffs challenge the LCFS's ethanol provisions whereas the AFPM Plaintiffs challenge its crude oil provisions.

The RMFU Plaintiffs' TAC contains four causes of action. TAC at 18-22. Claims one and two allege, respectively, that the LCFS is preempted by federal law on its face and as-applied to Plaintiff Growth Energy.[7] TAC at 15-18. Specifically, the RMFU Plaintiffs assert the federal Renewable Fuel Standard ("RFS"), 42 U.S.C. § 7545(o)(2)(A)(i),[8] of the Energy Independence and Security Act ("EISA") preempts the LCFS. *Id.* ¶¶ 66-68. Claims three and four allege, respectively, that the LCFS "improperly regulates, discriminates against, and unduly burdens interstate commerce and so is invalid" on its face and as applied to Growth Energy. *Id.* at 18-22.

The AFPM Plaintiffs assert three causes of action in their SAC. The first and second allege that all three versions of the LCFS violate the Commerce Clause because they "impermissibly regulate conduct occurring wholly outside of California." SAC ¶¶ 96, 104; *see also id.* ¶¶ 93, 101. The third cause of action asserts all three versions of the LCFS violate the Commerce Clause "by discriminating against transportation fuels produced in other States and other countries." *Id.* ¶ 111. The AFPM

---

[7] In *RMFU Amendment II*, the Court found that, of the RMFU Plaintiffs, only Growth Energy has standing to assert an as-applied challenge to the LCFS because the Court previously found that it was the only RMFU Plaintiff that provided evidence that the LCFS had caused it injury. *See* 2016 WL 3277018, at *4-5.

[8] 42 U.S.C. § 7545(o) of the EISA amended § 211(o) of the Clean Air Act, which contains the federal Renewable Fuel Standard ("RFS"). *See RMFU*, 730 F.3d at 1077; *see also Am. Fuel & Petro. Mfrs. v. O'Keefe*, 134 F. Supp. 3d 1270, 1276 (D. Or. 2015). The Court will refer to the statute interchangeably as "§ 211(o)," "§ 7545(o)," or "the RFS."

3

Plaintiffs further assert "[t]he discrimination inherent in the Original LCFS, 2012 LCFS, and 2015 LCFS is designed to provide an unfair competitive advantage to local economic interests and to promote the use of California fuels in California," which "impose[s] significant burdens on Plaintiffs' members in connection with their conduct of interstate commerce." *Id.* ¶¶ 113-14.

With respect to their Commerce Clause claims, both sets of Plaintiffs assert the ethanol provisions of the LCFS discriminate on their face, and in their purpose and effect. The RMFU Plaintiffs further assert the ethanol provisions fail under *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970).[9]

Thus, between both sets of Plaintiffs, they assert the following:

(1) The LCFS is preempted by federal law, namely, the RFS in the EISA, on its face and as applied to Growth Energy;

(2) The LCFS, in all three of its forms, is an impermissible extraterritorial regulation that violates the Commerce Clause; and

(3) The LCFS, in all three of its forms, violates the Commerce Clause

   (a) on its face,

   (b) in purpose and effect, and

   (c) under *Pike*.

Defendants (1) move for judgment on the pleadings under Federal Rule[10] of Civil Procedure 12(c) as to Plaintiffs' claims concerning the Original LCFS on the ground they are moot, and (2) move to dismiss the remaining claims under Rule 12(b)(6) as barred by the law of the case, or for failure to state a claim (or both). Plaintiffs oppose in all respects.

---

[9] The *Pike* balancing test provides that where a statute or regulation "even-handedly . . . effectuate[s] a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." 397 U.S. at 142.

[10] All further references to any "Rule" are to the Federal Rules of Civil Procedure unless otherwise indicated.

# III.    STANDARDS OF DECISION

## A.  Rule 12(b)(6)

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is a challenge to the sufficiency of the allegations set forth in the complaint. A 12(b)(6) dismissal is proper where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balisteri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990). In considering a motion to dismiss for failure to state a claim, the court generally accepts as true the allegations in the complaint, construes the pleading in the light most favorable to the party opposing the motion, and resolves all doubts in the pleader's favor. *Lazy Y. Ranch LTD v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).

To survive a 12(b)(6) motion to dismiss, the plaintiff must, in accordance with Rule 8, allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a Plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions." *Twombly*, 550 U.S. at 555 (internal citations omitted). Thus, "bare assertions . . . amount[ing] to nothing more than a 'formulaic recitation of the elements' . . . are not entitled to be assumed true." *Iqbal*, 556 U.S. at 681. "[T]o be entitled to the presumption of truth, allegations in a complaint . . . must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). In practice, "a complaint . . . must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Twombly*, 550

U.S. at 562.

**B. Rule 12(c)**

Federal Rule of Civil Procedure 12(c) permits a party to seek judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." "A motion for judgment on the pleadings should be granted where it appears the moving party is entitled to judgment as a matter of law." *Geraci v. Homestreet Bank*, 347 F.3d 749, 751 (9th Cir. 2003). A "judgment on the pleadings is appropriate when, even if all allegations in the complaint are true, the moving party is entitled to judgment as a matter of law." *Westlands Water Dist. v. Firebaugh Canal*, 10 F.3d 667, 670 (9th Cir.1993).

"A judgment on the pleadings is a decision on the merits." *3550 Stevens Creek Assocs. v. Barclays Bank of California,* 915 F.2d 1355, 1356 (9th Cir.1990), *cert. denied*, 500 U.S. 917 (1991). A 12(c) motion "is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Herbert Abstract Co. v. Touchstone Props., Ltd.*, 914 F.2d 74, 76 (5th Cir. 1990) (per curiam). "[T]he central issue is whether, in light most favorable to the plaintiff, the complaint states a valid claim for relief." *Hughes v. Tobacco Inst., Inc.*, 278 F.3d 417,420 (5th Cir.2001). "[A]ll allegations of fact of the opposing party are accepted as true." *Austad v. United States*, 386 F.2d 147, 149 (9th Cir.1967). Thus, a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is "functionally identical" to a motion to dismiss under Rule 12(b)(6). *Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989). Although Rule 12(c) does not mention leave to amend, courts have discretion to grant a Rule 12(c) motion with leave to amend. *See Carmen v. San Francisco Unified Sch. Dist.*, 982 F.Supp. 1396, 1401 (N.D.Cal. 1997).

Like a Rule 12(b)(6) motion to dismiss, a Rule 12(c) motion challenges the legal sufficiency of an opposing party's pleadings. "When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one."

*Balistreri*, 901 F.2d at 699. Dismissal is proper where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Id.* "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 545 (internal citations and quotations omitted). "While a complaint . . . does not need detailed factual allegations . . . a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitations of the elements of a cause of action will not do." *Id.* at 1964.

## IV.    <u>DISCUSSION</u>

**A.  Uncontested aspects of Defendants' motions**

The AFPM Plaintiffs candidly acknowledge that a number of their claims are foreclosed by *RMFU* and this Court's prior decisions and, accordingly, do not oppose Defendants' motions to dismiss them or for judgment on the pleadings on them. *See* Doc. 383 at 5-6. Those claims are:

- All claims against the Original and 2012 LCFS, except for the claims that those regulations discriminate against interstate commerce in purpose and effect;
- The Original, 2012, and 2015 LCFS are impermissible extraterritorial regulations;
- The crude oil provisions of the Original, 2012, and 2015 LCFS discriminate against interstate commerce; and
- The ethanol provisions of the Original, 2012, and 2015 LCFS facially discriminate against interstate commerce.

Doc. 383 at 5-6, 13-14. Although the RMFU Plaintiffs assert the same uncontested claims as the AFPM Plaintiffs do, they do not oppose Defendants' motion to dismiss or for judgment on the claims. *See* Doc. 384 at 24-28; *see also* Doc. 387 at 9. Because the parties agree that *RMFU* and the Court's prior decisions foreclose these claims, the Court GRANTS Defendants' motions on them WITHOUT LEAVE TO AMEND.[11]

---

[11] In evaluating whether the ethanol provisions are discriminatory, the Court has determined it is necessary to add an additional layer pertaining to the volume of fuels produced to its analytical approach. That layer was not applied in the MTD Order to the crude oil provision, at least not explicitly, particularly because the AFPM Plaintiffs have never raised it.

Therefore, all that remains of the AFPM Plaintiffs' claims are their claims that the ethanol provisions of the Original, 2012, and 2015 LCFS discriminate against interstate commerce in purpose and effect. *See* Doc. 383 at 6. The RMFU Plaintiffs assert the same claims, and additionally assert that all versions of the LCFS are preempted by federal law and the ethanol provisions of all versions of the LCFS fail under *Pike*.

**B.    Whether the AFPM Plaintiffs' claims against the Original and 2012 LCFS are moot**

Defendants move for judgment on the pleadings on AFPM Plaintiffs' claims against the Original LCFS and 2012 LCFS on the ground that they are moot because both versions have been repealed and replaced. Doc. 380-1 at 15. Specifically, Defendants argue those claims are moot because the Court cannot grant any prospective relief, and the Eleventh Amendment bars any retrospective relief. *Id.* at 16.

In their opposition, the AFPM Plaintiffs assert the Ninth Circuit held in *RMFU* that their challenges to repealed versions of the LCFS are not moot because "the credits allocated under both the Original LCFS and the 2012 LCFS continue to carry forward and may still be used by regulated parties to comply with the mandates of the 2015 LCFS." Doc. 383 at 15 (citing *RMFU*, 730 F.3d at 1097 n.12). Thus, according to the AFPM Plaintiffs, the Court can grant prospective relief because how credits were calculated under prior versions of the LCFS affects how they will be calculated in the future, and the Court can therefore order that "credits generated under those prior versions be recalculated on a nondiscriminatory basis that comports with the Constitution." *Id.* at 16.

Defendants argue in their reply that the AFPM Plaintiffs' SAC does not contemplate the relief they purportedly seek, as stated in their opposition, *i.e.*, that the Court order a recalculation of the credits assigned under the Original and 2012 LCFS. Doc. 385 at 3.[12] Defendants assert that, even if the SAC

---

Nonetheless, as discussed in greater detail below, the Court does not believe applying a volumetric approach would have changed the outcome of the MTD Order.

[12] Although Defendants correctly point out that the SAC does not explicitly contemplate the relief the AFPM Plaintiffs purportedly seek in their opposition, *see* SAC at 20, Defendants do not argue that this precludes the AFPM Plaintiffs from seeking that relief.

sought this remedy, it is unavailable to the AFPM Plaintiffs because it "1) would not redress the injuries AFPM alleges, 2) is barred by the Eleventh Amendment, 3) would be inherently inequitable, and 4) is the kind of individualized remedy AFPM lacks standing to seek." *Id.* at 4.

### 1. Relief AFPM Plaintiffs seek

In the SAC, the AFPM Plaintiffs seek the following relief:

A. A declaratory judgment, pursuant to 28 U.S.C. § 2201, that the LCFS, as originally enacted and as amended in 2012 and 2015, violates the United States Constitution and is unenforceable;
B. A preliminary and permanent injunction enjoining the Defendants from implementing or enforcing the LCFS;
C. An order awarding plaintiffs their costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and
D. Such other and further relief as the Court deems just and proper.

SAC at 20. The SAC thus does not explicitly request that the Court order a recalculation of credits assigned under the Original and 2012 LCFS, should the Court find them unconstitutional. Though Defendants suggest that this request is articulated only in the AFPM Plaintiffs' opposition, Defendants do not object to the Court's considering it. The Court will therefore assume without deciding that the AFPM Plaintiffs seek in the SAC the credits recalculation remedy that they articulate in their opposition. In any event, as discussed below, the AFPM Plaintiffs do not have standing to seek this remedy and, even if they did, it is barred by the Eleventh Amendment.

### 2. Standing

Defendants assert—for the first time in their reply—that the AFPM Plaintiffs lack standing.[13] The thrust of their one-paragraph argument is that determining the AFPM Plaintiffs' sought-after credit recalculation would require an assessment of the credits each of their thousands of members bought and sold, which is not permissible when a plaintiff, like the AFPM Plaintiffs, only has associational

---

[13] Generally, courts do not address arguments raised for the first time in a reply brief. *See, e.g.*, *United States v. Bohn*, 956 F.2d 208, 209 (9th Cir. 1992). But because standing relates to the Court's jurisdiction, Defendants' argument that the AFPM Plaintiffs lack standing is properly raised at any time. *See Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434-435 (2011).

standing.[14] Doc. 385 at 8. In support, Defendants rely exclusively on *Warth v. Seldin*, 422 U.S. 490, 511 (1975). *Id.*

In *Warth*, the Supreme Court explained that an entity has associational standing if, among other things, "the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause." *Id.*[15] *Warth* and its progeny "have been understood to preclude associational standing when an organization seeks damages on behalf of its members." *United Food & Comm. Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 554 (1996) (declining to apply to a union the prudential limitation barring an organization from seeking damages on behalf of its members, but only because Congress specifically permitted unions to do so).

Although the AFPM Plaintiffs state they do not seek damages, Doc. 383 at 16, their request for a recalculation of credits generated under the Original and 2012 LCFS is effectively a request for damages, or so analogous to a request for damages to render it indistinguishable from the circumstances underpinning *Warth*, 422 U.S. at 515-16 (association plaintiff failed to allege "monetary injury to itself, nor any assignment of the damages claims of its members. . . . [m]oreover . . . the damages claims are not common to the entire membership, nor shared by all in equal degree"). The AFPM Plaintiffs allege the LCFS is unconstitutionally discriminatory, in part because it requires regulated entities who purchase Midwest ethanol "to purchase vast quantities of other fuels that California has assigned very low carbon intensities or to purchase 'credits' accumulated by other entities subject to the LCFS." SAC ¶ 68; *see also id.* ¶ 33 (alleging fuel provides comply with the LCFS by, among other things, "purchas[ing] credits generated by other fuel providers"); Cal. Code Regs. § 95487 (outlining possible "Credit Transactions" under LCFS). As the AFPM Plaintiffs asserted on appeal before the Ninth Circuit: "The LCFS . . .

_____

[14] There is no dispute that the AFPM Plaintiffs have only associational standing. *See* SAC ¶¶ 8-12.

[15] An association has standing to sue on behalf of its members if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1975). Defendants only challenge the AFPM Plaintiffs' ability to satisfy the third element.

10

penaliz[es] the use of fuels whose carbon-intensity scores exceed the regulation's annual cap and plac[es] such fuels at a substantial disadvantage in the California market: parties using such fuels must either purchase credits from their competitors . . . or incur . . . penalties." Doc. 386-1 at 53. The AFPM Plaintiffs thus argued that the LCFS "is discriminatory because . . . higher carbon-intensity scores generate 'deficits' that must be eliminated through the generation or purchase of 'credits.'" *Id.* at 73. Because of this discriminatory effect, which leads to a price disparity between lower- and higher-carbon-intensity ethanol, the LCFS "could impose as much as $10 to $20 million in additional costs on regulated parties that sell gasoline in California." *Id.* at 39.

The AFPM Plaintiffs therefore contend the purported discriminatory effects of the LCFS caused their members to spend more money on purchasing credits to comply with the LCFS. If the Court were to order a recalculation of credits generated under the Original and 2012 LCFS, as they request, it would require a number of individualized determinations, including (1) who bought which credits; (2) whether the alleged discriminatory effects of the LCFS caused the party to spend more on those credits; and (3) if so, how that should be remedied, *i.e.*, how much the parties are owed due to their overpayment—in other words, what their damages are. These necessary individualized determinations thus render the AFPM Plaintiffs without associational standing to seek the credit recalculations that they request because it would be impossible to make the determinations without the participation of the AFPM Plaintiffs' members. *See Warth*, 422 U.S. at 515-16; *Brown Group*, 517 U.S. at 554.

### 3. Eleventh Amendment

Although the AFPM Plaintiffs claim they do not seek damages, the Court's conclusion that the credit recalculations would require determining how much their members *overpaid* for credits—and ordering corresponding relief—leads the Court to conclude that the AFPM Plaintiffs essentially seek retrospective damages that are barred by the Eleventh Amendment. As explained above, the AFPM Plaintiffs claim the purported discriminatory effects of the Original and 2012 LCFS required them to purchase more credits (*i.e.*, spend more money) than would have been required had that alleged

discrimination not existed. They now ask that the credits—all of which were bought and sold by them and other parties—be recalculated and redistributed in a different manner. In effect, the AFPM Plaintiffs request a reshuffling of state funds.

"Relief that in essence serves to compensate a party injured in the past by an action of a state official in his official capacity that was illegal under federal law is barred" by the Eleventh Amendment. *Papasan v. Allain*, 478 U.S. 265, 278 (1986). This includes cases for declaratory and injunctive relief that seek "a compensatory, backward-looking remedy," *Porter v. Jones*, 319 F.3d 483, 491 n.7 (9th Cir. 2003), and encompasses "relief that is tantamount to an award of damages for a past violation of federal law, even though styled as something else." *Papasan*, 478 U.S. at 278 (citations omitted). "On the other hand, relief that serves directly to bring an end to a *present* violation of federal law is not barred by the Eleventh Amendment even though accompanied by a substantial ancillary effect on the state treasury." *Id.* (emphasis added) (citations omitted).

Accordingly, to the extent the AFPM Plaintiffs seek compensatory relief (whether credit calculations or otherwise) that is based exclusively on Defendants' conduct that allegedly violated federal law *in the past*, the Eleventh Amendment precludes that relief. But, to the extent they seek relief for Defendants' past conduct that allegedly violated federal law that has an ongoing or future effect, the Eleventh Amendment does not preclude that relief. *See id.* The Court therefore GRANTS IN PART and DENIES IN PART Defendants' motion for judgment on Plaintiffs' claims concerning the Original and 2012 LCFS on the ground they are barred by the Eleventh Amendment.

As noted above, however, the Court finds it is a stretch, at best, to read the SAC as seeking the credit recalculation relief the AFPM Plaintiffs purportedly seek. More importantly, the Court finds that the Court cannot—legally or practically—order the recalculations. The AFPM Plaintiffs have provided no authority that remotely suggests that relief is permissible, and the Court cannot locate any. The Court therefore agrees with Defendants that, even if the Eleventh Amendment does not bar Plaintiffs' recalculation relief, the Court is unable to grant it because it would be impossible and inequitable to the

parties who have already bought and sold LCFS credits to recalculate and reassign the credits. As Defendants point out, millions of credits worth tens of millions of dollars have already been bought by numerous parties, most of which are not parties to this case. *See* Doc. 385 at 6-7. The Court therefore GRANTS Defendants' motion for judgment on Plaintiffs' claims against the Original and 2012 LCFS to the extent they seek a recalculation of already assigned credits because doing so would be inequitable and impractical.

### 4. Mootness

This brings the Court to the issue of whether the AFPM Plaintiffs' claims against the Original and 2012 LCFS are moot. A footnote in the Ninth Circuit's decision in *RMFU* is directly on point and controls here. The court held:

> Although the 2011 Provisions have been amended, this does not render the challenge to them moot. "A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Decker v. Nw. Envtl. Def. Ctr.*, ⸺ U.S. ⸺, 133 S.Ct. 1326, 1335 (2013) (quotation marks and citation omitted). Here, the 2011 Provisions applied to crude oil delivered through December 31, 2011, so one year of Fuel Standard credits were allocated based on the distinction between emerging and existing sources and between HCICOs and non-HCICOs. Advisory 13–01 altered the treatment of Potential HCICOs to conform to the amended provisions, but sellers of verified HCICOs could have reported individual carbon intensity values during 2011. Credits awarded based on those values will carry forward to subsequent years and may be used by a regulated party to comply with the Fuel Standard mandates. Cal. Code Regs. tit. 17, §§ 95484(b), (c)(4), 95485(c). The propriety of the scheme under which those credits were distributed remains a live controversy.

*RMFU*, 730 F.3d at 1097 n.12.

Plaintiffs had challenged the crude oil provisions of the Original LCFS (what the Ninth Circuit called "the 2011 Provisions") in this Court and, by the time *RMFU* issued, they had been amended by the 2012 LCFS. *See id.* The Ninth Circuit observed that the means by which credits were calculated under the Original LCFS had an effect on how they were calculated under the then-current version of the regulation, the 2012 LCFS. *Id.* The Ninth Circuit thus explicitly held that Plaintiffs' challenge to the Original LCFS was not moot because it had a live, ongoing effect then, which would continue into the future. *See id.*

That holding is directly applicable here. The AFPM Plaintiffs allege, consistent with *RMFU*, that the Original and 2012 LCFS affect how credits are calculated under the 2015 LCFS. Their challenge to the Original and 2012 LCFS therefore is not moot; it remains "a live controversy." *Id.*

Regardless of this conclusion, as explained above, the AFPM Plaintiffs' potential remedy for any finding that either the Original or 2012 LCFS (or both) violated federal law is limited to the present and future effects of the Original and 2012 LCFS, and declaratory and injunctive relief against the regulations. Further, any remedy that is akin to damages, such as the AFPM Plaintiffs' request for credits recalculation, is barred by the Eleventh Amendment. *See Papas*, 478 U.S. at 278 (citations omitted); *see also Taylor v. Westly*, 402 F.3d 924, 929-30 (9th Cir. 2005) ("[T]he Eleventh Amendment shields state governments . . . from declaratory judgments against the state governments that would have the practical effect of requiring the state treasury to pay money to claimants") (footnote omitted). Accordingly, Defendants' motion for judgment on Plaintiffs' claims against the Original and 2012 LCFS on the ground they are moot is GRANTED IN PART and DENIED IN PART.

## C. Preemption

The RMFU Plaintiffs contend the LCFS[16] is preempted under the Supremacy Clause because it conflicts with the EISA. *See* TAC ¶¶ 1, 65, 81; Doc. 384 at 16. Specifically, RMFU Plaintiffs allege the LCFS conflicts with: (1) the exemption from the RFS for certain fuel-producing facilities as provided in 42 U.S.C. § 7545(o)(2)(A)(i); (2) the geographical restrictions imposed on the EPA's rulemaking authority under the EISA provided in 42 U.S.C. § 7545(o)(2)(A)(iii)(II)(aa) ("the geographic restrictions"); and (3) "the EPA's discretion under the EISA to adjust the percent reductions in lifecycle [greenhouse gas ("GHG")] emissions standards . . . as well as the EPA's discretion to waive such requirements," as provided in 42 U.S.C. §§ 7545(o)(4), 7545(o)(7)(A). TAC ¶¶ 66-75.

### 1. Conflict preemption principles

---

[16] All further references to "the LCFS" are to the Original, 2012, and 2015 versions of the regulation unless otherwise indicated.

"The Supremacy Clause makes the laws of the United States 'the supreme Law of the Land; ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.'" *Atay v. Cty. of Maui*, 842 F.3d 688, 699 (9th Cir. 2016) (quoting U.S. Const., Art. VI, cl. 2). Accordingly, "state law is pre-empted to the extent that it actually conflicts with federal law." *English v. Gen. Elec. Co.*, 496 U.S. 72, 78-79 (1990). Actual conflict occurs "where it is impossible for a private party to comply with both state and federal requirements, or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).[17] "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000).

"[W]here a statute regulates a field traditionally occupied by states, such as health, safety, and land use, a 'presumption against preemption' adheres." *Atay*, 842 F.3d at 700 (quoting *Wyeth v. Levine*, 555 U.S. 565 n.3 (2009)). Because federal courts "assume that a federal law does not preempt the states' police power absent a 'clear and manifest purpose of Congress,'" *id.* (quoting *Wyeth*, 555 U.S. at 565), "a high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal Act." *Gade v. Nat'l Solid Waste Mgmt. Ass'n*, 505 U.S. 88, 110 (1992).

The California legislature enacted the LCFS to regulate air quality in an attempt to improve, among other things, the well-being of California's citizens and environment. *See RMFU*, 730 F.3d at 1079 (citing Cal. Health & Safety Code § 38501 (a)). The LCFS therefore falls within "an area of traditional state control." *Oxygenated Fuels Ass'n v. Davis*, 331 F.3d 665, 673 (9th Cir. 2003); *Exxon Mobil Corp. v. U.S. E.P.A.*, 217 F.3d 1246, 1255 (9th Cir. 2000) ("Air pollution prevention falls under the broad police powers of the states, which include the power to protect the health of citizens in the state. Environmental regulation traditionally has been a matter of state authority."). Federal courts are

---

[17] The RMFU Plaintiffs do not allege it is impossible for them to comply with both the RFS and LCFS.

"highly deferential to state law in areas traditionally regulated by the states" when assessing whether federal law preempts state laws regulating those areas. *Id.* To succeed on their preemption claims, then, the RMFU Plaintiffs must provide "clear evidence" that Congress intended to preempt the LCFS when enacting the EISA, or that they actually conflict with one another. *Id.* (quoting *Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 885 (2000)).

### 2. Analysis

#### a. The Court's previous preemption finding

The Court previously found that RMFU Plaintiffs stated a conflict preemption claim. *See Rocky Mountain Farmers Union v. Goldstene*, 719 F. Supp. 2d 1170, 1195 (E.D. Cal. 2010). RMFU Plaintiffs correctly argue that holding remains the law of the case and, accordingly, Defendants' motion to dismiss the preemption claims in the TAC should be denied. *See* Doc. 384 at 17. Defendants urge the Court to reconsider its prior holding. *See* Doc. 387 at 7.

The law of the case doctrine generally precludes a court from "reconsidering an issue that already has been decided by the same court, or a higher court in the identical case." *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997). Nonetheless, "[a] court may have discretion to depart from the law of the case where . . . the first decision was clearly erroneous." *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997). For the reasons discussed below, the Court concludes its prior holding that Plaintiffs have stated a conflict preemption claim was erroneous, and therefore declines to find it controlling here.

#### b. The geographic regulations do not preempt the LCFS

The geographic regulations provide in relevant part: "Regardless of the date of promulgation, the regulations promulgated under [§ 7545(o)(2)(A)(i)] . . . shall not . . . restrict geographic areas in which renewable fuel may be used." As Defendants correctly point out, this provision applies only to the EPA and any regulations it promulgates. *See Minn. Auto. Dealers Ass'n v. Stine*, Civil No. 15–2045 (JRT/KMM), 2016 WL 5660420, at *10 (D. Minn. Sept. 29, 2016) ("§ 7545(o)(2)(A)(iii)(II)(aa), which

prohibits the imposition of geographical restrictions . . . appl[ies] only to EPA."); *Am. Fuel & Petrochemical Mfrs. v. O'Keeffe*, 134 F. Supp. 3d 1270, 1288 (D. Or. 2015) ("The Oregon Program is also not an EPA regulation, such that the anti-geographic restriction provision embodied in [§ 7545(o)(2)(A)(iii)(II)(aa) is not implicated.") (citation omitted). "If Congress intended to limit a state's ability to impose . . . geographical restrictions, it could have done so." *Stine*, 2016 WL 5660420, at *10. RMFU Plaintiffs do not address the issue in their opposition. RMFU Plaintiffs therefore do not provide—and the Court cannot find—anything that suggests the geographic restrictions preempt the LCFS.

### c. Section 7545(o) does not conflict with and thus does not preempt the LCFS

The RMFU Plaintiffs' remaining two arguments concern whether certain provisions in § 7545(o) conflict with the LCFS. In their opposition, the RMFU Plaintiffs do not address their argument concerning how the LCFS allegedly conflicts with the EPA's discretion to adjust or waive certain GHG reduction requirements, as provided in §§ 7545(o)(4) and 7545(o)(7), respectively. As discussed in more detail below, these provisions, like those contained in § 7545(o)(2)(A) (which is the exclusive focus of RMFU Plaintiffs' briefing), pertain only to the RFS, which does not conflict with the LCFS.

Congress enacted the RFS[18] in 2005 "[i]n an attempt to increase the quantity of renewable fuels in the marketplace." *Am. Petro. Inst. v. Cooper*, 718 F.3d 347, 351 (4th Cir. 2013). Congress "authorized [the EPA] to adopt regulations to mandate supplies such as gasoline importers and refiners . . . to offer for sale renewable fuel, e.g., ethanol." *Id.* Under the RFS, numerous fuels are considered "renewable." *See* § 7545(o)(1)(J). "The EPA is charged with determining, annually, how much renewable fuel should enter the market place, and assigning volume-based quotes to obligated entities in order to meet the annual requirement." *Cooper*, 718 F.3d at 351. "In 2007, Congress amended [the RFS] both to significantly increase use of renewable fuel and to ensure this increase would reduce greenhouse-gas

---

[18] For an extensive overview of the RFS's legislative history, *see Nat'l Petrochemical & Refiners Ass'n v. E.P.A.*, 630 F.3d 145, 146-150 (D.C. Cir. 2010).

emissions and thereby 'lower the risk of climate change.'" *Nat'l Biodiesel Bd. v. E.P.A.*, 843 F.3d 1010, 1013-14 (D.C. Cir. 2016) (quoting 75 Fed. Reg. 14,670, 14,799).

Section 7545(o)(2)(A)(i) provides in relevant part:

> Not later than 1 year after December 19, 2007, the Administrator shall revise the regulations under this paragraph to ensure that transportation fuel sold or introduced into commerce in the United States (except in noncontiguous States or territories), on an annual average basis, contains at least the applicable volume of renewable fuel, advanced biofuel, cellulosic biofuel, and biomass-based diesel, determined in accordance with subparagraph (B) and, in the case of any such renewable fuel produced from new facilities that commence construction after December 19, 2007, achieves at least a 20 percent reduction in lifecycle greenhouse gas emissions compared to baseline lifecycle greenhouse gas emissions.

The RMFU Plaintiffs interpret this provision as Congress ensuring that producers of "grandfathered ethanol" (*i.e.*, ethanol produced in facilities that were constructed prior to the EISA's December 19, 2007 enactment) are exempt from GHG emissions controls. *See* Doc. 384 at 18-19. RMFU Plaintiffs contend that Congress intended this, in part, to guarantee a market for ethanol produced at "grandfathered" facilities. *See* TAC ¶¶ 68-70; Doc. 384 at 18-29. According to the RMFU Plaintiffs, the LCFS conflicts with this goal because its "inevitable long-term effect . . . [is] reducing or altogether ending the California market for corn ethanol from grandfathered plants that do not reduce carbon intensity to California's satisfaction." *Id.* at 20; *see also id.* at 18. Put bluntly, the RMFU Plaintiffs provide virtually no authority to support their position, whereas there is substantial authority that demonstrates the RFS not only does not preempt the LCFS, but that Congress intended to allow state legislation like the LCFS when enacting the Clean Air Act ("CAA") and the EISA.

First, the plain language of § 7545(o)(2)(A)(i) does not support the RMFU Plaintiffs' position. Nothing in the provision suggests that Congress intended the RFS to ensure market access or stability for ethanol (grandfathered or not). That provision does provide that "grandfathered" renewable fuel, including ethanol, is exempt from the RFS's GHG requirements. But, with regard to those requirements, the provision simply provides that renewable fuel produced after December 19, 2007 must achieve "*at least* a 20 percent reduction in lifecycle [GHG] emissions compared to baseline lifecycle [GHG]

18

emissions." § 7545(2)(A)(i) (emphasis added). "Baseline lifecycle GHG emissions," in turn, "means the average lifecycle [GHG] emissions . . . for gasoline or diesel . . . sold or distributed as transportation fuel in 2005." § 7545(o)(1)(C). The provision therefore contemplates only a minimum requirement that creates a floor (as opposed to a ceiling) for GHG emissions reductions from non-grandfathered fuels for the RFS; it makes no guarantees for any grandfathered fuel. *See O'Keeffe*, 134 F. Supp. 3d at 1288 ("that Congress elected to exempt such facilities from the requirement that certain fuels achieve a 20% reduction in lifecycle GHG emissions does not confer upon them a preferred or dominant status"). Nor does the RFS require that its mandated renewable fuel volumes be satisfied by any particular fuel. If Congress intended to ensure a market for ethanol (grandfathered or otherwise), it could have structured the RFS so that a fixed amount of ethanol was required to satisfy its renewable fuels volume requirements. More importantly, it is silent as to whether a *state* may nonetheless subject grandfathered fuels to GHG regulations. There is no indication that the RFS in general or § 7545(o)(2)(A)(i) in particular were intended to protect or ensure a market for ethanol. *See id.* ("the volume requirements for renewable fuel set in [§ 7545(o)(2)(A)(i)] do not include a minimum amount that must be met with corn ethanol generally, let alone from [grandfathered] corn ethanol").

Other aspects of the CAA and the EISA, as well as the EPA's rulemaking proceedings concerning the RFS, show that Congress did not intend for the RFS to preempt state legislation like the LCFS. *See Exxon Mobil*, 217 F.3d at 1255 ("The statutory framework surrounding a provision as well as the structure and purpose of the statute as a whole are relevant to analyzing the scope of preemption.") (citation and quotation marks omitted). "The central goal of the [CAA] is to reduce air pollution." *Oxygenated Fuels Ass'n, Inc. v. Davis*, 331 F.3d 665, 670 (9th Cir. 2003 (citing 42 U.S.C. § 7401(b)). The CAA aims "to encourage and assist the development and operation of regional air pollution prevention and control programs," 42 U.S.C. § 7401(b)(4), and "to encourage or otherwise promote reasonable Federal, State, and local governmental actions, consistent with the provisions of this chapter, for pollution prevention." *Id.* § 7401(c). Because the CAA "generally seeks to preserve state authority,"

*Davis*, 331 F.3d at 670, it "employs a 'cooperative federalism' structure under which the federal government develops baseline standards that the states individually implement and enforce." *Bell v. Cheswick Generating Station*, 734 F.3d 188, 190 (3d Cir. 2013).

"Congress set out the Act's purposes and objectives in a section of the Act labeled 'Congressional findings and declaration of purpose,' which provides in part 'that air pollution prevention . . . and air pollution control at its source is the primary responsibility of States and local governments.'" *Merrick v. Diageo Americas Supply, Inc.*, 805 F.3d 685, 690 (6th Cir. 2015) (quoting 42 U.S.C. § 7401(a)(3)). Further, the CAA "contains a separate savings clause entitled 'Retention of State authority,' codified at 42 U.S.C. § 7416," which is known as "the Clean Air Act's 'states' rights savings clause.'" *Id.* at 191. As the Sixth Circuit explained:

> The clause saves from preemption "the right of any State or political subdivision thereof to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution," except that the "State or political subdivision may not adopt or enforce any emission standard or limitation" that is "less stringent" than a standard or limitation under an applicable implementation plan or specified federal statute.

*Merrick*, 805 F.3d at 690 (citing 42 U.S.C. § 7416). This "sweeping" provision thus "explicitly protects the authority of the states to regulate air pollution." *Exxon Mobil Corp. v. U.S. E.P.A.*, 217 F.3d 1246, 1254, 1255 (9th Cir. 2000); *see also id.* at 1254 (observing that the CAA "makes clear that the states retain the leading role in regulating matters of health and air quality").

Congress enacted the EISA in 2007, which amended parts of the CAA. *See generally* Pub. L. No. 110-410 (codified as amended at § 7545(o)). The purpose of the EISA is

> [t]o move the United States toward greater energy independence and security, to increase the production of clean renewable fuels, to protect consumers, to increase the efficiency of products, buildings, and vehicles, to promote research on and deploy greenhouse gas capture and storage options, and to improve the energy performance of the Federal Government, and for other purposes.

*Id.* Relevant here, Section 204(b) of the EISA provides in full:

EFFECT ON AIR QUALITY AND OTHER ENVIRONMENTAL

> REQUIREMENTS.—Except as provided in section 211(o)(12) of the Clean Air Act,
> nothing in the amendments made by this title to section 211(o) of the Clean Air Act shall
> be construed as superseding, or limiting, any more environmentally protective
> requirement under the Clean Air Act, or under any other provision of State or Federal law
> or regulation, including any environmental law or regulation.

The plain language of this savings clause, like the one contained in the CAA, preserves the right of the states to enact their own legislation that is more restrictive than the EISA.

Simply put, both the CAA's and the EISA's savings clauses evince Congress's *express* intent *not* to preempt state legislation aimed at improving a state's air quality. *See RMFU*, 730 F.3d at 1097 ("Congress has expressly empowered California to take a leadership role as to air quality"). The RMFU Plaintiffs' interpretation of § 7545(o) (specifically, § 7545(o)(A)(2)(i)) does not suggest any contrary intent, and the RMFU Plaintiffs do not point to anything else that does. The RMFU Plaintiffs thus fall far short from providing *any* authority that indicates Congress's "clear and manifest purpose" in enacting the RFS was to preempt the states' "traditional role" of regulating their air quality.

Nonetheless, as the RMFU Plaintiffs correctly point out, a state law may still be preempted if it actually conflicts with federal law. *Davis*, 331 F.3d at 672. "Whatever the purpose or purposes of the state law, preemption analysis cannot ignore the effect of the challenged state action on the pre-empted field." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 107, 112 (1992). Accordingly, the Court must determine whether the effects of the LCFS interfere with the "goals and objectives" of the EISA, as well as the "methods" it employs to reach them. *See Davis*, 331 F.3d at 672-73; *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 491 (1987).

Much of the discussion above is directly applicable to this analysis. This is so because the RMFU Plaintiffs' primary argument as to whether the LCFS actually conflicts with the EISA is premised on their assumption that Congress intended the EISA to ensure a market for ethanol produced by corn grown in the Midwest, and guaranteed that grandfathered ethanol would not be subject to GHG regulations. As explained above, the plain language of the EISA makes no such guarantees. The RFS program, like the CAA in general, imposes a nationwide standard: it requires that at least a certain

volume of particular fuels, including "renewable fuels" be sold in the United States each year. "Renewable fuel," in turn, can be derived from a number of different sources—not just ethanol. Thus, the RFS's volume requirements theoretically could be met entirely without ethanol.

That the RFS imposes GHG emissions requirements only on non-grandfathered facilities does not mean that Congress intended to ensure that those facilities were entirely exempt from *all* GHG regulations, whatever their source. *Cf.* Doc. 379-1, Environmental Protection Agency, *Renewable Fuel Standard Program (RFS2): Summary and Analysis of Comments* (Feb. 2010) ("*RFS Summary*"), at 7-1 ("[T]hese [RFS] thresholds do not constitute a specific control on [GHGs] for transportation fuels (such as a low carbon fuel standard)"), *available at* https://www.epa.gov/sites/production/files/2015-08/documents/420r10003.pdf. As the EPA recognized, the purpose of the RFS is "to significantly increase the amount of renewable fuel used as transportation fuel over time, particularly fuels *with the lowest lifecycle GHG emissions*, in the transportation fuel supply." 80 Fed. Reg. 33100-01, 33102 (June 10, 2015) (emphasis added). And as the RMFU Plaintiffs emphasize, the LCFS attempts to do precisely the same thing. The LCFS therefore does not conflict with the RFS's goal of reducing GHG emissions. If anything, the programs are complementary. *Cf.* 80 Fed. Reg. 33,100-01, 33,103 (observing that the RFS "is complemented and supported by . . . myriad efforts and initiatives at the regional and local level").

Defendants argue statements EPA made during the RFS's notice and comment rulemaking proceedings directly undermine the RMFU Plaintiffs' theory that the RFS preempts the LCFS, and that the Court must defer to the EPA's interpretation. Although the Court disagrees with Defendants that these statements are entitled to deference or otherwise constitute any binding authority, they are consistent with and provide further support for the Court's interpretation of the RFS. *Cf. Geier*, 529 U.S. at 883 (holding that agency's amicus brief stating that state law would actually conflict with its regulation is entitled to "some weight" because it "is likely to have a thorough understanding of its own regulation and its objectives and is uniquely qualified to comprehend the likely impact of state

requirements.") (citation and quotation marks omitted). At least two comments from the EPA explicitly support Defendants' position that the RFS does not supplant a state's ability to enact its own legislation to improve its air quality through fuel regulations, and thus does not preempt the LCFS.

First, one of the Plaintiffs in this case, Renewable Fuels Associated, commented that the "EPA should preempt state programs designed to address carbon content and lifecycle analysis of fuels. [Renewable Fuels Association] believes that EPA should use its authority to preempt state low carbon fuel standards." Doc. 379-1, Environmental Protection Agency, *Renewable Fuel Standard Program (RFS2): Summary and Analysis of Comments* (Feb. 2010) ("*RFS Summary*"), at 13-14, *available at* https://www.epa.gov/ sites/production/files/2015-08/documents/420r10003.pdf. CARB made the following comment:

> [CARB] would like to see future RFS proposals reflect the existing standards in place in California's LCFS (low carbon fuel standard) in a variety of ways: California's LCFS avoids volumetric requirements and instead promotes carbon intensity reductions from a broad mix of fuels without applying set limits to individual fuels. No fuel production is "grandfathered", rather the LCFS applies a carbon intensity performance standard.

*Id.* at 13-15. In response to these (and other) comments, the EPA responded:

> Issues associated with State LCFS programs, and potential future Federal fuel standards, are not germane to the final RFS program. However, where possible we have attempted to structure the RFS2 program so as to be compatible with existing State LCS programs, including coordination on lifecycle modeling.

*Id.* Thus, the EPA was explicitly asked—by a Plaintiff in this case—to preempt state low carbon fuel standards, and was aware of California's LCFS when asked. The EPA not only expressly declined to do so, but concluded that state low carbon fuel standard programs are *irrelevant* to the RFS and, in any event, the EPA has intentionally structured the RFS to be "compatible" with them.

Finally, the RMFU Plaintiffs make passing arguments that the LCFS conflicts with the EISA's goal of decreasing the United States' dependence on foreign oil, thereby increasing the country's energy dependence. In support, the RMFU Plaintiffs point to Congress's finding that "the production of transportation fuels from renewable energy would help the United States . . . reduce the dependence of

the United States on energy imported from volatile regions of the world that are politically unstable," Pub. L. 110-140, § 806(a)(4), and note that one of the EISA's goals is "[t]o move the United States toward greater energy independence." Pub. L. 110-140. The RMFU Plaintiffs, however, provide *no* facts or explanation showing that the LCFS actually conflicts with this goal.

For these reasons, the Court finds that its prior holding that the RMFU Plaintiffs had stated a claim that the LCFS is preempted was clearly erroneous; the RMFU Plaintiffs have not stated and cannot state any preemption claim against the LCFS. Accordingly, the Court DISMISSES their preemption claims WITHOUT LEAVE TO AMEND because amendment would be futile.

**D. Commerce Clause**

As noted above, the only remaining claim the AFPM Plaintiffs assert is their claim that the ethanol provisions of all versions of the LCFS discriminate against interstate commerce in purpose and effect in violation of the Commerce Clause. The RMFU Plaintiffs assert the same claim, and also assert that the ethanol provisions of all versions of the LCFS fail under *Pike*. *See* Doc. 384 at 2.

As to their claim that the LCFS discriminates in purpose and effect, the thrust of Plaintiffs' argument is that the LCFS, by design and practical effect, penalizes non-California ethanol producers, specifically those from the Midwest, while benefitting California ethanol producers by assigning higher carbon intensity ("CI") scores to the former and lower CI scores to the latter through its "lifecycle" analysis of fuels, which causes chemically identical fuels sold in California to have varying CI scores due solely to where they are produced. *See, e.g.*, TAC ¶ 87; SAC ¶¶ 35, 46-50, 94. According to Plaintiffs, the LCFS is intentionally designed to make ethanol produced in the Midwest (and elsewhere) more expensive, and eventually will drive a number of non-California ethanol producers out of the California market entirely. This is due, in part, to the regulation's credits-deficits scheme, which inherently benefits California ethanol producers at the expense of out-of-state producers by incentivizing consumers to purchase California ethanol, even if it is physically identical to Midwest ethanol. SAC ¶ 54. In sum, Plaintiffs allege the LCFS "has erected a barrier to Midwest corn ethanol around its borders"

in an effort to benefit California ethanol. TAC ¶ 87; SAC ¶ 56.

The RMFU Plaintiffs' *Pike* claim builds on these allegations. The RMFU Plaintiffs argue that, in addition to the ethanol provisions' discriminatory effects, the LCFS provides no benefit to California because it "will not result in any measurable global climate change, nor in any measurable reduction of the effects of global warming." SAC ¶ 92; Doc. 384 at 27 ("the LCFS will have virtually no effect on the environment"). The RMFU Plaintiffs therefore contend the LCFS's burdens on interstate commerce far outweigh its benefits to California.

Defendants move to dismiss both claims under Rule 12(b)(6). Distilled, Defendants argue (1) *RMFU* precludes the Plaintiffs' claim that the LCFS discriminates in purpose and effect and, (2) regardless, neither states a claim.

### 1. Whether *RMFU* bars Plaintiffs' discriminatory purpose and effect claim against the ethanol provisions

The parties correctly observe that the Ninth Circuit not only did not decide Plaintiffs' claim that the ethanol provisions of the LCFS discriminate in purpose and effect, but remanded it for this Court's consideration. *See RMFU*, 730 F.3d at 1107 ("We remand the case for the district court to determine whether the ethanol provisions discriminate in purpose or effect and, if not, to apply the *Pike* balancing test."). Defendants nonetheless argue that the Ninth Circuit's holding that the Original LCFS's crude oil provisions do not discriminate in purpose or effect has preclusive effect here under the law of the case. Plaintiffs, on the other hand, argue that holding and its underlying reasoning does not "apply to the ethanol provisions, because those provisions have a different purpose and effect." Doc. 383 at 23; *see also* Doc. 384 at 24.[19]

As a preliminary matter, with regard to Plaintiffs' discriminatory *purposes* claim, the parties

---

[19] Though the RMFU Plaintiffs make this argument, they do not expound on it in a meaningful way. *See* Doc. 384 at 24; *but see id.* at 26 n.5. They simply assert that because the *RMFU* decision concerned the Original LCFS's crude oil provisions, it does not apply to their claim the ethanol provisions discriminate in purpose and effect because they are "different provisions in the LCFS, which had different justifications." *Id.* The Court therefore focuses on the AFPM Plaintiffs' arguments.

agree that there is no material difference between the ethanol provisions contained in the three versions of the LCFS. *See* Doc. 380-1 at 27; Doc. 383 at 23; Doc. 384 at 26. Plaintiffs do, however, assert the 2015 LCFS has more of a discriminatory effect than did the Original LCFS because of slight differences in how it permits CI score calculations for ethanols. *See id.* ("Thus, the amended LCFS continues the same discriminatory purposes and effects of the Original LCFS. Finally, to the extent that the 2015 LCFS's ethanol provisions are different than those of the Original LCFS, they only heighten the discriminatory impact.").

Even though the majority opinion in *RMFU* did not address Plaintiffs' claim that the Original LCFS's ethanol provisions discriminate in purpose and effect, the majority thoroughly reviewed and discussed the purposes of the Original LCFS in general and its ethanol provisions in particular when assessing Plaintiffs' claims that the ethanol provisions were facially discriminatory and impermissibly regulated extraterritorially. In so doing, the majority explicitly—and repeatedly—held that the ethanol provisions were not purposefully discriminatory, nor was the LCFS generally.[20]

---

[20] *See, e.g.*, *RMFU*, 730 F.3d at 1079-86 (discussing the LCFS's legislative history and how it operates); *id.* at 1089-90 ("Under dormant Commerce Clause precedent, if an out-of-state ethanol pathway does impose higher costs on California by virtue of its greater GHG emissions, there is a nondiscriminatory reason for its higher carbon intensity value."); *id.* at 1090 ("The Fuel Standard does not isolate California and protect its producers from competition."); *id.* ("CARB's method of lifecycle analysis treats ethanol the same regardless of origin, showing a nondiscriminatory reason for the unequal results of this analysis"); *id.* at 1091 (holding this Court's reasoning that finding lifecycle assessment factors associated with geography was discriminatory to be "incorrect"); *id.* at 1091 ("CARB's attention to emissions from transportation has no such isolating effect . . . . This is not a form of discrimination against out-of-state producers. Even if California were to someday produce significant amounts of corn for ethanol, the CA–GREET transportation factor would remain non-discriminatory to the extent it applies evenly to all pathways and measures real differences in the harmful effects of ethanol production."); *id.* at 1093 ("The Fuel Standard does not "artificially encourag[e] in-state production even when the same goods could be produced at lower cost in other States."" (citation omitted)); *id.* ("The dormant Commerce Clause does not require California to ignore the real differences in carbon intensity among out-of-state ethanol pathways, giving preferential treatment to those with a higher carbon intensity. These factors are not discriminatory because they reflect the reality of assessing and attempting to limit GHG emissions from ethanol production."); *id.* at 1093 ("We conclude . . . that the CA–GREET lifecycle analysis used by CARB, including the specific factors to which Plaintiffs object, does not discriminate against out-of-state commerce."); *id.* at 1096 ("The Fuel Standard's regional categories for the default pathways show every sign that they were chosen to accurately measure and control GHGs and were not an attempt to protect California ethanol producers."); *id.* ("The regional electricity supplies provide a second nondiscriminatory reason for CARB's decision."); *id.* at 1097 ("California's reasonable decision to use regional categories in its default pathways and in the text of Table 6 does not transform its evenhanded treatment of fuels based on their carbon intensities into forbidden discrimination."); *id.* at 1106 ("[The Commerce Clause] does not invalidate by strict scrutiny state laws or regulations that incorporate state boundaries for good and non-discriminatory reason[s]."); *id.* ("We will not at the outset block California from developing this innovative, nondiscriminatory regulation to impede global warming."); *see also Rocky Mountain Farmers Union v. Corey*, 740 F.3d 507, 510 (9th Cir. 2014) (Gould, J., concurring in denial from rehearing en banc) ("To the extent that California treats fuels based on their location, it does so for non-

And although part of the panel's analysis of the crude oil provisions, the full panel rejected Plaintiffs' "pull[ing] a few quotes from an expansive record [to] show CARB's [alleged] discriminatory purpose," finding that those quotes "do not plausibly relate to a discriminatory design and are 'easily understood, in context, as economic defense of a [regulation] genuinely proposed for environmental reasons.'" *Id.* at 1100 n.13 (citation omitted). The panel considered the LCFS's legislative materials that Plaintiffs provided to support their claim that the crude oil provisions were intentionally designed to be discriminatory against out-of-state interests, and the full panel found there was no explicit discriminatory purpose behind them. *Id.* at 1100. Instead, the panel concluded that "CARB's stated purpose was genuine. There was no protectionist purpose, no aim to insulate California firms from out-of-state competition." *Id.*

The Court has reviewed thoroughly the quotes from the LCFS's legislative that Plaintiffs cited in their briefs to the Ninth Circuit with those they cited in the SAC, the TAC, and their oppositions. The only quote Plaintiffs have cited that the Ninth Circuit did not consider is from a CARB press release. *See* Doc. 383 at 21 (citing CARB, *California Adopts Low Carbon Fuel Standard* (Apr. 23, 2009) ("Production of fuels within the state will also keep consumer dollars local by reducing the need to make fuel purchases from beyond its borders."), *available at* https://www.arb.ca.gov/newsrel/2009/ nr042309b.htm). Even assuming this press release constitutes an accurate reflection of the California legislature's and CARB's intent behind the LCFS, it is, at best, yet another "'economic defense of a [regulation] genuinely proposed for environmental reasons.'" *RMFU*, 730 F.3d at 1100 n.13 (citing *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 463 n. 7 (1981) ("We will not invalidate a state statute under the Equal Protection Clause merely because some legislators sought to obtain votes for the measure on the basis of its beneficial side effects on state industry."). Plaintiffs have not pointed to any portion of the LCFS's legislative history that the Ninth Circuit did not consider. Thus, to the extent

discriminatory reasons").

Plaintiffs rely on the Original LCFS's legislative history to support their discriminatory purpose claim, *RMFU* forecloses it.

Judge Murguia's dissent from the majority opinion holding that the ethanol provisions are not facially discriminatory bolsters this conclusion. *See RMFU*, 730 F.3d at 1108 (Murguia, J., dissenting). In her view, the majority erroneously "put[] the cart before the horse and consider[ed] California's *reasons* for distinguishing between in-state and out-of-state ethanol before examining the text of the statute to determine if it facially discriminates." *Id.* (emphasis added). She found "[t]his approach is inconsistent with Supreme Court precedent, which instructs that we must determine whether the regulation is discriminatory before we address the purported reasons for the discrimination." *Id.* (citation omitted).

Six judges dissented from the denial of rehearing *RMFU* en banc. *Rocky Mountain Farmers Union v. Corey*, 740 F.3d 507, 512 (9th Cir. 2014) ("*RMFU Denial*"). The en banc dissent characterized the *RMFU* majority opinion as holding that the Original LCFS's "ethanol regulations do not facially discriminate against interstate commerce because California has 'good and non-discriminatory reason[s]' for treating out-of-state ethanol differently." *Id.* at 514 (M. Smith, J., dissenting from denial of rehearing en banc) (quoting *RMFU*, 730 F.3d at 514). The dissent agreed with Judge Murguia that this holding "puts the cart before the horse," because "[t]he purpose of, or justification for, a law has no bearing on whether it is facially discriminatory.'" *Id.* (quoting *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 99 (1994)). The dissent acknowledged that the panel remanded the case to this Court to consider Plaintiffs' claim that the ethanol provisions discriminate in purpose and effect, but opined that the outcome of that issue is "predestined" given the panel's holding that the LCFS was enacted with "good and nondiscriminatory reason[s].'" *Id.* (quoting *RMFU*, 730 F.3d at 514).

Judge Gould, who authored *RMFU*, had "a simple response to this critique." *Id.* at 509. He explained:

We reviewed this case at the summary judgment stage. As such, we had to take as true all

facts presented by California and reasonable inferences therefrom. Our statement, then, about good and non-discriminatory reasons for incorporating state boundaries into the LCFS methodology is based on evidence that had to be credited at the summary judgment stage. It will not control what the district court decides on remand as it considers the LCFS's purpose and effect and makes factual findings on disputed evidence.

*Id.* Thus, the *RMFU* majority did not intend to foreclose Plaintiffs' claim that the LCFS's ethanol provisions are purposefully discriminatory. The majority only held that Plaintiffs' evidence and corresponding arguments presented on appeal as to why the provisions are discriminatory did not support their claims.

The logic and *record* underlying all of Plaintiffs' claims against the ethanol provisions, however, has not changed. *See* TAC ¶ 53 ("[T]he lynchpin of the entire regulatory scheme is still "carbon intensity," which continues to be based on "the full fuel life cycle, including all stages of fuel and feedstock production and distribution.") (citation omitted)); SAC ¶¶ 94, 112. Plaintiffs contend the 2015 LCFS's ethanol provisions are materially indistinguishable from those in the Original LCFS, and that both discriminate against interstate commerce in the exact same way, namely, through the discriminatory assignment of CI scores that are determined through a purposefully discriminatory lifecycle analysis—an issue the *RMFU* panel thoroughly considered and rejected. *See* Doc. 383 at 23; SAC ¶ 87; *supra* n.20. Their purposeful discrimination claim against the ethanol provisions rises and falls with their argument that the LCFS's design—specifically, the LCFS's geography-based calculations for determining a fuel's CI score—is inherently and intentionally discriminatory. The Ninth Circuit considered this to be the "crux" of Plaintiffs' challenge to the LCFS, *RMFU*, 730 F.3d at 1090, and rejected the argument in no uncertain terms. *See id.* at 1091, 1093; *see also supra* n.20. Plaintiffs make no meaningful effort to differentiate the factual and legal bases of their claims concerning the Original LCFS's ethanol provisions that the Ninth Circuit considered and rejected, and the bases of their pending claim that the 2015 LCFS's ethanol provisions have a discriminatory purpose. Plaintiffs do not, for instance, allege or otherwise suggest that they will be able to produce evidence previously unavailable to them that the Ninth Circuit did not consider. Nor do they argue that their discriminatory

purpose claim will rest on facts or theories that the *RMFU* panel did not consider. They essentially

reargue the position they took before the Ninth Circuit.

As noted above, the majority opinion in *RMFU* unequivocally held that—on the record and

arguments presented—the LCFS's ethanol provisions were not purposefully discriminatory. Plaintiffs,

however, have not alleged facts or advanced any argument that shows their pending discriminatory

purpose claims against the ethanol provisions are materially distinct from the claims the Ninth Circuit

considered in *RMFU*. As a result, *RMFU*'s holdings and underlying reason apply here. The Court is

therefore left to conclude that, despite the majority's clear intention to remand the case for the Court to

consider Plaintiffs' claim that the ethanol provisions are purposefully discriminatory, *RMFU* bars the

claim under the law of the case because it turns entirely on argument that *RMFU* held was erroneous, as

a matter of law. Accordingly, the Court DISMISSES WITHOUT LEAVE TO AMEND Plaintiffs' claim

that the LCFS's ethanol provisions have a discriminatory purpose.

*RMFU* does not shut the door on Plaintiffs' claim that the ethanol provisions have a

discriminatory effect. To succeed on this claim, Plaintiffs must provide evidence showing that those

provisions "have the effect of deleteriously intruding upon Interstate Commerce." *Black Star Farms*

*LLC v. Oliver*, 600 F.3d 1225, 1232 (9th Cir. 2010). "When challenged to provide such evidence"

concerning the Original LCFS's crude oil provisions, the AFPM Plaintiffs simply "relied on [their]

claim that the [crude oil provisions] had a discriminatory purpose," and failed to provide any evidentiary

support for their claim. *RMFU*, 730 F.3d at 1100. Their failing before the Ninth Circuit, then, was a

wholly evidentiary one. Accordingly, the Ninth Circuit did not make any factual or legal findings

concerning the effects of the crude oil provisions beyond observing that the AFPM Plaintiffs failed to

meet their burden. *RMFU* therefore has no bearing on Plaintiffs' claim that the ethanol provisions have a

discriminatory effect on interstate commerce.

**2. Whether Plaintiffs state a claim that the ethanol provisions of the LCFS discriminate against interstate commerce in effect**

**a. Standard**

Over 20 years ago, Justice Scalia remarked that "once one gets beyond facial discrimination [the Court's dormant Commerce Clause] jurisprudence becomes (and has long been) a quagmire." *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 210 (Scalia, J., concurring) (citations and quotation marks omitted). Subsequent precedent has not helped clear the weeds. As the Ninth Circuit recently observed in the context of a discriminatory effects challenge, "decisions interpreting the dormant Commerce Clause appear somewhat difficult to reconcile." *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 403 (9th Cir. 2015) (citation and quotation marks omitted); *see also id.* at 405 (outlining numerous possible tests for determining if a state law has discriminatory effects).

Like the Court's prior decision concerning the LCFS's crude oil provisions, this case does not fit neatly into existing Commerce Clause precedent. This is so because, as explained in more detail below, the LCFS's ethanol provisions, like the crude oil provisions, appear to burden and benefit some, but not all California and out-of-state ethanol producers alike. There is no across-the-board benefit to California producers, nor is there any across-the-board burden to out-of-state producers. The Court is unable to locate, and the parties do not provide, any case that is factually analogous or on point, and their briefs, which provide only a few pages of argument on the issue, and provide no help in determining which cases and principles should apply here.

A common thread exists in most, if not all, of the analogous Commerce Clause cases that is applicable here: "Modern dormant Commerce Clause jurisprudence primarily 'is driven by concern about economic protectionism—that is, regulatory measures designed to benefit in-state economic interests *by burdening out-of-state competitors*." *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1148 (9th Cir. 2012) (emphasis added) ("*Optometrists*"). The primary purpose of the Commerce Clause, then, is to prevent states and local governments from shielding their markets from

interstate competition and erecting barriers to the free flow of goods across the country by giving intrastate business the upper hand over out-of-state producers. *See Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 35 (1980); *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1154 n.14 (9th Cir. 2012) ("*Optometrists*") ("[D]ormant Commerce Clause jurisprudence is concerned with burdens resulting from discrimination and interference with the interstate flow of goods."). This principle guides the Court's analysis.

Accordingly, "there are two complementary components to a claim that a statute has a discriminatory effect on interstate commerce: the claimant must show both how local economic actors are favored by the legislation, and how out-of-state actors are burdened by the legislation." *Eastern Ky. Res. v. Fiscal Court of Magoffin Cty., Ky.*, 127 F.3d 532, 543 (6th Cir. 1997); *see also Pac. Nw. Venison Producers v. Smitch*, 20 F.3d 1008, 1012 (9th Cir. 1994) (holding Washington regulations were not discriminatory in effect because they did not "result in the citizens of Washington receiving benefits that are denied to others"). "In cases such as this, where neither facial discrimination nor an improper purpose has been shown, the evidentiary burden to show a discriminatory effect is particularly high." *RMFU*, 730 F.3d at 1100.

**b. Analysis**

The thrust of Plaintiffs' claim that the LCFS's ethanol provisions discriminate in practical effect is that they assign artificially lower CI scores to California-produced ethanol while assigning artificially higher CI scores to ethanol produced elsewhere, particularly in the Midwest. *See* SAC ¶¶ 122-14; TAC ¶¶ 51-52. It is alleged that because the LCFS encourages regulated parties to use fuels with lower CI scores, the LCFS inherently promotes California ethanols for LCFS compliance. *See* SAC ¶¶ 42-43; TAC ¶¶ 52-52. These CI scores, in turn, allegedly cause California ethanol to be more economically attractive in the California marketplace at the expense of out-of-state ethanol, all of which have artificially higher costs due to LCFS compliance. *See* SAC ¶¶ 58; TAC ¶¶ 55-57. It is further alleged that in order to comply with the LCFS, regulated parties will have to purchase significantly more ethanol

from sources other than the Midwest. In sum, Plaintiffs allege "the LCFS creates an incentive for regulated parties to use California corn ethanol instead of physically identical corn ethanol produced outside of California in the Midwest. The LCFS creates regulatory disincentives for using corn ethanol produced in the Midwest." SAC ¶ 54; *see also* TAC ¶ 59. According to Plaintiffs, once the LCFS is "fully implemented," Midwest ethanol will be entirely excluded from the California marketplace. SAC ¶ 57; TAC ¶ 59. In addition to this alleged discrimination, Plaintiffs assert that the LCFS will lead to investments in biofuel facilities in California, which will create thousands of jobs and "keep more money in the state." TAC ¶¶ 61, 91 (citation omitted).

Defendants move to dismiss Plaintiffs' claim in a conclusory manner. *See* Doc. 378-1 at 29-30; Doc. 380-1 at 29. Defendants argue Plaintiffs' argument that the LCFS has a discriminatory effect against out-of-state ethanols is overly narrow because it focuses exclusively on Midwestern ethanols instead of considering all non-California ethanols, and is undercut by the fact that a number of non-California ethanols, including some from the Midwest and foreign countries, receive low CI scores under the LCFS, many of which are lower than other California ethanols. *See* Doc. 380-1 at 29. Defendants contend that Plaintiffs' failure to account for all out-of-state ethanols is fatal to their claim. *See id.* Plaintiffs do not address this argument in their oppositions. *See* Doc. 383 at 20-24; Doc. 384 at 25-27.

Table 6 of the Original LCFS provided thirteen default pathways for corn-based ethanols that corresponded to how they are produced. *See* CARB, Table 6, Carbon Intensity Lookup Table for Gasoline and Fuels that Substitute for Gasoline, *available at* https://www.arb.ca.gov/fuels/lcfs/ lu_tables_11282012.pdf; *see also RMFU*, 730 F.3d at 1100, App'x One. As Judge Murguia observed in her dissent, the default pathways for certain ethanols produced by the same means in California and the Midwest are assigned different CI scores:

> The LCFS assigns a default carbon intensity value of 88.90 gCO2e/MJ to California producers utilizing a dry mill, dry DGS, and natural gas production process. Midwest producers utilizing the same production process are assigned a default carbon intensity

value of 98.40 gCO2e/MJ, resulting in a 9.5 gCO2e/MJ difference in favor of California
producers. Next, California producers utilizing a dry mill, dry DGS, eighty percent
natural gas, and twenty percent biomass production process enjoy a 9.4 gCO2e/MJ lower
carbon intensity value than their Midwest counterparts. Finally, California producers
benefit from a 9.36 gCO2e/MJ lower carbon intensity value over their Midwest
counterparts for a dry mill, wet DGS, eighty percent natural gas, and twenty percent
biomass production process.

*Id.* at 1108 n.1 (Murguia, J., dissenting). In addition, California producers using a dry mill, wet DGS,

and natural gas were assigned a default CI score of 80.70 gCO2e/MJ, whereas Midwestern producers

using the same process were assigned a default CI score of 90.10 gCO2e/MJ. *See* Table 6. Moreover, all

of the California-produced ethanols received lower default CI scores than all of those produced in the

Midwest. *See id.* Based on this alone, it therefore appears that the Original LCFS's ethanol provisions

assign more favorable CI scores to California ethanols compared to identical Midwest ethanols, which

would support an inference that the provisions have a discriminatory effect.

A review of the pertinent 2015 amendments to the LCFS shows that there are significant changes

to the Original LCFS.[21] The Original LCFS established a number of default pathways for various fuels,

including ethanols, meaning that they were assigned default CI scores. *See RMFU*, 730 F.3d at 1081

(citing Cal. Code Regs. tit. 17, § 95486(b)(1) [22], tbl. 6 ("Table 6")); *id.* at 1082. If a regulated party

desired, it could apply for an individualized pathway for the fuel it produced under "Method 2A" or

"Method 2B," which would assign its fuel its actual CI score, if approved. *See id.* at 1082.

The 2015 LCFS did away these default pathways for ethanol. *See* § 95488(b); CARB, Staff

Report: Initial Statement of Reasons for Proposed Rulemaking: Proposed Re-Adoption of the Low

Carbon Fuel Standard ("2015 ISOR"), at II-9-10, III-30, *available at* https://www.arb.ca.gov/regact/

---

[21] For the reasons explained above, the differences do not affect the Court's analysis of whether the LCFS, in any of its forms, is purposefully discriminatory. As noted, Plaintiffs argue that the LCFS was passed for discriminatory reasons and its geography-dependent considerations—which are inherent in all forms of the LCFS—are purposefully discriminatory. How the LCFS calculates CI scores and the practical effect that has on ethanol producers and whether the effect, if any, is discriminatory—issues the Ninth Circuit did not consider in *RMFU*—form the basis of their discriminatory effects claim.

[22] All further statutory references are to Title 17 of the California Code of Regulations unless otherwise indicated.

2015/lcfs2015 /lcfs15isor.pdf; CARB, Final Statement of Reasons for Rulemaking ("2015 FSOR"), at

1226, 1234, *available at* https://www.arb.ca.gov/regact/2015/lcfs2015/ fsorlcfs.pdf. Under the 2015

LCFS, ethanol producers must apply for an individualized CI score. *See* §§ 95488(b)(1)(A), (c)(1),

(c)(3)(A). If they do not, they are assigned a default score contained in "Table 7." *See* § 95488(d), tbl. 7.

Once CARB has certified the fuel's CI score, the score may be used "by fuel producers, regulated

parties, and other entities." CARB, *LCFS Pathway Certified Carbon Intensities*, https://www.arb.ca.gov/

fuels/lcfs/fuelpathways/pathwaytable.htm.

    Table 7 provides five default CI scores for ethanols. Corn-based ethanols—regardless of where

and how they are produced—are assigned the same CI score. Plaintiffs do not (and cannot) argue that

these default pathways are discriminatory, but they do argue that the manner in which individualized

pathways are calculated under 2015 LCFS's ethanol provisions discriminate against Midwestern

ethanols. *See, e.g.*, Doc. 383 at 24.

    As Defendants point out and Plaintiffs fail to address, Brazilian firms that produced ethanol from

sugarcane were assigned default CI scores lower than *all* corn-based ethanols. *See id.* (assigning

Brazilian sugarcane ethanols default pathways of 58.40, 66.40, and 73.40 gCO2e/MJ). Compared to

their California-produced counterparts—which the *RMFU* panel held were similarly situated[23]

competitors for Commerce Clause purposes,—Brazilian ethanols seemingly *benefitted* from the LCFS's

default pathways because *all of them* received more favorable default CI scores than California ethanols.

Further, "[a]s of mid–2011, CARB had approved ethanol pathways with carbon intensities ranging from

56.56 to 120.99 gCO2e/MJ,"[24] and "[t]he individualized pathway with the lowest carbon intensity was

---

[23] *See RMFU*, 730 F.3d at 1088 ("Ethanol from Brazil, the Midwest, and California may end up blended in the same gallon of fuel. Because of this close competition, all sources of ethanol in the California market should be compared, and the district court erred in excluding Brazilian ethanol from its analysis."). "Entities are similarly situated for constitutional purposes if their products compete against each other in a single market," *id.* at 1088, and the AFPM Plaintiffs assert that Midwestern ethanol "is clearly the primary competitor for California-produced biofuel." Doc. 383 at 23. In any event, Plaintiffs do not suggest that California, Midwestern, and Brazilian ethanol are not similarly situated for Commerce Clause purposes.

[24] Because the individualized pathways are variable and have changed throughout the years, the Court cannot locate—and the parties do not provide—a list of the pathways as they existed before the Ninth Circuit. Based on the Table 6

achieved by a Midwest producer through Method 2A." *RMFU*, 730 F.3d at 1084.[25] To date, numerous

Midwestern producers have obtained CI scores lower—sometimes dramatically so—than their

California counterparts. *See generally* CARB, LCFS Pathway Certified Carbon Intensities,

https://www.arb.ca.gov/fuels/lcfs/fuelpathways/pathwaytable.htm (last visited June 6, 2017).

The AFPM Plaintiffs impliedly address this observation by correctly pointing out that, as of

2011, the Midwest produced over 94% (11.3 billion gallons) of domestic ethanol, whereas the West

Coast only produces less than 1%, making Midwest ethanol "the primary competitor for California-

produced biofuel." Doc. 383 at 22 (citing 75 Fed. Reg. 14,670, 14,745 (Mar. 26, 2010)).[26] Plaintiffs

argue that "the possibility that the [ethanol] provisions may not have the same impact on some small

percentage of other out-of-state ethanols . . . a possibility that, in any event cannot be resolved on a

motion to dismiss—would not insulate the provisions' discriminatory purpose and impact on Midwest

ethanol." Doc. 383 at 23 (citing *New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 275 (1988)).[27]

Put another way, the AFPM Plaintiffs correctly observe that it is not possible to assess the

discriminatory effects, if any, that the LCFS may have on ethanol producers without knowing how much

---

[25] As Table 6 indicates, a number of Midwestern ethanol producers were able to achieve CI scores well below those assigned to two of the California default pathways with CI scores of 95.66 and 88.90. *See, e.g.*, Table 6 "ETH016" (87.16 CI score), "ETH017" (85.24 CI score), "ETHC019" (87.86 CI score), "ETHC020" (85.91 CI score), "ETHC021" (83.96 CI score), "ETHC022" (87.16 CI score), and "ETHC023" (84.29 CI score). The AFPM Plaintiffs assert in a wholly conclusory manner that the Method 2 process for obtaining individualized pathways was "burdensome and discriminatory," but provide no explanation why. *See* Doc. 383 at 23.

[26] This Rule explains that, though "there appears to be a wide range of Brazilian production and domestic consumption estimates," the EPA estimates Brazil will import approximately 2.2 billion gallons of ethanol into the country by 2022. *See* 75 Fed. Reg. 14670, 14747.

[27] The AFPM Plaintiffs describe *Limbach* as concerning a case in which an Ohio "provision creating tax credit for instate ethanol violated the Commerce Clause because 'the out-of-state product is placed at a substantial commercial disadvantage,' even though out-of-state ethanols from certain states were also eligible for the credit." Doc. 383 at 23 (quoting *Limbach*, 486 U.S. at 275. *Limbach*, however, involved a facially discriminatory statute. *See* 486 U.S. at 276 ("Our cases, however, indicate that where discrimination is patent, as it is here, neither a widespread advantage to in-state interests nor a widespread disadvantage to out-of-state competitors need be shown."). Because the statute was facially discriminatory, the Court held it was irrelevant that it only discriminated against one out-of-state entity in practical effect. *See id.* Further, in noting the law's placing the at-issue product "at a substantial commercial disadvantage," the Court rejected Ohio's defense of the law that it did not violate the Commerce Clause because it only made the product less profitable in Ohio, and did not force it out of the Ohio marketplace entirely. *Id.* at 275. *Limbach* therefore has no applicability here.

ethanol the affected producers import to California. Although a number of ethanol producers from the Midwest and Brazil have obtained low CI scores and a number of California producers have obtained high CI scores, it is indeterminable how much ethanol these and other producers contribute to the California ethanol market. Without that information, the Court cannot assess adequately the extent to which ethanol producers are benefited or burdened by the LCFS.[28]

There is no dispute that Midwestern producers account for the overwhelming majority of ethanol produced in the country. Although a number of them have obtained low CI scores under the LCFS, dozens of them have not, and a number of them have obtained scores higher than almost all California ethanols. Given that (1) an uncontested purpose and goal of the LCFS is to reduce corn-based ethanol, which is almost exclusively produced in the Midwest; (2) the Original LCFS's ethanol provisions seemingly treat some ethanols produced in the Midwest less favorably than identically produced California ethanols; and (3) the Midwest produces the lion's share of the nation's ethanol—close to 95% by some estimates—it is plausible that Midwestern ethanol producers will be disproportionately burdened by the LCFS compared to their California counterparts. The Court therefore concludes that Plaintiffs have stated a claim that both the Original and 2015 LCFS ethanol provisions discriminate in practical effect against Midwestern ethanols. Accordingly, Defendants' motion to dismiss Plaintiffs' discriminatory effects claims against those provisions is DENIED.

### c. *Pike* **claim**

To succeed on their *Pike* claim, the RMFU Plaintiffs must establish that "the burdens that the [LCFS] imposes on interstate commerce clearly outweigh the local benefits arising from it." *Kleenwell Biohazard Waste & Gen. Eco. Consultants, Inc. v. Nelson*, 48 F.3d 391, 399 (9th Cir. 1995) (citation

---

[28] An analogy is illustrative here. If a state statute burdened some out-of-state beer producers and some in-state producers, but benefited others, it would be difficult not to conclude that the statute is nonetheless discriminatory if only the out-of-state producers that were burdened were firms that produced enormous amounts of beer (*e.g.*, Budweiser) while the only burdened in-state and benefited out-of-state beer producers were a handful of microbrewers. So, too, the LCFS may be discriminatory if the evidence shows that, for instance, the LCFS burdens 100% of the Midwestern ethanol producers who account for 90% of all ethanol produced in the country by volume while burdening only 1% of California ethanol producers who produce less than 1% of the nation's ethanol.

omitted). The thrust of the RMFU Plaintiffs' *Pike* claim is that the LCFS's ethanol provisions will impose a substantial burden on interstate commerce (*i.e.*, Midwestern ethanol) while providing little, if any, benefits to California. The RMFU Plaintiffs assert that "CARB has admitted the LCFS will have virtually no effect on the environment." Doc. 384 at 27; SAC ¶ 55. Defendants argue the claim fails because the RMFU Plaintiffs have failed to allege that the LCFS's ethanol provisions will impose a substantial burden on interstate commerce. *See* Doc. 378-1 at 30; Doc. 387 at 11.

As explained above, the RMFU Plaintiffs have plausibly alleged that the ethanol provisions will cause significant financial harm to Midwestern ethanol producers. Because Defendants' motion to dismiss the claim turns on their assertion that the RMFU Plaintiffs have failed to allege any substantial burden on interstate commerce, the motion is DENIED on that ground alone.

Further, the RMFU Plaintiffs have plausibly alleged that that burden far outweighs the benefits California will obtain as a result of the LCFS. Although the RMFU Plaintiffs do not cite or quote in their opposition the purported admission by CARB that the LCFS will not confer any benefits on California, the Court assumes they are referring to the following quotation from the 2009 FSOR: "GHG emission reductions by the LCFS alone will not result in significant climate change." *See* TAC ¶ 55; *see also RMFU Denial*, 740 F.3d 507, 516 (M. Smith, J., dissenting from denial of rehearing en banc) ("CARB acknowledges that '[greenhouse gas] emission reductions by the [Fuel Standard] alone will not result in significant climate change.'"). Thus, according to CARB, the LCFS will have a marginal, if any, positive effect on the harms from climate change that it is aimed at redressing. Given this, the Court concludes the RMFU Plaintiffs plausibly have alleged that the ethanol provisions of the Original and 2015 LCFS imposes burdens on interstate commerce that outweigh the local benefits it provides. Accordingly, the Court DENIES Defendants' motion to dismiss the RMFU Plaintiffs' *Pike* claim.

**3. Additional analysis of the AFPM Plaintiffs' claim that the crude oil provisions discriminate in practical effect**

As discussed in detail above, the RMFU Plaintiffs argue the Court cannot accurately assess the

38

discriminatory effects of the ethanol provisions without accounting for the amount (*i.e.*, volume) of ethanol purportedly burdened or benefited by the LCFS. In light of this argument and the Court's finding above that Plaintiffs state a discriminatory effects claim against the ethanol provisions, the Court finds it appropriate to add the following observations and analysis concerning the AFPM Plaintiffs' discriminatory effects claims against the 2012 and 2015 crude oil provisions, beyond that contained in the MTD Order, because the RMFU Plaintiffs' argument appears to apply with equal force those claims, even though the AFPM Plaintiffs do not advance the argument.[29]

    As the Court explained in the MTD Order, the claims discussed therein were premised on the AFPM Plaintiffs' position that the crude oil provisions are discriminatory because of their credit-deficit calculating scheme.[30] The LCFS aims to reduce the use of crude oil in general and in particular the use of the most carbon intense crude oils through a system of assigning credits and deficits. In general, a regulated party complies with the LCFS if its credits are greater than or equal to its deficits. *See generally* § 95485. The use of some fuels will generate deficits whereas the use of others will generate credits. Credit-generating fuels are ones the LCFS encourages because they are lower-polluting than the deficit-generating fuels the LCFS discourages. Accordingly, the regulation's credit-deficit scheme is an effort to promote cleaner fuels by requiring regulated parties who use deficit-generating fuels to offset their deficits by using credit-generating fuels.

    Under both the 2012 and 2015 LCFS, credits and deficits for crude oils are assigned at two

---

[29] *RMFU* precludes any claim against the Original LCFS's crude oil provisions. *See* 730 F.3d at 1078.

[30] *See* Doc. 383 at 19 ("Defendants incorrectly argue that the provisions 'do[] not favor (or disfavor) crude oils based on origin' because 'all regulated parties that provide gasoline or diesel would incur incremental deficits,' and 'the carbon-intensity values for crude oils show that California has some of the highest values of all.' This argument in fact demonstrates why the provisions are discriminatory: all regulated parties . . . are assigned deficits based on the average carbon intensity of all crude oils, not their own individual carbon intensities. This system discriminates in favor of the California crude oils with 'some of the highest values of all,' . . . while burdening the out-of-state crude oils with much lower individual scores. . . . [T]he 2015 provisions are unconstitutionally discriminatory because their overall impact is to benefit California crude oil at the expense of out-of-state crude oil, even though they do not benefit every California crude oil.") (citations omitted); *see also id.* at 18 ("the use of the 'Annual Crude Average' is discriminatory because interstate and foreign crude oils with carbon intensities lower than the average are disadvantaged by having to use the average score rather than their individualized scores").

"steps." "Step One" in the context of crude oil calculates "base deficits" by comparing a compliance target that declines over time to a baseline calculated using the average carbon intensity of all gasoline and diesel imported into California in 2010. Specifically, at Step One, CARB calculates a party's "base deficits," using the following calculation: $Deficits_{Base}^{XD} \ (MT) = (CI_{Standard}^{XD} - CI_{BaselineAvg}^{XD}) \times E^{XD} \times C$ . The input $CI_{standard}^{XD}$ stands for "the average carbon intensity requirement of either gasoline . . . or diesel fuel . . . for a given year as provided in sections 95484(b) and (c), respectively." § 95489(b). Each of those provisions contains a table that provides the compliance CI score target for crudes and diesels that regulated parties must meet. *See id.* The input "$CI_{BaselineAvg}^{XD}$" stands for the "Baseline Average" CI scores for either gasoline or diesel, and represents the average carbon intensity of all gasoline and diesel imported into California in the "baseline calendar year" of 2010, when the LCFS went into effect. *Id.* Those values are contained in Table 6 in § 95488, *see* § 95488(c)(4)(B), and provide that the Baseline Average CI score for gasoline is 99.78 gCO2e/MJ and 99.78 gCO2e/MJ for diesel. Both values were determined, in part, by "using the CI [average] for crude oil supplied to California refineries in 2010," which was 11.39 gCO2e/MJ. *See* § 95454; *see also* CARB, *Supplement Version 2.0 to: Detailed California-Modified GREET Pathway for California Reformulated Gasoline Blendstock for Oxygenate Blending (CARBOB) from Average Crude Refined in California* (Sept. 12, 2012) ("CARBOB Supplement"), *available at* https://www.arb.ca.gov/ regact/2011/lcfs2011/carbob.pdf.

The AFPM Plaintiffs argue the use of these averages is discriminatory in that it has the practical effect of favoring California crudes over foreign crudes. *See, e.g.*, SAC ¶¶ 51, 73, 78; Doc. 383 at 18-19.[31] In other words, according to the AFPM Plaintiffs, if a crude oil is assigned an artificial CI score

---

[31] In their opposition, the AFPM Plaintiffs argue that "[a]mong other things, the use of the 'Annual Crude Average' is discriminatory," but they do not explain how the crude oil provisions are allegedly discriminatory beyond their use of the Annual Crude Average. The opposition contains no argument of Step one, base deficits, or the Baseline Crude Average beyond quoting the Court's mentioning it. Instead, the opposition focuses exclusively on why the "Annual Crude Average" in Step Two is discriminatory. And while the opposition mentions "incremental deficits" three times, it does not discuss "base deficits." Likewise, the SAC repeatedly mentions "incremental deficits," but does not mention anything about base deficits. Though the AFPM Plaintiffs clearly challenged Step One earlier in this litigation, *see* Doc. 336 at 8-9, the SAC and their opposition are less clear. In an abundance of caution, the Court addresses both Step One and Step Two.

(based on an average) that is higher than its real CI score, that crude oil is burdened by the LCFS. Conversely, if a crude oil is assigned an artificial CI score (based on an average) that is lower than its real CI score, then that crude oil is benefited by the LCFS. The AFPM Plaintiffs contend foreign crudes are burdened (*i.e.*, the LCFS assigns at least some of them a CI score (based on average) higher than their real CI score) while at least some California crudes are benefited (*i.e.*, the LCFS assigns them a CI score (based on average) lower than their real CI score).

The MTD Order held that, as a matter of law, the fact that the Baseline Crude Average used in Step One benefited and burdened some, but not all out-of-state crudes while simultaneously benefiting and burdening some, but not all California crudes meant that Step One was not discriminatory. *See* MTD Order at *33, 36. The Order further held that Step Two could not form the basis of a discriminatory effects claim because it had not been triggered, meaning that no incremental deficits have been assigned under Step Two. *Id.* at *31. Accordingly, the Court did not engage in any kind of volumetric analysis.

Even applying the volumetric approach used above in the context of the ethanol provisions, the result would have been the same. The CARBOB Supplement contains information on the CI score and volume in the California market for each crude oil. The document shows the percentage of the market that a given fuel comprised in 2010 and its assigned CI score. As noted above, CARB averaged these results to arrive at the Baseline Crude Average of 11.39 gCO2e/MJ. CARB assigned an average of 12.90 gCO2e/MJ to California crudes, which accounted for 38.78% of the market. The thirteen foreign fuels that had a CI score higher than the Baseline Crude Average, thereby benefitting from it, according to the AFPM Plaintiffs, accounted for 29.72% of the market, whereas the twenty-seven foreign fuels that were burdened by its use due to having a lower CI score accounted for 31.5% of the market.

The CARBOB Supplement provides a partial breakdown of California crudes that shows their individual CI scores and the volume they contributed to the 2010 California market. *See* CARBOB Supplemental at Table 2. Twenty-two California crudes that had CI scores lower than the Baseline Crude Average (11.39 gCO2e/MJ)—and were allegedly burdened by its use—accounted for 54.4%

41

(303,860 BOPD) of the California-produced crudes. *See id.* Eleven other crudes accounted for the remaining 45.6% (254,629 BOPD) of California-produced crudes that were allegedly burdened by the use of the Baseline Crude Average. *See id.* This would suggest that a majority of California crudes were burdened by the Baseline Crude Average.

Table 2, however, only accounts for crudes that produced at least 2,000 barrels of oil per day ("BOPD"). Given that California's crude CI average was 12.90 gCO2e/MJ and that Table 2 only accounts for crudes with production of at least 2,000 BOPD, it appears that Table 2 does not provide information about the crudes whose production was under 2,000 BOPD and whose CI was sufficiently higher to drive up the average CI score for California crudes to 12.90 gCO2e/MJ. In other words, this suggests that these small-scale producers, who are not represented on Table 2, produced enough crude with a CI score higher than the California crudes represented on Table 2 such that they caused California's average CI score to exceed the Baseline Crude Average.

Thus, when accounting for volume of production, the result is the same as in the prior MTD Order: a number of both foreign and California crudes are benefited while a number of both foreign and California crudes are benefited. Although a substantial amount of the California-produced crude oil is burdened, it appears that, on average, California crudes benefit from the use of the Baseline Crude Average. And while approximately 30% of the market is composed of foreign crudes that are benefited by the Baseline Crude Average, slightly more foreign crude is burdened by its use. This result, where, on average, California crude seemingly benefits from Baseline Crude Average while, on average, foreign crude is seemingly burdened by it, "does not fit neatly, if at all, into dormant Commerce Clause precedent." MTD Order at *33. Plaintiffs do not provide, and the Court cannot locate, any precedent that suggests a state law offends the dormant Commerce Clause when it confers a benefit on a substantial amount of out-of-state producers while simultaneously burdening a substantial amount of similarly

situated in-state producers. More importantly, the crude oil provisions must be considered as a whole,[32] and "Step Two" of the LCFS's deficit-credit scheme shows that it is not discriminatory overall.

At "Step Two," CARB calculates a different kind of deficit, called "incremental deficits." *Id.* Incremental deficits are only assigned if the "Annual Crude Average" is greater than the "Baseline Crude Average," both of which are calculated on a three-year basis and are determined, in part, based on the volume of crude oil imported into California over that three-year period. *Id.*; *see also* CARB, *Calculation of 2015 Crude Average Carbon Intensity Value* (June 23, 2016) ("the CI Calculation Tables"), at 2, *available at* https://www.arb.ca.gov/fuels/lcfs/crude-oil/2015_crude_average_ci_value_final.pdf. The Baseline Crude Average multiplies pre-determined CI scores by the actual volume of crude imported into California, but the Annual Crude Average uses the actual average CI of each crude imported, taking into account the amount (in barrels) of each crude.

The most recent calculation of these figures (as far as the Court can determine) occurred for the 2015 calendar year, which applies to the 2017 compliance period. *See* CI Calculation Tables. For 2015, the Baseline Crude Average used pre-determined CI scores of 11.39, 11.39, and 11.98 (in gCO2e/MJ) for the years 2013, 2014, and 2015, respectively. *See id.*; *see also* § 95489(b) (requiring use of those CI scores). When the volume of crude for each year was input, the resulting CI score was 11.59 gCO2e/MJ. *See* CI Calculation Tables at 2. Accordingly, 11.59 gCO2e/MJ is the current Annual Crude Average. *See id.*

The AFPM Plaintiffs assert the use of the Annual Crude Average is impermissibly discriminatory because it is an *average* of all crudes, so crude oils whose actual, individualized carbon intensities are below this average are unfairly penalized by its use because they are artificially assigned more deficits than they would be if their actual CI scores were used. *See* Doc. 383 at 19. Though

---

[32] *See Healy*, 512 U.S. at 198 (holding that, even assuming the two components of the challenged statute were constitutional, their combined effect was unconstitutional); *DIRECTV, Inc. v. Tolson*, 513 F.3d 119, 122 (4th Cir. 2008) (observing the Supreme Court "emphasized [in *Healy*] that state economic regulation must be considered as a whole" when assessing its discriminatory effects).

Plaintiffs acknowledge that some California crudes have actual CI scores that are lower than the Annual Crude Average each year, they contend the "overall impact" of its use is to provide an overall benefit to California crudes at the expense of out-of-state crudes. According to Plaintiffs, the Annual Crude Average is discriminatory because it assigns an average CI score to all crudes, as opposed to their actual, individualized CI scores. Thus, according to Plaintiffs, if a crude's actual CI score is lower than the Annual Crude Average, that crude is burdened by the use of the Annual Crude Average because regulated parties that use it will incur more deficits. If the crude's CI score is higher than the Annual Crude Average, that crude benefits from the use of the Annual Crude Average because regulated parties that use it will incur fewer deficits.

The Court notes at the outset that no incremental deficits will be assessed for the 2017 compliance period because the most recent Annual Crude Average (11.54 gCO2e/MJ) is lower than the corresponding Baseline Average (11.59). *See* CI Calculation Tables at 2. Accordingly, as the Court held in the MTD Order, Plaintiffs' claim that the incremental deficit scheme in Step Two is discriminatory is not plausible. It is difficult to conceive how a provision that has not been triggered could be discriminatory in its effects, and Plaintiffs offer no explanation as to how it could be.

More importantly, however, judicially noticeable facts establish that the allegedly discriminatory averages the LCFS employs that Plaintiffs contend are not discriminatory. In fact, Step Two's use of the Annual Crude Average benefits a substantial amount of the foreign crude imported into California while burdening a substantial amount of California's own crudes.

CARB publishes the data that goes into calculating each year's Annual Crude Average. The CI Calculation Tables contain four columns that list the country or state of origin, name, CI score, and the amount (in barrels) of each crude oil consumed in California for 2013, 2014, and 2015. They also show how much crude was consumed in California each year. It is thus possible to calculate how many fuels are, according to Plaintiffs' theory, burdened or benefited by the applicable Annual Crude Average, and

how much of California's crude oil market they comprise.[33] The Court is therefore able to determine how much of the California market is composed of foreign crudes that are burdened or benefited by the Annual Crude Average, as well as how much of the market is composed of California crudes that are burdened or benefited.

Whether crude oils will incur incremental deficits turns on whether the Annual Crude Average is greater than the Baseline Crude Average, both of which are based on a three-year average that accounts for the amount and carbon intensity of all crudes imported to California. *See* § 95489(b). Again, if the Annual Crude Average is not greater than the Baseline Crude Average, then no incremental deficits are assessed. The most current figures represent the state of the California crude market in 2013, 2014, and 2015. *See* CI Calculation Tables at 2. The Annual Crude Average of 11.54 gCO2e/MJ was less than the corresponding Baseline Crude Average of 11.59 gCO2e/MJ, meaning that, as noted above, incremental deficits were not assessed.

Because no incremental deficits have been assessed, it is impossible to see how this scheme is discriminatory. In fact, if incremental deficits were assessed based on a crude's individual score instead of an average of the entire market, as Plaintiffs seek, a number of foreign crudes that make up a substantial portion of the California crude oil market whose CI scores are higher than the Baseline Crude Average (11.59 gCO2e/MJ) would have caused regulated parties that used it to incur incremental deficits, meaning that those crudes actually *benefited* from the use of the Annual Crude Average.[34]

---

[33] As discussed in more detail below, because the Midwest produces the overwhelming majority of corn ethanol, Plaintiffs assert their discriminatory effects challenge against the ethanol provisions requires a volumetric analysis to assess accurately the *actual* effect the LCFS provisions have on ethanol producers, and whether the impact, if any, disproportionately affects ethanol producers from certain regions of the country more than others (*e.g.*, the Midwest). The reason for this is straightforward: the Midwest produces dramatically more ethanol than anywhere else in the country. Although Plaintiffs have not raised the issue with regard to crude oils, the same logic applies because certain regions of the country and the world produce more crude oil than others. Thus, to account fully for the effects of the LCFS and to determine whether they are discriminatory, the Court must consider both a fuel's CI score and how much of that fuel is consumed in California. Because the MTD Order did not do so, instead focusing only CI scores, the Court does so now, even though Plaintiffs did not raise the issue.

[34] Although crudes with CI scores lower than the Annual Crude Average potentially could have been burdened by its use if incremental deficits were assessed, that did not occur. Accordingly, it is illogic to conclude any crude was burdened by the

45

In 2013, eight foreign crudes accounting for approximately 148,000,000 barrels, or approximately 25% of the total California crude oil market, had CI scores higher than 11.59 gCO2e/MJ. Had their actual, individualized scores been used instead of the Annual Crude Average, they would have incurred deficits. Likewise, in 2014, eleven foreign crudes accounting for approximately 223,000,000 barrels, or approximately 36.3%, had CI scores higher than the Annual Crude Average. And, in 2015, twenty-five foreign oils that account for approximately 19.5% of the market (approximately 118,200,000 barrels) had CI scores higher than the Annual Crude Average.

California crudes also benefited from the use of the Annual Crude Average. In 2013, twenty-one California crudes that accounted for approximately 16.5% of the market had CI scores higher than 11.59 gCO2e/MJ. In 2014, twenty-three California crudes that accounted for approximately 17% of the market had CI scores higher than 11.59 gCO2e/MJ. The results in 2015 are virtually identical: twenty-three California crudes that accounted for approximately 17% of the market had CI scores higher than 11.59 gCO2e/MJ.

Thus, in 2013, 2014, and 2015, more foreign crude oil, by volume and corresponding market share, benefited from the use of the Annual Crude Average than did California crudes. In fact, in 2013 and 2014, *significantly* more foreign crude oil benefited than did California crude oil—almost twice the amount of benefited California crude in 2013 (approximately 25% of the total market vs. 16.5%), and more than twice the amount in 2014 (approximately 36% of the total market vs. 17%) . Given this, it is difficult to see how the incremental deficits scheme in Step Two could have a discriminatory effect on foreign oil, particularly given that no crudes were burdened because incremental deficits were not assessed. If Plaintiffs had their way, and all crudes were assigned their real CI score, *substantially* more foreign crudes, constituting large portions of the entire California crude oil market, would have caused regulated parties that used them to incur incremental deficits. Instead, no incremental deficits were

Annual Crude Average.

assessed. And although some California crudes benefited from this scenario, significantly more foreign crude oil did.

On balance, the Court finds that the AFPM Plaintiffs do not and cannot state a claim that the LCFS's crude oil provisions discriminate against foreign crude oils in practical effect. Although Step One appears to benefit California overall, it nonetheless burdens a significant number of California producers while benefitting a significant number of out-of-state producers. Step Two, on the other hand, provides a clear overall advantage to out-of-state producers when compared to their California counterparts. If incremental deficits were assessed under Step Two in the manner the AFPM Plaintiffs sought, a substantial amount of foreign crude would cause regulated parties that use it to incur incremental deficits. Instead, that foreign crude does not generate incremental deficits, meaning Step Two currently benefits it. The crude oil provisions therefore are not an attempt "to benefit economic in-state economic interests *by burdening* out-of-state competitors." *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008) (emphasis added). Accordingly, the Court DISMISSES the AFPM Plaintiffs' discriminatory effects claim against the provisions WITHOUT LEAVE TO AMEND because amendment would be futile.

## V. CONCLUSION AND ORDER

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Defendants' motions for judgment on the pleadings and to dismiss the SAC and TAC. The Court ORDERS that:

1. Defendants' motion for judgment on Plaintiffs' claims concerning the Original LCFS on the ground they are moot and barred by the Eleventh Amendment is GRANTED IN PART and DENIED IN PART as discussed above;

2. Defendants' motion to dismiss Plaintiffs' claim that the ethanol provisions of the Original and 2015 LCFS discriminate in practical effect is DENIED;

3. Defendants' motion to dismiss the RMFU Plaintiffs' *Pike* claim against the ethanol provisions of the Original and 2015 LCFS is DENIED;

4.  Defendants' motions to dismiss Plaintiffs' remaining claims are GRANTED WITHOUT LEAVE TO AMEND; and

5.  The parties shall submit a joint status report by June 30, 2017, explaining how they wish to proceed.

Counsel should not assume that there will be another opportunity, beyond the one provided in this Order, to file another pleading.


IT IS SO ORDERED.

Dated:   **June 15, 2017**                    **/s/ Lawrence J. O'Neill**
                                                        UNITED STATES CHIEF DISTRICT JUDGE